# United States Court of Appeals for the District of Columbia Circuit

FINNBIN, LLC,

*Petitioner*,

*v.*

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

*Respondent.*

**OPENING BRIEF OF PETITIONER FINNBIN, LLC**

On Petition for Review of a Final Rule
of the United States Consumer Product Safety Commission

KATHLEEN R. HARTNETT
  *Counsel of Record*
JULIE VEROFF
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com
jveroff@cooley.com

ADAM M. KATZ
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com

*Counsel for Petitioner Finnbin, LLC*

November 8, 2021

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 15(c)(3), 26.1, and 28(a)(1), Petitioner Finnbin, LLC ("Finnbin") submits this certificate as to parties, rulings, and related cases.

## A.      Parties and *Amici*

The parties to this case are Finnbin and the United States Consumer Product Safety Commission (the "Commission"). As of the date of this filing, there are no intervenor or *amici* parties.

## B.      Ruling Under Review

Finnbin seeks review of the Commission's final rule entitled *Safety Standard for Infant Sleep Products* ("Rule"), 86 Fed. Reg. 33022, which was promulgated on June 23, 2021 and which is scheduled to take effect on June 23, 2022. AR 2096.

## C.      Related Cases

As of the date of this filing, Finnbin is not aware of any related cases.

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit Rule 26.1, Finnbin states that it is a for-profit, limited liability company organized under the laws of Utah.  Finnbin's line of business is flat infant sleep products, including "baby boxes," which are boxes marketed and intended to provide newborn infants with a safe sleeping environment.  Finnbin is a wholly-owned subsidiary of Finnbin Holdings, LLC ("Finnbin Holdings"), a limited liability company organized under the laws of Delaware.  Finnbin Holdings has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............i

DISCLOSURE STATEMENT ................................................................. ii

TABLE OF AUTHORITIES ................................................................vi

GLOSSARY....................................................................................xi

STATEMENT OF JURISDICTION.................................................. xiii

STATEMENT OF THE ISSUES.........................................................xiv

STATUTES AND REGULATIONS....................................................xvi

INTRODUCTION ...........................................................................1

STATEMENT OF THE CASE............................................................3

    A.    Finnbin ........................................................................3

    B.    ASTM International and Voluntary Industry Standards............4

    C.    Statutory Background ..................................................5

        1.    The CPSA and the CPSIA ..............................5

        2.    Section 104 of the CPSIA................................7

    D.    The Rule and Its Rulemaking History ......................10

        1.    In 2013, the Commission Adopts a Mandatory Standard for "Bassinets/Cradles" Based on an Existing Voluntary Standard for Such Products............10

        2.    In 2017, the Commission Proposes Regulating Inclined Sleep Products Based on an Existing Voluntary Standard for Such Products .........................11

        3.    In 2019, the Commission Halts Work on the 2017 NPRM to Reconsider Requirements for Inclined Sleep Products .............................................12

        4.    The Commission Abruptly Changes Course in 2019, Leading to the Final Rule Shoehorning Dozens of Flat Sleep Products into the Inclined Sleep Products Standard, Subject to the Bassinet/Cradle Requirements......................................12

i.      *The Commission Proposes Without Explanation in the 2019 SNPR to Expand the Scope of the Voluntary Standard for Inclined Sleep Products to Cover All "Infant Sleep Products" Not Otherwise Regulated* .........12

ii.     *The Commission's First Explanation for Expanding the Scope of the Voluntary Standard Reveals the Lack of Supporting Evidence* ............................................15

iii.    *The Commission Receives an Outpouring of Negative Comments on the 2019 SNPR's Expanded Scope, Including About the Lack of Supporting Data and Risk of Harm to Infants* ................................................15

iv.     *The Commission Adopts the Rule Over Dissent, Making No Substantive Changes in Response to Comments* ........................19

E.      Procedural History ...................................25

STANDARD OF REVIEW ...............................................25

SUMMARY OF ARGUMENT ..........................................26

STATEMENT OF STANDING .........................................28

ARGUMENT ..................................................................29

I.      The Commission Acted Contrary to Law and in Excess of its Authority by Adopting a Rule Under Section 104 that Expands the Scope of a Voluntary Standard....................................29

A.      Section 104 of the CPSIA Requires the Commission to Adopt or Increase the Stringency of an Existing Voluntary Standard—It Does Not Permit the Commission to Expand a Standard's Scope ...........................29

B.      The Commission's Reading of Section 104 Would Dramatically Aggrandize the Authority Conferred by Congress...................................34

II.    The Commission Acted Arbitrarily and Capriciously by Adopting a One-Size-Fits-All Effective Ban on Flat Infant Sleep Products Without Supporting Evidence and Despite Increased Risks to Infants ............................................................40

    A.    The Commission Impermissibly Sought to Justify Its Regulation of the Disparate Category of *All* Previously Unregulated Infant Sleep Products By Reference to Limited Anecdotal Evidence.....................................................40

    B.    The Commission Impermissibly Banned Baby Boxes and In-Bed Sleepers Despite Uncontroverted Evidence Indicating that Doing So Will Increase Risks to Infant Safety.....................................................................................48

CONCLUSION...............................................................................................53

CERTIFICATE OF COMPLIANCE...........................................................54

# TABLE OF AUTHORITIES

**Cases**

*Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005) ........................................... 52

*Am. Bar Ass'n v. FTC*,
430 F.3d 457 (D.C. Cir. 2005) ............................................. 38

*American Federation of Gov't Employees, Local 2924 v. Federal Labor Relations Authority*,
470 F.3d 375 (D.C. Cir. 2006) ............................................. 47

*Banks v. Booth*,
3 F.4th 445 (D.C. Cir. 2021) ............................................... 38

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ................................................. 28

*Dow AgroSciences LLC v. National Marine Fisheries Service*,
707 F.3d 462 (4th Cir. 2013) ............................................... 46

*Gen. Chem. Corp. v. United States*,
817 F.2d 844 (D.C. Cir. 1987) ............................................. 52

*Gulf S. Insulation v. CPSC*,
701 F.2d 1137 (5th Cir. 1983) ............................................. 45

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......................................................... 28

*Motor Vehicle Mfrs. Assoc. v. State Farm Auto Mut. Ins. Co.*,
463 U.S. 29 (1983) .......................................... 40, 48, 51, 52

*Natural Resources Def. Council v. EPA*,
643 F.3d 311 (D.C. Cir. 2011) ............................................. 29

*Petroleum Communications, Inc. v. FCC*,
22 F.3d 1164 (D.C. Cir. 1994) ............................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

*Riegel Textile Corp. v. Celanese Corp.*,
  649 F.2d 894 (2d Cir. 1981) ...............................................................6

*Shays v. FEC*,
  528 F.3d 914 (D.C. Cir. 2008)...........................................................29

*United Techs. Corp. v. Dep't of Def.*,
  601 F.3d 557 (D.C. Cir. 2010).............................................................51

*Utility Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014)............................................................................34

*Zen Magnets, LLC v. CPSC*,
  841 F.3d 1141 (10th Cir. 2016) .....................................................6, 45

## Statutes and Regulations

5 U.S.C.
  § 553............................................................................................8
  § 706(2) ........................................................................................26

15 U.S.C.
§ 1278a ................................................................................ 31, 36
§ 2053(a) ........................................................................................ 5
§ 2056 .............................................................................................. 5
§ 2056a .......................................................................... 1, 7, 8, 32, 51
§ 2056a(b)(1) .......................................................... 30, 33, 35, 37, 48
§ 2056a(b)(3) ............................................................................... 29
§ 2056a(b)(4) ............................................................................... 35
§ 2056a(f) ................................................................................... 7, 32
§ 2057 ............................................................................. 6, 7, 36, 37
§ 2058 ............................................................................... 5, 7, 37
§ 2058(a) ........................................................................................ 5
§ 2058(c) ........................................................................................ 5
§ 2058(d)(2) .................................................................................... 5
§ 2058(f) ...................................................................................... 5, 6
§ 2060(c) ........................................................................................ 6
§ 2060(g) ...................................................................................... 29
§ 2060(g)(2) ................................................................................. 25
§ 2060(g)(3) ................................................................................. 26
§ 2064 ............................................................................................ 7

Consumer Product Safety Act, Pub. L. No. 92-573, 86 Stat. 1207
(1972) ............................................................................................ 5

Consumer Product Safety Improvement Act of 2008, Pub. L. No. 110-
314, 122 Stat. 3016 (2008) ........................................................... 7

16 C.F.R.
§ 1218 ........................................................................................... 46
§ 1219 ........................................................................................... 46
§ 1221 ........................................................................................... 47

**Other Authorities**

ASTM, *Committee F15 on Consumer Products* (last visited Nov. 7,
2021), https://bit.ly/3pUnbzA ...................................................... 4

ASTM, *The History of ASTM International* (last visited Nov. 7, 2021),
https://bit.ly/3EAPVB8 ................................................................. 4

# TABLE OF AUTHORITIES

**Page(s)**

ASTM, *Technical Committees by Designation* (last visited Nov. 7, 2021), https://bit.ly/3Euw9aE ...............................................................4

D.C. Circuit Rule 32(e) ...............................................................54

*Cribs, Playpens, and Bassinets*, Nationwide Children's (last visited Nov. 8, 2021), https://bit.ly/3m1uRxm...........................................46

Federal Rule of Appellate Procedure
32(a)(7)(B)(iii) ...............................................................54
32(a)(7)(C) ...............................................................54

Finnbin, *About Finnbin Baby Box Company* (last visited Nov. 7, 2021), https://bit.ly/3mRLFrb ...............................................4

Finnbin, *Baby Box History & Tradition* (last visited Nov. 7, 2021), https://bit.ly/2Y2UyVh ...............................................3, 4

H.R. Rep. 110-501 (Dec. 19, 2007), 2007 WL 4470989...........................................8

*Safety Standard for Bassinets and Cradles*, 78 Fed. Reg. 63019 (Oct. 23, 2013) ...............................10, 13, 14, 16, 21, 24, 34, 38, 44

*Safety Standard for Carriages and Strollers*, 79 Fed. Reg. 13208 (Mar. 10, 2014) ...............................................9, 30

*Safety Standard for Frame Child Carriers*, 80 Fed. Reg. 11113 (Mar. 2, 2015) ...............................................9

*Safety Standard for High Chairs*, 83 Fed. Reg. 23858 (June 19, 2018)...................9

*Safety Standard for Infant Bath Tubs*, 82 Fed. Reg. 15615 (Mar. 30, 2017) ...............................................9

*Safety Standard for Infant Inclined Sleep Products*, 82 Fed. Reg. 16963 (Apr. 7, 2017)...............................................11, 12, 13, 42

*Safety Standard for Infant Sleep Products*, 84 Fed. Reg. 60949 (Nov. 12, 2019) ...............................12, 13, 14, 15, 18, 19, 22, 31

# TABLE OF AUTHORITIES

*Safety Standard for Infant Sleep Products*, 86 Fed. Reg. 33022 (June 23, 2021) ............................ 12, 20, 21, 25, 28, 30–32, 35, 37–39, 42–45, 47, 51

*Safety Standard for Portable Bed Rails*, 77 Fed. Reg. 12182 (Feb. 29, 2012) ................................................................................9

*Safety Standard for Sling Carriers*, 82 Fed. Reg. 8671 (Jan. 30, 2017)..............9, 30

*Safety Standard for Soft Infant and Toddler Carriers*, 79 Fed. Reg. 17422 (Mar. 28, 2014) ...........................................................9

*Safety Standards for Gates and Enclosures*, 85 Fed. Reg. 40100 (July 6, 2020) .......................................................................9

*Safety Standards for Play Yards*, 77 Fed. Reg. 52220 (Aug. 29, 2012)...................9

"Stringent," Cambridge Online Dictionary (last visited Nov. 8, 2021), https://bit.ly/3EStNTg..........................................................30

"Stringent," Dictionary.com (last visited Nov. 8, 2021), https://bit.ly/3mTtyRA...........................................................30

"Stringent," Merriam-Webster Online Dictionary (last visited Nov. 8, 2021), https://bit.ly/31G6Wfh ..........................................30

# GLOSSARY

| | |
|---|---|
| 2017 NPRM | *Safety Standard for Infant Inclined Sleep Products*, Notice of Proposed Rulemaking, 82 Fed. Reg. 16963 (AR 150) |
| 2019 SNPR | *Safety Standard for Infant Sleep Products*, Supplemental Notice of Proposed Rulemaking, 84 Fed. Reg. 60949 (AR 511) |
| AR | Administrative Record |
| APA | Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946) |
| ASTM | ASTM International, a private standards-setting organization |
| Baby Boxes | Boxes made of sturdy cardboard and designed to provide a flat, portable sleep space for infants (AR 2102) |
| Bassinet Standard | *Safety Standard for Bassinets and Cradles*, Final Rule, 78 Fed. Reg. 63019 (AR 1) |
| Bassinets | A small, flat bed designed for infant sleep supported by freestanding legs, a stationary frame/stand, and a wheeled or rocking base (AR 2162) |
| Commission | The United States Consumer Product Safety Commission |
| CPSA | Consumer Product Safety Act, Pub. L. No. 92-573, 86 Stat. 1207 (1972) |
| CPSIA | Consumer Product Safety Improvement Act of 2008, Pub. L. 110-314, 122 Stat. 3016 (2008) |

| | |
|---|---|
| December 2019 Letter | Letter from Celestine Kish to ASTM, dated December 12, 2019, regarding inclined infant sleep products, in-bed sleepers, compact bassinets, and baby boxes (AR 535) |
| In-Bed Sleepers | Flat infant sleep products with low sides and not built on a stand, and which sometimes have mesh sides with a thin built-in mattress, and that are designed to facilitate safer bedsharing between parents and infants (AR 916–22) |
| Inclined Infant Sleep Products | A freestanding infant sleep product generally supported by a stationary or rocker base and that is positioned between 10° and 30° from the horizontal (AR 2179) |
| Rule | *Safety Standard for Infant Sleep Products*, Final Rule, 86 Fed. Reg. 33022 (AR 2096) |

## STATEMENT OF JURISDICTION

On June 23, 2021, the Commission issued *Safety Standard for Infant Sleep Products*, 86 Fed. Reg. 33022 (the "Rule"), a final rule. Administrative Record ("AR") 2096. Finnbin timely petitioned for review on August 23, 2021. Dkt. No. 1911243; 15 U.S.C. § 2060(g)(2). As the Rule relates to "durable infant or toddler products," this Court has jurisdiction pursuant to 15 U.S.C. § 2060(g)(1)(C).

# STATEMENT OF THE ISSUES

1.      Section 104 of the Consumer Product Safety Improvement Act of 2008 ("CPSIA") authorizes the Commission to "examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products," and then promulgate standards that are either (1) "substantially the same as such voluntary standards," or (2) "more stringent than such voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with such products."  15 U.S.C. § 2056a(b)(1).

In this case, by a divided vote, the Commission invoked its Section 104 authority to adopt a final rule that vastly expanded the *scope* of a voluntary standard designed solely for *inclined* infant sleep products, sweeping in and effectively banning all previously unregulated *flat* infant sleep products, such as baby boxes and in-bed sleepers.  Because Section 104 limits the Commission to increasing the "stringen[cy]" of an existing voluntary standard, did the Commission act in excess of statutory authority and contrary to law within the meaning of 5 U.S.C. § 706(2) by increasing the voluntary standard's scope?

2.      The Rule requires all "infant sleep products"—defined as all infant sleep products "not already subject to a mandatory CPSC sleep standard," AR 2134 —to satisfy a single safety standard applicable to another product, bassinets.  Was the Commission's adoption of the Rule with respect to previously unregulated flat

sleep products arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2), because the Commission (a) relied on limited and anecdotal data in claimed support of a one-size-fits-all approach that effectively bans most flat infant sleep products, and (b) ignored undisputed evidence that banning baby boxes and in-bed sleepers will increase risks to infant safety?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum appended to the end of this brief.

**INTRODUCTION**

This case concerns the Consumer Product Safety Commission's abuse of its limited authority under Section 104 of the Consumer Product Safety Improvement Act of 2008 ("CPSIA"). Under Section 104, the Commission may either (1) adopt existing voluntary safety standards for durable nursery products or (2) increase the stringency of such standards. 15 U.S.C. § 2056a. In the Rule under review, however, the Commission did neither. Rather, it took a voluntary standard applicable to one product (inclined infant sleepers), expanded the scope of that standard to include *all* otherwise unregulated infant sleep products, applied the requirements for a different product (bassinets) to all such products, and in doing so effectively banned dozens of previously unregulated flat sleep products, including the baby boxes produced by Finnbin. The Commission's approach is unlawful and the Rule should be vacated.

1. The Rule is contrary to law and in excess of statutory authority because Section 104 does not authorize the Commission to increase the *scope* of a voluntary standard to cover additional products. Rather, Section 104's streamlined authority limits the Commission to either adopting an existing voluntary standard or increasing its *stringency—i.e.*, its strictness. Here, the Commission had under review a voluntary standard for inclined sleepers. But instead of simply adopting that voluntary standard or making it stricter, the Commission swept into that

1

standard *all* previously unregulated infant sleep products—inclined or not. Further, the Commission modified the standard to apply the requirements for *bassinets*—themselves subject to a *different* voluntary standard and rulemaking—to *all* of the products covered by the Rule. It did so knowing that the Rule would effectively ban dozens of flat infant sleep products—such as the baby boxes sold by Finnbin and in-bed sleepers—because they are not bassinets and therefore necessarily cannot meet bassinet requirements. And the Commission took this precipitous action knowing full well that voluntary standards were in development for baby boxes and in-bed sleepers. Yet, rather than wait to review these standards once they emerged, as Section 104 authorizes, the Commission exceeded its Section 104 authority by purporting to expand the scope of the voluntary standard it had before it.

That approach is contrary to law and to the Commission's uniform practice to date. And were the Commission's approach permitted, Congress's limitation of the Section 104 power to review *existing* voluntary standards would be meaningless, as the Commission could simply expand the coverage of such standards. Notably, the Commission has other statutory powers—ones imposing more onerous evidentiary burdens than Section 104—to regulate durable nursery products that are not the subject of an existing voluntary standard. The question here is whether the Commission may expand the coverage of existing voluntary standards under its discrete Section 104 authority. The statute makes clear it may not.

2.     Although the Rule's lack of statutory authority is dispositive, the Rule is additionally subject to vacatur because its inclusion of previously unregulated flat infant sleep products is arbitrary and capricious in multiple respects. First, the Commission relied solely upon limited, anecdotal incident reports (the vast majority of which involved no harm to an infant) to support shoehorning a wide range of products into a one-size-fits-all effective ban. Second, the Commission failed to contend with the undisputed evidence that banning baby boxes and in-bed sleepers will expose infants to *increased* risk of harm, given that bedsharing will occur regardless of the Commission's ban on products that make bedsharing safer.

Plainly the matter of infant safety is a critical one—one that Finnbin fully supports and seeks to advance. Here, however, the Commission placed expediency before both its statutory authority and reasoned decisionmaking. The Rule should be vacated with respect to previously unregulated flat sleep products.

## STATEMENT OF THE CASE

### A.     Finnbin

Finnbin is a Utah-based small business that markets and sells flat infant sleep products, including "baby boxes." Finnbin, *Baby Box History & Tradition* (last visited Nov. 7, 2021), https://bit.ly/2Y2UyVh. Baby boxes are sturdy cardboard boxes designed to provide a safe sleeping environment for infants. *Id.* Founded by a husband and wife expecting their first child, Finnbin was inspired by Finland's

"maternity package" program, under which all parents-to-be are provided with a baby box to promote safe infant sleep and reduce the risk of infant mortality. Finnbin, *About Finnbin Baby Box Company* (last visited Nov. 7, 2021), https://bit.ly/3mRLFrb.

Finland's program has been in existence since the 1930s, Finnbin, *Baby Box History & Tradition* (last visited Nov. 7, 2021), https://bit.ly/2Y2UyVh, and in the years since, many healthcare organizations and government entities in the United States have adopted the practice of providing free baby boxes as part of health equity initiatives, AR 1485, 1604, 2102. Despite widespread usage of baby boxes, neither Finnbin nor the Commission have identified a single report of an injury or death relating to a baby box.

## B. ASTM International and Voluntary Industry Standards

Since 1898, ASTM International has facilitated collaboration among manufacturers, academics, end users, and governments in publishing voluntary technical standards across a wide range of products. *See* ASTM, *The History of ASTM International* (last visited Nov. 7, 2021), https://bit.ly/3EAPVB8. ASTM includes over 150 committees of volunteer specialists. *See* ASTM, *Technical Committees by Designation* (last visited Nov. 7, 2021), https://bit.ly/3Euw9aE. Within its "consumer products" committee, ASTM has multiple subcommittees devoted to infant sleep products. *See* ASTM, *Committee F15 on Consumer Products*

(last visited Nov. 7, 2021), https://bit.ly/3pUnbzA.

The Commission has for years collaborated alongside ASTM. And since the passage of the CPSIA, the Commission has relied upon its Section 104 authority to adopt dozens of ASTM's voluntary infant product standards—usually without modification. *See infra*. at 8–10.

### C. Statutory Background

#### 1. The CPSA and the CPSIA

In 1972, Congress enacted the Consumer Product Safety Act, Pub. L. No. 92-573, 86 Stat. 1207 (codified as amended at 15 U.S.C. § 2051 *et seq.*) (the "CPSA") to "protect the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1). The CPSA established the Commission. 15 U.S.C. § 2053(a).

The Commission has authority under the CPSA to promulgate "consumer product safety rules." *Id.* §§ 2056, 2058. When it acts pursuant to its CPSA rulemaking authority, the Commission must follow exacting procedures to gather information, including about existing voluntary standards, *id.* § 2058(a), and must allow "interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions," *id.* § 2058(d)(2). The Commission also must conduct various detailed regulatory analyses in issuing proposed and final rules, *id.* §§ 2058(c), (f), and ultimately must

support a final rule with findings of "(1) the degree and nature of the risk of injury sought to be prevented; (2) the approximate number and type of products subject to the rule; (3) the public's need for those products, and the probable effect of the rule on the utility, cost, and availability of the products; and (4) any means of reducing the risk of injury while minimizing adverse effects on competition or other commercial practices," *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1147 (10th Cir. 2016) (citing 15 U.S.C. § 2058(f)). When regulating under the CPSA, the Commission also must conduct an extensive cost-benefit analysis requiring four separate conclusions, including "'that the rule imposes the least burdensome requirement which prevents or adequately reduces the risk of injury for which the rule is being promulgated.'" *Id.* (quoting 15 U.S.C. § 2058(f)). Judicial review of CPSA rules are subject to "substantial evidence" review normally reserved for formal rulemaking. 15 U.S.C. § 2060(c).

The CPSA also authorizes the Commission to promulgate a rule *banning* a hazardous consumer product if it "finds that . . . [a] consumer product presents an unreasonable risk of injury," and that "no feasible consumer product safety standard . . . would adequately protect the public from the unreasonable risk of injury associated with such product." 15 U.S.C. § 2057; *see Riegel Textile Corp. v. Celanese Corp.*, 649 F.2d 894, 898 (2d Cir. 1981) (banning permitted under the CPSA "only if no safety standard could be devised which would adequately protect

the public"). Any rule banning a product under the Commission's CPSA authority also must meet the general rulemaking requirements set forth above. 15 U.S.C. §§ 2057, 2058.

In 2008, the Consumer Product Safety Improvement Act, Pub. L. No. 110-314, 122 Stat. 3016 (the "CPSIA") (codified as amended throughout 15 U.S.C. §§ 2051–2089) was enacted, providing the Commission with additional sources of regulatory and enforcement authority, including those targeted at "children's products." Among other things, the CPSIA provided the Commission with enhanced recall authority, under which it may order a manufacturer, distributor, or retailer to "cease distribution of [a] product" if the Commission follows a detailed process and makes necessary findings, such as that the product has a "defect which . . . creates a substantial risk of injury to the public." 15 U.S.C. § 2064.

### 2. Section 104 of the CPSIA

Section 104 of the CPSIA—the authority invoked by the Commission for the Rule at issue here—is not a general rulemaking power. Rather, it is a discrete power allowing the Commission to review existing voluntary standards for "durable infant or toddler products" and either adopt those standards or increase their stringency. 15 U.S.C. § 2056a.[1] Section 104 provides as follows:

---

[1] "Durable infant or toddler product" is defined as "a durable product intended for use, or that may reasonably be used, by children under the age of 5 years." 15 U.S.C. § 2056a(f).

The Commission shall—

 (A) in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts, examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products; and

 (B) in accordance with [5 U.S.C. § 553], promulgate product safety standards that—

  (i) are substantially the same as such voluntary standards; or

  (ii) are more stringent than such voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with such products.

15 U.S.C. § 2056a(b).

Section 104 is thus a strictly cabined authority. It provides the Commission with a streamlined power to enact safety standards for products that are already the subject of a voluntary standard, rather than having to enact a new standard from scratch under the much more exacting requirements of the CPSA. But, because Section 104 rulemaking is not subject to all of the CPSA requirements for rules, bans, or recalls described above, Section 104 limits the Commission to evaluating existing voluntary standards and either adopting them or increasing their stringency—nothing more. *See id.*; H.R. Rep. 110-501 (Dec. 19, 2007), 2007 WL 4470989 (Section 104 "requires the CPSC to assess the effectiveness of *existing* voluntary safety standards that cover these products" (emphasis added)).

In the 13 years between the enactment of the CPSIA and the start of this

litigation, the Commission has relied upon its Section 104 authority dozens of times. In almost all cases, the Commission adopted the existing voluntary standard without change. *See, e.g.*, *Safety Standard for Portable Bed Rails*, 77 Fed. Reg. 12182 (Feb. 29, 2012); *Safety Standards for Play Yards*, 77 Fed. Reg. 52220 (Aug. 29, 2012); *Safety Standard for Soft Infant and Toddler Carriers*, 79 Fed. Reg. 17422, (Mar. 28, 2014); *Safety Standard for Frame Child Carriers*, 80 Fed. Reg. 11113, (Mar. 2, 2015); *Safety Standard for Infant Bath Tubs*, 82 Fed. Reg. 15615, (Mar. 30, 2017); *Safety Standard for High Chairs*, 83 Fed. Reg. 23858, (June 19, 2018).

In a handful of cases, the Commission adopted the voluntary standard with changes to the standard's stringency—not its scope—as authorized by Section 104. *See, e.g.*, *Safety Standard for Carriages and Strollers*, 79 Fed. Reg. 13208 (Mar. 10, 2014) (adopting voluntary standard with a "modification" to the test used to police "head entrapment hazards"); *Safety Standard for Sling Carriers*, 82 Fed. Reg. 8671, (Jan. 30, 2017) (adopting voluntary standard "with one modification" to require that warning labels "remain in contact with the fabric around the entire perimeter of the label" rather than be "attached by only one seam"); *Safety Standards for Gates and Enclosures*, 85 Fed. Reg. 40100 (July 6, 2020) (adopting voluntary standard with modifications to (1) add a warning label for pressure-mounted gates, and (2) add "side-pressure indicators" to gates to "provide consumers feedback as to whether the gate is correctly installed").

We are unaware of any example of the Commission using its Section 104 authority—as it did here—to expand the scope of a voluntary standard so as to cover different products than those already covered by the voluntary standard.

### D. The Rule and Its Rulemaking History

#### 1. In 2013, the Commission Adopts a Mandatory Standard for "Bassinets/Cradles" Based on an Existing Voluntary Standard for Such Products

In 2013, pursuant to Section 104, the Commission issued a mandatory standard for "bassinets/cradles" based on an existing ASTM voluntary standard for such products, *Safety Standard for Bassinets and Cradles*, 78 Fed. Reg. 63019 (Oct. 23, 2013) ("the Bassinet Standard"). AR 1. The Commission described a "bassinet/cradle," by reference to the existing voluntary standard, as an infant sleep product that had legs, a frame, and a base. *Id.* The Bassinet Standard "incorporate[d] the voluntary standard" with "modifications and additions," including with respect to mattress flatness and the test used to measure stability. *Id.*

The Commission explained that the scope of products covered by the Bassinet Standard matched the scope of products covered by the voluntary standard. AR 3 ("The scope that was proposed in the SNPR has subsequently been adopted by ASTM and is the scope in the current version of the ASTM standard . . . ."). It further explained that certain freestanding products (such as "Moses baskets") and inclined products did *not* fall within the Bassinet Standard unless they could be

"converted to a bassinet" and were used as such (*e.g.*, by adding a "base/stand").

AR 1.  The Commission noted that "inclined product[s] intended for sleeping would

fall under the inclined sleep product standard currently under development by

ASTM."  AR 3.

> **2.  In 2017, the Commission Proposes Regulating Inclined Sleep Products Based on an Existing Voluntary Standard for Such Products**

In April 2017, pursuant to Section 104, the Commission issued a Notice of

Proposed Rulemaking to adopt a mandatory standard for "infant inclined sleep

products," *Safety Standard for Infant Inclined Sleep Products*, 82 Fed. Reg. 16963

(Apr. 7, 2017) (the "2017 NPRM"), based upon the then-existing voluntary standard

for such products.  AR 150.  In explaining the need for a mandatory rule, the

Commission collected over a decade's worth of data regarding 657 incident reports

involving inclined products (including 14 fatalities), and identified nine different

recalls.  AR 152–53.  As Commission staff later explained, the "scope of products

covered" by the 2017 NPRM "tracked the scope of" the voluntary standard.  AR 202.

The 2017 NPRM proposed adopting ASTM's voluntary standard for inclined

sleep products with a single, minor modification to ASTM's definition of

"accessory" to account for certain "recently-identified soft-sided [inclined]

products."  AR 152.  The Commission and ASTM agreed on incorporating this

adjustment into the voluntary standard.  AR 155–56.

**3.** **In 2019, the Commission Halts Work on the 2017 NPRM to Reconsider Requirements for Inclined Sleep Products**

In June 2019, the Commission's staff proposed that the Commission terminate and withdraw the 2017 NPRM, in light of additional "infant fatalities associated with *inclined* sleep products" and "recent recalls of *inclined* sleep products." AR 201 (emphases added). According to the staff, since issuing the 2017 NPRM, the Commission had "received reports of 42 additional fatalities that involved . . . inclined sleep products." AR 204. Accordingly, the staff proposed "reconsider[ing] requirements for inclined sleep products." AR 201. The June 2019 recommendation did not mention flat sleep products.

To date, the Commission has not voted on the proposal to terminate and withdraw the 2017 NPRM. AR 2098.

**4.** **The Commission Abruptly Changes Course in 2019, Leading to the Final Rule Shoehorning Dozens of Flat Sleep Products into the Inclined Sleep Products Standard, Subject to the Bassinet/Cradle Requirements**

   *i.*   *The Commission Proposes Without Explanation in the 2019 SNPR to Expand the Scope of the Voluntary Standard for Inclined Sleep Products to Cover All "Infant Sleep Products" Not Otherwise Regulated*

In November 2019—just months after its staff's recommendation to reconsider the requirements for *inclined* sleep products—the Commission issued a Supplemental Notice of Proposed Rulemaking to the 2017 NPRM, purportedly pursuant to Section 104, *Safety Standard for Infant Sleep Products*, 84 Fed. Reg.

60949 (Nov. 12, 2019) (the "2019 SNPR"). AR 511. The 2019 SNPR proposed mandating a standard for *all previously unregulated* "infant sleep products"—not just inclined sleep products—by sweeping those products into the inclined sleep products standard. AR 512. Commission staff's recommendation for the 2019 SNPR candidly acknowledged that this approach would "change the *scope*" of the inclined sleeper voluntary standard so as to cover *all* "infant sleep products," defined as "products intended for infant sleep that are not already addressed by another standard." AR 268 (emphasis added); *see* AR 513 (2019 SNPR describing "substantial modifications," to the voluntary standard, "including revisions in the *scope*" (emphasis added)).

The 2019 SNPR marked a sharp divergence from both the 2017 NPRM and the Commission's historical adherence to Section 104's requirement of developing product-specific requirements based on existing voluntary standards. Until the 2019 SNPR, the Commission had promulgated and/or proposed standards under Section 104 tailored to specific categories of infant products and their existing voluntary standards: bassinets and cradles, cribs, play yards, bedside sleepers, and inclined infant sleep products, among others. AR 512. Now, the Commission proposed mandating a new catch-all "infant sleep products" category to capture all previously unregulated infant sleep products, and further proposed applying the substance of the *Bassinet Standard*—a standard for a different product—to the

diverse array of products it proposed to sweep into the 2019 SNPR. AR 513.

Neither the 2019 SNPR nor the Commission staff's 149-page briefing package to the Commission for the 2019 SNPR, AR 328–475, explained *why* flat infant sleep products should be swept into the inclined sleep product standard. Nor did these documents explain why the Bassinet Standard requirements should apply to all "infant sleep products" other than to state that those requirements are "established." AR 518. Nor still did these documents even mention baby boxes, in-bed sleepers, or any specific types of flat infant sleep products. AR 328–475, 511–25. Rather, the evidentiary support for the SNPR was uniformly targeted to *inclined* infant sleep products, including:

- Data relating to infant *inclined* sleep product-related deaths and injuries dating back to 2005. AR 350.

- A Commission-solicited biomechanical analysis of *inclined* sleep, which was led by a Ph.D. in biomechanics and supported by a pediatric pulmonologist, a pediatric spine surgeon, a pediatric orthopedic surgeon, a pediatric psychologist, and two Ph.D. biomechanics researchers. AR 358.

- An assessment of ASTM's voluntary standard for infant *inclined* sleep products conducted by an industrial engineer. AR 446.

- A physiological analysis of the extent to which infant *inclined* sleep products may lead to plagiocephaly (flat head syndrome) or torticollis (the tilting/rotation of an infant's head). AR 451.

- A summary of recalls of infant *inclined* sleep products between 2000 and 2019. AR 472.

ii.     *The Commission's First Explanation for Expanding the Scope of the Voluntary Standard Reveals the Lack of Supporting Evidence*

The Commission first explained the 2019 SNPR's expansion of the scope of the voluntary standard beyond inclined sleep products in a two-page letter, dated December 12, 2019, sent from a Commission staffer to ASTM (the "December 2019 Letter"). AR 535. This letter described the Commission's concerns as follows:

> Staff has concerns about the safety of in-bed sleepers because they have the potential for instability as well as the inability to prevent an adult from rolling onto the infant. . . . Another concern of staff's is the safety of compact bassinets and baby boxes because, without a built-in stand [of the kind used in a bassinet], compact bassinets and baby boxes could be used as an in-bed sleeper with the potential for instability. Moreover, depending on the side height, these products might not prevent an adult from rolling onto the infant.

AR 535–36. Thus, the Commission's stated concerns were twofold: (1) in-bed sleepers' risk of instability and overlay (an adult rolling onto an infant); and (2) the risk of compact bassinets and baby boxes being used as in-bed sleepers and leading to injury. The letter provided no evidence substantiating these concerns. AR 536.

iii.     *The Commission Receives an Outpouring of Negative Comments on the 2019 SNPR's Expanded Scope, Including About the Lack of Supporting Data and Risk of Harm to Infants*

Following the December 2019 Letter, the Commission received an outpouring of negative comments in response to the 2019 SNPR. Among other things, the comments highlighted: the impropriety of using a single standard to regulate a wide

range of distinct products, the Commission's failure to substantiate its stated concerns regarding flat sleepers with data, and the Commission's failure to recognize that effectively banning in-bed sleep products would likely increase the risk of harm to infants, not mitigate such risk.

*One-Size-Fits-All Approach.* Objecting to treating all flat sleepers the same and incorporating them into a voluntary standard for *inclined* sleepers that applies the Bassinet Standard, commenters explained that different products exhibit different features and risks and therefore necessitate different standards. *See, e.g.*, AR 566 ("This proposal is concerning in that it lumps compact bassinets into a category that isn't applicable."); AR 615 ("We urge that the Commission refrain from adopting a 'one size fits all' approach."); AR 1127 ("The differences between products necessitates different requirements; hence the existence of different Standards for bassinets, play yards, cribs, non-full size cribs, bed side sleepers and carriages and strollers.").

*Lack of Data.* A number of commenters observed that the Commission had provided no examples of baby boxes resulting in injury or death. For instance, an expert in pediatric trauma commented on the unblemished safety record of baby boxes: of the many thousands of Finnish parents whose babies sleep in baby boxes each year, "there are zero reported product-related deaths or injuries." AR 567. Likewise, multiple commenters noted that baby boxes are far safer than

Commission-approved cribs, as "[i]t is a fact that about 100 infants die each year in cribs." AR 559.

Many others commented on the absence of data supporting the Commission's concerns about in-bed sleepers stated in the December 2019 Letter—the risks of instability and overlay. *See*, *e.g.*, AR 544 (noting the Commission did not "include incidents of parent roll over or instability," creating a "disconnect which CPSC must shed light on"); *see also* AR 559, 617, 911, 917. The Commission's lack of data was reinforced at a February 2020 meeting between the Commission staff and ASTM, where one ASTM participant confirmed that "in-bed sleepers don't have incident data for roll overs or instability." AR 628.

***Unintended Dangers.*** Multiple commenters noted that parent-child bedsharing is widely practiced, that "simply telling [parents] not to is ineffective," AR 919, and that in-bed sleepers mitigate the risks associated with bedsharing. *See*, *e.g.*, AR 917–29 (collecting studies showing that most American parents bedshare, that parents are generally not responsive to being told not to bedshare, and that in-bed sleepers reduce the risk of overlay); AR 934 (same). ASTM members separately informed Commission staff that "bed sharing is not going away." AR 628. Commenters also observed that the absence of "overlay deaths reported on any brand or style of in-bed sleeper," indicates that in-bed sleepers limit overlay. AR 914. For example, one commenter summarized a series of studies in New Zealand in which

thousands of in-bed sleep products were provided to a community that practiced bedsharing over the course of several years, and the infant mortality rate dropped by approximately 30% in that time period.  AR 922–24.

Taken together, the evidence of persistent prevalence of bedsharing, the absence of data showing harm from in-bed sleepers, and the studies indicating that in-bed sleepers may reduce the risks of bedsharing, led commenters to explain that removing in-bed sleepers entirely would "force tired parents and other caregivers to either sleep with their baby in their bed next to them"—and risk overlay—or "jerry-rig products to create a barrier between them and their baby," which could "introduce a much *greater* risk to infants."  AR 616–17.

Beyond these substantive criticisms, several commenters criticized the process leading to the inclusion of flat sleep products in the 2019 SNPR.  As the Commission knew when it issued the SNPR, ASTM was in the midst of creating product-specific safety standards for flat sleep products, including baby boxes and in-bed sleepers.  *See*, *e.g.*, AR 615 ("[S]hort shrift was given to the voluntary standards process of 'non-inclined' infant sleep products, underway since 2017."); AR 912.  Many commenters objected to the Commission's short-circuiting its consultation with ASTM about the development of flat sleep products standards, by instead rushing to sweep such products into the 2019 SNPR so as to regulate many products out of existence.  *See*, *e.g.*, AR 615 ("If the Commission staff was, or is,

aware of data which points to an immediate need for a mandatory standard that might cover numerous types of infant products, it should share same. In this instance, it has not."); AR 914 ("What is most troubling about the CPSC's proposed action is that it unilaterally stops work by stakeholders who are actively engaged in developing voluntary standards."); AR 934.

iv.    *The Commission Adopts the Rule Over Dissent, Making
       No Substantive Changes in Response to Comments*

In January 2021, the Commission sent a letter to ASTM encouraging ASTM to "remove the word 'inclined' from the . . . scope" of ASTM's voluntary inclined sleeper standard in order to "align[]" the scope of the standard with the 2019 SNPR. AR 1125. ASTM refused to adopt this change.

In May 2021, Commission staff submitted to the Commission a proposed final rule, making no substantive changes from the 2019 SNPR and thus enlarging the scope of the voluntary standard to include all previously unregulated flat sleep products. AR 1149.

On June 2, 2021, the Commission met and voted 3-1 to adopt the Rule as proposed. AR 2081. Commissioner Baiocco voted to take other action—namely issuing a rule that would cover only inclined products, consistent with the scope of the voluntary standard. *Id.* She explained she would "advance the rule as it was intended to apply to inclined sleep products but . . . carve out and have a hearing and do a deeper dive into the [flat] products that I've been told by pretty much everybody

I've asked, can have a standard in and of itself." *Id.* The Rule was published on June 23, 2021, with an effective date of June 23, 2022. AR 2096.

In the Rule as finalized, the Commission cited no examples of baby boxes leading to injury or death, and it also continued to claim overlay as an in-bed sleeper risk without identifying any overlay incidents relating to an in-bed sleeper. AR 2102–05, 2123. The Commission acknowledged that "[m]ultiple commenters expressed concern about in-bed sleepers, baby boxes, and compact bassinets being subject to the standard" because, *inter alia*, "[i]n-bed sleepers, baby boxes, and compact bassinets are not identified in CPSC data," and there is a "[p]otential disparity in safety among in-bed sleepers versus a potential ban of in-bed sleepers." AR 2123. In response, the Commission first recognized that bedsharing is ubiquitous—"24.4 percent of parents bed-share[] . . . often or always"—but stated that it "c[ould] not recommend bed-sharing as a safe sleep practice," ignoring and not disputing the comments that bedsharing will continue regardless of the Rule and that in-bed sleepers make bedsharing safer for infants. AR 2101, 2123. Second, the Commission noted 11 reports of fatalities and 16 reports of injuries spread across all flat infant sleep products, but did not acknowledge or respond to the points that none of these reports related to baby boxes or to overlay in in-bed sleepers, or that they indicated no pattern of instability or overlay (the Commission's claimed concerns). AR 2123; *see also infra* (summarizing in detail these 27 incident reports).

The Commission further acknowledged that the Rule—by sweeping in baby boxes, in-bed sleepers, and other previously unregulated flat sleep products, and applying the Bassinet Standard—would effectively ban most such products by forcing suppliers to either "redesign" the products as different products, "stop selling the products," or "remarket the products as not intended for infant sleep." AR 2139. The Commission specifically acknowledged that for both "soft-sided" products like many in-bed sleepers, and "rigid-sided" products like baby boxes, the only way to comply with the Rule would be to convert the product into an entirely different product, such as a bassinet. AR 2140–41. This would likely mean abandoning the utility of the original product altogether. For example, "adding rigid higher sides" is "contrary to the intended product use [of] in-bed sleepers," which parents use to mitigate risks of overlay while maintaining the close visual and tactile contact with an infant that is core to the practice of bedsharing. AR 2140. And even if manufacturers were willing and able to convert their stock into different products, the Commission admitted that "even a simple re-design could cost hundreds of thousands of dollars per model and require new third-party testing, and all of the product marketing, instructions, and packaging would have to be revised." *Id.* Thus, the Commission suggested remarketing baby boxes "as storage boxes" and in-bed sleepers "as pet beds." *Id.*

Between the Commission staff's submission of the proposed final rule to the

Commission in May 2021 and the Commission's approval in June 2021, the Commission received a renewed round of negative comments regarding the inclusion of previously unregulated flat sleep products. These comments largely tracked the comments following the 2019 SNPR, noting the ongoing lack of supporting data, the risk of inadvertently making bedsharing more dangerous, the irrationality of applying a one-size-fits-all standard, and the Commission's disregard for its responsibility to consult with ASTM on a product-specific standard. *See*, *e.g.*, AR 1604–07 (noting the absence of incident data on baby boxes), AR 2009–10 (noting that "a majority of U.S. moms bedshare," that the "greatest risk to infants who bedshare . . . is overlay," and that "research on in-bed sleepers demonstrates that these products can facilitate safe sleep for infants by mitigating (or preventing) the overlay risk"); AR 1495 ("[N]ot all products are capable of being regulated by a single Standard."); AR 2072 (the Commission should "work in the ASTM process to promptly finalize the already far-along drafts of ASTM safety standards").

Finnbin in particular wrote to the Commission in early May 2021 to highlight the long and uninterrupted history of safety regarding baby boxes:

> *[I]n more than 90 years of existence, I am unaware of a single documented injury or death reported from the intended use of a baby box.* . . . This particular decision by the CPSC is being made with a lack of evidentiary data to suggest that baby boxes pose any hazard to infants or children. Sometimes, a lack of data is data in and of itself. . . . *I would conservatively estimate that far more than a million children across the globe have slept in a baby box without incident*—a figure that would be considered the gold standard for the industry when

compared to similar products.

AR 1485–86 (emphases added). Several weeks later, Finnbin wrote again to ask the Commission to consider the "perfect safety record" of baby boxes that have "zero documented incidents of injuries or death both domestically and abroad," before "put[ting] all US-based baby box companies out of business." AR 1604.

At the Commission's June 2, 2021 decisional meeting—before a vote was taken on the Rule—Commissioner Feldman moved for Commission staff to resubmit the final rule package as a supplemental notice of proposed rulemaking to collect comments on the "underlying justification for including the flat infant sleep products." AR 2083 (38:31–38:48). Commissioner Feldman stated, "I'm concerned if we issue the rule today," it would be challenged for its "procedural deficiencies" and subject to "judicial scrutiny" relating to, *inter alia*, "data issues," and the fact that "CPSC wasn't entirely clear why flat products were to be included." *Id.* (39:06–40:27). Commissioner Adler opposed the motion, calling it "paralysis by analysis," *Id.* (41:13–41:20), complaining that rulemaking under the CPSA is "about as swift as a herd of turtles stampeding through a vat of peanut butter," and arguing that Section 104 would "expedite" the process. *Id.* (42:22–42:48). The motion deadlocked 2-2. AR 2080.

At this same meeting, Commissioner Baiocco asked the staff present whether "infant sleep products" would need to be redesigned in order to meet the bassinet

standard and the staff confirmed that they would. AR 2083 (30:44–30:59). She then asked if the staff knew what products and how many "would be forced into a redesign or forced off the market" and the staff responded that it would apply to "dozens of products in the in-bed sleeper category and also dozens of products in the various bassinets that do not have legs or a stand." *Id.* (31:04–32:45). She further inquired whether these previously unregulated flat products "should have their own voluntary standard," and the staff acknowledged that "ASTM is actually working to develop a voluntary standard for in-bed sleepers." *Id.* (32:54–33:15). On the subject of in-bed sleepers, she also asked whether the staff considered input from anyone with expertise in bedsharing as part of the rulemaking and the staff answered that they did not know:

> **Commissioner Baiocco:** Have we considered any expertise or heard from anyone with a background in bedsharing products as part of our package?
>
> **Staff:** Well, . . . we did receive comments from consumers about the in-bed sleepers, again, I don't know the background of all the people.

*Id.* (33:48–35:25).

Commissioner Baiocco issued a voting statement criticizing the Commission for ignoring the realities of bedsharing and the risk of harm to children from "bann[ing] *de facto*" products that make bedsharing safer:

> Make no mistake. Bedsharing occurs despite the advice of doctors, regardless of whether friends and family members approve, and will continue despite what opinions this Agency may have . . . .

24

Simply stated, to the extent that the mandatory rule will change the type and availability of products used by bedsharers, these parents will be left to figure out for themselves how best to compensate for the anticipated product void. I am particularly troubled about this situation because it very well may lead to and expose certain babies to unreasonable risks of harm. . . .

It is imprudent and perhaps even irresponsible for the Agency to ignore these realities and to not fully consider the consequences here.

AR 2086–88.

Commissioner Adler also issued a voting statement, asserting his view that the rule was not "vulnerable to legal challenge." AR 2091. Commissioner Adler also stated that "[n]othing in the infant sleep rule" prevented parents from bedsharing, which he stated can and does "lead to tragedies," without addressing the evidence that in-bed sleep products make bedsharing safer for infants. AR 2094. Instead, he stated that "CPSC regulates products, not behavior. So, the issue before the agency was simply whether to permit in-bed sleepers." *Id.*

### E. Procedural History

The Rule was published on June 23, 2021. AR 2096. Finnbin timely filed a petition for review in this Court on August 23, 2021. Dkt. No. 1911243.

## STANDARD OF REVIEW

The CPSIA provides that where, as here, a petition for review is filed under 15 U.S.C. § 2060(g)(2), this Court is to review the petition "in accordance with" the APA. 15 U.S.C. § 2060(g)(3). Under the APA, this Court must set aside agency

action that is "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

## SUMMARY OF ARGUMENT

It is beyond debate that the safety of infants is of great importance. The question presented here, however, is whether the Commission exceeded its statutory authority and violated the APA when it adopted a Rule that expanded the scope of a voluntary standard for inclined sleep products to cover—and effectively ban—all infant sleep products not previously subject to a voluntary standard. Because the Commission's inclusion of otherwise unregulated flat sleep products in the Rule is contrary to law and in excess of its statutory authority, as well as arbitrary and capricious in multiple respects, it should be vacated.

*First*, the Rule is contrary to law and in excess of statutory authority because Section 104 limits the Commission to two options: (1) adopt an existing voluntary standard or (2) make an existing standard more "stringent." Here, instead, the Commission drastically expanded the *scope* of the infant inclined sleeper standard, sweeping in all otherwise unregulated flat sleep products and subjecting all covered products to a standard designed for an entirely different product (bassinets). In so doing, the Commission effectively banned dozens of flat sleep products under the guise of increasing the "stringency" of the inclined sleeper standard.

This Rule is an aberration.  For the 13 years after Section 104 was enacted until the adoption of this Rule, the Commission never once altered the scope of a voluntary standard to include products not already covered.  The Rule's overreach under Section 104—if permitted to stand—would allow the Commission an easy end-run around the weighty showings Congress requires the Commission to make before it regulates, bans, or recalls products from scratch under the CPSA and CPSIA.

**Second**, the Rule's inclusion of all previously unregulated flat sleep products is arbitrary and capricious.  The Rule relies on inapposite and limited anecdotal data to lump together a wide range of previously unregulated flat sleep products into a one-size-fits-all standard governed by the substantive requirements for bassinets— an entirely different product.  And despite the Commission's claim that baby boxes are dangerous and that in-bed sleepers risk overlay, it has presented no evidence to support those contentions.  To the contrary, the undisputed evidence and comments before the Commission show that a precipitous ban on previously unregulated flat sleep products is likely to increase the risk of harm to infants.  These aspects of the Rule, both individually and collectively, are arbitrary and capricious.

Notably, the Commission did not need to exceed its statutory authority under Section 104 to address previously unregulated flat sleep products.  Voluntary ASTM standards for various flat infant sleep products are in progress and can be reviewed

under Section 104.  Moreover, the Commission has non-Section 104 authorities to regulate products in the first instance if it does not want to wait to review an existing voluntary standard under Section 104.  In all events, the Rule's inclusion of non-inclined infant sleep products is unlawful and must be vacated.

## STATEMENT OF STANDING

Finnbin has standing because it has suffered an injury in fact that is traceable to the Rule and that would be redressed by a favorable judicial decision.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). Finnbin's line of business is flat infant sleep products, including baby boxes.  The Rule effectively bans baby boxes; the Commission recognized that converting baby boxes into another type of product could "cost hundreds of thousands of dollars," AR 2140; and the Rule prevents Finnbin from pursuing other avenues for its flat sleep product business such as in-bed sleepers and compact bassinets.  As a direct result of the Rule, Finnbin has been forced to suspend its operations.  And due to the Rule's open-endedness, any new and innovative flat infant sleep product that Finnbin might create to preserve its flat sleep product business would likewise be prohibited.  *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("Economic harm to a business clearly constitutes an injury-in-fact.").  Vacatur of the Rule with respect to flat infant sleep products would lift the effective ban on Finnbin's business.  Finnbin is therefore "adversely affected" by the Rule and

entitled to maintain this action pursuant to 15 U.S.C. §§ 2056a(b)(3), 2060(g).

## ARGUMENT

## I. THE COMMISSION ACTED CONTRARY TO LAW AND IN EXCESS OF ITS AUTHORITY BY ADOPTING A RULE UNDER SECTION 104 THAT EXPANDS THE SCOPE OF A VOLUNTARY STANDARD

Agency action is contrary to law if it violates a statute's "plain language," *Natural Resources Def. Council v. EPA*, 643 F.3d 311, 322 (D.C. Cir. 2011), or "frustrate[s] the policy that Congress sought to implement," *Shays v. FEC*, 528 F.3d 914, 925 (D.C. Cir. 2008) (quotation marks omitted).  The Rule does both.  *First*, the Commission purported to expand the *scope* of an existing voluntary standard under Section 104 of the CPSIA, despite that Section 104's plain language limits the Commission's authority to either adopting or increasing the *stringency* of a voluntary standard.  *Second*, the Commission's approach frustrates congressional intent by transforming a limited conferral of authority to review existing standards into *carte blanche* to regulate anew and even ban entire swaths of consumer products without having to make the showings required by the CPSA and CPSIA.

## A. Section 104 of the CPSIA Requires the Commission to Adopt or Increase the Stringency of an Existing Voluntary Standard—It Does Not Permit the Commission to Expand a Standard's Scope

Section 104 requires the Commission to consult with interested parties, assess existing voluntary safety standards, and then choose one of two options:  (1) adopt the existing standard in "substantially the same" form; or (2) promulgate standards that are "more stringent" than the existing standard.  15 U.S.C. § 2056a(b)(1).

29

The Commission plainly did not adopt the voluntary inclined sleep product standard in "substantially the same" form. *See*, *e.g.*, AR 2107 ("CPSC's final rule makes substantial modifications to [the voluntary inclined sleep standard].").

Nor did the Commission make the voluntary standard "more stringent" by sweeping in all previously unregulated flat sleep products. The word "stringent" means "strict." *See*, *e.g.*, "Stringent," Merriam-Webster Online Dictionary (last visited Nov. 8, 2021) ("[M]arked by rigor, strictness, or severity especially with regard to [a] rule or standard."), https://bit.ly/31G6Wfh; "Stringent," Dictionary.com (last visited Nov. 8, 2021) ("[R]igorously binding or exacting; strict; severe."), https://bit.ly/3mTtyRA; "Stringent," Cambridge Online Dictionary (last visited Nov. 8, 2021) (listing "strict" as the first synonym), https://bit.ly/3EStNTg. Making a standard stricter could, for example, involve modifying a stroller standard to impose a more onerous test to detect the risk of an infant's head getting trapped, *see Safety Standard for Carriages and Strollers*, 79 Fed. Reg. 13208 (Mar. 10, 2014), or modifying a sling carrier standard to require that warning labels be affixed "around the entire perimeter" rather than just by "one seam," *Safety Standard for Sling Carriers*, 82 Fed. Reg. 8671 (Jan. 30, 2017).

Confirming this interpretation, the phrase "more stringent" is used elsewhere in the CPSIA to mean making a regulatory requirement more strict—not changing its scope or subject matter. Specifically, a provision addressing "children's

products" containing lead under the header "More stringent lead paint ban" instructs the Commission to modify its regulations "by substituting '0.009 percent' for '0.06 percent'" as the maximum concentration of lead allowable, 15 U.S.C. § 1278a(f)(1)—not by changing the definition of "children's products."

Here, in contrast, by sweeping all previously unregulated flat sleep products into a voluntary standard for inclined products, the Commission did not adjust the *stringency* of the voluntary standard. Rather, it drastically expanded the *scope* of the voluntary standard, so as to include not only inclined products, but a diverse array of flat products, including baby boxes, in-bed sleepers, baby nests, baby pods, compact bassinets, travel bassinets with soft padded or mesh sides, and baby tents. AR 2099; *see* AR 268 (staff recommending to "change the scope"); AR 513 (2019 SNPR proposing to make "revisions in the scope" of the voluntary standard); AR 2098 (Rule adopting "modifications to the . . . scope"). And by open-endedly defining "infant sleep products" as products "not already subject to one of CPSC's mandatory standards," AR 2096, the Rule also captures any and all new infant sleep products that may be invented in the future and are not yet developed—in other words, the Rule effectively bans products that the Commission has not evaluated because they do not yet exist. *See*, *e.g.*, AR 1489 (comment observing that the Rule will "halt[] innovation").

The Commission's explanation for expanding the scope of the voluntary standard makes clear its misapprehension of its statutory authority. In the Rule, the Commission stated that "nothing in section 104 of the CPSIA requires the Commission to delay" promulgating a standard "until all ASTM members have reached a consensus on whether and how to create or revise a voluntary standard." AR 2129. That is wrong. Section 104 limits the Commission's authority to "examin[ing] and assess[ing] the effectiveness of *any voluntary consumer product safety standards* for durable infant or toddler products" and either adopting or increasing the stringency of such standards. 15 U.S.C. § 2056a (emphasis added). Notably, Section 104 lists out categories of durable nursery products, confirming that Congress intended the Commission to consider such products on a category-by-category basis. *Id.* § 2056a(f) (separately enumerating, *inter alia*, "cribs," "toddler beds," and "bassinets and cradles").

The Commission has other statutory tools at its disposal if it wishes to promulgate a rule or initiate a recall or ban independent of any preexisting voluntary standard. *See supra* at 5–7. Importantly, because those regulatory pathways permit the Commission to do more than just adopt or increase the stringency of a pre-existing standard, they sensibly require a more onerous showing than that required under Section 104. *See id.*

Section 104 is a different, much more limited tool. It does not authorize *ab initio* rulemaking. It authorizes action only where the Commission is reviewing an existing "voluntary consumer product safety standard[]." 15 U.S.C. § 2056a(b)(1). The Commission's interpretation of Section 104—allowing it to enlarge the scope of a voluntary standard to sweep in different products not covered by the voluntary standard—is contrary to Section 104's plain meaning. Were the Commission's approach permissible, the Commission could brush aside the scope of an existing standard and convert it into a standard—or ban—applicable to whatever range of products it chooses. Not only is there no support in Section 104 for this approach, but it would bypass the rigorous constraints Congress imposed for ordinary rulemaking under the CPSA.

Although Section 104's language is dispositive of the Commission's overreach, the Commission's unbroken practice since the passage of the CPSIA until now confirms the limited nature of its Section 104 authority. We are not aware of any prior instance in which the Commission has used its Section 104 authority to—as here—expand the scope of a voluntary standard so as to capture types of products not covered by the standard. *See supra* at 8–10 (describing previous Section 104 rulemakings). Indeed, it is telling that before adopting the Rule, the Commission *asked* ASTM to enlarge the scope of the voluntary standard to conform to the Commission's intended broadening—indicating the Commission's awareness that it

lacked such a power on its own. AR 1125. As the Commission apparently recognized in securing such an adjustment from ASTM to align with the Bassinet Standard, AR 3, it does not have the unilateral power under Section 104 to expand the scope of a voluntary standard. This Court should be "skeptic[al]" of the Commission's claim to have "discover[ed] in a long-extant statute an unheralded power to regulate." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014).

## B. The Commission's Reading of Section 104 Would Dramatically Aggrandize the Authority Conferred by Congress

If left uncorrected, the Commission's reading of Section 104 would transform the narrow source of authority Congress conferred—reviewing and potentially tightening existing voluntary standards for durable nursery products—into an expansive power to regulate anew and even ban entire swaths of such products, without having to meet the ordinary, exacting CPSA requirements for such rulemaking. Because the Commission's view of its Section 104 authority would create an end-run around the limits placed by Congress, it cannot stand.

Section 104 authorizes a streamlined process for regulation, in which the Commission "shall" closely collaborate with experts and other interested parties to assess existing voluntary standards for specific "durable or infant products" and, as needed, adjust the stringency of such standards to "further reduce the risk of injury associated with [the] products" covered by the voluntary standard. 15 U.S.C. § 2056a(b)(1). Illustrating how closely the Section 104 authority is tied to existing

voluntary standards, Section 104 further provides that once the Commission issues a mandatory standard for a certain type of durable nursery project based on a voluntary standard, if the voluntary standard changes, it will *become* the mandatory standard absent objection from the Commission. *Id.* § 2056a(b)(4)(B).

Under the Commission's erroneous conception of Section 104, however, it may regulate anew and even ban entire classes of durable nursery products that are not currently the subject of any voluntary standard by simply expanding the "scope" of an existing voluntary standard. *See* AR 268, 513, 2098. And, according to the Commission, it may do so constrained by nothing more than Section 104's requirement that any revision of an existing voluntary standard "further reduce the risk of injury associated with such products." 15 U.S.C. § 2056a(b)(1)(B).

Here, that flawed conception of its authority led the Commission to sweep a wide variety of previously unregulated flat sleep products into a voluntary standard for *inclined* sleep products—all without having to meet any of the CPSA's exacting requirements for regulating a product anew, including conducting a cost-benefit analysis. *See supra* at 5–7. Indeed, the Commission candidly conceded that it did not follow those requirements. *See* AR 2114 (responding to a comment that the Commission should "perform a full cost-benefit analysis," by pointing out that "[t]he Commission is not required to conduct cost-benefit analyses under section 104").

Worse still, the Rule effectively *bans* "dozens" of flat infant sleep products

swept into the inapposite voluntary standard, AR 2083 (31:04–32:45), including the baby boxes produced by Finnbin.  By the Commission's own admission, the Rule will require this whole swath of previously unregulated products to either (1) "redesign" into an entirely different product at great cost, or else (2) be "forced off the market."  *Id.*  In either case, the affected category can no longer continue to exist as such, constituting an effective ban.

The Commission lacks authority to accomplish such a ban via Section 104, not only because the Commission may not increase the scope of a voluntary standard under Section 104, but also because when Congress gave the Commission the power to "ban" or "prohibit" products in either the CPSA or CPSIA, it used those words. *See*, *e.g.*, 15 U.S.C. § 2057 (power to declare a product "a banned hazardous product"); *id.* § 1278a (designating children's products with lead to be "banned"); *id.* 2067(c) ("The Commission may prohibit a person from exporting from the United States . . . any consumer product that is not in conformity with any applicable consumer product safety rule.").  Moreover, when the Commission is empowered to ban products, there are accompanying checks that conspicuously do not apply when the Commission acts under its Section 104 authority.  Those checks are even more restrictive than the already exacting requirements applicable when the Commission regulates anew (rather than relying upon an existing voluntary standard).  *See* 15 U.S.C. § 2057 (requiring the Commission to, *inter alia*, find that "no feasible

consumer product safety standard . . . would adequately protect the public").

In contrast to the rigorous constraints applicable to the Commission when it acts pursuant to its general powers to regulate or ban products, *see, e.g.*, 15 U.S.C. §§ 2057, 2058, the only finding that the Commission must make in reviewing an existing voluntary standard under Section 104 is that any additional stringency "further reduce[s] the risk of injury associated with such products." *Id.* § 2056a(b)(1)(B)(ii). That requirement makes sense given that Section 104 only permits the Commission to adjust the stringency of existing voluntary standards. But that requirement would be nonsensical if the Commission were permitted under Section 104 to sweep entirely new categories of products into existing voluntary standards in order to accomplish an effective ban, thereby bypassing the exacting requirements for ordinary rules, bans, and recalls in the CPSA and CPSIA.

The Commission's claimed basis for its expansive vision of Section 104 is the provision's language allowing the Commission to make an existing standard "more stringent." *See*, *e.g.*, AR 2127 (the Rule characterizing its changes to the inclined sleep standard as "modifications to make the standard more stringent"). But increasing the stringency—*i.e.*, strictness—of an existing standard is entirely different from expanding the *scope* of an existing standard to include new products, let alone banning the newly included products. Not only does the plain text of the CPSIA provide no support for the Commission's approach, but the Commission's

notion that the word "stringent" allows it to regulate and ban all previously unregulated durable nursery products without following the ordinary CPSA requirements runs headfirst into the well-established principle of statutory interpretation that Congress does not hide "elephants" in "mouseholes." *See*, *e.g.*, *Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021) ("We have stated before that Congress does not hide elephants in mouseholes."); *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005) (rejecting an interpretation of a statute that would have required the Court to "conclude that Congress . . . had hidden a rather large elephant in a rather obscure mousehole").

The Court need not speculate on how disruptive and harmful the Commission's erroneous view of its Section 104 power is, as this case clearly illustrates the point. Based on no more than a purported finding that requiring previously unregulated flat sleepers to meet the Bassinet Standard "further reduce[s] the risk of injury associated with infant sleep products, both flat and inclined," AR 2098, and observing that it has no obligation under Section 104 to conduct a cost-benefit analysis, AR 2126, the Commission enacted a rule that will drive dozens of manufacturers from the market without making the showings otherwise required by the CPSA and CPSIA for such drastic action. *See*, *e.g.*, AR 2140–41 (noting that "suppliers of low, soft-sided products . . . are unlikely to be able to redesign their products to meet any of the sleep standards, so they will need to decide whether to

exit the market"); AR 2142 ("Hundreds of home-based manufacturers based in the U.S. . . . are likely to be significantly impacted."); *id.* ("[T]he final rule is likely to have a significant economic impact on a substantial number of small entities.").

Notably, the Commission took this unlawful action knowing full well that voluntary standards for previously unregulated flat sleep products are emerging and eventually could be reviewed by the Commission pursuant to Section 104. *See supra* at 18–19, 22. It also took this unlawful action with full knowledge of the authorities at its disposal outside Section 104 if it wishes to regulate, recall, or ban a product that is not yet the subject of an existing voluntary standard. *See supra* at 5–7. Even if those other authorities were viewed as, as Commission Adler put it, "about as swift as a herd of turtles stampeding through a vat of peanut butter," AR 2083 (42:22–42:52), that does not give the Commission license to exceed its Section 104 authority or to take precipitous action that is contrary to law.

\* \* \*

In expanding the scope of the voluntary standard for inclined sleep products to cover all previously unregulated infant sleep products and then effectively banning those products, the Commission has exceeded its statutory authority in Section 104 of the CPSIA and acted contrary to law. The Rule should be vacated as to all products outside the scope of the inclined sleep products voluntary standard, including the baby boxes produced by Finnbin.

## II. THE COMMISSION ACTED ARBITRARILY AND CAPRICIOUSLY BY ADOPTING A ONE-SIZE-FITS-ALL EFFECTIVE BAN ON FLAT INFANT SLEEP PRODUCTS WITHOUT SUPPORTING EVIDENCE AND DESPITE INCREASED RISKS TO INFANTS

Agency actions violate the APA as arbitrary and capricious if they fail to "examine the relevant data and articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted). This includes if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*.

The Rule's inclusion of previously unregulated flat sleep products is arbitrary and capricious for two main reasons: the Commission takes a one-size-fits-all approach to the products at issue that is unsupported by evidence, and it fails to confront the uncontroverted evidence that banning in-bed sleepers exposes infants to increased risk while bedsharing. These fundamental defects require vacatur.

### A. The Commission Impermissibly Sought to Justify Its Regulation of the Disparate Category of *All* Previously Unregulated Infant Sleep Products By Reference to Limited Anecdotal Evidence

In its effort to justify including and effectively banning all previously unregulated flat sleep products, the Rule illogically and conjecturally relies upon

limited, anecdotal data about various flat products to support a one-size-fits-all prohibition across a wide range of distinct products. This was arbitrary and capricious. The data cited by the Commission does not support treating all flat products the same or banning them. Indeed, despite the Commission's claimed concerns that baby boxes risk infant harm and that in-bed sleepers risk overlay, the Commission cited *no* data regarding either baby boxes or overlay in in-bed sleepers.

To begin with, there is a striking contrast between the Commission's cited support for regulating *inclined* sleepers (which the Commission does not rely on to justify including flat products) and its cited support for including flat products. The Commission based its assessment of *inclined* sleep products on, among other things, a scientific study and hundreds of incident reports relating to such products.

For the study, Commission staff contracted with Dr. Erin M. Mannen—a professor of orthopedic surgery and a "mechanical engineer with a biomechanics specialization"—to "conduct infant testing to evaluate the design of inclined sleep products." AR 340. Supported by a team of scientists, Dr. Mannen's study lasted a full year and resulted in a 76-page report that analyzed incident reports, examined various inclined sleep products, and conducted an "*in vivo* biomechanics study of infants 2-6 months of age." AR 358–434.

As for data, the Commission cited 657 incident reports (including 14 deaths) relating to inclined sleep products of which the Commission was aware at the time

of the 2017 NPRM, AR 1157, and an additional 522 incident reports (69 fatal) relating to inclined sleep products of which the Commission became aware between the 2017 NPRM and the time the Rule was finalized, AR 2110.

In stark contrast, for previously unregulated flat sleep products, the Commission neither conducted nor cited any study, as it had for inclined products. And as to incident report data, rather than compiling hundreds of incident reports concerning a single product-type—as it did for inclined products—the Commission relied on just 183 "anecdotal incident reports" spread across *all* subcategories of previously unregulated flat sleep products. AR 2104–06. Moreover, a majority of these incident reports (115) concerned one discrete issue: "lock/latch" problems mainly relating to "different models of a particular stand-alone compact bassinet" that involved no injuries. AR 2104. The next largest category (29) comprised reports based on "consumers' or safety advocates' [expressed] concerns about the perceived safety hazard of a product" that also involved no injuries. AR 2105.

The cited incident reports simply do not support the Commission's categorical approach to flat sleep products. *None* of the incident reports cited by the Commission involved baby boxes. And *none* of the cited incident reports involve overlay with respect to in-bed sleepers—despite the Commission continuing to cite "overlay" as a risk associated with "in-bed sleepers." AR 2123.

Of the 183 cited reports, 11 involved fatalities and 16 involved injury.

AR 2104–05. No fatality or injury cited pertained to baby boxes or in-bed sleeper overlay. As the Commission acknowledged, the "number of emergency department-treated injuries associated with flat sleep products . . . is insufficient to derive any reportable national estimates." AR 2104. Of the fatalities:

- 7 involved suffocation: 1 partially rolled over in a soft-sided compact bassinet/travel bed; 1 rolled over the edge of an in-bed sleeper, 1 improperly placed stomach-down in an in-bed sleeper became entangled with a blanket; 1 placed in a compact bassinet/travel bed on top of an adult bed became trapped between the bed and the wall; 1 placed in a handheld basket on top of an adult bed rolled over; 1 placed in an in-bed sleeper inside of a standard bassinet rolled over, and 1 wrapped in a blanket and placed inside an in-bed sleeper rolled over. AR 2105.

- 4 involved other issues: 1 placed in an in-bed sleeper inside a play yard and became "entrapped somehow"; 1 placed in an in-bed sleeper, exited the sleeper onto an adult bed, and became entrapped between the footboard and the mattress; and 2—one in a basket, the other in an in-bed sleeper—died of "undetermined causes." *Id.*

The 16 injuries were similarly non-overlapping and product-dependent:

- 1 "suffered unspecified breathing difficulties" in an unspecified product;

- 1 fell out of an in-bed sleeper when a "sibling jumped onto the couch where the in-bed sleeper was situated";

- 10 fell out of an unspecified "sleeper product" wherein for "most cases the sequence of events leading to each fall was unreported," but one reported incident involved the sleeper "slipp[ing] off the adult bed";

- 1 suffered an allergic reaction (unspecified product);

- 1 suffered breathing difficulty (unspecified product);

- 1 was cut by the "rough mesh wall surface of the sleeper" (unspecified

product); and

- 1 fell from the sleeper when a sibling pulled on it (unspecified product). *Id.*

By reference to the entire universe of 183 incident reports (not just fatalities and injuries), the Commission described purported "hazard patterns." *Id.* In addition to the 115 incident reports involving the "lock/latch" issue noted above and the 29 incident reports based on "concerns" of consumers or safety advocates (with none of those 144 incident reports involving any injuries), the Commission claimed the following "patterns":

- 12 reports of infants falling out of the product, which included an "infant falling out of a sleeper when a sibling jumped onto the couch containing the sleeper" (1 death and 10 injuries)

- 12 reports of "instability" including "products with legs lifting up higher or leaning on one side" (most baby boxes and in-bed sleepers do not have legs) (2 injuries)

- 9 reports of suffocation involving compact bassinets/travel beds, baskets, and in-bed sleepers used in various ways, such as an in-bed sleeper used "inside a standard bassinet and another[] inside a play yard" (8 deaths)

- 3 "miscellaneous" issues relating to "mold or quality of the product material" (3 injuries)

- 3 "undetermined" issues (2 fatalities and 1 injury)

AR 2105–06.

Based solely on that anecdotal hodge-podge, the Commission adopted the Rule's requirement that *all* previously unregulated flat infant sleep products meet

the Bassinet Standard, effectively banning such products. AR 2086. This was arbitrary and capricious in multiple respects.

*First*, the Commission impermissibly extrapolated from limited and anecdotal data involving disparate previously unregulated flat sleep products—including several one-of-a-kind situations—to support a sweeping ban. *See Zen Magnets*, 841 F.3d at 1151 (vacating a rule where the Commission "extrapolate[d]" a nationwide trend based on "imprecis[e]" injury reports, such that only a small fraction of the reports definitely involved the product being regulated); *Gulf S. Insulation v. CPSC*, 701 F.2d 1137, 1146 (5th Cir. 1983) (vacating a rule where the Commission, *inter alia*, over-relied on a "single experiment," involving "only 240 subjects," to "make precise estimates of . . . risk"). There was no reasoned basis for the Commission's reliance upon these varied incident reports—ranging from "lock/latch" issues to mold to cuts on mesh to using products in unintended ways—to lump together dozens of different products for uniform regulation.

*Second*, and relatedly, the Commission recognized that the hazard patterns "varied according to the type and usage pattern of the product," AR 2105, and yet unjustifiably adopted a one-size-fits-all rule for previously unregulated flat sleep products, lumping them together with inclined sleepers, ignoring variations across products, and subjecting all products to a standard for an entirely different product (bassinets). *See Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C.

Cir. 1994) ("An agency must justify its failure to take account of circumstances that appear to warrant different treatment for different parties."); *Dow AgroSciences LLC v. National Marine Fisheries Service*, 707 F.3d 462, 473–74 (4th Cir. 2013) (finding a rule that uniformly treated "variable water environments" in a "one-size-fits-all" manner was arbitrary and capricious in light of the agency's "fail[ure] to address why the [rules] do not vary according to channel depth and width"; the agency did not, for instance, "explain why buffers designed to protect 'off channel habitats' should also apply to protect large, flowing rivers").

It is beyond dispute that any harm to an infant is a tragedy. But the Commission here failed to connect the cited incident reports to its categorical conclusion that a wide swath of disparate flat sleep products may not exist unless they become a different product. Notably, the 11 fatality reports cited by the Commission were spread across *all* previously unregulated flat products, in contrast to 83 deaths relating to inclined sleepers alone, AR 1157, 1159, 2102, and to the "more than 9,500 injuries and over 100 deaths relating to cribs, playpens and bassinets [that] are seen in U.S. emergency departments each year." *Cribs, Playpens, and Bassinets*, Nationwide Children's (last visited Nov. 8, 2021), https://bit.ly/3m1uRxm. Yet cribs, bassinets, and play yards have all long been permitted by the Commission, whereas previously unregulated sleep products are now effectively banned. 16 C.F.R. § 1219 (cribs); 16 C.F.R. § 1218 (bassinets);

16 C.F.R. § 1221 (play yards).

**_Finally_**, the Commission impermissibly adopted a rule based on claimed risks from infant products (including baby boxes[2]) and hazard situations (such as in-bed sleeper overlay) that are not supported by the evidence cited. *See American Federation of Gov't Employees, Local 2924 v. Federal Labor Relations Authority*, 470 F.3d 375, 381 (D.C. Cir. 2006) ("We will uphold the [agency's] decision, if, but only if, we can discern a reasoned path from the facts and considerations before the [agency] to the decision it reached." (quotation marks omitted)). The Commission identified *zero* injuries or fatalities (or any other incident reports) relating to baby boxes. And yet, the Rule forces baby box purveyors to either incur hundreds of thousands of dollars to redesign their products into bassinets (which they are not), or else shut down. Likewise, the Commission identified *zero* incidents of overlay involving an in-bed sleeper, yet sought to justify the Rule as mitigating that risk, AR 2123. If anything, the absence of any overlay evidence supports the many comments observing that in-bed sleepers—now banned—mitigate the risk of overlay while bedsharing. *See infra*.

Because there is no "rational connection between the facts found and the choice made" by the Commission with respect to previously unregulated flat sleep

---

[2] Besides baby boxes, "baby nests"—also banned—were likewise not specifically referenced in any of the incident reports referenced in the Rule. AR 2104–05.

products, including because the Commission's "explanation for its decision [] runs counter to the evidence before the agency," the Rule's inclusion of previously unregulated flat sleep products is arbitrary and capricious and should be vacated. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

> **B.** **The Commission Impermissibly Banned Baby Boxes and In-Bed Sleepers Despite Uncontroverted Evidence Indicating that Doing So Will Increase Risks to Infant Safety**

Under Section 104, the Commission may adjust voluntary standards only to "further reduce the risk of injury associated with [infant] products." 15 U.S.C. § 2056a(b)(1)(B)(ii). By adopting the Rule despite undisputed evidence that the Rule *increases* risks to infants, the Commission disregarded its statutory duty, "entirely failed to consider an important aspect of the problem," and acted arbitrarily and capriciously. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quotations omitted).

***First***, with respect to baby boxes, the undisputed evidence made plain that baby boxes make infants *safer*. In one study cited by a commenter, 1,312 new parents in Wisconsin received a baby box at the time of hospital discharge, 62% reported still using the box at follow-up appointments, and 9% reported that the baby box was "the only safe sleep space in their home." AR 568. That same commenter pointed out that even based on the generous assumption that every single live birth in the United States has access to a crib or play yard, those products would have an injury rate of 3-4 injuries per 1,000 units—as opposed to baby boxes, which are

associated with *no* incident reports of injuries. *Id.* Another commenter noted that since baby boxes emerged in Finland in the 1930s, the infant mortality rate in Finland has dropped from 1 in 10 children to 2 deaths in 1,000 children. AR 1605. The Commission neglected entirely to acknowledge, much less factor in, the fact that baby boxes (among numerous other products the Rule will ban) have a stellar safety record and are widely viewed as preventing—not risking—infant harm.

***Second***, with respect to in-bed sleepers, numerous commenters pointed out that (1) millions of parents in the United States bedshare; (2) they do so for a variety of reasons, and there is research showing that bedsharing can have positive effects on infant health; (3) bedsharing parents are unlikely to stop bedsharing even if told to do so; (4) bedsharing presents a risk of overlay; (5) there is research showing that in-bed sleepers mitigate the risk of overlay; and (6) the Commission has not identified a single instance of overlay with an in-bed sleeper. *See*, *e.g.*, AR 559, 616–17, 911, 913, 934, 2008, 2060.

A comment submitted on behalf of a group of professionals who had spent their "entire careers in the field of product safety" is representative. AR 916. It explained that in-bed sleepers are designed to facilitate bedsharing for "parents who wish to be close—both visually and tactilely—to their babies at night," but who also may want "some barrier separating them from their baby" to reduce the risk of overlay. AR 917. The comment cited studies estimating that between 61% and 76%

of American parents bedshare, and studies showing that bedsharing "affords health and emotional benefits to mothers and babies," such as "increased breastfeeding and reduced stress" to the baby. AR 918–19. The comment explained that parents bedshare for varied reasons: "to facilitate breastfeeding, desire to be close to the baby (for bonding), to comfort a sick child, to alleviate parental anxiety, generational guidance, and cultural reasons," in addition to parents who "do not intend to bedshare, but circumstances cause them to bring the baby into the bed (*e.g.*, to feed the baby, or if the baby is fussy or having difficulty sleeping)." AR 919.

The comment collected studies showing that for parents who bedshare, the advice of an expert or doctor telling them not to has "no impact," even when parents have "an awareness of risks." AR 919–22. The comment noted that overlay is a significant danger of bedsharing and that the "perimeter sides" of in-bed sleepers "mitigate[], and in some cases prevent[], the risks of overlay." AR 922. The comment cited several studies substantiating this safety effect. AR 922–25. Finally, the comment pointed out that "it is a mistake to think that removing in-bed sleepers from the market will cause consumers to place babies to sleep in a crib, bassinet, or cradle. For these parents, the alternative to using an in-bed sleeper is to put the baby directly on the mattress," where the risk of overlay is much higher. AR 926.

The Commission disputed none of these points. Instead, the Commission provided two insufficient responses. First, the Commission reasoned that, "CPSC

data for in-bed sleepers is anecdotal in nature, and therefore, we may not have received overlay incidents that involve an in-bed sleeper, but the large number of overlay incidents reported to the CPSC generally indicate that bedsharing can be hazardous." AR 2123. Second, including as articulated in Commissioner Adler's voting statement, the Commission reasoned that it regulates "products" not "behavior," so parents can continue to bedshare. AR 2094.

That reasoning for banning in-bed sleepers is arbitrary and capricious. To begin, the Commission is entitled to no deference for its unsupported hunch that because *bedsharing* risks overlay, *in-bed sleepers* also risk overlay. *See*, *e.g.*, *United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (courts "do not defer to the agency's conclusory or unsupported suppositions" (quotation marks omitted)). To the contrary, the undisputed evidence supplied by commenters indicates that in-bed sleepers *mitigate the risk* of overlay from the bedsharing that will inevitably continue to occur. *See supra* at 17–18, 22, 49–50.

Moreover, the Commission's obligation under the CPSIA to decide if a more stringent standard would "further reduce the risk of injury," 15 U.S.C. § 2056a(b), does not allow it to blind itself to human behavior, to the extent that is an "important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. If a known, established behavior (here, bedsharing) risks "injury" absent the availability of a product that mitigates the risk (here, in-bed sleepers), it is arbitrary and capricious

51

for the Commission to ignore reality and knowingly send infants into harm's way. *See*, *e.g.*, *Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Admin.*, 429 F.3d 1136, 1146 (D.C. Cir. 2005) (finding an agency rule arbitrary and capricious because the agency "ignore[d] . . . documented risks").  In any event, the Commission's attempted distinction between "products" and "behavior" fails on its own terms: the Commission contended it regulates "products" not "behavior," AR 2094, yet banned in-bed sleepers based on a behavior (bedsharing) absent evidence of danger associated with the product (overlay with in-bed sleepers).  *See*, *e.g.*, *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (holding agency action arbitrary because it was "internally inconsistent").

At bottom, the Commission's decision to ban all previously unregulated flat sleep products unless they redesign to be bassinets—based on claimed risks from *bedsharing*—is irrational and "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43—indeed, *the* important aspect of the problem, infant safety.  As the uncontroverted evidence shows, bedsharing will occur with or without this Rule, and the unavailability of baby boxes and in-bed sleepers will make bedsharing less safe.  The Commission's adoption of the Rule while blinding itself to reality and disclaiming responsibility for the regulation's threat to infant safety is arbitrary and capricious, and requires vacatur with respect to previously unregulated flat sleep products.

## CONCLUSION

The Court should vacate the Rule with respect to previously unregulated flat infant sleep products.

Dated: November 8, 2021

Respectfully submitted,

/s/  Kathleen R. Hartnett
KATHLEEN R. HARTNETT
JULIE VEROFF
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com
jveroff@cooley.com

ADAM M. KATZ
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and D.C. Circuit Rule 32(e), I hereby certify that this brief complies with the applicable type-volume limitations. The brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1), the brief contains 12,981 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare this brief.

/s/ Kathleen R. Hartnett
KATHLEEN R. HARTNETT

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of November, 2021, the foregoing statement of issues was served on all registered counsel through this court's electronic filing system.

/s/ Kathleen R. Hartnett
KATHLEEN R. HARTNETT

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM TABLE OF CONTENTS

15 U.S.C. § 2056 ..................................................................Add. 3

15 U.S.C. § 2056a ................................................................Add. 5

15 U.S.C. § 2057 ................................................................Add. 12

15 U.S.C. § 2058 ................................................................Add. 13

15 U.S.C. § 2060 ................................................................Add. 21

15 U.S.C. § 2064 (excerpt) ................................................Add. 25

# 15 U.S.C. § 2056

**Consumer product safety standards**

**(a) Types of requirements**

The Commission may promulgate consumer product safety standards in accordance with the provisions of section 2058 of this title. A consumer product safety standard shall consist of one or more of any of the following types of requirements:

**(1)** Requirements expressed in terms of performance requirements.

**(2)** Requirements that a consumer product be marked with or accompanied by clear and adequate warnings or instructions, or requirements respecting the form of warnings or instructions.

Any requirement of such a standard shall be reasonably necessary to prevent or reduce an unreasonable risk of injury associated with such product.

**(b) Reliance of Commission upon voluntary standards**

**(1)** The Commission shall rely upon voluntary consumer product safety standards rather than promulgate a consumer product safety standard prescribing requirements described in subsection (a) whenever compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed and it is likely that there will be substantial compliance with such voluntary standards.

**(2)** The Commission shall devise procedures to monitor compliance with any voluntary standards—

**(A)** upon which the Commission has relied under paragraph (1);

**(B)** which were developed with the participation of the Commission; or

**(C)** whose development the Commission has monitored.

**(c) Contribution of Commission to development cost**

If any person participates with the Commission in the development of a consumer product safety standard, the Commission may agree to contribute to the person's cost with respect to such participation, in any case in which the Commission determines that such contribution is likely to result in a more satisfactory standard than would be developed without such contribution, and that the person is financially responsible. Regulations of the Commission shall set forth the items of cost in which it may participate, and shall exclude any contribution to the acquisition of land or buildings. Payments under agreements entered into under this subsection may be made without regard to section 3324(a) and (b) of title 31.

# 15 U.S.C. § 2056a

## Standards and consumer registration of durable nursery products

### (a) Short title

This section may be cited as the "Danny Keysar Child Product Safety Notification Act".

### (b) Safety standards

#### (1) In general

The Commission shall—

**(A)** in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts, examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products; and

**(B)** in accordance with section 553 of title 5, promulgate consumer product safety standards that—

**(i)** are substantially the same as such voluntary standards; or

**(ii)** are more stringent than such voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with such products.

#### (2) Timetable for rulemaking

Not later than 1 year after August 14, 2008, the Commission shall commence the rulemaking required under paragraph (1) and shall promulgate standards for no fewer than 2 categories of durable infant or toddler products every 6 months thereafter, beginning with the product categories that the Commission determines to be of highest priority, until the Commission has promulgated standards for all such product categories. Thereafter, the Commission shall periodically review and revise the standards set forth under this subsection to ensure that such standards provide the highest level of safety for such products that is feasible.

**(3) Judicial review**

Any person adversely affected by such standards may file a petition for review under the procedures set forth in section 2060(g) of this title, as added by section 236 of this Act.

**(4) Process for considering subsequent revisions to voluntary standard**

**(A) Notice of adoption of voluntary standard**

When the Commission promulgates a consumer product safety standard under this subsection that is based, in whole or in part, on a voluntary standard, the Commission shall notify the organization that issued the voluntary standard of the Commission's action and shall provide a copy of the consumer product safety standard to the organization.

**(B) Commission action on revised voluntary standard**

If an organization revises a standard that has been adopted, in whole or in part, as a consumer product safety standard under this subsection, it shall notify the Commission. The revised voluntary standard shall be considered to be a consumer product safety standard issued by the Commission under section 2058 of this title, effective 180 days after the date on which the organization notifies the Commission (or such later date specified by the Commission in the Federal Register) unless, within 90 days after receiving that notice, the Commission notifies the organization that it has determined that the proposed revision does not improve the safety of the consumer product covered by the standard and that the Commission is retaining the existing consumer product safety standard.

**(c) Cribs**

**(1) In general**

It shall be a violation of section 2068(a)(1) of this title for any person to which this subsection applies to manufacture, sell, contract to sell or resell, lease, sublet, offer, provide for use, or otherwise place in the stream of commerce a crib that is not in compliance with a standard promulgated under subsection (b).

**(2) Persons to which subsection applies**

This subsection applies to any person that—

   **(A)** manufactures, distributes in commerce, or contracts to sell cribs;

   **(B)** based on the person's occupation, holds itself out as having knowledge or skill peculiar to cribs, including child care facilities and family child care homes;

   **(C)** is in the business of contracting to sell or resell, lease, sublet, or otherwise place cribs in the stream of commerce; or

   **(D)** owns or operates a place of public accommodation affecting commerce (as defined in section 2203 of this title applied without regard to the phrase "not owned by the Federal Government").

**(3) Application of any revision**

With respect to any revision of the standard promulgated under subsection (b)(1)(B) subsequent to the initial promulgation of a standard under such subsection, paragraph (1) shall apply only to a person that manufactures or imports cribs, unless the Commission determines that application to any other person described in paragraph (2) is necessary to protect against an unreasonable risk to health or safety. If the Commission determines that application to a person described in paragraph (2) is necessary, it shall provide not less than 12 months for such person to come into compliance.

**(4) Crib defined**

In this subsection, the term "crib" includes—

   **(A)** new and used cribs;

   **(B)** full-sized or nonfull-sized cribs; and

   **(C)** portable cribs and crib-pens.

**(d) Consumer registration requirement**

**(1) Rulemaking**

Notwithstanding any provision of chapter 6 of title 5 or the Paperwork Reduction Act of 1980 (44 U.S.C. 3501 et seq.), not later than 1 year after August 14, 2008, the Commission shall, pursuant to its authority under section 2065(b) of this title, promulgate a final consumer product safety rule to require each manufacturer of a durable infant or toddler product—

**(A)** to provide consumers with a postage-paid consumer registration form with each such product;

**(B)** to maintain a record of the names, addresses, e-mail addresses, and other contact information of consumers who register their ownership of such products with the manufacturer in order to improve the effectiveness of manufacturer campaigns to recall such products; and

**(C)** to permanently place the manufacturer name and contact information, model name and number, and the date of manufacture on each durable infant or toddler product.

**(2) Requirements for registration form**

The registration form required to be provided to consumers under paragraph (1) shall—

**(A)** include spaces for a consumer to provide the consumer's name, address, telephone number, and e-mail address;

**(B)** include space sufficiently large to permit easy, legible recording of all desired information;

**(C)** be attached to the surface of each durable infant or toddler product so that, as a practical matter, the consumer must notice and handle the form after purchasing the product;

**(D)** include the manufacturer's name, model name and number for the product, and the date of manufacture;

**(E)** include a message explaining the purpose of the registration and designed to encourage consumers to complete the registration;

**(F)** include an option for consumers to register through the Internet; and
**(G)** include a statement that information provided by the consumer shall not be used for any purpose other than to facilitate a recall of or safety alert regarding that product.

In issuing regulations under this section, the Commission may prescribe the exact text and format of the required registration form.

### (3) Record keeping and notification requirements

The rules required under this section shall require each manufacturer of a durable infant or toddler product to maintain a record of registrants for each product manufactured that includes all of the information provided by each consumer registered, and to use such information to notify such consumers in the event of a voluntary or involuntary recall of or safety alert regarding such product. Each manufacturer shall maintain such a record for a period of not less than 6 years after the date of manufacture of the product. Consumer information collected by a manufacturer under this Act may not be used by the manufacturer, nor disseminated by such manufacturer to any other party, for any purpose other than notification to such consumer in the event of a product recall or safety alert.

### (4) Study

The Commission shall conduct a study at such time as it considers appropriate on the effectiveness of the consumer registration forms required by this section in facilitating product recalls and whether such registration forms should be required for other children's products. Not later than 4 years after August 14, 2008, the Commission shall report its findings to the appropriate Congressional committees.

### (e) Use of alternative recall notification technology

### (1) Technology assessment and report

The Commission shall—

**(A)** beginning 2 years after a rule is promulgated under subsection (d), regularly review recall notification technology and assess the effectiveness

of such technology in facilitating recalls of durable infant or toddler products; and

**(B)** not later than 3 years after August 14, 2008, and periodically thereafter as the Commission considers appropriate, transmit a report on such assessments to the appropriate Congressional committees.

## (2) Determination

If, based on the assessment required by paragraph (1), the Commission determines by rule that a recall notification technology is likely to be as effective or more effective in facilitating recalls of durable infant or toddler products as the registration forms required by subsection (d), the Commission—

**(A)** shall submit to the appropriate Congressional committees a report on such determination; and

**(B)** shall permit a manufacturer of durable infant or toddler products to use such technology in lieu of such registration forms to facilitate recalls of durable infant or toddler products.

## (f) Definition of durable infant or toddler product

As used in this section, the term "durable infant or toddler product"—

**(1)** means a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years; and

**(2)** includes—

**(A)** full-size cribs and nonfull-size cribs;

**(B)** toddler beds;

**(C)** high chairs, booster chairs, and hook-on chairs;

**(D)** bath seats;

**(E)** gates and other enclosures for confining a child;

**(F)** play yards;

**(G)** stationary activity centers;

**(H)** infant carriers;

**(I)** strollers;

**(J)** walkers;

**(K)** swings; and

**(L)** bassinets and cradles.

# 15 U.S.C. § 2057

**Banned hazardous products**

Whenever the Commission finds that—

> **(1)** a consumer product is being, or will be, distributed in commerce and such consumer product presents an unreasonable risk of injury; and

> **(2)** no feasible consumer product safety standard under this chapter would adequately protect the public from the unreasonable risk of injury associated with such product,

the Commission may, in accordance with section 2058 of this title, promulgate a rule declaring such product a banned hazardous product.

**Procedure for consumer product safety rules**

**(a) Commencement of proceeding; publication of prescribed notice of proposed rulemaking; transmittal of notice**

A proceeding for the development of a consumer product safety rule may be commenced by the publication in the Federal Register of an advance notice of proposed rulemaking which shall—

**(1)** identify the product and the nature of the risk of injury associated with the product;

**(2)** include a summary of each of the regulatory alternatives under consideration by the Commission (including voluntary consumer product safety standards);

**(3)** include information with respect to any existing standard known to the Commission which may be relevant to the proceedings, together with a summary of the reasons why the Commission believes preliminarily that such standard does not eliminate or adequately reduce the risk of injury identified in paragraph (1);

**(4)** invite interested persons to submit to the Commission, within such period as the Commission shall specify in the notice (which period shall not be less than 30 days or more than 60 days after the date of publication of the notice), comments with respect to the risk of injury identified by the Commission, the regulatory alternatives being considered, and other possible alternatives for addressing the risk;

**(5)** invite any person (other than the Commission) to submit to the Commission, within such period as the Commission shall specify in the notice (which period shall not be less than 30 days after the date of publication of the notice), an existing standard or a portion of a standard as a proposed consumer product safety standard; and

**(6)** invite any person (other than the Commission) to submit to the Commission, within such period as the Commission shall specify in the notice (which period shall not be less than 30 days after the date of publication of the

notice), a statement of intention to modify or develop a voluntary consumer product safety standard to address the risk of injury identified in paragraph (1) together with a description of a plan to modify or develop the standard.

The Commission shall transmit such notice within 10 calendar days to the appropriate Congressional committees.

## (b) Voluntary standard; publication as proposed rule; notice of reliance of Commission on standard

**(1)** If the Commission determines that any standard submitted to it in response to an invitation in a notice published under subsection (a)(5) if promulgated (in whole, in part, or in combination with any other standard submitted to the Commission or any part of such a standard) as a consumer product safety standard, would eliminate or adequately reduce the risk of injury identified in a notice under subsection (a)(1), the Commission may publish such standard, in whole, in part, or in such combination and with nonmaterial modifications, as a proposed consumer product safety rule.

**(2)** If the Commission determines that—

**(A)** compliance with any standard submitted to it in response to an invitation in a notice published under subsection (a)(6) is likely to result in the elimination or adequate reduction of the risk of injury identified in the notice, and

**(B)** it is likely that there will be substantial compliance with such standard, the Commission shall terminate any proceeding to promulgate a consumer product safety rule respecting such risk of injury and shall publish in the Federal Register a notice which includes the determination of the Commission and which notifies the public that the Commission will rely on the voluntary standard to eliminate or reduce the risk of injury, except that the Commission shall terminate any such proceeding and rely on a voluntary standard only if such voluntary standard is in existence. For purposes of this section, a voluntary standard shall be considered to be in existence when it is finally approved by the organization or other person which developed such standard, irrespective of the effective date of the standard. Before relying upon any voluntary consumer product safety standard, the Commission shall afford interested persons (including manufacturers, consumers, and consumer organizations) a reasonable opportunity to submit written comments regarding

such standard. The Commission shall consider such comments in making any determination regarding reliance on the involved voluntary standard under this subsection.

## (c) Publication of proposed rule; preliminary regulatory analysis; contents; transmittal of notice

No consumer product safety rule may be proposed by the Commission unless the Commission publishes in the Federal Register the text of the proposed rule, including any alternatives, which the Commission proposes to promulgate, together with a preliminary regulatory analysis containing—

**(1)** a preliminary description of the potential benefits and potential costs of the proposed rule, including any benefits or costs that cannot be quantified in monetary terms, and an identification of those likely to receive the benefits and bear the costs;

**(2)** a discussion of the reasons any standard or portion of a standard submitted to the Commission under subsection (a)(5) was not published by the Commission as the proposed rule or part of the proposed rule;

**(3)** a discussion of the reasons for the Commission's preliminary determination that efforts proposed under subsection (a)(6) and assisted by the Commission as required by section 2054(a)(3) of this title would not, within a reasonable period of time, be likely to result in the development of a voluntary consumer product safety standard that would eliminate or adequately reduce the risk of injury addressed by the proposed rule; and

**(4)** a description of any reasonable alternatives to the proposed rule, together with a summary description of their potential costs and benefits, and a brief explanation of why such alternatives should not be published as a proposed rule.

The Commission shall transmit such notice within 10 calendar days to the appropriate Congressional committees. Any proposed consumer product safety rule shall be issued within twelve months after the date of publication of the notice, unless the Commission determines that such proposed rule is not reasonably necessary to eliminate or reduce the risk of injury associated with the product or is not in the public interest. The Commission may extend the twelve-month period for good cause. If the Commission extends such period, it

shall immediately transmit notice of such extension to the appropriate Congressional committees. Such notice shall include an explanation of the reasons for such extension, together with an estimate of the date by which the Commission anticipates such rulemaking will be completed. The Commission shall publish notice of such extension and the information submitted to the Congress in the Federal Register. Nothing in this subsection shall preclude any person from submitting an existing standard or portion of a standard as a proposed consumer product safety standard.

**(d) Promulgation of rule; time**

**(1)** Within 60 days after the publication under subsection (c) of a proposed consumer product safety rule respecting a risk of injury associated with a consumer product, the Commission shall—

**(A)** promulgate a consumer product safety rule respecting the risk of injury associated with such product, if it makes the findings required under subsection (f), or

**(B)** withdraw the applicable notice of proposed rulemaking if it determines that such rule is not (i) reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with the product, or (ii) in the public interest;

except that the Commission may extend such 60-day period for good cause shown (if it publishes its reasons therefor in the Federal Register).

**(2)** Consumer product safety rules shall be promulgated in accordance with section 553 of title 5, except that the Commission shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions. A transcript shall be kept of any oral presentation.

**(e) Expression of risk of injury; consideration of available product data; needs of elderly and handicapped**

A consumer product safety rule shall express in the rule itself the risk of injury which the standard is designed to eliminate or reduce. In promulgating such a rule the Commission shall consider relevant available product data including the results of research, development, testing, and investigation activities

conducted generally and pursuant to this chapter. In the promulgation of such a rule the Commission shall also consider and take into account the special needs of elderly and handicapped persons to determine the extent to which such persons may be adversely affected by such rule.

**(f) Findings; final regulatory analysis; judicial review of rule**

**(1)** Prior to promulgating a consumer product safety rule, the Commission shall consider, and shall make appropriate findings for inclusion in such rule with respect to—

**(A)** the degree and nature of the risk of injury the rule is designed to eliminate or reduce;

**(B)** the approximate number of consumer products, or types or classes thereof, subject to such rule;

**(C)** the need of the public for the consumer products subject to such rule, and the probable effect of such rule upon the utility, cost, or availability of such products to meet such need; and

**(D)** any means of achieving the objective of the order while minimizing adverse effects on competition or disruption or dislocation of manufacturing and other commercial practices consistent with the public health and safety.

**(2)** The Commission shall not promulgate a consumer product safety rule unless it has prepared, on the basis of the findings of the Commission under paragraph (1) and on other information before the Commission, a final regulatory analysis of the rule containing the following information:

**(A)** A description of the potential benefits and potential costs of the rule, including costs and benefits that cannot be quantified in monetary terms, and the identification of those likely to receive the benefits and bear the costs.

**(B)** A description of any alternatives to the final rule which were considered by the Commission, together with a summary description of their potential benefits and costs and a brief explanation of the reasons why these alternatives were not chosen.

**(C)** A summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the Commission of such issues.

The Commission shall publish its final regulatory analysis with the rule.

**(3)** The Commission shall not promulgate a consumer product safety rule unless it finds (and includes such finding in the rule)—

**(A)** that the rule (including its effective date) is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with such product;

**(B)** that the promulgation of the rule is in the public interest;

**(C)** in the case of a rule declaring the product a banned hazardous product, that no feasible consumer product safety standard under this chapter would adequately protect the public from the unreasonable risk of injury associated with such product;

**(D)** in the case of a rule which relates to a risk of injury with respect to which persons who would be subject to such rule have adopted and implemented a voluntary consumer product safety standard, that—

**(i)** compliance with such voluntary consumer product safety standard is not likely to result in the elimination or adequate reduction of such risk of injury; or

**(ii)** it is unlikely that there will be substantial compliance with such voluntary consumer product safety standard;

**(E)** that the benefits expected from the rule bear a reasonable relationship to its costs; and

**(F)** that the rule imposes the least burdensome requirement which prevents or adequately reduces the risk of injury for which the rule is being promulgated.

**(4)**

**(A)** Any preliminary or final regulatory analysis prepared under subsection (c) or (f)(2) shall not be subject to independent judicial review, except that when an action for judicial review of a rule is instituted, the contents of any such regulatory analysis shall constitute part of the whole rulemaking record of agency action in connection with such review.

**(B)** The provisions of subparagraph (A) shall not be construed to alter the substantive or procedural standards otherwise applicable to judicial review of any action by the Commission.

**(g) Effective date of rule or standard; stockpiling of product**

**(1)** Each consumer product safety rule shall specify the date such rule is to take effect not exceeding 180 days from the date promulgated, unless the Commission finds, for good cause shown, that a later effective date is in the public interest and publishes its reasons for such finding. The effective date of a consumer product safety standard under this chapter shall be set at a date at least 30 days after the date of promulgation unless the Commission for good cause shown determines that an earlier effective date is in the public interest. In no case may the effective date be set at a date which is earlier than the date of promulgation. A consumer product safety standard shall be applicable only to consumer products manufactured after the effective date.

**(2)** The Commission may by rule prohibit a manufacturer of a consumer product from stockpiling any product to which a consumer product safety rule applies, or to which a rule under this chapter or similar rule, regulation, standard, or ban under any other Act enforced by the Commission applies, so as to prevent such manufacturer from circumventing the purpose of such rule, regulation, standard, or ban. For purposes of this paragraph, the term "stockpiling" means manufacturing or importing a product between the date of promulgation of such rule, regulation, standard, or ban and its effective date at a rate which is significantly greater (as determined under the rule under this paragraph) than the rate at which such product was produced or imported during a base period (prescribed in the rule under this paragraph) ending before the date of promulgation of the rule, regulation, standard, or ban.

**(h) Amendment or revocation of rule**

The Commission may by rule amend or revoke any consumer product safety rule. Such amendment or revocation shall specify the date on which it is to take effect which shall not exceed 180 days from the date the amendment or revocation is published unless the Commission finds for good cause shown that a later effective date is in the public interest and publishes its reasons for such finding. Where an amendment involves a material change in a consumer product safety rule, sections 2056 and 2057 of this title, and subsections (a) through (g) of this section shall apply. In order to revoke a consumer product safety rule, the Commission shall publish a proposal to revoke such rule in the Federal Register, and allow oral and written presentations in accordance with subsection (d)(2) of this section. It may revoke such rule only if it determines that the rule is not reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with the product. Section 2060 of this title shall apply to any amendment of a consumer product safety rule which involves a material change and to any revocation of a consumer product safety rule, in the same manner and to the same extent as such section applies to the Commission's action in promulgating such a rule.

**(i) Petition to initiate rulemaking**

The Commission shall grant, in whole or in part, or deny any petition under section 553(e) of title 5 requesting the Commission to initiate a rulemaking, within a reasonable time after the date on which such petition is filed. The Commission shall state the reasons for granting or denying such petition. The Commission may not deny any such petition on the basis of a voluntary standard unless the voluntary standard is in existence at the time of the denial of the petition, the Commission has determined that the voluntary standard is likely to result in the elimination or adequate reduction of the risk of injury identified in the petition, and it is likely that there will be substantial compliance with the standard.

# 15 U.S.C. § 2060

**Judicial review of consumer product safety rules**

## (a) Petition by persons adversely affected, consumers, or consumer organizations

Not later than 60 days after a consumer product safety rule is promulgated by the Commission, any person adversely affected by such rule, or any consumer or consumer organization, may file a petition with the United States court of appeals for the District of Columbia, or for the circuit in which such person, consumer, or organization resides or has his principal place of business for judicial review of such rule. Copies of the petition shall be forthwith transmitted by the clerk of the court to the Commission or other officer designated by it for that purpose and to the Attorney General. The record of the proceedings on which the Commission based its rule shall be filed in the court as provided for in section 2112 of title 28. For purposes of this section, the term "record" means such consumer product safety rule; any notice or proposal published pursuant to section 2056, 2057, or 2058 of this title; the transcript required by section 2058(d)(2) of this title of any oral presentation; any written submission of interested parties; and any other information which the Commission considers relevant to such rule.

## (b) Additional data, views, or arguments

If the petitioner applies to the court for leave to adduce additional data, views, or arguments and shows to the satisfaction of the court that such additional data, views, or arguments are material and that there were reasonable grounds for the petitioner's failure to adduce such data, views, or arguments in the proceeding before the Commission, the court may order the Commission to provide additional opportunity for the oral presentation of data, views, or arguments and for written submissions. The Commission may modify its findings, or make new findings by reason of the additional data, views, or arguments so taken and shall file such modified or new findings, and its recommendation, if any, for the modification or setting aside of its original rule, with the return of such additional data, views, or arguments.

## (c) Jurisdiction; costs and attorneys' fees; substantial evidence to support administrative findings

Upon the filing of the petition under subsection (a) of this section the court shall have jurisdiction to review the consumer product safety rule in accordance with chapter 7 of title 5, and to grant appropriate relief, including interim relief, as provided in such chapter. A court may in the interest of justice include in such relief an award of the costs of suit, including reasonable attorneys' fees (determined in accordance with subsection (f)[1] and reasonable expert witnesses' fees. Attorneys' fees may be awarded against the United States (or any agency or official of the United States) without regard to section 2412 of title 28 or any other provision of law. The consumer product safety rule shall not be affirmed unless the Commission's findings under sections 2058(f)(1) and 2058(f)(3) of this title are supported by substantial evidence on the record taken as a whole.

**(d) Supreme Court review**

The judgment of the court affirming or setting aside, in whole or in part, any consumer product safety rule shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of title 28.

**(e) Other remedies**

The remedies provided for in this section shall be in addition to and not in lieu of any other remedies provided by law.

**(f) Computation of reasonable fee for attorney**

For purposes of this section and sections 2072(a) and 2073 of this title, a reasonable attorney's fee is a fee (1) which is based upon (A) the actual time expended by an attorney in providing advice and other legal services in connection with representing a person in an action brought under this section, and (B) such reasonable expenses as may be incurred by the attorney in the provision of such services, and (2) which is computed at the rate prevailing for the provision of similar services with respect to actions brought in the court which is awarding such fee.

**(g) Expedited judicial review**

**(1) Application**

---

[1] So in original.  Probably should be followed by closing parenthesis.

This subsection applies, in lieu of the preceding subsections of this section, to judicial review of—

**(A)** any consumer product safety rule promulgated by the Commission pursuant to section 2064(j) of this title (relating to identification of substantial hazards);

**(B)** any consumer product safety standard promulgated by the Commission pursuant to section 2089 of this title (relating to all-terrain vehicles);

**(C)** any standard promulgated by the Commission under section 2056a of this title (relating to durable infant and toddler products); and

**(D)** any consumer product safety standard promulgated by the Commission under section 2056b of this title (relating to mandatory toy safety standards).

## (2) In general

Not later than 60 days after the promulgation, by the Commission, of a rule or standard to which this subsection applies, any person adversely affected by such rule or standard may file a petition with the United States Court of Appeals for the District of Columbia Circuit for judicial review of such rule. Copies of the petition shall be forthwith transmitted by the clerk of the court to the Commission or other officer designated by it for that purpose and to the Attorney General. The record of the proceedings on which the Commission based its rule shall be filed in the court as provided for in section 2112 of title 28.

## (3) Review

Upon the filing of the petition under paragraph (2) of this subsection, the court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5 and to grant appropriate relief, including interim relief, as provided in such chapter.

## (4) Conclusiveness of judgment

The judgment of the court affirming or setting aside, in whole or in part, any final rule under this section shall be final, subject to review by the Supreme

Court of the United States upon certiorari or certification, as provided in section 1254 of title 28.

**(5) Further review**

A rule or standard with respect to which this subsection applies shall not be subject to judicial review in proceedings under section 2066 of this title (relating to imported products) or in civil or criminal proceedings for enforcement.

# 15 U.S.C. § 2064 (excerpt)

**Substantial product hazards**

## (a) "Substantial product hazard" defined

For purposes of this section, the term "substantial product hazard" means—

**(1)** a failure to comply with an applicable consumer product safety rule under this chapter or a similar rule, regulation, standard, or ban under any other Act enforced by the Commission which creates a substantial risk of injury to the public, or

**(2)** a product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public.

## (b) Noncompliance with applicable consumer product safety rules; product defects; notice to Commission by manufacturer, distributor, or retailer

Every manufacturer of a consumer product, or other product or substance over which the Commission has jurisdiction under any other Act enforced by the Commission (other than motor vehicle equipment as defined in section 30102(a)(7) of title 49), distributed in commerce, and every distributor and retailer of such product, who obtains information which reasonably supports the conclusion that such product—

**(1)** fails to comply with an applicable consumer product safety rule or with a voluntary consumer product safety standard upon which the Commission has relied under section 2058 of this title;

**(2)** fails to comply with any other rule, regulation, standard, or ban under this chapter or any other Act enforced by the Commission;

**(3)** contains a defect which could create a substantial product hazard described in subsection (a)(2); or

**(4)** creates an unreasonable risk of serious injury or death,

shall immediately inform the Commission of such failure to comply, of such defect, or of such risk, unless such manufacturer, distributor, or retailer has actual knowledge that the Commission has been adequately informed of such defect, failure to comply, or such risk. A report provided under paragraph (2) may not be used as the basis for criminal prosecution of the reporting person under section 1264 of this title, except for offenses which require a showing of intent to defraud or mislead.

**(c) Notice of defect or failure to comply; mail notice**

**(1)** If the Commission determines (after affording interested persons, including consumers and consumer organizations, an opportunity for a hearing in accordance with subsection (f) of this section) that a product distributed in commerce presents a substantial product hazard and that notification is required in order to adequately protect the public from such substantial product hazard, or if the Commission, after notifying the manufacturer, determines a product to be an imminently hazardous consumer product and has filed an action under section 2061 of this title, the Commission may order the manufacturer or any distributor or retailer of the product to take any one or more of the following actions:

**(A)** To cease distribution of the product.

**(B)** To notify all persons that transport, store, distribute, or otherwise handle the product, or to which the product has been transported, sold, distributed, or otherwise handled, to cease immediately distribution of the product.

**(C)** To notify appropriate State and local public health officials.

**(D)** To give public notice of the defect or failure to comply, including posting clear and conspicuous notice on its Internet website, providing notice to any third party Internet website on which such manufacturer, retailer, distributor, or licensor has placed the product for sale, and announcements in languages other than English and on radio and television where the Commission determines that a substantial number of consumers to whom the recall is directed may not be reached by other notice.

**(E)** To mail notice to each person who is a manufacturer, distributor, or retailer of such product.

**(F)** To mail notice to every person to whom the person required to give notice knows such product was delivered or sold.

Any such order shall specify the form and content of any notice required to be given under such order.

**(2)** The Commission may require a notice described in paragraph (1) to be distributed in a language other than English if the Commission determines that doing so is necessary to adequately protect the public.

**(3)** If a district court determines, in an action filed under section 2061 of this title, that the product that is the subject of such action is not an imminently hazardous consumer product, the Commission shall rescind any order issued under this subsection with respect to such product.

. . . .