## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

FINNBIN, LLC,

Petitioner,

v.

CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

On Petition for Review

### BRIEF FOR RESPONDENT

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

SCOTT R. McINTOSH
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.     Parties and Amici**

Petitioner is Finnbin, LLC.   Respondent is the Consumer Product Safety Commission.   No amici curiae or intervenors have sought to participate before this Court.

**B.     Ruling Under Review**

The petition seeks review of a final rule of the Consumer Product Safety Commission, *Safety Standard for Infant Sleep Products*, 86 Fed. Reg. 33,022 (June 23, 2021) (JA__).

**C.     Related Cases**

This case has not previously been before this Court or any court.   The government's counsel are unaware of any related cases currently pending in this Court or any other court.

*/s/ Daniel Winik*
Daniel Winik

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF ISSUES ................................................................ 1

PERTINENT STATUTORY PROVISIONS ....................................... 2

STATEMENT OF THE CASE ........................................................... 2

    A.    Statutory Background ......................................................... 2

    B.    The Challenged Rulemaking ............................................... 7

SUMMARY OF ARGUMENT ......................................................... 14

STANDARD OF REVIEW .............................................................. 17

ARGUMENT ................................................................................ 18

I.    THE COMMISSION HAS AUTHORITY TO REGULATE PRODUCTS NOT GOVERNED BY A CURRENT VOLUNTARY STANDARD ................................ 18

    A.    Finnbin's Argument Was Never Presented To The Commission .................................................................... 18

    B.    Finnbin's Argument Is Incorrect ....................................... 19

        1.    Finnbin's argument is contrary to the statutory text ........ 20

        2.    Finnbin's position is inconsistent with the statutory structure and purpose ......................................... 24

        3.    Even if the statute permitted Finnbin's contrary construction, the Commission's interpretation would be entitled to deference ............................. 28

    C.    Finnbin's Efforts To Justify Its Position Are Unpersuasive ....... 29

II.  IT WAS NOT ARBITRARY OR CAPRICIOUS FOR THE COMMISSION TO SUBJECT BABY BOXES TO THE BASSINET STANDARD ................................. 33

    A.  The Commission Had Ample Reason To Require Baby Boxes To Have A Stand And Meet Stability Standards..............33

    B.  Finnbin's Responses Are Unpersuasive.......................................36

CONCLUSION ...................................................................................... 48

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.,*
   429 F.3d 1136 (D.C. Cir. 2005) ................................................. 18

*American Society for Testing & Materials v. Public.Resource.Org, Inc.,*
   896 F.3d 437 (D.C. Cir. 2018) ................................................................3

*American Textile Manufacturers Institute, Inc. v. Donovan,*
   452 U.S. 490 (1981) ....................................................................... 43, 47

*Association for Community Affiliated Plans v. Department of the Treasury,*
   966 F.3d 782 (D.C. Cir. 2020) ...........................................................30

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,*
   419 U.S. 281 (1974) ...............................................................................37

*Chamber of Commerce of the United States of America v. SEC,*
   412 F.3d 133 (D.C. Cir. 2005) .............................................................37

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984) ...............................................................................28

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ....................................................................... 28, 29

*Forester v. CPSC,*
   559 F.2d 774 (D.C. Cir. 1977) ..................................................... 37, 38

*Genus Medical Technologies LLC v. FDA,*
   994 F.3d 631 (D.C. Cir. 2021) .............................................................24

*Gulf South Insulation v. CPSC,*
   701 F.2d 1137 (5th Cir. 1983)..............................................................39

*Kimbrough v. United States,*
  552 U.S. 85 (2007) ......................................................................31

*Koretoff v. Vilsack,*
  707 F.3d 394 (D.C. Cir. 2013) ...................................................19

*National Lifeline Association v. FCC,*
  983 F.3d 498 (D.C. Cir. 2020) ...................................................17

*National Wildlife Federation v. EPA,*
  286 F.3d 554 (D.C. Cir. 2002) ...................................................19

*Natural Resources Defense Council v. Wheeler,*
  955 F.3d 68 (D.C. Cir. 2020) .....................................................46

*New York Stock Exchange LLC v. SEC,*
  962 F.3d 541 (D.C. Cir. 2020) ...................................................46

*NextEra Desert Center Blythe, LLC v. FERC,*
  852 F.3d 1118 (D.C. Cir. 2017) .................................................41

*North Carolina v. FERC,*
  730 F.2d 790 (D.C. Cir. 1984) ...................................................46

*Nuclear Energy Institute, Inc. v. EPA,*
  373 F.3d 1251 (D.C. Cir. 2004) .................................................19

*Stilwell v. Office of Thrift Supervision,*
  569 F.3d 514 (D.C. Cir. 2009) ...................................................37

*United States v. L.A. Tucker Truck Lines, Inc.,*
  344 U.S. 33 (1952) ......................................................................18

*Utility Air Regulatory Group v. EPA,*
  573 U.S. 302 (2014) ....................................................................32

*Zen Magnets, LLC v. CPSC,*
    841 F.3d 1141 (10th Cir. 2016) ................................................. 39, 42

**Statutes:**

Consumer Product Safety Act,
    Pub. L. No. 92-573, 86 Stat. 1207 (1972):
        § 2 ................................................................................................2
        § 4 ................................................................................................2
        § 7 ................................................................................................2

5 U.S.C. § 706(2)(A) ...........................................................................17

5 U.S.C. § 706(2)(C) ...........................................................................17

15 U.S.C. § 2056(b) .............................................................................24

15 U.S.C. § 2056(b)(1) ..........................................................................3

15 U.S.C. § 2056a ............................................. 7, 11, 12, 13, 14, 17, 19, 21, 23, 24,
                        25, 26, 27, 29, 30, 31, 32, 37, 42

15 U.S.C. § 2056a(b)(1) ........................................................ 1, 3, 6, 21

15 U.S.C. § 2056a(b)(1)(A) .................................................... 20, 21, 31

15 U.S.C. § 2056a(b)(1)(B) ...................................................................25

15 U.S.C. § 2056a(b)(1)(B)(ii) ...........................................................21

15 U.S.C. § 2056a(b)(2) ......................1, 6, 16-17, 22, 23, 30, 36, 39, 42, 43, 47, 48

15 U.S.C. § 2056a(b)(3) .......................................................................17

15 U.S.C. § 2056a(f)(1) .................................................................. 6, 20

15 U.S.C. § 2058(b) .............................................................................24

15 U.S.C. § 2058(f)(3)(A) .................................................... 3, 39, 42

15 U.S.C. § 2058(f)(3)(D) .................................................... 3, 24

15 U.S.C. § 2058(f)(3)(E) .................................................... 3, 42

15 U.S.C. § 2058(f)(3)(F) .................................................... 3, 42

15 U.S.C. § 2060(g)(3) ..........................................................17

29 U.S.C. § 655(b)(5) ............................................................43

**Regulations:**

16 C.F.R. pts. 1215-1235, 1237-1239.......................................7

16 C.F.R. pt. 1218 .................................................................7

16 C.F.R. pt. 1219 .................................................................7

16 C.F.R. pt. 1220 .................................................................7

16 C.F.R. pt. 1221 .................................................................7

16 C.F.R. pt. 1222 .................................................................7

**Legislative Materials:**

153 Cong. Rec.  7701 (2007) ............................................ 4, 25

153 Cong. Rec. 36,237 (2007) ...............................................5

154 Cong. Rec. 3449 (2008) ..................................................25

154 Cong. Rec. 3461 (2008) ....................................................5

H.R. 1698, 110th Cong. (2007).................................................4

H.R. 4040, 110th Cong. (2007)...............................................................5

H.R. Rep. No. 110-787 (2008) ...............................................................5

S. 2636, 110th Cong. (2008).....................................................................5

**Other Authorities:**

Finnbin, *Baby Box Boxinet*, https://perma.cc/E7QT-CKPH
  (last visited Nov. 16, 2021)................................................................45

*Safety Standard for Bassinets and Cradles,*
  78 Fed. Reg. 63,019 (Oct. 23, 2013)................................................35

*Safety Standard for Crib Bumpers/Liners,*
  85 Fed. Reg. 18,878 (Apr. 3, 2020) ..................................................7

*Safety Standard for Crib Mattresses,*
  85 Fed. Reg. 67,906 (Oct. 26, 2020)................................................7

*Safety Standard for Infant Inclined Sleep Products,*
  82 Fed. Reg. 16,963 (Apr. 7, 2017)..................................................8

*Safety Standard for Infant Inclined Sleep Products,*
  84 Fed. Reg. 60,949 (Nov. 12, 2019) ...............................................8

*Safety Standard for Infant Inclined Sleep Products,*
  86 Fed. Reg. 33,022 (June 23, 2021)..............8, 9, 10, 11, 12, 13, 26, 27, 28, 29,
                              31, 33, 34, 35, 36, 40, 44, 46, 47, 48

U. S. Consumer Prod. Safety Comm'n, *Fisher-Price Recalls*
  *Rock 'n Play Sleepers Due to Reports of Deaths* (Apr. 12, 2019),
  https://go.usa.gov/xMu3a. .............................................................7

# STATEMENT OF ISSUES

The Consumer Product Safety Improvement Act of 2008 directed the Consumer Product Safety Commission to "examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products" and then "promulgate consumer product safety standards that" are either "substantially the same as such voluntary standards" or "are more stringent than such voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with such products." 15 U.S.C. § 2056a(b)(1). The Act directed the Commission to continue promulgating such standards "until the Commission has promulgated standards for *all* … categories" of "durable infant and toddler products." *Id.* § 2056a(b)(2) (emphasis added).

Acting under those provisions, the Commission has promulgated a safety standard governing infant sleep products, including cardboard "baby boxes." The petition presents two questions:

1.     If outside standard-setting organizations do not adopt voluntary safety standards for a category of durable infant or toddler products, does their inaction strip the Commission of authority to promulgate a mandatory safety standard under § 2056a for that category of products?

2.     Was it reasonable for the Commission to require baby boxes to meet strength and stability requirements, and to be supported by a base, in light of record evidence that, without those safeguards, flat infant sleep products pose serious risks to infants?

## PERTINENT STATUTORY PROVISIONS

The pertinent statutory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory Background

1.     Congress established the Consumer Product Safety Commission in 1972 "to protect the public against unreasonable risks of injury associated with consumer products." Consumer Product Safety Act, Pub. L. No. 92-573, §§ 2, 4, 86 Stat. 1207, 1208, 1210-1211 (1972). Among the powers Congress gave the Commission was the authority to issue safety standards for consumer products. *Id.* § 7, 86 Stat. at 1212-1215.

That general authority to promulgate safety standards is cabined, however, in various ways. As amended, the Consumer Product Safety Act provides that "[t]he Commission shall rely upon voluntary consumer product safety standards," rather than issuing a mandatory standard, "whenever

compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed" by the voluntary standards, as long as "it is likely that there will be substantial compliance with such voluntary standards." 15 U.S.C. § 2056(b)(1). The Commission cannot promulgate a mandatory standard under this authority unless it finds that existing voluntary standards do not meet the statutory criteria, *id.* § 2058(f)(3)(D), and it must terminate its consideration of a proposed mandatory standard if a sufficient voluntary standard is issued, *id.* § 2058(b). The Commission also cannot promulgate a mandatory standard under this authority unless it determines that doing so "is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with" the product in question, "that the benefits expected from the [standard] bear a reasonable relationship to its costs," and that the standard "imposes the least burdensome requirement which prevents or adequately reduces the risk of injury for which [it] is being promulgated." *Id.* § 2058(f)(3)(A), (E), (F).

Voluntary product safety standards are developed by private organizations including ASTM International, originally known as the American Society for Testing and Materials. *See, e.g.*, *American Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 441 (D.C. Cir. 2018) (ASTM

issues "standards establish[ing] best practices and specifications in a wide variety of fields, including consumer products, textiles, medical services, electronics, construction, aviation, and petroleum products"). As Finnbin explains (at 4), ASTM determines its standards through a collaborative process that includes manufacturers as well as "academics, end users, and governments."

2. The limits on the Commission's general authority under the Consumer Product Safety Act drew the attention of lawmakers concerned about their effect on the safety of infant and toddler products. After unsuccessfully proposing related bills in prior congressional sessions, Congresswoman Jan Schakowsky introduced the Infant and Toddler Durable Product Safety Act in March 2007. H.R. 1698, 110th Cong. (2007). In remarks introducing the bill, she explained that "there are no mandatory safety standards for the majority of the children's products being sold today" and that, "although there may be voluntary standards in place, there are no requirements that all potential hazards are addressed in those standards." 153 Cong. Rec. 7701 (2007). The bill accordingly proposed to direct the Commission to promulgate a safety standard "for each durable infant or toddler product." H.R. 1698, § 5(a).

A version of that requirement was incorporated into a broader consumer product safety bill, H.R. 4040, § 104, 110th Cong. (2007). *See* 153 Cong. Rec. 36,237 (2007) (statement of Rep. Schakowsky) (H.R. 4040 "includes provisions from legislation I introduced to require long-overdue mandatory safety standards for durable infant and toddler products"). The same requirement was incorporated by amendment in the Senate version of the bill, S. 2636, 110th Cong. (2008). *See* 154 Cong. Rec. 3461-3463 (2008). In introducing that amendment, Senator Amy Klobuchar explained: "Right now the safety of the Nation's nursery products depends on a system of voluntary standards. And while voluntary standards are a good first step, we have seen over and over again that they are not enough." 154 Cong. Rec. 3449. The Conference Report on the bill—by then known as the Consumer Product Safety Improvement Act of 2008—explained that the provision in question "requires the Commission to promulgate rules to ensure the highest level of safety for durable infant and toddler products." H.R. Rep. No. 110-787, at 67 (2008) (Conf. Rep.).

As enacted, the provision states that "[t]he Commission shall"

> (A) in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child

product engineers and experts, examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products; and

    (B) in accordance with section 553 of Title 5, promulgate consumer product safety standards that—

        (i) are substantially the same as such voluntary standards; or

        (ii) are more stringent than such voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with such products.

15 U.S.C. § 2056a(b)(1). The statute defines a "'durable infant or toddler product'" as "a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years." *Id.* § 2056a(f)(1).

Congress directed the Commission to begin issuing mandatory standards under this new provision within one year after its enactment and to "promulgate standards for no fewer than 2 categories of durable infant or toddler products every 6 months thereafter, … until the Commission has promulgated standards for *all* such product categories." 15 U.S.C. § 2056a(b)(2) (emphasis added). After that point, the statute provides, "the Commission shall periodically review and revise the" set of standards "to ensure that such standards provide the highest level of safety for such products that is feasible." *Id.*

Aside from the standard challenged here, the Commission has issued mandatory standards governing 24 categories of durable infant or toddler products. *See* 16 C.F.R. pts. 1215-1235, 1237-1239. Rulemaking continues for other categories. *See, e.g.*, *Safety Standard for Crib Mattresses*, 85 Fed. Reg. 67,906 (Oct. 26, 2020) (notice of proposed rulemaking); *Safety Standard for Crib Bumpers/Liners*, 85 Fed. Reg. 18,878 (Apr. 3, 2020) (same).

**B.    The Challenged Rulemaking**

1.    Among the mandatory standards the Commission has promulgated under § 2056a are five that regulate products marketed and used for infant sleep: bassinets and cradles, 16 C.F.R. pt. 1218; full-size cribs, 16 C.F.R. pt. 1219; non-full-size cribs, 16 C.F.R. pt. 1220; play yards, 16 C.F.R. pt. 1221; and bedside sleepers, 16 C.F.R. pt. 1222.

Many products marketed for infant sleep, however, do not fall into one of those categories—and some have placed infants at risk of death or serious injury. In recent years, for example, the popular Rock 'n Play inclined sleeper was recalled after more than 30 infants died while using the product. U.S. Consumer Prod. Safety Comm'n, *Fisher-Price Recalls Rock 'n Play Sleepers Due to Reports of Deaths* (Apr. 12, 2019), https://go.usa.gov/xMu3a.

In 2017, the Commission issued a notice of proposed rulemaking to promulgate an additional mandatory standard for "infant inclined sleep products"—that is, products with a sleep surface at "an incline greater than 10 degrees from horizontal." *Safety Standard for Infant Inclined Sleep Products*, 82 Fed. Reg. 16,963, 16,964 (Apr. 7, 2017) (JA__). The Commission did not, however, promulgate a final rule based on the 2017 notice. Instead, in 2019, the Commission issued a supplemental notice of proposed rulemaking. *Safety Standard for Infant Sleep Products*, 84 Fed. Reg. 60,949 (Nov. 12, 2019) (JA__). The supplemental notice proposed a rule to cover *all* "infant sleep products" not governed by one of the five existing standards, as opposed to only the "infant inclined sleep products" covered by the 2017 notice. *Id.* at 60,951 (JA__). It proposed to subject such products to the requirements of the existing standard for bassinets and cradles and to limit the incline of their sleep surfaces to 10 degrees or less. *Id.*

2. The Commission finalized the rule largely as proposed in the 2019 supplemental notice. *Safety Standard for Infant Sleep Products*, 86 Fed. Reg. 33,022 (June 23, 2021) (JA__). The final rule "requires that 'infant sleep products'"—"defined as products marketed or intended to provide a sleeping accommodation for an infant up to 5 months of age, and that are not

covered by" one of the five existing mandatory standards for products marketed for infant sleep—"meet the requirements" of the bassinet and cradle standard, including by "conforming to the definition of a 'bassinet/cradle,'" and have a sleep surface inclined at an angle of 10 degrees or less. *Id.* at 33,024 (JA__). The previously "unregulated sleep products" covered by the rule include "[i]nfant inclined sleep products, in-bed sleepers, baby boxes, compact/travel bassinets without handles or handholds, and infant travel tents." *Id.* at 33,033 (JA__).

The Commission explained that the objective of the rule was "to set a baseline of safety for infant sleep products." 86 Fed. Reg. at 33,024 (JA__). The preamble surveys evidence of hazards related to infant sleep products—both flat and inclined—that were not subject to the Commission's existing standards. *Id.* at 33,028-33,033 (JA__). As to flat products—*i.e.*, those "with a sleep surface angle equal to or less than 10 degrees," *id.* at 33,022 (JA__)—the Commission identified actual incidents in which infants had "fall[en] out of the product or" not been "kept contained within the product," as well as incidents in which "products ha[d] slipped off or flipped over from the adult beds/couches on which they were resting," among other hazards. *Id.* at 33,031 (JA__). The Commission identified 11 deaths and 16 injuries to infants

"associated with the use of flat sleep products" during the two-year span it examined.  *Id.* at 33,030-33,031 (JA\_\_).

The Commission explained that the rule "addresses" those "hazards" by subjecting all infant sleep products, as defined in the rule, to "the requirements of the bassinet and cradle standard."  86 Fed. Reg. at 33,033 (JA\_\_).  That standard (including the definition of a bassinet or cradle) requires covered sleep products to be supported by a base or stand, *id.* at 33,043 (JA\_\_), to pass a "[s]tatic load test … intended to ensure structural integrity even when a child three times the recommended … weight uses the product," *id.* at 33,035 (JA\_\_), and to satisfy "[s]tability requirements … intended to ensure that the product does not tip over when pulled on by a 2-year-old male," as well as a "[s]ide height requirement … intended to prevent falls," *id.*

The Commission determined that those requirements were "adequate to address the risk of injury associated with flat infant sleep products."  86 Fed. Reg. at 33,041 (JA\_\_).  For example, the Commission explained that the "requirement to have a stand, and be raised off the floor, increases the stability of a portable product by discouraging or preventing use of the product on other, less stable, surfaces, such as elevated surfaces or soft surfaces (couches and adult beds)."  *Id.* at 33,043 (JA\_\_).  And it explained that the

bassinet standard's "stability requirement"—specifying that a product must "withstand … without tipping" the forces that could be applied by "a 2-year-old male pulling on the side of the product"—would mitigate the risk that a flat sleep product could "tip over" or fall from an elevated surface like a couch or an adult bed. *Id.*

The Commission responded to numerous comments on the proposed standard. In response to comments questioning the inclusion of baby boxes and other flat sleep products in the proposed standard, the Commission explained that it had identified injuries and deaths caused by hazards associated with flat infant sleep products and concluded that the application of the bassinet standard to those products would mitigate the identified risks. 86 Fed. Reg. at 33,049 (JA__).

The Commission also responded to comments suggesting that it should have deferred action to await the potential issuance of voluntary standards for the covered infant sleep products. It explained that nothing in § 2056a required it "to delay addressing risks of harm to the most vulnerable infants in sleep products that parents rely upon … until all ASTM members have reached a consensus on whether and how to create or revise a voluntary standard to address the risk." *Id.* at 33,055 (JA__). If it were required to

await action by ASTM before it could exercise its § 2056a authority, the Commission explained, it would be "relinquishing the statutory mandate to protect consumers by ceding product safety to the very industry Congress required the agency to regulate." *Id.* The Commission further observed that if it "could not use its authority" under § 2056a to impose a mandatory standard on products not "covered by any existing ASTM standard," then "ASTM could dictate when and if durable infant or toddler products are regulated." *Id.* at 33,059 (JA__). The Commission emphasized its statutory duty "to ensure that durable infant or toddler product standards provide the highest level of safety for such products that is feasible." *Id.* at 33,056-33,057 (JA__); *id.* at 33,059-33,060 (JA__).

The Commission recognized that its rule would have a "significant" effect on "two suppliers of baby boxes," including Finnbin, although it noted that any "[s]uppliers of baby boxes … with rigid or rigid-framed sides" could respond by "choos[ing] to offer their products with a stand to meet the bassinet standard." 86 Fed. Reg. at 33,066 (JA__).

The rule was strongly supported by the American Academy of Pediatrics, which wrote that it "would protect infants from dangerous products that are not suitable for sleep[.]" JA__[AR611]. The Academy added that

"[b]aby boxes … , which are not yet proven to be safe and effective, should … be required to meet existing safety standards." *Id.* A coalition of 94 medical, public health, and consumer organizations lent further support to the rule. JA__[AR624-627]; *see also* JA__[AR941-943] (comment from Kids in Danger); JA__[AR1102-1104] (letter from American Academy of Pediatrics and other organizations urging that the rule be finalized without delay); JA__[AR1577-1579] (similar, from Consumer Reports). And Congresswoman Schakowsky—who sponsored the legislation that enacted § 2056a, *see supra* pp. 4-5—joined colleagues in praising the rule for closing a "loophole" for sleep products not governed by an existing mandatory standard. JA__[AR2055-2056]; *see also* JA__[AR2006-2007] (supportive letter from another Member of Congress). She and her colleagues wrote that baby boxes, among other unregulated flat sleep products, "pose substantial dangers to babies." JA__[AR2056].

The rule is set to take effect on June 23, 2022—twelve months after its publication. 86 Fed. Reg. at 33,063 (JA__). Finnbin timely filed this petition for review.

# SUMMARY OF ARGUMENT

I.     Finnbin is incorrect that the Commission lacks regulatory authority under 15 U.S.C. § 2056a over products that are not within the scope of a current voluntary standard.

As an initial matter, this argument is waived because it was not presented to the Commission during notice and comment.

It is also erroneous.  Under Finnbin's theory, the Commission's authority to mandate safety standards for durable infant and toddler products under § 2056a would depend wholly on the actions of voluntary standard-setting organizations like ASTM; those organizations' failure to set voluntary standards would preclude the Commission from setting mandatory standards under that provision.  The Commission would thus be divested of its targeted regulatory authority precisely when the need for that authority is greatest.  That is inconsistent with both the text and the purpose of the Consumer Product Safety Improvement Act, which gave the Commission special authority to set mandatory standards for durable infant or toddler products—and directed the Commission to set standards for *all* such products—in order to ensure the greatest feasible level of safety for such products.  Even

if the statute could be read to permit Finnbin's interpretation, moreover, the Commission's contrary interpretation would warrant *Chevron* deference.

II.    Finnbin is equally incorrect to contend that the Commission acted arbitrarily or capriciously in subjecting baby boxes to the bassinet standard, including its stand and performance requirements.  The Commission identified deaths and injuries to infants arising from hazards associated with flat sleep products.  Two such hazards are readily apparent for baby boxes: (1) the risk that they can fall off adult furniture, like beds or couches, on which they are placed, and (2) the risk that a baby can crawl out, roll out, or fall out of them.  Requiring sleep products to incorporate a stand and to pass strength and stability tests, consistent with the bassinet standard, mitigates both hazards.  It was therefore wholly reasonable for the Commission to determine that baby boxes would be safer if subjected to the bassinet standard.  That determination was supported by the American Academy of Pediatrics and other expert organizations.

Finnbin objects that the Commission lacked evidence of deaths or injuries specific to baby boxes, but Finnbin identifies no evidence that baby boxes are exempt from the risks that the Commission identified for flat infant sleep products in general, and those risks are commonsensical.  For example,

it does not take extensive data to understand that a cardboard baby box without a stand can fall off a bed or couch, just as other flat infant sleep products sometimes fall off beds or couches, or that a baby could suffer injury if that happens.

Finnbin also contends that the Commission's action will *increase* risks to infants, pointing particularly to the supposed consequences of subjecting *in-bed sleepers* to the bassinet standard. But in-bed sleepers are distinct products, which Finnbin does not manufacture, so Finnbin would not benefit from a ruling that the Commission acted arbitrarily or capriciously in subjecting in-bed sleepers to the bassinet standard—and it therefore lacks standing to seek such a ruling.

Finnbin's argument also fails on the merits, both as to in-bed sleepers and to the limited extent that it addresses baby boxes. Finnbin's point is essentially that, if parents do not have access to in-bed sleepers or baby boxes in their currently unregulated state, they may choose to place their babies in less safe sleep environments rather than availing themselves of the many safe sleep products available on the market. But the statute directs the Commission to impose mandatory standards that "provide the highest level of safety for" durable infant or toddler products "that is feasible." 15 U.S.C.

§ 2056a(b)(2). It does not require the Commission to allow a durable infant or toddler product to remain unregulated on the theory that some consumers might not use the product if it were subjected to standards that would make it safer.

## STANDARD OF REVIEW

This Court reviews rules promulgated under § 2056a "in accordance with" the Administrative Procedure Act. 15 U.S.C. § 2060(g)(3); *see id.* § 2056a(b)(3). That standard allows the Court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

"In determining whether a disputed agency action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' the party challenging the action bears the burden of proof. 'Under this highly deferential standard of review, the court presumes the validity of agency action and must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment.'" *National Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020) (citations omitted).

**ARGUMENT**

## I. THE COMMISSION HAS AUTHORITY TO REGULATE PRODUCTS NOT GOVERNED BY A CURRENT VOLUNTARY STANDARD

Finnbin principally contends that the challenged rule is contrary to law because it covers products not governed by any current voluntary standard. That argument fails both because it was never presented to the Commission and because it is inconsistent with the text and purpose of the statute.

### A. Finnbin's Argument Was Never Presented To The Commission

A party seeking judicial review of an agency rule issued through notice-and-comment rulemaking may raise only issues that were presented to the agency during the administrative process. *See, e.g.*, *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148-1150 (D.C. Cir. 2005). This rule reflects both the limits on judicial review of the agency action and the "'[s]imple fairness'" of not "'toppl[ing] over administrative decisions unless the administrative body … has erred against objection made at the time appropriate under its practice.'" *Id.* at 1148 (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). And it extends to arguments contesting an agency's statutory authority to engage in the challenged action: Although "agencies are required to ensure that

they have authority to issue a particular regulation," they "have no obliga-
tion to anticipate every conceivable argument about why they might lack
such statutory authority." *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir.
2013) (per curiam).

Here, although some commenters urged that the Commission await
the potential issuance of voluntary standards by ASTM, neither Finnbin it-
self nor any other commenter presented the argument that Finnbin is now
making—the argument that the Commission lacks authority under § 2056a
to issue mandatory standards for any products not already covered by a vol-
untary standard. This Court requires "'the argument [petitioner] advances
here' to be raised before the agency, not merely the same general legal issue."
*Koretoff*, 707 F.3d at 398 (quoting *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d
1251, 1291 (D.C. Cir. 2004) (per curiam)). That is reason enough to reject
Finnbin's argument: "It is well established" that "this Court will not con-
sider" issues "not raised in comments before the agency." *National Wildlife
Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) (per curiam).

## B. Finnbin's Argument Is Incorrect

In any event, Finnbin's argument is inconsistent with both the text and
the purpose of the statute—and even if the statute could be read to permit

Finnbin's conclusion that the Commission lacked authority here, the Commission's contrary conclusion is entitled to deference.

### 1. Finnbin's argument is contrary to the statutory text

The statutory text makes clear that the Commission must promulgate appropriately protective mandatory standards for *all* durable infant or toddler products—not just those subject to a current voluntary standard.

Congress directed the Commission to undertake an initial survey to "examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products." 15 U.S.C. § 2056a(b)(1)(A). The statutory definition of a "durable infant or toddler product"—namely, "a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years," *id.* § 2056a(f)(1)—encompasses products that are not subject to any existing voluntary standard. Once the Commission had undertaken this initial survey of "the effectiveness of any voluntary" standards for durable infant or toddler products, its statutory mandate was to determine whether the existing voluntary standards were adequate—in which case Congress directed it to mandate compliance with "substantially the same" standards—or whether "more stringent standards would further reduce the risk of injury associated

with" durable infant or toddler products, in which case Congress directed it to mandate compliance with those "more stringent standards." *Id.* § 2056a(b)(1).

It is straightforward to apply this framework to a type of product—like baby boxes—that is not covered by an existing voluntary standard. Baby boxes fall within the statutory definition of "durable infant or toddler products." The statute therefore required the Commission to consider "the effectiveness of any voluntary … standards" governing baby boxes and to determine whether "more stringent standards would further reduce the risk of injury associated with such products." 15 U.S.C. § 2056a(b)(1)(A), (B)(ii). There are no voluntary standards governing baby boxes, so if the Commission concluded that "more stringent standards"—that is, any standards at all—would "reduce the risk of injury associated with" baby boxes, it was required to impose those "more stringent standards." *Id.* § 2056a(b)(1)(B)(ii). There is no plausible reading of the statute under which the inaction of voluntary standard-setting organizations precludes the Commission from exercising its § 2056a authority with respect to a given category of durable infant or toddler products when the imposition of a mandatory standard would "reduce the risk of injury associated with" those products. Nor (to the extent

Finnbin contends otherwise) is there any basis to believe the Commission would be required to craft a standard for such products from scratch, instead of subjecting them to the requirements of an appropriate mandatory standard that already exists—here, the bassinet and cradle standard.

The conclusion that Congress wanted the Commission to impose mandatory standards for *all* "durable infant and toddler products"—including those not already covered by a voluntary standard—is bolstered by the provisions instructing the Commission on how to proceed after the initial survey discussed above. Congress directed the Commission to "commence" issuing mandatory standards within a year after the statute's enactment and to "promulgate standards for no fewer than 2 categories of durable infant or toddler products every 6 months thereafter, beginning with the product categories that the Commission determines to be of highest priority, until the Commission has promulgated standards for *all such product categories*." 15 U.S.C. § 2056a(b)(2) (emphasis added). That provision unmistakably authorizes the Commission to issue mandatory standards for *all* "durable infant and toddler products," not just those subject to existing voluntary standards.

The statute also directs the Commission to "periodically review and revise the standards set forth under" that mandate "to ensure that such

standards provide the highest level of safety for such products"—*i.e.*, "durable infant or toddler products"—"that is feasible." 15 U.S.C. § 2056a(b)(2). This language reinforces that the absence of a voluntary standard governing a particular product does not preclude the Commission from issuing a mandatory standard for that product. To the contrary, the statute authorizes the Commission to promulgate a mandatory standard for *every* durable infant or toddler product and directs it to ensure, on a periodic basis, "that such standards provide the highest level of safety for such products that is feasible." *Id.*

Finnbin's argument is thus impossible to square with the statutory text. Finnbin would have the Court conclude that the Commission lacks authority under § 2056a to set a mandatory standard for a given category of durable infant and toddler products where ASTM has refused or otherwise failed to establish a voluntary standard on such products. But Congress directed the Commission to promulgate mandatory standards "for *all* such product categories," with an eye toward ensuring the "highest level of safety for such products that is feasible." 15 U.S.C. § 2056a(b)(2) (emphasis added).

### 2. Finnbin's position is inconsistent with the statutory structure and purpose

Even if the statutory text permitted Finnbin's interpretation, that interpretation would be inconsistent with the structure of the Commission's statutory authorities and the purpose of § 2056a.  *See, e.g.*, *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 637 (D.C. Cir. 2021) (if statutory "text alone is insufficient to end the inquiry" as to statutory meaning, "we may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history" (quotation marks omitted)).

As discussed above, the Commission's § 2056a authority over durable infant or toddler products differs from its general authorities under the Consumer Product Safety Act.  Under those general authorities, the Commission must "rely upon voluntary consumer product safety standards," rather than issuing mandatory standards, as long as "it is likely that there will be substantial compliance with such voluntary standards" and that compliance will "eliminate or adequately reduce the risk of injury" from the products in question.  15 U.S.C. § 2056(b); *see id.* § 2058(b), (f)(3)(D).  Section 2056a, by contrast, *requires* the Commission to impose mandatory standards and specifies that they must be "more stringent than" voluntary standards if "more

stringent standards would further reduce the risk of injury associated with" the products in question. *Id.* § 2056a(b)(1)(B). Thus, it is clear from the relationship among the Commission's authorities that the provision at issue here reflects a deliberate shift away from required reliance on voluntary standards for durable infant or toddler products. Finnbin's argument, which would allow inaction by a voluntary standard-setting organization to *preclude* action by the Commission, is inconsistent with that legislative choice.

Finnbin's argument is also inconsistent with § 2056a's purpose, as evidenced both by the statutory structure and by legislative history. As discussed above, § 2056a's principal legislative sponsors placed heavy emphasis on the inadequacy of voluntary standards for durable infant or toddler products. In introducing the bill that evolved into § 2056a, Congresswoman Schakowsky explained that the bill would require mandatory safety standards for such products because voluntary standards were "set by the very industries looking to make profits." 153 Cong. Rec. 7701. And in introducing the relevant language as an amendment to the Senate version of the legislation, Senator Klobuchar explained that "while voluntary standards" were "a good first step, … they [were] not enough." 154 Cong. Rec. 3449.

Finnbin's argument—which would allow the inaction of voluntary stand-ard-setting organizations to *preclude* the Commission from imposing man-datory standards for a given type of product under § 2056a—could hardly be more inconsistent with the objectives expressed by § 2056a's sponsors (in-deed, one of those sponsors filed a comment supporting the rule, JA__[AR2055-2056]).

This is more than an abstract concern:  In promulgating the challenged rule, the Commission explained how ASTM's standard-setting process had fallen short of addressing the hazards associated with infant sleep products. After the Commission issued its supplemental notice of proposed rulemak-ing in 2019, Commission staff "urged the" relevant "ASTM subcommittee … to meet and discuss how to address issues presented in" the notice, but the subcommittee did not reconvene until late August 2020—more than nine months after the notice and more than a month after Commission staff sub-mitted a letter again urging the subcommittee to "meet in the immediate fu-ture."  86 Fed. Reg. at 33,034 (JA__); JA__[AR1108-1109] (July 2020 letter to subcommittee); *see also* JA__[AR535-536] (December 2019 letter to subcom-mittee).  The subcommittee did "establish[] a task group to revise the infant inclined sleep standard's title, introduction, and scope, to be more in line

with the proposal in the 2019" notice. 86 Fed. Reg. at 33,034 (JA__). And in December 2020, following the work of that task group, the subcommittee introduced a ballot to expand the scope of its voluntary standard "to include all infant sleep products," *id.*—a proposal that Commission staff supported, JA__[AR1125-1126]. But the subcommittee rejected that proposal in January 2021. 86 Fed. Reg. at 33,034 (JA__).

On Finnbin's theory, ASTM's refusal to update its voluntary standards to cover all infant sleep products—despite having been presented with repeated opportunities to do—would strip the Commission of authority to promulgate mandatory standards for such products under § 2056a. Finnbin admits as much. *See* Br. 32 (it "is wrong" to say "that 'nothing in'" the Act "'requires the Commission to delay' promulgating a standard 'until all ASTM members have reached a consensus on whether and how to create or revise a voluntary standard'"). That would manifestly undermine Congress's purpose in enacting § 2056a. The need for regulatory authority is highest where, as here, ASTM has failed to establish any standard at all. To construe the statute to divest the agency of authority in the setting where it is needed most would undermine Congress's goals in enacting § 2056a.

### 3. Even if the statute permitted Finnbin's contrary construction, the Commission's interpretation would be entitled to deference

Even if the statute could conceivably be read to permit Finnbin's interpretation, moreover, the Commission's determination of its own statutory authority would be entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The *Chevron* framework applies to "an agency's interpretation of a statutory ambiguity that concerns the scope of its regulatory authority," just as it does to other statutory ambiguities, and requires courts to defer to an agency's "'permissible construction of the statute'" unless "'Congress has directly spoken to the precise question at issue.'" *City of Arlington v. FCC*, 569 U.S. 290, 293, 296 (2013).

Here, although no commenter raised Finnbin's argument about the scope of the Commission's statutory authority (which means that argument is waived, *see supra* pp. 18-19), the Commission explained in response to other comments that nothing in the statute required it "to delay addressing risks of harm to the most vulnerable infants in sleep products that parents rely upon … until all ASTM members have reached a consensus on whether and how to create or revise a voluntary standard to address the risk." 86 Fed. Reg. at 33,055 (JA__). The Commission observed that if it "could not

use its authority to expand the scope of a rule to include" products not "covered by any existing ASTM standard," then "ASTM could dictate when and if durable infant or toddler products are regulated," *id.* at 33,059 (JA__), which would contravene the Commission's statutory mandate "to ensure that durable infant or toddler product standards provide the highest level of safety for such products that is feasible," *id.* at 33,056-33,057 (JA__); *id.* at 33,059-33,060 (JA__). Even if that agency interpretation were not compelled by the statutory text and purpose, it would at a minimum be "'permissible'" and thus entitled to deference, *City of Arlington*, 569 U.S. at 296.

### C. Finnbin's Efforts To Justify Its Position Are Unpersuasive

Finnbin's principal argument is that the Commission's understanding of § 2056a would allow it to "bypass the rigorous constraints Congress imposed for ordinary rulemaking under the" Consumer Product Safety Act. Br. 33; *see also, e.g.*, Br. 34-36. Indeed it would. But that was the whole point of § 2056a: to give the Commission *greater* powers, less dependent on voluntary standards set by outside organizations, with respect to durable infant or toddler products.

Section 2056a is hardly a statutory "mousehole," as Finnbin suggests (at 38); it expressly creates a distinct regulatory regime for this category of products. *Cf. Association for Cmty. Affiliated Plans v. Department of the Treasury*, 966 F.3d 782, 790 (D.C. Cir. 2020) ("[A] legislative provision authorizing the Departments to define an entire category of insurance not subject to ordinary federal standards is no 'mousehole.'"). Nor is its effect as much of an "elephant" as Finnbin suggests (at 38). Contrary to Finnbin's claim (at 33) that the Commission's interpretation would allow it to apply a mandatory standard "to whatever range of products it chooses," the authority created by § 2056a is expressly limited to durable infant or toddler products—and as to those products, Congress specifically provided that all categories should be regulated. 15 U.S.C. § 2056a(b)(2).

Finnbin makes no attempt to explain why Congress—having given the Commission separate and especially powerful authority to regulate durable infant or toddler products—would have wanted the Commission's ability to exercise that authority to depend on the actions of outside standard-setting organizations. The statute directs the Commission to *consult* with such organizations, but only in the process of "examin[ing] and assess[ing] the ef-

fectiveness of" voluntary standards. 15 U.S.C. § 2056a(b)(1)(A). Had Congress intended Finnbin's interpretation, it could quite easily have written the statute to say that the Commission could issue mandatory standards only for products already subject to a voluntary standard or only with the agreement of ASTM. The absence of those provisions from the statutory text is powerful evidence that Congress did not intend them. *See, e.g.*, *Kimbrough v. United States*, 552 U.S. 85, 103 (2007).

Because the Commission's authority under § 2056a is "not subject to … the … requirements for rules, bans, or recalls" under the Consumer Product Safety Act (Finnbin Br. 8), it is irrelevant whether—as Finnbin claims—the standard in question can be understood as "banning" baby boxes (Br. 37). In any event, the standard no more "bans" Finnbin's baby boxes, as currently designed, than any safety standard "bans" noncompliant products; a requirement that cars provide seatbelts is not usually thought of as a "ban" on seatbelt-less cars. And as the Commission observed, "[s]uppliers of baby boxes … with rigid or rigid-framed sides" could "choose to offer their products with a stand" in order to comply with the bassinet standard. 86 Fed. Reg. at 33,066 (JA__).

Finally, Finnbin emphasizes that the Commission has not previously exercised its authority to set mandatory standards for infant or toddler products that are not covered by a voluntary standard. But that is because most durable infant or toddler products *are* covered by voluntary standards. There is nothing improper about the Commission's exercising the full measure of authority Congress gave it under § 2056a; indeed, the Commission would be derogating Congress's intent if it did anything less.

Finnbin's quotation of *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014), for the proposition that "[t]his Court should be 'skeptic[al]' of the Commission's claim to have 'discover[ed] in a long-extant statute an unheralded power to regulate'" (Br. 34), is particularly off-base. What the Supreme Court actually said in *Utility Air* is that courts look with skepticism on an agency's claim to have "discover[ed] in a long-extant statute an unheralded power to regulate '*a significant portion of the American economy*.'" 573 U.S. at 324 (emphasis added). Finnbin omits the italicized language, which wholly changes the meaning of the Supreme Court's statement.

The Commission's comprehensive regulation of durable infant or toddler products is not an extension of what Congress intended, let alone one that (as in *Utility Air*) implicates the major-questions canon. It is exactly

what Congress prescribed, whereas Finnbin's proposed constraint on the Commission's authority would rewrite the statute's text and undermine its purpose.

## II. IT WAS NOT ARBITRARY OR CAPRICIOUS FOR THE COMMISSION TO SUBJECT BABY BOXES TO THE BASSINET STANDARD

Finnbin is equally incorrect in claiming that the Commission's inclusion of baby boxes in a standard governing all flat infant sleep products is arbitrary and capricious.

### A. The Commission Had Ample Reason To Require Baby Boxes To Have A Stand And Meet Stability Standards

As discussed above, the Commission identified 11 deaths and 16 injuries to infants "associated with the use of flat sleep products" during a two-year span. 86 Feg. Reg. at 33,030-33,031 (JA__). Those figures likely underestimate the true incidence of injuries and deaths associated with the use of unregulated flat sleep products, because they reflect only the 183 incidents reported to the Commission by doctors, hospitals, manufacturers, or retailers, and because those reports were "ongoing," *id.* at 33,030 (JA__).

The incident reports revealed two major types of hazards associated with flat infant sleep products like baby boxes. *First*, flat sleep products that are not equipped with a stand, including baby boxes, can easily be placed

atop beds, couches, or other pieces of furniture (at a height where parents can more easily access the product).  And because such products are not attached to the furniture, they can fall off—especially when the furniture is soft, as with a bed or couch.  Thus, the Commission noted one incident in which a "2-month-old infant fell out of an in-bed sleeper and suffered head injuries when a sibling jumped onto the couch where the in-bed sleeper was situated," and another in which a "sleeper slipped off of the adult bed on which it was placed."  86 Fed. Reg. at 33,031 (JA__).  Injuries from these and similar falls included "skull fracture, closed-head injury, and head contusion," as well as "face abrasion."  *Id.*

*Second*, flat sleep products that are not subject to strength and stability tests can easily fail to contain an infant.  For example, the Commission noted one incident in which an infant fell from a flat sleep product "when a sibling pulled on the sleeper, causing it to flip over," and another in which an infant "crawl[ed]" or "roll[ed]" out of an in-bed sleeper placed on an adult bed and became "entrapped between the footboard and the mattress," dying "of positional asphyxia."  86 Fed. Reg. at 33,031.  It is not difficult to see how an infant could similarly fall, roll, or crawl out of a cardboard baby box.

The requirements of the bassinet standard—which this rule imposes on previously unregulated infant sleep products, including baby boxes—mitigate exactly those risks. As Finnbin explains (at 10), a bassinet must have "legs, a frame, and a base." *See* JA__[AR2162] (definition of "bassinet/cradle" in current ASTM bassinet standard); *Safety Standard for Bassinets and Cradles*, 78 Fed. Reg. 63,019 (Oct. 23, 2013) (JA__) (adopting ASTM bassinet standard, with modifications, as mandatory). As the Commission explained, the "requirement to have a stand, and be raised off the floor," mitigates the risk that baby boxes and similar flat sleep products may be placed on surfaces that are "elevated," or that are "soft" and thus "less stable"—surfaces like "couches and adult beds"—from which they can easily fall. 86 Fed. Reg. at 33,043 (JA__).

The bassinet standard also mitigates the second (and related) major risk of such products: that the child can crawl out, roll out, or fall out, whether because the product tips over or because it fails to contain the child's own activity. *See* 86 Fed. Reg. at 33,043 (JA__). The standard addresses that concern by requiring products to undergo a "[s]tatic load test … intended to ensure structural integrity even when a child three times the rec-

ommended … weight uses the product," as well as to comply with "[s]tability requirements … intended to ensure that the product does not tip over when pulled on by a 2-year-old male" and a "[s]ide height requirement … intended to prevent falls."  *Id.* at 33,035 (JA__).

The Commission reasonably determined that these requirements, taken together, were "adequate to address the risk of injury associated with flat infant sleep products."  86 Fed. Reg. at 33,041 (JA__).  That determination was supported, as noted above, by the American Academy of Pediatrics and other expert organizations.  *See*  JA__[AR609-611];  JA__[AR624-627]; JA__[AR941-943]; JA__[AR1102-1104].  It reflects the Commission's application of its considerable expertise to the evidence in the record.  And it comports with the Commission's statutory mandate to impose standards, for each category of durable infant or toddler products, that "provide the highest level of safety for such products that is feasible."  15 U.S.C. § 2056a(b)(2).

B.    **Finnbin's Responses Are Unpersuasive**

Finnbin offers no persuasive rebuttal of the Commission's reasoning.

1.    Finnbin's first argument (at 40-48) is that the Commission's data were "limited," "anecdotal," and not specific to baby boxes.  But "[t]he APA imposes no general obligation on agencies to produce empirical evidence";

what it requires is simply that an agency "justify its rule with a reasoned explanation," *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009), one that "articulate[s] a 'rational connection between the facts found and the choice made,'" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). Thus, the Court in *Stilwell* rejected an argument that an agency had "failed to present any substantial empirical evidence justifying [its] new regulation," explaining that the argument was inconsistent with "the deferential nature of arbitrary and capricious review of agency rules." 569 F.3d at 519. It is well established, moreover, that agencies "need not suffer the flood before building the levee"; they can "adopt prophylactic rules to prevent potential problems before they arise." *Id.*; *see also, e.g.*, *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 141 (D.C. Cir. 2005) (agencies can "make 'precautionary or prophylactic responses to perceived risks'"). Thus, even when the Commission acts under authorities less generous than § 2056a, this Court has held that it need not "develop a precise 'body count' of actual injuries that will be reduced by" a proposed standard before imposing such a standard. *Forester v. CPSC*, 559 F.2d 774, 788 (D.C. Cir. 1977) (rulemaking under the Federal Hazardous Substances Act).

Here, the Commission's assessment of the record reflects more than enough factual basis to determine that flat sleep products for infants would be significantly safer if subjected to the requirements of the bassinet standard, and that is as true for baby boxes as it is for other types of flat sleep products. The adequacy of the data is particularly clear because the risks addressed by this rule are matters of common sense. It does not take extensive data to understand that if a cardboard box containing a baby is placed on a bed or couch, it can fall off, or that such a fall can injure the baby. Nor is extensive data needed to understand that a cardboard box containing only a baby and a light mattress can easily tip over, perhaps if pulled by a sibling. The Commission had all the information it needed to perceive those risks and identify appropriate means of mitigating them. Nothing in the statute requires the Commission to delay promulgating a safety standard for a category of durable infant or toddler products until it can associate an infant injury or death with each product within that category. *Cf. Forester*, 559 F.2d at 789 (citing a statement quoted in a Senate report on amendments to the Federal Hazardous Substances Act: "When your intelligence tells you that something will create an injury and that it seems conceptually clear that an injury will occur, it is primitive to wait until a number of people have lost

their lives, or sacrificed their limbs before we attempt to prevent those accidents.").

Finnbin's authorities (at 45) are not to the contrary. Both *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141 (10th Cir. 2016), and *Gulf South Insulation v. CPSC*, 701 F.2d 1137 (5th Cir. 1983), addressed whether the Commission had satisfied one of the requirements for imposing mandatory standards under the more general authority provided by the Consumer Product Safety Act: the need to show that doing so "is reasonably necessary to eliminate or reduce an unreasonable risk of injury," 15 U.S.C. § 2058(f)(3)(A). *See Zen Magnets*, 841 F.3d at 1151-1152; *Gulf South Insulation*, 701 F.2d at 1142. In fulfilling that requirement, the Commission must "balance the costs and benefits identified in its findings," weighing "the severity of the injury that may result from the product, factored by the likelihood of the injury," against "the harm the regulation imposes upon manufacturers and consumers." *Zen Magnets*, 841 F.3d at 1147 (quotation marks omitted). That exercise places far greater weight on data analysis than the distinct statutory regime applicable here, which requires the Commission to "provide the highest level of safety for" durable infant and toddler "products that is feasible," 15 U.S.C. § 2056a(b)(2).

Finnbin emphasizes that the Commission did not identify incidents that had involved baby boxes as opposed to other types of flat sleep products, but it offers no explanation of why baby boxes would be exempt from the risks the Commission identified for flat sleep products in general. Nor could Finnbin offer any such explanation: There is nothing about baby boxes that makes them obviously less likely than other types of flat sleep products to tip over or fall off a bed or couch. Baby boxes comprise only a tiny fraction of the domestic market for flat infant sleep products—"under 20,000 per year," relative to "1 million" in-bed sleepers, 86 Fed. Reg. at 33,027-33,028 (JA__)—so it is unsurprising that most injuries involved different types of products.

Finally, Finnbin criticizes the Commission for not citing data showing "overlay with respect to in-bed sleepers" (Br. 42; *see also* Br. 41, 43, 47). But the Commission's reasons for subjecting baby boxes to the bassinet standard—discussed above—did not include any effort to mitigate "overlay" (a term referring to the risk that parents sharing a bed with their baby may roll over onto the baby). Finnbin's contrary account rests on a December 2019 letter "sent from a Commission staffer to ASTM." Br. 15; *see* JA__[AR535-

536] (letter).  But the letter makes clear that it reflects the views of Commission staff, not the Commission, JA__[AR535] n.1 — and the letter also predates the final rule by more than a year and half.  The validity of agency action is judged on the basis of the agency's final reasoning, not the tentative views of its staff at an earlier stage of the decisional process.  *See, e.g., NextEra Desert Ctr. Blythe, LLC v. FERC,* 852 F.3d 1118, 1122 (D.C. Cir. 2017) ("[I]t is a well-worn principle that 'reviewing courts may affirm [an agency order] based only on reasoning set forth by the agency itself.'").

2.    Finnbin also contends (at 48-52) that the Commission's action is arbitrary and capricious because it will *increase* risks to infants.  Almost none of that argument, however, concerns the Commission's treatment of baby boxes.  Instead, it focuses primarily on in-bed sleepers, distinct products that Finnbin does not manufacture.

a.    In the one paragraph (at 48-49) that concerns baby boxes, Finnbin asserts that "baby boxes make infants *safer*."  As an initial matter, that argument overstates what studies have shown about the benefits of baby boxes.[1]

---

[1] For example, although Finnbin notes (Br. 49) that infant mortality in Finland has declined significantly "since baby boxes emerged in Finland in the 1930s," Finnbin does not explain why that decline should be attributed to baby boxes as opposed to other developments over the past nine decades.

The position of the American Academy of Pediatrics is that baby boxes "are not yet proven to be safe and effective." JA__[AR611]. But even assuming baby boxes are indeed "*safer*" sleep environments than certain other products or spaces parents might use (Br. 48), that does not satisfy the Commission's statutory mandate to "provide the highest level of safety for" durable infant or toddler "products that is feasible," 15 U.S.C. § 2056a(b)(2). The relevant question is not whether baby boxes are "*safer*" than certain other options (Br. 48) but whether the category of infant sleep products is as safe as is "feasible." The Commission reasonably concluded that such products can feasibly be made safer by requiring them to satisfy the bassinet standard.

To the extent its baby boxes cannot be redesigned to satisfy the standard, as Finnbin appears to suggest, Finnbin's argument is essentially that "the harm the regulation imposes upon manufacturers and consumers" outweighs "the severity of the injury that may result from the product, factored by the likelihood of the injury," *Zen Magnets*, 841 F.3d at 1147 (quotation marks omitted). But that is a relevant consideration only in the exercise of the Commission's more general authorities under the Consumer Product Safety Act, *see* 15 U.S.C. § 2058(f)(3)(A), (E), (F). Under § 2056a, Congress gave the Commission a different mandate with respect to durable infant or

toddler products: to "provide the highest level of safety for such products that is feasible." *Id.* § 2056a(b)(2).

As the Supreme Court explained in construing a similar provision of the Occupational Health and Safety Act—one requiring the imposition of a "standard which most adequately assures, to the extent feasible … , that no employee will suffer material impairment of health" from a particular hazard, 29 U.S.C. § 655(b)(5)—"[t]he plain meaning of the word 'feasible'" is "'capable of being done, executed, or effected.'" *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 508-509 (1981). "In effect," the Court explained, the choice of a "feasibility" standard "itself define[s] the basic relationship between costs and benefits, by placing the 'benefit' of [safety] above all other considerations save those making attainment of this 'benefit' unachievable." *Id.* at 509. Because flat infant sleep products can feasibly be made safer by requiring them to conform to the bassinet standard, it is irrelevant whether particular manufacturers would prefer to produce, or particular consumers to use, non-conforming products.

b.     The rest of Finnbin's argument addresses in-bed sleepers—distinct products used for "bedsharing." Finnbin argues that many parents will share a bed with their baby no matter what and that the practice is safer if

they have access to in-bed sleepers than if they do not. That argument fails here, however, for reasons both jurisdictional and substantive.

The jurisdictional problem is that Finnbin does not manufacture in-bed sleepers; it manufactures baby boxes. *See* Br. 28-29 (statement of standing); JA__[AR1486] (comment from Finnbin's founder and CEO, noting that he could not "speak to any of the other products" covered by the rule). Baby boxes and in-bed sleepers are different products, as the rule explains. *See* 86 Fed. Reg. at 33,027 (discussing in-bed sleepers among "soft-sided" flat sleep products); *id.* at 33,027-33,028 (discussing baby boxes among "rigid-sided" flat sleep products). In-bed sleepers, as Finnbin's brief explains (at 49), "are designed to facilitate bedsharing for 'parents who wish to be close—both visually and tactilely—to their babies at night[.]'" They thus "have low, soft sides," 86 Fed. Reg. at 33,027, sometimes made of "mesh," JA__[AR922]. This, for example, is what a typical in-bed sleeper might look like:



JA__[AR1418]. This, by contrast, is a profile view of Finnbin's baby box:



Finnbin, *Baby Box Boxinet*, https://perma.cc/E7QT-CKPH (last visited Nov. 16, 2021). It is hard to see why parents desiring "'visual[] and tactile[]'" contact with their baby while sharing a bed (Finnbin Br. 49) would choose to place the baby in a cardboard box with sides almost eleven inches high (Finnbin, *Baby Box Boxinet*, *supra*).

Because Finnbin does not manufacture in-bed sleepers, it would not benefit from a ruling that the Commission's action was arbitrary and capricious insofar as it subjected in-bed sleepers to the bassinet standard. To the extent that such a ruling could warrant vacatur of the rule at all, any vacatur could properly extend only to in-bed sleepers—not to Finnbin's products, as to which the rule would remain valid—because there is no basis for any

"substantial doubt that the agency would have adopted the same disposition" as to baby boxes if its imposition of the bassinet standard on in-bed sleepers "were subtracted" from the rule, *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984).  "It is a routine feature of severability doctrine that a court may invalidate only some applications even of indivisible text, so long as the 'valid applications can be separated from invalid ones,'" and courts "*should* 'try to limit the solution to'" any such "'problem'" in that fashion.  *Natural Res. Def. Council v. Wheeler*, 955 F.3d 68, 81-82 (D.C. Cir. 2020) (emphasis added).  Finnbin has standing only to "assert … its own alleged injuries, not those of" in-bed sleeper manufacturers.  *New York Stock Exch. LLC v. SEC*, 962 F.3d 541, 552 (D.C. Cir. 2020).

The substantive problems with Finnbin's argument are equally significant.  As an initial matter, the Commission found that bedsharing presents an "increased risk of" Sudden Infant Death Syndrome, "overlay" and the attendant potential for suffocation, "and other hazards."  86 Fed. Reg. at 33,049; *see* JA__[AR1446-1450] (staff memorandum on which the Commission based this finding).  Finnbin acknowledges (at 49) the "risk of overlay"; it simply contends that "in-bed sleepers mitigate" that risk.  But the Commission took a different view, expressing "substantial concerns that a low,

soft-sided, in-bed sleeper may not prevent a parent from inadvertently laying over an infant and suffocating the baby." 86 Fed. Reg. at 33,049 (JA__). And the record supports those concerns: The American Academy of Pediatrics commented that "[t]here is insufficient evidence to assure the safety of in-bed sleep products, and many of these products have soft sleep surfaces[] and non-rigid sides that pose a suffocation risk." JA__[AR610]. It is hardly arbitrary or capricious for the Commission to recognize those risks.

Even if it were clear that bedsharing is safer with in-bed sleepers than without, moreover, that would not have the implication that Finnbin suggests. As discussed above, the Commission's statutory mandate is to impose standards sufficient to "provide the highest level of safety … that is feasible" for all durable infant or toddler products, including in-bed sleepers. 15 U.S.C. § 2056a(b)(2). The feasibility standard prioritizes the safety of a given category of products "above all other considerations save those making attainment of this benefit unachievable." *American Textile Mfrs.*, 452 U.S. at 509 (quotation marks omitted). It does not require the Commission to allow a given type of product to remain unregulated, with attendant risks to the safety of children, on the theory that some consumers might not use the product—or any of the safe alternatives available on the market—if it were

subjected to standards that would make it safer.  And for good reason:  That approach would risk "provid[ing] parents with a potentially false sense of security," 86 Fed. Reg. at 33,049.  The point of the Consumer Product Safety Improvement Act is that, when parents buy a durable product for their infant or toddler, they should be able to know that it is as safe as it can "feasibl[y]" be, 15 U.S.C. § 2056a(b)(2).  Finnbin's argument, if accepted, would undermine that assurance.

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
   *Acting Assistant Attorney General*

SCOTT R. McINTOSH

*/s/ Daniel Winik*
DANIEL WINIK
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7245*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-8849*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,604 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

# ADDENDUM

# TABLE OF CONTENTS

15 U.S.C. § 2056a.................................................................................... A1

**15 U.S.C. § 2056a**

**§ 2056a. Standards and consumer registration of durable nursery products**

…

(b) Safety standards

(1) In general

The Commission shall—

(A) in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts, examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products; and

(B) in accordance with section 553 of Title 5, promulgate consumer product safety standards that—

(i) are substantially the same as such voluntary standards; or

(ii) are more stringent than such voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with such products.

(2) Timetable for rulemaking

Not later than 1 year after August 14, 2008, the Commission shall commence the rulemaking required under paragraph (1) and shall promulgate standards for no fewer than 2 categories of durable infant or toddler products every 6 months thereafter, beginning with the product categories that the Commission determines to be of highest priority, until the Commission has promulgated standards for all such product categories. Thereafter, the Commission shall periodically review and revise the standards set forth under this subsection to ensure that such standards provide the highest level of safety for such products that is feasible.

(3) Judicial review

Any person adversely affected by such standards may file a petition for review under the procedures set forth in section 2060(g) of this title, as added by section 236 of this Act.

(4) Process for considering subsequent revisions to voluntary standard

(A) Notice of adoption of voluntary standard

When the Commission promulgates a consumer product safety standard under this subsection that is based, in whole or in part, on a voluntary standard, the Commission shall notify the organization that issued the voluntary standard of the Commission's action and shall provide a copy of the consumer product safety standard to the organization.

(B) Commission action on revised voluntary standard

If an organization revises a standard that has been adopted, in whole or in part, as a consumer product safety standard under this subsection, it shall notify the Commission. The revised voluntary standard shall be considered to be a consumer product safety standard issued by the Commission under section 2058 of this title, effective 180 days after the date on which the organization notifies the Commission (or such later date specified by the Commission in the Federal Register) unless, within 90 days after receiving that notice, the Commission notifies the organization that it has determined that the proposed revision does not improve the safety of the consumer product covered by the standard and that the Commission is retaining the existing consumer product safety standard.

…

(f) Definition of durable infant or toddler product

As used in this section, the term "durable infant or toddler product"—

(1) means a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years; and

(2) includes—

(A) full-size cribs and nonfull-size cribs;

(B) toddler beds;

(C) high chairs, booster chairs, and hook-on chairs;

(D) bath seats;

(E) gates and other enclosures for confining a child;

(F) play yards;

(G) stationary activity centers;

(H) infant carriers;

(I) strollers;

(J) walkers;

(K) swings; and

(L) bassinets and cradles.