# United States Court of Appeals for the District of Columbia Circuit

FINNBIN, LLC,

*Petitioner*,

*v.*

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

*Respondent.*

## REPLY BRIEF OF PETITIONER FINNBIN, LLC

On Petition for Review of a Final Rule
of the United States Consumer Product Safety Commission

KATHLEEN R. HARTNETT
  *Counsel of Record*
JULIE VEROFF
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com
jveroff@cooley.com

ADAM M. KATZ
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com

*Counsel for Petitioner Finnbin, LLC*

January 19, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

GLOSSARY ............................................................................... vi

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................. 3

    I.    Section 104 Does Not Authorize the Commission to Expand the
        Scope of a Voluntary Standard ................................................ 3

        A.    The Commission's Waiver Argument is Meritless .................. 3

        B.    The Commission's Interpretation of Section 104 Ignores
              the Relevant Statutory Text and Structure, Misconstrues
              the Legislative History, and Would Replace a Targeted
              Conferral of Authority with Sweeping Power .......................... 8

        C.    The Commission is Not Entitled to *Chevron* Deference ......... 20

    II.    The Commission Acted Arbitrarily and Capriciously in
        Adopting a One-Size-Fits-All Ban on Dozens of Flat Infant
        Sleep Products ......................................................... 22

        A.    The Commission Concedes that the Rule Prohibits Baby
              Boxes Without Citing a Single Instance of Harm Relating
              to a Baby Box ........................................................ 22

        B.    Precipitously Banning In-Bed Sleepers Will Endanger
              Infants ................................................................. 26

        C.    Finnbin has Standing to Challenge the Rule's Application
              to Flat Infant Sleep Products ........................................ 27

CONCLUSION ............................................................................ 29

CERTIFICATE OF COMPLIANCE ....................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appalachian Power Co. v. EPA*,
 135 F.3d 791 (D.C. Cir. 1998) ......................................................................... 5

*Bowen v. Georgetown University Hospital*,
 488 U.S. 204 (1988) ...................................................................................... 22

*Cal. Communities Against Toxics v. EPA*,
 928 F.3d 1041 (D.C. Cir. 2019) ....................................................................... 6

*Chamber of Commerce v. SEC*,
 412 F.3d 133 (D.C. Cir. 2005) ................................................................... 24, 25

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
 467 U.S. 837 (1984) ................................................................................... 20, 21

*Colorado River Indian Tribes v. Nat'l Indian Gaming Com'n*,
 466 F.3d 134 (D.C. Cir. 2006) ................................................................... 11, 12

*Engine Mfrs. Ass'n v. EPA*,
 88 F.3d 1075 (D.C. Cir. 1996) ......................................................................... 6

*Epiq Systems Corp. v. Lewis*,
 138 S. Ct. 1612 (2018) .................................................................................... 21

*Etelson v. Office of Personnel Mgmt.*,
 684 F.2d 918 (D.C. Cir. 1982) ......................................................................... 3

*Forester v. Consumer Prod. Safety Comm'n of U.S.*,
 559 F.2d 774 (D.C. Cir. 1977) ........................................................................ 24

*Hispanic Affairs Project v. Acosta*,
 901 F.3d 378 (D.C. Cir. 2018) ................................................................... 3, 5, 6

*Hormel v. Helvering*,
 312 U.S. 552 (1941) ........................................................................................ 7

*Koretoff v. Vilstaff*,
 707 F.3d 394 (D.C. Cir. 2013) ...................................................................... 7, 8

# TABLE OF AUTHORITIES

**Page(s)**

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)..............................................................................28

*MCI Telecomms. Corp. v. AT & T*,
    512 U.S. 218 (1994)..............................................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................25

*Nat. Res. Def. Council, Inc. v. EPA*,
    824 F.2d 1146 (D.C. Cir. 1987)............................................................5

*Nat. Res. Def. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014)............................................................6

*Office of Communication of United Church of Christ v. FCC*,
    779 F.2d 702 (D.C. Cir. 1985)..............................................................4

*Oklahoma Dep't of Environmental Quality v. EPA*,
    740 F.3d 185 (D.C. Cir. 2014)..............................................................7

*SAS Institute, Inc. v. Iancu*,
    138 S. Ct. 1348 (2018)........................................................................20

*Stilwell v. Office of Thrift Supervision*,
    569 F.3d 514 (D.C. Cir. 2009)............................................................23

*U.S. Telecom Ass'n v. FCC*,
    359 F.3d 554 (D.C. Cir. 2004)............................................................21

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014)......................................................................18, 21

*Watt v. Alaska*,
    451 U.S. 259 (1981)............................................................................19

*Wisconsin Central Ltd. v. United States*,
    138 S. Ct. 2067 (2018)........................................................................21

*Wyoming Outdoor Council v. U.S. Forest Service*,
    165 F.3d 43 (D.C. Cir. 1999)..............................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

15 U.S.C.
    § 1278a ....................................................................................13
    § 2056(a) ................................................................................15
    § 2056a .....................................................................................1
    § 2056a(b)(1) .........................................................9, 10, 11, 13
    § 2056a(b)(2) .................................................................11, 12
    § 2057 ......................................................................................13
    § 2058 ...............................................................................13, 15

**Other Authorities**

153 Cong. Rec. 7701 (2007) ......................................................15

154 Cong. Rec. 3449 (2008) ......................................................16

154 Cong. Rec. 3455 (2008) ......................................................16

*Commission Participation and Commission Employee Involvement in Voluntary Standards Activities*, 81 Fed. Reg. 5369 (Feb. 2, 2016) .............16, 18

Consumer Product Safety Commission, *Budget and Performance*, https://bit.ly/3FiGjft ..........................................................17

Consumer Product Safety Commission, *Fiscal Year 2022: Performance Budget Request to Congress* 26 (May 2021), https://bit.ly/3sF3Gwj ......................................................17

Consumer Product Safety Commission, *Injuries and Deaths Associated with Nursery Products Among Children Younger than Age Five* (Dec. 2020), https://bit.ly/30RYMQO ................................25

*Global Baby Durable Products Industry (2020 to 2025)*, Associated Press (June 4, 2020), https://bit.ly/3G3yEle. ......................................19

H.R. 1698, 110th Cong. (2007) ...........................................14, 15

H.R. Rep. 110-501 (2007) .........................................................16

iv

# TABLE OF AUTHORITIES

**Page(s)**

*Optional Charter Provisions in Mutual Holding Company Structures*,
73 Fed. Reg. 39216 (July 9, 2008)......................................................................24

"Than," Merriam-Webster Online Dictionary, https://bit.ly/32hMJwY .................10

# GLOSSARY

| | |
|---|---|
| 2017 NPR | *Safety Standard for Infant Inclined Sleep Products*, Notice of Proposed Rulemaking, 82 Fed. Reg. 16963 (AR 150) |
| 2019 Supplemental NPR | *Safety Standard for Infant Sleep Products*, Supplemental Notice of Proposed Rulemaking, 84 Fed. Reg. 60949 (AR 511) |
| AR | Administrative Record |
| APA | Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946) |
| ASTM | ASTM International, a private standards-setting organization |
| Baby Boxes | Boxes made of sturdy cardboard and designed to provide a flat, portable sleep space for infants (AR 2102) |
| Bassinet Standard | *Safety Standard for Bassinets and Cradles*, Final Rule, 78 Fed. Reg. 63019 (AR 1) |
| Bassinets | A small, flat bed designed for infant sleep supported by freestanding legs, a stationary frame/stand, and a wheeled or rocking base (AR 2162) |
| Commission | The United States Consumer Product Safety Commission |
| CPSA | Consumer Product Safety Act, Pub. L. No. 92-573, 86 Stat. 1207 (1972) |
| CPSIA | Consumer Product Safety Improvement Act of 2008, Pub. L. 110-314, 122 Stat. 3016 (2008) |

| | |
|---|---|
| December 2019 Letter | Letter from Celestine Kish to ASTM, dated December 12, 2019, regarding inclined infant sleep products, in-bed sleepers, compact bassinets, and baby boxes (AR 535) |
| In-Bed Sleepers | Flat infant sleep products with low sides and not built on a stand, and which sometimes have mesh sides with a thin built-in mattress, and that are designed to facilitate safer bedsharing between parents and infants (AR 916–22) |
| Inclined Infant Sleep Products | A freestanding infant sleep product generally supported by a stationary or rocker base and that is positioned between 10° and 30° from the horizontal (AR 2179) |
| Rule | *Safety Standard for Infant Sleep Products*, Final Rule, 86 Fed. Reg. 33022 (AR 2096) |

**INTRODUCTION**

The Commission exceeded its authority under Section 104 of the CPSIA when it took the unprecedented step of purporting to expand the scope of a voluntary standard for one type of durable nursery product so as to sweep in and ban dozens of products not covered by that voluntary standard.[1]  Section 104 provides the Commission with regulatory power that is streamlined but limited to the context of adopting standards that are "substantially the same as" or "more stringent than" an *existing* voluntary standard.  15 U.S.C. § 2056a.  Section 104 does not allow the Commission to expand the *scope* of an existing voluntary standard or to regulate anew.  Instead, other authorities readily available to the Commission provide such powers, subject to additional procedural requirements that the Commission did not attempt to follow here.  Accordingly, the Rule lacks statutory authority.

The Rule undisputedly is not "substantially the same as" the voluntary standard:  the existing voluntary standard applies only to inclined infant sleepers, whereas the Rule sweeps in *all* previously unregulated flat sleep products.  The Commission instead argues that expanding a voluntary standard's *scope* makes it "more stringent" within the meaning of Section 104.  But increasing "stringency" (*i.e.*, strictness) is not the same as broadening "scope" (*i.e.*, coverage)—a point to

---

[1] Defined terms have the meanings assigned in Finnbin's opening brief.

which the Commission has not responded.  Section 104 authorizes only the former, but the Rule does the latter.  It therefore cannot stand.

Unable to overcome this central point requiring vacatur, the Commission cobbles together a selective understanding of Section 104's purpose and history, including by reference to text *outside* the relevant subsection of Section 104 that cannot (and does not) alter the requirement that regulation proceed by reference to existing voluntary standards.  And when read in context, the other indicia of meaning cited by the Commission uniformly support Finnbin's position: that Section 104 allows for the swift regulation of infant products, but only where a voluntary standard for the product at issue already exists.

The Commission complains that enforcing Section 104 as written will allow voluntary standard-setting organizations to prevent the Commission from regulating infant products outside the scope of existing voluntary standards.  That is simply wrong.  The Commission has numerous other powers that allow it to regulate products anew without deferring to the scope of existing voluntary standards.  That these other powers are subject to additional regulatory requirements—such as cost-benefit analysis—provides no basis to transform Section 104 into an end-run around such requirements.  Indeed, the pre-conditions set by Congress for the Commission to regulate were intended to prevent precisely the type of illogical outcome at issue here: a Rule that bans baby boxes without citing a single instance of harm associated

with their century-long history and that bans in-bed sleepers despite uncontroverted evidence that doing so will make infants less safe.

Because the Rule is contrary to and in excess of the Commission's authority under Section 104, and also because it is arbitrary and capricious, it should be vacated with respect to previously unregulated flat sleep products.

## ARGUMENT

## I. SECTION 104 DOES NOT AUTHORIZE THE COMMISSION TO EXPAND THE SCOPE OF A VOLUNTARY STANDARD

### A. The Commission's Waiver Argument is Meritless

The Commission argues, erroneously, that Finnbin's contrary to law argument is waived for failure to present it during the rulemaking process. (Commission Br. 18–19.) The doctrine of administrative exhaustion ensures "that an agency has had an opportunity to consider the matter, make its ruling, and state the reasons for its action before a court weighs in," and avoids "sandbagging" the agency with obscure claims. *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018) (cleaned up). The doctrine "is to be applied flexibly, with an eye toward its underlying purposes." *Etelson v. Office of Personnel Mgmt.*, 684 F.2d 918, 923 (D.C. Cir. 1982). Thus, this Court has refused to find an issue waived when it was (1) raised by third parties during the rulemaking, (2) considered by the agency *sua sponte*, or (3) a key assumption upon which agency action was premised. All three

of those circumstances squarely apply here and the Commission's waiver argument is, as such, meritless.

**First**, multiple commenters in the rulemaking flagged that the Rule failed to track the ASTM voluntary standard, as Section 104 requires. *See, e.g., Office of Communication of United Church of Christ v. FCC*, 779 F.2d 702, 706 (D.C. Cir. 1985) (issue preserved when it was "raised" by "other parties . . . in the notice and comment proceeding"). For example:

- Under the header, "The [voluntary] In-Bed Infant Sleeper Standard Process Must Continue," a commenter stated, "Since 1981 the Commission has been directed to defer to voluntary standards" and "Section 104 . . . continues with that mandate." The comment criticized the Commission for "skip[ping] this important step" of the ASTM process and charged that "this action was not in accordance with Section 104." The commenter urged the Commission to "limit the scope of any new rulemaking to that of inclined . . . products" covered by the voluntary standard. AR 614–16.

- Another commenter—the Juvenile Products Manufacturers Association, whose members represent 95% of the nursery products in North America— argued the Commission did not "meet . . . Section 104 requirements" because it unilaterally made a "drastic modification" to the voluntary standard's scope. The Association asked the Commission to "follow the ASTM . . . process of revising [the voluntary standard]." AR 939. The Association also asserted that the Rule "is not permitted under or consistent with [the Commission's] 10+ year approach to Section 104" in part "proceed[ing] in accordance with Section 104" "requires development . . . within ASTM" processes and "re-issuance of a[ new] NPR." AR 1129–32.

These comments raised the question of whether the Commission can, under Section 104, "promulgate a mandatory safety standard" for a category of products when no voluntary standard exists "for that category of products." (Commission

Br. 1.)  Under this Court's precedent, that is more than enough to preclude waiver. *See*, *e.g.*, *Hispanic Affairs Project*, 901 F.3d at 390 (rejecting waiver argument because, "[w]hile not always models of clarity, multiple comments in the administrative record broached the question"); *Appalachian Power Co. v. EPA*, 135 F.3d 791, 817–18 (D.C. Cir. 1998) (rejecting agency attempt to "seize[] on" variance between arguments raised during rulemaking and on appeal because it was "of no import whether that challenge is phrased in exactly the same way," "word for word," when the comments were "in substance, if not in form, the same objection" and "sufficient to put [the agency] on notice").

**Second**, the record makes clear that the Commission in fact considered Finnbin's contrary to law argument.  *See*, *e.g.*, *Nat. Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (rejecting waiver argument "because the agency in fact considered the statutory issue").   In the Rule's preamble, the Commission discussed, *at length*, its views on the precise question Finnbin raises— does Section 104 permit the Commission to expand the scope of an existing voluntary standard to capture products not already covered by that standard—and determined (erroneously) that it does.  For example:

- "Rulemaking pursuant to sections 7 and 9 of the CPSA [sometimes] requires the Commission to rely on a voluntary standard, rather than promulgate a rule, . . . . [but t]hose criteria are not relevant under section 104. . . . . [T]he Commission is not required to 'defer' to the voluntary standard." . . . . [N]othing in section 104 . . . requires the Commission to delay [adopting a

5

mandatory standard] . . . until all ASTM members have reached a consensus on whether and how to create or revise a voluntary standard." AR 2129.

- "CPSC will not delay the final rule [to await a voluntary standard covering flat infant sleep products], and section 104 of the CPSIA does not require CPSC to delay." AR 2131.

- "If CPSC could not use its [Section 104] authority to *expand the scope* of a rule to include such products, . . . ASTM could dictate when and if durable infant or toddler products are regulated." AR 2133 (emphasis added).

These proffered "justification[s]" provide "telling evidence that the challenge was properly before the agency." *Hispanic Affairs Project*, 901 F.3d at 390; *see, e.g.*, *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1084 (D.C. Cir. 1996) (argument preserved where agency "defended its position at some length in the final rule"); *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1022 (D.C. Cir. 2014) (argument preserved because "EPA's response . . . suggests that EPA understood [the comments] to challenge EPA's statutory authority"); *Cal. Communities Against Toxics v. EPA*, 928 F.3d 1041, 1049–50 (D.C. Cir. 2019) (same).

**Third**, the Commission's conclusion that Section 104 allows expanding the scope of an existing voluntary standard was *the* key assumption underlying the Rule and therefore presents no concern of unfair surprise. "Exhaustion . . . is not a license for agency passivity. Agencies always bear the affirmative burden of examining a key assumption" before issuing a rule. *Hispanic Affairs Project*, 901 F.3d at 389 (cleaned up). This Court thus does not find waiver where a rule's key assumption is the subject of dispute. *See, e.g.*, *Nat. Res. Def. Council*, 755 F.3d at 1023 (rejecting

6

agency argument that challenge to its statutory authority was waived: "that EPA had statutory authority . . . was a key assumption underlying [its action]" (cleaned up)); *Oklahoma Dep't of Environmental Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014) (challenge to agency's statutory authority to regulate certain land preserved, because "[u]nfair surprise" was "not a concern" when the challenge related to the threshold authority to regulate said land). Here, the Rule depends entirely on the Commission's assumption that Section 104 empowers it to expand the scope of an existing voluntary standard. This key assumption is properly before this Court.

Notably, and as the Commission concedes, the Rule marks the first and only time since Section 104's passage that the Commission has purported to expand the scope of a voluntary standard. This case therefore presents an important question of statutory authority that was incumbent upon the Commission to assess. Given the drastic consequences that would flow from the Commission's novel and expansive reading of Section 104—creating an end-run around the procedural guardrails that apply when the Commission regulates anew and wiping out entire sectors of the infant sleep market—it would be all the more unjust to find waiver here. *Cf. Hormel v. Helvering*, 312 U.S. 552, 558 (1941) (waiver "should not be applied where the obvious result would be a plain miscarriage of justice").

***Finally***, the circumstances here are materially different than those in *Koretoff v. Vilstaff*, 707 F.3d 394 (D.C. Cir. 2013), upon which the Commission relies.

(Commission Br. at 19.)  In that case, at a pre-rulemaking meeting, petitioners orally addressed to an agency representative a question about the agency's authority under a *regulation*.  This off-hand, pre-rulemaking remark was insufficient to preserve the claim on appeal that the agency lacked *statutory* authority—particularly absent evidence that the agency independently considered the issue.  *Koretoff*, 707 F.3d at 397–99.  Unlike in *Koretoff*, the Commission's authority under Section 104 to expand the scope of a voluntary standard was repeatedly broached during the rulemaking and addressed head-on by the Commission in the Rule.

**B.     The Commission's Interpretation of Section 104 Ignores the Relevant Statutory Text and Structure, Misconstrues the Legislative History, and Would Replace a Targeted Conferral of Authority with Sweeping Power**

Until the Rule, the Commission invoked its Section 104 rulemaking power dozens of times, but—consistent with that authority—only to examine existing voluntary standards and either adopt those standards or adjust their stringency.  Now, the Commission claims to have unearthed a new power in Section 104: to expand the scope of existing voluntary standards so as to sweep in and ban entire swaths of durable nursery products, without considering plausible alternatives or cost-benefit

data.  The Rule's aberration from the Commission's past practice is contrary to the relevant text, structure, history, and purpose of Section 104.[2]

***Text.***   The Commission's brief fails to engage with the operative and straightforward text of the subsection of Section 104 that purportedly authorized the Rule.  This text instructs the Commission to "examine and assess" *existing* voluntary standards and then "promulgate . . . standards" that are: (1) are "***substantially the same*** as such voluntary standards"; or (2) "***more stringent than*** such voluntary standards."   15 U.S.C. § 2056a(b)(1) (emphases added).   Mandatory standards promulgated by the Commission that fit neither description are unauthorized by Section 104.  It is undisputed that the Rule is not "substantially the same" as the inclined sleeper voluntary standard that the Commission had under review.  The only question then is whether the Rule may rely on Section 104 to expand the *scope* of the inclined sleeper voluntary standard by describing the expanded-scope standard as a "more stringent" standard.  It cannot.

The key phrase—"more stringent than such voluntary standards"—has two components:  (1) the mandatory standard must be more "stringent"; and (2) the increase in stringency is to be measured by comparing the mandatory standard to

---

[2] Only after the Commission tried and failed to persuade ASTM to expand the scope of the voluntary standard did it take the position that it could expand scope unilaterally.  (Commission Br. 27.)

"such voluntary standards," that is, existing voluntary standards.  The Commission

ignores both components.

Concerning the first component, the Commission does not dispute that

"stringent" means "strict."  (Finnbin Br. 30.)  Yet, the Commission argues that

Section 104 allows it to expand the "scope" of a voluntary standard to cover products

not covered by a "current voluntary standard" (Commission Br. 14), while failing to

respond to Finnbin's argument that "strictness" and "scope" are different concepts

with different definitions (Finnbin Br. 30–31).  By analogy, if an agency examined

a voluntary set of safety standards for cars and passed a rule saying, "this standard

now also applies to planes, trains, and boats," it would not be making the voluntary

car standard more stringent, but expanding its scope.  So too here.

With respect to the second component, and compounding its error, the

Commission overlooks that the question is not how "stringent" a mandatory standard

is in a vacuum, but whether it is "more stringent ***than such voluntary standards***."

15 U.S.C. § 2056a(b)(1)(B) (emphasis added); *see* "Than," Merriam-Webster Online

Dictionary ("[I]n comparison with"), https://bit.ly/32hMJwY.  Revealingly, the

section of the Commission's brief that addresses "statutory text" (Commission Br.

20–23) omits this comparator phrase—"than such voluntary standards"—leading the

Commission to suggest that the relevant stringency comparison is between the Rule

and nothing at all.  But, as the Rule itself confirms, the relevant comparison is

between the Rule and the *existing voluntary standard*: "[T]he final rule would incorporate . . . ASTM F3118-17a [the inclined sleeper standard], with substantial modifications to make the standard more stringent." AR 2127.

Finding no textual support in the relevant subsection of Section 104—15 U.S.C. § 2056a(b)(1), which authorizes the Commission to promulgate mandatory standards—the Commission instead invokes, out of context, the separate "timetable" subsection: § 2056a(b)(2). (Commission Br. 22–23.) That timetable subsection imposes deadlines for the Commission to "commence the rulemaking" in § 2056a(b)(1) and provides for the periodic review of mandatory standards *after* they are adopted under § 2056a(b)(1) to ensure these already-mandatory standards "provide the highest level of safety . . . feasible." That subsection does not address— and thus cannot override—the limits of the Commission's authority to adopt mandatory standards in the first instance under § 2056a(b)(1).

The Commission objects that enforcing Section 104 as written would inhibit its ability to promote infant safety. (Commission Br. 27.) But it is well-established that "[a]gencies are 'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Colorado River Indian Tribes v. Nat'l Indian Gaming Com'n*, 466 F.3d 134, 139 (D.C. Cir. 2006) (quoting *MCI Telecomms. Corp. v. AT & T*, 512 U.S. 218, 231 n.4 (1994)). Congress certainly intended in Section 104 to pursue infant safety

expeditiously (a goal Finnbin strongly supports), but "it is equally clear that Congress wanted to do this in a particular way." *Id*. at 140. This bedrock interpretive principle—distinguishing the *ends* of a statute from its *means*—is especially apt here, where the timetable subsection upon which the Commission stakes its case directs the Commission back to "the rulemaking required under paragraph (1)," *i.e.*, *§ 2056a(b)(1)'s* limitation to adopting standards that are substantially the same as voluntary standards or more stringent. 15 U.S.C. § 2056a(b)(2). In other words, the timetable subsection "leads us back to the opening question—what is the statutory basis empowering the Commission" to enact standards in the first place. *Colorado River Indian Tribes*, 466 F.3d at 140. As the text makes clear, that authority is limited to adopting or increasing the stringency of existing voluntary standards.

**Structure.** Lacking textual support, the Commission shifts to structure, urging that Section 104 "reflects a deliberate shift away from required reliance on voluntary standards." (Commission Br. 25.) But structure does not support the Commission's position—to the contrary, it shows that other authorities are available for the broad powers the Commission erroneously seeks to shoehorn into Section 104.

The Commission notes that under other provisions of the CPSA and CPSIA, it must "rely upon voluntary . . . standards" only when such standards would "eliminate or adequately reduce the risk of injury" and "it is likely that there will be substantial compliance." (*Id*. at 24 (quotation marks omitted).) But it does not

follow that Section 104 does not mean what it says: that the Commission must adopt durable nursery product standards "substantially the same as . . . voluntary standards" unless making such standards "more stringent" will "reduce the risk of injury." 15 U.S.C. § 2056a(b)(1)(B). In other words, unlike other authorities at the Commission's disposal (which require the Commission to defer to voluntary standards under limited conditions), Section 104 *always* requires regulation by reference to existing voluntary standards. *Compare id.* (instructing the Commission to "examine" "voluntary . . . standards" and adopt standards that are the same or more stringent than "such voluntary standards"), *with*, *e.g.*, *id.* § 2058 (instructing the Commission to begin rulemaking by "identify[ing] the product and the nature of the risk of injury").

Another key difference between Section 104 and the Commission's other powers further belies the Commission's categorical claim that Section 104 provides "*greater* powers." (Commission Br. 29.) Unlike other CPSA and CPSIA powers, *e.g.*, 15 U.S.C. §§ 1278a, 2057, Section 104 does not authorize the Commission to "ban" products. When Congress intended the Commission to have the power to eliminate products from the market, it said so. (Finnbin Br. 35–37.) Section 104 says nothing of banning, yet banning what the Rule does.

The Commission's response to this glaring distinction is unpersuasive. The Commission first suggests that because Section 104 is "not subject to" the procedural

checks that accompany the Commission's banning powers in the CPSA and CPSIA (*e.g.*, cost-benefit analysis), "it is irrelevant whether . . . the [Rule] can be understood as 'banning'" products.  (Commission Br. 31.)  This misses the point: the question is not whether the Commission must comply with other banning pre-conditions when issuing a ban under Section 104, but whether it has authority to ban under Section 104 in the first place (it does not).

The Commission next urges that the Rule is not really a ban, arguing that "a requirement that cars provide seatbelts is not usually thought of as a 'ban' on seatbelt-less cars."  (*Id.*)  But this analogy implies a line-drawing problem where none exists.  There may be cases in which differentiating between stringency and scope proves difficult, but this is not that case.  The Rule does not, for example, simply require baby boxes to be made of sturdier material that is not readily available.  Rather, it requires *all* flat infant sleep products not already covered by a voluntary standard to be converted into a bassinet—an entirely different product.  It thus bans these other products.

***Legislative history.***  The Commission mischaracterizes the legislative history, which unambiguously supports Finnbin.  The Commission first points to remarks by Congresswoman Jan Schakowsky regarding the Infant and Toddler Durable Product Safety Act, H.R. 1698, 110th. Cong. (2007).  (Commission Br. 4, 25.)  However, Congresswoman Schakowsky was not concerned with the *absence* of standards, but

with the fact that *existing* voluntary standards were not mandatory and, sometimes, needed to be made more stringent.  She remarked that the "majority of standards that are in place are voluntar[y]" and that "although there may be voluntary standards in place," these standards are not always "enforced," and in some cases do not "address[]" "all potential hazards."  153 Cong. Rec. 7701.

In any case, the Infant and Toddler Durable Product  Safety Act never made it out of committee and, crucially, lacked Section 104's choice between adopting voluntary standards and making them more stringent.  In fact, that bill instructed the Commission to promulgate standards under 15 U.S.C. §§ 2056(a) and 2058, H.R. 1698, 110th. Cong. (2007), which require cost-benefit analyses and the many other procedural checks catalogued in Finnbin's opening brief.  (Finnbin Br. 5–7).  That even this unpassed bill imposed significant constraints dispels the Commission's notion that vigilantly pursuing infant safety and abiding by procedural checks designed to ensure prudent regulation are mutually exclusive.

Elsewhere (Commission Br. 5, 25), the Commission selectively quotes from a statement made by Senator Amy Klobuchar regarding the operative language of Section 104, included in the Senate version of the CPSIA.  But the Commission omits language from the Senator's statement (in emphasis) making clear that regulation under Section 104 was to be by reference to voluntary standards:

> It is clear we must ***strengthen*** our safety standards and ***make them stronger*** for nursery products.  Right now the safety of the Nation's

nursery products depends on a system of voluntary standards. And while voluntary standards are a good first step, we have seen over and over again that they are not enough. The amendment [I am] offering would ***direct the CPSC to evaluate and revamp these safety standards and give them the force of law.*** It is telling the CPSC, you have to do your job. ***Revamp these standards and make them better. This amendment directs the CPSC to work with consumer groups, child product manufacturers and engineers and safety experts to examine and assess the effectiveness of our current system of voluntary safety standards for nursery products.***

154 Cong. Rec. 3449 (emphases added).

The omitted language entirely changes the statement's meaning: the Commission is to "evaluate" the "current" set of voluntary standards, "work with" stakeholders to "strengthen" and "revamp" them as needed, and then give these voluntary standards "the force of law" to ensure compliance. Nothing in this statement supports the view that Section 104 *sub silentio* provided the Commission *carte blanche* authority.[3] Senator Klobuchar's statement comports with the broader legislative history, which reflects an interest in "streamlin[ing]" rulemaking, H.R. Rep. 110-501 (2007), at 20, not in imposing new mandatory standards without basis in existing ones.

---

[3] Senator Bill Nelson described this "a *consensus process* involving . . . consumer groups, juvenile product manufacturers, and experts." 154 Cong. Rec. 3455. And the Commission has observed: "Participation by all concerned stakeholders collectively to develop . . . standards" is the "most effective way to mitigate the risk of injury." *Commission Participation and Commission Employee Involvement in Voluntary Standards Activities*, 81 Fed. Reg. 5369, 5374 (Feb. 2, 2016).

16

***Past practice.*** The Commission concedes that in the years since Section 104 was enacted, and dozens of rulemakings thereunder, it has *never* taken the view that it may expand the scope of a voluntary standard, much less ban products not already covered by a preexisting standard. (Commission Br. 32.)

What the Commission does not say is that it has issued statements taking the opposite position. For example, the Commission's 2022 Performance Budget Request to Congress said: "The CPSIA requires the Commission to promulgate mandatory regulations by adopting ***existing*** voluntary standards (in whole or in part) for . . . durable infant or toddler products." Consumer Product Safety Commission, *Fiscal Year 2022: Performance Budget Request to Congress* 26 (May 2021), https://bit.ly/3sF3Gwj (emphasis added). A substantively identical statement appears in *all* of the Commission's publicly-available budget requests for 2013 through 2021.[4] Consumer Product Safety Commission, *Budget and Performance* (last visited Jan. 19, 2021), https://bit.ly/3FiGjft. As another example, the Commission stated in a preamble to a 2016 rule:

> In the case of section 104 . . . , voluntary standards ***are the basis*** for the Commission's rulemaking for a durable infant or toddler product. . . . . In effect, Congress directed certain juvenile product ***voluntary standards*** to become ***precursors of mandatory rules***, but still required

---

[4] This same statement also appears in the Commission's strategic plans for 2016–2020 and 2018–2022. Consumer Product Safety Commission: Strategic Plan 2016–2020 at 52 n.16, https://bit.ly/351kh3t; Consumer Product Safety Commission: Strategic Plan 2018–2022 at 50 n.15, https://bit.ly/3IbXrEy.

the Commission to use notice and comment rulemaking to **make such standards mandatory rules**.

81 Fed. Reg. at 5374 (emphases added); *see Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("[T]he preamble . . . is evidence of an agency's contemporaneous understanding.").

The Commission fails to justify the Rule's about-face. The Commission first argues that it has never before expanded the scope of a voluntary standard because "most . . . products *are* covered by voluntary standards." (Commission Br. 32.) But that contention is impossible to square with, *inter alia*, the Commission's earlier statements that "existing" voluntary standards form the "basis" for Section 104 rulemaking, *supra* at 17, or the Commission here repeatedly asking ASTM to voluntarily expand the scope of the inclined sleeper standard, AR 2108. Notably, many ASTM durable nursery standards later adopted by the Commission as mandatory did not exist at the time of Section 104's enactment.

Next, the Commission suggests that the principle repeated in *Utility Air*—that courts should be skeptical of agencies claiming to discover new expansive powers in an old statute—does not apply here because the "'unheralded power'" in *Utility Air* concerned a "'*significant portion of the American economy*.'" (Commission Br. 32 (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014)). Even if that principle were limited to issues with major economic consequences (it is not), the

global durable infant product market was valued at $20.7 billion in 2019[5] and affects millions of households each year. But the principle is not so limited; the Rule construes Section 104 with novel breath, which necessitates close scrutiny. *Watt v. Alaska*, 451 U.S. 259, 272–73 (1981) (where agency "interpreted the [statute] when passed, and for 10 years thereafter" in one way, that "contemporaneous construction carrie[d] persuasive weight" and the "current interpretation, being in conflict," merited "considerably less deference").

***Purpose.*** Finally, the Rule's logic would convert Section 104's cabined source of streamlined authority into virtually unlimited power to regulate and ban durable nursery products. According to the Commission, it may—consistent with Section 104—decide that one type of infant sleep product is the safest, issue a regulation banning all other infant sleep products, drive dozens of manufacturers out of business, and never make a single finding as to costs and benefits or plausible alternatives. The only finding the Commission need make under this view is that its adopted standard reduces the risk of injury in the banned products. Because any ban on a product necessarily reduces the risk of injury with that product, under the Commission's reasoning, it could even ban *all* durable nursery products.

---

[5] *Global Baby Durable Products Industry (2020 to 2025)*, Associated Press (June 4, 2020), https://bit.ly/3G3yEle.

That cannot be correct.  Section 104 outlines a close relationship between mandatory and existing voluntary standards, and says nothing of bans, authority to regulate from scratch, or authority to broaden the scope of existing voluntary standards.  This deafening silence makes the Commission's reading a paradigmatic elephant-in-a-mousehole.  The Commission seeks exemption from this principle by noting that Section 104 is "limited to durable infant or toddler products." (Commission Br. 30.)  But the unchecked power to upend an entire ($20 billion) industry still requires congressional authorization.  Because Section 104 does not provide that power, the Rule fails.

## C.    The Commission is Not Entitled to *Chevron* Deference

In two short paragraphs, the Commission falls back on *Chevron*. (Commission Br. 28.)  *Chevron* cannot save the Rule because Section 104 unambiguously limits the Commission to adopting a voluntary standard or adjusting its stringency, and even if there were ambiguity, the Commission's interpretation is unreasonable and adopted for the sake of this litigation.

This Court "owe[s] an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,'" it is "unable to discern Congress's meaning."  *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  The "failure of congress to use 'Thou Shalt Not' language

doesn't create a statutory ambiguity of the sort that triggers *Chevron*." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004). What matters is whether interpretive "clues" render the language "clear enough." *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).

As explained *supra*, the relevant text, structure, and legislative history all make clear that Section 104 empowers the Commission to take just one of two actions: adopt a voluntary standard or make that standard more "stringent." Where, as here, these traditional tools of interpretation "supply an answer," "*Chevron* leaves the stage." *Epiq Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (quotation marks omitted).

Even if Section 104 were ambiguous (it is not), the Commission would not be owed deference because its interpretation is unreasonable and litigation-driven.

**First,** *Chevron* requires agencies to "operate within the bounds of reasonable interpretation." *Utility Air*, 573 U.S. at 321 (quotation marks omitted). Reasonable interpretation "must account for both the specific context in which language is used and the broader context of a statute." *Id.* (cleaned up). The Commission's principal defense of its interpretation for *Chevron* purposes is: if Section 104 did not permit the Commission to "expand the scope of a rule to include products not covered by any existing ASTM standard, then ASTM could dictate when and if durable infant or toddler products are regulated." (Commission Br. 28–29 (quotation marks

omitted).).  This assertion is demonstrably wrong.  Section 104's limitations do not cede authority to standard-setting organizations; rather, the Commission has multiple other sources of authority it could use to adopt a standard governing a previously unregulated product.  (Finnbin Br. 5–7.)

***Second***, no deference is owed to "litigating positions . . . unsupported by regulations, rulings, or administrative practice."  *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 212 (1988).  The Commission argues that the separate "timetable" subsection of Section 104 empowers the Commission to "issue mandatory standards for *all* 'durable infant and toddler products,' not just those subject to existing voluntary standards."  (Commission Br. 22.)  As explained above, *supra* at 11–12, this argument fails as an interpretative matter.  But it also reflects a litigation position untethered from the Rule's rationale, the history of Section 104 rulemaking, and the Commission's prior conflicting statements, *supra* at 14–20.

## II.  THE COMMISSION ACTED ARBITRARILY AND CAPRICIOUSLY IN ADOPTING A ONE-SIZE-FITS-ALL BAN ON DOZENS OF FLAT INFANT SLEEP PRODUCTS

### A.  The Commission Concedes that the Rule Prohibits Baby Boxes Without Citing a Single Instance of Harm Relating to a Baby Box

The Commission does not dispute that it cannot identify a single case of a baby box harming an infant.  It is arbitrary and capricious to ban a near-century-old product without any proof it is dangerous and despite evidence that other products permitted by the Commission result in numerous injuries and deaths each year.

The Commission asks the Court to overlook this gap because the Rule collects "reports . . . associated with flat infant sleep products like baby boxes." (Commission Br. 33.) But, as the Commission recognizes, baby boxes, in-bed sleepers, and other flat infant sleep products are all "*different* products." (*Id.* at 44 (emphasis added).) It is arbitrary to assume that a safety issue with one would apply to all, much less equally. For example, the Commission asserts that "flat sleep products . . . can easily fail to contain an infant" (*id.* at 34), but an infant is unlikely to crawl out of a hard-sided, 11-inch-tall baby box—indeed, baby boxes already *satisfy* the Bassinet Standard's 7.5-inch side-height requirement. AR 2165.[6]

The cases cited by the Commission fail to address the Rule's deficiencies. The Commission points to *Stilwell v. Office of Thrift Supervision* for the proposition that an agency need not present "substantial empirical evidence." 569 F.3d 514, 519 (D.C. Cir. 2009). But Finnbin does not argue a lack of substantial evidence; it argues that the complete absence of evidence bespeaks irrational and arbitrary reasoning.

---

[6] *Amici* make a similar error: conflating that there have been no identified deaths or injuries associated with baby boxes with arguments made by Fisher-Price about the "Rock 'n Play." (Amici Br. 10). Rock 'n Play made its "no death or injury" argument hardly a year after the product was first introduced, whereas baby boxes have existed for over *90 years* without incident. AR 1485–86. Plainly the absence of negative data is more powerful when it pertains to the course of almost a century rather than a year. *Amici* also state that "experts have concluded that infants should sleep on their backs, on firm and flat surfaces in their own space, with no extra padding or bedding" (Amici Br. 2)—that disqualifies the 30-degree-inclined Rock 'n Play, but perfectly describes baby boxes.

Notably, the *Stilwell* rule identified "several situations" where the undesirable conduct occurred, *Optional Charter Provisions in Mutual Holding Company Structures*, 73 Fed. Reg. 39216, 39217 (July 9, 2008)—there is no such record here.

*Forester v. Consumer Prod. Safety Comm'n of U.S.* is similarly inapposite. In *Forester*, the Commission adopted bicycle regulations and the challenger "assail[ed] sixteen specific provisions of the regulations" on the grounds that the Commission had not shown that "each will eliminate a hazard that has caused a significant proportion of cyclist injuries." 559 F.2d 774, 788 (D.C. Cir. 1977). There, however, it was accepted by all that bicycles cause considerable injuries and that regulation was justified; the Court merely held that the Commission (under a different statute) need not tie each individual element of the regulation to a set number of "actual injuries." *Id*. Had the Commission banned bicycles without being able to identify even one bicycle injury—as it has done here with respect to baby boxes—*Forester* would have been a completely different case.

*Chamber of Commerce v. SEC* fares no better. There, responding to "revelations of certain abuses" relating to "conflicts of interest" in the mutual fund industry, the SEC adopted rules "strengthening the role of independent directors" across several types of transactions. The Court rejected plaintiff's argument that the rule imposed conflict-of-interest controls on types of transactions that had not yet been directly implicated among the "documented abuses." 412 F.3d 133, 139–41

24

(D.C. Cir. 2005). But, among other things, *Chamber of Commerce* involved *new* "revelations" that required a real-time response, not—as here—a product that has been used without reported harm for nearly a century.

*Chamber of Commerce* highlights another error in the Commission's reasoning. There, the SEC's rule policed conflicts of interest in various transactions, but did not prohibit those transactions entirely while simultaneously allowing transactions with documented histories of abuse to continue. Here, by contrast, the Rule bans baby boxes absent evidence of harm, while sanctioning the use of (a) bassinets and (b) cribs and mattresses, which the Commission's own data reflects caused 67 and 113 infant *deaths* from 2015–2017, respectively. Consumer Product Safety Commission, *Injuries and Deaths Associated with Nursery Products Among Children Younger than Age Five* 8 tbl. 3 (Dec. 2020), https://bit.ly/30RYMQO.[7] This contradiction precludes finding a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).

---

[7] The Commission responds that the "question is not whether baby boxes are '*safer*' than . . . other options," "but whether the category of infant sleep products is as safe as is 'feasible.'" (Commission Br. 42.) This nonsensically puts the safety of *products* over the safety of *infants*. On that logic, the Commission could *allow* a product that resulted in death in 9 out of 10 uses and *ban* another product that resulted in 1 injury in every 1,000 uses so long as the former product was as safe as *that product* could be and the latter might be made even safer.

## B. Precipitously Banning In-Bed Sleepers Will Endanger Infants

The Commission does not dispute (nor could it) that a standard that *increased* the risk of harm to infants would be arbitrary and capricious. But that is what the Rule does: numerous studies show that parents widely practice bedsharing and are unlikely to stop even if told to do so, that in-bed sleepers mitigate risks associated with bedsharing, and, therefore, banning in-bed sleepers will expose infants to more danger from bedsharing, not less. (Finnbin Br. 49–52.)

The Commission responds that it found "bedsharing" to be dangerous and that it need not allow a "product to remain unregulated on the theory that some consumers might not use the product if it were subjected to standards that would make it safer." (Commission Br. 47.) That response cannot rescue the Rule.

***First***, whether *bedsharing* is risky is irrelevant to whether *in-bed sleepers* make bedsharing safer. The Commission could not rebut a claim that an infant sleep product makes sleeping safer by responding that sleeping is itself dangerous. Likewise here, even if in-bed sleepers "may not prevent" overlay from bedsharing in *all* cases, as the Commission claims (*id.* (quotation marks omitted)), that is no reason to expose infants to the unmitigated risk of bedsharing.

***Second***, it is misleading to describe the Rule as making in-bed sleepers "safer." The Rule does not call for implementable adjustments to in-bed sleepers— it removes them from the market entirely by requiring them to be bassinets. As the

Rule recognizes, in-bed sleepers "cannot meet the bassinet standard" given the differences between these products.  AR 2140.

*Finally*, the Commission argues that "[e]ven if it were clear that bedsharing is safer with in-bed sleepers," banning in-bed sleepers would be rational because Section 104 "prioritizes the safety of a given category of products."  (Commission Br. 47.)  But, as described *supra* at 25 n.7, this turns on an unfounded reading of the statute that elevates product safety over infant safety.  The Commission posits that its reading provides "assurance" to parents that products are safe (Commission Br. 48), but surely Congress would not have wanted to give parents a false sense of security that bedsharing is safer without an in-bed sleeper.

### C.     Finnbin has Standing to Challenge the Rule's Application to Flat Infant Sleep Products

The Commission briefly contends that the Court may not consider the Rule's irrational inclusion of flat infant sleep products generally because Finnbin "manufactures baby boxes."  (Commission Br. 44.)  But Finnbin has standing to challenge the Rule's application to in-bed sleepers and other flat infant sleep products because that aspect of the Rule (1) imposes direct economic harm on Finnbin, and (2) substantiates Finnbin's argument that it was arbitrary and capricious to adopt a one-size-fits-all standard for distinct products.

*First*, the Rule harms Finnbin financially.  Finnbin's "line of business is flat infant sleep products, *including* 'baby boxes.'"  (Finnbin Br. 28 (emphasis added).)

While Finnbin has, to date, only manufactured baby boxes, the Rule's ban on flat infant sleep products "prevents Finnbin from pursuing other avenues for its flat sleep product business such as in-bed sleepers" and the "Rule's open-endedness" bars Finnbin from creating "new and innovative flat infant sleep product[s] . . . to preserve its . . . business." (*Id*.) Further, but for the Rule, Finnbin could and would market its baby boxes—or a slightly modified version of its baby boxes—as in-bed sleepers. Indeed, Commission staff noted during the rulemaking, "baby boxes could be used as an in-bed sleeper." AR 536. Thus, even if the Court vacated only the Rule's application to in-bed sleepers, Finnbin would benefit from the ability to reopen (after closing due to the Rule) and market its wares for in-bed sleep. *See Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (a plaintiff need only show a "favorable decision will relieve a discrete injury," not that it "will relieve his every injury" (quotation marks omitted)).

**Second**, Finnbin has standing to challenge the Rule's inclusion of in-bed sleepers and other flat infant sleep products because that inclusion illustrates the irrationality of the Commission's "one-size-fits-all approach." (Finnbin Br. 57.) The Rule's failure to account for the distinctions between different flat infant sleep products resulted in an unprecedented and sweeping ban on baby boxes and dozens of other products.

## CONCLUSION

The Court should vacate the Rule with respect to previously unregulated flat infant sleep products.

Dated: January 19, 2022         Respectfully submitted,

/s/  Kathleen R. Hartnett
KATHLEEN R. HARTNETT
JULIE VEROFF
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com
jveroff@cooley.com

ADAM M. KATZ
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com

*Counsel for Petitioner*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and D.C. Circuit Rule 32(e), I hereby certify that this brief complies with the applicable type-volume limitations. The brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1), the brief contains 6,497 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare this brief.

/s/ Kathleen R. Hartnett
KATHLEEN R. HARTNETT

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of January, 2022, the foregoing brief was

served on all registered counsel through this court's electronic filing system.

/s/ Kathleen R. Hartnett
KATHLEEN R. HARTNETT