# United States Court of Appeals for the District of Columbia Circuit

FINNBIN, LLC,

*Petitioner*,

*v.*

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

*Respondent.*

## DEFERRED JOINT APPENDIX VOLUME I OF II

On Petition for Review of a Final Rule
of the United States Consumer Product Safety Commission

KATHLEEN R. HARTNETT
  *Counsel of Record*
JULIE VEROFF
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com
jveroff@cooley.com
*Counsel for Finnbin*

ADAM M. KATZ
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com
*Counsel for Finnbin*

*(additional counsel listed on inside cover)*

January 26, 2022

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*
SCOTT R. MCINTOSH
DANIEL WINIK
  *Attorneys, Appellate Staff*
Civil Division, Room 7245
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-8849
*Counsel for the Commission*

# TABLE OF CONTENTS

# VOLUME I

| Document Name | Date | JA Page |
|---|---|---|
| Amended Certified List of the Record | — | JA 1 |
| Federal Register Notice, "Safety Standard for Bassinets and Cradles," Final Rule, 78 Fed. Reg. 63019 (Oct. 23, 2013) | 10/23/2013 | JA 16 |
| Federal Register Notice, "Safety Standard for Infant Inclined Sleep Products," Notice of Proposed Rulemaking, 82 Fed. Reg. 16963 (Apr. 7, 2017) | 4/7/2017 | JA 34 |
| CPSC Ballot Vote Sheet Transmitting Draft *Federal Register* Notice: Safety Standard for Infant Inclined Sleep Products: Termination of Rulemaking | 6/12/2019 | JA 47 |
| CPSC Ballot Vote Sheet Transmitting Draft *Federal Register* Notice: Supplemental Notice of Proposed Rulemaking to Establish a Safety Standard for Infant Sleep Products, and CPSC Staff's Briefing Package | 10/16/2019 | JA 57 |
| Federal Register Notice, "Safety Standard for Infant Sleep Products," Supplemental Notice of Proposed Rulemaking, 84 Fed. Reg. 60949 (Nov. 12, 2019) | 11/12/2019 | JA 266 |
| Letter from Celestine Kish to Scott Lewis, Subcommittee Chairman for ASTM Bassinets and Cradles, and Richard Rosati, Subcommittee Chairman for ASTM Infant Incline Sleep Product, ASTM International: "Re: ASTM F15.18 Bassinet and Cradles and Infant Inclined Sleep Products Updates" | 12/12/2019 | JA 281 |
| Comment from Anthony A. Paolo, Credo Advisors LLC: "Re-Supplemental Notice of Proposed Rulemaking for Infant Sleep Products/Docket No. 2017-0020" | 1/8/2020 | JA 283 |
| Comment from Mary F. Toro, Consumer Safety Consultancy LLC: "RE: Comments to Docket No. CPSC-2017-0020 submitted electronically through www.regulations.gov" | 1/21/2020 | JA 284 |
| Comment from Amber Kroeker, Pip & Grow: "RE: Comments to Docket No. CPSC-2017-0020: Safety Standard for Infant Sleep Products" | 1/27/2020 | JA 287 |

| | | |
|---|---|---|
| Comment from Sara H. Goza, American Academy of Pediatrics: "Re: CPSC-2017-0020" | 2/25/2020 | JA 291 |
| Comment from Joanne E. Mattiace: "Re: Supplemental Notice of Proposed Rulemaking for Infant Sleep Products Docket No. 2017-0020" | 2/25/2020 | JA 295 |
| Comment from 94 National and State Medical, Public Health, and Consumer Organizations: "Re: CPSC-2017-0020" | 2/25/2020 | JA 302 |
| Meeting Log, Compact Bassinet, Task Group of Bassinet Subcommittee | 2/25/2020 | JA 306 |
| Comment from Lisa Furuland Kotsianis, DockATot: "Re: CPSC's November 12, 2019 Supplemental Notice of Proposed Rulemaking for Infant Sleep Products/Docket No. 2017-0020" | 2/26/2020 | JA 308 |
| Comment from Michael S. Wogalter, North Carolina State University, Michael J. Kalsher, Rensselaer Polytechnic Institute, Alison Vredenburgh, Vredenburgh & Associates, Inc., Ilene Zackowitz, Vredenburgh & Associates, Inc.: "RE: Comments to Docket No. CPSC-2017-0020" | 2/26/2020 | JA 310 |
| Comment from Carol Pollack-Nelson and Sarah B. Newens, Independent Safety Consulting, LLC: "Re: Comments to Docket No. CPSC-2017-0020" | 2/26/2020 | JA 313 |
| Comment from John Konsin | 2/26/2020 | JA 331 |
| Comment from Nancy A. Cowles, Kids in Danger: "Comments of Kids in Danger to the Consumer Product Safety Commission on the Supplemental Notice of Proposed Rulemaking on Infant Sleep Products (CPSC-2017-0020)" | 2/26/2020 | JA 333 |
| Letter from American Academy of Pediatrics, Consumer Federal of America, Consumer Reports, Kids in Danger, Public Citizen, and U.S. PIRG Education Fund, to Robert S. Adler, Acting Chairman, Elliot F. Kaye, Commissioner, Dana Baiocco, Commissioner, and Peter A. Feldman, Commissioner | 4/13/2020 | JA 336 |
| Letter from Celestine Kish to Richard Rosati, ASTM Subcommittee Chair for ASTM Infant Inclined Sleep Products: "Re: ASTM F15.18 Infant Inclined Sleep Products" | 7/16/2020 | JA 339 |
| Letter from Celestine T. Kish to Richard Rosati, Subcommittee Chairman for ASTM Infant Inclined Sleep Products, ASTM | 1/11/2021 | JA 341 |

| | | |
|---|---|---|
| International: "Re: ASTM F15.18 Infant Inclined Sleep Products: Ballot F15-18 (20-01), Item #1." | | |
| Letter from Kelly Mariotti, JPMA, to Patricia Edwards | 2/2/2021 | JA 343 |

# VOLUME II

| | | |
|---|---|---|
| CPSC Ballot Vote Sheet Transmitting Draft *Federal Register* Notice – Final Rule: Safety Standard for Infant Sleep Products, and CPSC Staff's Briefing Package | 5/12/2021 | JA 350 |
| Late Comment from Shawn, Finnbin: "Final Rule/With Respect to Baby Boxes" | 5/17/2021 | JA 679 |
| Late Comment from Brian, DockATot, with Letter Attached: "CPSC's Proposed Final Rule for Infant Sleep Products" | 5/17/2021 | JA 681 |
| Letter from Lisa Trofe, JPMA, to Patricia Edwards, with February 2, 2021 Letter Attached | 5/17/2021 | JA 685 |
| Late Comment from William Wallace and Oriene Shin, Consumer Reports, "CR letter to Commissioners on draft final rule for infant sleep products," with Letter Attached | 5/27/2021 | JA 696 |
| Late Comment from Shawn, Finnbin: "Final Rule Vote: Safety Standard for Infant Sleep Products" | 5/27/2021 | JA 699 |
| Late Comment from Rep. Susan Wild | 6/1/2021 | JA 703 |
| Late Comment from Carol Pollack-Nelson, Independent Safety Consulting, LLC, with Letter Attached: "Re: Final Rule" | 6/1/2021 | JA 706 |
| Late Comment from Rep. Jan Schakowsky, Rep. Tony Cardenas, Sen. Richard Blumenthal, and Sen. Tammy Duckworth | 6/1/2021 | JA 710 |
| Late Comment from Carol Pollack-Nelson, Independent Safety Consulting, LLC, with Letter Attached: "Re: Final Rule and question regarding unintended consequences" | 6/1/2021 | JA 713 |
| Late Comment from Trip Coyne, DockATot: "Thank You" | 6/2/2021 | JA 720 |
| Minutes of Commission Meeting, Decisional Matter: Final Rule: Safety Standard for Infant Sleep Products | 6/2/2021 | JA 722 |

| | | |
|---|---|---|
| Video of Commission Meeting – Decisional Matter: Safety Standard for Infant Sleep Products (document contains link to video) | 6/2/2021 | JA 729 |
| Statement of Commissioner Dana Baiocco on Final Rule for Infant Sleep Products | 6/3/2021 | JA 730 |
| Statement of Acting Chairman Robert S. Adler re: Vote on Final Rule to Establish a Safety Standard for Infant Sleep Products | 6/15/2021 | JA 733 |
| Federal Register Notice, "Safety Standard for Infant Sleep Products," Final Rule, 86 Fed. Reg. 33022 (June 23, 2021) | 6/23/2021 | JA 738 |
| ASTM F2194–16e1, Standard for Consumer Safety Specification for Bassinets and Cradles (approved on April 15, 2016) | — | JA 789 |
| ASTM F3118-17a, Standard Consumer Safety Specification for Infant Inclined Sleep Products (approved on September 1, 2017) | — | JA 805 |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of January, 2022, the enclosed appendix was served on all registered counsel through this court's electronic filing system. I further certify that all parties required to be served will be served by third-party commercial carrier for delivery within two days of the electronic filing, pursuant to Federal Rule of Appellate Procedure 25(c)(1) and D.C. Circuit Rule 25(d).

/s/ Kathleen R. Hartnett
KATHLEEN R. HARTNETT

IN THE UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| FINNBIN, LLC | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 21-1180 |
| | ) | |
| CONSUMER PRODUCT SAFETY COMMISSION, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## AMENDED CERTIFIED LIST OF THE RECORD PURSUANT TO RULE 17(b) OF THE FEDERAL RULES OF APPELLATE PROCEDURE

I hereby certify, to the best of my knowledge, that the materials identified in the

attached amended numbered list constitute the administrative record of the Respondent,

Consumer Product Safety Commission, in the proceeding for which judicial review is

sought in the above-titled action.

Dated: November 1, 2021

Alberta Mills

Digitally signed by Alberta
Mills
Date: 2021.11.01 11:11:22
-04'00'

_____

Alberta E. Mills, Secretary
Consumer Product Safety Commission

IN THE UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| FINNBIN, LLC | ) |
| | ) |
|     Petitioner, | ) |
| | ) |
|     v. | )     No. 21-1180 |
| | ) |
| CONSUMER PRODUCT SAFETY COMMISSION, | ) |
| | ) |
|     Respondent. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## **AMENDED CERTIFIED LIST OF THE RECORD**

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| 1 | Federal Register Notice, "Safety Standard for Bassinets and Cradles," Final Rule, 78 Fed. Reg. 63019 (Oct. 23, 2013) | 10/23/2013 | 1-18 |
| 2 | Federal Register Notice, "Safety Standard for Bassinets and Cradles; Correction," Final Rule; Correction, 78 Fed. Reg. 77574 (Dec. 24, 2013) | 12/24/2013 | 19 |
| 3 | CPSC Ballot Vote Sheet Transmitting Draft *Federal Register* Notice: Proposed Rule to Establish a Safety Standard for Infant Inclined Sleep Products, and CPSC Staff's Briefing Package | 03/22/2017 | 20-148 |
| 4 | Record of Commission Action, Proposed Rule: Safety Standard for Infant Inclined Sleep Products | 03/31/2017 | 149 |
| 5 | Federal Register Notice, "Safety Standard for Infant Inclined Sleep Products," Notice of Proposed Rulemaking, 82 Fed. Reg. 16963 (Apr. 7, 2017) | 04/07/2017 | 150-162 |
| 6 | Comment from Evan Quinn: "Safety Standard for Infant Inclined Sleep Products" | 04/17/2017 | 163-164 |
| 7 | Comment from Cody Bates: "Infant Inclined Sleep Products" | 05/15/2017 | 165 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| 8 | Comment from Stephanie Guzman, University of Minnesota: "Re: CPSC Docket No. 2017-0020 – Safety Standard for Infant Inclined Sleep Products" | 06/04/2017 | 166-168 |
| 9 | Comment from Jeffrey T. Phipps: "Re: Docket Number-CPSC-2017-0020; Safety Standard for Infant Inclined Sleep Products" | 06/21/2017 | 169-171 |
| 10 | Comment from Danielle Iverson, JPMA: "Re: NOTICE OF PROPOSED RULEMAKING (NPR): CPSIA Section 104: Safety Standard for Infant Incline Sleep Products: Docket No. CPSC-2017-0020" | 06/21/2017 | 172-173 |
| 11 | Comment from Nancy A. Cowles, Kids in Danger, Rachel Weintraub, Consumer Federation of America, William Wallace, Consumers Union, Joan Muratore, Consumer Reports, Remington A. Gregg, Public Citizen, Edmund Mierzwinski, U.S. PIRG: "Comments of Kids in Danger, Consumer Federation of America, Consumers Union, and Public Citizen to the U.S. Consumer Product Safety Commission on the Notice of Proposed Rulemaking, 'Safety Standard for Infant Inclined Sleep Products'" | 06/21/2017 | 174-179 |
| 12 | Comment from Fernando Stein, American Academy of Pediatrics: "Re: 'Safety Standard for Infant Inclined Sleep Products', Docket No. CPSC-2017-0020" | 07/05/2017 | 180-182 |
| 13 | Letter from Celestine Kish to Mike Steinwachs, Subcommittee Chairman for ASTM Infant Inclined Sleep Products, ASTM: "Re: ASTM F15 Ballot (17-07), item 9, Infant Inclined Sleep Products" | 09/29/2017 | 183-184 |
| 14 | Meeting Log, Meeting of ASTM Infant Inclined Sleep Products Electrical Task Group | 01/11/2018 | 185-186 |
| 15 | Meeting Log, Meeting of ASTM Infant Inclined Sleep Products Roll Over Task Group | 06/05/2018 | 187-188 |
| 16 | Meeting Log, Meeting of ASTM Infant Inclined Sleep Products Roll Over Task Group | 09/20/2018 | 189-190 |
| 17 | Meeting Log, Meeting of ASTM Infant Inclined Sleep Products Subcommittee | 10/16/2018 | 191-193 |
| 18 | Meeting Log, Meeting of ASTM Infant Inclined Sleep Products Roll Over Task Group | 03/19/2019 | 194-195 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| 19 | Letter from Celestine Kish to Joel Taft, Subcommittee Chairman for ASTM Infant Inclined Sleep Products, ASTM: "Re: ASTM F15 Ballot (19-04), Item 4, Infant Inclined Sleep Products" | 04/26/2019 | 196 |
| 20 | CPSC Ballot Vote Sheet Transmitting Draft *Federal Register* Notice: Safety Standard for Infant Inclined Sleep Products: Termination of Rulemaking | 06/12/2019 | 197-206 |
| 21 | CPSC Staff Statement and Fors Marsh Group Report, "Consumer Product Safety Commission (CPSC): Caregiver Perceptions and Reactions to Safety Messaging Final Report" | 08/12/2019 | 207-260 |
| 22 | Meeting Log, Meeting of ASTM Infant Inclined Sleep Products Hazard Identification Task Group | 08/14/2019 | 261-262 |
| 23 | Meeting Log, Meeting of the ASTM Infant Inclined Sleep Product Task Group | 08/21/2019 | 263 |
| 24 | Meeting Log, ASTM F15 Infant Inclined Sleep Products Labeling Task Group | 08/30/2019 | 264 |
| 25 | Meeting Log, Infant Inclined Sleep Product Hazard Identification Task Group | 09/04/2019 | 265 |
| 26 | Meeting Log, Infant Inclined Sleep Product Hazard Identification Task Group | 09/16/2019 | 266 |
| 27 | Meeting Log, Infant Inclined Sleep Product Side Height Task Group | 09/19/2019 | 267 |
| 28 | CPSC Ballot Vote Sheet Transmitting Draft *Federal Register* Notice: Supplemental Notice of Proposed Rulemaking to Establish a Safety Standard for Infant Sleep Products, and CPSC Staff's Briefing Package | 10/16/2019 | 268-476 |
| 29 | Meeting Log, Infant Inclined Sleep Product Task Group Leads | 10/18/2019 | 477 |
| 30 | Meeting Log, ASTM F15 Juvenile Products Subcommittee Meetings | 10/21/2019 – 10/23/2019 | 478-489 |
| 31 | Record of Commission Action, Supplemental Notice of Proposed Rulemaking for Infant Sleep Products | 10/25/2019 | 490 |
| 32 | Letters from Marta L. Tellado, Consumer Reports, to Michael Dwyer, JPMA, Jason Macari, Baby Delight Inc., Tom Gwiazdowski, Artsana USA, Inc. (Chicco), Paul Powers, Dorel Juvenile Group, Jon Chamberlain, Evenflo | 11/04/2019 | 491-510 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| | Company, Inc., Lorne Jason Clute, Hiccapop, Ynon Kreiz, Mattel, Inc., Ravi Saligram, Newell Brands (Graco), Jini Kim, Nuna Inc., and Mark Messner, SUMR Brands | | |
| 33 | Federal Register Notice, "Safety Standard for Infant Sleep Products," Supplemental Notice of Proposed Rulemaking, 84 Fed. Reg. 60949 (Nov. 12, 2019) | 11/12/2019 | 511-525 |
| 34 | Comment from Beverly Acosta | 11/13/2019 | 526 |
| 35 | Comment from Valeria Rivera | 11/15/2019 | 527 |
| 36 | Comment from Alex Robinson: "Comment on Proposed Rule by Consumer Product Safety Commission 'Safety Standard for Infant Sleep Products'" | 11/24/2019 | 528-533 |
| 37 | Comment from Ricki Martin | 12/09/2019 | 534 |
| 38 | Letter from Celestine Kish to Scott Lewis, Subcommittee Chairman for ASTM Bassinets and Cradles, and Richard Rosati, Subcommittee Chairman for ASTM Infant Incline Sleep Product, ASTM International: "Re: ASTM F15.18 Bassinet and Cradles and Infant Inclined Sleep Products Updates" | 12/12/2019 | 535-536 |
| 39 | Meeting Log, Infant Inclined Sleep Product and Bassinet Subcommittee Chairs | 12/23/2019 | 537-538 |
| 40 | Comment from Shi baoxiang, China WTO/TBT National Notification & Enquiry Center: "Comments from P.R. China on United States of America, Notification G/TBT/N/USA/1285/Rev.1" | 12/24/2019 | 539-542 |
| 41 | Comment from Lauren O | 01/06/2020 | 543 |
| 42 | Comment from Anthony A. Paolo, Credo Advisors LLC: "Re-Supplemental Notice of Proposed Rulemaking for Infant Sleep Products/Docket No. 2017-0020" | 01/08/2020 | 544 |
| 43 | Email from Joanne E. Mattiace to J. Gibson Mullan: "CPSC Docket 2017-0020" | 01/11/2020 | 545-548 |
| 44 | CPSC Ballot Vote Sheet Transmitting Draft *Federal Register* Notice: Supplemental Notice of Proposed Rulemaking to Establish a Safety Standard for Infant Sleep Products; Notice of Extension of Comment Period | 01/15/2020 | 549-553 |
| 45 | Email from Laxmi Ravikumar, Intertek, to Celestine Kish and Hope Nesteruk: "16 CFR 1236 – Infant Sleep Products" | 01/15/2020 | 554-555 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| 46 | Comment from Laxmi Ravikumar | 01/17/2020 | 556 |
| 47 | Comment from Mary F. Toro, Consumer Safety Consultancy LLC: "RE: Comments to Docket No. CPSC-2017-0020 submitted electronically through www.regulations.gov" | 01/21/2020 | 557-559 |
| 48 | Letter from American Academy of Pediatrics, Consumer Federal of America, Consumer Reports, Kids in Danger, Public Citizen, and U.S. PIRG Education Fund, to Robert S. Adler, Acting Chairman, Elliot F. Kaye, Commissioner, Dana Baiocco, Commissioner, and Peter A. Feldman, Commissioner | 01/22/2020 | 560-561 |
| 49 | Record of Commission Action, Supplemental Notice of Proposed Rulemaking for Infant Sleep Products; Notice of Extension of Comment Period | 01/22/2020 | 562 |
| 50 | Comment from Warren Prunella: "US Consumer Product Safety Commission Safety Standard for Infant Sleep Products, Docket Number CPSC-2017-0020 – comments of Warren J. Prunella" | 01/24/2020 | 563-565 |
| 51 | Comment from Amber Kroeker, Pip & Grow: "RE: Comments to Docket No. CPSC-2017-0020: Safety Standard for Infant Sleep Products" | 01/27/2020 | 566-569 |
| 52 | Comment from Jeffrey M. Harris and Tiffany H. Bates, Consovoy McCarthy PLLC, Antonin Scalia Law School Administrative Law Clinic: "Re: Supplemental Notice of Proposed Rulemaking: Safety Standard for Infant Sleep Products; Docket ID No. CPSC-2017-0020" | 01/27/2020 | 570-582 |
| 53 | Federal Register Notice, "Supplemental Notice of Proposed Rulemaking to Establish a Safety Standard for Infant Sleep Products; Notice of Extension of Comment Period," 85 Fed. Reg. 4918 (Jan. 28, 2020) | 01/28/2020 | 583-584 |
| 54 | Email from Rick Locker, Locker Greenberg & Brainin LLP, to Celestine Kish: "Re: Inclined Infant Seating and Activity Products" | 01/31/2020 | 585-586 |
| 55 | Comment from Anonymous | 02/07/2020 | 587 |
| 56 | Comment from Anonymous | 02/07/2020 | 588 |
| 57 | Comment from Katie Morin | 02/07/2020 | 589 |
| 58 | Comment from Marcy Ward | 02/07/2020 | 590 |
| 59 | Comment from Sara Thompson | 02/07/2020 | 591 |
| 60 | Comment from Tayla Hart | 02/07/2020 | 592 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| 61 | Comment from Anonymous | 02/08/2020 | 593 |
| 62 | Comment from Amanda Conway | 02/08/2020 | 594 |
| 63 | Comment from Kareston Markley | 02/08/2020 | 595 |
| 64 | Comment from Katie OTool | 02/08/2020 | 596 |
| 65 | Comment from Kayla Roberts | 02/08/2020 | 597 |
| 66 | Comment from Kristin Carlton | 02/08/2020 | 598 |
| 67 | Comment from Miranda Evans with JPG attachment | 02/08/2020 | 599-600 |
| 68 | Comment from Sara Kinrade | 02/08/2020 | 601 |
| 69 | Comment from Sarah Cortell Vandersypen | 02/08/2020 | 602 |
| 70 | Comment from Sharon Xie | 02/08/2020 | 603 |
| 71 | Comment from Sierra Strom | 02/08/2020 | 604 |
| 72 | Comment from Stephanie Anonymous | 02/08/2020 | 605 |
| 73 | Comment from Christine Reilly | 02/18/2020 | 606 |
| 74 | Comment from Ali Dodd | 02/23/2020 | 607 |
| 75 | Comment from JaeLyne Bates | 02/24/2020 | 608 |
| 76 | Comment from Sara H. Goza, American Academy of Pediatrics: "Re: CPSC-2017-0020" | 02/25/2020 | 609-612 |
| 77 | Comment from Joanne E. Mattiace: "Re: Supplemental Notice of Proposed Rulemaking for Infant Sleep Products Docket No. 2017-0020" | 02/25/2020 | 613-619 |
| 78 | Comment from Julia Costello | 02/25/2020 | 620-621 |
| 79 | Comment from Legal Label, Inc.: "Re: Supplemental Notice of Proposed Rulemaking for Infant Sleep Products Docket No. 2017-0020" | 02/25/2020 | 622-623 |
| 80 | Comment from 94 National and State Medical, Public Health, and Consumer Organizations: "Re: CPSC-2017-0020" | 02/25/2020 | 624-627 |
| 81 | Meeting Log, Compact Bassinet, Task Group of Bassinet Subcommittee | 02/25/2020 | 628-629 |
| 82 | Comment from Anonymous: "Comments concerning CPSC Docket No. 2017-0020" | 02/26/2020 | 630-633 |
| 83 | Comment from Brian Thiel | 02/26/2020 | 634 |
| 84 | Comment from Rachel Weintraub, Consumer Federation of America: "Docket No. CPSC 2017-0020-Safety Standards for Infant Sleep Products" | 02/26/2020 | 635-637 |
| 85 | Comment from William Wallace and Oriene Shin, Consumer Reports: "'Safety Standard for | 02/26/2020 | 638-910 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| | Infant Sleep Products' Docket No. CPSC-2017-0020" | | |
| 86 | Comment from Lisa Furuland Kotsianis, DockATot: "Re: CPSC's November 12, 2019 Supplemental Notice of Proposed Rulemaking for Infant Sleep Products/Docket No. 2017-0020" | 02/26/2020 | 911-912 |
| 87 | Comment from Michael S. Wogalter, North Carolina State University, Michael J. Kalsher, Rensselaer Polytechnic Institute, Alison Vredenburgh, Vredenburgh & Associates, Inc., Ilene Zackowitz, Vredenburgh & Associates, Inc.: "RE: Comments to Docket No. CPSC-2017-0020" | 02/26/2020 | 913-915 |
| 88 | Comment from Carol Pollack-Nelson and Sarah B. Newens, Independent Safety Consulting, LLC: "Re: Comments to Docket No. CPSC-2017-0020" | 02/26/2020 | 916-933 |
| 89 | Comment from John Konsin | 02/26/2020 | 934-935 |
| 90 | Comment from Kelly Mariotti, JPMA: "Re: Comments on Docket CPSC-2017-0020-0010 Infant Sleep Products Supplemental NPR" | 02/26/2020 | 936-940 |
| 91 | Comment from Nancy A. Cowles, Kids in Danger: "Comments of Kids in Danger to the Consumer Product Safety Commission on the Supplemental Notice of Proposed Rulemaking on Infant Sleep Products (CPSC-2017-0020)" | 02/26/2020 | 941-943 |
| 92 | Comment from Kristine Mako Thiel | 02/26/2020 | 944 |
| 93 | Comment from Lisa Gilbert and Remington A. Gregg, Public Citizen: "RE: Supplemental Notice of Proposed Rules Regarding Infant Sleep Products [CPSC Docket No. 2017-0020]" | 02/26/2020 | 945-947 |
| 94 | Comment from Grace Brombach, U.S. PIRG Education Fund, with supporting signatures attached | 02/26/2020 | 948-1098 |
| 95 | Meeting Log, Baby Box, Task Group of Bassinet Subcommittee | 03/02/2020 | 1099 |
| 96 | Email from Joanne E. Mattiace to Jonathan Midgett and Jana Fong-Swamidoss: "Docket No. 2017-0020/JEM Law Firm Comments on SNPR" | 03/03/2020 | 1100-1101 |
| 97 | Letter from American Academy of Pediatrics, Consumer Federal of America, Consumer | 04/13/2020 | 1102-1104 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| | Reports, Kids in Danger, Public Citizen, and U.S. PIRG Education Fund, to Robert S. Adler, Acting Chairman, Elliot F. Kaye, Commissioner, Dana Baiocco, Commissioner, and Peter A. Feldman, Commissioner | | |
| 98 | Comment from Kristine Mako Thiel to Robert S. Adler, Acting Chairman, Elliot F. Kaye, Commissioner, Dana Baiocco, Commissioner, and Peter A. Feldman, Commissioner | 04/15/2020 | 1105-1107 |
| 99 | Letter from Celestine Kish to Richard Rosati, ASTM Subcommittee Chair for ASTM Infant Inclined Sleep Products: "Re: ASTM F15.18 Infant Inclined Sleep Products" | 07/16/2020 | 1108-1109 |
| 100 | Phone Log, Celestine Kish and Rick Rosati, Sub-committee Chair for Infant Inclined Sleep Products | 07/21/2020 | 1110 |
| 101 | Meeting Log, ASTM Bassinet Stability Task Group | 07/23/2020 | 1111 |
| 102 | Phone Log, Celestine Kish and Anna Carter, Iron Mountain, Lead for Infant Inclined Sleep Products Task Group | 08/13/2020 | 1112 |
| 103 | Meeting Log, Meeting of the ASTM Infant Inclined Sleep Products Subcommittee | 08/26/2020 | 1113-1114 |
| 104 | Meeting Log, Meeting of the Title/Intro/Scope Infant Inclined Sleep Products Task Group | 09/17/2020 | 1115 |
| 105 | Meeting Log, Meeting of the Labeling Task Group for Infant Sleep Products | 09/29/2020 | 1116 |
| 106 | Meeting Log, Meeting of the Name/Intro/Scope Infant Inclined Sleep Products Task Group | 10/08/2020 | 1117 |
| 107 | Letter from Celestine Kish to Scott Lewis, Subcommittee Chairman for ASTM Bassinets and Cradles, ASTM International: "Re: ASTM F15.18 Bassinet and Cradles: Ballot F15 (20-09), Items #5, 6, and 7" | 10/16/2020 | 1118-1120 |
| 108 | Meeting Log, Meeting of the Cross References Infant Sleep Products Task Group | 10/19/2020 | 1121 |
| 109 | Meeting Log, F15.18 Infant Inclined Sleep Products | 11/10/2020 | 1122-1123 |
| 110 | Meeting Log, Meeting of the Title/Intro/Scope Infant Inclined Sleep Products Task Group | 12/02/2020 | 1124 |
| 111 | Letter from Celestine T. Kish to Richard Rosati, Subcommittee Chairman for ASTM Infant Inclined Sleep Products, ASTM International: | 01/11/2021 | 1125-1126 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| | "Re: ASTM F15.18 Infant Inclined Sleep Products: Ballot F15-18 (20-01), Item #1." | | |
| 112 | Letter from Kelly Mariotti, JPMA, to Patricia Edwards | 02/02/2021 | 1127-1133 |
| 113 | Meeting Log, Meeting of the Standards Comparison/Performance Infant Sleep Products Task Group | 02/18/2021 | 1134-1135 |
| 114 | Meeting Log, Meeting of the F15.18 Standards Comparison/Performance Infant Sleep Products Task Group | 03/11/2021 | 1136-1137 |
| 115 | Meeting Log, Meeting of the F15.18 Standards Comparison/Performance Infant Sleep Products Task Group | 04/14/2021 | 1138-1139 |
| 116 | Meeting Log, Meeting of the Infant Inclined Sleep Products Title/Intro/Scope Task Group | 04/22/2021 | 1140-1141 |
| 117 | Late Comment from American Academy of Pediatrics, Consumer Federation of America, Consumer Reports, and Kids in Danger: "ASTM Standards and Expert Safe Sleep Principles," with September 2019 Letter attached | 04/30/2021 | 1142-1147 |
| 118 | Meeting Log, ASTM F15.18 Infant Inclined Sleep | 05/03/2021 | 1148 |
| 119 | CPSC Ballot Vote Sheet Transmitting Draft *Federal Register* Notice – Final Rule: Safety Standard for Infant Sleep Products, and CPSC Staff's Briefing Package | 05/12/2021 | 1149-1477 |
| 120 | Late Comment from Francesca: "CPSIA Section 104" | 05/16/2021 | 1478 |
| 121 | Late Comment from Katie: "CPSC Safety Standards – concerns" | 05/16/2021 | 1479 |
| 122 | Late Comment from Manda: "Safe Bedsharing Products" | 05/16/2021 | 1480 |
| 123 | Late Comment from Crystal: "Bedsharing Regulation Proposition" | 05/16/2021 | 1481-1482 |
| 124 | Late Comment from Lauren: "Bedsharing regulation – be a pioneer not a puppet" | 05/16/2021 | 1483 |
| 125 | Late Comment from Hillary: "CPSC and Bedsharing" | 05/16/2021 | 1484 |
| 126 | Late Comment from Shawn, Finnbin: "Final Rule/With Respect to Baby Boxes" | 05/17/2021 | 1485-1486 |
| 127 | Late Comment from Jamilka: "Bedsharing" | 05/17/2021 | 1487 |
| 128 | Late Comment from Brian, DockATot, with Letter Attached: "CPSC's Proposed Final Rule for Infant Sleep Products" | 05/17/2021 | 1488-1491 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| 129 | Late Comment from Becky: "Bedsharing" | 05/17/2021 | 1492 |
| 130 | Letter from Lisa Trofe, JPMA, to Patricia Edwards, with February 2, 2021 Letter Attached | 05/17/2021 | 1493-1503 |
| 131 | Phone Log, Allison Steinle and Jana Fong-Swamidoss with William Wallace, Jen Schehter, Oriene Shin, and Gabe Knight, Consumer Reports: CPSC related topics | 05/17/2021 | 1504 |
| 132 | Late Comment from Rachel, Best Practice Quality LLC, with Letter Attached | 05/18/2021 | 1505-1506 |
| 133 | Late Comment from Joe Croft: "Infant Sleep Products" | 05/18/2021 | 1507 |
| 134 | Late Comment from Sean Beckstrom, Newell Brands, Inc.: "Infant Sleep Products Final Rule" | 05/19/2021 | 1508-1509 |
| 135 | Commission Briefing, Celestine Kish and Mary House: "Safety Standard for Infant Sleep Products: Draft Final Rule" | 05/19/2021 | 1510-1530 |
| 136 | Video of Commission Meeting – Briefing Matter: Final Rule: Safety Standard for Infant Sleep Products (document contains link to video) | 5/19/2021 | 1531 |
| 137 | Late Comment from Elissa: "CPSC commissioned education" | 05/19/2021 | 1532 |
| 138 | Late Comment from Destinee: "Safe Sleep products" | 05/24/2021 | 1533-1534 |
| 139 | Late Comment from Amanda, Benny Bears: "Final Rule," with Letter Attached | 05/25/2021 | 1535-1537 |
| 140 | Late Comment from Brooke: "Safe Sleep for Infants" | 05/25/2021 | 1538-1539 |
| 141 | Late Comment from Jessica: "Please vote to advocate for safe sleep!" | 05/25/2021 | 1540-1541 |
| 142 | Late Comment from Laura: "Please vote in favor of the proposed Infant Sleep Product Rule" | 05/25/2021 | 1542-1543 |
| 143 | Late Comment from Molly: "Please approve safety standards for infant sleep products" | 05/25/2021 | 1544-1545 |
| 144 | Late Comment from Michelle: "June 2nd vote" | 05/25/2021 | 1546 |
| 145 | Late Comment from Kristen: "Help keep babies safe!" | 05/25/2021 | 1547-1548 |
| 146 | Late Comment from Isabel: "Final Rule on Safety Standard for Infant Sleep Products", with Letter Attached | 05/25/2021 | 1549-1550 |
| 147 | Late Comment from Lindy: "CPSC Rule" | 05/25/2021 | 1551-1552 |
| 148 | Late Comment from Gina | 05/25/2021 | 1553 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| 149 | Late Comment from Sarah: "Safe sleep standards" | 05/25/2021 | 1554 |
| 150 | Late Comment from Morgan: "Section 104 of the Consumer Product Safety Act" | 05/25/2021 | 1555 |
| 151 | Late Comment from Stephanie, "Safe sleep rule," with Letter Attached | 05/25/2021 | 1556-1557 |
| 152 | Late Comment from Kristen: "Help keep babies safe!" | 05/25/2021 | 1558-1559 |
| 153 | Phone Log, Commissioner Kaye, Allison Steinle, and Jana Fong-Swamidoss with Nancy Cowles, Kids in Danger, Rachel Weintraub, Consumer Federation of America, Joanne E. Mattiace, Law Offices of Joanne E. Mattiace (Observer), Carol Pollack-Nelson, Independent Safety Consulting, LLC (Observer), and Brian Grochal, DockATot (Observer): Infant Sleep Products Rulemaking | 05/25/2021 | 1560 |
| 154 | Phone Log, Commissioner Kaye and Nancy Cowles, Kids in Danger: Infant Sleep Products Rulemaking | 05/25/2021 | 1561 |
| 155 | CPSC Staff's Response to Commissioner's Hearing Questions: Draft Final Rule for Infant Sleep Products | 05/26/2021 | 1562-1564 |
| 156 | Late Comment from Ali: "Final safety rule for infant sleep products" | 05/26/2021 | 1565-1566 |
| 157 | Late Comment from Hilary: "Final Rule – CPSC Sleep Safety" | 05/26/2021 | 1567-1568 |
| 158 | Late Comment from Carlie: "Safety standards" | 05/26/2021 | 1569-1570 |
| 159 | Late Comment from Jennifer: "Protect Children from Unsafe Sleep Products" | 05/26/2021 | 1571-1572 |
| 160 | Late Comment from Erich Batra, Pennsylvania State University College of Medicine, "Letter on Proposed rule for infant sleep products," with Letter Attached | 05/27/2021 | 1573-1575 |
| 161 | Late Comment from Mary Beth: "Unsafe Sleep Products" | 05/27/2021 | 1576 |
| 162 | Late Comment from William Wallace and Oriene Shin, Consumer Reports, "CR letter to Commissioners on draft final rule for infant sleep products," with Letter Attached | 05/27/2021 | 1577-1579 |
| 163 | Late Comment from Laura: "Voting in favor of mandatory safety standard for infant sleep" | 05/27/2021 | 1580-1581 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| 164 | Late Comment from Kate, Charlie's Kids Foundation: "VOTE YES to Save Babies" | 05/27/2021 | 1582-1583 |
| 165 | Late Comment from Tara, Newaygo County Prevention of Child Abuse and Neglect, "Safe Sleep Advocacy," with Letter Attached | 05/27/2021 | 1584-1585 |
| 166 | Late Comment from Jessica: "Infant Sleep Product rule" | 05/27/2021 | 1586-1587 |
| 167 | Late Comment from Lynn, ELECT Program, "For your consideration for Safe Infant Sleep," with Letter Attached | 05/27/2021 | 1588-1590 |
| 168 | Late Comment from Nashaly with Letter Attached | 05/27/2021 | 1591-1592 |
| 169 | Late Comment from Alan H. Schoem, on behalf of Dream on Me, with Letter Attached, "Re: Aftermarket Play Yard Mattresses" | 05/27/2021 | 1593-1595 |
| 170 | Late Comment from Kelli, Northern Counties Healthcare, Inc.: "Upcoming Vote" | 05/27/2021 | 1596-1598 |
| 171 | Late Comment from Sofia: "Sofia Gora Bedsharing" | 05/27/2021 | 1599 |
| 172 | Late Comment from Christina: "Infant Sleep Product Rule" | 05/27/2021 | 1600-1601 |
| 173 | Late Comment from Becky: "6/2/21 CPSC Ruling on Safe Sleep Products" | 05/27/2021 | 1602-1603 |
| 174 | Late Comment from Shawn, Finnbin: "Final Rule Vote: Safety Standard for Infant Sleep Products" | 05/27/2021 | 1604-1607 |
| 175 | Late Comment from Northwest Infant Survival & SIDS Alliance: "Final Ruling Infant Sleep Safety Standards" | 05/27/2021 | 1608-1609 |
| 176 | Late Comment from Sophia | 05/27/2021 | 1610-1611 |
| 177 | Late Comment from Amber, Pip & Grow | 05/28/2021 | 1612-1613 |
| 178 | Late Comment from Jim: "Safe Sleeping devices," with Letter Attached | 05/28/2021 | 1614-1616 |
| 179 | Late Comment from Erin | 05/28/2021 | 1617 |
| 180 | Late Comment from Paul: "Infant Sleep Product rule" | 05/28/2021 | 1618 |
| 181 | Phone Log, Jana Fong Swamidoss with Nancy Cowles, Kids in Danger: Infant Sleep Products Rulemaking | 05/28/2021 | 1619 |
| 182 | Phone Log, Commissioner Kaye, Allison Steinle, and Jana Fong-Swamidoss with Trip Coyne, DockATot, Brian Grochal, DockATot, | 05/28/2021 | 1620 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
|  | Roma Patel, DockATot, Matt Howsare, Cooley, Carol Pollack-Nelson, Independent Safety Consulting, LLC, and Dev Gowda, Kids in Danger (Observer): Infant Sleep Products Rulemaking |  |  |
| 183 | Late Comment Samantha: "Please Vote YES on the Final Rule: Safety Standard for Infant Sleep Products" | 05/29/2021 | 1621-1623 |
| 184 | Late Comment from Harper, All for Childhood: "Infant Sleep Products Standards" | 05/29/2021 | 1624 |
| 185 | Late Comment from Victoria: "Please save children's lives by voting in favor of the proposed Infant Sleep Product rule on June 2nd" | 05/30/2021 | 1625 |
| 186 | Late Comment from Courtney: "MANDATORY STANDARDS FOR BABY PRODUCTS" | 05/30/2021 | 1626 |
| 187 | Late Comment from Katie: "Infant Sleep Product Rule please vote in favor" | 05/30/2021 | 1627-1628 |
| 188 | Late Comment from Lisa: "Safe Sleep" | 05/31/2021 | 1629 |
| 189 | Late Comment from Deja: "Vote for Safety Standards" | 05/31/2021 | 1630 |
| 190 | Late Comment from Sarah: "Final Rule: Safety Standard for Infant Sleep Products" | 05/31/2021 | 1631-1632 |
| 191 | Late Comment from William Wallace and Oriene Shin, Consumer Reports, with Attached Petition to U.S. Consumer Product Safety Commission | 06/01/2021 | 1633-2004 |
| 192 | Late Comment from Rep. Susan Wild | 06/01/2021 | 2005-2007 |
| 193 | Late Comment from Carol Pollack-Nelson, Independent Safety Consulting, LLC, with Letter Attached: "Re: Final Rule" | 06/01/2021 | 2008-2011 |
| 194 | Late Comment from Carol Pollack-Nelson, Independent Safety Consulting, LLC, with Studies and February 26, 2020 Letter Attached | 06/01/2021 | 2012-2053 |
| 195 | Late Comment from Rep. Jan Schakowsky, Rep. Tony Cardenas, Sen. Richard Blumenthal, and Sen. Tammy Duckworth | 06/01/2021 | 2054-2056 |
| 196 | Late Comment from Taylor: "Please support bedsharing families" | 06/01/2021 | 2057-2059 |
| 197 | Late Comment from Carol Pollack-Nelson, Independent Safety Consulting, LLC, with Letter Attached: "Re: Final Rule and question regarding unintended consequences" | 06/01/2021 | 2060-2066 |

| Document Number | Document Name | Date | Page(s) |
|---|---|---|---|
| 198 | Late Comment from Carol Pollack-Nelson, Independent Safety Consulting, LLC, with Letter Attached: "Re: Final Rule" | 06/01/2021 | 2067-2070 |
| 199 | Phone Log, Jana Fong-Swamidoss with William Wallace, Consumer Reports: CPSC related topics | 06/01/2021 | 2071 |
| 200 | Late Comment from Trip Coyne, DockATot: "Thank You" | 06/02/2021 | 2072-2073 |
| 201 | Late Comment from Kate, Pip & Grow | 06/02/2021 | 2074-2075 |
| 202 | Minutes of Commission Meeting, Decisional Matter: Final Rule: Safety Standard for Infant Sleep Products | 06/02/2021 | 2076-2082 |
| 203 | Video of Commission Meeting – Decisional Matter: Safety Standard for Infant Sleep Products (document contains link to video) | 06/02/2021 | 2083 |
| 204 | Statement of Commissioner Peter A. Feldman on Infant Sleep Final Rule | 06/02/2021 | 2084 |
| 205 | Statement of Acting Chairman Robert Adler on the Passage of the Final Rule on Infant Sleep Products | 06/02/2021 | 2085 |
| 206 | Statement of Commissioner Dana Baiocco on Final Rule for Infant Sleep Products | 06/03/2021 | 2086-2088 |
| 207 | Statement of Commissioner Elliot F. Kaye on the Passage of a Safety Standard for Infant Sleep Products | 06/09/2021 | 2089-2090 |
| 208 | Statement of Acting Chairman Robert S. Adler re: Vote on Final Rule to Establish a Safety Standard for Infant Sleep Products | 06/15/2021 | 2091-2095 |
| 209 | Federal Register Notice, "Safety Standard for Infant Sleep Products," Final Rule, 86 Fed. Reg. 33022 (June 23, 2021) | 06/23/2021 | 2096-2146 |
| 210 | ASTM F2194-13, Standard for Consumer Safety Specification for Bassinets and Cradles (approved on April 1, 2013) | ----- | 2147-2160 |
| 211 | ASTM F2194–16e1, Standard for Consumer Safety Specification for Bassinets and Cradles (approved on April 15, 2016) | ----- | 2161-2176 |
| 212 | ASTM F3118-17a, Standard Consumer Safety Specification for Infant Inclined Sleep Products (approved on September 1, 2017) | ----- | 2177-2195 |



# CONSUMER PRODUCT SAFETY COMMISSION

**16 CFR Parts 1112 and 1218**

[Docket No. CPSC–2010–0028]

## Safety Standard for Bassinets and Cradles

**AGENCY:** Consumer Product Safety Commission.

**ACTION:** Final rule.

**SUMMARY:** The Danny Keysar Child Product Safety Notification Act, Section 104 of the Consumer Product Safety Improvement Act of 2008 (CPSIA), requires the United States Consumer Product Safety Commission (Commission or CPSC) to promulgate consumer product safety standards for durable infant or toddler products. These standards are to be "substantially the same as" applicable voluntary standards or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product. The Commission is issuing a safety standard for bassinets and cradles in response to the direction under Section 104(b) of the CPSIA.

**DATES:** The rule will become effective on April 23, 2014, with the exception of § 1218.2(b)(3)(i) through (iv), (b)(5), and (b)(7), which will become effective on April 23, 2015. The incorporation by reference of the publication listed in this rule is approved by the Director of the **Federal Register** as of April 23, 2014.

**FOR FURTHER INFORMATION CONTACT:** William Dewgard, Directorate for Compliance, Consumer Product Safety Commission, telephone: 301–504–7599; email: *WDewgard@cpsc.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background and Statutory Authority

The Consumer Product Safety Improvement Act of 2008 (CPSIA, Pub. L. 110–314) was enacted on August 14, 2008. Section 104(b) of the CPSIA, part of the Danny Keysar Child Product Safety Notification Act, requires the Commission to: (1) Examine and assess the effectiveness of voluntary consumer product safety standards for durable infant or toddler products, in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts; and (2) promulgate consumer product safety standards for durable infant and toddler products. These standards are to be substantially the same as applicable

voluntary standards or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product.

The term "durable infant or toddler product" is defined in section 104(f)(1) of the CPSIA as "a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years." Bassinets and cradles are specifically identified in section 104(f)(2)(L) of the CPSIA as a durable infant or toddler product.

On April 28 2010, the Commission issued a notice of proposed rulemaking (NPR) for bassinets and cradles. 75 FR 22303. The NPR proposed to incorporate by reference the voluntary standard, ASTM F2194–07a ᵉ¹, *Standard Consumer Safety Specification for Bassinets and Cradles,* with certain changes to provisions in the voluntary standard to strengthen the ASTM standard.

The Commission published a supplemental notice of proposed rulemaking (SNPR) on October 18, 2012. 77 FR 64055. The SNPR proposed to incorporate the voluntary standard, ASTM F2194–12, with: (1) Modifications to sections pertaining to scope and terminology and the stability test procedure, and (2) the addition of new provisions for a segmented mattress flatness test and a removable bed stability requirement.

In this document, the Commission is issuing a safety standard for bassinets and cradles. Pursuant to Section 104(b)(1)(A), the Commission consulted with manufacturers, retailers, trade organizations, laboratories, consumer advocacy groups, consultants, and members of the public in the development of this standard, largely through the ASTM process. The rule incorporates the voluntary standard, ASTM F2194–13, *Standard Consumer Safety Specification for Bassinets and Cradles* (ASTM F2194–13), by reference, with the following modifications and additions: a clarification to the scope of the bassinet/cradle standard; a change to the pass/fail criterion for the mattress flatness test; an exemption from the mattress flatness requirement for bassinets that are less than 15 inches across; the addition of a removable bed stability requirement; and a change to the stability test procedure requiring the use of a newborn CAMI dummy rather than an infant CAMI dummy.

## II. The Product

ASTM F2194–13 defines "bassinet/cradle" as a "small bed designed

primarily to provide sleeping accommodations for infants, supported by free standing legs, a stationary frame/stand, a wheeled base, a rocking base, or which can swing relative to a stationary base." While in a rest position, a bassinet/cradle is intended to have a sleep surface less than or equal to 10° from horizontal. The bassinet/cradle is not intended to be used beyond the age of approximately five months or when a child is able to push up on his hands and knees. Bassinet and cradle attachments for non-full-size cribs or play yards are considered part of the bassinet/cradle category, as are bedside sleepers that can be converted to four-sided bassinets not attached to a bed.

Cribs, Moses baskets, and products used in conjunction with an inclined infant swing or stroller, and products that are intended to provide only an inclined sleep surface of greater than 10 degrees horizontal, are not included under the category of "bassinets/cradles." (A Moses basket is a portable cradle for a newborn or infant, often made of straw or wicker, that can be used with a variety of rocking and stationary stands. As with other bassinets and cradles, Moses baskets are not intended for use after a child can push up on its hands and knees.) However, Moses baskets and carriage accessories that can be converted to a bassinet or cradle by attachment to a separate base/stand would be considered bassinets/cradles when used with the base/stand. Similarly, products that could be used at an incline of 10 degrees or less from horizontal, as well as more than 10 degrees from horizontal, would be considered bassinets/cradles when in the flatter configuration(s).

## III. Incident Data

The preamble to the SNPR summarized incident data involving bassinets and cradles reported to the Commission as of January 18, 2012. 77 FR 64055 (October 18, 2012). CPSC's Directorate for Epidemiology, Division of Hazard Analysis has updated this information to include bassinet- and cradle-related incident data reported to the Commission from January 18, 2012 through March 31, 2013. A search of the CPSC epidemiological databases showed that there were 71 new incidents related to bassinets and cradles reported during this time frame. Thirty-eight of the 71 were fatal, and 33 were nonfatal. Sixteen of the nonfatal incidents involved injuries. Almost all of the new incidents reportedly occurred between 2010 and 2012. Reporting is ongoing, however, so the incident totals are subject to change.

*A. Fatalities*

The majority of the deaths (32 out of 38) were asphyxiations due to the presence of soft or extra bedding in the bassinet, prone placement of the infant, and/or the infant getting wedged between the side of the bassinet and additional bedding. All but four of the 38 decedents were five months or less in age, the ASTM-recommended age range for bassinet use; three of the decedents were six months old and another was an eight-month-old.

Two of the 38 deaths were associated with design aspects of the product. One of these was a suffocation death in a corner of the bassinet whose rocking feature contributed to its non-level resting position; the other fatality occurred when the bassinet was knocked over by an older sibling.

There were three fatalities with insufficient information and one fatality with confounding information preventing CPSC from determining the hazard scenario.

*B. Nonfatal Incidents*

A total of 33 bassinet-related nonfatal incidents were reported from January 18, 2012 through March 31, 2013. Of these, 16 reports indicated an injury to an infant using the bassinet or cradle at the time of the incident. The majority of these injuries (11 out of 16, or 69 percent) were due to falls out of the bassinets. All 11 fall injuries were reported through NEISS, with little or no circumstantial information on how the fall occurred. However, the reports do indicate that 55 percent of the injured infants who fell out of bassinets were older than the ASTM-recommended maximum age limit of five months. All of the falls resulted in head injuries. Among the remaining five nonfatal injuries, mostly head injuries, no hospitalizations were reported. All but six of the injured were five months or less in age.

The remaining 17 incident reports indicated that no injury had occurred or provided no information about any injury. However, many of the descriptions indicated the potential for a serious injury or even death.

*C. Hazard Pattern Identification*

The hazard patterns identified in the 71 new incident reports were similar to the hazard patterns that were identified in the incidents considered for the SNPR and are grouped in the following categories (in descending order of frequency of incidents):

*1. Non-product-related issues:* Thirty-four of the 71 reports (48 percent) concerned incidents that involved no

product defect or failure. This category consisted of 32 fatalities that were associated with the use of soft/extra bedding, prone positioning, and/or the infant getting wedged between the side of the bassinet and additional bedding. In addition, there were two nonfatal injury incidents that did not involve any product-related issues.

*2. Product-related issues:* The hazard scenarios in 25 of the 71 reported incidents (35 percent) were attributed to a failure/defect or a potential design flaw in the product. This category includes one fatality and 13 injuries. Listed below are the reported problems, beginning with the most frequently reported concerns:

• Reports of infants falling or climbing out of bassinets/cradles accounted for a total of 13 incidents, all of which were received from emergency departments around the United States. Eleven of the incidents reported a nonfatal injury; the remaining two infants were reported to be uninjured.

• Lack of structural integrity, which includes issues such as instability, loose hardware, and product collapse, among others, was reported in nine incidents—one with a fatality and two with nonfatal injuries.

• Problems with accessories (such as the stand or sheets), which were sold with the bassinets, were reported in two incidents. However, no injuries were reported.

• One other product-related problem, involving the battery compartment of an older product, was reported in one non-injury incident.

*3. Recalled product-related issues:* There were six reports (eight percent) that were associated with three different recalled product-related issues. (Two of the recalls were published since the incident data for the SNPR briefing package was presented; at the time, these issues were classified under the "structural integrity" and "rocking" categories.) Although there were no injuries, there was a fatality included among the six incident reports. In the fatal incident, it is reported that the tilting of the bassinet caused the decedent to roll and press up against the side and suffocate.

*4. Miscellaneous other issues:* The remaining six incident reports (eight percent) were related to other unspecified issues. The reports described the incidents with insufficient specificity or provided confounding information, preventing CPSC staff from identifying the hazard scenario. There were four fatalities, one nonfatal injury, and one non-injury incident reported in this category.

**IV. Overview of ASTM F2194**

ASTM F2194, *Standard Consumer Safety Specification for Bassinets and Cradles,* establishes safety performance requirements, test methods, and labeling requirements to minimize the identified hazard patterns associated with the use of bassinets/cradles. ASTM first published a consumer product safety standard for bassinets and cradles in 2002. The standard was revised several times over the next 11 years. The current version of the standard is ASTM F2194–13. The more significant requirements of ASTM F2194 include:

• Scope—describes the types of products intended to be covered under the standard.

• Spacing of rigid side components—is intended to prevent child entrapment between both uniformly and non-uniformly spaced components, such as slats.

• Openings for mesh/fabric—is intended to prevent the entrapment of children's fingers and toes, as well as button ensnarement.

• Static load test—is intended to ensure structural integrity even when a child three times the recommended (or 95th percentile) weight uses the product.

• Stability requirements—is intended to ensure that the product does not tip over when pulled on by a two-year-old male.

• Sleeping pad thickness and dimensions—is intended to minimize gaps and the possibility of suffocation due to excessive padding.

• Tests of locking and latching mechanisms—is intended to prevent unintentional folding while in use.

• Suffocation warning label—is intended to help prevent soft bedding incidents.

• Fabric-sided openings test—is intended to prevent entrapments.

• Rock/swing angle requirement—is intended to address suffocation hazards that can occur when latch/lock problems and excessive rocking or swinging angles press children into the side of the bassinet/cradle.

• Occupant restraints—is intended to prevent incidents where unused restraints have entrapped and strangled children.

• Side height requirement—is intended to prevent falls.

• Segmented mattress flatness—is intended to address suffocation hazards associated with "V" shapes that can be created by the segmented mattress folds.

The voluntary standard also includes: (1) Torque and tension tests to prevent components from being removed; (2) requirements for several bassinet/cradle

features to prevent entrapment and cuts (minimum and maximum opening size, small parts, hazardous sharp edges or points, and edges that can scissor, shear, or pinch); (3) requirements for the permanency and adhesion of labels; (4) requirements for instructional literature; and (5) corner post extension requirements intended to prevent pacifier cords, ribbons, necklaces, or clothing that a child may be wearing from catching on a projection.

## V. The SNPR and ASTM F2194–13

The SNPR proposed to incorporate by reference ASTM F2194–12, with four modifications/additions to the voluntary standard:

(1) Scope and Terminology: The SNPR proposed excluding inclined products from the scope of the standard, by revising the scope and including a detailed note with examples of what products were and were not included in the scope of the standard. The SNPR also proposed two existing definitions be revised for clarity.

(2) Segmented Mattress Flatness Test: The SNPR proposed a new test requirement and associated test procedure to address suffocation incidents in segmented mattresses. As discussed in the preamble to the SNPR, the mattress flatness requirement is primarily aimed at incidents involving bassinet/play yard combination products that tend to use segmented mattresses, where seams could pose a suffocation and positional asphyxiation hazard. Under the Commission's pass/fail criteria proposed in the SNPR, a bassinet attachment with a segmented mattress would fail if any tested seam creates an angle greater than 10 degrees.

(3) Removable Bed Stability Requirement: The SNPR proposed a new test requirement and associated test procedure to address fatal and nonfatal incidents associated with bassinets that have removable bassinet beds. In the proposed requirement, a removable bassinet bed that was not properly attached or assembled to its base would be required to meet one of the following requirements:

a. The base/stand shall not support the bassinet (*i.e.*, the bassinet bed falls from the stand so that it is in contact with the floor); or

b. The lock/latch shall automatically engage under the weight of the bassinet bed (without any other force or action); or

c. The stand/base shall not be capable of supporting the bassinet bed within 20 degrees of horizontal; or

d. The bassinet shall contain a visual indicator mechanism that shall be visible on both sides of the product to indicate whether the bassinet is properly attached to the base; or

e. The bassinet shall not tip over and shall retain the CAMI newborn dummy when subjected to the stability test outlined in the standard.

(4) Stability Test Procedure: The SNPR proposed a revised test procedure for stability. The revision specifies the use of a newborn CAMI dummy, rather than the six month CAMI dummy that is referenced in the ASTM standard.

The SNPR's provisions concerning the scope and terminology and the proposed segmented mattress flatness test requirement were balloted by ASTM in 2012, and the provisions are now included in the latest revision of the voluntary standard, ASTM F2194. Although the mattress flatness test procedure in ASTM F2194–13 is identical to what is proposed in the SNPR, the pass/fail criterion is different. As stated previously, under the Commission's pass/fail criteria, as proposed in the SNPR, a bassinet attachment with a segmented mattress will fail if any tested seam creates an angle greater than 10 degrees. ASTM F2194–13 allows measured angles between 10 degrees and 14 degrees to pass, as long as the mean of three measurements on that seam is less than 10 degrees.

The removable bed stability requirement proposed in the SNPR is not in the current ASTM standard, but a similar version is expected to be balloted by ASTM for inclusion in the next revision. Similarly, the change in the stability test procedure proposed in the SNPR is not in ASTM F2194–13, but it is expected to be balloted by ASTM for inclusion in its next revision.

## VI. Response to Comments

There were 27 comments received on the SNPR, including: one from Health Canada; one from a group of consumer's groups (Kids In Danger, Consumers Union, American Academy of Pediatrics, Consumer Federation of America, Public Citizen, and U.S. PIRG); one from the Juvenile Products Manufacturers Association (JPMA); and two from bassinet manufacturers. The remaining 22 comments were from consumers, law students, or unaffiliated sources. The comments raised several issues, which resulted in two changes to the final rule. Several commenters made general statements supporting the overall purpose of the proposed rule. All of the comments can be viewed at: *www.regulations.gov*, by searching under the docket number of the rulemaking, CPSC–2010–0028. Following is a summary of and responses to the comments.

*Scope*

*Comment:* Two commenters provided almost identical comments and suggestions for changes to the scope. The commenters asserted that the scope was unclear about what products are included in the scope and under what conditions. For instance, one comment stated that it was not clear from the SNPR how products with an inclined seat back surface (reclined seat back), such as infant seats, infant bouncer seats, and infant rockers that do not provide an "inclined sleep surface" would be treated under the standard.

*Response:* The scope that was proposed in the SNPR has subsequently been adopted by ASTM and is the scope in the current version of the ASTM standard, ASTM F2194–13. The comments received reflect continued ambiguity regarding some aspects of the scope. Therefore, the Commission is providing additional clarity in the final rule.

Inclined products fall under a variety of different ASTM standards, depending on the product's function. For instance, ASTM standards include a handheld carrier standard, an infant bouncer standard, and a new rocker standard that is currently under development. None of those products is intended for sleep. An inclined product intended for sleeping would fall under the inclined sleep product standard currently under development by ASTM. The Commission's intent is that the scope of the bassinet standard exclude all inclined products when the incline is more than 10 degrees from horizontal.

However, the Commission intends that any product that has both a flat (10 degrees or less) sleep surface and an inclined surface greater than 10 degrees from horizontal shall fall under the scope of the bassinet standard when configured in the flat mode, and will fall under the scope of the appropriate inclined product standard(s) while in the inclined mode. In this manner, all uses of the product are addressed by safety standards. This type of product is considered a multimode product, or a combination product, *i.e.*, the product can convert from one use mode to another.

During the recent ASTM F15 juvenile products subcommittee meetings held in April 2013, scope clarity was raised in various product subcommittees where multimode products are commonly considered. Most of those product subcommittees proposed to modify the scope section of the appropriate standard to clarify that these combination products shall fall

under the scope of all relevant standards when in the corresponding use mode.

This intent to include multimode products under multiple standards is well established in ASTM standards, including the bassinet standard. One example of a multimode product is a carriage basket that is removable from a stroller base. The scope section of ASTM F2194–13 clearly states that products used in conjunction with a stroller are not covered by the standard. Yet, the current scope section also states: "Carriage baskets/bassinets that are removable from the stroller base are covered under the scope of this standard when the carriage basket/bassinet meets the definition of a bassinet/cradle found in 3.1.1." Clearly, the intent of the ASTM standard is to see that this multimode product falls within the scope of the stroller standard when attached to the stroller frame and falls within the scope of the bassinet standard when attached to a separate frame/stand.

Thus, to remove any ambiguity regarding multimode products, the Commission's standard modifies the note that accompanies the scope provision of ASTM F2194–13 to clarify that a multimode product with a bassinet-use mode must meet the bassinet standard when in the bassinet-use mode.

*Comment:* One commenter suggested that the scope of the standard needs more specific age restrictions.

*Response:* The scope of a standard is intended to define broadly an entire product category. Within that category, manufacturers have the freedom to tailor their product to a specific market niche, which might be more specialized than other products in the same category. Providing too many specific restrictions within the scope of a standard makes the standard weaker by excluding many products that ought to be included. In general, ASTM standards are defined by their respective industries, using terms that produce a standard that is as useful as possible to that industry. The Commission agrees with the bassinet industry on the existing age recommendations in the ASTM standard.

*Removable Bassinet Bed Requirements*

*Comment:* One group of commenters suggested that the Commission eliminate the two "passive" pass conditions (20 degrees and passing stability) of the removable bassinet bed stability requirement in favor of the other pass criteria, which the group of commenters said they believe makes the user actively aware that the bassinet is not attached properly.

*Response:* The SNPR proposed several options to meet the removable bassinet bed requirements. This approach is less restrictive than prescribing one pass criterion, and the approach allows for more innovation in product designs. By permitting five different options to meet this requirement, manufacturers have a variety of design choices available.

*Comment:* Some commenters said they believe that allowing the bassinet to "fail" (by falling to the ground or to a 20 or more degree angle) encourages manufacturers to make products that are less stable to ensure that their bassinets pass this requirement. Another commenter stated that it was foreseeable that some caregivers may attempt to attach the bassinet bed to its stand while the child is in the product and that this might expose children to unnecessary hazards.

*Response:* Two of the five options to pass the removable bed requirement are closely related to one another. These two options are: (1) The sleep surface shall be at least 20 degrees off from a horizontal plane; and (2) the bassinet bed falls from the stand and contacts the floor. These two requirements were added after consultations with stakeholders (ASTM task group members). Several stakeholders stated that if a bassinet stand was designed to support the bassinet bed only if it were locked properly, then the bassinet stand should be able to pass the requirement. For instance, in the case of a stand that looks like a saw horse, or "A" frame that has a lock/latch connection at the top of the "A" on the frame and on the underside of the bassinet bed, the caregiver would have to line up both halves of the lock/latch to attach the bed to the stand. It would be unreasonable to believe that caregivers would place the bassinet bed on an "A" frame stand without engaging the lock/latch because the design of the stand would cause the bassinet bed to fall to the ground if the lock was not engaged.

Rather than specifying a design requirement, the task group converted the requirement to a performance requirement, by simulating what would happen if the unreasonable act occurred. In other words, this option requires the bassinet bed to fall to the ground if the lock is not properly engaged.

Once that requirement was vetted by the task group, another stakeholder raised the possibility that the bassinet bed, in the act of falling, might get caught on the stand before hitting the ground. The stakeholder asserted that simply because the bassinet bed did not hit the ground should not constitute a failure. Thus, the 20-degree tilt option

was added to address the possibility that the bassinet bed, in the process of falling, might get caught on the stand and to complement the fall-to-the-ground option.

A bassinet that relies on either of these two options to pass the requirement would be considered to provide immediate positive feedback. Caregivers who attempt to place the bassinet bed on this type of stand without locking it in place will realize instantly that they did not engage the lock because the bassinet bed will not assume a stable position that allows the caregivers to release their grasp. The immediate feedback of instability will minimize the possible hazards, making falling unlikely. The Commission believes that the steep angle needed to pass is unlikely to allow consumers to let children fall. The instability of such a unit is immediately obvious to the user, precluding a delayed response. Consumers are likely to check the stability of the product before removing their hands from it. Even in the case of a caregiver who attempts to place an occupied bassinet bed on a stand using this option, the caregiver will be present and potentially will be able to prevent or arrest the fall of the bassinet bed. The Commission considers the possibility of a fall hazard in this scenario to be highly unlikely; and on the rare chance that a fall occurs, the fall in these circumstances would be considered less significant than an unattended fall to the floor.

*Comment:* One commenter stated that the option—"The lock/latch shall automatically engage under the weight of the bed (without any other force/action)"—should be a requirement for all bassinets.

*Response:* The Commission is providing manufacturers with options to meet the removable bassinet bed requirements. This approach is less restrictive than prescribing one requirement and allows for more innovation in product designs.

*Comment:* One commenter stated that adding the removable bassinet bed stability requirement is premature. The commenter expressed the belief that the requirement should be removed from the regulation and that ASTM should be allowed to continue working on the issue.

*Response:* The Commission is aware of two deaths associated with this hazard scenario. (One of these deaths occurred in Canada; thus, it was not included in incident data counts reported in the SNPR briefing package.) Therefore, the Commission does not believe that this requirement is premature. The Commission believes

that stakeholders have had plenty of time to test, review, discuss, and refine the proposed requirements before and after the SNPR was published. In fact, the language recommended for the final rule is essentially the same as what ASTM expects to ballot soon as a new requirement to address the same hazard.

*Comment:* A commenter stated that color-only visual indicators should not be allowed as an option to pass the removable bassinet bed requirement because people who are color-blind would not be able to distinguish between locked and unlocked.

*Response:* The requirement for visual indicators allows manufacturers to design a visual indicator that can be recognized by a person with a color vision deficiency. In addition, there are many other options to pass the requirement, and individuals who are color-blind can choose to purchase a product that does not use color indicators.

*Comment:* Some commenters expressed a belief that allowing removable bassinet beds to pass the stability test by tilting to a 20-degree angle was hazardous because consumers might think that a 20-degree angle is still usable, perhaps as an inclined sleeper.

*Response:* The Commission believes that an angle of 20° or more is acceptable to demonstrate that the bassinet is not useable. A steeper angle would also be acceptable, but the Commission is not convinced this is needed. Twenty degrees is twice the maximum allowable tilt for bassinets, which are intended to have a flat sleeping surface. In deciding on the 20° angle, the ASTM task group noted an incident (101101HCC3107) where a consumer clearly saw that something was wrong with his bassinet when he saw it tilted and deemed it to be unusable. From the photos, the tilt was estimated to be approximately 17°.

*Mattress Flatness*

*Comment:* Some commenters suggested that the mattress flatness requirements should be limited to 8° from the horizontal rather than 10°.

*Response:* Although the Commission would be amenable to using this more conservative margin of safety, *i.e.,* a tolerance of 16° of motion rather than 20°, the industry has maintained that a larger tolerance is necessary, due to the inherent variability of manufacturing products with fabric and foam. The industry claims that tighter tolerances on a segmented mattress made with the materials that are commonly used in these products would make it impossible to manufacture such

mattresses. The Commission believes that the 10° limit is adequate to protect the expected user population.

*Comment:* A commenter suggested that the threshold limit for flatness should be 14° to preserve test-retest reliability.

*Response:* ASTM F2194–13 now includes the mattress flatness test requirement and procedure, as written in the SNPR, with the exception of the angle requirement. ASTM's requirement allows the use of an average for measurements over 10° and under 14°, while the SNPR proposed a maximum allowable measurement of 10°. Based on testing performed by an ASTM task group that was established to assess the reliability and repeatability of the mattress flatness test, the reliability of the test is adequate when the test is performed on products designed to pass the test. The commenter did not provide any new or different information to the Commission to support the suggestion for using the averaging method; thus, the Commission continues to support the 10° flatness criterion as proposed in the SNPR.

*Comment:* Some commenters questioned the use of a cylinder as a surrogate for a human occupant, and another commenter suggested that an automated human model would be more appropriate.

*Response:* An automated human model is not readily available. It is customary in the juvenile product industry to use easily manufactured shapes made from common materials. This testing strategy enhances the repeatability of the test. An ASTM task group conducted a repeatability and reproducibility study to compare various surrogates for use in the mattress flatness test. The cylinder was the best choice, based on the study results.

*Comment:* Some commenters suggested using the dummy in the test for mattress flatness so that infant position would be a factor.

*Response:* The test cylinder is a repeatable method that identifies hazardous products to the satisfaction of industry and the Commission. Unfortunately, the CAMI dummy is too stiff to be useful for simulating suffocation positions and would not be suitable to serve that purpose.

*Comment:* Some commenters wanted more explanation of how the cylinder sufficiently simulates an infant rolling into a mattress crease, as demonstrated in the mattress flatness test.

*Response:* The Commission has examined bassinets that pass the test and bassinets that fail. When visual comparisons and measurements of

angles are made to compare the movements of the mattresses during a test using an anthropomorphic dummy versus tests using a cylinder, few discernible differences are evident. The shape of the test weight does not seem to be as important as the mass of the test weight in identifying hazardous products.

*Comment:* Two commenters offered opinions about the mattress flatness testing and designs of bassinet accessories that use support rods underneath the mattress. One of the two comments suggested that the mattress flatness test be performed with and without the bars in place. Moreover, the commenter suggested that if the bars are required to be in place to pass the flatness test, then they should be attached permanently. Similarly, the other comment suggested that the frame supporting the floor (mattress) should come preassembled to eliminate the possibility that the consumer can misassemble the product.

*Response:* The Commission agrees with these comments. In January 2013, ASTM balloted a revised mattress flatness test, requiring that any segmented mattress that has consumer-assembled mattress support rods, be tested with and without the mattress support rods. This requirement resulted from the Commission's play yard misassembly NPR that was published in August 2012. The ballot item passed and is now part of ASTM F2194–13. The final rule incorporates by reference ASTM F2194–13; thus, the test will include the suggestion from the commenters.

*Comment:* A commenter stated that that the mattress flatness test could not be performed on bassinets that were less than 15 inches wide because of the width of the cylinder and the block used in that test method. Furthermore, the commenter noted that such a small, narrow occupant-retention space would not present the same hazards involved in incidents with wider play yard bassinet accessories.

*Response:* The Commission agrees that bassinets with occupant-retention spaces that are narrower than the test apparatus are unlikely to be used with an infant placed orthogonally between walls that are so narrow. In the case where an infant is placed in a narrow bassinet correctly and then moves or shifts 90°, the narrowness of the bassinet would likely not permit the infant to lie in a fully prone position, face down in an orthogonal seam. Thus, an exemption from the flatness test for mattress pad seams that run orthogonally between the sides of a bassinet with a width of 15 inches or

less seems reasonable. Therefore, the Commission is modifying the standard to exempt from the mattress flatness test bassinets that are narrower than 15 inches.

*Effective Date*

*Comment:* We received several comments on the effective date proposed in the SNPR. One commenter, representing several advocacy groups, supported the six-month effective date proposed in the SNPR. A second commenter agreed, expressing concerns that if the date were extended and a death occurred, "consumers might view the death as the result of the CPSC putting the interests of for-profit entities . . . ahead of the safety of infants who use their products."

In contrast, several other commenters, including one manufacturer, recommended longer effective dates to reduce the impact of the rule, particularly for small businesses that have "fewer resources and connections within the industry" and that "may have to significantly alter their means of production." Suggested effective dates ranged from 9 to 15.5 months, with commenters recommending that the CPSC focus on relief for firms that would be disproportionately impacted by the rule. Commenters suggested longer effective dates for firms newly covered by the expanded scope, and firms whose products would be subject to the removable bassinet bed requirement.

A manufacturer commenting on the effective date stated that a longer effective date is needed for firms that will need to redesign their products to meet the removable bassinet bed requirement. This firm stated that an effective date of at least 15.5 months is needed to reflect accurately the challenges of redesigning the product.

*Response:* The Commission recognizes that some manufacturers will be required to redesign, test new prototype products, and then retool their production process to meet the new removable bassinet bed provision. Based on a comment from one manufacturer who stated it would need a minimum of 15.5 months to redesign its product, the Commission considers 18 months to be a reasonable time period to accommodate other manufacturers that might also need to redesign their products. Therefore, the Commission is implementing a six-month effective date for the final rule, with the specific exception of extending the effective date for the removable bassinet bed test requirement to 18 months.

*Stability Testing—CAMI Dummy*

*Comment:* Some commenters suggested using an infant and a newborn dummy in the stability test methods, while others said they believe the incident data do not support the need to change from an infant dummy to a newborn dummy because this change neglects the evidence that larger infants also use bassinets and cradles.

*Response:* The use of both dummies is unnecessary because the worst case scenario for stability is the smaller size dummy. The larger size dummy makes the product more stable. Therefore, if a product passes with a newborn, the product will also pass with an infant. Performing the test with two different dummies would be redundant and would only add to the cost of testing.

The Commission is requiring use of the newborn CAMI to make the test more stringent. Even if a majority of the incidents were not directly attributable to product stability, the instability of the product, in many incidents, was to blame, including two fatal incidents (one of which was reported from Canada).

*Incident Data Analysis*

*Comment:* Some commenters asserted that a causal relationship could not be established for fatalities that the Commission attributed to design defects. They also stated that the information used by the Commission to analyze fall incidents was circumstantial. Other commenters suggested that additional information should be collected to determine the extent to which product design was at fault, to evaluate the cause of falls, and to "improve and expand on the regulations and guidelines set forth in the proposed rule."

*Response:* The Commission gathered as much information as possible on every cited product-related fatality through an in-depth, on-site field investigation. Although the Commission agrees with the commenters that additional information-gathering on all nonfatal injuries could be useful, given resource limitations, the Commission cannot follow up on every injury report with an in-depth investigation. Many of the nonfatal injuries were based on emergency department-treated cases from NEISS hospitals, and confidentiality requirements often prevent any additional contact with patients. In addition, even with cases that are followed, completion of the investigation is not guaranteed because of a lack of consumer cooperation or the inability to establish contact with the consumer.

Short of a controlled experimental setting, causal links are difficult to establish from observational data based on un-witnessed incidents. However, the combined judgment of subject matter experts at CPSC, corroborated by investigating state/county/local officials, supports the conclusions.

*Comment:* One set of commenters expressed the belief that the data presented in the SNPR is skewed and purposely misleading. There were specifics outlined in the comment, which are addressed in the response.

*Response:* The Commission disagrees strongly with the commenters' assertion regarding the way the data are presented. For fatalities, the commenters contend that almost all of the incidents were due to caregiver negligence, even the ones that the Commission considered to be product related.

The commenters first argued that the Commission needed to gather more information on the fatalities deemed by the Commission to be product related. CPSC staff gathered as much information as possible on every cited product-related fatality through an in-depth, on-site field investigation. Because these incidents were not witnessed, the judgments of subject matter experts at CPSC and state/county/local investigating officials were combined to arrive at the conclusions about the manner of the deaths.

Second, the commenters asserted that of the three deaths that were due to infants sliding out of the fabric-sided opening, two were of the infants were older than the recommended-user age. Hence, the commenters further asserted, these two deaths cannot be counted as product-related because they were the result of caregiver negligence. The Commission disagrees with this assertion because the third decedent, who died in the same manner, was well within the recommended age limit. Therefore, the age of the other two decedents, barely a month above the recommended age limit, was deemed not to be a factor in the entrapments.

Third, the commenters stated that the non-product-related deaths appear to be due to caregiver negligence and do not justify CPSC's increasing the economic burden on manufacturers through added regulations. This argument has no basis because CPSC's regulation does not make any changes to the current voluntary standard based on these non-product-related fatalities.

For the nonfatal injuries, the commenters said they believe there is no justification for placing a burden on manufacturers by including one injury, due to a moldy mattress, in the report.

CPSC staff includes all in-scope incidents in its hazard sketch, even if the Commission is not proposing any provisions to address the issue. Therefore, the manner in which staff reports the incident data does not impose any burden on manufacturers.

In addition, the commenters argued that six percent of the injuries from bassinets that were damaged during delivery were instances of blatant negligence on the part of the owners. First, to clarify, the Commission reported that six percent of the incidents, not injuries, involved bassinets damaged during delivery. Second, there were no injuries associated with these incidents, and the Commission did not propose any provisions to address the issue.

*Comment:* Some commenters said that the Commission needs to provide justification for its statement that the descriptions in the noninjury incident reports indicated the potential for serious injury. The commenters stated that without any further explanation, the statement seems "arbitrary."

*Response:* CPSC staff has reviewed a number of incidents in which the caregiver was reported to be nearby and was able to rescue the infant from danger. Similar scenarios, with the infant unattended, have led to less favorable outcomes. Thus, the potential for serious consequences is not conjecture, and the statement is justified.

*Size and Weight Limits*

*Comment:* Some commenters suggested that the weight of an infant occupant should be considered in the standard's scope to safeguard infants who exceed the recommended weight and size.

*Response:* The maximum weight of an occupant is already considered in the static load requirements in ASTM F2194–13, which the rule incorporates by reference. The industry requires a bassinet to be loaded to three times the manufacturer's recommended weight. The side heights are also intended to account for the largest infants who might still use the bassinet.

*Bassinet Misuse*

*Comment:* One commenter expressed concern that the possibility of consumer misuse of bassinets would negate any effects of the new requirements.

*Response:* The Commission believes that strengthening the standard is the best way to improve product safety and that if significant product misuse becomes evident in injury reports, more developments are possible.

*Comment:* Another commenter suggested that educational campaigns about the proper and improper uses of bassinets would be sufficient.

*Response:* The Commission believes that educational campaigns play an important role in injury prevention but are best preceded by mechanical and physical safety requirements designed to make accidents as unlikely as possible to occur.

*Restraints*

*Comment:* One commenter expressed the belief that the lack of incidents with harnesses could be due to other factors, as much as to the lack of harnesses in bassinets.

*Response:* Deaths and injuries in other infant products have been attributed to restraints/harness that were not used or were used improperly. Therefore the Commission is not making any changes regarding the current prohibition of restraints in bassinets.

*Warnings*

*Comment:* Some commenters recommended the use of pictures or visual aids to clarify the warning messages.

*Response:* The Commission acknowledges that well-designed graphics can be useful in certain circumstances. However, the design of effective graphics can be difficult. Some seemingly obvious graphics are poorly understood and can give rise to interpretations that are opposite the intended meaning (so called "critical confusions"); therefore, a warning pictogram should be developed with empirical study and well tested on the target audience. Although the Commission may take action in the future if it believes graphic symbols are needed to reduce the risk of injury associated with these products, the rule permits, but does not mandate, such supporting graphics. With respect to the idea of creating a pictogram to communicate the dangers of soft bedding, the Commission agrees that a well-developed and tested pictogram could increase comprehension and acknowledges that such elements could be developed with some empirical study; the Commission, however, does not have the resources for such a project at this time and could not validate a warning graphic without research. However, there are a number of products for which such a soft bedding pictogram could be useful, such as bedside sleepers, bassinets, cribs, play yards, inclined sleep products, and others. Because of this, an ASTM cross-product ad hoc working group may be the best place to develop such a

pictogram. This could foster cross-product harmonization of such a pictogram and would allow testing and validation of the pictogram. CPSC staff will gladly participate in any such group, and should the need arise, staff will consider future action once such a graphic is developed.

*Comment:* A commenter suggested adding statistics to the suffocation warning.

*Response:* Crafting a warning requires balancing the brevity of the message with its attention-grabbing features and informational content. Too much information makes a long label that is likely to be ignored by consumers. On the other hand, too little information leaves consumers unsure of the message. CPSC staff's opinion is that the addition of statistical information on the suffocation warning label will not increase the effectiveness of the warning.

*Comment:* A commenter suggested that the warnings contain the maximum recommended age of the bassinet occupant, *i.e.,* five months.

*Response:* The current warning contains a developmental milestone, rather than an age maximum. Developmental milestones have the advantage of allowing for individual variability in use patterns. Some children will gain strength and coordination faster than others and will need to be removed from the bassinet sooner. Since children's abilities are more important than their age when evaluating the applicability of the warning, the age is not included in the warning.

*Comment:* A commenter suggested that the warnings should be displayed in a prominent position.

*Response:* The ASTM standard, which the rule incorporates by reference, already contains a common definition for "conspicuous" warnings in Section 3.3.3, with corresponding requirements in Sections 8.3, 8.4, and 8.5.

*Comment:* A commenter suggested strengthening the warning labels by requiring mattress pads to have the following statement: "This padding has been tested to reduce the risk of suffocation to a minimal level," adding that "additional padding increases this risk substantially and has caused fatalities."

*Response:* Although the standard does contain a requirement for the mattress pad to remain level, the standard does not contain a test for reducing the risk of suffocation created by the softness of the padding, which seems to be the assumption made by the commenter. The standard already contains a warning in Section 8.4.2, instructing

against the use of additional bedding materials. This required warning must be visible to the consumer when the product is in the manufacturer's recommended-use position. Thus, the warning will not be covered by sheets, which are allowed, and will be more effective than on the mattress pad where any messages will be covered.

*Comment:* Another commenter suggested that consumers need to be warned of the hazards associated with segmented mattresses.

*Response:* Warnings are the last stage at which attempts are made to remove a hazard from a product. Changing the product is more effective. The standard contains performance requirements designed to eliminate the hazards associated with segmented mattresses, so it is not necessary to include a warning.

*Comment:* Several commenters suggested that warnings should have larger fonts, duplication on opposing walls of the bassinet, duplication on the packaging and on the product, more detailed hazard descriptions, and more information in supporting educational materials and product advertisements.

*Response:* Although CPSC staff agrees that any warning could be strengthened with a size, color, or other graphical features, the product's final appearance also needs to be considered because exceptionally large or graphic warnings may cause consumers to remove or deface the warnings, thereby rendering them ineffective for later users. The current warning requirements match industry standards for many juvenile products.

*The Necessity for a Standard*

*Comment:* Several commenters stated that the proposed standard for bassinets and cradles should not be adopted because the number of injuries and fatalities due to design defects was very low.

*Response:* The Consumer Product Safety Improvement Act (CPSIA) requires the Commission to issue a mandatory standard for bassinets and cradles, regardless of the number of incidents involving those products. Given the the CPSIA directive, the options are either to adopt the existing voluntary standard, as is, or revise the standard to make improvements. Even if a majority of the incidents were not directly attributable to defects in the product design, many incidents were. Congress mandated that CPSC adopt a more stringent standard if the Commission determined that a more stringent standard "would further reduce the risk of injury." The

Commission feels strongly that the final rule would do so.

*Mattress Thickness (Rigid Products and Falls)*

*Comment:* Some commenters expressed concern that the standard allows for rigid-sided bassinets with thicker mattresses than soft-sided bassinets. These commenters said they feel that thicker mattresses may pose more of a risk of babies falling out when a baby rolls to one side and the product tilts.

*Response:* There are two requirements in the existing ASTM standard, which the rule incorporates by reference, which would prevent the scenario described by the commenters. The first is the side height requirement, which states that the side height of the bassinet be 7.5″ above the uncompressed surface of the mattress. Thus, if a bassinet maker supplies a thick mattress with the rigid-sided bassinet, the side heights must account for the thicker mattress and still yield 7.5″ of side height above the mattress surface. In addition, the standard has a rock/swing angle requirement that limits the maximum angle a rocking bassinet can have, as well as a maximum rest angle it can have. The rest angle is measured using a CAMI doll placed up against the side of the bassinet. Thus, the standard uses a worst-case placement scenario for the occupant during the testing.

*Health Canada Standard*

*Comment:* A representative of Health Canada corrected a statement in the SNPR and the corresponding staff briefing package, which states: "The Canadian standard (SOR 86–962:2010) includes requirements for cribs and non-full-size cribs. This standard does not distinguish between a bassinet and non-full-size cribs." The commenter noted that this overview statement was incorrect because on November 18, 2010, the amended Cribs, Cradles, and Bassinets Regulations (SOR/2010–261) came into effect, and now bassinets are included in the scope.

*Response:* The Commission thanks Health Canada staff for the correction and the subsequent information regarding how SOR 2010/261 distinguishes bassinets, cradles, and cribs. As the Commission now understands, Health Canada defines these three products according to the sleep surface area contained in the product.

*Play Yard Misassembly Requirement in Docket CPSC–2011–0064*

*Comment:* The commenter repeated comments submitted for Docket CPSC–

2011–0064, regarding the play yard misassembly requirement that was proposed in August 2012.

*Response:* The Commission has addressed these comments in the final rule briefing package for Play Yard Misassembly Requirement, dated June 26, 2013.

*International Standards*

*Comment:* Commenters remarked that more information regarding the international standards that were mentioned in the SNPR would be helpful.

*Response:* The Commission provided the names and designations of the standards, plus a description of where they differed substantially from the ASTM standard. Due to copyright laws, the Commission was not able to provide full copies of the standards. All of the standards are available for purchase online by anyone who seeks more information.

*ASTM Copyright and Accessibility*

*Comment:* Some commenters stated that the ASTM standard for bassinets and cradles should not be the basis of a mandatory rule because, as a copyrighted standard, the ASTM standard is not easily accessible to the public and creates an undue financial burden on small manufacturers and the general public.

*Response:* Section 104(b) of the CPSIA requires the Commission to issue standards for durable infant or toddler products that are substantially the same as applicable voluntary standards or are more stringent if more stringent standards would further reduce the risk of injury. Incorporating a voluntary standard, such as incorporating the ASTM standard by reference, is a well-recognized procedure for agencies. The incorporation satisfies the requirement of publication in the **Federal Register**. *See* 5 U.S.C. 552(a)(1)(E) ("matter reasonably available to the class of persons affected thereby is deemed published in the **Federal Register** when incorporated by reference therein with the approval of the Director of the Federal Register").

*Falls From Bassinets/Side Height*

*Comment:* Some commenters suggested that the side height requirements need to be higher because consumers seem to be using bassinets with children older than the recommended ages. One commenter expressed the belief that the standard should match the Canadian side height requirement.

*Response:* The ASTM subcommittee discussed the side heights of bassinets

for years. There was no side height requirement until recently. Consumers use the products longer than manufacturers recommend. High side heights could cause consumers to use their bassinets even longer than they have been using them because the older, larger children who can push up on their hands and sit unassisted will look safer in a bassinet with tall sides. The unintended consequence of taller sides might be an increase in falls from bassinets because older children are stronger and more agile than newborns. After much discussion, the ASTM subcommittee agreed to a 7.5-inch side height, based on the precedent set by the Canadians, who measure from the bottom of the bassinet rather than the mattress top. This difference in measurement landmarks makes it appear that the ASTM standard permits shorter sides; but in reality, the effective side height of a bassinet in Canada is the same as in the ASTM standard. This side height requirement did not necessitate drastic changes in the bassinet designs on the market; so it would be unlikely that instituting the requirement would have any effect on consumer behavior.

*Comment:* Several commenters suggested that side height requirements might not be effective against misuse. One commenter expressed the belief that the burden should be placed on caregivers and that the standard needs no modification to address falls. Another suggested that warning labels should be strengthened instead.

*Response:* The side height requirement (7.5-inch minimum) is already part of ASTM F2194–13, which this rule incorporates by reference. The rule does not add anything further because the Commission believes that the requirements should be effective against misuse. The Commission believes that, at a minimum, this requirement will help protect infants who have not exceeded the maximum age requirement for bassinet use. Additionally, the Commission supports the current warnings in the ASTM standard.

*Existing Inventory*

*Comment:* One commenter expressed concern that the Commission did not address the existing cradle and bassinet inventory that would need "to be discarded or recalled" when the regulation becomes effective.

*Response:* The bassinet and cradle standard is prospective. It will apply to products manufactured or imported on or after the effective date. Therefore, existing inventory would not be affected.

*Cost Benefit Analysis*

*Comment:* Several commenters expressed the belief that a cost-benefit analysis should be performed, and they stated that the proposed rule should not be adopted because costs are likely to exceed benefits.

*Response:* Section 104(b) of the Consumer Product Safety Improvement Act (CPSIA), part of the Danny Keysar Child Product Safety Notification Act, requires the CPSC to issue a standard at least as stringent as the voluntary standard, or more stringent if the Commission determines that a more stringent standard would further reduce the risk of injury associated with such products. Thus, the Commission must issue a mandatory standard for bassinets and cradles, regardless of the costs and benefits of the rule.

*Third Party Testing Cost*

*Comment:* Two commenters expressed concern about the "substantial additional costs" that will result from a new requirement for third party testing that will be added by the bassinet/cradle standard.

*Response:* The testing costs referred to by the commenters result from the third party testing and certification requirements imposed under sections 14(a)(2) and 14(d)(2) of the Consumer Product Safety Act (CPSA), as amended by the CPSIA. The costs associated with testing will be substantially the same, regardless of the form the final bassinet/cradle standard takes.

*Definition of a Small Business*

*Comment:* One commenter questioned defining "small manufacturers" as those with fewer than 500 employees. The commenter noted that business size can vary widely within such a broadly defined group. The commenter expressed concern that the economic impact could be disproportionately significant for the very smallest firms.

*Response:* The U.S. Small Business Administration (SBA) is the source of the definition of "small manufacturers" of bassinets and cradles. Regardless of the desirability of a finer gradation in defining small businesses, the SBA definition governs the small business determination in the context of a regulatory flexibility analysis.

*Impact of Expanding the Scope*

*Comment:* One commenter expressed concern about the "adverse monetary impact" that expanding the scope of the standard to include Moses baskets would have upon some suppliers. The commenter felt that the alternative of ceasing to supply stands for these newly covered products requires further

inquiry before "suggesting that this is a viable alternative." Other commenters questioned methods firms might use to mitigate their "upfront costs," including amortizing, "increased product sales," and passing "the additional costs on to consumers."

*Response:* When used with a stand, Moses baskets meet the definition of a "bassinet" (or "cradle," in the case of a rocking stand), and therefore, they must be tested as a bassinet. Given that most suppliers of Moses baskets do not include stands, supplying Moses baskets without stands is one viable option that firms are already practicing.

Similarly, the statement that "direct impact may be mitigated if costs are treated as new product expenses that can be amortized" recognizes one of the methods firms use routinely in the development of new products to reduce the immediate financial impact; rather than incurring all of the development costs up front, amortizing allows the firm to spread the impact over time. Finally, for most products, firms are usually able to pass on some, but not all, increases in production costs to consumer. The portion of costs that are passed on (i.e. not absorbed by the firm) partially offset or mitigate the impact of the rule.

*Aiding Small Businesses*

*Comment:* One commenter suggested that the Commission "create a framework with which to aid some of the smaller manufacturers and distributors with finding the resources, information and connections they need to comply with the new standards."

*Response:* CPSC's Small Business Ombudsman provides small businesses with guidance to assist them in complying with CPSC requirements. Assistance is available to firms in understanding and complying with CPSC regulations (*http://www.cpsc.gov/en/Business—Manufacturing/Small-Business-Resources/*).

*Small Bedding Suppliers*

*Comment:* One commenter asked that the Commission put "less weight" on small bedding suppliers in the regulatory flexibility analysis. The commenter expressed concern that: "[N]oncompliant bedding could potentially negate the efficiency of . . ." safety measures such as strangulation warnings ". . . or require manufacturers to take additional steps to correct noncompliant bedding."

*Response:* The standard does not include any bedding requirements. However, in investigating the bassinet/cradle market, staff could not determine the underlying source of bassinets for

several suppliers of bassinets. The firms for whom the bassinet source could not be identified shared one major characteristic: They were primarily bedding suppliers who sold bassinets or cradles with the appropriate bedding covering the bassinet/cradle frame. Because these firms supply bassinets/ cradles, they are affected by the rule and impacts must be fully considered under the Regulatory Flexibility Act.

*Labeling Costs*

*Comment:* One commenter objected to the costs that will be associated with changing the warning labels.

*Response:* The commenter misunderstood the information presented in the Paperwork Reduction Act section of the SNPR. The commenter interpreted the cost per burden hour associated with labeling ($27.55) to be the increased cost per unit, which is an incorrect conclusion.

## VII. Assessment of Voluntary Standard ASTM F2194–13 and Description of Final Rule

Consistent with section 104(b) of the CPSIA, this rule establishes new 16 CFR part 1218, "Safety Standard for Bassinets and Cradles." The new part incorporates by reference the requirements for bassinets and cradles in ASTM F2194–13, with certain additions and changes to strengthen the ASTM standard, to further reduce the risk of injury. The following discussion describes the final rule, the changes, and the additions to the ASTM requirements. (The description of the amendment to 16 CFR part 1112 may be found in Section XIII of this preamble.)

*A. Scope (§ 1218.1)*

The final rule states that part 1218 establishes a consumer product safety standard for bassinets and cradles manufactured or imported on or after the date that is six months after the date of publication of a final rule in the **Federal Register**, except that the effective date for the removable bassinet bed requirements would be 18 months after the date of publication of a final rule in the **Federal Register**.

*B. Incorporation by Reference (§ 1218.2)*

Section 1218.2(a) explains that, except as provided in § 1218.2(b), each bassinet and cradle must comply with all applicable provisions of ASTM F2194–13, "Standard Consumer Safety Specification for Bassinets and Cradles," which is incorporated by reference. Section 1218.2(a) also provides information on how to obtain a copy of the ASTM standard or to inspect a copy of the standard at the

CPSC. The Commission received no comments on this provision in the SNPR, but the Commission is changing the language in the incorporation in the final rule to refer to ASTM F2194–13, the current version of the ASTM standard.

*C. Changes to Requirements of ASTM F2194–13*

1. Clarification of Scope. (§ 1218.2(b)(1)(i)). The final rule modifies the scope of ASTM F2194–13 to clarify that multimode combination products must meet the bassinet/cradle standard in any configuration where the seat incline is 10 degrees or less from horizontal. This modification resulted from comments on the SNPR seeking clarification on what products are included in the scope, as more fully discussed in Section VI.

2. Change to Stability Test Procedure. (§ 1218.2(b)(2) and § 1218.2(b)(6)). In the SNPR, the Commission proposed that bassinet/cradle stability testing be conducted with a CAMI newborn dummy, rather than the CAMI infant dummy. Because ASTM has yet to adopt this modification (although it is expected to be balloted in the near future), the Commission is including it in the final rule.

It is appropriate that the smaller newborn CAMI dummy be used for stability testing, because bassinets and cradles are intended to be used by very young children. The heavier (17.5-pound) infant CAMI currently specified for stability testing in ASTM F2194–13 could make these products more stable when tested than they would actually be in a real-world situation.

3. Removable Bassinet Bed. (§ 1218.(b)(3), (5), and (7)). In the SNPR, the Commission proposed adding a requirement for removable bassinet beds (along with test procedures and new definitions). As stated in the preamble of the SNPR (77 FR 64061), there have been several incidents involving bassinet beds that were designed to be removed from their stand, four of which have In-Depth Investigations. During the incidents, the bed portion of the unit was not locked completely or attached properly to its stand. The bed portion of the unit appeared to be stable, giving the caregivers a false sense of security. For various reasons, the bed portion fell or tilted off of its stand. There have also been nonfatal incidents involving bassinet beds that tipped over or fell off their base/stand when they were not properly locked/latched to their base/ stand, or the latch failed to engage as intended. In May 2012, 46,000 bassinets that could appear to latch to the stand when they actually had not latched

were recalled. (*http://www.cpsc.gov/ cpscpub/prerel/prhtml12/12173.html*).

The SNPR proposed multiple options for a bassinet with a removable bed attachment to pass the proposed requirement. These options include: (1) Ensuring that the bed portion of the bassinet is inherently stable when the bassinet bed is placed on the stand unlatched; (2) use of a false lock/latch visual indicator mechanism; (3) use of a stand that collapses if the bassinet bed is not properly attached; and (4) the presence of an obvious unsafe angle (more than 20 degrees) or a bassinet bed falls to the floor when it is not properly attached to the stand.

Since the issuance of the SNPR, ASTM has made several clarifying changes to the removable bassinet bed requirement, definitions, and test procedures, and ASTM is expected to send these changes out for ballot in the near future. Most of the differences are editorial changes to provide clarity to the test requirement and the test procedure. The significant, noneditorial differences between the requirement proposed in the SNPR and what ASTM is expected to ballot are as follows:

• The next ASTM ballot is expected to exclude play yard bassinets, as defined in the standard, from the removable bassinet bed definition. Thus, play yard bassinets would not be subject to the removable bassinet bed stability requirement.

• The next ASTM ballot is expected to expand on one of the pass criteria for the removable bed stability requirement, to allow bassinet stands that cannot remain in their proper use position unless the bassinet bed is properly attached.

The Commission agrees with these revisions and is adding the revised removable bassinet bed requirement as part of the final bassinet/cradle rule.

4. Mattress Flatness. (§ 1218.2(b)(4)(i)). A segmented mattress flatness requirement and associated test procedures were proposed by the Commission as part of the SNPR. ASTM adopted the requirement with modified, less stringent pass/fail criteria. The final rule modifies the pass/fail criteria in ASTM F2194–13 to mirror the SNPR proposal.

As stated in Section V, the mattress flatness requirement is primarily aimed at incidents involving bassinet/play yard combination products that tend to use segmented mattresses, where seams could pose a suffocation and positional asphyxiation hazard. Under the Commission's pass/fail criteria, a bassinet attachment with a segmented mattress will fail if any tested seam creates an angle greater than 10 degrees.

ASTM F2194–13 allows measured angles between 10 degrees and 14 degrees to pass, as long as the mean of three measurements on that seam is less than 10 degrees. As discussed in the preamble to the SNPR, the 14-degree angle was based on an extrapolation of angles formed by dimensions of average infant faces. 77 FR 64060–64061. The Commission is uncomfortable using the average infant facial dimension as the basis for this requirement. Therefore, instead of using the average infant anthropometrics as a basis for the pass/ fail criteria, the Commission continues to support using the smallest users' anthropometrics to set the test requirement of 10 degrees maximum for each measurement taken.

5. Exemption from Mattress Flatness Requirement. (§ 1218.2(b)(4)(i)). The final rule exempts from the mattress flatness requirement bassinets that are less than 15 inches across. These products do not pose the hazard the requirement is intended to address, and they are also not wide enough to test using the required procedures and equipment.

## VIII. Effective Date

The Administrative Procedure Act (APA) generally requires that the effective date of a rule be at least 30 days after publication of the final rule. 5 U.S.C. 553(d). The Commission is setting an effective date for the standard six months after publication for products manufactured or imported on or after that date, with the exception of the removable bassinet bed test requirement and procedure.

The Commission recognizes that some manufacturers will be required to redesign, test new prototype products, and then retool their production process in order to meet the new removable bassinet bed provision. Based on a comment from a manufacturer who asked for a minimum of 15.5 months to redesign its product, the Commission considers 18 months to be a reasonable time period to take into account other manufacturers who might also need to redesign their product. Therefore, the Commission is setting an 18-month effective date for the removable bassinet bed test requirement.

## IX. Regulatory Flexibility Act

### A. Introduction

The Regulatory Flexibility Act (RFA) requires that agencies review rules for their potential economic impact on small entities, including small businesses. 5 U.S.C. 604. Section 604 of the RFA requires that agencies prepare a final regulatory flexibility analysis

when they promulgate a final rule, unless the head of the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. The final regulatory flexibility analysis must describe the impact of the rule on small entities and identify any alternatives that may reduce the impact. Specifically, the final regulatory flexibility analysis must contain:

• A succinct statement of the objectives of, and legal basis for, the rule;

• a summary of the significant issues raised by public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

• a description of, and, where feasible, an estimate of, the number of small entities to which the rule will apply;

• a description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities subject to the requirements and the type of professional skills necessary for the preparation of reports or records; and

• a description of the steps the agency has taken to reduce the significant economic impact on small entities, consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the rule, and why each one of the other significant alternatives to the rule considered by the agency, which affect the impact on small entities, was rejected.

### B. The Market for Bassinets/Cradles

Bassinets and cradles are typically produced and/or marketed by juvenile product manufacturers and distributors, or by furniture manufacturers and distributors, some of which have separate divisions for juvenile products. CPSC staff believes that there are currently at least 62 suppliers of bassinets and/or cradles to the U.S. market; 26 are domestic manufacturers; 19 are domestic importers; three are domestic retailers; and two are domestic firms with unknown supply sources. Twelve foreign firms currently supply the U.S. market: 10 manufacturers, one firm with an unknown supply source, and one importer that imports from foreign companies and distributes from outside of the United States. Eight additional firms specialize in children's bedding, some of which is sold with

bassinets or cradles; the supply sources for these eight firms could not be identified.

Bassinets and cradles from 11 of the 62 firms have been certified as compliant by the Juvenile Products Manufacturers Association (JPMA), the major U.S. trade association that represents juvenile product manufacturers and importers. Firms supplying bassinets or cradles would be certified to the ASTM voluntary standard F2194–12a, while firms supplying play yards with bassinet/ cradle attachments would also have to meet F406–12a. (JPMA typically allows six months for products in their certification program to shift to a new standard once it is published. ASTM F2194–12a was published in September 2012, and therefore, the standard would have become effective in March 2013. The more recent standard, ASTM F2194–12b, was published in December 2012, and therefore, that standard was not yet effective when research for this rule was conducted.) Twenty-four additional firms claim compliance with the relevant ASTM standard for at least some of their bassinets and cradles. Whether the bassinets or cradles supplied by the eight bedding suppliers comply with ASTM F2194 is not known.

According to a 2005 survey conducted by the American Baby Group (2006 Baby Products Tracking Study), 64 percent of new mothers own bassinets; 18 percent own cradles; and 39 percent own play yards with bassinet attachments. Approximately 50 percent of bassinets, 56 percent of cradles, and 18 percent of play yards were handed down or purchased secondhand. Thus, approximately 50 percent of bassinets, 44 percent of cradles, and 82 percent of play yards were acquired new. These statistics suggest annual sales of a total of approximately three million units sold per year, consisting of about 1.3 million bassinets (.5 × .64 × 4 million births per year), 317,000 cradles (.44 × .18 × 4 million), and 1.3 million play yards with bassinet attachments (.82 × .39 × 4 million). (U.S. Department of Health and Human Services, Centers for Disease Control and Prevention (CDC), National Center for Health Statistics, National Vital Statistics System, "Births: Final Data for 2010," *National Vital Statistics Reports* Volume 61, Number 1 (August 28, 2012): Table I. Number of births in 2010 is rounded from 3,999,386.)

National injury estimates were not reported by the Directorate for Epidemiology in the supplemental NPR or in the current FR briefing package because the data failed to meet NEISS

publication criteria. However, emergency department injury estimates over the approximately five years covered by the supplemental NPR and the current FR briefing package, from 2008 through 2012, averaged less than 250 annually. Based on data from the 2006 Baby Products Tracking Study, approximately 4.8 million bassinets and cradles were owned by new mothers. Therefore, the injury rate may be on the order of about 0.5 emergency department-treated injuries per 10,000 bassinets/cradles available for use in the households of new mothers ((250 injuries ÷ 4.84 million products in households of new mothers) × 10,000).

*C. Reason for Agency Action and Legal Basis for the Rule*

The Danny Keysar Child Product Safety Notification Act requires the CPSC to promulgate a mandatory standard for bassinets/cradles that is substantially the same as, or more stringent than, the voluntary standard. The Commission is adopting ASTM F2194–13 with five modifications or additions that reflect: (1) Changes proposed in the SNPR that are not part of F2194–13; (2) responses to public comments; and/or (3) additional work undertaken by ASTM, but not yet adopted. The changes will address a variety of known hazard patterns, including suffocation and positional asphyxia.

*D. Requirements of the Final Rule*

As stated in Section VII, the Commission is incorporating the voluntary standard for bassinets/cradles, ASTM F2194–13, by reference, with five changes.

The Commission is implementing two modifications to ASTM F2194–13 in response to SNPR comments; neither is expected to have a negative impact on firms. The first is a modification to the scope that would clarify that multimode or combination products must meet the bassinet/cradle standard in any configuration where the seat incline is 10 degrees or less from horizontal. Because the clarifying modifications do not change the scope of the standard, the modifications have no additional impact. The second is an exemption from the mattress flatness requirement for bassinets that are less than 15 inches across. Because of the characteristics of the narrower bassinets, these products are not subject to the hazard that the requirement is intended to address. Additionally, these narrower bassinets are not wide enough to test using the required procedures and equipment.

The Commission is implementing three additional changes to ASTM F2194–13, each of

1. Stability Testing

As stated in Section V of this preamble, in the SNPR, the Commission proposed that bassinet/cradle stability testing be conducted with a CAMI newborn dummy, rather than the CAMI infant dummy. Because ASTM has yet to adopt this modification (although the modification is expected to be balloted in the near future), the Commission is including the modification in the final rule. Based on limited testing, many bassinets/cradles appear to be able to pass this modified test procedure without modification. However, a few products may potentially require modifications to meet the revised stability test procedure. Staff believes that the modified test procedure is likely to affect only a few manufacturers, and likely will not require product redesign. Affected firms would most likely increase the stability of their product by widening the structure, making the bassinet bed deeper, or making the base heavier. The cost of meeting the modified requirement could be more significant if a change to the hard tools used to manufacture the bassinet is necessary. During the production process, a hard tool, which is a mold of the desired bassinet component shape, is injected with plastic or another material using a molding machine.

2. Mattress Flatness

A segmented mattress flatness requirement and associated test procedures were proposed by the Commission as part of the SNPR. ASTM adopted the requirement with modified (and less stringent) pass/fail criteria. The Commission is modifying the pass/ fail criteria in ASTM F2194–13 to mirror the SNPR proposal.

The mattress flatness requirement is primarily aimed at incidents involving bassinet/play yard combination products that tend to use segmented mattresses, where seams could pose a suffocation and positional asphyxiation hazard. Under the Commission's pass/ fail criteria, a bassinet attachment with a segmented mattress will fail if any tested seam creates an angle greater than 10 degrees. ASTM F2194–13 allows measured angles between 10 degrees and 14 degrees to pass, as long as the mean of three measurements on that seam is less than 10 degrees.

Based on staff's testing, the play yard bassinet attachments of many suppliers (both compliant and non-compliant) appear to pass the requirement without

any modifications. Bassinet attachments that would require some modification would need to increase the mattress support in their bassinets. Additional mattress support could be accomplished, for example, by retrofitting play yard bassinets to use longer rods or a better-fitting mattress shell. The cost of such a retrofit is unknown and would likely vary from product to product; however, a retrofit generally is less expensive than a product redesign.

3. Removable Bassinet Bed

As stated in Section V of this preamble, in the SNPR, the Commission proposed adding a requirement for removable bassinet beds (along with test procedures and new definitions). Since then, an ASTM task group has made several clarifying changes to the requirement, definitions, and test procedures and is expected to recommend them for ballot. The Commission is adopting the revised removable bassinet bed requirement as part of the final bassinet/cradle rule.

There are several firms supplying bassinets with removable bassinet beds to the U.S. market. The majority will require no modifications to meet the requirement. However, at least three firms are expected to need changes to one or more of their bassinets. Firms could meet the removable bassinet requirement in a number of ways, including redesigning the product entirely. However, many firms are likely to opt for less expensive alternatives, such as more sensitive locks that activate with little pressure (*i.e.,* with just the weight of the bassinet), where possible.

The costs and time involved in a redesign could be significant; one manufacturer stated in SNPR comments that the manufacturer would require 15.5 months to redesign its product to meet the removable bassinet bed requirement. Therefore, the Commission is setting an 18-month effective date for this requirement, while maintaining a six-month effective date for the remainder of the final rule.

*E. Other Federal or State Rules*

A final rule implementing sections 14(a)(2) and 14(i)(2) of the Consumer Product Safety Act (CPSA), as amended by the CPSIA, *Testing and Labeling Pertaining to Product Certification,* 16 CFR part 1107, became effective on February 8, 2013 (the 1107 rule). Section 14(a)(2) of the CPSA requires every manufacturer of a children's product that is subject to a product safety rule to certify, based on third party testing, that the product complies

with all applicable safety rules. Section 14(i)(2) of the CPSA requires the Commission to establish protocols and standards: (i) For ensuring that a children's product is tested periodically and when there has been a material change in the product; (ii) for the testing of representative samples to ensure continued compliance; (iii) for verifying that a product tested by a conformity assessment body complies with applicable safety rules; and (iv) for safeguarding against the exercise of undue influence on a conformity assessment body by a manufacturer or private labeler.

Because bassinets and cradles will be subject to a mandatory children's product safety rule, these products also will be subject to the third party testing requirements of section 14(a)(2) of the CPSA and the 1107 rule when the bassinet/cradle mandatory standard and the notice of requirements become effective.

*F. Impact on Small Businesses*

At least 62 firms are currently known to be marketing bassinets and/or cradles in the United States. Under U.S. Small Business Administration (SBA) guidelines, a manufacturer of bassinets/cradles is small if the business has 500 or fewer employees; importers and wholesalers are considered small if they have 100 or fewer employees. Based on these guidelines, about 39 of the 62 total firms are small firms—21 domestic manufacturers, 16 domestic importers, and two firms with unknown supply sources. An additional eight small firms supplying bassinets/cradles along with their bedding; these may or may not originate from one of the 62 firms already accounted for. Other unknown small bassinet/cradle suppliers also may operate in the U.S. market.

Small Manufacturers

The expected impact of the final standard on small manufacturers will differ based on whether their bassinets/cradles are already compliant with F2194–12a. (Play yards with bassinet attachments must comply with the effective play yard standard (F406), which includes a requirement that the attachment meet the bassinet/cradle standard.) In general, firms whose bassinets and cradles meet the requirements of F2194–12a are likely to continue to comply with the voluntary standard as new versions are published. Many of these firms are active in the ASTM standard development process, and compliance with the voluntary standard is part of an established business practice. Firms supplying bassinets and cradles that comply with

ASTM F2194–12a are likely also to comply with F2194–13 before the final bassinet/cradle rule becomes effective.

The majority of the changes to the voluntary standard (ASTM F2194–13) are the same as at the SNPR level; only the expanded scope proposed in the SNPR has been completely incorporated into the voluntary standard. Therefore, the expected impact of the final rule remains substantially the same as the impact presented in the initial regulatory flexibility analysis for the SNPR.

For manufacturers whose products are likely to meet the requirements of ASTM F2194–13 (14 of 21 firms), the direct impact could be significant for one or more firms if they must redesign their bassinets to meet the final rule. Although the products of all firms would be subject to the stability testing requirements, in most cases, modifications are unlikely to be required and the costs are not expected to be significant. The products of five firms could be affected by the mattress flatness requirement (*i.e.*, they produce play yards with bassinet attachments), and at least three (and possibly five) of the known firms may be affected by the removable bassinet bed requirement. For the most part, the bassinets/cradles and bassinet cradle attachments supplied by these firms will be able to meet the changes to ASTM F2194–13 without modification. In cases where modifications are necessary, firms would most likely opt to retrofit their products, rather than undertake an expensive redesign. However, some products may require redesign, particularly to meet the new removable bassinet bed requirement, and therefore, costs could be significant in some cases. The Commission is adopting an 18-month effective date for the removable bassinet bed portion of the final rule to reduce the impact on affected firms.

Meeting ASTM F2194–13's requirements could necessitate product redesign for at least some bassinets/cradles not believed to be compliant with F2194–12a (7 of 21 firms). These firms could require redesign regardless of the modifications. A redesign would be minor if most of the changes involve adding straps and fasteners or using different mesh or fabric, but could be more significant if changes to the frame are required, including changes to side height. One manufacturer estimated that a complete play yard redesign, including engineering time, prototype development, tooling, and other incidental costs, would cost approximately $500,000. The Commission believes that a bassinet redesign would tend to be comparable.

Consequently, the final rule could potentially have a significant direct impact on small manufacturers whose products do not conform to F2194–12a. Any direct financial impact may be mitigated if a firm chooses to treat costs as new product expenses that can be amortized over time rather than a large, one time expense.

Some firms whose bassinets/cradles are neither certified as compliant, nor claim compliance with F2194–12a, in fact, may be compliant with the standard. The Commission has identified many such cases with other products. To the extent that some of these firms may supply compliant bassinets/cradles and have developed a pattern of compliance with the voluntary standard, the direct impact of the final rule will be less significant than described above. If two small firms with unknown supply sources, none of whose products appear to comply with F2194–12a, are manufacturers, these firms also may need to redesign their products to meet the final rule.

In addition to the direct impact of the final rule described above, the rule will have some indirect impacts. Once the new requirements become effective, all manufacturers will be subject to the additional costs associated with the third party testing and certification requirements under the testing rule, *Testing and Labeling Pertaining to Product Certification* (16 CFR part 1107). Third party testing will pertain to any physical and mechanical test requirements specified in the bassinet/cradle final rule; lead and phthalates testing is already required. Impacts of third party testing are not due directly to the bassinet/cradle rule's requirements, but are due to the testing rule's requirements. Consequently, impacts from the testing rule are indirect impacts from the bassinet/cradle final rule, and such indirect impacts could be significant.

One manufacturer estimated that testing to the ASTM voluntary standard runs around $1,000 per model sample, although the manufacturer noted that the costs could be lower for some models where the primary difference is fabric rather than structure.

On average, each small domestic play yard manufacturer supplies seven different models of bassinets/cradles and play yards with bassinet/cradle accessories to the U.S. market annually. Therefore, if third party testing were conducted every year on a single sample for each model, third party testing costs for each manufacturer would be about $7,000 annually. Based on a review of firm revenues, the impact of third party testing to ASTM F2194–13 is unlikely to

be significant if only one bassinet/cradle sample per model is required. However, if more than one sample would be needed to meet the testing requirements, third party testing costs could have a significant impact on a few of the small manufacturers.

Small Importers

As with manufacturers of compliant bassinets/cradles, the seven small importers of bassinets/cradles currently in compliance with F2194–12a could experience significant direct impacts as a result of the final rule if product redesign is necessary. In the absence of regulation, these importing firms would likely continue to comply with the voluntary standard as it evolves, as well as the final mandatory standard. Any increase in production costs experienced by their suppliers may be passed on to the importers.

Importers of bassinets/cradles would need to find an alternate source if their existing supplier does not come into compliance with the requirements of the final rule, which may be the case with the nine importers of bassinets/cradles not believed to be in compliance with F2194–12a. Some could respond to the rule by discontinuing the import of their noncomplying bassinets/cradles, possibly discontinuing the product line altogether. The impact of such a decision could be mitigated by replacing the noncompliant bassinet/cradle with a compliant bassinets/cradle, or by deciding to import an alternative product.

As is the case with manufacturers, all importers will be subject to third party testing and certification requirements, and consequently, will experience costs similar to those for manufacturers if their supplying foreign firm(s) does not perform third party testing. The resulting costs could have a significant impact on a few small importers that must perform the testing themselves if more than one sample per model were required.

Other Possible Suppliers

Eight known small firms specialize in the supply of bedding, including bedding for bassinets and cradles, and the eight firms sell bassinet and cradle bedding with a bassinet or cradle.

Although these firms do not manufacture the bassinets or cradles themselves, whether they purchase the bassinets or cradles domestically or from overseas is not known. These firms may source the bassinets and cradles sold with bedding in full or in part from one of the 62 firms discussed above. If the eight firms do not source from one of the 62 firms, then the eight firms represent additional suppliers to the U.S. market.

The eight firms with unknown supply sources would be affected in a manner similar to importers; they would need to find an alternate source if their existing supplier does not come into compliance with the requirements of the final rule. Unlike most importers, however, the firms would not have the option of replacing a noncompliant bassinet/ cradle with another product. Although the firms could opt to sell the bedding without the associated bassinet/cradle, such an approach would represent a change from their historical method of sale and might adversely impact their business strategy.

As with manufacturers and importers, these eight firms will also be subject to third party testing and certification requirements, and will experience costs similar to those for manufacturers if their supplying firm(s) does not perform third party testing. The resulting costs could have a significant impact on some of these small bassinet or cradle suppliers that must perform the testing themselves.

G. Alternatives

Under the Danny Keysar Child Product Safety Notification Act of the CPSIA, one alternative that would reduce the impact on small entities is to make the voluntary standard mandatory with no modifications. Doing so would reduce the potential impact on firms whose bassinets/cradles comply with the voluntary standard. However, because of the severity of the incidents associated with removable bassinet beds, instability, and mattress tilt, the Commission is not pursuing this alternative.

The Commission is imposing a six-month effective date for the final rule with an 18-month effective date, supported by SNPR comments

submitted by one manufacturer, for the removable bassinet bed requirement. Setting a later effective date for either part will allow suppliers additional time to modify and/or develop compliant bassinets/cradles and spread the associated costs over a longer period of time.

X. Environmental Considerations

The Commission's regulations address whether the Commission is required to prepare an environmental assessment or an environmental impact statement. These regulations recognize that certain CPSC actions normally have "little or no potential for affecting the human environment." One such action is establishing rules or safety standards for products. 16 CFR 1021.5(c)(1). This rule falls within the categorical exclusion.

XI. Paperwork Reduction Act

This rule contains information collection requirements that are subject to public comment and review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521). The preamble to the proposed rule (77 FR at 64055 through 64076) discussed the information collection burden of the proposed rule and specifically requested comments on the accuracy of our estimates. Briefly, sections 8 and 9 of ASTM F2194–13 contain requirements for marking, labeling, and instructional literature. These requirements fall within the definition of "collection of information," as defined in 44 U.S.C. 3502(3).

OMB has assigned control number 3041–0157 to this information collection. The Commission did not receive any comments regarding the information collection burden of this proposal. However, the final rule makes modifications regarding the information collection burden because the number of estimated suppliers subject to the information collection burden is now estimated to be 62 firms, rather than the 55 firms initially estimated in the proposed rule.

Accordingly, the estimated burden of this collection of information is modified as follows:

TABLE 1—ESTIMATED ANNUAL REPORTING BURDEN

| 16 CFR Section | Number of respondents | Frequency of responses | Total annual responses | Hours per response | Total burden hours |
|---|---|---|---|---|---|
| 1218 ......................................................................... | 62 | 5 | 310 | 1 | 310 |

There are 62 known entities supplying bassinets to the U.S. market. All 62 firms are assumed to use labels already on both their products and their packaging, but they might need to make some modifications to their existing labels. The estimated time required to make these modifications is about one hour per model. Each entity supplies an average of five different models of bassinets; therefore, the estimated burden associated with labels is 1 hour per model × 55 entities × 5 models per entity = 310 hours. We estimate that the hourly compensation for the time required to create and update labels is $27.55 (U.S. Bureau of Labor Statistics, "Employer Costs for Employee Compensation," March 2012, Table 9, total compensation for all sales and office workers in goods-producing private industries: *http://www.bls.gov/ncs/*). Therefore, the estimated annual cost to industry associated with the labeling requirement is $8,540.50 ($27.55 per hour × 310 hours = $8,540.50).

In compliance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), we have submitted the information collection requirements of this final rule to the OMB, and OMB has assigned control number 3041–0157 to the information collection.

## XII. Preemption

Section 26(a) of the CPSA, 15 U.S.C. 2075(a), provides that where a consumer product safety standard is in effect and applies to a product, no state or political subdivision of a state may either establish or continue in effect a requirement dealing with the same risk of injury unless the state requirement is identical to the federal standard. Section 26(c) of the CPSA also provides that states or political subdivisions of states may apply to the Commission for an exemption from this preemption under certain circumstances. Section 104(b) of the CPSIA refers to the rules to be issued under that section as "consumer product safety rules," thus implying that the preemptive effect of section 26(a) of the CPSA would apply. Therefore, a rule issued under section 104 of the CPSIA will invoke the preemptive effect of section 26(a) of the CPSA when it becomes effective.

## XIII. Certification and Notice of Requirements (NOR)

Section 14(a) of the CPSA imposes the requirement that products subject to a consumer product safety rule under the CPSA, or to a similar rule, ban, standard or regulation under any other act enforced by the Commission, must be certified as complying with all applicable CPSC-enforced requirements. 15 U.S.C. 2063(a). Section 14(a)(2) of the CPSA requires that certification of children's products subject to a children's product safety rule be based on testing conducted by a CPSC-accepted third party conformity assessment body. Section 14(a)(3) of the CPSA requires the Commission to publish a notice of requirements (NOR) for the accreditation of third party conformity assessment bodies (or laboratories) to assess conformity with a children's product safety rule to which a children's product is subject. The safety standard for bassinets and cradles is a children's product safety rule that requires the Commission to issue an NOR.

The Commission recently published a final rule, *Requirements Pertaining to Third Party Conformity Assessment Bodies,* 78 FR 15836 (March 12, 2013), which is codified at 16 CFR part 1112 (referred to here as Part 1112). This rule became effective June 10, 2013. Part 1112 establishes requirements for accreditation of third party conformity assessment bodies (or laboratories) to test for conformance with a children's product safety rule in accordance with Section14(a)(2) of the CPSA. Part 1112 also codifies a list of all of the NORs that the CPSC had published at the time part 1112 was issued. All NORs issued after the Commission published part 1112, such as the bassinet and cradle standard, require an amendment to part 1112. Accordingly, this rule amends part 1112 to include the bassinet and cradle standard in the list with the other children's product safety rules for which the CPSC has issued NORs.

Laboratories applying for acceptance as a CPSC-accepted third party conformity assessment body to test to the new standard for bassinets and cradles are required to meet the third party conformity assessment body accreditation requirements in part 1112. When a laboratory meets the requirements as a CPSC-accepted third party conformity assessment body, it can apply to the CPSC to have 16 CFR part 1218, "Safety Standard for Bassinets and Cradles," included in its scope of accreditation of CPSC safety rules listed for the laboratory on the CPSC Web site at: *www.cpsc.gov/labsearch*.

In connection with the part 1112 rulemaking, CPSC staff conducted an analysis of the potential impacts on small entities of the rule establishing accreditation requirements, 78 FR 15836, 15855–58 (March 12, 2013), as required by the Regulatory Flexibility Act and prepared a Final Regulatory Flexibility Analysis (FRFA). Briefly, the FRFA concluded that the requirements would not have a significant adverse impact on a substantial number of small laboratories because no requirements are imposed on laboratories that do not intend to provide third party testing services under section 14(a)(2) of the CPSA. The only laboratories that are expected to provide such services are those that anticipate receiving sufficient revenue from providing the mandated testing to justify accepting the requirements as a business decision. Laboratories that do not expect to receive sufficient revenue from these services to justify accepting these requirements would not likely pursue accreditation for this purpose. Similarly, amending the part 1112 rule to include the NOR for the bassinet and cradle standard would not have a significant adverse impact on small laboratories. Most of these laboratories will have already been accredited to test for conformance to other juvenile product standards and the only costs to them would be the cost of adding the bassinet and cradle standard to their scope of accreditation. As a consequence, the Commission certifies that the notice requirements for the bassinet and cradle standard will not have a significant impact on a substantial number of small entities.

To ease the transition to new third party testing requirements for bassinets and cradles subject to the standard and to avoid a "bottlenecking" of products at laboratories at or near the effective date of required third party testing for bassinets and cradles, the Commission, will, under certain circumstances, accept certifications based on testing that occurred before the effective date for third party testing.

The Commission will accept retrospective testing for 16 CFR part 1218, safety standard for bassinets and cradles, if the following conditions are met:

• The children's product was tested by a third party conformity assessment body accredited to ISO/IEC 17025:2005(E) by a signatory to the ILAC–MRA at the time of the test. The scope of the third party conformity body accreditation must include testing in accordance with 16 CFR part 1218. For firewalled third party conformity assessment bodies, the firewalled third party conformity assessment body must be one that the Commission, by order, has accredited on or before the time that the children's product was tested, even if the order did not include the tests contained in the safety standard for bassinets and cradles at the time of initial Commission acceptance. For governmental third party conformity

assessment bodies, accreditation of the body must be accepted by the Commission, even if the scope of accreditation did not include the tests contained in the safety standard for bassinets and cradles at the time of initial CPSC acceptance.

• The test results show compliance with 16 CFR part 1218.

• The bassinet or cradle was tested, with the exception of the removable bassinet bed attachment requirements, on or after the date of publication in the **Federal Register** of the final rule for 16 CFR part 1218 and before April 23, 2014. For bassinets or cradles that are subject to the removable bassinet bed attachment requirements, testing to the removable bassinet bed attachment requirements was conducted on or after the date of publication in the **Federal Register** of the final rule for 16 CFR part 1218 and before April 23, 2015.

• The laboratory's accreditation remains in effect through April 23, 2014.

### List of Subjects

*16 CFR Part 1112*

Administrative practice and procedure, Audit, Consumer protection, Reporting and recordkeeping requirements, Third party conformity assessment body.

*16 CFR Part 1218*

Consumer protection, Imports, Incorporation by reference, Infants and children, Labeling, Law enforcement, and Toys.

For the reasons discussed in the preamble, the Commission amends 16 CFR chapter II as follows:

## PART 1112—REQUIREMENTS PERTAINING TO THIRD PARTY CONFORMITY ASSESSMENT BODIES

■ 1. The authority citation for part 1112 continues to read as follows:

**Authority:** 15 U.S.C. 2063; Pub. L. 110–314, section 3, 122 Stat. 3016, 3017 (2008).

■ 2. Amend § 1112.15 by adding paragraph (b)(33) to read as follows:

### § 1112.15 When can a third party conformity assessment body apply for CPSC acceptance for a particular CPSC rule or test method?

\* \* \* \* \*

(b) \* \* \*

(33) 16 CFR part 1218, Safety Standard for Bassinets and Cradles.

■ 3. Add a new part 1218 to read as follows:

## PART 1218—SAFETY STANDARD FOR BASSINETS AND CRADLES

Sec.
1218.1 Scope.
1218.2 Requirements for bassinets and cradles.

**Authority:** Sec. 104, Pub. L. 110–314, 122 Stat. 3016 (August 14, 2008); Pub. L. 112–28, 125 Stat. 273 (August 12, 2011).

### § 1218.1 Scope.

This part establishes a consumer product safety standard for bassinets and cradles manufactured or imported on or after April 23, 2014, except for the removable bassinet bed attachment requirements at § 1218.2(b)(3)(i) through (iv), (b)(5), and (b)(7), which are effective April 23, 2015.

### § 1218.2 Requirements for bassinets and cradles.

(a) Except as provided in paragraph (b) of this section, each bassinet and cradle must comply with all applicable provisions of ASTM F2194–13, Standard Consumer Safety Specification for Bassinets and Cradles, approved on April 1, 2013. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from ASTM International, 100 Bar Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; *http:// www.astm.org/cpsc.htm.* You may inspect a copy at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/ federal_register/code_of_federal regulations/ibr_locations.html.*

(b) Comply with ASTM F2194–13 standard with the following additions or exclusions:

(1) Instead of complying with Note 1 of section 1.3.1 of ASTM F2194–13, comply with the following:

(i) **Note 1**—Cradle swings with an incline less than or equal to 10° from horizontal while in the rest (non-rocking) position are covered under the scope of this standard. A sleep product that only has inclined sleeping surfaces (intended to be greater than 10° from horizontal while in the rest (non-rocking) position) does not fall under the scope of this standard. If a product can be converted to a bassinet/cradle use mode and meets the definition of a bassinet/cradle found in 3.1.1 while in that mode, the product shall be included in the scope of this standard, when it is in the bassinet/cradle use mode. For example, strollers that have a carriage/bassinet feature are covered by the stroller/carriage standard when in the stroller use mode. Carriage baskets/bassinets that are removable from the stroller base are covered under the scope of this standard when the carriage basket/bassinet meets the definition of a bassinet/cradle found in 3.1.1. In addition, bassinet/cradle attachments to cribs or play yards, as defined in 3.1.2 or 3.1.12, are included in the scope of the standard when in the bassinet/cradle use mode.

(ii) [Reserved]

(2) Add "CAMI Newborn Dummy (see Figure 1A). Drawing numbers 126–0000 through 126–0015 (sheets 1 through 3), 126–0017 through 126–0027, a parts list entitled "Parts List for CAMI Newborn Dummy," and a construction manual entitled "Construction of the Newborn Infant Dummy" (July 1992). Copies of the materials may be inspected at NHTSA's Docket Section, 400 Seventh Street SW., Room 5109, Washington, DC, or at the Office of the Federal Register, 800 North Capital Street NW., Suite 700, Washington, DC." to "2.3 Other References" and use the following figure:



**FIG. 1a CAMI Newborn Dummy**

(3) In addition to complying with section 3.1.17 of ASTM F2194–13, comply with the following:

(i) 3.1.18. *bassinet bed, n*—the sleeping area of the bassinet/cradle, containing the sleep surface and side walls.

(ii) 3.1.19. *removable bassinet bed, n*—A bassinet bed that is designed to separate from the base/stand without the use of tools. Play yard bassinets, as defined in 3.1.13, are excluded from this definition.

(iii) 3.1.20. *false lock/latch visual indicator, n*—a warning system, using contrasting colors, lights, or other similar means designed to visually alert caregivers when a removable bassinet bed is not properly locked onto its base/stand.

(iv) 3.1.21. *intended use orientation, n*—The bassinet bed orientation (*i.e.,* the position where the head and foot ends of the bassinet bed are located), with respect to the base/stand, as recommended by the manufacturer for intended use.

(4) Instead of complying with section 6.7 of ASTM F2194–13, comply with the following:

(i) 6.7. *Bassinets with Segmented Mattresses: Flatness Test*—If the bassinet or bassinet accessory has a folding or segmented mattress, or both, any angle when measured in 7.8 less than or equal to 10° is an immediate pass. Any angle when measured in 7.8 greater than 10° is an immediate failure. Segmented bassinet mattresses that have seams (located between segments or where the mattress folds) that are less than 15 inches in length are excluded from this requirement.

(ii) [Reserved]

(5) In addition to complying with section 6.9.2 of ASTM F2194–13, comply with the following:

(i) 6.10. *Removable Bassinet Bed Attachment*—Any product containing a removable bassinet bed with a latching or locking device intended to secure the bassinet bed to the base/stand, shall comply with at least one of the following 6.10.1, 6.10.2, 6.10.3, 6.10.4 or 6.10.5 when tested in accordance with 7.12.

(ii) 6.10.1. The base/stand shall not support the bassinet bed (i.e., the bassinet bed falls from the stand and contacts the floor or the base/stand collapses when the bassinet bed is not locked on the base/stand).

(iii) 6.10.2. The lock/latch shall automatically engage under the weight of the bassinet bed (without any other force or action) in all lateral positions (Figure 24).

(iv) 6.10.3. The sleep surface of the bassinet bed shall be at an angle of at least 20° from a horizontal plane when the bassinet bed is in an unlocked position.

(v) 6.10.4. The bassinet/cradle shall provide a false latch/lock visual indicator(s). At a minimum, an indicator shall be visible to a person standing near both of the two longest sides of the product.

(vi) 6.10.5. The bassinet bed shall not tip over and shall retain the CAMI newborn dummy when tested in accordance with 7.12.5.3.

(6) Instead of complying with section 7.4.4 of ASTM F2194–13, comply with the following:

(i) 7.4.4. Place the CAMI Newborn Dummy, Mark II, on the sleeping pad in the center of the product face up with the arms and legs straightened.

(A) *Rationale.* The newborn CAMI dummy represents a 50th percentile newborn infant, which is a more appropriate user of a bassinet than the CAMI infant dummy, which represents a 50th percentile 6-month-old infant.

(B) [Reserved]

(ii) [Reserved]

(7) In addition to complying with section 7.11.4 of ASTM F2194–13, comply with the following:

(i) 7.12. *Removable Bassinet Bed Attachment Tests*

(ii) 7.12.1. Assemble the bassinet/cradle base/stand only, in accordance with manufacturer's instructions in one of the manufacturer's recommended use positions. If the base/stand does not remain in the use position when the bassinet bed is not locked onto it, the product meets the requirements of 6.10.1.

(iii) 7.12.2. Place the base/stand and the inclinometer on a flat level horizontal surface (0 ± −0.5°) to establish a test plane. Zero the inclinometer.

(iv) 7.12.3. Remove the mattress pad from the bassinet bed.

**Note to paragraph (b)(7)(iv):** For mattresses that are integral with the mattress support, do not remove the mattress and perform all angle measurements for 7.12 on a 6 by 6 by ³⁄₈-in. nominal aluminum block placed on the center of the mattress.

(v) 7.12.4. Place the bassinet bed on the base/stand in the intended use orientation without engaging any latch or lock mechanism between the base/stand and the bassinet bed. If the bed automatically engages to the base/stand do not disengage the lock/latch. If the bassinet bed can rest on the base/stand in its intended use orientation in one or more lateral unlocked position (Figure 24), the unit shall be evaluated in the lateral position most likely to fail the requirements specified in 6.10.

(vi) Figure 24: Bassinet Bed Resting on Stand, Showing Possible Alternate Lateral Positions.



Figure 24: Bassinet Bed Resting on Stand,
Showing Possible Alternate Lateral Positions

(vii) 7.12.4.1. If the base/stand supports the bassinet bed in any unlocked position, place the inclinometer on the mattress support at the approximate center of the mattress support. Care should be taken to avoid seams, snap fasteners, or other items that may affect the measurement reading. Record the angle measurement.

(viii) 7.12.4.2. If the base/stand supports the bassinet bed and the angle of the mattress support surface measured in 7.12.4.1 is less than 20 degrees from a horizontal plane, evaluate whether the bassinet has a false latch/lock visual indicator per 6.10.4.

(ix) 7.12.4.3. If the base/stand supports the bassinet bed, and the angle of the mattress support surface measured in 7.12.4.1 is less than 20 degrees from a horizontal plane, and the bassinet does not contain a false latch/lock visual indicator, test the unit in accordance with sections 7.4.2 through 7.4.7.

(x) 7.12.5. Repeat 7.12.2 through 7.12.4 for all of the manufacturer's base/stand recommended positions and use modes.

(xi) 7.12.6. Repeat 7.12.4 through 7.12.5 with the bassinet bed rotated 180 degrees from the manufacturers recommended use orientation, if the base/stand supports the bassinet bed in this orientation.

(A) *Rationale.* (*1*) This test requirement addresses fatal and nonfatal incidents involving bassinet beds that tipped over or fell off their base/stand when they were not properly locked/latched to their base/stand or the latch failed to engage as intended. Products that appear to be in an intended use position when the lock or latch is not properly engaged can create a false

sense of security by appearing to be stable. Unsecured or misaligned lock/latch systems are a hidden hazard because they are not easily seen by consumers due to being located beneath the bassinet or covered by decorative skirts. In addition, consumers will avoid activating lock/latch mechanisms for numerous reasons if a bassinet bed appears stable when placed on a stand/base. Because of these foreseeable use conditions, this requirement has been added to ensure that bassinets with a removable bassinet bed feature will be inherently stable or it is obvious that they are not properly secured.

(*2*) 6.10 allows bassinet bed designs that:

(*i*) Cannot be supported by the base/stand in an unlocked configuration,

(*ii*) Automatically lock and cannot be placed in an unlocked position on the base/stand,

(*iii*) Are clearly and obviously unstable when the lock/latch is misaligned or unused,

(*iv*) Provide a visual warning to consumers when the product is not properly locked onto the base/stand, or

(*v*) Have lock/latch mechanisms that are not necessary to provide needed stability.

(B) [Reserved]

Dated: September 30, 2013.

**Todd A. Stevenson,**

*Secretary, Consumer Product Safety Commission.*

[FR Doc. 2013–24203 Filed 10–22–13; 8:45 am]

**BILLING CODE 6355–01–P**

# DEPARTMENT OF ENERGY

## Federal Energy Regulatory Commission

### 18 CFR Part 40

**[Docket Nos. RM12–1–000 and RM13–9–000; Order No. 786]**

## Transmission Planning Reliability Standards

**AGENCY:** Federal Energy Regulatory Commission, Energy.

**ACTION:** Final rule.

**SUMMARY:** Under section 215 of the Federal Power Act, the Federal Energy Regulatory Commission approves Transmission Planning (TPL) Reliability Standard TPL–001–4, submitted by the North American Electric Reliability Corporation, the Commission-certified Electric Reliability Organization. Reliability Standard TPL–001–4 introduces significant revisions and improvements by requiring annual assessments addressing near-term and long-term planning horizons for steady state, short circuit and stability conditions. Reliability Standard TPL–001–4 also includes a provision that allows a transmission planner to plan for non-consequential load loss following a single contingency by providing a blend of specific quantitative and qualitative parameters for the permissible use of planned non-consequential load loss to address bulk electric system performance issues, including firm limitations on the maximum amount of load that an entity may plan to shed, safeguards to ensure against inconsistent results and arbitrary determinations that allow for the planned non-consequential load loss,



(GPS) standard instrument approach procedures for Finleyville Airpark. Controlled airspace extending upward from 700 feet above the surface within a 7.3-mile radius of the airport would be established for IFR operations.

Class E airspace designations are published in Paragraph 6005 of FAA Order 7400.11A, dated August 3, 2016, and effective September 15, 2016, which is incorporated by reference in 14 CFR 71.1. The Class E airspace designation listed in this document will be published subsequently in the Order.

## Regulatory Notices and Analyses

The FAA has determined that this proposed regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. It, therefore: (1) Is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a Regulatory Evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified that this proposed rule, when promulgated, will not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

## Environmental Review

This proposal would be subject to an environmental analysis in accordance with FAA Order 1050.1F, "Environmental Impacts: Policies and Procedures" prior to any FAA final regulatory action.

## Lists of Subjects in 14 CFR part 71

Airspace, Incorporation by reference, Navigation (air).

## The Proposed Amendment

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

## § 71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of FAA Order 7400.11A, Airspace Designations and Reporting Points, dated August 3, 2016, effective September 15, 2016, is amended as follows:

*Paragraph 6005   Class E Airspace Areas Extending Upward From 700 feet or More Above the Surface of the Earth.*

\*    \*    \*    \*    \*

### AEA PA E5   Finleyville, PA, [New]

Finleyville Airpark, PA
  (Lat. 40°14′45″ N., long. 80°00′44″ W.)
  That airspace extending upward from 700 feet above the surface within a 7.3-mile radius of Finleyville Airpark.

Issued in College Park, Georgia, on March 27, 2017.

**Joey L. Medders,**

*Acting Manager, Operations Support Group, Eastern Service Center, Air Traffic Organization.*

[FR Doc. 2017–06754 Filed 4–6–17; 8:45 am]

**BILLING CODE 4910–13–P**

## CONSUMER PRODUCT SAFETY COMMISSION

### 16 CFR Parts 1112, 1130, and 1236

**[CPSC Docket No. 2017–0020]**

## Safety Standard for Infant Inclined Sleep Products

**AGENCY:** Consumer Product Safety Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Danny Keysar Child Product Safety Notification Act, section 104 of the Consumer Product Safety Improvement Act of 2008 (CPSIA), requires the United States Consumer Product Safety Commission (Commission or CPSC) to promulgate consumer product safety standards for durable infant or toddler products. These standards are to be "substantially the same as" applicable voluntary standards, or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product. The Commission is proposing a safety standard for infant inclined sleep products (inclined sleep products) in response to the direction under section 104(b) of the CPSIA. In addition, the Commission is proposing an amendment to include inclined sleep products in the list of notice of requirements (NORs) issued by the Commission. The Commission is also proposing to explicitly identify infant inclined sleep products as a durable infant or toddler product subject to CPSC's consumer registration requirements.

**DATES:** Submit comments by June 21, 2017.

**ADDRESSES:** Comments related to the Paperwork Reduction Act aspects of the marking, labeling, and instructional literature requirements of the proposed mandatory standard for inclined sleep products should be directed to the Office of Information and Regulatory Affairs, the Office of Management and Budget, Attn: CPSC Desk Officer, FAX: 202–395–6974, or emailed to *oira_submission@omb.eop.gov.*

Other comments, identified by Docket No. CPSC–2017–0020, may be submitted electronically or in writing:

*Electronic Submissions:* Submit electronic comments to the Federal eRulemaking Portal at: *http://www.regulations.gov.* Follow the instructions for submitting comments. The Commission does not accept comments submitted by electronic mail (email), except through *www.regulations.gov.* The Commission encourages you to submit electronic comments by using the Federal eRulemaking Portal, as described above.

*Written Submissions:* Submit written submissions by mail/hand delivery/courier to: Office of the Secretary, Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814; telephone (301) 504–7923.

*Instructions:* All submissions received must include the agency name and docket number for this proposed rulemaking. All comments received may be posted without change, including any personal identifiers, contact information, or other personal information provided, to: *http://www.regulations.gov.* Do not submit confidential business information, trade secret information, or other sensitive or protected information that you do not want to be available to the public. If furnished at all, such information should be submitted in writing.

*Docket:* For access to the docket to read background documents or comments received, go to: *http://www.regulations.gov,* and insert the docket number, CPSC–2017–0020, into the "Search" box, and follow the prompts.

**FOR FURTHER INFORMATION CONTACT:** Celestine T. Kish, Project Manager, Directorate for Engineering, U.S. Consumer Product Safety Commission, 5 Research Place, Rockville, MD 20850; telephone: (301) 987–2547; email: *ckish@cpsc.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background and Statutory Authority

The CPSIA was enacted on August 14, 2008. Section 104(b) of the CPSIA, part of the Danny Keysar Child Product Safety Notification Act, requires the Commission to: (1) Examine and assess the effectiveness of voluntary consumer product safety standards for durable infant or toddler products, in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts; and (2) promulgate consumer product safety standards for durable infant or toddler products. Standards issued under section 104 are to be "substantially the same as" the applicable voluntary standards, or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product.

Section 104(f)(1) of the CPSIA defines the term "durable infant or toddler product" as "a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years." The definition lists examples of several categories of durable infant or toddler products, including bassinets and cradles. Staff initially considered inclined sleep products to fall within the scope of the bassinet/cradle standard, but as work progressed on that standard, it became evident that one rule could not effectively address all products. Accordingly, the Commission directed staff to separate inclined sleep products into a separate rulemaking effort. Thus, the inclined sleep products safety standard is an outgrowth of the bassinet/cradle safety standard, addressing products with an incline greater than 10 degrees from horizontal. ASTM simultaneously began work on developing a voluntary standard for inclined sleep products. ASTM published the resulting infant inclined sleep products standard in May 2015, and most recently revised the standard in January of 2017.

This proposed rule would establish a standard for inclined sleep products as a type of durable infant or toddler product under section 104 of the CPSIA. Because the inclined sleep product standard is an outgrowth of the bassinet/cradle standard, a category that the statutory definition of "durable infant or toddler product" explicitly lists, inclined sleep products could be considered a type of bassinet. Section 104(f). Thus, to avoid possible confusion about inclined sleep products

being a durable infant or toddler product, the Commission proposes to amend the definition of "durable infant or toddler product" in the consumer registration rule to explicitly include "infant inclined sleep products."

Pursuant to section 104(b)(1)(A) of the CPSIA, the Commission consulted with manufacturers, retailers, trade organizations, laboratories, consumer advocacy groups, consultants, and members of the public in the development of this notice of proposed rulemaking (NPR), largely through the ASTM process.

Based on a briefing package prepared by CPSC staff, the NPR would incorporate by reference the most recent voluntary standard developed by ASTM International, ASTM F3118–17, *Standard Consumer Safety Specification for Inclined Sleep Products,* with a modification to the standard's definition of "accessory." [*https://www.cpsc.gov/s3fs-public/Proposed%20Rule%20-%20Safety%20Standard%20for%20Infant%20Inclined%20Sleep%20Products%20-%20March%2022%2C%202017.pdf*] If finalized, the ASTM standard, as modified, would be a mandatory safety rule under the Consumer Product Safety Act (CPSA).

The testing and certification requirements of section 14(a) of the CPSA apply to the standards promulgated under section 104 of the CPSIA. Section 14(a)(3) of the CPSA requires the Commission to publish an NOR for the accreditation of third party conformity assessment bodies (test laboratories) to assess conformity with a children's product safety rule to which a children's product is subject. The proposed rule for inclined sleep products, if issued as a final rule, would be a children's product safety rule that requires the issuance of an NOR. To meet the requirement that the Commission issue an NOR for the inclined sleep products standard, this NPR also proposes to amend 16 CFR part 1112 to include 16 CFR part 1236, the CFR section where the inclined sleep products standard will be codified, if the standard becomes final.

## II. Product Description

### A. Infant Inclined Sleep Products, Generally

There are many different styles of infant inclined sleep products available for infants and newborns. These can be categorized as:

▪ Hammocks (typically constructed of fabric and suspended from one or two points, either above or on either side; constructed of various materials; generally conform to the shape of the

child when placed in the product; can either be supported by a frame or other structure, such as a ceiling);

▪ Newborn or infant frame type (intended to be placed on the floor; self-supporting; typically use a metal frame with a rigid or semi-rigid sleeping surface; base may be stationary or allow side to side rocking; may be intended for use by either newborns or infants, or both, depending on the size);

▪ Compact (freestanding with the bottom of the seat a maximum of 6 inches above the floor; generally constructed of foam with a fixed seat back angle between 10° and 30°; intended to be used on the floor); and

▪ Newborn or infant inclined sleep product accessories (intended to provide sleeping accommodations and are attached to or supported in some way by another product; a rigid frame product that has either a stationary or fixed base and in some cases may be removed and used independently; products intended for newborn use have a seat back less than 17 inches).

Products intended for use with newborns are generally similar in design to products intended for infants, except that products intended for use with newborns have a seat back length of 17 inches or less.

### B. Definition of "Infant Inclined Sleep Product"

An "infant inclined sleep product," as defined by ASTM F3118–17, includes three key components:

▪ *Age of intended product occupant:* the product must be intended for infants up to five months old (3 months for certain smaller products). The product may additionally be intended for older children, possibly in a different configuration, provided that its intended use also includes children up to five months.

▪ *Sleep:* the product must be primarily intended and marketed to provide sleeping accommodations.

▪ *Surface incline:* the product must have at least one inclined sleep surface position that is greater than 10 degrees, but less than or equal to 30 degrees.

In sum, the inclined sleep products standard covers "a free standing product with an inclined sleep surface primarily intended and marketed to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on sides, whichever comes first."

The ASTM standard also covers newborn inclined sleep products, compact inclined sleep products, and inclined sleep product accessories. According to the ASTM standard, a newborn inclined sleep product is a

JA035

"smaller product intended for newborns up to 3 months old or when newborn begins to wiggle out of position or turn over in the product or weighs more than 15 lb (6.8 kg), whichever comes first." A compact inclined sleep product is "a free standing infant or newborn inclined sleep product having a distance of 6.0 in. or less between the underside of the lowest point on the seat bottom and the support surface (floor)." The ASTM standard defines "infant and newborn inclined sleep product accessories" as products "which are attached to, or supported by, another product with the same age or abilities, or both, as the free standing products." The ASTM standard currently limits inclined sleep product accessories to rigidly framed products, but the Commission proposes to modify the definition in ASTM F3118–17 of "infant and newborn inclined sleep product accessories" to remove the phrase "rigidly framed" so that the standard will include recently-identified soft-sided products that attach to cribs and play yards.

The scope section of ASTM F3118–17 further provides that if the inclined sleep product can be converted into a product for which another ASTM standard consumer safety specification exists, the product shall meet the applicable requirements of that standard, in addition to those of ASTM F3118–17.

CPSC and ASTM recognize that the scope section of the standard as currently written may contain some ambiguity about the meaning of "intended and marketed to provide sleeping accommodations." CPSC and ASTM staff continue to work to reduce this ambiguity to provide greater clarity for inclined sleep product suppliers to determine whether their products fall within the scope of the ASTM standard. One option would be for the standard to clarify "intended . . . to provide sleeping accommodations." ASTM and CPSC recognize that infants sleep in many products, some of which are designed specifically for sleep, while others are designed for other purposes (*i.e.,* infant swings). CPSC requests comments on the need to define "intended or marketed to provide sleeping accommodations," along with potential definitions of that term, as well as whether and the extent to which clarification regarding which products constitute multi-use inclined sleep products is needed.

### III. Incident Data

The Commission is aware of a total of 657 incidents (14 fatal and 643 nonfatal) related to infant inclined sleep products, reported to have occurred

between January 1, 2005 and September 30, 2016. Information on 40 percent (261 out of 657) of the incidents was based solely on reports submitted to CPSC by manufacturers and retailers through CPSC's "Retailer Reporting System." Various sources, such as hotlines, internet reports, newspaper clippings, medical examiners, and other state and local authorities provided the CPSC with the remaining incident reports. Because reporting is ongoing, the number of reported fatalities, nonfatal injuries, and non-injury incidents may change in the future.

#### A. Fatalities

CPSC has reports of 14 fatalities associated with the use of an infant inclined sleep product, which occurred between January 1, 2005 and September 30, 2016.

■ Eight of the 14 deaths involved rocker-like inclined sleep products.

○ In three cases, the unstrapped decedent was found to have rolled over into a face-down position.

○ In two additional cases, the decedent reportedly rolled over into a face down position, but no information was available on the use of a restraint.

○ For the remaining three cases, there was insufficient information about the cause or manner of the deaths.

■ Four of the 14 deaths involved reclined infant seat-type products.

○ In three cases, the products were placed inside cribs and the decedents (two with restraints, one without restraints) were found to have rolled over the edge of the products into the bedding in the cribs.

○ In the remaining one case, restraints were not used and the decedent was found to have rolled over into a face-down position.

■ Two of the 14 deaths involved infant hammocks.

○ In one case, the decedent had rolled over on her stomach—restraint-use not mentioned—and was found face down on a foam mattress.

○ In the one remaining case, the decedent was trapped in the head down position, with face pressed against bedding material after product straps were not assembled correctly, allowing the product to tip out of position.

#### B. Nonfatalities

CPSC has reports of 643 inclined sleep product-related nonfatal incidents that were reported to have occurred between January 1, 2005 and September 30, 2016. Of the 643 incidents, 301 involved an injury to the infant during use of the product. The majority of the injured (256 out of 301) were between 1 month and 8 months of age. Age was

reported to be over 8 months for 16 of the injured infants, and was not reported for 29 of the injured infants.

The severity of the injury types among the 301 reported injuries were as follows:

■ 20 required hospital admissions (17 for respiratory problems suffered due to mold on the sleep product, 2 for treatment of a head injury due to a fall, and 1 for observation of an infant who had stopped breathing for unspecified reasons).

■ 27 were treated and released from emergency departments. These infants were treated for respiratory problems, head injuries (such as a skull fracture or a *closed-head injury*), contusions/bruises, and, in one case, foreign objects (namely, metal shavings from the product) that entered the infant's eye.

■ 151 required treatment for *plagiocephaly* (flat head syndrome), *torticollis* (twisted neck syndrome), or both conditions, associated with the use of the inclined sleep product.

■ 90 were treated for mostly respiratory and some skin problems associated with mold on the product.

■ Seven infants suffered minor bumps/bruises/lacerations due to falls or near-falls.

■ Three suffered a combination of respiratory problems along with flat head syndrome or fall injuries.

■ One eye-burn injury, one thermal burn due to electrical overheating, and one abnormal back curvature condition attributed to the use of an inclined sleep product.

The remaining 342 incident reports stated that no injury had occurred or provided no information about any injury. However, many of the descriptions indicated the potential for a serious injury or even death.

#### C. Hazard Pattern Identification

CPSC staff considered all 657 reported incidents to identify hazard patterns associated with inclined sleep products. ASTM F3118–17 covers a variety of products. Some, like hammocks, are suspended in air, while other seat-like products are meant to be placed on a level floor (although incident reports indicate they often were not). Yet others sit as attachments on larger nursery products.

Because inclined sleep products include a variety of product types, staff identified different hazard patterns depending on which product was involved and how it was used. CPSC staff identified the following hazard patterns associated with inclined sleep products:

1. *Design Problems (75%):* 492 incidents fell within this category. Staff

JA036

identified two major design issues: (1) Infants reportedly developed respiratory and/or skin ailments due to the growth of mold on the product; and (2) infants reportedly developed physical deformations such as *plagiocephaly* (flat head syndrome) and/or *torticollis* (twisted neck syndrome) from extended use of the product. Although this category does not include any deaths, this category includes 17 hospitalizations and 13 emergency department (ED) visits, all for treating respiratory problems associated with the use of the inclined sleep product. This category also includes an additional 244 non-hospitalized, non-ED injuries.

2. *Compromised Structural integrity (5%):* 36 incident reports noted some level of failure of the product or its components. These failures included buckles or straps breaking, pads/seats/ liners tearing, hardware coming loose, and metal stands/bars and other unspecified components breaking. No injuries or fatalities were reported in this category.

3. *Inadequate restraints (5%):* 35 incidents reportedly occurred when the restraint failed to adequately confine the infant in position. These incidents include two deaths when an infant, although restrained, rolled over, out of position, and ended up with face buried in nearby soft bedding. Three of the nine injuries in this category were treated in emergency departments and resulted from a strapped-in infant falling out of the product entirely.

4. *Electrical issues (3%):* 22 incidents involved overheating or melting of components such as the vibrating unit, battery cover, switch, or motor. One incident resulted in a thermal burn.

5. *Non-product-related/unknown issues (3%):* In 18 incidents either the manner in which the product was used led to an incident or not enough information was available to determine how the incident occurred. This category includes 10 fatalities and four injuries. User error contributed to six asphyxiation fatalities in this category; all decedents were left unstrapped and later found in a prone position. Two additional fatalities occurred when an infant rolled out of position while in the product; it was unknown if a restraint was used. The incident reports did not indicate clearly the circumstances that led to the remaining two fatalities. Of the four injuries, staff attributed two to user error; staff has very little information about the circumstances leading to the remaining two injury incidents.

6. *Infant positioning during use (2%):* In 13 reported incidents the infant moved into a compromised position.

Most of the incidents involved hammock-like products, which shifted into a non-level rest position as the infant moved. Two infants ended up trapped in a corner with face in the fabric/bedding of the product. In two other reports, consumers complained of difficulty in preventing the infant from getting into a head-to-chin position.

7. *Miscellaneous product-related issues (1%):* Nine incident reports noted a variety of product-related issues. These included: Complaints of poor finish (metal shavings, sharp edges, a threaded needle left in the product), instability (product, suspended mid-air, flipping over, or product, sitting on floor, tipping over), incomplete packaging (missing parts and instructions), and noxious odor. In addition, one incident reported both restraint inadequacy and mold growth, indicating a design problem. Two injuries were reported in this category, including one treated and released from a hospital emergency department.

8. *Unspecified falls (1%):* In nine incidents, an infant fell from the inclined sleep product, but very little information was available on the circumstances surrounding the falls. All of the incidents were reported through hospital emergency departments and were reports of head injuries (skull fracture or *closed-head injury*) or face contusion. One infant was hospitalized while others were treated and released.

9. *Consumer comments (4%):* 23 incidents fall in this category. The reports consisted of consumer comments/observations of perceived safety hazards or complaints about unauthorized sale of infant inclined sleep products. None of these reports indicated that any incident actually occurred.

### D. Product Recalls

Compliance staff reviewed recalls of infant inclined sleep products from May 10, 2000 to March 1, 2016. During that time, there were nine consumer-level recalls involving infant inclined sleep products. The recalls were conducted to resolve issues involving mold, structural stability, entrapment, suffocation, falls, and strangulation. Three recalls involved inclined sleep products and six recalls involved infant hammocks (which are within the scope of F3118–17).

One recall for mold affected 800,000 units of infant inclined sleep products. Two recalls for entrapment and suffocation affected 195,000 units of inclined sleep products. The six additional recalls were the result of potential suffocation, strangulation, structural stability, entrapment, and fall

hazards. Those recalls collectively affected 25,368 hammock units.

## IV. International Standards for Inclined Sleep Products

Other standards include infant inclined sleep products within their scope, but these standards are intended primarily to address hazards associated with products having flat sleeping surfaces, such as bassinets and cradles. These include:

• *The Cribs, Cradles, and Bassinets regulation included in the Canada Consumer Product Safety Act:* The Canadian regulation has similar requirements to ASTM F3118, such as warnings, labels, and general performance requirements (*e.g.* lead content, small parts, openings). The Canadian regulation has additional requirements for slat strength, mesh material, structural integrity, and mattress supports. Upon review, CPSC staff determined that the Canadian regulation provides similar performance requirements, but does not provide the comprehensive product assessment of the specific hazards identified in CPSC incident data that the ASTM standard does.

• *The European standard (SS–EN 1130: Furniture, Cribs, and Cradles Safety Requirements):* EN 1130 covers only inclined sleep products with a body and frame. The European standard would not include hammocks or similar products that are suspended from ceilings or other structures. EN 1130 includes requirements for construction and materials similar to the general ASTM F3118 requirements. Additional requirements include labeling, use instructions, packaging, and stability. EN 1130 is intended primarily to address hazards associated with bassinets and cradles and not the unique hazards associated with inclined sleep products. Based on evaluation, CPSC staff believes the ASTM standard is more inclusive because it includes all hammock styles and provides a more comprehensive assessment of potential hazards associated with inclined sleep products.

• *The Australian standard (AS/NZS 4385 Infants' rocking cradles—Safety requirements):* AS/NZS 4385 is intended for rocking cradles that swing, rock, or tilt, but specifically excludes hammocks that do not have this feature. It is unclear if tilt means incline, thereby including in the Australian standard inclined sleep products as defined in ASTM F3118. AS/NZS 4385 contains requirements for construction, toxicology, and flammability. There are also other general provisions such as those for included toys. AS/NZS 4385

has some similar performance requirements, but is not as comprehensive as ASTM F3118 in assessing the potential hazards associated with inclined sleep products.

## V. Voluntary Standard—ASTM F3118

### A. History of ASTM F3118

Section 104(b)(1)(A) of the CPSIA requires the Commission to consult representatives of "consumer groups, juvenile product manufacturers, and independent child product engineers and experts" to "examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products." As a result of incidents arising from inclined sleep products, CPSC staff requested that ASTM develop voluntary requirements to address the hazard patterns related to the use of inclined sleep products. ASTM first approved ASTM F3118 on April 1, 2015, and published it in May 2015. Through the ASTM process, CPSC staff consulted with manufacturers, retailers, trade organizations, laboratories, consumer advocacy groups, consultants, and members of the public. The current standard, ASTM F3118–17, was approved on January 1, 2017, and published in March of 2017. This is the third revision to the standard since it was first published in May 2015.

### B. Description of the Current Voluntary Standard—ASTM F3118–17

ASTM F3118–17 includes the following key provisions: Scope, terminology, general requirements, performance requirements, test methods, marking and labeling, and instructional literature.

*Scope.* This section states the scope of the standard, detailing what constitutes an infant inclined sleep product. As stated in section II.A. of this preamble, the Scope section describes an inclined sleep product as "a free standing product with an inclined sleep surface primarily intended and marketed to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on sides, whichever comes first." This section also states that the standard covers newborn inclined sleep products, compact inclined sleep products, and inclined sleep products accessories. This section further explains that if the inclined sleep product can be converted into a product for which another ASTM standard consumer safety specification exists, the product shall meet the applicable requirements of that standard, in addition to those of ASTM F3118–17.

*Terminology.* This section provides definitions of terms specific to this standard.

*General Requirements.* This section addresses numerous hazards with several general requirements, most of which are also found in the other ASTM juvenile product standards. The general requirements included in this section are:

- Lead in paint;
- Sharp edges or points;
- Small parts;
- Wood parts;
- Scissoring, shearing, and pinching;
- Openings;
- Exposed coil springs;
- Protective components;
- Labeling; and
- Toys.

*Performance Requirements and Test Methods.* These sections contain performance requirements specific to inclined sleep products (discussed here) and the test methods that must be used to assess conformity with such requirements.

- *Stability:* This requirement is intended to prevent inclined sleep products from tipping over while in use.
- *Unintentional folding:* This requirement is intended to prevent unintentional folding of the product while it is in use, regardless of type of lock/latch the product uses (if any).
- *Restraint systems:* This requirement is intended to ensure the integrity and effectiveness of restraint systems, which (when present) must include both a waist and crotch restraint, but not shoulder straps. Additionally, the inclined sleep product's restraint system must be designed so that the crotch restraint has to be used whenever the restraint system is used. The restraint system must be attached to the product in one of the manufacturer's recommended use positions at the time of shipment.
- *Side height:* This requirement is intended to prevent falls, in conjunction with head, foot, and side containment requirements.
- *Head, foot, and side containment:* This requirement is intended to prevent falls, in conjunction with side height requirements.
- *Side to side surface containment:* This requirement is intended to ensure a seat back shape that prevents children from rotating into a sideways position.
- *Seat back length:* This requirement is intended to prevent older children from being placed in inclined sleep products intended for younger users by restricting the head containment area available on the seat back.
- *Structural integrity:* This requirement is intended to ensure that

the inclined sleep product remains cohesive after both dynamic and static load testing. It is also intended to ensure that the product can support the intended user's weight when a safety margin is factored in.

*Marking and Labeling.* This section contains various requirements relating to warnings, labeling, and required markings for inclined sleep products. This section prescribes various substance, format, and prominence requirements for such information.

*Instructional Literature.* This section requires that instructions be provided with inclined sleep products and be easy to read and understand. Additionally, the section contains requirements relating to instructional literature contents and format.

## VI. Assessment of the Voluntary Standard ASTM F3118–17

CPSC staff identified 657 incidents (including 14 deaths) related to the use of inclined sleep products. CPSC staff examined the incident data, identified hazard patterns in the data, and worked with ASTM to develop the performance requirements in ASTM F3118. The incident data and identified hazard patterns served as the basis for the development of ASTM F3118–15 and F3118–17 by ASTM with CPSC staff support throughout the process.

CPSC believes that the current voluntary standard, ASTM F3118–17, addresses the primary hazard patterns identified in the incident data, with one modification to the standard's definition of "accessory." CPSC concludes that more stringent requirements relating to the standard's definition of "accessory" would further reduce the risk of injury associated with inclined sleep products.

The following section discusses how each of the identified product-related issues or hazard patterns listed in section III.C. of this preamble is addressed by the current voluntary standard, ASTM F3118–17, and discusses the proposed more stringent requirement where appropriate:

### A. Design Problems

Incident reports indicate that 75 percent of reported incidents were associated with the design of the inclined sleep product. Staff identified two major design issues: Infant respiratory and/or skin ailments due to mold growth on the product, and (2) Infant physical deformations such as *plagiocephaly* (flat head syndrome) and/ or *torticollis* (twisted neck syndrome) from extended product use.

In the reported cases of mold that resulted in respiratory problems for infants using the product, all cases were

related to one particular manufacturer's inclined sleep product. CPSC conducted a recall of that product in 2013. Infants who use an inclined sleep product that is known to develop visible mold can be at risk of developing health effects such as allergies, asthma, mycosis, and effects of mycotoxins. However, because the mold growth was restricted to one manufacturer's product and that product was recalled, the Commission is not proposing any modifications to address potential hazards associated with mold.

Plagiocephaly, cranial deformity or asymmetry (commonly known as flat head) is a condition that may exist at birth due to mechanical constraint of fetal head movement in the womb, birth-related injuries during assisted delivery, or as a result of increased likelihood of skull deformity as a consequence of premature birth. Muscular torticollis (twisted neck) is a known risk factor associated with plagiocephaly caused by constraint of head and neck movement. Although incident data indicate that consumers believe use of an inclined sleep product is the cause for their child's plagiocephaly/torticollis, there is no evidence to support this belief. The increase in the number of children with plagiocephaly may actually be attributed to the American Academy of Pediatrics' (AAP) recommendation to place infants to sleep on their backs to decrease the risk of sudden infant death syndrome (SIDS). Because the development of plagiocephaly and torticollis is not exclusively attributable to the use of infant inclined sleep products, the conditions are not addressable with performance standards. The Commission is not proposing any modifications to the voluntary standard to address these issues.

*B. Inadequate Restraints*

ASTM F3118–17 does not require the inclusion of any type of restraint system. However, for products that do include restraints, the ASTM standard includes performance requirements to address restraint operation and function. Two deaths occurred in an inclined sleep product that was recalled during the development of the ASTM voluntary standard. The ASTM standards subcommittee developed the restraint requirements and containment requirements to address these deaths and injuries. The Commission believes that these restraint performance requirements adequately address this hazard pattern, and notes that these are similar requirements used in other juvenile product safety standards.

*C. Compromised Structural Integrity*

The incidents included in this category consisted of complaints related to buckles/straps breaking, pads/seats/liners tearing, hardware coming loose, and metal stands/bars and other unspecified components breaking. The static and dynamic load tests included in F3118–17 address structural integrity in a similar manner to other ASTM juvenile product standards. Following evaluation of these tests, the Commission believes that these requirements adequately address this hazard pattern.

*D. Infant Positioning During Use*

Most infant position incidents involved hammock-like products, which shifted into a non-level rest position as the infants moved, resulting in the infants becoming trapped in a corner with their face in the fabric/bedding of the product. Two fatalities occurred in this manner. Hazardous positioning involves multiple factors, such as the fabric or material used on the product's side, inclusion of a mat or mattress, and the infant's ability to reposition in the product. As the factors involved in these incidents are complex and not easily addressable, ASTM F3118–17 does not include specific performance requirements to directly address this scenario at this time. The voluntary standard addresses instability with a performance test; however, the intent of that test is to address incidents such as siblings pulling on the side and tipping the inclined sleep product. CPSC will continue to monitor incident data and could consider changes to the standard in the future if needed.

*E. Non-Product-Related/Unknown*

There were ten fatalities and four injuries in this category. User error contributed to six of the asphyxiation fatalities. All decedents were left unstrapped and later found in a prone position. ASTM F3118–17 has requirements for restraints (where the product includes restraints) and side containment to prevent infants from moving out of position. In addition, CPSC staff has worked with the ASTM subcommittee on the warnings and instructions to provide consumers with adequate information to use the product correctly.

*F. Miscellaneous Product-Related Issues*

CPSC considers incidents in this category (involving such hazards as stray objects, incomplete packaging, missing parts, and noxious odors) to present manufacturing quality control issues, not safety-related issues. Therefore, these incidents are not addressable by this standard. Requirements relating to other miscellaneous product-related issues, such as prevention of rough finishes, sharp edges, and points are included in the general requirements of ASTM F3118–17. The voluntary standard also includes performance requirements for the stability of infant, newborn, and compact inclined sleep products. CPSC evaluated these requirements and concludes that they are adequate to address this hazard pattern.

*G. Electrical Issues*

Since CPSC staff began monitoring the incident reports for inclined sleep products, incidents involving electrical issues have risen from 1 percent to 3 percent of the total reported incidents. One thermal burn injury was reported in this category. CPSC staff recently shared this new data with the ASTM subcommittee and suggested that electrical requirements similar to those in other juvenile products be added to F3118. The Commission requests comments regarding inclusion of electrical requirements to prevent further additional incidents, such as overheating, melting battery compartments, and thermal burns.

*H. Unspecified Falls*

There were eight reports of falls from the product with little detail on the incidents that led to the injury. Without details, it is unclear how the incident occurred or if it would be addressed by any performance standard. However, ASTM F3118–17 includes stability and containment requirements, as described in earlier sections, which address known hazard patterns that could result in falls.

*I. Consumer Comments*

This category contained 23 reports from consumers about perceived product hazards that did not result in incidents. CPSC staff reviewed the reports and determined that the information did not describe a hazardous situation or a situation not already addressed by the ASTM standard.

## VII. Proposed Standard for Infant Inclined Sleep Products

As discussed in the previous section, most of the requirements of ASTM F3118–17 are sufficient to reduce the risk of injury posed by inclined sleep products. However, CPSC concludes that the accessory definition should be modified by removing "rigid frame" from the definition to further reduce the risk of injury associated with product use. ASTM F3118–17 defines

"accessory inclined sleep product" as "a rigid framed inclined sleep product that is intended to provide sleeping accommodations for infants or newborns and attaches to or is supported by another product." During 2016 ASTM subcommittee meetings, CPSC staff became aware of a new product that ASTM subcommittee members agreed should be classified as an accessory inclined sleep product, except for the fact that the product did not have a "rigid frame." The subcommittee members agreed that "rigid frame" should be removed from the accessory definition. CPSC agrees with this approach and therefore proposes to incorporate by reference ASTM F3118–17 with a modification that would remove the phrase "rigid frame" from the definition of "accessory inclined sleep product."

## VIII. Proposed Amendment to 16 CFR Part 1112 To Include NOR for Infant Inclined Sleep Products

The CPSA establishes certain requirements for product certification and testing. Products subject to a consumer product safety rule under the CPSA, or to a similar rule, ban, standard or regulation under any other act enforced by the Commission, must be certified as complying with all applicable CPSC-enforced requirements. 15 U.S.C. 2063(a). Certification of children's products subject to a children's product safety rule must be based on testing conducted by a CPSC-accepted third party conformity assessment body. *Id.* 2063(a)(2). The Commission must publish an NOR for the accreditation of third party conformity assessment bodies to assess conformity with a children's product safety rule to which a children's product is subject. *Id.* 2063(a)(3). Thus, the proposed rule for 16 CFR part 1236, *Standard Consumer Safety Specification for Infant Inclined Sleep Products,* if issued as a final rule, would be a children's product safety rule that requires the issuance of an NOR.

The Commission published a final rule, *Requirements Pertaining to Third Party Conformity Assessment Bodies,* 78 FR 15836 (March 12, 2013), codified at 16 CFR part 1112 ("part 1112") and effective on June 10, 2013, which establishes requirements for accreditation of third party conformity assessment bodies to test for conformity with a children's product safety rule in accordance with section 14(a)(2) of the CPSA. Part 1112 also codifies all of the NORs issued previously by the Commission.

All new NORs for new children's product safety rules, such as the inclined sleep products standard, require an amendment to part 1112. To meet the requirement that the Commission issue an NOR for the inclined sleep products standard, as part of this NPR, the Commission proposes to amend the existing rule that codifies the list of all NORs issued by the Commission to add inclined sleep products to the list of children's product safety rules for which the CPSC has issued an NOR.

Test laboratories applying for acceptance as a CPSC-accepted third party conformity assessment body to test to the new standard for inclined sleep products would be required to meet the third party conformity assessment body accreditation requirements in part 1112. When a laboratory meets the requirements as a CPSC-accepted third party conformity assessment body, the laboratory can apply to the CPSC to have 16 CFR part 1236, *Standard Consumer Safety Specification for Infant Inclined Sleep Products,* included in the laboratory's scope of accreditation of CPSC safety rules listed for the laboratory on the CPSC Web site at: *www.cpsc.gov/labsearch.*

## IX. Proposed Amendment to Definitions in Consumer Registration Rule

The statutory definition of "durable infant or toddler product" in section 104(f) applies to all of section 104 of the CPSIA. In addition to requiring the Commission to issue safety standards for durable infant or toddler products, section 104 of the CPSIA also directed the Commission to issue a rule requiring that manufacturers of durable infant or toddler products establish a program for consumer registration of those products. Public Law 110–314, section 104(d).

Section 104(f) of the CPSIA defines the term "durable infant or toddler product" and lists examples of such products:

(f) Definition Of Durable Infant or Toddler Product. As used in this section, the term "durable infant or toddler product"—

(1) means a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years; and

(2) includes—

(A) full-size cribs and nonfull-size cribs;

(B) toddler beds;

(C) high chairs; booster chairs, and hook-on-chairs;

(D) bath seats;

(E) gates and other enclosures for confining a child;

(F) play yards;

(G) stationary activity centers;

(H) infant carriers;

(I) strollers;

(J) walkers;

(K) swings; and

(L) bassinets and cradles.
Public Law 110–314, section 104(f).

The infant inclined sleep products safety standard is an outgrowth of the bassinet safety standard. When considering the bassinet standard, the Commission stated that a separate standard targeted specifically to inclined sleep products would more effectively address the hazards associated with those products. 77 FR 64055, 64059 (Oct. 18, 2012). Therefore, CPSC staff began working with ASTM to develop a voluntary standard that would cover the wide array of products on the market that provide infants and toddlers with inclined sleeping environments. Inclined sleep products, like bassinets, are thus durable products within the meaning of section 104 of the CPSIA.

Because the inclined sleep product standard is an outgrowth of the bassinet standard, inclined sleep products may be considered a sub-category of bassinets. To provide greater clarity that inclined sleep products are durable infant or toddler products, the Commission proposes to amend the Commission's consumer registration rule to explicitly include inclined sleep products.

In 2009, the Commission issued a rule implementing the consumer registration requirement. 16 CFR part 1130. As the CPSIA directs, the consumer registration rule requires each manufacturer of a durable infant or toddler product to: provide a postage-paid consumer registration form with each product; keep records of consumers who register their products with the manufacturer; and permanently place the manufacturer's name and certain other identifying information on the product. When the Commission issued the consumer registration rule, the Commission identified six additional products as "durable infant or toddler products":

- Children's folding chairs;
- changing tables;
- infant bouncers;
- infant bathtubs;
- bed rails; and
- infant slings.

16 CFR 1130.2. The Commission stated that the specified statutory categories were not exclusive, but that the Commission should explicitly identify the product categories that are covered. The preamble to the 2009 final consumer registration rule states: "Because the statute has a broad

definition of a durable infant or toddler product but also includes 12 specific product categories, additional items can and should be included in the definition, but should also be specifically listed in the rule.'' 74 FR 68668, 68669 (Dec. 29, 2009).

In this document, the Commission proposes to amend the definition of ''durable infant or toddler product'' in the consumer registration rule to clarify that inclined sleep products fall within the term ''durable infant or toddler product'' as used in the product registration card rule and section 104 of the CPSIA.

## X. Incorporation by Reference

The Commission proposes to incorporate by reference ASTM F3118–17, with one modification to the standard, discussed above. The Office of the Federal Register (OFR) has regulations concerning incorporation by reference. 1 CFR part 51. For a proposed rule, agencies must discuss in the preamble of the NPR ways that the materials the agency proposes to incorporate by reference are reasonably available to interested persons or how the agency worked to make the materials reasonably available. In addition, the preamble of the proposed rule must summarize the material. 1 CFR 51.5(a).

In accordance with the OFR's requirements, section V.B. of this preamble summarizes the provisions of ASTM F3118–17 that the Commission proposes to incorporate by reference. ASTM F3118–17 is copyrighted. By permission of ASTM, the standard can be viewed as a read-only document during the comment period on this NPR, at: *http://www.astm.org/cpsc.htm.* Interested persons may also purchase a copy of ASTM F3118–17 from ASTM International, 100 Bar Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; *http://www.astm.org/cpsc.htm.* One may also inspect a copy at CPSC's Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923.

## XI. Effective Date

The Administrative Procedure Act (APA) generally requires that the effective date of a rule be at least 30 days after publication of the final rule. 5 U.S.C. 553(d). ASTM F3118–17 is a new voluntary standard that covers a variety of products whose manufacturers may not be aware that their product must comply. The Commission is proposing to incorporate by reference ASTM F3118–17, with one modification. To allow time for infant

inclined sleep product manufacturers to bring their products into compliance after a final rule is issued, the Commission is proposing an effective date of 12 months after publication of the final rule in the **Federal Register** for products manufactured or imported on or after that date. The Commission believes that most firms should be able to comply with the 12-month timeframe, but asks for comments on the proposed 12-month effective date. We also propose a 12-month effective date for the amendments to parts 1112 and 1130.

## XII. Regulatory Flexibility Act

### A. Introduction

The Regulatory Flexibility Act (RFA) requires that agencies review a proposed rule for the rule's potential economic impact on small entities, including small businesses. Section 603 of the RFA generally requires that agencies prepare an initial regulatory flexibility analysis (IRFA) and make the analysis available to the public for comment when the agency publishes an NPR. 5 U.S.C. 603. Section 605 of the RFA provides that an IRFA is not required if the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. Staff could not rule out a significant economic impact for six of the 10 known small suppliers of inclined sleep products to the U.S. market. Accordingly, staff prepared an IRFA and poses several questions for public comment to help staff assess the rule's potential impact on small businesses.

The IRFA must describe the impact of the proposed rule on small entities and identify significant alternatives that accomplish the statutory objectives and minimize any significant economic impact of the proposed rule on small entities. Specifically, the IRFA must contain:

■ A description of the reasons why action by the agency is being considered;

■ a succinct statement of the objectives of, and legal basis for, the proposed rule;

■ a description of, and where feasible, an estimate of the number of small entities to which the proposed rule will apply;

■ a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities subject to the requirements and the type of professional skills necessary for the preparation of reports or records; and

■ identification, to the extent possible, of all relevant federal rules that may duplicate, overlap, or conflict with the proposed rule; and

In addition, the IRFA must describe any significant alternatives to the proposed rule that accomplish the stated objectives of applicable statutes and minimize any significant economic impact of the proposed rule on small entities.

### B. Market Description

The Commission has identified 25 firms supplying inclined sleep products to the U.S. market. Sixteen of these firms produce infant sleep hammocks. The majority of the 25 known firms (including 12 manufacturers and five importers) are domestic. The remaining eight firms (seven manufacturers and one retailer) are foreign.

### C. Reason for Agency Action and Legal Basis for Proposed Rule

As discussed in section I. of this preamble, section 104 of the CPSIA requires the CPSC to promulgate consumer product safety standards for durable infant or toddler products that are substantially the same as, or more stringent than, the relevant voluntary standard. As explained in section IX of this preamble, ASTM's standard for infant inclined sleep products developed out of CPSC's efforts on bassinets. CPSC and ASTM determined that a separate standard was necessary for these products.

### D. Impact of Proposed 16 CFR Part 1236 on Small Businesses

CPSC staff is aware of approximately 25 firms currently marketing inclined sleep products in the United States, 17 of which are domestic. Under U.S. Small Business Administration (SBA) guidelines, a manufacturer of inclined sleep products is considered small if it has 500 or fewer employees; and importers and wholesalers are considered small if they have 100 or fewer employees. Staff limited its analysis to domestic firms because SBA guidelines and definitions pertain to U.S.-based entities. Based on these guidelines, 14 of the 17 domestic firms are small—10 manufacturers and four importers. Additional unknown small domestic inclined product suppliers may be operating in the U.S. market.

1. Small Manufacturers

i. Small Manufacturers With Compliant Inclined Sleep Products

Of the ten small manufacturers, three produce inclined sleep products that are likely to comply with ASTM F3118–17 which is in effect for testing purposes

under the Juvenile Product Manufactures Association (JPMA) certification program. Although only one lead firm is currently listed on the JPMA Web site as having certified inclined sleep products, we expect the products of these three small manufacturers to comply because the firms were involved in the standard's development. In general, staff expects that small manufacturers whose inclined sleep products comply with the current voluntary standard will remain compliant with the voluntary standard as it evolves, because they follow and, in this case, actively participate in the standard development process. Therefore, compliance with the voluntary standard is part of an established business practice. ASTM F3118–17 is the version of the voluntary standard upon which the staff-recommended mandatory standard is based; therefore, we expect these firms are already in compliance.

In light of the expectation that these firms will already be complying with ASTM F3118–17 by the time it becomes effective, and that none would be impacted by the proposed change to the definition of an "accessory inclined sleep product," the economic impact of the proposed rule should be small for the three small domestic manufacturers supplying compliant inclined sleep products to the U.S. market.

ii. Small Manufacturers With Noncompliant Inclined Sleep Products

Seven small manufacturers (two of which would only be included due to the proposed change to the definition of an "accessory inclined sleep product") produce inclined sleep products that do not comply with the voluntary standard. CPSC cannot rule out a significant economic impact for six small manufacturers, but was able to rule out a significant impact for one small manufacturer (one of the manufacturers that the standard covers only as a result of CPSC's proposed modification). These firms may not be aware of the ASTM voluntary standard or may believe that their product falls outside the scope of the standard. All six firms are likely to require modifications, some of which may be significant, to meet the base requirements of the voluntary standard. Four of these firms (two of which would be covered by the standard as a result of the proposed modification to the standard) may not currently have warning labels or instruction manuals for their products, and therefore may be required to make modifications to comply with the ASTM standard.

The extent and cost of the changes that these firms would be required to make to comply with the standard cannot be determined and, therefore, staff cannot rule out a significant economic impact. Additionally, the four firms that do not currently have warning labels or instruction manuals for their products appear to very small, supplying very few products in very low quantities. The cost of developing warning labels and instruction manuals is, therefore, more likely to have a significant economic impact on these firms, as their resources may be more limited.

Additionally, staff believes that as many as five of the seven firms with noncompliant inclined sleep products may not be aware of the inclined sleep products voluntary standard, which could increase the time period required for firms to come into compliance. The Commission proposes a longer than usual effective date of 12 months to give firms time to familiarize themselves with the scope of the new standard and develop new/modified products if needed.

The Commission requests information on the changes that may be required to meet the voluntary standard ASTM F3118–17, in particular whether redesign or retrofitting would be necessary, as well as the associated costs and time frame for the changes.

Third Party Testing Costs for Small Manufacturers

Under section 14 of the CPSA, when new inclined sleep product requirements become effective, all manufacturers will be subject to the third party testing and certification requirements under the 1107 rule. Third party testing will include any physical and mechanical test requirements specified in the final inclined sleep products rule. Manufacturers and importers should already be conducting required lead testing for inclined sleep products. Third party testing costs are in addition to the direct costs of meeting the inclined sleep product standard.

Three of the small inclined sleep product manufacturers are already testing their products to verify compliance with the ASTM standard, though not necessarily by a third party. For these manufacturers, the impact to testing costs would be limited to the difference between the cost of third party tests and the cost of current testing regimes. Staff contacted manufacturers of inclined sleep products. They estimate that third party testing inclined sleep products to the ASTM voluntary standard would cost about $300 to $1,000 per model sample. For the three

small manufacturers that are already testing, the incremental costs are unlikely to be economically significant, and informal discussions with several firms actively participating in the ASTM voluntary standard development process suggest such.

For the seven small manufacturers that are not currently testing their products to verify compliance with the ASTM standard, the impact of third party testing, by itself, could result in significant costs for one firm. Staff made this determination based on an examination of firm revenues from recent Dun & Bradstreet or ReferenceUSAGov reports. Although staff does not know how many samples will be needed to meet the "high degree of assurance" criterion required in the 1107 rule, testing costs could exceed one percent of gross revenue with as few as four samples tested for this firm (assuming high-end testing costs of $1,000 per model sample). Revenue information was not available for the four small manufacturers and, therefore, no impact evaluation could be made. All four firms are very small, however, so staff cannot rule out a significant impact.

The Commission welcomes comments regarding overall testing costs and incremental costs due to third party testing (i.e., how much does moving from a voluntary to a mandatory third party testing regime add to testing costs, in total and on a per test basis). In addition, the Commission welcomes comments regarding the number of inclined sleep product units that typically need to be tested to provide a "high degree of assurance."

2. Small Importers

Four small importers supply inclined sleep products to the U.S. market (two of which are multi-use products that the clarified scope is meant to address); none of their products comply with the ASTM voluntary standard. Staff has insufficient information to rule out a significant impact for these firms, particularly given the lack of sales revenue data. Whether there is a significant economic impact will depend upon the extent of the changes required to come into compliance and the response of their supplying firms. Manufacturers may pass onto importers any increase in production costs that manufacturers incur as a result of changes made to meet the mandatory standard. These costs would include those associated with coming into compliance with the voluntary standard, as well as those associated with the proposed modification to the voluntary standard.

Two of the four known importers are tied directly to their foreign suppliers. Therefore, finding an alternative supply source would not be a viable alternative. However, the foreign suppliers to these firms may have an incentive to work with their U.S. distributors to maintain an American market presence. Discontinuing the sale of inclined sleep products would likely have a significant impact on one of these firms because their entire product line consists of inclined sleep products and accessory products. The remaining two small importers do not supply many other products, and as a result, discontinuing the sale of inclined sleep products could have a significant impact on those firms as well.

As with manufacturers, importers will be subject to third party testing and certification requirements, and consequently, will be subject to costs similar to those for manufacturers if their supplying foreign firm(s) does not perform third party testing. The four known small importers do not currently test their products to verify compliance with the ASTM standard. Therefore, the full extent of third party testing costs would be due to these small importers having to comply with a mandatory standard (and not related to CPSC's proposed modification to the standard). Based on the revenue data available, it does not appear that third party testing will have a significant impact on one of the four small importers. However, there was no revenue data available for the remaining three small importers of inclined sleep products not believed to comply with the voluntary ASTM standard. Therefore, we had no basis for evaluating the size of the impact on that firm.

### 3. Summary

In summary, based upon current information, we cannot rule out a significant economic impact for six of the ten firms operating in the U.S. market for inclined sleep products. The 12-month proposed effective date would help to spread costs over a longer time-frame.

### 4. Alternatives

At least three alternatives are available to minimize the economic impact on small entities supplying inclined sleep products while also meeting the statutory objectives:

### i. Adopt ASTM F3118–17 With No Modifications

Section 104 of the CPSIA requires that the Commission promulgate a standard that is either substantially the same as the voluntary standard or more stringent if the Commission determines that more stringent standards would further reduce the risk of injury. Therefore, adopting ASTM F3118–17 with no modifications is the least stringent rule that could be promulgated for inclined sleep products. Although it would not reduce the testing costs triggered by the rule, this alternative would eliminate any economic impact on the two firms that would be subject to the rule as a result of the proposed modification to the definition of ''accessory inclined sleep product.'' However, adopting ASTM F3118–17 with no modifications would not address the risk of injuries and death in what are clearly inclined sleep product accessories except that they do not have rigid frames. Additionally, the impact on one of these firms would be limited to warning label and instructional literature changes.

### ii. Allow a Later Effective Date

The Commission could reduce the proposed rule's impact on small businesses by setting a later effective date. A later effective date would reduce the economic impact on firms in two ways. Firms would be less likely to experience a lapse in production/importation, which could result if they are unable to bring their products into compliance and certify compliance based on third party tests within the required timeframe. Also, firms could spread the costs of developing compliant products over a longer time period, thereby reducing their annual costs, as well as the present value of their total costs (*i.e.*, they could time their spending to better accommodate their individual circumstances). The Commission believes that the proposed 12-month effective date would allow firms that may not be aware of the ASTM voluntary standard or may believe that their product falls outside the scope of the standard time to make this determination and bring their products into compliance. However, an even later effective date would further reduce these costs.

### iii. Time the Effective Date for Warning Labels and Instruction Manuals To Coincide With the Timing of Model Changes in the Durable Nursery Product Market

The Commission could time the effective date for warning labels and instruction manuals to coincide with the timing of model changes in the durable nursery product market. This alternative may reduce the impact on all of the known small businesses supplying inclined sleep products to the U.S. market. In particular, this timing could reduce costs associated with inventory issues that may result from changes that companies may need to make to warning labels and instruction manuals that are keyed to model and SKU numbers. The Commission requests comments on the extent of cost savings that may result from timing the effective date of the rule to coincide with the timing of model changes within the industry.

### E. Impact of Proposed 16 CFR Part 1112 Amendment on Small Businesses

This proposed rule would also amend part 1112 to add inclined sleep products to the list of children's products for which the Commission has issued an NOR. As required by the RFA, staff conducted a Final Regulatory Flexibility Analysis (FRFA) when the Commission issued the part 1112 rule (78 FR 15836, 15855–58). The FRFA concluded that the accreditation requirements would not have a significant adverse impact on a substantial number of small testing laboratories because no requirements were imposed on test laboratories that did not intend to provide third party testing services. The only test laboratories that were expected to provide such services were those that anticipated receiving sufficient revenue from the mandated testing to justify accepting the requirements as a business decision.

Based on similar reasoning, amending 16 CFR part 1112 to include the NOR for the infant inclined sleep product standard will not have a significant adverse impact on small test laboratories. Moreover, based upon the number of test laboratories in the United States that have applied for CPSC acceptance of accreditation to test for conformance to other mandatory juvenile product standards, we expect that only a few test laboratories will seek CPSC acceptance of their accreditation to test for conformance with the infant inclined sleep product standard. Most of these test laboratories will have already been accredited to test for conformance to other mandatory juvenile product standards, and the only costs to them would be the cost of adding the infant inclined sleep product standard to their scope of accreditation. As a consequence, the Commission certifies that the proposed NOR amending 16 CFR part 1112 to include the infant inclined sleep products standard will not have a significant impact on a substantial number of small entities.

### F. Impact of Product Registration Rule, 16 CFR Part 1130, on Small Businesses

As discussed above in Sections I and IX, the Commission proposes to amend

the definition of "durable infant or toddler product" in the consumer registration rule to reduce any uncertainty as to whether inclined sleep products are "durable infant or toddler products." The product registration rule requires that firms provide consumers with a postage-paid consumer registration card with each product, although firms may also maintain on-line registration pages as well. The information supplied on the cards (but not necessarily the cards themselves) must be maintained for a minimum of six years.

Of the 14 small domestic firms identified by staff as supplying inclined sleep products to the U.S. market, it is likely that six will not be significantly impacted by the requirements of the product registration rule. Four of the six firms supply combination products, such as play yards with accessory inclined sleep products that are already covered under the product registration rule. All six firms have other products that are already subject to the product registration rule, as well as on-line product registration sites. Therefore, these firms likely already have the infrastructure to maintain the records and would, at most, require cards to be printed for, and shipped with, their inclined sleep products.

To comply with the product registration rule, the remaining eight firms (most of which produce only infant hammocks on a very small scale) would need to develop a postage-paid product registration card for their inclined sleep products, include the card with their other packaged materials, and develop/maintain a system to store the information collected. Each model would require a unique registration card that clearly identifies the product (*e.g.,* model name, model number, product identification number, or other identifier typically used by the firm). For many of the components that would make up the cost for firms that supply inclined sleep products to comply with product registration card requirements, cost would depend on the number of products an inclined sleep products supplier sells annually. Such cost components include card design, paper supplies, cutting and printing, postage, card attachment to product, and data entry, storage, and maintenance for returned cards. The Directorate for Economic Analysis's memorandum at Tab F of the staff's briefing package provides detailed information on the range of costs for individual elements of inclined sleep product suppliers complying with product registration card requirements. [*https:// www.cpsc.gov/s3fs-public/Proposed %20Rule%20-%20Safety%20Standard %20for%20Infant%20Inclined %20Sleep%20Products%20-%20March %2022%2C%202017.pdf*] The prices for the inclined sleep products supplied by the eight firms likely to be impacted by the product registration rule range from $30 to $250. Firms selling inclined sleep products on the high end of that range may be able to easily absorb these costs if they sell a larger volume (for example, a $1.10 per product cost increase represents about 0.004% of a $250 inclined sleep product), while it may be more difficult for a company selling their inclined sleep products for $30 to absorb or pass on their cost increase even if they are a relatively high volume firm (a $1.10 per product cost increase represents about 0.037% of a $30 inclined sleep product).

## XIII. Environmental Considerations

The Commission's regulations address whether the agency is required to prepare an environmental assessment or an environmental impact statement. Under these regulations, certain categories of CPSC actions normally have "little or no potential for affecting the human environment," and therefore do not require an environmental assessment or an environmental impact statement. Safety standards providing requirements for products come under this categorical exclusion. 16 CFR 1021.5(c)(1). The proposed rule falls within the categorical exclusion.

## XIV. Paperwork Reduction Act

This proposed rule contains information collection requirements that are subject to public comment and review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521). In this document, pursuant to 44 U.S.C. 3507(a)(1)(D), we set forth:

- A title for the collection of information;
- a summary of the collection of information;
- a brief description of the need for the information and the proposed use of the information;
- a description of the likely respondents and proposed frequency of response to the collection of information;
- an estimate of the burden that shall result from the collection of information; and
- notice that comments may be submitted to the OMB.

*Title:* Safety Standard for Infant Inclined Sleep Products.

*Description:* The proposed rule would require each inclined sleep product to comply with ASTM F3118–17, *Standard Consumer Safety Specification for Infant Inclined Sleep Products,* with one modification. Sections 8 and 9 of ASTM F3118–17 contain requirements for marking, labeling, and instructional literature. These requirements fall within the definition of "collection of information," as defined in 44 U.S.C. 3502(3).

*Description of Respondents:* Persons who manufacture or import infant inclined sleep products.

*Estimated Burden:* We estimate the burden of this collection of information as follows:

### TABLE 1—ESTIMATED ANNUAL REPORTING BURDEN

| 16 CFR section | Number of respondents | Frequency of responses | Total annual responses | Hours per response | Total burden hours |
|---|---|---|---|---|---|
| 1236 .................................................................. | 25 | 2 | 50 | 1 | 50 |

Our estimate is based on the following:

Twenty-five known entities supply inclined sleep products to the U.S. market may need to make some modifications to their existing warning labels. We estimate that the time required to make these modifications is about 1 hour per model. Based on an evaluation of supplier product lines, each entity supplies an average of 2 models of inclined sleep products; therefore, the estimated burden associated with labels is 1 hour per model × 25 entities × 2 models per entity = 50 hours. We estimate the hourly compensation for the time required to create and update labels is $33.30 (U.S. Bureau of Labor Statistics, "Employer Costs for Employee Compensation," September 2016, Table

9, total compensation for all sales and office workers in goods-producing private industries: *http://www.bls.gov/ncs/*). Therefore, the estimated annual cost to industry associated with the labeling requirements is $1,665 ($33.30 per hour × 50 hours = $1,665). No operating, maintenance, or capital costs are associated with the collection.

Section 9.1 of ASTM F3118–17 requires instructions to be supplied with the product. Under the OMB's regulations (5 CFR 1320.3(b)(2)), the time, effort, and financial resources necessary to comply with a collection of information that would be incurred by persons in the "normal course of their activities" are excluded from a burden estimate, where an agency demonstrates that the disclosure activities required to comply are "usual and customary." We are unaware of inclined sleep products that generally require use instructions but lack such instructions. However, it is possible that some firms selling homemade infant hammocks on a very small scale may not supply instruction manuals as part of their "normal course of activities." Based on information collected for the infant slings rulemaking, staff tentatively estimates that each small entity supplying homemade infant hammocks might require 50 hours to develop an instruction manual to accompany their products. It is uncertain how many homemade infant hammock suppliers are in operation at any point in time, but based on staff's review of the marketplace, 50 firms seems like a reasonable outside bound. These firms typically supply only one infant hammock model. Therefore, the costs of designing an instruction manual for these firms could be as high as $82,550 (50 hours per model × 50 entities × 1 models per entity = 2,500 hours × $33.02 per hour = $82,550). Not all firms would incur these costs every year, but new firms that enter the market would and this is a highly fluctuating market. Other firms are estimated to have no burden hours associated with section 9.1 of ASTM F3118–17 because any burden associated with supplying instructions with inclined sleep products would be "usual and customary" and not within the definition of "burden" under the OMB's regulations.

Based on this analysis, staff estimates that the proposed standard for inclined sleep products would impose a burden to industry of 2,550 hours at a cost of $84,915 annually.

In compliance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), we have submitted the information collection requirements of this rule to the OMB for review. Interested persons are requested to submit comments regarding information collection by May 8, 2017, to the Office of Information and Regulatory Affairs, OMB (see the **ADDRESSES** section at the beginning of this notice). Pursuant to 44 U.S.C. 3506(c)(2)(A), we invite comments on:

• Whether the collection of information is necessary for the proper performance of the CPSC's functions, including whether the information will have practical utility;

• the accuracy of the CPSC's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

• ways to enhance the quality, utility, and clarity of the information to be collected;

• ways to reduce the burden of the collection of information on respondents, including the use of automated collection techniques, when appropriate, and other forms of information technology; and

• the estimated burden hours associated with label modification, including any alternative estimates.

## XV. Preemption

Section 26(a) of the CPSA, 15 U.S.C. 2075(a), provides that when a consumer product safety standard is in effect and applies to a product, no state or political subdivision of a state may either establish or continue in effect a standard or regulation that prescribes requirements for the performance, composition, contents, design, finish, construction, packaging, or labeling of such product dealing with the same risk of injury unless the state requirement is identical to the federal standard. Section 26(c) of the CPSA also provides that states or political subdivisions of states may apply to the Commission for an exemption from this preemption under certain circumstances. Section 104(b) of the CPSIA refers to the rules to be issued under that section as "consumer product safety rules." Therefore, the preemption provision of section 26(a) of the CPSA would apply to a rule issued under section 104.

## XVI. Request for Comments

This NPR begins a rulemaking proceeding under section 104(b) of the CPSIA to issue a consumer product safety standard for inclined sleep products, to amend part 1112 to add inclined sleep products to the list of children's product safety rules for which the CPSC has issued an NOR, and to amend part 1130 to identify inclined sleep products as a durable infant or toddler product subject to CPSC

consumer registration requirements. We invite all interested persons to submit comments on any aspect of this proposal. In addition to requests for specific comments elsewhere in this NPR, the Commission requests comments on the standard's scope language, the proposed effective date, and the costs of compliance with, and testing to, the proposed inclined sleep products safety standard. During the comment period, the ASTM F3118–17 Standard Consumer Safety Specification for Infant Inclined Sleep Products, is available as a read-only document at: *http://www.astm.org/cpsc.htm.*

Comments should be submitted in accordance with the instructions in the **ADDRESSES** section at the beginning of this notice.

## List of Subjects

### 16 CFR Part 1112

Administrative practice and procedure, Audit, Consumer protection, Reporting and recordkeeping requirements, Third party conformity assessment body.

### 16 CFR Part 1130

Administrative practice and procedure, Business and industry, Consumer protection, Reporting and recordkeeping requirements.

### 16 CFR Part 1236

Consumer protection, Imports, Incorporation by reference, Infants and children, Labeling, Law enforcement, and Toys.

For the reasons discussed in the preamble, the Commission proposes to amend Title 16 of the Code of Federal Regulations as follows:

## PART 1112—REQUIREMENTS PERTAINING TO THIRD PARTY CONFORMITY ASSESSMENT BODIES

■ 1. The authority citation for part 1112 continues to read as follows:

**Authority:** 15 U.S.C. 2063; Pub. L. 110–314, section 3, 122 Stat. 3016, 3017 (2008).

■ 2. Amend § 1112.15 by adding paragraph (b)(46) to read as follows:

### § 1112.15  When can a third party conformity assessment body apply for CPSC acceptance for a particular CPSC rule and/or test method?

\*　　\*　　\*　　\*　　\*

(b) \* \* \*

(46) 16 CFR part 1236, Safety Standard for Infant Inclined Sleep Products.

\*　　\*　　\*　　\*　　\*

■ 3. The authority citation for part 1130 continues to read as follows:

**Authority:** 15 U.S.C. 2056a, 2056(b).

■ 4. Amend § 1130.2 by adding paragraph (a)(19) to read as follows:

## PART 1130—REQUIREMENTS FOR CONSUMER REGISTRATION OF DURABLE INFANT OR TODDLER PRODUCTS

### § 1130.2 Definitions.

\* \* \* \* \*

(a) \* \* \*

(19) Infant inclined sleep products.

\* \* \* \* \*

■ 5. Add part 1236 to read as follows:

## PART 1236—SAFETY STANDARD FOR INFANT INCLINED SLEEP PRODUCTS

Sec.
1236.1   Scope.
1236.2   Requirements for infant inclined sleep products.

**Authority:** Sec. 104, Pub. L. 110–314, 122 Stat. 3016 (August 14, 2008); Sec. 3, Pub. L. 112–28, 125 Stat. 273 (August 12, 2011).

### § 1236.1   Scope.

This part establishes a consumer product safety standard for infant inclined sleep products, including newborn inclined sleep products, compact inclined sleep products, and accessory inclined sleep products.

### § 1236.2   Requirements for infant inclined sleep products.

(a) Except as provided in paragraph (b) of this section, each infant inclined sleep product must comply with all applicable provisions of ASTM F3118–17, Standard Consumer Safety Specification for Infant Inclined Sleep Products (approved on January 1, 2017). The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from ASTM International, 100 Bar Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; *http:// www.astm.org/cpsc.htm.* You may inspect a copy at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/ federal_register/ code_of_federalregulations/ ibr_locations.html.*

(b) Instead of complying with section 3.1.1 of ASTM F3118–17, comply with the following:

(1) 3.1.1 *accessory inclined sleep product, n*—an inclined sleep product

that is intended to provide sleeping accommodations for infants or newborns and attaches to or is supported by another product.

(2) [Reserved]

Dated: April 3, 2017.

**Todd A. Stevenson,**

*Secretary, Consumer Product Safety Commission.*

[FR Doc. 2017–06875 Filed 4–6–17; 8:45 am]

**BILLING CODE 6355–01–P**

---

## DEPARTMENT OF THE INTERIOR

### Office of Surface Mining Reclamation and Enforcement

### 30 CFR Part 901

**[SATS No. AL–080–FOR; Docket ID: OSM– 2016–0011; S1D1S SS08011000 SX064A000 178S180110; S2D2S SS08011000 SX064A000 17XS501520]**

### Alabama Abandoned Mine Land Reclamation Plan

**AGENCY:** Office of Surface Mining Reclamation and Enforcement, Interior.

**ACTION:** Proposed rule; public comment period and opportunity for public hearing on proposed amendment.

**SUMMARY:** We, the Office of Surface Mining Reclamation and Enforcement (OSMRE), are announcing receipt of a proposed amendment to the Alabama Abandoned Mine Land Reclamation (AMLR) Plan (hereinafter, the Plan) under the Surface Mining Control and Reclamation Act of 1977 (SMCRA or the Act). Alabama proposes revisions to modernize its Plan, which remains largely unchanged since its approval on May 20, 1982, and encompass the November 14, 2008, changes to the Federal regulations.

This document gives the times and locations that the Alabama Plan and proposed amendment to that plan are available for your inspection, the comment period during which you may submit written comments on the amendment, and the procedures that we will follow for the public hearing, if one is requested.

**DATES:** We will accept written comments on this amendment until 4:00 p.m., c.t., May 8, 2017. If requested, we will hold a public hearing on the amendment on May 2, 2017. We will accept requests to speak at a hearing until 4:00 p.m., c.t. on April 24, 2017.

**ADDRESSES:** You may submit comments, identified by SATS No. AL–080–FOR by any of the following methods:

• Mail/*Hand Delivery:* Sherry Wilson, Director, Birmingham Field Office,

Office of Surface Mining Reclamation and Enforcement, 135 Gemini Circle, Suite 215, Homewood, Alabama 35209.

• *Fax:* (205) 290–7280.

• *Federal eRulemaking Portal:* The amendment has been assigned Docket ID OSM–2016–0008. If you would like to submit comments go to *http:// www.regulations.gov.* Follow the instructions for submitting comments.

*Instructions:* All submissions received must include the agency name and docket number for this rulemaking. For detailed instructions on submitting comments and additional information on the rulemaking process, see the "Public Comment Procedures" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

*Docket:* For access to the docket to review copies of the Alabama Plan, this amendment, a listing of any scheduled public hearings, and all written comments received in response to this document, you must go to the address listed below during normal business hours, Monday through Friday, excluding holidays. You may receive one free copy of the amendment by contacting OSMRE's Birmingham Field Office or the full text of the plan amendment is available for you to review at *www.regulations.gov.*

Sherry Wilson, Director, Birmingham Field Office, Office of Surface Mining Reclamation and Enforcement, 135 Gemini Circle, Suite 215, Homewood, Alabama 35209, Telephone: (205) 290– 7282, Email: *swilson@osmre.gov.*

In addition, you may review a copy of the amendment during regular business hours at the following location:

Alabama Department of Labor, Abandoned Mine Land Reclamation Program, 11 West Oxmoor Road, Suite 100, Birmingham, Alabama 35209, Telephone: (205) 945–8671.

**FOR FURTHER INFORMATION CONTACT:** Sherry Wilson, Director, Birmingham Field Office. Telephone: (205) 290– 7282. Email: *swilson@osmre.gov.*

**SUPPLEMENTARY INFORMATION:**

I. Background on the Alabama Plan
II. Description of the Proposed Amendment
III. Public Comment Procedures
IV. Procedural Determinations

### I. Background on the Alabama Plan

The Abandoned Mine Land Reclamation Program was established by Title IV of the Act, (30 U.S.C. 1201 *et seq.*) in response to concerns over extensive environmental damage caused by past coal mining activities. The program is funded by a reclamation fee collected on each ton of coal that is produced. The money collected is used to finance the reclamation of abandoned

JA046



**UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814**

**DATE:** June 12, 2019

**BALLOT VOTE SHEET**

This document has been electronically
approved and signed.

**TO:**       The Commission
                Alberta E. Mills, Secretary

**THROUGH:** Patricia M. Hanz, General Counsel
                Mary T. Boyle, Executive Director

**FROM:**     Patricia M. Pollitzer, Assistant General Counsel
                Mary A. House, Attorney, OGC

**SUBJECT:**  Termination of Rulemaking for Infant Inclined Sleep Products

BALLOT VOTE DUE   <u>Tuesday, June 18, 2019</u>

      The U.S. Consumer Product Safety Commission (CPSC) issued a notice of proposed rulemaking (NPR) in April 2017 to establish a mandatory safety standard for infant inclined sleep products, pursuant to the Danny Keysar Child Product Safety Notification Act, section 104 of the Consumer Product Safety Improvement Act of 2008 (CPSIA). The NPR proposed to adopt a voluntary standard for infant inclined sleep products developed by ASTM International, with a modification to the standard's definition of "accessory." Since then, CPSC has become aware of additional fatalities and information that warrant reconsideration of the requirements proposed in the NPR.

      Accordingly, as requested by the Office of the Executive Director (OEX), the Office of the General Counsel (OGC) is forwarding for Commission consideration, the attached draft *Federal Register* notice, which would terminate the rulemaking to establish a mandatory safety standard for infant inclined sleep products and terminate associated amendments to the consumer registration rule and notice of requirements.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE   JA047
UNDER CPSA 6(b)(1)

Please indicate your vote on the following options:

I.   Approve publication of the attached document in the *Federal Register,* as drafted.


_____              _____
(Signature)                                                             (Date)


II.  Approve publication of the attached document in the *Federal Register,* with the specified changes:


_____

_____

_____

_____


_____              _____
(Signature)                                                             (Date)


III. Do not approve publication of the attached document in the *Federal Register*.


_____              _____
(Signature)                                                             (Date)


IV.  Take other action specified below:


_____

_____

_____

_____


_____              _____
(Signature)                                                             (Date)

Attachment:  Draft *Federal Register* Notice: Safety Standard for Infant Inclined Sleep Products: Termination of Rulemaking

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE          JA048
UNDER CPSA 6(b)(1)

**Billing Code 6355-01-P**

**CONSUMER PRODUCT SAFETY COMMISSION**

**16 CFR Parts 1112, 1130, and 1235**

**[CPSC Docket No. 2017-0020]**

**Safety Standard for Infant Inclined Sleep Products: Termination of Rulemaking**

**AGENCY:** Consumer Product Safety Commission.

**ACTION:** Termination of rulemaking.

**SUMMARY:** In the **Federal Register** of April 7, 2017, the Consumer Product Safety Commission (CPSC) published a notice of proposed rulemaking (NPR) pursuant to the Danny Keysar Child Product Safety Notification Act, section 104 of the Consumer Product Safety Improvement Act of 2008 (CPSIA), to promulgate a consumer product safety standard for infant inclined sleep products (inclined sleep products), a type of durable infant or toddler product. The NPR proposed to adopt a voluntary standard for inclined sleep products developed by ASTM International, with a modification to the standard's definition of "accessory." Based on subsequent information and events, the Commission is terminating the rulemaking and withdrawing the inclined sleep product NPR. Additionally, the Commission is terminating the related proposed amendment to include inclined sleep products in the list of notice of requirements (NORs), as well as the related proposed amendment to identify explicitly infant inclined sleep products as a durable infant or toddler product subject to CPSC's consumer registration requirements.

**FOR FURTHER INFORMATION CONTACT:** Celestine T. Kish, Project Manager, Directorate for Engineering, U.S. Consumer Product Safety Commission, 5 Research Place, Rockville, MD 20850; telephone: (301) 987-2547; email: *ckish@cpsc.gov*.

JA049

**SUPPLEMENTARY INFORMATION:**

## I.    Background and Statutory Authority

One of the CPSC's missions is to protect the public against unreasonable risks of injury associated with consumer products.  15 U.S.C. 2051(b)(1).  In furtherance of this mission, section 104(b) of the CPSIA, part of the Danny Keysar Child Product Safety Notification Act, requires the Commission to: (1) examine and assess the effectiveness of voluntary consumer product safety standards for durable infant or toddler products, in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts; and (2) promulgate consumer product safety standards for durable infant or toddler products.  Standards issued under section 104 are to be "substantially the same as" the applicable voluntary standards, or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product.  15 U.S.C. 2056a(b)(1).

A "durable infant or toddler product" is a "durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years." *Id*. 2056a(f)(1).  The CPSIA also includes a non-exhaustive list of categories of products that are durable infant or toddler products, such as cribs, toddler beds, and bassinets and cradles. *Id*. 2056a(f)(2).  Inclined sleep products are a "durable infant or toddler product" under section 104 of the CPSIA, as a subset of the bassinet and cradle category.

As stated in the NPR, CPSC staff initially considered inclined sleep products to fall within the scope of the bassinet/cradle standard, currently codified as 16 C.F.R. part 1218.  82 FR 16963, 16964 (April 7, 2017).  As work progressed on the bassinet/cradle standard, staff advised the Commission that one rule could not effectively address all products, and the

JA050

Commission directed staff to address inclined sleep products in a separate rulemaking. Thus, the NPR for inclined sleep products was an outgrowth of the bassinet/cradle safety standard to address products intended for infant sleep with an incline greater than 10 degrees and less than or equal to 30 degrees from horizontal. ASTM simultaneously began work on developing a voluntary standard for inclined sleep products. On April 7, 2017, the Commission issued an NPR, proposing to adopt as mandatory, the voluntary standard for inclined sleep products that ASTM International developed, ASTM F3118-17, *Standard Consumer Safety Specification for Infant Inclined Sleep Products* (ASTM F3118-17), with a modification to the standard's definition of "accessory." 82 FR 16963.

## II.  Termination of NPR to Create a Safety Standard for Inclined Sleep Products

The Commission is terminating this rulemaking for inclined sleep products. Based on the information described below, including the number of infant fatalities associated with inclined sleep products, the Commission's safety alerts based on some of these fatalities, and two recent recalls of inclined sleep products, the Commission concludes that the NPR proposing to incorporate by reference ASTM F3118-17, with a modification to the standard's definition of "accessory," is unlikely to adequately address the risk of injury associated with inclined sleep products. The Commission is terminating the rulemaking and withdrawing the NPR to reconsider requirements for inclined sleep products, including, but not limited to, the level of incline, appropriate age designations, use of restraints, side height, and accessories. CPSC staff will continue to assess all product requirements independently, as well as work with stakeholders, as appropriate, through the ASTM process.

JA051

A.    *Description of the Product*

The scope of products covered by the NPR tracked the scope of ASTM F3118-17, covering "a free standing product with an inclined sleep surface primarily intended and marketed to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on sides, whichever comes first." The NPR described the following categories of infant inclined sleep products.

▪ **Hammocks** (typically constructed of fabric and suspended from one or two points, either above or on either side; constructed of various materials; generally conform to the shape of the child when placed in the product; can either be supported by a frame or other structure, such as a ceiling);

▪ **Newborn or infant frame type** (intended to be placed on the floor; self-supporting; typically use a metal frame with a rigid or semi-rigid sleeping surface; base may be stationary or allow side to side rocking; may be intended for use by either newborns or infants, or both, depending on the size);

▪ **Compact** (freestanding with the bottom of the seat a maximum of 6 inches above the floor; generally constructed of foam with a fixed seat back angle between 10° and 30°; intended to be used on the floor); and

▪ **Newborn or infant inclined sleep product accessories** (intended to provide sleeping accommodations and are attached to or supported in some way by another product; a rigid frame product that has either a stationary or fixed base and in some cases may be removed and used independently; products intended for newborn use have a seat back less than 17 inches). Products intended for use with newborns are generally similar in design to products intended for

JA052

infants, except that products intended for use with newborns have a seat back length of 17 inches or less.

Additionally, the NPR described three key components of an "infant inclined sleep product" contained in ASTM F3118-17:

- **Age of intended product occupant**: the product must be intended for infants up to five months old (3 months for certain smaller products). The product may additionally be intended for older children, possibly in a different configuration, provided that its intended use also includes children up to five months.

- **Sleep**: the product must be primarily intended and marketed to provide sleeping accommodations.

- **Surface incline**: the product must have at least one inclined sleep surface position that is greater than 10 degrees, but less than or equal to 30 degrees.

  B.  *Fatal Incidents and Recalls Associated With Inclined Sleep Products*

    1.  <u>Fatalities</u>

At the time of the NPR, the Commission was aware of 14 fatal incidents related to infant inclined sleep products, which were reported to have occurred between January 1, 2005 and September 30, 2016. Eight of the 14 deaths involved rocker-like inclined sleep products; in three cases, the unstrapped decedent was found to have rolled over into a facedown position. Two additional cases also reported a rollover into a facedown position, but they did not include any information about use of a restraint. CPSC had little information about the cause or manner of the three remaining deaths. The NPR recognized that reporting was ongoing and the number of reported fatalities could change.

JA053

Since the NPR published, CPSC staff has received reports of 42 additional fatalities that involved rocker-like inclined sleep products. The dates of death among the new reports span from 2011 to 2019. Among them, 10 decedents rolled over from supine to prone or side position in the product; 18 decedents did not roll over at all; and no roll-over information was available on 14 of the remaining deaths. CPSC staff is not usually able to obtain information on the use of restraints.

2.      Safety Alerts and Recalls

The NPR described recalls involving inclined sleep products that occurred from May 10, 2000 to March 1, 2016. During that time, CPSC conducted nine consumer-level recalls involving infant inclined sleep products. CPSC conducted the recalls to resolve issues involving mold, structural stability, entrapment, suffocation, falls, and strangulation. Three recalls involved inclined sleep products, and six recalls involved infant hammocks. One recall for mold affected 800,000 units of infant inclined sleep products. Two recalls for entrapment and suffocation affected 195,000 units of inclined sleep products. The six additional recalls were the result of potential suffocation, strangulation, structural stability, entrapment, and fall hazards, collectively affecting 25,368 hammock units.

Since March 1, 2016, CPSC issued two safety alerts and conducted two recalls involving inclined sleep products. On May 31, 2018, the Commission issued a safety alert, "CPSC Consumer Alert: Caregivers Urged To Use Restraints With Inclined Sleep Products."[1] The safety alert advised of infant rollover deaths in inclined sleep products, and reminded caregivers to always use restraints, and to stop using the product as soon as an infant can roll over. Additionally, on April 5, 2019, based on 10 fatalities involving unrestrained infants older than 3

---

[1] https://www.cpsc.gov/content/cpsc-consumer-alert-caregivers-urged-to-use-restraints-with-inclined-sleep-products

JA054

months who rolled over in a Fisher-Price Rock 'N Play, the Commission issued a safety alert, "CPSC ALERT: CPSC and Fisher-Price Warn Consumers About Fisher-Price Rock 'N Play Due to Reports of Death When Infants Roll Over in the Product."[2] The safety alert described the hazard and advised consumers to stop use of the product when an infant reaches three months of age, or as soon as an infant exhibits rollover capabilities. On April 12, 2019, CPSC announced a recall of this product, involving 4.7 million products.[3] Shortly thereafter, on April 26, 2019, CPSC announced a recall of another, rocking style, inclined sleep product, the Kids II Rocking Sleeper, related to 5 rollover fatalities.[4] Both recalled products met the requirements of ASTM F3118-17,[5] the voluntary standard on which the NPR was based.

## III.  Termination of NPR to Amend the Consumer Registration Rule

The NPR also proposed to amend the definition of "durable infant or toddler product" in the consumer registration rule to explicitly include "infant inclined sleep products" to avoid possible confusion about whether an inclined sleep product is considered a durable infant or toddler product. 82 FR at 16969-70. Because the Commission is terminating the NPR for inclined sleep products, the Commission is also terminating the rulemaking to amend 16 C.F.R. part 1130 to include inclined sleep products in the definition of a "durable infant or toddler product." However, as stated in the NPR, inclined sleep products meet the definition of a "durable infant or toddler product" and continue to be subject to part 1130. 82 FR at 16969.

---

[2] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product
[3] https://www.cpsc.gov/Recalls/2019/Fisher-Price-Recalls-Rock-n-Play-Sleepers-Due-to-Reports-of-Deaths
[4] https://www.cpsc.gov/Recalls/2019/Kids-II-Recalls-All-Rocking-Sleepers-Due-to-Reports-of-Deaths
[5] At the May 2019 ASTM meeting regarding inclined sleep products, ASTM subcommittee members decided to reconsider performance requirements in ASTM F3118-17, and is forming task groups to undertake such review.

JA055

**IV.    Termination of NPR to Amend Notice of Requirements**

The Commission is also terminating the NPR to issue an NOR for the inclined sleep

products standard, which proposed to amend 16 CFR part 1112 to include 16 CFR part 1235, the

CFR section where the inclined sleep products standard would have been codified, if the

standard had become final.  82 FR at 16969.

**V.     Future Action**

Although the Commission is terminating this rulemaking, CPSC staff will continue

assessing requirements for inclined sleep products to address hazards presented by this product,

independently, as well as working with stakeholders, as appropriate, through the ASTM process.

CPSC plans to propose appropriate requirements for inclined sleep products in the future.


Dated: _____


_____
Alberta E. Mills, Secretary
Consumer Product Safety Commission



**UNITED STATES**
**CONSUMER PRODUCT SAFETY COMMISSION**
**4330 EAST WEST HIGHWAY**
**BETHESDA, MD 20814**

This document has been electronically
approved and signed.

**DATE:** October 16, 2019

**BALLOT VOTE SHEET**

**TO:** The Commission
Alberta E. Mills, Secretary

**THROUGH:** Melissa V. Hampshire, Acting General Counsel
Mary T. Boyle, Executive Director

**FROM:** Patricia M. Pollitzer, Assistant General Counsel
Mary A. House, Attorney, OGC

**SUBJECT:** Supplemental Notice of Proposed Rulemaking for Infant Sleep Products

BALLOT VOTE DUE  Tuesday, October 22, 2019

     The U.S. Consumer Product Safety Commission (CPSC) published a notice of proposed rulemaking in April 2017 (2017 NPR) pursuant to the Danny Keysar Child Product Safety Notification Act, section 104 of the Consumer Product Safety Improvement Act of 2008 (CPSIA) to promulgate a consumer product safety standard for infant inclined sleep products. Based on subsequent information and events, CPSC staff is recommending that the Commission issue a supplemental notice of proposed rulemaking (Supplemental NPR), proposing to adopt the current ASTM standard for infant inclined sleep products, with modifications that would make the mandatory standard more stringent than the voluntary standard. The draft Supplemental NPR proposes to limit the seat back angle for sleep to 10 degrees or less, and to change the scope of the standard to cover products intended for infant sleep that are not already addressed by another standard. Accordingly, the draft Supplemental NPR proposes to use the term "infant sleep products" for the CPSC standard. The draft Supplemental NPR also proposes to amend the consumer registration rule (16 CFR part 1130) to identify explicitly infant sleep products as a durable infant or toddler product subject to part 1130, and the regulation regarding third party conformity assessment bodies (16 CFR part 1112) to add infant sleep products to the Commission's list of notices of requirements.

     The Office of the General Counsel (OGC) is forwarding a draft Supplemental NPR for Commission consideration.

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE     JA057
UNDER CPSA 6(b)(1)

Please indicate your vote on the following options:

I.      Approve publication of the attached document in the *Federal Register,* as drafted.


_____                    _____
(Signature)                                                            (Date)


II.     Approve publication of the attached document in the *Federal Register,* with the specified changes:

_____

_____

_____

_____


_____                    _____
(Signature)                                                            (Date)


III.    Do not approve publication of the attached document in the *Federal Register*.


_____                    _____
(Signature)                                                            (Date)


IV.     Take other action specified below:

_____

_____

_____

_____


_____                    _____
(Signature)                                                            (Date)

Attachment:  Draft *Federal Register* Notice: Supplemental Notice of Proposed Rulemaking to Establish a Safety Standard for Infant Sleep Products

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE     JA058
UNDER CPSA 6(b)(1)

**Billing Code 6355-01-P**

**CONSUMER PRODUCT SAFETY COMMISSION**

**16 CFR Parts 1112, 1130, and 1236**

**[CPSC Docket No. 2017-0020]**

**Safety Standard for Infant Sleep Products**

**AGENCY:** Consumer Product Safety Commission.

**ACTION:** Supplemental notice of proposed rulemaking.

**SUMMARY:** In the **Federal Register** of April 7, 2017, the Consumer Product Safety

Commission (CPSC) published a notice of proposed rulemaking (2017 NPR) pursuant to the

Danny Keysar Child Product Safety Notification Act, section 104 of the Consumer Product

Safety Improvement Act of 2008 (CPSIA), to promulgate a consumer product safety standard for

infant inclined sleep products (inclined sleep products). The 2017 NPR allowed an incline

between 10 and 30 degrees for the seat back angle of an inclined sleep product. The 2017 NPR

proposed to adopt a voluntary standard for inclined sleep products developed by ASTM

International, with a modification to the standard's definition of "accessory." Based on

subsequent information and events, the Commission is now issuing a supplemental proposed rule

(Supplemental NPR), proposing to adopt the current ASTM standard for inclined sleep products,

with modifications that would make the mandatory standard more stringent than the voluntary

standard. The proposed changes include limiting the seat back angle for sleep to 10 degrees or

less. CPSC's proposed standard would cover products intended for infant sleep that are not

already addressed by another standard. Additionally, the Commission proposes to include the

mandatory standard for infant sleep products in the Commission's list of notices of requirements

(NORs). The Commission also proposes to amend the consumer registration rule to identify

JA059

explicitly infant sleep products as a durable infant or toddler product subject to CPSC's consumer registration requirements.

**DATES:** Submit comments by [<mark>INSERT DATE 75 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER</mark>].

**ADDRESSES:** Comments related to the Paperwork Reduction Act aspects of the marking, labeling, and instructional literature requirements of the proposed mandatory standard for infant sleep products should be directed to the Office of Information and Regulatory Affairs, the Office of Management and Budget, Attn: CPSC Desk Officer, FAX: 202-395-6974, or e-mailed to oira_submission@omb.eop.gov.

Other comments, identified by Docket No. CPSC-2017-0020, may be submitted electronically or in writing:

*Electronic Submissions*: Submit electronic comments to the Federal eRulemaking Portal at: http://www.regulations.gov. Follow the instructions for submitting comments. CPSC does not accept comments submitted by electronic mail (e-mail), except through www.regulations.gov. CPSC encourages you to submit electronic comments by using the Federal eRulemaking Portal, as described above.

*Written Submissions:* Submit written submissions in the following way: Mail/Hand delivery/Courier (for paper, disk, or CD-ROM submissions) to: Division of the Secretariat, Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814; telephone (301) 504-7923.

*Instructions:* All submissions received must include the agency name and docket number for this proposed rulemaking. All comments received may be posted without change, including any personal identifiers, contact information, or other personal information provided,

to: http://www.regulations.gov.  Do not submit electronically any confidential business information, trade secret information, or other sensitive or protected information that you do not want to be available to the public.  If you wish to provide such information, please submit it in writing.

*Docket:*  For access to the docket to read background documents or comments received, go to: http://www.regulations.gov, and insert the docket number, CPSC-2017-0020, into the "Search" box, and follow the prompts.

**FOR FURTHER INFORMATION CONTACT:** Celestine T. Kish, Project Manager, Directorate for Engineering, U.S. Consumer Product Safety Commission, 5 Research Place, Rockville, MD 20850; telephone: (301) 987-2547; email: *ckish@cpsc.gov*.

**SUPPLEMENTARY INFORMATION:**

**I.      Background and Statutory Authority**

*A.      Statutory Authority*

Section 104(b) of the CPSIA, 15 U.S.C. 2056a(b), requires the Commission to: (1) examine and assess the effectiveness of voluntary consumer product safety standards for durable infant or toddler products, in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts; and (2) promulgate consumer product safety standards for durable infant or toddler products.  Standards issued under section 104 are to be "substantially the same as" the applicable voluntary standards, or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product.  15 U.S.C. 2056a(b)(1)(B).

JA061

Section 104 of the CPSIA requires the Commission to consult with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts to examine and assess the effectiveness of the relevant voluntary standards. CPSC staff regularly participates in the juvenile products subcommittee meetings of ASTM International (ASTM). ASTM subcommittees consist of members who represent producers, users, consumers, government, and academia.[1] The consultation process for the inclined sleep products rulemaking commenced in 2011, and CPSC staff has been actively participating in the development of the new standard since that time.

A "durable infant or toddler product" is a "durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years." *Id*. 2056a(f)(1). The CPSIA includes a non-exhaustive list of categories of products that are durable infant or toddler products, such as cribs, toddler beds, and bassinets and cradles. *Id*. 2056a(f)(2). As discussed in section I.B of this preamble, in the 2017 NPR CPSC proposed to categorize infant inclined sleep products as a "durable infant or toddler product" under section 104 of the CPSIA, as a subset of the bassinet and cradle category. In this Supplemental NPR, CPSC proposes to identify "infant sleep products" as a category of durable infant or toddler products under section 104(f) of the CPSIA. CPSC proposes to define "infant sleep products" as products that provide sleeping accommodations for infants and are not currently covered by bassinets/cradles, cribs (full-size and non-full size), play yards, and bedside sleepers, as a durable infant or toddler product under section 104(f) of the CPSIA. Section 104(d) of the CPSIA requires durable infant or toddler products to establish product registration programs and comply with CPSC's implementing rule, 16 CFR part 1130. Under section 14 of the CPSA, children's products (such as durable infant or

---

[1] ASTM International website: www.astm.org, About ASTM International.

JA062

toddler products) must comply with testing and certification requirements that are implemented through 16 CFR parts 1107 and 1109.

B.    *2017 NPR*

When staff began work on the bassinet and cradle standard, staff considered infant inclined sleep products to fall within the scope of the bassinet/cradle standard.  However, because the bassinet/cradle standard did not address products on the market that had a sleep incline greater than 10 degrees, the Commission directed staff to initiate a separate rulemaking effort for infant inclined sleep products.  Accordingly, the infant inclined sleep products safety standard was an outgrowth of the bassinet/cradle safety standard, intended to address products with an incline greater than 10 degrees from horizontal.

In 2011, at the time CPSC separated infant inclined sleep products from the bassinet/cradle standard, ASTM simultaneously began work on developing a voluntary standard for infant inclined sleep products.  ASTM published the resulting infant inclined sleep products standard in May 2015, and updated the standard twice in 2016 and twice in 2017.  ASTM's latest standard for this product category is designated, ASTM F3118-17a, *Standard Consumer Safety Specification for Infant Inclined Sleep Products* (ASTM F3118-17a).

Pursuant to the procedure described in section 104 of the CPSIA, the 2017 NPR proposed a mandatory standard for infant inclined sleep products, incorporating by reference the then-current voluntary standard, ASTM F3118-17, with a modification to the standard's definition of "accessory."  82 FR 16964 (April 7, 2017).  At the time of the 2017 NPR for infant inclined sleep products, which included hammocks, the Commission was aware of 14 fatal incidents related to infant inclined sleep products, which were reported to have occurred between January 1, 2005 and September 30, 2016.  Staff determined that 8 of the 14 infant deaths involved

JA063

freestanding, framed inclined sleep products, and that 3 infant deaths involved an unrestrained infant who was found to have rolled over into a facedown position.  Staff found that in two additional deaths, the infant reportedly rolled over into a facedown position, but the reports did not include any information about use of a restraint.  CPSC staff had little information about the cause or manner of the three remaining infant deaths.  *Id*. at 16965-66.  Staff's incident data analysis in the 2017 NPR considered that these 14 fatalities and other reported incidents could be addressed by the requirements in the voluntary standard, ASTM F3118-17.  *Id*. at 16967-68.

The 2017 NPR indicated that ASTM F3118-17 addressed the primary hazard patterns CPSC identified in the 657 incidents (including 14 deaths), except for the definition of "accessory."  Specifically, the 2017 NPR proposed that CPSC's standard would not include the term "rigid frame" in the definition of "accessory inclined sleep product" in section 3.1.1 of ASTM F3118-17, broadening the definition to encompass a new product that did not have a rigid frame.  *Id*. at 16968-69, and 16975.  The Commission concluded that these more stringent requirements were necessary to further reduce the risk of injury associated with infant inclined sleep products relating to the use of an inclined sleep product accessory.  *Id*. at 16967.

As the 2017 NPR explained, durable infant or toddler products are children's products that must be certified as complying with all applicable CPSC-enforced requirements.  15 U.S.C. 2063(a); 82 FR at 16969.  Certification must be based on testing conducted by a CPSC-accepted third party conformity assessment body (test laboratory).  15 U.S.C. 20163(a)(2).  CPSC must publish a NOR for the accreditation of test laboratories to assess a product's conformity with a children's product safety rule, such as the proposed rule on infant inclined sleep products.  Accordingly, the 2017 NPR proposed that if issued as a final rule, the new *Standard Consumer Safety Specification for Infant Inclined Sleep Products*, to be codified at 16 CFR part 1236,

would be added to the list of NORs for children's product safety rules in 16 CFR part 1112, so that test laboratories applying for CPSC-acceptance could seek accreditation to test inclined infant sleep products. 82 FR at 16969.

Finally, the 2017 NPR proposed to amend 16 CFR part 1130, the Commission's requirements for consumer registration for durable infant or toddler products. *Id*. at 16969-70. The Commission proposed to amend the definition of "durable infant or toddler product" to clarify that infant inclined sleep products fall within the term, and are subject to the product registration card requirements in part 1130. *Id*.

On June 12, 2019, CPSC staff submitted a briefing package and a draft **Federal Register** notice to the Commission recommending that the Commission terminate the 2017 NPR. Staff recommended terminating the 2017 NPR because, by that time, CPSC had received reports of 42 additional fatalities since issuing the 2017 NPR, which were associated with rocker-like inclined sleep products, and because the Commission had issued additional safety alerts and recalls involving infant inclined sleep products. On October 16, 2019, staff provided the Commission with a briefing package recommending that the Commission instead issue this Supplemental NPR.[2]

C. *2019 Supplemental NPR - Overview*

In this Supplemental NPR, the Commission proposes to issue a standard for infant sleep products, *i.e.,* products that (1) provide sleeping accommodations for infants and (2) are not currently covered by bassinets/cradles, cribs (full-size and non-full size), play yards, and bedside sleepers. The Supplemental NPR proposes to incorporate by reference ASTM F 3118-17a with

---

[2] The October 16, 2019, Staff Briefing Package: Draft Supplemental Notice of Proposed Rulemaking for Infant Sleep Products under the Danny Keysar Child Product Safety Notification Act (Staff Supplemental Briefing Package) is available at: [INSERT LINK TO STAFF BRIEFING PACKAGE]

modifications to require that: (1) the seat back angle intended for sleep must be equal to or less than 10° and (2) the infant sleep product must meet the requirements for a bassinet/cradle in the standard at 16 CFR part 1218. The Commission also proposes to amend the consumer registration rule to identify "infant sleep products" as a category of durable infant or toddler products under section 104(f) of the CPSIA. Additionally, the Commission proposes to amend its regulation at 16 CFR part 1112 to add infant sleep products to the list of products that require third party testing.

## II.     Product Description

### A.     *Scope of Products Within the Supplemental NPR*

The scope of products covered by the 2017 NPR tracked the scope of ASTM F3118-17, covering "a free standing product with an inclined sleep surface primarily intended and marketed to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on sides, whichever comes first." The Supplemental NPR proposes to incorporate ASTM F3118-17a with substantial modifications, including revisions in the scope of the standard, section 1.3, to remove the term "inclined," and to include any infant sleep product not currently covered by another mandatory rule for infant sleep products: bassinets/cradles, cribs (full-size and non-full-size), play yards, and bedside sleepers. Accordingly, the scope of the Supplemental NPR includes all of the products in the 2017 NPR, plus additional infant sleep products not covered by any other infant sleep product standard. The following types of infant sleep products fall within the scope of the Supplemental NPR:

- *Frame-Type Inclined Sleep Products* – Frame-type inclined sleep products are elevated, intended to be placed on the floor, and are self-supporting. Typically, this design uses a metal frame covered by a fabric insert that contains the occupant. Some

JA066

frame-type products have a rigid plastic insert under the sleeping surface, and/or extra padding with head positioning cushions. The base may be stationary or allow side-to-side/head-to-toe rocking. This type of product could have a fixed incline or be adjustable. Frame-type products can be intended for use by newborns or infants, or both, depending on the size of the product.

- *Hammocks* – Hammocks are typically constructed of fabric and suspended from one or two points, either above or on either side. Hammock products are constructed of various materials and generally conform to the shape of the child when placed in the product. However, some hammock designs use a mat, mattress, or other type of pad to provide a semi-rigid sleeping surface that maintains the product's form. Hammocks are intended to be suspended and can be supported by a frame or other structure, such as a ceiling.

- *Compact Inclined Sleep Products* – Compact inclined sleep products are freestanding, with the bottom of the seat a maximum of 6 inches (152 mm) above the floor. These products tend to be constructed of foam and are intended to be used on the floor.

- *Accessory Inclined Sleep Products* – An accessory inclined sleep product is intended to provide sleeping accommodations for infants or newborns and are attached to, or supported in some way, by another product. These products can be fixed or adjustable. An inclined sleep accessory is typically a rigid-frame product that has a stationary or fixed base and, in some cases, inclined sleep product accessories may be removed and used independently.

*B.      Market Description*

The Supplemental NPR proposes to cover any infant product "primarily intended and marketed[3] to provide sleeping accommodations" that is designed for infants five months old or younger and that is not covered by another standard.[4]  In general, the Supplemental NPR does not propose to cover products with adjustable seat back positions that are covered by other mandatory or voluntary standards in inclined position(s), such as bouncers, rockers, hand-held carriers, or infant swings, unless they have a seat back angle that is specifically marketed for sleep for children 5 months or younger.  To date, CPSC staff has found one bouncer on the market with an inclined position marketed for sleep for children in this age range.

Inclined infant sleep products sell on the U.S. market for approximately $65 for a frame-style inclined sleeper, $110 for a compact sleeper, $165 for an infant hammock,[5] and $236 for a play yard with an inclined sleeper accessory.[6]  A hammock-style crib accessory that would be covered by the Supplemental NPR (but does not currently fall under the voluntary inclined sleeper standard or another sleep standard) sells for approximately $50.

Several product categories would not fall under the scope of the Supplemental NPR: (1) sleep positioners; (2) sleep wedges, many of which are marketed as medical devices, putting them under the jurisdiction of the Food and Drug Administration; and (3) miniature infant hammocks marketed exclusively for use as photographic props (*i.e.,* photos of newborn babies).

---

[3] This would include marketing information (such as on websites or in ad campaigns), product and retail package labeling, as well as supplier statements about the product.

[4] These include: Safety Standard for Full-Size Baby Cribs (16 CFR 1219); Safety Standard for Non-Full-Size Baby Cribs and Ply Yards (16 CFR 1220 and 1221); Safety Standard for Bedside Sleepers (16 CFR 1222); and Safety Standard for Bassinets and Cradles (16 CFR 1218).

[5] The average price for an infant hammock supplied by a home-based manufacturer is approximately $200.

[6] Staff averaged prices across all models found for a particular type.  Staff ignored as unknown shipping costs for a few hammock models delivered from overseas suppliers, which means that the average cost for an infant hammock may be a low estimate, depending upon how many hammocks are entering the U.S. via these overseas suppliers.

JA068

## III. Incident Data and Hazard Patterns

At the time of the 2017 NPR, the Commission was aware of 14 fatal incidents related to infant inclined sleep products, which were reported to have occurred between January 1, 2005 and September 30, 2016.  Eight of the 14 deaths involved rocker-like inclined sleep products; in three cases, the unstrapped decedent was found to have rolled over into a facedown position.  Two additional cases also reported a rollover into a facedown position, but the reports did not include any information about use of a restraint.  CPSC had little information about the cause or manner of the three remaining deaths.  The NPR recognized that reporting was ongoing and the number of reported fatalities could change.  This Supplemental NPR updates fatal and nonfatal incident reports associated with the use of an infant inclined sleep product.

CPSC is aware of 451 incidents (59 fatal and 392 nonfatal) related to infant inclined sleep products that occurred from January 1, 2005 through June 30, 2019 and reported between October 1, 2016 and June 30, 2019.  This count includes incidents reported after the reporting end date stated in the 2017 NPR.  Forty-three percent of the incident reports (196 out of 451) are based solely on information from manufacturers/retailers.  Various sources, such as hotlines, Internet reports, newspaper clippings, medical examiners, and other state/local authorities provided the remaining incident reports to CPSC.  Reporting is ongoing, and therefore, the number of reported fatalities, nonfatal injuries, and non-injury incidents may change in the future.  Tab A of the Staff Supplemental Briefing Package describes the incident data and the hazard patterns associated infant inclined sleep products.

JA069

*A.    Fatalities*

Since the 2017 NPR, through June 30, 2019, CPSC received reports of 59 deaths.  One fatality involved a foam-based infant reclined sleeper; two fatalities occurred in napper attachments of play yards; and the remaining fatalities occurred in freestanding framed inclined sleep products.  CPSC staff reviewed and categorized incident reports associated with the fatalities:

- Twenty-eight of the 59 reports contain unclear, conflicting, and/or inconsistent information.  For example, in this category medical examiners often conclude the cause of death to be Sudden Infant Death Syndrome (SIDS) or Sudden Unexpected Infant Death (SUID) along with a co-contributing condition such as unsafe sleep environment (*e.g*., soft bedding, inclined sleep surface) or other pre-existing medical condition.  Considering all factors in each report confounds staff's ability to determine the pre-dominant factor causing a fatality.  Occasionally, wording on the documents cite "several possibilities" and the cause of death is coded as Undetermined.  Lack of clarity in these reports make it difficult for CPSC staff to consistently classify the 28 deaths.

- Eighteen reports describe infants placed in the product supine but who ended up in a compromised position in the product, resulting in suffocations or positional asphyxiations.  In 11 of the 18 cases, no restraints were used; another six infants were placed in a supine position, but the use of restraints is unknown; and in one case, the infant was left restrained and supine, but found supine, slumped in a chin-to-chest position.  One additional unrestrained infant fell out of the product and became wedged in a confined space.

JA070

- Eight reports provide very little information on the incidents. Lack of any information on the circumstances leading up to the death does not allow staff to classify these deaths.

- Four reports describe infant placement issues; three of the four decedents were reportedly placed prone on soft bedding in the product; and another decedent suffocated when a young sibling climbed into the sleep product on top of her.

CPSC does not know the age for 10 deceased infants. Staff concludes that for the remaining deaths, 39 infants were 5 months or less in age, while six infants were between 6- and 8-months of age. One decedent was 9-months old.

B.    *Nonfatal Incidents*

Reports indicate that 96 of the 451 inclined sleep product-related nonfatal incidents involved an injury to the infant during product use. The severity of the injury types among the 96 reported injuries are as follows:

- Seven infants required hospital admission. Six of the seven infants suffered episodes of respiratory distress due to rolling over in the product; mold in the product; or undetermined reasons. One of the seven infants had to be hospitalized for *scoliosis* (curvature) of the back attributed to product use.

- Sixteen infants were treated and released from emergency departments (EDs). Eleven of these infants were treated for head injuries and contusions/bruises resulting from falls; three infants were treated for unexplained respiratory distress. Mold growth on the product was associated with respiratory distress in one additional infant and seizure symptoms in another.

JA071

- Seventy-three infants received some professional medical care, first-aid treatment, or the level of care received was not reported. Among them, 32 infants suffered from plagiocephaly (flat head syndrome), torticollis (twisted neck syndrome), or both conditions, associated with the use of the inclined sleep product; 27 infants suffered mostly respiratory and some skin problems associated with mold on the product; infants sustained the remaining injuries due to a fall from the product or a minor electric shock, or their injuries are unspecified.

The remaining 296 incident reports indicate that no injury occurred to the infant or provided no information about an injury. However, many of the descriptions indicate the potential for a serious injury, or even death, similar to those reported in the incident data.

C.      *Hazard Pattern Identification*

The 2017 NPR identified nine hazard patterns among the 657 reported incidents. These hazard patterns included: design issues, lack of structural integrity, inadequate restraints, electrical issues, non-product-related or unknown issues, difficulty with correct positioning, miscellaneous product-related issues, unspecified falls, and consumer comments. Although the distribution of the data in this Supplemental NPR update varied somewhat, CPSC finds that the broader hazard categories are very similar. Within the broader hazard category of design, the Supplemental NPR identifies one new hazard pattern, as described below.

CPSC staff considered all 451 reported incidents (59 fatal and 392 nonfatal) to identify hazard patterns associated with infant inclined sleep products. The infant inclined sleep products category includes a variety of products. Some products, like hammocks, are suspended in air, while other seat-like products are meant to be placed on a floor level (yet incident reports indicate these products often were not placed on floor level). Other products sit on top of larger

JA072

nursery products as attachments.  CPSC staff identified hazard patterns that are quite different depending on which product is involved and how the product is being used.  In order of frequency of incident reports, CPSC staff grouped the hazard patterns into the following categories:

1. ***Design*** of the infant inclined sleep product: One hundred and thirty-eight of the 451 reported incidents (31 percent) are in this category. Staff identified three major issues:

    ***a.*** Fifty-nine reported incidents (43 percent) involved infants who developed respiratory and/or skin ailments due to the growth of mold on the product;

    ***b.*** Forty-six reported incidents (33 percent) involved infants that rolled over—fully or partially—from their original supine position.  Reports describe infants as young as 1- or 2-months of age as having rolled over; parents/caregivers, who witnessed and reported some of the nonfatal incidents, were able to rescue distressed infants quickly.  Eighteen infants died due to suffocation or asphyxiation.  Although a few of the infants were strapped into the product, a majority of the infants were either not restrained or the use of restraint is unreported.

    ***c.*** Thirty-three reported incidents (24 percent) involved infants that developed physical deformations from extended product use, such as *plagiocephaly* (flat head syndrome), *scoliosis* (curvature) of the back, and/or *torticollis* (twisted neck syndrome).

The design category includes 19 deaths, 5 hospitalizations, and 4 emergency department (ED) visits.  All but two of the deaths resulted from infants rolling over into a prone or semi-prone position, one decedent was found still supine and restrains, but slumped in a chin-to-chest position.  The other infant rolled out of the product and wedged into a confined space.  Infants

JA073

DRAFT

unrestrained in the product caused two ED-treated falls.  An additional 62 non-hospitalized, non-ED injuries are reported in this category.

2.      *Electrical* issues: One hundred and twenty-seven of the 451 incident reports (28 percent) report battery leakage, electric shock, and/or overheating/melting of components, such as the vibrating unit, battery cover, switch, plug, or motor. Reports include two injuries in this category due to electric shock.

3.      *Consumer comments*: Ninety of the 451 reports (20 percent) fall into this category. The reports consist of consumer comments/observations of perceived safety hazards, complaints about unauthorized sale of infant inclined sleep products, or inquiries regarding safety recall on inclined sleep products. One complaint describes misinformation in the instruction material. None of these reports indicate that an incident actually occurred.

4.      *Undetermined* due to confounding information: Thirty-four of the 451 reports (8 percent) provide unclear, conflicting, and/or inconsistent information. Among the 28 deaths reported in this category, for example, medical examiners often concluded the cause of death to be SIDS or SUID, along with a co-contributing condition such as an unsafe sleep environment (*e.g.,* soft bedding, inclined sleep surface) or pre-existing medical condition. Staff is unable to determine the role of the product when documents describe multiple potentially contributing factors. Occasionally, the wording on the documents cite "several possibilities," and the cause of death is coded as Undetermined. For the 6 nonfatal injuries, including the 2 hospitalized and 2 ED-treated injuries, the report described respiratory distress due to temporary cessation of breathing; however, these reports contain no official diagnosis for these episodes.

5.      Lack of *structural integrity*: Twenty-eight of the 451 incidents (6 percent) report some sort of breakage of the product or its components. These reports include complaints of

JA074

buckle/straps breaking, components such as hub, rail, or leg detaching/disengaging, hardware coming loose, and other unspecified components breaking. This category includes two ED-treated injuries, both due to falls.

6.  ***Other product-related*** issues: Thirteen of the 451 incidents (3 percent) report other product-related issues, such as instability (product tipping over), inadequacy of restraint (infants falling out in spite of being restrained), or product assembly/installation difficulties. This category contains seven fall-related injuries, including two injuries that were treated and released from a hospital ED.

7.  ***Infant placement*** issues:  Four of the 451 incidents reports (1 percent) indicate that infant placement contributed to the incident.  Of the four fatalities, reports describe three infants placed in a prone position on soft bedding; and another infant being crushed by a young sibling who climbed on top of her.

8.  ***Insufficient information***: For 17 of the 451 incidents (4 percent), reports contain insufficient information for staff to categorize them accurately.  Staff has no information available on the circumstances of 8 deaths in this category.  Reports for six injuries in this category describe unspecified falls treated in hospital EDs, with no information was on restraint usage.

D.  *Product Recalls and Safety Alerts*

From May 10, 2000 to August 20, 2019, CPSC conducted 13 consumer-level recalls involving infant inclined sleep products.  The recalls were conducted in response to hazards involving strangulation, suffocation, fall, structural stability, entrapment, exposure to mold, and death.  Six recalls involved infant hammocks, six recalls involved infant inclined sleep products, and one recall involved an infant inclined sleep accessory included with a play yard.  Tab G in

the Staff Supplemental Briefing Package contains a detailed chart outlining recalls involving infant inclined sleep products.

The six infant hammocks were recalled for hazards including: strangulation, suffocation, fall, structural stability, and entrapment. Recalls affected approximately 25,400 units of infant hammocks.

The six infant inclined sleep products and one infant inclined sleep accessory included with a play yard were recalled due to hazards including: entrapment, suffocation, fall, exposure to mold, and death after infants rolled from their back to their stomach or side while unrestrained in the products. Recalls affected approximately 6.4 million units of infant inclined sleep products. One recall for exposure to mold affected 800,000 units, and two recalls for entrapment and suffocation affected 195,000 units.

In 2019, two recalls occurred due to reports of infant deaths while using infant inclined sleep products, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances. In response to the reported deaths in those products, CPSC conducted two additional recalls due to safety concerns with infant inclined sleep products, one with an infant inclined sleep product, and one with an infant inclined sleep accessory included with a play yard. Recalls involving infant inclined sleep products affected approximately 5.4 million units and the recall involving the infant inclined sleep accessory affected approximately 71,000 units.

The Commission also has issued two safety alerts involving infant inclined sleep products. A May 31, 2018 safety alert[7] advised of infant rollover deaths in inclined sleep products, and reminded caregivers to always use restraints and to stop using the product as soon

---

[7] https://www.cpsc.gov/content/cpsc-consumer-alert-caregivers-urged-to-use-restraints-with-inclined-sleep-products

JA076

as an infant can roll over.  An April 5, 2019 safety alert[8] advised consumers to stop use of the inclined sleep product when an infant reaches three months of age, or as soon as an infant exhibits rollover capabilities.

## IV.    Mannen Study

During the development of this Supplemental NPR briefing package, staff received reports of 451 new incidents, 59 of which were deaths that occurred while in infant inclined sleep products.  Accordingly, Commission staff contracted with Dr. Erin Mannen, Ph.D., a mechanical engineer with a biomechanics specialization, to conduct infant testing to evaluate the design of inclined sleep products.  Tab B of the Staff Supplemental Briefing Package contains Dr. Mannen's study, *Biomechanical Analysis of Inclined Sleep* (Mannen Study).

The Mannen Study examined how 10 infants move and use their muscles on flat, inclined surfaces, and in selected inclined sleep products, and whether such product designs directly impact safety or present a risk factor that could contribute to the suffocation of an infant.  Testing compared infants' muscle movement and oxygen saturation on a flat crib mattress at 0°, 10°, and 20° versus seven different inclined sleep products.  Researchers recorded infant muscle activity using surface electromyography (EMG), and recorded oxygen saturation using a medical grade pulse oximeter.  Researchers placed infants in a random order in each of the 10 testing conditions, in both the supine and prone positions, for at least 60 seconds (unless the oximeter data fell below 95%, in which case they were removed early to ensure safety).

Following are key findings of the Mannen Study:

---

[8] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product

JA077

- Inclined surfaces and incline sleep products resulted in significantly higher muscle activity of the turn core muscle (abdominals), which may lead to quicker fatigue and suffocation if an infant finds themselves prone in an incline sleep product.

- Muscle synergies (*i.e.,* how muscles work together) are significantly different in inclined sleep products.  If an infant rolls from supine to prone in an inclined sleep product, it is likely the first time the baby has experienced the position and the demands the position requires of the muscles.

- Some inclined sleep products require greater neck and trunk adjustments during prone positioning, indicating that infants may struggle to adjust their posture to enable breathing and attempt to self-correct if a roll from supine to prone occurs.

- Prone lying in the incline sleep products puts infant at higher risk of suffocation as evidenced by oxygen saturation results.

- Some evidence was found that supports the idea that the inclined sleep products make the babies roll more easily from supine to prone.  The flexed trunk and ease of head lifting during supine lying in an inclined sleep product may indicate that supine to prone rolling is achieved more easily.

- If babies roll from supine to prone in an inclined sleep product, then, due to the high musculoskeletal demands necessary to maintain safe posture to prevent suffocation, babies would fatigue faster than they would on a stable, flat surface.

- None of the inclined sleep products that were tested and evaluated as a part of this study are safe for infant sleep.

Additionally, the Mannen Study concludes:

JA078

- ***20-Degree Incline Puts Infants at Risk for Muscle Fatigue and Suffocation***

  Based on the results of the biomechanical study, the 20-degree incline resulted in significantly different muscle activity for the infants compared to the zero-degree incline surface. The increased demand on the abdominal muscles could lead to increased fatigue and suffocation if an infant is unable to reposition themselves after an accidental roll from supine to prone occurs.

- ***10-Degree Incline Does Not Significantly Impact Infant Motion or Muscle Activity***

  Based on the results of the biomechanical study, fewer differences in muscle activity or lying posture were revealed at a 10-degree mattress incline compared to the zero-degree incline surface. Ten degrees is a safe incline for sleep on a crib mattress surface.

- ***Inclines Between 10 and 20 Degrees Should Be More Thoroughly Studied***

  The experimental design of this study did not examine the angles between 10 and 20 degrees, so future work should focus on understanding which, if any, angles between 10 and 20 degrees may be safe for infant sleep.

The Mannen Study further states: "It is likely that in incidents where babies were found deceased in the prone position, that an accidental roll occurred, and after some amount of struggling, the baby was fatigued and could no longer move into a position to prevent suffocation." Dr. Mannen concludes that an incline of 20 degrees or more puts an infant at risk compared to a 0-10 degree incline. Although her study did not test infants on inclines between 10-20 degrees, and thus did not offer conclusions for these angles, CPSC staff advises that additional testing on inclines between 10-20 degrees is unnecessary, because staff concludes that a flat surface that does not

JA079

exceed 10 degrees offers the safest sleep environment for infants.  This conclusion comports with staff's recommendations to remove the term "inclined" from the proposed mandatory standard, and to require that all sleep products not otherwise specified as cribs (full-size or non-full-size), play yards, or bedside sleepers meet the requirements in 16 CFR 1218 Safety Standard for Bassinets and Cradles, which, among other requirements, mandates that the seat back surface angle intended for sleep be 10 degrees or less.

## V.      International Standards for Inclined Sleep Products

The 2017 NPR described international standards that include infant inclined sleep products within their scope, noting that these standards are intended primarily to address hazards associated with products having flat sleeping surfaces, such as bassinets and cradles. These standards include:

- *The Cribs, Cradles, and Bassinets regulation included in the Canada Consumer Product Safety Act*: The Canadian regulation has similar requirements to ASTM F3118, such as warnings, labels, and general performance requirements (*e.g.* lead content, small parts, openings).  The Canadian regulation has additional requirements for slat strength, mesh material, structural integrity, and mattress supports.  CPSC staff determined that the Canadian regulation provides similar performance requirements as ASTM F3118, but contains a more stringent requirement limiting the sleep seat back angle to 7° or less.  However, the Canadian regulation allows a product to be marketed as a "napper," which the Supplemental NPR proposes not to allow.

- *The European standard (SS-EN 1130: Furniture, Cribs, and Cradles Safety Requirements)*: EN 1130 covers only inclined sleep products with a body and frame.

JA080

The European standard would not include hammocks or similar products that are suspended from ceilings or other structures.  EN 1130 includes requirements for construction and materials similar to the general ASTM F3118 requirements.  Additional requirements include labeling, use instructions, packaging, and stability.  EN 1130 is intended primarily to address hazards associated with bassinets and cradles and not the unique hazards associated with inclined sleep products.  CPSC staff believes the ASTM standard is more inclusive because it includes all hammock styles.  Additionally, EN 1130 does not address the hazards identified in the Mannen Study.

- *The Australian standard (AS/NZS 4385 Infants' rocking cradles --Safety requirements)*: AS/NZS 4385 is intended for rocking cradles that swing, rock, or tilt, but specifically excludes hammocks that do not have this feature.  Staff is unclear whether tilt means incline, thereby including in the Australian standard inclined sleep products as defined in ASTM F3118.  AS/NZS 4385 contains requirements for construction, toxicology, and flammability, as well as general provisions, such as those for included toys.  AS/NZS 4385 has some similar performance requirements as ASTM F3118, but is not as comprehensive.  Additionally, the AS/NZS 4385 does not address the hazards identified in the Mannen Study.

## VI.    Voluntary Standard–ASTM F3118

### A.  History of ASTM F3118

Section 104(b)(1)(A) of the CPSIA requires the Commission to consult representatives of "consumer groups, juvenile product manufacturers, and independent child product engineers and experts" to "examine and assess the effectiveness of any voluntary consumer product safety

JA081

standards for durable infant or toddler products." As a result of incidents arising from inclined sleep products, the Commission directed CPSC staff to work with ASTM to develop voluntary requirements to address the hazard patterns related to the use of inclined sleep products. ASTM first approved ASTM F3118 on April 1, 2015, and published it in May 2015. Through the ASTM process, CPSC staff consulted with manufacturers, retailers, trade organizations, laboratories, consumer advocacy groups, consultants, and members of the public. The current standard, ASTM F3118-17a, was approved on September 1, 2017, and published in October of 2017. This is the fourth revision to the standard since it was first published in May 2015. ASTM F3118-17a is intended to address the following hazards: *(1)* falls, *(2)* positional asphyxiation, and *(3)* obstruction of nose and mouth by bedding.

B.    *Description of the Current Voluntary Standard–ASTM F3118-17a*

The 2017 NPR described the key provisions of ASTM F3118-17, including: scope, terminology, general requirements, performance requirements, test methods, marking and labeling, and instructional literature. 82 FR at 16967. The Supplemental NPR proposes to incorporate by reference the most recent version of the voluntary standard, ASTM F3118-17a, which is substantially the same as ASTM F3118-17, except that the accessory definition was updated to match the modification recommended in the 2017 NPR. Like the previous version, ASTM F3118-17a describes the scope of the voluntary standard, defines terms for various types of inclined sleep products, and sets out requirements for performance (such as for structural integrity and stability) and for warnings and instructions. As discussed elsewhere in this

JA082

preamble, CPSC's proposed standard would make substantial modifications to ASTM F3118-17a.

## VII.    Assessment of the Voluntary Standard ASTM F3118-17a

In the 2017 NPR, CPSC proposed that incorporating by reference ASTM F3118-17, with a modification to the definition of "accessory," would address the primary hazard patterns identified in the incident data.  82 FR at 16967-68.  However, since the 2017 NPR, CPSC has become aware of additional fatalities and contracted the Mannen Study.  The Mannen Study and more recent incident data indicate that ASTM F3118-17a is not adequate to address the risk of injury associated with infant inclined sleep products because the standard allows for products with a seat back angle greater than 10 degrees.  The Commission finds that more stringent requirements than those found in ASTM F3118-17a are necessary in a mandatory rule to further reduce the risk of injury associated with infant inclined sleep products.

Following is an explanation of how the Supplemental NPR would address the product-related hazard patterns identified in section III.C of this preamble, discussing the proposed more stringent requirements where appropriate.

### A      Design Problems

#### 1.      Suffocation Hazard

The Mannen Study results reveal that a 20° incline results in significantly different muscle activity for the infants compared to a 0° incline surface.  The increased demand on infant abdominal muscles could lead to increased fatigue and suffocation if an infant is unable to reposition themselves after a roll from supine to prone occurs.  At a 10° incline, fewer differences in muscle activity or lying posture were revealed compared to the 0° incline surface.  According to Dr. Mannen's report, "ten degrees is likely a safe incline for sleep on a crib

JA083

mattress surface." Accordingly, the Commission proposes modifications to the introduction, scope, definitions, and performance requirements in ASTM F3118-17a, as described in section VIII of this preamble, to address the potential hazards of an infant sleeping on an inclined surface. Although her study did not test infants on inclines between 10°-20°, and thus did not offer conclusions for these angles, CPSC staff advises that additional testing on inclines between 10°-20° is unnecessary, concluding that a flat surface that does not exceed 10° offers the safest sleep environment for infants and would further reduce the risk of injury associated with inclined sleep products.

2.      Additional Design Issues

CPSC staff identified two additional design issues: (1) Infant respiratory and/or skin ailments due to mold growth on the product, and (2) infant physical deformations such as *plagiocephaly* (flat head syndrome) and/or *torticollis* (twisted neck syndrome) from extended product use. In the reported cases of mold that resulted in respiratory problems for infants using the product, all cases were related to one particular manufacturer's inclined sleep product. CPSC conducted a recall of that product in 2013. Infants who use an inclined sleep product that is known to develop visible mold can be at risk of developing health effects such as allergies, asthma, mycosis, and effects of mycotoxins. However, because the mold growth was restricted to one manufacturer's product and that product was recalled, the Commission is not proposing any modifications to address potential hazards associated with mold.

Plagiocephaly, cranial deformity or asymmetry (commonly known as flat head) is a condition that may exist at birth due to mechanical constraint of fetal head movement in the womb, birth-related injuries during assisted delivery, or as a result of increased likelihood of skull deformity as a consequence of premature birth. Muscular torticollis (twisted neck) is a

JA084

known risk factor associated with plagiocephaly caused by constraint of head and neck movement. Although incident data indicate that consumers believe use of an inclined sleep product is the cause for their child's plagiocephaly/torticollis, no evidence supports this belief. Increase in the number of children with plagiocephaly may actually be attributed to the American Academy of Pediatrics' (AAP) recommendation to place infants to sleep on their backs to decrease the risk of sudden infant death syndrome (SIDS). Because the development of plagiocephaly and torticollis is not exclusively attributable to the use of infant inclined sleep products, the conditions are not addressable with performance standards. The Commission is not proposing any modifications to the voluntary standard to address these issues. Tab E of the Staff Supplemental Briefing Package provides the Directorate for Health Science's analysis of plagiocephaly and torticollis related to infant sleep products.

### B. Electrical issues

Staff determined that 127 of the 451 new incidents are related to electrical issues. The electrical-related issues included battery leakage, electric shock, and overheating of components. Some inclined sleep products have accessories that provide music, rocking motion, or vibration, which are either battery- or a/c-powered; however, F3118-17a does not include any performance requirements for electrical components. Other juvenile products that have similar features include performance requirements that could apply for infant sleep products. CPSC staff has raised this issue and is working with the ASTM Ad Hoc task group to develop performance requirements to address electrical hazards across juvenile products. Performance requirements would apply to other children's product standards, such as bouncers, swings, and bassinets. Because these requirements are currently under development, the Commission is not proposing electrical requirements in this Supplemental NPR, and instead expects staff to continue working

JA085

with applicable ASTM subcommittees to develop electrical requirements for all applicable durable infant or toddler products with electrical components.

    *C.*    *Structural Integrity and Other Product Related Issues*

Structural integrity and other product related issues identified in this Supplemental NPR are similar to issues previously found in bassinet/cradle incidents. Accordingly, performance and testing requirements in the bassinet/cradle standard will likely address these incidents for infant sleep products.

    *D.*    *Infant Placement Issues*

Infants placed prone on soft bedding in inclined sleep products are at great risk for suffocation because of the incline and the soft bedding. Although requiring infant sleep products to comply with the bassinet/cradle standard will reduce the incline angle, and will provide warnings about not using soft bedding, parents may still place infants prone in the product. Staff will continue to work with ASTM and other organizations with information and education campaigns to prevent infants' deaths due to unsafe sleep practices.

## VIII.  Proposed Standard for Infant Sleep Products

This Supplemental NPR proposes to establish a children's product safety standard for infant sleep products as a type of durable infant or toddler product under section 104 of the CPSIA. The Mannen Study findings and incident reports indicate that neither ASTM F3118-17, nor ASTM F3118-17a, are adequate to address the risk of injury associated with infant inclined sleep products, because these voluntary standards allow for infant inclined sleep products with a seat back angle greater than 10 degrees. More stringent requirements are necessary in the mandatory standard to further reduce the risk of injury associated with infant inclined sleep

JA086

products. Accordingly, the Supplemental NPR proposes to incorporate by reference ASTM F3118-17a as the mandatory standard for infant sleep products, with the following modifications:

a. Modify the introduction and scope of the standard to state the purpose of the standard is to address all infant sleep products not already covered by traditional sleep product standards.

b. Modify the definitions of accessory, compact, infant inclined sleep products, and newborn inclined sleep products to remove the term "inclined."

c. Modify seat back angle so the maximum allowable seat back angle must be equal to or less than 10° in all positions recommended for sleep.

d. Add new requirement - infant sleep products must meet 16 CFR 1218 Safety Standard for Bassinets and Cradles.

e. Remove all the performance requirements except for the above new or modified requirements.

f. Remove all test methods except for maximum seat back angle.

The Supplemental NPR proposes that infant sleep products meet 16 CFR 1218 Safety Standard for Bassinets and Cradles because this standard is an established standard for products that provide sleep accommodations for infants, and the standard addresses the hazard associated with inclined sleep by limiting the seat back angle to 10 degrees or less. Additionally, the name of CPSC's standard would not include the term "inclined," and would be codified as 16 CFR part 1236, Safety Standard for Infant Sleep Products. A redline of these proposed changes is included at Tab C of the Staff Supplemental Briefing Package.

The Supplemental NPR proposes that infant sleep products meet the warning requirements in the bassinet and cradle standard, instead of those stated in ASTM F3118-17a.

For this proposed modification, the Supplemental NPR relies on focus groups with parents and grandparents of infants less than 1 year of age. Participants provided information on caregivers' perceptions and reactions to safety messaging, indicating that participants were aware of warning labels on infant sleep products. Additionally, participants reported that the label shown during the focus group looked similar and contained comparable information to labels that they find on products they own. Some participants reported that they tend to gloss over warning labels, as they believe the language to be the same on every label. Some participants reported that they thought the main message on a warning label was to be careful and keep an eye on their infant. In contrast, a few participants believed that manufacturers use warning labels to protect themselves from liability or litigation. Participants' recommendations to improve warning labels included making the labels more concise and making the labels "stand out." CPSC staff is working with a contractor to develop new safe sleep warnings and messaging, potentially across all sleep products. In the future, staff could recommend changes in warnings based on this work.

## IX. Proposed Amendment to 16 CFR part 1112 to Include NOR for Infant Sleep Products

The CPSA establishes certain requirements for product certification and testing. Products subject to a consumer product safety rule under the CPSA, or to a similar rule, ban, standard or regulation under any other act enforced by the Commission, must be certified as complying with all applicable CPSC-enforced requirements. 15 U.S.C. 2063(a). Certification of children's products subject to a children's product safety rule must be based on testing conducted by a CPSC-accepted third party conformity assessment body. *Id*. 2063(a)(2). The Commission must publish an NOR for the accreditation of third party conformity assessment bodies to assess

JA088

conformity with a children's product safety rule to which a children's product is subject. *Id.* 2063(a)(3). Thus, the proposed rule for 16 CFR part 1236, *Standard Consumer Safety Specification for Infant Inclined Sleep Products*, if issued as a final rule, would be a children's product safety rule that requires the issuance of an NOR.

The Commission published a final rule, *Requirements Pertaining to Third Party Conformity Assessment Bodies*, 78 FR 15836 (March 12, 2013), codified at 16 CFR part 1112 ("part 1112") and effective on June 10, 2013, which establishes requirements for accreditation of third party conformity assessment bodies to test for conformity with a children's product safety rule in accordance with section 14(a)(2) of the CPSA. Part 1112 also codifies all of the NORs issued previously by the Commission.

All new NORs for new children's product safety rules, such as the inclined sleep products standard, require an amendment to part 1112. To meet the requirement that the Commission issue an NOR for the inclined sleep products standard, as part of this NPR, the Commission proposes to amend the existing rule that codifies the list of all NORs issued by the Commission to add inclined sleep products to the list of children's product safety rules for which the CPSC has issued an NOR.

Test laboratories applying for acceptance as a CPSC-accepted third party conformity assessment body to test to the new standard for inclined sleep products would be required to meet the third party conformity assessment body accreditation requirements in part 1112. When a laboratory meets the requirements as a CPSC-accepted third party conformity assessment body, the laboratory can apply to the CPSC to have 16 CFR part 1236, *Standard Consumer Safety Specification for Infant Sleep Products*, included in the laboratory's scope of accreditation of CPSC safety rules listed for the laboratory on the CPSC website at: www.cpsc.gov/labsearch.

**X.** **Proposed Amendment to Definitions in Consumer Registration Rule**

The statutory definition of "durable infant or toddler product" in section 104(f) applies to all of section 104 of the CPSIA. In addition to requiring the Commission to issue safety standards for durable infant or toddler products, section 104 of the CPSIA also directed the Commission to issue a rule requiring that manufacturers of durable infant or toddler products establish a program for consumer registration of those products. Pub. L. 110-314, section 104(d).

Section 104(f) of the CPSIA defines the term "durable infant or toddler product" and lists examples of such products:

(f) DEFINITION OF DURABLE INFANT OR TODDLER PRODUCT. As used in this section, the term "durable infant or toddler product" –

(1) means a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years; and

(2) includes –

(A) full-size cribs and non-full-size cribs;

(B) toddler beds;

(C) high chairs; booster chairs, and hook-on-chairs;

(D) bath seats;

(E) gates and other enclosures for confining a child;

(F) play yards;

(G) stationary activity centers;

(H) infant carriers;

(I) strollers;

(J) walkers;

(K) swings; and

(L) bassinets and cradles.

Pub. L. 110-314, section 104(f).

As discussed previously, the infant sleep products safety standard is an outgrowth of the bassinet safety standard. The Supplemental NPR proposes that any infant sleep product that is not already subject to a mandatory consumer product safety rule for infant sleep, be subject to proposed part 1236, which would limit the seat back incline angle to 10 degrees or less. Like bassinets, such sleep products are durable products within the meaning of section 104 of the CPSIA.

Because this infant sleep product standard is an outgrowth of the bassinet standard, infant sleep products may be considered a sub-category of bassinets. To provide greater clarity that inclined sleep products are durable infant or toddler products, the Commission proposes to amend the Commission's consumer registration rule to explicitly include infant sleep products.

In 2009, the Commission issued a rule implementing the consumer registration requirement. 16 CFR part 1130. As the CPSIA directs, the consumer registration rule requires each manufacturer of a durable infant or toddler product to: provide a postage-paid consumer registration form with each product; keep records of consumers who register their products with the manufacturer; and permanently place the manufacturer's name and certain other identifying information on the product. When the Commission issued the consumer registration rule, the Commission identified six additional products as "durable infant or toddler products":

- children's folding chairs

- changing tables;

JA091

- infant bouncers;

- infant bathtubs;

- bed rails; and

- infant slings.

16 CFR 1130.2.  The Commission stated that the specified statutory categories were not exclusive, but that the Commission should explicitly identify the product categories that are covered.  The preamble to the 2009 final consumer registration rule states: "Because the statute has a broad definition of a durable infant or toddler product but also includes 12 specific product categories, additional items can and should be included in the definition, but should also be specifically listed in the rule."  74 FR 68668, 68669 (Dec. 29, 2009).

In this Supplemental NPR, the Commission proposes to amend the definition of "durable infant or toddler product" in the consumer registration rule to clarify that infant sleep products fall within the term "durable infant or toddler product" as a subset of bassinets and cradles, and must comply with the product registration card rule and section 104 of the CPSIA.

## XI.    Incorporation by Reference

The Commission proposes to incorporate by reference ASTM F3118-17a, with substantial modifications to further reduce the risk of injury.  The Office of the Federal Register (OFR) has regulations concerning incorporation by reference. 1 CFR part 51.   For a proposed rule, agencies must discuss in the preamble of the NPR ways that the materials the agency proposes to incorporate by reference are reasonably available to interested persons or how the

JA092

agency worked to make the materials reasonably available. In addition, the preamble of the proposed rule must summarize the material.  1 CFR 51.5(a).

In accordance with the OFR's requirements, section VIII of this preamble summarizes the provisions of ASTM F3118-17a that the Commission proposes to incorporate by reference. ASTM F3118-17a is copyrighted.  By permission of ASTM, the standard can be viewed as a read-only document during the comment period on this NPR, at: http://www.astm.org/cpsc.htm. Interested persons may also purchase a copy of ASTM F3118-17 from ASTM International, 100 Bar Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; http://www.astm.org/cpsc.htm.  One may also inspect a copy at CPSC's Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301-504-7923.

## XII.    Effective Date

The Administrative Procedure Act (APA) generally requires that the effective date of a rule be at least 30 days after publication of the final rule. 5 U.S.C. 553(d).  ASTM F3118-17a is a relatively new voluntary standard that covers a variety of products whose manufacturers may not be aware that their product must comply.  The Commission is proposing to incorporate by reference ASTM F3118-17a, with substantial modifications to further reduce the risk of injury associated with infant inclined sleep products.  To allow time for infant sleep product manufacturers to bring their products into compliance after a final rule is issued, the Commission proposes a 12-month effective date after publication of a final rule, for products manufactured or imported on or after that date.  Because of the number of proposed modifications to ASTM F3118-17a, compliance with the mandatory standard may require time beyond the typical 6-month effective date for a section 104 rule.  The Commission expects that most firms should be

JA093

able to comply within the 12-month timeframe. Alternatively, given the hazards involved with infant inclined sleep products, the Commission could issue a final rule with a shorter effective date so that safer products would be available sooner. The Commission requests comments on whether either a longer or shorter effective date would be appropriate.

## XIII. Regulatory Flexibility Act

### A. Introduction

The Regulatory Flexibility Act (RFA) requires that agencies review a proposed rule for the rule's potential economic impact on small entities, including small businesses. Section 603 of the RFA generally requires that agencies prepare an initial regulatory flexibility analysis (IRFA) and make the analysis available to the public for comment when the agency publishes an NPR. 5 U.S.C. 603. Section 605 of the RFA provides that an IRFA is not required if the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. The IRFA must describe the impact of the proposed rule on small entities and identify significant alternatives that accomplish the statutory objectives and minimize any significant economic impact of the proposed rule on small entities. Specifically, the IRFA must contain:

- a description of the reasons why action by the agency is being considered;

- a succinct statement of the objectives of, and legal basis for, the proposed rule;

- a description of, and where feasible, an estimate of the number of small entities to which the proposed rule will apply;

- a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of

JA094

small entities subject to the requirements and the type of professional skills

necessary for the preparation of reports or records; and

- identification, to the extent possible, of all relevant federal rules that may

    duplicate, overlap, or conflict with the proposed rule; and

Additionally, the IRFA must describe any significant alternatives to the proposed

rule that accomplish the stated objectives of applicable statutes and minimize any

significant economic impact of the proposed rule on small entities.

CPSC staff prepared an IRFA for this rulemaking which appears at Tab F of the Staff

Supplemental Briefing Package.  We provide a summary of the IRFA below.

### B.    *Reasons for Agency Action and Legal Basis for Supplemental NPR*

As explained elsewhere in this preamble, section 104 of the CPSIA authorizes the

Commission to issue standards for durable infant or toddler products and requires that such

products comply with product registration requirements. The Commission is issuing this

Supplemental NPR in response to reports of deaths involving inclined sleep products.

### C.    *Supplemental NPR Requirements*

The Supplemental NPR would incorporate by reference the voluntary standard for

inclined sleep products (ASTM F3118-17a) with substantial modifications described in section

VIII of this preamble.  Products subject to the proposed standard would need to have a sleep

surface angle no greater than 10° and would need to meet the requirements of the CPSC standard

for bassinets and cradles.  If the Commission issues a final rule, the proposed rule would become

a mandatory standard, and firms with a sleep product that is subject to the rule would need to

evaluate their product, determine what changes would be required to meet the standard, and

modify the product so that it complies with the standard or cease supplying the product to the

JA095

U.S. market. The manufacture or importation of noncompliant products would be prohibited after the effective date of the standard. Additionally, manufacturers and importers must certify that their products comply with applicable children's products safety standards, and this certification must be based on testing by a third party. 16 CFR part 1107.

D.     *Small Entities Supplying Infant Sleep Products and the Supplemental NPR's Impact on Small Businesses*

Since the Commission issued the 2017 NPR, the U.S. inclined sleep product market has changed substantially. Manufacturers and importers have largely stopped producing for sale most frame-style inclined sleep products from the market, including some that were not subject to recalls, although one or two types of products remain.[9] Additionally, a significant decline in the infant hammock market has occurred, both among larger-scale suppliers and home-based manufacturers.

As part of the current market evaluation, staff identified 18 firms still supplying sleep products to the U.S. market with sleep surface angles greater than 10 degrees, but less than or equal to 30 degrees. Staff identified an additional firm supplying a sleep product with an incline of 10 degrees or less that is not being tested for compliance with either the bassinet standard or another sleep product standard (and thus, likely would be subject to the Supplemental NPR). Of these 19 total firms, six appear to be very small, home-based manufacturers of infant hammocks (two operating domestically and four overseas).[10] The RFA covers only domestic suppliers. Seven of the 19 firms are not as small as the home-based infant hammock manufacturers, but would meet the definition of "small" domestic entities based on U.S. Small Business

---

[9] Some units may still be available for sale even for products that are no longer being produced (this does *not* include recalled models).
[10] These suppliers were identified online, and staff believes that there may be additional home-based manufacturers supplying infant hammocks on a very small scale (possibly including some without an on-line presence).

JA096

Administration (SBA) guidelines for their North American Industry Classification System (NAICS) codes. These seven firms typically have only one inclined sleep model in their product lines.

In summary, CPSC staff is aware of nine small domestic firms currently marketing products that would be impacted by the Supplemental NPR in the United States (two home-based domestic hammock manufacturers, four small domestic manufacturers of inclined sleep products, and three small importers of inclined sleep products). Staff cannot definitively determine the impact of the Supplemental NPR because the impact would depend on several unknown factors including:

- How firms respond to the rule (*e.g.,* they would redesign, remarket, or drop products subject to the Supplemental NPR);
- The costs associated with redesigning, remarketing, or replacing an inclined sleep product;
- The change, if any, on demand for that product.

Staff estimates that third party testing costs could be $30 to $100 per sample for the maximum incline test alone, and testing to the bassinet standard could add costs up to another $1000. Reliance on third party tests obtained by suppliers as allowed by the component part testing rule (16 CFR part 1109) could reduce testing costs to some extent. Staff found that third party costs are likely to be significant for the two very small home-based manufacturers of infant hammocks *if they choose to redesign;* and costs could be significant for an additional two small manufacturers, if they chose to redesign their products and testing as few as four units per model were required to provide a "high degree of assurance."

JA097

*E.      Alternatives*

At least two alternatives are available that could minimize the economic impact on small entities while also meeting the statutory objectives:[11] (1) eliminate the requirement that products must meet the bassinet standard if they do not already fall into another sleep product standard; or (2) allow a later effective date. However, under the first alternative, the cost of redesign would still likely be significant.   Moreover, the Supplemental NPR is intended to ensure that all products providing sleep accommodations for infants meet a base set of safety requirements. This alternative would not accomplish this goal.

Second, the Commission could also reduce the Supplemental NPR's impact on small businesses by setting a later effective date than the proposed 12 months.  A later effective date would reduce the economic impact on firms redesigning their existing products in two ways. Firms would be less likely to experience a lapse in production/importation, which could result if they are unable to bring their products into compliance and certify compliance based on third party tests within the required timeframe.  Also, firms could spread the costs of developing compliant products over a longer time period, thereby reducing their annual costs, as well as the present value of their total costs (*i.e.,* they could time their spending to better accommodate their individual circumstances).  The Commission requests comments on the 12-months effective date, which was set to help reduce the impact on affected firms, as well as feedback on how firms would likely respond to the Supplemental NPR.

---

[11] Staff considered whether adopting the voluntary inclined sleeper standard with no modifications might also be an alternative, but ruled it out because it would not address the injuries and deaths that led to the recent inclined sleeper recalls.

JA098

*F.*     *Small Business Impacts of the Accreditation Requirements for Testing*

      *Laboratories*

In accordance with section 14 of the CPSA, all children's products that are subject to a children's product safety rule must be tested by a CPSC-accepted third party conformity assessment body (i.e., testing laboratory) for compliance with applicable children's product safety rules. Testing laboratories that want to conduct this testing must meet the NOR pertaining to third party conformity testing. NORs have been codified for existing rules at 16 CFR part 1112. Consequently, the Commission proposes to amend 16 CFR part 1112 to establish the NOR for those testing laboratories that want to test for compliance with the infant sleep products final rule (in essence, test for maximum seat back angle). This section assesses the impact of the amendment on small laboratories.

A final regulatory flexibility analysis (FRFA) was conducted as part of the promulgation of the original 1112 rule (78 FR 15836, 15855-58), as required by the RFA. Briefly, the FRFA concluded that the accreditation requirements would not have a significant adverse impact on a substantial number of small laboratories because no requirements were imposed on laboratories that did not intend to provide third party testing services. The only laboratories that were expected to provide such services were those that anticipated receiving sufficient revenue from the mandated testing to justify accepting the requirements as a business decision.

Based on similar reasoning, amending the rule to include the NOR for the infant sleep product standard will not have a significant adverse impact on small laboratories. Moreover, based upon the number of laboratories in the United States that have applied for CPSC acceptance of the accreditation to test for conformance to other juvenile product standards, we expect that only a few laboratories will seek CPSC acceptance of their accreditation to test for

JA099

conformance with the infant sleep product standard. Most of these laboratories will have already been accredited to test for conformance to other juvenile product standards, and the only costs to them would be the cost of adding the infant sleep product standard to their scope of accreditation, a cost that test laboratories have indicated is extremely low when they are already accredited for other section 104 rules. Consequently, the Commission certifies that the NOR for the infant sleep product standard will not have a significant impact on a substantial number of small entities.

## XIV. Environmental Considerations

The Commission's regulations address whether the agency is required to prepare an environmental assessment or an environmental impact statement. Under these regulations, certain categories of CPSC actions normally have "little or no potential for affecting the human environment," and therefore do not require an environmental assessment or an environmental impact statement. Safety standards providing requirements for products come under this categorical exclusion. 16 CFR 1021.5(c)(1). The Supplemental NPR falls within the categorical exclusion.

## XV. Paperwork Reduction Act

This proposed rule contains information collection requirements that are subject to public comment and review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521). In this document, pursuant to 44 U.S.C. 3507(a)(1)(D), we set forth:

- a title for the collection of information;
- a summary of the collection of information;

JA100

- a brief description of the need for the information and the proposed use of the information;

- a description of the likely respondents and proposed frequency of response to the collection of information;

- an estimate of the burden that shall result from the collection of information; and

- notice that comments may be submitted to the OMB.

*Title*: Safety Standard for Infant Sleep Products

*Description*: The Supplemental NPR would incorporate by reference ASTM F3118-17a, *Standard Consumer Safety Specification for Infant Inclined Sleep Products,* but with modifications, including to sections 8 and 9 which contain requirements for marking, labeling, and instructional literature. The Supplemental NPR would exclude from the rule infant sleep products covered by another mandatory standard for sleep products (Section 1.3). However, the Supplemental NPR would modify section 5.2 of ASTM F3118-17a to require that accessory, compact, infant sleep products, and newborn sleep products meet the requirements of the Safety Standard for Bassinets and Cradles (16 CFR 1218), including the marking, labeling, and instructional requirements. These marking, labeling, and instructional requirements fall within the definition of "collection of information," as defined in 44 U.S.C. 3502(3).

*Description of Respondents*: Persons who manufacture or import infant sleep products.

*Estimated Burden*: We estimate the burden of this collection of information as follows:

JA101

Table 1 – Estimated Annual Reporting Burden

| Burden Type | Type of Supplier | Number of Respondents | Frequency of Responses | Total Annual Responses | Hours per Response | Total Burden Hours |
|---|---|---|---|---|---|---|
| Labeling | Home-based manufacturers | 6 | 1 | 6 | 7 | 42 |
| | Other Suppliers | 13 | 1 | 13 | 1 | 13 |
| **Labeling Total** | | | | | | **55** |
| Instructional literature | Home-based manufacturers | 6 | 1 | 50 | 300 | 300 |
| **TOTAL BURDEN** | | | | | | **355** |

Our estimate is based on the following:

Two groups of quantifiable entities supply infant sleep products to the U.S. market that will likely need to make some modifications to their existing warning labels to meet the requirements for bassinet and cradle warnings. The first group consists of very small home-based manufacturers, which may not currently have warning labels on their infant sleep products. Similar rulemakings (such as that for sling carriers) assumed that it would take home-based manufacturers approximately 15 hours to develop a new label. Given that some home-based manufacturers supply infant sleep products with warning labels already, we have estimated approximately 7 hours per response for this group of suppliers. Therefore, the total burden hours for very small home-based manufacturers is 7 hours per model x 6 entities x 1 models per entity = 42 hours.

The second group of quantifiable entities supplying infant sleep products to the U.S. market that will need to make some modifications to their existing warning labels are non-home-based manufacturers and importers. These firms do not operate at the low production volume of the home-based firms. All of the firms in this second group have existing warning labels on their

JA102

products, but not for bassinets and cradles and would therefore, have to make label modifications. Given that these firms are used to working with warning labels, we estimate that the time required to make any modifications now or in the future would be about 1 hour per model. Based on an evaluation of supplier product lines, each entity supplies an average of 1 model of infant sleeper; therefore, the estimated burden associated with labels for this second group is 1 hours per model x 13 entities x 1 models per entity = 13 hours.

The total burden hours attributable to warning labels is the sum of the burden hours for both entity groups: very small home-based manufacturers (42 burden hours) + non-home-based manufacturers and importers (13 burden hours) = 55 burden hours. We estimate the hourly compensation for the time required to create and update labels is $34.61 (U.S. Bureau of Labor Statistics, "Employer Costs for Employee Compensation," March 2019, total compensation for all sales and office workers in goods-producing private industries, series id CMU201G000200000D: http://www.bls.gov/ncs/). Therefore, the estimated annual cost to industry associated with the labeling requirements is $1,904 ($34.61 per hour x 55 hours = $1,904). No operating, maintenance, or capital costs are associated with the collection.

The Standard for Bassinets and Cradles (section 9) requires instructions to be supplied with the product. As already noted, the proposed Safety Standard for Infant Sleep Products requires accessory, compact, infant sleep products, and newborn sleep products to meet these requirements. Under the OMB's regulations (5 CFR 1320.3(b)(2)), the time, effort, and financial resources necessary to comply with a collection of information that would be incurred by persons in the "normal course of their activities" are excluded from a burden estimate, where an agency demonstrates that the disclosure activities required to comply are "usual and customary."

JA103

We are unaware of infant sleep products that generally require use instructions but lack such instructions.  However, it is possible that the six home-based manufacturers of infant hammocks may not supply instruction manuals as part of their "normal course of activities."  Based on information collected for the infant slings rulemaking, staff tentatively estimates that each small entity supplying homemade infant hammocks might require 50 hours to develop an instruction manual to accompany their products.  These firms typically supply only one infant hammock model.  Therefore, the costs of designing an instruction manual for these firms could be as high as $10,383 (50 hours per model x 6 entities x 1 models per entity = 300 hours x $34.61 per hour = $10,383).  Not all firms would incur these costs every year, but new firms that enter the market would incur these costs, and this is a highly fluctuating market.  Other firms are estimated to have no burden hours associated with section 9 of the Standard for Bassinets and Cradles because any burden associated with supplying instructions with infant sleep products would be "usual and customary" and not within the definition of "burden" under the OMB's regulations.

Based on this analysis, CPSC staff estimates that the Supplemental NPR for infant sleep products would impose a burden to industry of 355 hours at a cost of $12,287 annually.

In compliance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), we have submitted the information collection requirements of this rule to the OMB for review.  Interested persons are requested to submit comments regarding information collection by **[INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**, to the Office of Information and Regulatory Affairs, OMB (see the ADDRESSES section at the beginning of this notice).

Pursuant to 44 U.S.C. 3506(c)(2)(A), we invite comments on:

JA104

- whether the collection of information is necessary for the proper performance of the CPSC's functions, including whether the information will have practical utility;

- the accuracy of the CPSC's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

- ways to enhance the quality, utility, and clarity of the information to be collected;

- ways to reduce the burden of the collection of information on respondents, including the use of automated collection techniques, when appropriate, and other forms of information technology;

- the estimated burden hours required for home-based manufacturers to modify warning labels;

- the estimated burden hours associated with label modification for non-home-based suppliers, including any alternative estimates;

- the estimated burden hours required for home-based manufacturers to modify (or, in some cases, create) instruction manuals.

## XVI.  Preemption

Section 26(a) of the CPSA, 15 U.S.C. 2075(a), provides that when a consumer product safety standard is in effect and applies to a product, no state or political subdivision of a state may either establish or continue in effect a standard or regulation that prescribes requirements for the performance, composition, contents, design, finish, construction, packaging, or labeling of such product dealing with the same risk of injury unless the state requirement is identical to the federal standard. Section 26(c) of the CPSA also provides that states or political subdivisions of states may apply to the Commission for an exemption from this preemption under certain circumstances. Section 104(b) of the CPSIA refers to the rules to be issued under that section as

JA105

"consumer product safety rules." Therefore, the preemption provision of section 26(a) of the CPSA would apply to a rule issued under section 104.

## XVII. Request for Comments

This Supplemental NPR proposes a rule under section 104(b) of the CPSIA to issue a consumer product safety standard for infant sleep products, to amend part 1112 to add infant sleep products to the list of children's product safety rules for which the CPSC has issued an NOR, and to amend part 1130 to identify infant sleep products as a durable infant or toddler product subject to CPSC consumer registration requirements. The Commission requests comments on the standard's scope language; the proposed effective date; the costs of compliance with, and testing to, the proposed Safety Standard for Infant Sleep Products; and any aspect of this proposal. During the comment period, the ASTM F3118-17a Standard Consumer Safety Specification for Infant Inclined Sleep Products, is available as a read-only document at: http://www.astm.org/cpsc.htm.

The Commission requests comments on the following specific issues:

- Products likely to be impacted by the Supplemental NPR, including the product categories discussed in the preamble and any additional types of products that commenters believe may be impacted by the Supplemental NPR.

- How firms with inclined sleep surfaces will likely respond to the Supplemental NPR, including suppliers of products with inclines above 10 degrees and products with inclines less than or equal to 10 degrees that do not already comply with the bassinet standard. We would also appreciate any information on the possible responses of consumers to changes in marketing. Additionally, any information on the approximate percentage of revenue attributable to these types of products

JA106

would be valuable.  The Commission also requests any information regarding the safety of sleep angles in excess of 10 degrees but less than 20 degrees

- The impact that promulgating the Supplemental NPR would have on the cost of testing and certifying products, particularly on small manufacturers and importers. Any information on the number of samples that must be tested would be especially helpful.  The Commission also requests comments on the third party testing costs of the maximum incline test in the Supplemental NPR.

- The cost of redesign, the time required for redesign, the likely response of manufacturers to the Supplemental NPR's requirements (*i.e.,* redesign, remarket, or drop), the possible change in demand due to remarketing or changing the sleep surface's degree of incline, the cost of (and time required for) remarketing, and (for firms supplying comments) the relative significance of inclined sleepers to their total revenue.  The Commission also requests comments on testing costs, including the number of inclined sleeper units that typically need to be tested to provide a "high degree of assurance" of compliance.

- The age and developmental milestones referenced in the scope and definitions of the various infant inclined sleep products covered by ASTM F3118-17a.  Because this Supplemental NPR proposes to address "infant sleep products" not already covered by traditional sleep products, the Commission is considering removing the upper age limit from the scope of the mandatory standard, to accommodate a broad scope of infant sleep products within the standard.  The Commission's consideration is based on the fact that when staff knew the age of an infant, twenty percent of the fatalities and injuries involved infants 6 months and older.

JA107

- The APA generally requires that the effective date of a rule be at least 30 days after publication of the final rule. 5 U.S.C. 553(d). Section XII of this preamble proposes a 12-month effective date after publication of a final rule, for products manufactured or imported on or after that date, stating that a longer effective date than the typical 6 months for a section 104 rule may be necessary because of the number of proposed modifications to ASTM F3118-17a. Given the hazards involved with infant inclined sleep products, the Commission could issue a final rule with a shorter effective date so that safer products would be available sooner. The Commission requests comments on whether either a longer or shorter effective date would be appropriate.

Comments should be submitted in accordance with the instructions in the **ADDRESSES** section at the beginning of this notice.

**List of Subjects**

**16 CFR Part 1112**

Administrative practice and procedure, Audit, Consumer protection, Reporting and recordkeeping requirements, Third party conformity assessment body.

**16 CFR Part 1130**

Administrative practice and procedure, Business and industry, Consumer protection, Reporting and recordkeeping requirements.

**16 CFR Part 1236**

Consumer protection, Imports, Incorporation by reference, Infants and children, Labeling, Law enforcement, and Toys.

JA108

For the reasons discussed in the preamble, the Commission proposes to amend Title 16 of the Code of Federal Regulations as follows:

## PART 1112—REQUIREMENTS PERTAINING TO THIRD PARTY CONFORMITY ASSESSMENT BODIES

1. The authority citation for part 1112 continues to read as follows:

**Authority:** 15 U.S.C. 2063; Pub. L. 110-314, section 3, 122 Stat. 3016, 3017 (2008).

2. Amend § 1112.15 by adding paragraph (b)(46) to read as follows:

## § 1112.15  When can a third party conformity assessment body apply for CPSC acceptance for a particular CPSC rule and/or test method?

\*       \*       \*       \*       \*

(b) \* \* \*

(46) 16 CFR part 1236, Safety Standard for Infant Sleep Products.

\*       \*       \*       \*       \*

3. The authority citation for part 1130 continues to read as follows:

**Authority**:  15 U.S.C. 2056a, 2056(b).

4. Amend § 1130.2 by revising paragraph (a)(12) to read as follows:

## PART 1130—REQUIREMENTS FOR CONSUMER REGISTRATION OF DURABLE INFANT OR TODDLER PRODUCTS

## § 1130.2  Definitions.

\*       \*       \*       \*       \*

(a) \* \* \*

(12) Bassinets and cradles, including bedside sleepers and infant sleep products;

\*       \*       \*       \*       \*

5. Add part 1236 to read as follows:

**PART 1236-SAFETY STANDARD FOR INFANT SLEEP PRODUCTS**

Sec.

1236.1  Scope.

1236.2  Requirements for infant sleep products.

**Authority**:  Sec. 104, Pub. L. 110-314, 122 Stat. 3016 (15 U.S.C. 2056a); Sec. 3, Pub. L. 112-28, 125 Stat. 273.

**§ 1236.1  Scope.**

This part establishes a consumer product safety standard for infant sleep products, including: frame-type, hammock, compact, and accessory.  This consumer product safety standard covers all infant sleep products that are not covered by another consumer product safety standard, including:

- 16 CFR 1218 Safety Standard for Bassinets and Cradles

- 16 CFR 1219 Safety Standard for Full-Size Baby Cribs

- 16 CFR 1220 Safety Standard for Non-Full-Size Baby Cribs

- 16 CFR 1221 Safety Standard for Play Yards

- 16 CFR 1222 Safety Standard for Bedside Sleepers

**§ 1236.2  Requirements for infant sleep products.**

(a) Except as provided in paragraph (b) of this section, each infant sleep product must comply with all applicable provisions of ASTM F3118-17a, Standard Consumer Safety Specification for Infant Inclined Sleep Products (approved on September 1, 2017).  The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.  You may obtain a copy from ASTM International, 100 Bar Harbor

Drive, P.O. Box 0700, West Conshohocken, PA 19428; http://www.astm.org/cpsc.htm.  You

may inspect a copy at the Office of the Secretary, U.S. Consumer Product Safety Commission,

Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301-504-7923, or at the

National Archives and Records Administration (NARA).  For information on the availability of

this material at NARA, call 202-741-6030, or go to:

 http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

(b) Comply with ASTM F3118-17a with the following additions or exclusions:

(1) Instead of complying with Introduction of ASTM F3118-17a, comply with the

following:

(i) INTRODUCTION

This consumer safety specification addresses incidents associated with infant inclined

sleep products identified by the U.S. Consumer Product Safety Commission (CPSC).

In response to incident data compiled by the CPSC, this consumer safety specification

attempts to minimize the following: (1) fall hazards, (2) positional asphyxiation, and (3)

obstruction of nose and mouth by bedding.  The purpose of the standard is to address infant sleep

products not already covered by traditional sleep product standards and to prevent deaths due to

the use of Infant Sleep Products with a seat back angle greater than 10° from the horizontal.

This consumer safety specification is written within the current state-of-the-art of infant

sleep product technology and will be updated whenever substantive information becomes

available that necessitates additional requirements or justifies the revision of existing

requirements.

(ii) [Reserved]

JA111

(2) In section 1.1 of ASTM F3118-17a, replace the term "infant inclined sleep products" with "infant sleep products."

(3) In section 1.2 of ASTM F3118-17a, replace the term "infant inclined sleep products" with "infant sleep products."

(4) Instead of complying with section 1.3 of ASTM F3118-17a, comply with the following:

(i) 1.3 This consumer safety performance specification covers products that are not covered by other ASTM standards such as:

- ASTM F1169 Standard Consumer Safety Specification for Full-Size Baby Cribs

- ASTM F406 Standard Consumer Safety Specification for Non-Full-Size Baby Cribs/Play Yards

- ASTM F2194 Standard Consumer Safety Specification for Bassinets and Cradles

- ASTM F2906 Standard Consumer Safety Specification for Bedside Sleepers

This consumer safety performance specification covers free standing products with an infant sleep surface primarily intended and marketed to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on sides, whichever comes first. It also covers a smaller products intended for newborns up to 3 months old or when a newborn begins to wiggle out of position or turn over in the product or weighs more than 15 lb (6.8 kg), whichever comes first. It also covers infant and newborn sleep product accessories, which are attached to or supported by, another product with the same age or abilities, or both, as the free standing products. If the infant sleep product can be converted into a product for which another ASTM standard consumer safety specification exists, the product shall meet the applicable requirements of that standard.

(ii) [Reserved]

(5) In section 1.4 of ASTM F3118-17a, replace the term "infant inclined sleep product" with "infant sleep product."

(6) Instead of complying with section 2 of ASTM F3118-17a, comply with the following:

(i) 2. Referenced Documents

(ii) 2.1 ASTM Standards.[12]

- F406 Standard Consumer Safety Specification for Non-Full-Size Baby Cribs/Play Yards

- F1169 Standard Consumer Safety Specification for Full-Size Baby Cribs

- F2194 Consumer Safety Specification for Bassinets and Cradles

- F2906 Standard Consumer Safety Specification for Bedside Sleepers

(iii) 2.2 Federal Standards.[13]

- 16 CFR 1218 - Safety Standard for Bassinets and Cradles

- 16 CFR 1219 - Safety Standard for Full-Size Baby Cribs

- 16 CFR 1220 - Safety Standard for Non-Full-Size Baby Cribs

- 16 CFR 1221 - Safety Standard for Play Yards

- 16 CFR 1222 - Safety Standard for Bedside Sleepers

(8) Do not comply with sections 2.3 and 2.4 of ASTM F3118-17a, including Figures 1 and 2.

(9) In section 3.1.1 of ASTM F3118-17a, replace the following terms:

---

[12] For referenced ASTM standard, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For Annual Book of ASTM Standards volume information, refer to the standard's Document Summary page on the ASTM website.

[13] Available from U.S. Government Printing Office Superintendent of Documents, 732 N. Capitol St., NW, Mail Stop: SDE, Washington, DC 20401, http://www.access.gpo.gov.

(i) Replace the term "accessory inclined sleep product" with "accessory infant sleep product."

(ii) Replace the term "inclined sleep product" with "infant sleep product."

(10) In section 3.1.2 of ASTM F3118-17a, replace the following terms:

(i) Replace the term "compact inclined sleep product" with "compact infant sleep product."

(ii) Replace the term "newborn inclined sleep product" with "newborn infant sleep product."

(11) Do not comply with sections 3.1.3 through 3.1.6 of ASTM F3118-17a.

(12) Instead of complying with section 3.1.7 of ASTM F3118-17a, comply with the following:

(i) 3.1.7 *infant sleep product, n*—a freestanding product, intended to provide a sleeping accommodation for an infant up to approximately 5 months of age, that is generally supported by a stationary or rocker base and that is not subject to any of the following standards:

- 16 CFR 1218 – Safety Standard for Bassinets and Cradles

- 16 CFR 1219 – Safety Standard for Full-Size Baby Cribs

- 16 CFR 1220 and 1221 – Safety Standard for Non-Full-Size Baby Cribs and Play Yards

- 16 CFR 1222 – Safety Standard for Bedside Sleepers

(ii) [Reserved]

(13) Do not comply with sections 3.1.7.1 through 3.1.9 of ASTM F3118-17a.

(14) Instead of complying with section 3.1.10 of ASTM F3118-17a, comply with the following:

(i) 3.1.10 *newborn sleep product, n*—a free standing product, intended to provide sleeping accommodations for a newborn up to approximately 3 months of age, that is supported by a stationary or rocker base and whose seat back length, measured from the bight, is not greater than 17 in. (432 mm) and that is not subject to any of the following standards:

- 16 CFR 1218 – Safety Standard for Bassinets and Cradles

- 16 CFR 1219 – Safety Standard for Full-Size Baby Cribs

- 16 CFR 1220 and 1221 – Safety Standard for Non-Full-Size Baby Cribs and Play Yards

- 16 CFR 1222 – Safety Standard for Bedside Sleepers

(ii) [Reserved]

(15) Do not comply with sections 3.1.11 through 3.1.13 of ASTM F3118-17a.

(16) Do not comply with section 5 of ASTM F3118-17a.

(17) Do not comply with sections 6.1 through 6.8 of ASTM F3118-17a.

(18) Instead of complying with section 6.9 of ASTM F3118-17a, comply with the following:

(i) *6.9 Maximum Seat Back Angle:*

(ii) *6.9.1 Accessory, Compact, and Infant Sleep Product*—The angle of the seat back surface intended for sleep along the occupants head to toe axis relative to the horizontal shall not exceed 10° when tested in accordance with 7.11.2.

(iii) *6.9.2 Accessory, Compact, and Newborn Sleep Product*—The angle of the seat back surface intended for sleep along the occupants head to toe axis relative to the horizontal shall not exceed 10° when tested in accordance with 7.11.3.

(iv) 6.9.3 *Accessory, Compact, Infant Sleep Products, and Newborn Sleep Products*—shall meet requirements of 16 CFR 1218 Safety Standard for Bassinets and Cradles.

(19) Do not comply with sections 6.10 through 7.10 of ASTM F3118-17a.

(20) In section 7.11.2.1 of ASTM F3118-17a, replace "*Infant Inclined Sleep Product and Infant Inclined Sleep Product Accessory*" with "*Accessory, Compact, Infant Sleep Products, and Newborn Sleep Products.*"

(21) In section 7.11.2.1 of ASTM F3118-17a, replace "If applicable, place the product in the manufacturer's recommended highest incline angle position." with "If applicable, place the product in the manufacturer's recommended highest seat back angle position intended for sleep."

(22) In section 7.11.3 of ASTM F3118-17a, replace "*Newborn Inclined Sleep Product and Newborn Inclined Sleep Product Accessory*" with "*Accessory, Compact, Infant Sleep Products, and Newborn Sleep Products.*"

(23) Do not comply with sections 7.12 through 9, or the Appendix, of ASTM F3118-17a.

Dated: _____

_____
Alberta E. Mills,
Secretary, Consumer Product Safety Commission

JA116



# Staff Briefing
# Package

**Draft Supplemental Notice of Proposed Rulemaking for Infant Sleep Products under the Danny Keysar Child Product Safety Notification Act**

**October 16, 2019**

**Table of Contents**

Briefing Memorandum ............................................................................................................3

TAB A: Infant Inclined Sleep Product-Related Deaths, Injuries, and Potential Injuries Reported Between October 1, 2016 and June 30, 2019 Covering January 1, 2005 – June 30, 2019 ... 23

TAB B: Biomechanical Analysis of Inclined Sleep ................................................................31

TAB C: Staff's Review and Evaluation of ASTM F3118-17a, Standard Consumer Safety Specification for Infant Inclined Sleep Products, for Incorporation by Reference into Staff's Draft Proposed Rule ................................................................................... 108

TAB D: Human Factors Assessment of ASTM 3118-17a Requirements for Infant Inclined Sleep Products (CPSIA Section 104) ................................................................ 119

TAB E: Directorate for Health Sciences response to consumer complaints that the sleep product caused plagiocephaly (flat head syndrome), and torticollis (twisted neck syndrome) or both conditions ................................................................................... 124

TAB F: Initial Regulatory Flexibility Analysis of the Staff-Recommended Proposed Standard for Infant Inclined Sleep Products, the Accreditation Requirements for Conformity Assessment Bodies for Testing Conformance to the Infant Inclined Sleep Products Standard, and the Impact of the Product Registration Rule ........................................................ 131

TAB G: Infant Inclined Sleep Products: Summary of Recalls – May 10, 2000 through August 20, 2019 ................................................................................... 145

# Briefing Memorandum

**Memorandum**

DATE: October 16, 2019

TO:         The Commission
            Alberta E. Mills, Secretary

THROUGH:    Melissa V. Hampshire, Acting General Counsel
            Mary T. Boyle, Executive Director
            DeWane Ray, Deputy Executive Director for Safety Operations

FROM:       Duane E. Boniface, Assistant Executive Director
            Office of Hazard Identification and Reduction

            Celestine T. Kish, Project Manager
            Division of Human Factors, Directorate for Engineering Sciences

SUBJECT:    Draft Supplemental Notice of Proposed Rulemaking for Infant Sleep Products

# I.    INTRODUCTION

On April 7, 2017, the Consumer Product Safety Commission (CPSC) published a proposed rule for Infant Inclined Sleep Products (82 *Fed. Reg.* 16963 (April 7, 2017)) (2017 NPR)[1] under section 104 of the Consumer Product Safety Improvement Act of 2008 (CPSIA), Danny Keysar Child Product Safety Notification Act.  This briefing package pertains to a draft supplemental notice of proposed rulemaking (Supplemental NPR) for infant sleep products that is based on the current voluntary standard, ASTM F3118-17a, *Standard Consumer Safety Specification for Infant Inclined Sleep Products,* with modifications.  Under the ASTM standard, the infant inclined sleep products category covers sleep products with an inclined angle between 10° and 30° for use by infants up to about 5 months of age.  The briefing package reviews the relevant incident data, assesses the ASTM standard's effectiveness, and recommends that the Commission issue a Supplemental NPR with a modified name and more limited scope than the ASTM standard.  In addition, the briefing package discusses the potential impact the draft Supplemental NPR would have on small businesses, reviews recent recalls associated with infant inclined sleep products, and provides

---

[1] On June 12, 2019, CPSC staff submitted a briefing package to the Commission, recommending that the Commission terminate the 2017 NPR, stating that CPSC staff received reports of 42 additional fatalities that involved rocker-like inclined sleep products and detailing Commission safety alerts and recalls.  As of this date, the Commission has not voted on the package.

staff's recommendations to the Commission. Finally, the draft Supplemental NPR includes a notice of requirements (NOR), which explains how test laboratories could become CPSC-accepted third party conformity assessment bodies to test infant sleep products to the new safety standard.

Throughout this package, the term "Infant Inclined Sleep Products" is used to describe the current voluntary standard and current products on the market that are associated with the voluntary standard. The term "Infant Sleep Products" is used to describe products within the scope of the draft Supplemental NPR, because the proposed rule will limit sleep product seat back angles to 10° or less, thus eliminating the need for the word "inclined" to describe the products.

## II. BACKGROUND

### A. *Requirements for CPSIA Section 104 Rules*

Section 104 of the CPSIA requires CPSC to: (1) examine and assess voluntary safety standards for durable infant or toddler products, and (2) promulgate mandatory consumer product safety standards that are substantially the same as the voluntary standards or more stringent than the voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with these products. Section 104(f) of the CPSIA defines "durable infant or toddler products" as "durable products intended for use, or that may be reasonably expected to be used, by children under the age of 5 years."

The list of products in section 104(f) of the CPSIA does not specifically include infant inclined sleep products. However, when considering a standard for bassinets and cradles, the Commission determined that hammocks and other inclined sleep products[2] should be addressed separately from bassinets and cradles, which are specifically identified as "durable infant or toddler products."[3] Staff recommends that, in addition to proposing a standard establishing requirements for infant sleep products, the Commission propose to amend 16 CFR part 1130, Requirements for Consumer Registration of Durable Infant or Toddler Products, to clarify that the category of infant sleep products covers all other infant sleep products not currently covered by bassinets/cradles, cribs (full-size and non-full size), play yards, and bedside sleepers.

Section 104 of the CPSIA also requires the Commission to consult with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts to examine and assess the effectiveness of the relevant voluntary standards. CPSC staff regularly participates in the juvenile products subcommittee meetings of ASTM International

---

[2] 77 *Fed. Reg.* 64055, 64059 (October 18, 2012) (16 CFR part 1218).
[3] 74 *Fed. Reg.* 68668 (December 29, 2009) (16 CFR part 1130.2(a)(16)).

(ASTM). ASTM subcommittees consist of members who represent producers, users, consumers, government, and academia.[4] The consultation process for this rulemaking commenced in 2011, when ASTM began developing a new voluntary standard to address hammocks and inclined sleep products. Staff has been actively participating in the development of the new standard since 2011.

## B. ASTM Voluntary Standard Overview

ASTM F3118, *Standard Consumer Safety Specification for Infant Inclined Sleep Products,* is the voluntary standard developed to address the identified hazard patterns associated with the use of infant inclined sleep products. The current standard, ASTM F3118-17a, was approved on September 1, 2017, and published in October 2017. This is the fourth revision since the standard was first published in May 2015.

ASTM F3118-17a contains both general and product-specific performance requirements, and references CPSC requirements for lead in paint, sharp edges or points, and small parts. ASTM F3118-17a contains mechanical requirements for scissoring, shearing, and pinching. Performance requirements in ASTM F3118-17a relate to stability, unintentional folding, restraints, side height, containment, incline, structural integrity, dynamic load, static load, and newborn products' seat back length. The scope of the standard encompasses a wide variety of products that offer not only an inclined sleep position, but also other uses while the child is awake. Due to the variety of products that are covered by ASTM F3118-17a, manufacturers must choose from multiple warning labels in the standard to address appropriately hazards associated with different combinations of product features.

## C. Products

Staff began to consider hammocks and inclined sleep products as a part of its work toward a section 104 mandatory standard for bassinets and cradles. "Bassinets/cradles" are defined as providing sleep accommodations with an inclined surface 10° to flat. As work progressed, it became evident to staff that one rule could not effectively address all products without possibly banning hammocks as a class. The Commission directed staff to begin a separate rulemaking for the subset of hammock/inclined sleep products.[5] At the same time, ASTM began work on developing a voluntary standard for inclined sleep products (including hammocks).

---

[4] ASTM International website: www.astm.org, About ASTM International.
[5] https://www.regulations.gov/docket?D=CPSC-2010-0028.

Developed in response to incident data supplied by CPSC staff, ASTM F3118-17a addresses: *(1)* fall hazards, *(2)* positional asphyxiation, and *(3)* obstruction of nose and mouth by bedding.

The scope section of ASTM F3118-17a states:

> "1.3 This consumer safety performance specification covers a free standing product with an inclined sleep surface *primarily intended and marketed* to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on sides, whichever comes first. It also covers a smaller product intended for newborns up to 3 months old or when newborn begins to wiggle out of position or turn over in the product or weighs more than 15 lb (6.8 kg), whichever comes first. It also covers infant and newborn inclined sleep product accessories, which are attached to, or supported by, another product with the same age or abilities, or both, as the free standing products. If the inclined sleep product can be converted into a product for which another ASTM standard consumer safety specification exists, the product shall meet the applicable requirements of that standard. For example, an inclined sleep product that can have the recline angle adjusted below 10° shall also comply with the applicable requirements of Consumer Safety Specification F2194." (Emphasis added).

ASTM F3118-17a provides definitions for several types of products covered by the standard:

- an "infant inclined sleep product" is "a freestanding product, intended to provide a sleeping accommodations (sic) for an infant up to approximately 5 months of age, that is generally supported by a stationary or rocker base with one or more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal."
- a "newborn inclined sleep product" is "a free standing product, intended to provide sleeping accommodations for a newborn up to approximately 3 months of age, that is supported by a stationary or rocker base with one or more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal and whose seat back length, measured from the bight, is not greater than 17 in. (432 mm)."
- "compact infant inclined sleep products" is "a free standing infant or newborn inclined sleep product having a distance of 6.0 in. (152 mm) or less between the underside of the lowest point on the seat bottom and the support surface (floor)."
- "accessory inclined sleep products" is "an inclined sleep product that is intended to provide sleeping accommodations for infants or newborns and attaches to or is supported by another product."

The voluntary standard does not provide a "hammock" definition. However, hammocks fall under the "infant inclined sleep product" definition in ASTM F3118-17a because hammocks have a sleep incline angle between 10° and 30°.

## D.  Juvenile Products Manufacturers Association Certification[6]

The Juvenile Products Manufacturers Association (JPMA) has a certification program for a variety of juvenile products, including infant inclined sleep products.  To obtain JPMA certification, manufacturers submit their products to an independent test laboratory for conformance testing to the most current ASTM voluntary standard.  Currently, four manufacturers supply JPMA-certified infant inclined sleep products.  CPSC staff notes that a lack of participation in the JPMA certification program does not mean that the products are not compliant with, or tested to, the ASTM standard.  ASTM F3118-17a is currently in effect for testing purposes under the JPMA certification program.  Typically, a 6-month period exists between the time an ASTM standard is published and the time JPMA adopts the standard for use in manufacturer testing to receive JPMA certification.

## E.  Incident Data

The memorandum from the Directorate for Epidemiology staff (Tab A) discusses 451 incidents (59 fatal and 392 nonfatal) related to infant inclined sleep products that occurred from January 1, 2005 through June 30, 2019, and reported between October 1, 2016 and June 30, 2019.  The memorandum updates information provided in the 2017 NPR.  Thus, the memorandum includes incidents reported after the end date specified in the 2017 NPR.  Forty-three percent of the incident reports (196 out of 451) are based solely on information from manufacturers/retailer.  Various sources, such as hotlines, Internet reports, newspaper clippings, medical examiners, and other state/local authorities provided the remaining incident reports to CPSC.  Reporting is ongoing, and therefore, the number of reported fatalities, nonfatal injuries, and non-injury incidents may change in the future.

### 1.  Fatalities
CPSC received reports of 59 fatalities associated with the use of an infant inclined sleep product.  When age was known, reports indicate that 39 infants were 5 months or less in age, while six infants were between 6 and 8 months of age.  One decedent was 9 months old.

Reports indicate that 56 of the 59 infant deaths involved freestanding, framed inclined sleep products; two deaths involved napper attachments of play yards; and one death involved a foam-based infant reclined sleeper.  Twenty-eight of the 59 reports contain unclear,

---

[6] Certification JPMA. Juvenile Product Manufacturers Association. (n.d.). Retrieved on April 29, 2016, from: http://jpma.org/content/certification/overview.

conflicting, and/or inconsistent information. Eight reports provide very little information on the incident, preventing staff from classifying these deaths. Eighteen reports describe infants placed in the product supine, but note that these infants ended up in a compromised position in the product, resulting in suffocations or positional asphyxiation. One unrestrained infant fell out of the product and became wedged in a confined space. Three decedents were placed prone in the product on soft bedding, and one infant suffocated when a sibling climbed on top of her in the product.

     2.   Nonfatal Incidents

Reports indicate that 96 of the 451 inclined sleep product-related, nonfatal incidents involved an injury to the infant during product use.

The severity of the injury types among the 96 reported injuries are described below:

- Seven infants required hospital admission. Six of the seven infants suffered episodes of respiratory distress due to rolling over in the product; mold in the product; or undetermined reasons. One of the seven infants was hospitalized for *scoliosis* (curvature) of the back attributed to product use.
- Sixteen infants were treated and released from emergency departments (EDs). Eleven of these infants were treated for head injuries and contusions/bruises resulting from falls; three infants were treated for unexplained respiratory distress. Mold growth on the product was associated with respiratory distress for one additional infant and seizure symptoms in another.
- Seventy-three infants received some professional medical care, first-aid treatment, or the level of care received was not reported. Among them, 32 infants suffered from plagiocephaly (flat head syndrome), torticollis (twisted neck syndrome), or both conditions, associated with the use of the inclined sleep product; 27 infants suffered mostly respiratory and some skin problems associated with mold on the product; infants sustained the remaining injuries due to a fall from the product, or a minor electric shock, or unspecified.

The remaining 296 incident reports indicate that no injury occurred to the infant or provided no information about an injury. However, many of the descriptions indicate the potential for a serious injury, or even death, similar to the descriptions reported in the incident data.

## F. Hazard Pattern Characterization Based on Incident Data

This section summarizes the hazard pattern characterizations based on the incident data. Figure 1 shows the distribution of hazard patterns by frequency.

**Figure 1: Distribution of Incident Reports Associated with Infant Inclined Sleep Products by Hazard Pattern Characterizations Reported Between October 1, 2016 - June 30, 2019**



31% Design Issues (74% of injuries; 32% of deaths)

28% Electrical Issues (2% of injuries; no deaths)

20% Consumer Comments (No injuries; no deaths)

8% Undetermined Issues (6% of injuries; 47% of deaths)

6% Structural Integrity Issues (2% of injuries; no deaths)

3% Other Product Related Issues (9% of injuries; no deaths)

1% Infant Placement Issues (No injuries; 7% of deaths)

4% Insufficient Information (6% of injuries; 14% of deaths)

Source: CPSC epidemiological databases CPSRMS and NEISS. Note: Percentages do not always add to 100 due to rounding.

1. ***Design*** of the infant inclined sleep product: 138 of the 451 reported incidents (30 percent) are in this category.  Staff identified three major issues:

    *a.* According to 59 of the 138 reported incidents (43 percent), infants developed respiratory and/or skin ailments due to the growth of mold on the product;

***b.*** According to 46 of the 138 reported incidents (33 percent), infants rolled over—fully or partially—from their original supine position. Although some of the infants were rescued, 18 died due to suffocation or asphyxiation. A few of the infants were strapped into the product, but a majority of the infants was either not restrained or the use of restraint is unreported.

   ***c.*** According to 33 of the 138 reported incidents (24 percent), infants developed physical deformations from extended use of the product, such as *plagiocephaly* (flat head syndrome), *scoliosis* (curvature) of the back, and/or *torticollis* (twisted neck syndrome).

The *Design* category includes 19 deaths, 5 hospitalizations, and 4 ED visits. All but 2 of the deaths resulted from infants rolling over into a prone or semi-prone position; 1 decedent was found still supine and restrained, but slumped in a chin-to-chest position. The other infant rolled out of the product and ended up wedged into a confined space. Infants unrestrained in the product led to two ED-treated falls.

2. ***Electrical*** issues: CPSC staff determined that 127 of the 451 incident reports (28 percent) reported battery leakage, electric shock, and/or overheating/melting of components, such as the vibrating unit, battery cover, switch, plug, or motor. Reports include two injuries in this category due to electric shock.

3. ***Consumer comments***: CPSC staff determined that 90 of the 451 reports (20 percent) involved consumer comments, however, none of these reports indicates that an incident occurred. The reports consist of consumer comments/observations of perceived safety hazards, complaints about unauthorized sale of infant inclined sleep products, or inquiries regarding safety recalls on inclined sleep products. One complaint describes misinformation in the product instruction materials.

4. ***Undetermined*** due to confounding information: CPSC staff determined that 34 of the 451 reports (8 percent) provided unclear, conflicting, and/or inconsistent information. Among the 28 deaths reported in this category, for example, medical examiners often concluded the cause of death to be Sudden Infant Death Syndrome (SIDS) or Sudden Unexpected Infant Death (SUID), along with a co-contributing condition, such as unsafe sleep environment (*e.g.,* soft bedding, inclined sleep surface) or pre-existing medical condition. Staff is unable to determine the product's role when documents describe multiple potentially contributing factors. Occasionally, the wording on the documents cites "several possibilities," and the cause of death is coded as "Undetermined." For the 6 nonfatal injuries, including the 2 hospitalized and 2 ED-treated injuries, the documents describe respiratory distress due to temporary cessation of breathing; however, the documents contain no official diagnosis for these episodes.

5. Lack of *structural integrity*: CPSC staff found that 28 of the 451 incidents (6 percent) report some sort of breakage of the product or its components. These reports include complaints of buckle/straps breaking, components such as hub, rail, or leg detaching/disengaging, hardware coming loose, and other unspecified components breaking. This category includes 2 ED-treated injuries, both due to falls.

6. *Other product-related* issues: Thirteen of the 451 incidents (3 percent) report other product-related issues, such as instability (product tipping over), inadequacy of restraints (infants falling out in spite of being restrained), or product assembly/installation difficulties. This category contains 7 fall-related injuries, including 2 that were treated and released from a hospital ED.

7. *Infant placement* issues: Four of the 451 incident reports (1 percent) indicate that infant placement contributed to the incident. Of the four fatalities, reports describe three infants placed in a prone position on soft bedding, and another infant being crushed by a young sibling who climbed on top of her.

8. *Insufficient information*: Seventeen of the 451 incident reports (4 percent) contain insufficient information to categorize the reports accurately. Staff has no information available on the circumstances of the remaining 8 deaths in this category. Reports for 6 injuries in this category describe unspecified falls treated in hospital EDs, with no information on restraint usage.

## III.   DISCUSSION

### A.  Reason for Draft Supplemental NPR

The Commission issued a June 2010 NPR for bassinets and cradles acknowledging that, by their nature, most infant hammocks would likely be unable to meet the proposed performance criteria of a 5° rest angle, 5° flatness angle, and a 20° maximum rock/swing angle, and thus, would be effectively banned. However, the Commission stated that until a new standard for hammocks was established, hammocks should be included in the bassinet standard. In October 2012, the Commission issued a Supplemental NPR for bassinets and cradles that did not include hammocks and other inclined sleep products, both in response to comments to the NPR and because ASTM was making progress developing a new voluntary standard for hammocks and other inclined sleep products.[7] Comments on the 2012 bassinet Supplemental NPR universally opposed including hammocks and other inclined sleep products in the bassinet and cradle standard, asserting that inclusion in the standard would effectively ban hammocks and other

---

[7] 77 Fed. Reg. 64055 (Oct. 18, 2012).

inclined sleeping products because of the restriction on the level of incline. In addition, commenters argued that hammocks and other inclined sleeping products have utility and should be subject to a standard specific to those products. Comments on the 2012 bassinet Supplemental NPR also opined that banning hammocks and other inclined sleeping products might increase hazardous sleeping arrangements, causing consumers to resort to a substitute product, such as a car seat or makeshift soft bedding, to prop up an infant at an incline. At the time, the Commission agreed with the commenters that alternative products or makeshift products would present additional hazards if consumers chose to use them instead of cribs, bassinets, or other common juvenile products intended for sleep.

At the time of the 2017 NPR for Infant Inclined Sleep Products, which included hammocks, the Commission was aware of 14 fatal incidents related to infant inclined sleep products, which were reported to have occurred between January 1, 2005 and September 30, 2016. Eight of the 14 deaths involved freestanding, framed inclined sleep products; in three cases, the unrestrained decedent was found to have rolled over into a facedown position. Two additional cases also reported a rollover into a facedown position, but they did not include any information about use of a restraint. CPSC staff had little information about the cause or manner of the three remaining deaths. The analysis in the 2017 NPR considered that these fatalities and other incidents were addressable by the design and performance requirements in the voluntary standard.

However, as staff continued to work with ASTM to strengthen the voluntary standard, which a final rule for infant inclined sleep products would reference, CPSC staff received reports of 59 additional fatalities that involved freestanding, framed inclined sleep products, two accessories, and one compact product. The dates of death among the new reports span from 2005 to 2019.

As staff became aware of more deaths in the products, staff worked with manufacturers to alert and remind consumers to use the restraints and to stop using the products when the infant begins to roll over. Because the units involved in the incidents met the ASTM F3118-17a voluntary standard referenced in the 2017 NPR, staff recommended that the Commission terminate rulemaking and withdraw the 2017 NPR[8]. Staff is now recommending instead that the Commission issue a Supplemental NPR, as described in this memorandum.

## B. Biomechanical Study (See Tab B)

Commission staff contracted with Dr. Erin Mannen, Ph.D., a mechanical engineer with a biomechanics specialization, to conduct infant testing to evaluate the design of inclined sleep products. The study examined how 10 infants moved and used their muscles on flat and inclined surfaces and in selected inclined sleep products, and studied whether those designs directly impact safety or present a risk factor that could contribute to the suffocation of an

---

[8] See footnote 1 for status of 2017 NPR.

infant.  Testing compared infants' muscle movement and oxygen saturation on a flat crib
mattress at 0°, 10°, and 20° versus seven different inclined sleep products.  Infant muscle
activity was recorded using surface electromyography (EMG), and oxygen saturation was
recorded using a medical grade pulse oximeter.  Researchers placed the infants in a random
order in each of the 10 testing conditions in both the supine and prone positions for at least 60
seconds (unless the oximeter data fell below 95 percent, in which case they were removed
early to ensure safety).

Key findings from Dr. Mannen's study include:

- "Inclined surfaces and incline sleep products resulted in significantly higher
  muscle activity of the turn core muscle (abdominals), which may lead to quicker
  fatigue and suffocation if an infant finds themselves prone in an incline sleep
  product.
- Muscle synergies (*i.e.,* how muscles work together) are significantly different in
  inclined sleep products.  If an infant rolls from supine to prone in an inclined sleep
  product, it is likely the first time the baby has experienced the position and the
  demands the position requires of the muscles.
- Some inclined sleep products require greater neck and trunk adjustments during
  prone positioning, indicating that infants may struggle to adjust their posture to
  enable breathing and attempt to self-correct if a roll from supine to prone occurs.
- Prone lying in the incline sleep products puts infant at higher risk of suffocation
  as evidenced by oxygen saturation results.
- Some evidence was found that support the idea that the inclined sleep products
  make the babies roll more easily from supine to prone.  The flexed trunk and ease
  of head lifting during supine lying in an inclined sleep product may indicate that
  supine to prone rolling is achieved more easily.
- If babies roll from supine to prone in an inclined sleep product, then, due to the
  high musculoskeletal demands necessary to maintain safe posture to prevent
  suffocation, babies would fatigue faster than they would on a stable, flat surface.
- None of the inclined sleep products that were tested and evaluated as a part of this
  study are safe for infant sleep."

## C.  Adequacy of F3118 Requirements (See Tabs C, D, and E)

Based on the incident data discussed above and the biomechanical study, staff finds ASTM
F3118-17a inadequate to address the hazards of an infant lying in an inclined sleep product
with an angle greater than 10°.  Staff concludes that more stringent requirements are needed
to further reduce the risk of injury associated with infant inclined sleep products.

*Introduction, and Scope*

The introduction of ASTM F3118 *Standard Consumer Safety Specification for Infant Inclined Sleep Products* presents the category of "*Infant Inclined Sleep Products*" and the scope identifies the products. According to the scope, this standard covers:

> "a free standing product with an inclined sleep surface primarily intended and marketed to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on side, whichever comes first. It also covers smaller product intended for newborns up to 3 months old or when newborn begins to wiggle out of position or turn over in the product or weighs more than 15 lb (6.8 kg), whichever comes first. It also covers infant and newborn inclined sleep product accessories, which are attached to, or supported by another product with the same age or abilities, or both as the free standing product."

Staff considers the use of the word "inclined" within the introduction and scope of this standard inappropriate because an "inclined" position is not a safe sleep position. Therefore, staff recommends not including the word "inclined" in the CPSC standard and identifying the products covered in CPSC's safety standard as "infant sleep products." This standard would cover any infant sleeping products not currently covered by standards and regulations for traditional sleeping products, such as, bassinets/cradles, cribs (full-size and non-full-size), play yards, and bedside sleepers. In addition, CPSC staff believes that any mention of sleep, including "napping," should be considered "primarily intended and marketed to provide sleeping accommodations" and, therefore, be covered by this standard.

Staff is interested in receiving comments regarding the age and developmental milestones referenced in the scope and definitions of the various infant inclined sleep products covered by the current standard. Since this Supplemental NPR is attempting to address "infant sleep products" not already covered by traditional sleep products, staff believes removing the upper age limit from the scope will allow for broader coverage of the standard. When age was known, twenty percent of the fatalities and injuries involved infants 6 months and older.

*Product design*

The results of the biomechanical study revealed that a 20° incline resulted in significantly different muscle activity for the infants, compared to a 0° incline surface. The increased demand on the abdominal muscles could lead to increased fatigue and suffocation if an infant is unable to reposition itself after rolling from a supine to prone position. At a 10° incline, fewer differences in muscle activity or lying posture were revealed, compared to the 0° incline surface. According to Dr. Mannen's report, "ten degrees is likely a safe incline for sleep on a crib mattress surface." Dr. Mannen concludes that an incline of 20° or more puts an infant at risk compared to a 0°-10° incline. Although her study did not test infants on inclines between 10°-20°, and thus did not offer conclusions for these angles, CPSC staff does

not believe additional testing on inclines between 10°-20° is necessary because we conclude that a flat surface that does not exceed 10° offers the safest sleep environment for infants. Staff recommends requiring 16 CFR 1218 Safety Standard for Bassinets and Cradles because it is an established standard, which, among other requirements, mandates that the seat back surface angle intended for sleep be 10 degrees or less.

Based on the incident reports and the results of the biomechanical study, CPSC staff recommends that the Commission propose to incorporate by reference ASTM F3118-17a with the following modifications to address the hazards of an infant lying on an inclined surface:

1. Modify the introduction and scope of the standard to state that the purpose of the standard is to address infant sleep products not already covered by traditional sleep product standards.
2. Modify the definitions of "accessory," "compact," "infant inclined sleep products," and "newborn inclined sleep products" to remove the term "inclined."
3. Modify seat back angle so that the maximum allowable seat back angle intended for sleep must be equal to or less than 10° in all positions recommended for sleep.
4. Add new requirement – accessory, compact, infant and newborn sleep products must meet 16 CFR part 1218 – Safety Standard for Bassinets and Cradles.
5. Remove all of the performance requirements, except for the new or modified requirements mentioned above.
6. Remove all test methods, except for maximum seat back angle.

*Electrical*

Staff determined that 127 of the 451 new incidents are related to electrical issues. The electrical-related issues included battery leakage, electric shock, and overheating of components. Some inclined sleep products have accessories that provide music, rocking motion, or vibration, which are either battery- or a/c-powered; however, F3118-17a does not include any performance requirements for electrical components. Other juvenile products that have similar features include performance requirements that could apply for infant sleep products. CPSC staff has raised this issue and is working with the ASTM Ad Hoc task group to develop performance requirements to address electrical hazards across juvenile products. Performance requirements would apply to other children's product standards, such as bouncers, swings, and bassinets. Because these requirements are currently under development, CPSC staff recommends not proposing electrical requirements in this Supplemental NPR, and instead suggests continuing to work with applicable ASTM subcommittees to develop electrical requirements for all applicable durable infant or toddler products with electrical components.

*Warnings*

Focus groups with parents and grandparents of infants less than 1 year of age provided information on caregivers' perceptions and reactions to safety messaging[1], indicating that participants were aware of warning labels on infant sleep products. Additionally, participants reported that the label shown during the focus group looked similar and contained comparable information to labels that they find on products they own. Some participants reported that they tend to gloss over warning labels, as they believe the language to be the same on every label. Regarding the purpose of warning labels, some participants reported that they thought the main message was to be careful and keep an eye on their infant, while a few participants believed that manufacturers use warning labels to protect themselves from liability or litigation. Participants' recommendations to improve warning labels included making the labels more concise and making the labels "stand out." CPSC staff is working with a contractor to develop new safe sleep warnings and messaging, potentially across all sleep products. In the future, staff could recommend changes in warnings based on this work.

*Plagiocephaly/torticollis*
Although the incident data indicate that consumers believe using an inclined sleep product caused their child's plagiocephaly/torticollis, staff found no evidence to support this belief. The increase in the number of children with plagiocephaly may result from the American Academy of Pediatrics' (AAP) recommendation to place infants to sleep on their backs to decrease the risk of SIDS. In the first few months of life, infants spend most of their awake and sleep time on their back. The weight and pressure of their head facing up, causes the back of the head to flatten, regardless of the product the child is using. To help prevent the development of flat head, and to promote the upper shoulder muscle strength necessary for healthy growth, AAP currently recommends a certain amount of prone positioning, or "tummy time," while the infant is awake and under parental supervision. Because the development of plagiocephaly and torticollis is not exclusively attributable to the use of infant inclined sleep products, and the conditions are not addressable with performance standards, staff is not recommending any modifications to the voluntary standard to address these issues.

## D. Product Registration Rule Amendment

In addition to requiring the Commission to issue safety standards for durable infant or toddler products, section 104 of the CPSIA also directed the Commission to issue a rule requiring that manufacturers of durable infant or toddler products establish a program for consumer registration of those products. The statutory definition of "durable infant or toddler product" in section 104(f) applies to all of section 104 of the CPSIA.

Section 104(f) of the CPSIA defines the term "durable infant or toddler product" and lists examples of such products:
(f) DEFINITION OF DURABLE INFANT OR TODDLER PRODUCT. As used in this section, the term "durable infant or toddler product" –

(1) means a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years; and

(2) includes –

(A) full-size cribs and non-full-size cribs;

(B) toddler beds;

(C) high chairs; booster chairs, and hook-on-chairs;

(D) bath seats;

(E) gates and other enclosures for confining a child;

(F) play yards;

(G) stationary activity centers;

(H) infant carriers;

(I) strollers;

(J) walkers;

(K) swings; and

(L) bassinets and cradles.

The infant inclined sleep products safety standard developed out of the bassinet safety standard. Inclined sleep products, like bassinets, are durable products intended for use by children under the age of 5 years. While considering the bassinet standard, the Commission stated that a separate standard targeted specifically to inclined sleep products would address more effectively the hazards associated with those products. 77 *Fed. Reg.* 64055, 64059 (Oct. 18, 2012). Therefore, CPSC staff began working with ASTM to develop a voluntary standard that would cover the wide array of products on the market that provide infants and toddlers with inclined sleeping environments.

In 2009, the Commission issued a rule implementing the consumer registration requirement, 16 CFR part 1130. As the CPSIA directs, the consumer registration rule requires each manufacturer of a durable infant or toddler product to provide a postage-paid consumer registration form with each product; keep records of consumers who register their products with the manufacturer; and permanently place the manufacturer's name and certain other identifying information on the product. When the Commission issued the consumer registration rule, the Commission identified six additional products as "durable infant or toddler products":

- children's folding chairs;
- changing tables;
- infant bouncers;
- infant bathtubs;
- bed rails; and
- infant slings.

The Commission stated that the specified statutory categories were not exclusive, but that the Commission should explicitly identify the product categories that are covered. The preamble to the 2009 final consumer registration rule states: "Because the statute has a broad definition of a durable infant or toddler product but also includes 12 specific product categories, additional items can and should be included in the definition, but should also be specifically listed in the rule." 74 *Fed. Reg.* 68668, 68669 (Dec. 29, 2009).

Staff recommends that the Commission propose to amend the definition of "durable infant or toddler product" in the consumer registration rule to reduce any uncertainty about whether infant sleep products fall within the term "durable infant or toddler product," as used in the product registration card rule and section 104 of the CPSIA. Staff's recommendation to require infant sleep products to meet the bassinets standard, but also keep infant sleep products as a separate standard provides a clear connection between the two sleep categories for infants under the age of 5 months. Specifically, staff recommends amending 16 CFR part 1130.2(a)(12) to read:

- Bassinets and cradles, including bedside sleepers <u>and infant sleep products</u>.

### E. Potential Small Business Impact

Staff identified 18 firms still supplying sleep products to the U.S. market with sleep surface angles greater than 10 degrees, but less than or equal to 30 degrees, which under the current voluntary standard are considered infant inclined sleep products. One additional firm supplies a sleep product with an angle of 10 degrees or less that is not tested for compliance with either the bassinet standard or another sleep product standard. The majority of suppliers to the U.S. market are domestic (13 firms). Of these, two appear to be very small, home-based domestic manufacturers of infant hammocks.[9] None has more than one infant hammock model in their product line, and they supply few, if any, other products. They generally have low sales volumes. Staff identified another seven firms (four manufacturers and three importers) that, although not as small as the home-based suppliers, still meet the definition of "small" domestic entities, based on U.S. Small Business Administration (SBA) guidelines in their North American Industry Classification System (NAICS) codes. These firms also typically have only one inclined sleep product model in their product lines, but have much larger sales volumes than the home-based suppliers.

The remaining two firms are foreign manufacturers (along with four home-based foreign manufacturers). Additionally, staff identified a few inclined sleep products entering the U.S. market via online retailers that operate marketplaces for smaller sellers and foreign retailers

---

[9] These suppliers were identified online and staff believes that there may be additional home-based suppliers operating in the infant sleep product market on a very small scale (possibly including some without an on-line presence).

willing to supply foreign-manufactured inclined sleepers directly to U.S. consumers.  Foreign suppliers are not considered in the regulatory flexibility analysis because SBA guidelines and definitions pertain only to U.S.-based entities.

As described in Tab F, the draft Supplemental NPR could have a significant impact on small firms that currently manufacture or import infant inclined sleep products, as well as small firms whose products may have difficulty meeting the bassinet standard's requirements. However, the impact depends on several unknown factors, including:

- How firms respond to the rule (*e.g.,* would they redesign, remarket, or drop);
- The costs associated with redesigning, remarketing, or replacing their inclined sleep product
- The change in demand, if any, for that product.

Staff found that third party costs are likely to be significant for the two very small, home-based manufacturers of infant hammocks (*if* they choose to redesign) and could be significant for two additional small manufacturers, if they choose to redesign their products *and* four or five units per model were required to provide a "high degree of assurance."

Staff seeks comments from firms that manufacture or import infant inclined sleep products regarding how they are likely to meet the requirements of the draft Supplemental NPR and the impact that the draft Supplemental NPR would have on them.  We also seek comments concerning any alternatives to the draft Supplemental NPR that would meet the same safety objectives but reduce the burden on small entities.  This includes the 12 months effective date that staff recommended to help reduce the impact of the draft Supplemental NPR on small firms and give them additional time to familiarize themselves with the scope of the standard and develop new/modified products, if needed.

### F.  Compliance Recall Information

Compliance staff reviewed recalls of infant inclined sleep products from May 10, 2000 to August 20, 2019.  During that period, there were 13 consumer-level recalls involving infant inclined sleep products.  The recalls were conducted in response to hazards involving strangulation, suffocation, fall, structural stability, entrapment, exposure to mold, and deaths. Six recalls involved infant hammocks, six recalls involved infant inclined sleep products, and one recall involved an infant inclined sleep accessory included with a play yard.  The 13 recalls involved approximately 6.5 million units.

### IV.  NOTICE OF REQUIREMENTS

Section 14(a) of the CPSA requires that any children's product subject to a consumer product safety rule under the CPSA must be certified as complying with all applicable CPSC-enforced requirements. The children's product certification must be based on testing conducted by a CPSC-accepted third party conformity assessment body (test laboratory). The CPSA requires the Commission to publish a notice of requirements (NOR) for the accreditation of third party test laboratories to determine compliance with a children's product safety rule to which a children's product is subject. A Supplemental NPR for infant sleep products, if issued as a final rule, would be a children's product safety rule that requires issuing an NOR.

The Commission published a final rule, *Requirements Pertaining to Third Party Conformity Assessment Bodies*, 16 CFR part 1112 (78 *Fed. Reg.* 15836 (March 12, 2013)) (referred to here as part 1112). This rule took effect on June 10, 2013. Part 1112 establishes the requirements for accreditation of third party testing laboratories to test for compliance with a children's product safety rule. The final rule also codifies all of the NORs that the CPSC has published, to date, for children's product safety rules. All new children's product safety rules, such as the proposed rule for infant sleep products, would require an amendment to part 1112 to create an NOR. Therefore, staff recommends that the Commission propose to amend part 1112 to include infant sleep products in the list of children's product safety rules for which the CPSC has issued NORs.

## V.  RECOMMENDED EFFECTIVE DATE

To allow time for infant sleep product manufacturers to bring their products into compliance after a final rule is issued, staff recommends an effective date of 12 months after publication of a final rule for products manufactured or imported on or after that date. Staff is recommending incorporating by reference ASTM F3118-17a, with modifications. Staff believes that the proposed modifications may require time beyond the typical 6-month effective date for a section 104 rule. Staff believes that most firms should be able to comply within the 12-month timeframe, but requests comments on the appropriate effective date. Specifically, the APA generally requires that the effective date of a rule be at least 30 days after publication of the final rule. 5 U.S.C. § 553(d). As noted above, typically section 104 rules have effective dates between 6 and 12 months after the final rule is issued, but given the hazards involved with these products, staff could recommend a shorter time period for effectiveness.

## VI.  STAFF RECOMMENDATIONS

CPSC staff recommends that the Commission propose to incorporate by reference the voluntary standard, ASTM F3118-17a, *Standard Consumer Safety Specification for Infant Inclined Sleep Products*, with modifications to introduction, scope, performance, and testing requirements so infant sleep products that are not covered by standards for bassinets, cribs (full-size and non-full size), play yards, or bedside sleepers must have seat back angles intended for sleep of 10° or less

and must meet the requirements of 16 CFR part 1218 Safety Standard for Bassinets and Cradles.

Specifically, staff recommends that the Commission publish the draft Supplemental NPR, incorporating by reference the current standard, with modifications as noted in this package. Staff also recommends requesting public comment regarding all aspects of the draft Supplemental NPR. Because infant sleep products were not specifically mentioned as a durable infant or toddler product in section 104(f)(2), staff also recommends proposing to amend 16 CFR part 1130 to identify specifically infant sleep products.

**TAB A: Infant Inclined Sleep Product-Related Deaths, Injuries, and Potential Injuries Reported Between October 1, 2016 and June 30, 2019 Covering Incidents from January 1, 2005 – June 30, 2019**

**T
A
B

A**



**UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
4330 EAST WEST HIGHWAY
BETHESDA, MARYLAND 20814**

**Memorandum**

Date:     August 26, 2019

TO          :     Celestine T. Kish
                        Infant Inclined Sleep Products Project Manager
                        Division of Human Factors
                        Directorate for Engineering Sciences

THROUGH :     Stephen Hanway
                        Associate Executive Director
                        Directorate for Epidemiology

FROM      :     Risana Chowdhury, Division Director
                        Division of Hazard Analysis
                        Directorate for Epidemiology

SUBJECT  :     Infant Inclined Sleep Product-Related Deaths, Injuries, and Potential Injuries
                        Reported Between October 1, 2016 and June 30, 2019[1]

This memorandum updates the data in the Infant Inclined Sleep Products notice of proposed
rulemaking briefing package presented to the Commission in March 2017 (2017 NPR). Staff
of the Consumer Product Safety Commission (CPSC staff) extracted data for the 2017 NPR
on October 14, 2016. The 2017 NPR data included all incidents reported to have occurred
from January 1, 2005 through September 30, 2016. This memorandum includes any newly
reported infant inclined sleep product-related incidents from the January 2005 – September
2016 timeframe, as well as all new incidents reported to have occurred between October 1,
2016 and June 30, 2019. Staff found that the number of emergency department (ED)-treated
injuries reported through the National Electronic Surveillance System (NEISS) associated
with infant inclined sleep products, for the time frame covered, was insufficient to derive any
reportable national estimates.[2] Hence, staff does not present injury estimates in this

---

[1] This analysis was prepared by CPSC staff. It has not been reviewed or approved by, and may not necessarily reflect the views of, the Commission.
[2] According to the NEISS publication criteria, an estimate must be 1,200 or greater, the sample size must be 20 or greater, and the coefficient of
variation must be 33 percent or smaller.

memorandum. However, staff includes the emergency department-treated injuries in the total count of reported incidents.

**Incident Data[3]**

Since the 2017 NPR, CPSC staff received a total of 451 new incident reports related to infant inclined sleep products. Eighty-four percent of the new incidents are reported to have occurred between October 2016 and June 2019 (*i.e.,* after the timeframe covered in the 2017 NPR); the remaining 16 percent are newly reported incidents that occurred in the earlier timeframe of 2005 – September 2016. Forty-three percent of the incident reports (196 out of 451) are based solely on information from manufacturers/retailer.

Of the 451 reported incidents, 59 are fatalities; among the remaining 392 non-fatal incidents, 96 report an injury. Two hundred and seventy-six (276) incident reports provide the victim's age. Table 1 provides the age breakdown from the 451 incident reports.

**Table 1: Age Distribution in Infant Inclined Sleep Product-Related Incidents Reported Between October 1, 2016 and June 30, 2019**

| *Age of Child* | *All Incidents* | | *Injuries and Fatalities* | |
|---|---|---|---|---|
| | *Frequency* | *Percentage* | *Frequency* | *Percentage* |
| Unreported* | 175 | 39 | 16 | 10 |
| One – Five Months | 218 | 48 | 108 | 70 |
| Six – Eight Months | 49 | 11 | 23 | 15 |
| Nine – Twelve Months | 7 | 2 | 6 | 4 |
| Over One year | 2 | <0.5 | 2 | 1 |
| *Total* | *451* | *100* | *155* | *100* |

Source: CPSC epidemiological databases CPSRMS and NEISS. Percentages may not add to 100 due to rounding.
* Age may be "unreported" under two circumstances: age was unknown or age was not reported because the incident involved no injury.


*Fatal Incidents*

Since the 2017 NPR, CPSC staff received reports of 59 deaths. One product is a foam-based infant reclined sleeper; two products are napper attachments of play yards; and the remaining products are

---

[3] CPSC staff searched two databases: the Consumer Product Safety Risk Management System (CPSRMS) and the National Electronic Injury Surveillance System (NEISS). Reported deaths and incidents do not provide a complete count of all that occurred during this period. However, they do provide a minimum number of deaths and incidents occurring during this period and illustrate the circumstances involved in the incidents related to infant inclined sleep products.

CPSC staff extracted reported incident data on 7/19/19. Staff extracted all data coded under product codes 5037 (hammocks), 1537 (bassinets/cradles), 1513 (playpens), 1529 (portable cribs), 1542 (baby mattresses or pads), 1553 (portable baby swings), and 1558 (baby bouncer seats), and staff used keyword searches to identify the potentially in-scope cases. Upon careful joint review with CPSC's Directorates for Engineering Sciences and Economics staff, staff considered many cases out-of-scope for the purposes of this memorandum. For example, staff excluded from the analysis cases where a pre-existing medical condition was the official cause of death or cases where the infant using the product was much older than the recommended age. However, staff retained all incidents where hazardous environments in and around the infant inclined sleep product resulted in fatalities, injuries, or near-injuries. With the exception of incidents occurring on U.S. military bases, staff excluded all incidents that occurred outside of the U.S. To prevent any double counting, staff consolidated and counted as one incident when staff identified multiple reports of the same incident.

freestanding framed inclined sleep products. Staff reviewed and categorized incident reports associated with the fatalities:

- Twenty-eight of the 59 reports contain unclear, conflicting, and/or inconsistent information. For example, in this category medical examiners often conclude the cause of death to be Sudden Infant Death Syndrome (SIDS) or Sudden Unexpected Infant Death (SUID) along with a co-contributing condition such as unsafe sleep environment (*e.g.*, soft bedding, inclined sleep surface) or other pre-existing medical condition. Considering all factors in each report confounds staff's ability to determine the predominant factor causing a fatality. Occasionally, wording on the documents cite "several possibilities" and the cause of death is coded as Undetermined. Lack of clarity in these reports make it difficult for CPSC staff to consistently classify the 28 deaths.

- Eighteen reports describe infants placed in the product supine but who ended up in a compromised position in the product, resulting in suffocations or positional asphyxiations. In 11 of the 18 cases, no restraints were used; another six infants were placed in a supine position, but the use of restraints is unknown; and in one case, the infant was left restrained and supine, but found supine, slumped in a chin-to-chest position. One additional unrestrained infant fell out of the product and became wedged in a confined space.

- Eight reports provide very little information on the incidents. Lack of any information on the circumstances leading up to the death does not allow staff to classify these deaths.

- Four reports describe infant placement issues; three of the four decedents were reportedly placed prone on soft bedding in the product; and another decedent suffocated when a young sibling climbed into the sleep product on top of her.

CPSC does not know the age for 10 deceased infants. Staff concludes that, for the remaining deaths, 39 infants were 5 months or less in age, and six infants were between 6- and 8-months of age. One decedent was 9-months old.

*Nonfatal Incidents*

Ninety-six of the 451 infant inclined sleep product-related incident reports involve a nonfatal injury. Among these injuries staff found:

- Seven infants required hospital admission. Six of the seven infants suffered episodes of respiratory distress due to rolling over in the product; mold in the product; or undetermined reasons. One of the seven infants was hospitalized for *scoliosis* (curvature) of the back attributed to product use.

- Sixteen infants were treated and released from hospital emergency departments. Eleven of the sixteen infants were treated for head injuries and contusions/bruises resulting from falls; three infants were treated for unexplained respiratory distress. Mold growth on the product was associated with respiratory distress in one additional infant and seizure symptoms in another.

- Seventy-three infants received some professional medical care, first-aid treatment, or the level of care received was not reported. Among them, 32 infants suffered from *plagiocephaly*

(flat head syndrome), *torticollis* (twisted neck syndrome), or both conditions, associated with the use of the inclined sleep product; 27 infants suffered mostly respiratory and some skin problems associated with mold on the product; infants sustained the remaining injuries due to a fall from the product or a minor electric shock, or their injuries are unspecified.

The remaining 296 incident reports indicate that no injury occurred or provided no information about an injury. However, many of the descriptions indicate the potential for a serious injury or even death.

**Hazard Patterns**

In the 2017 NPR, CPSC staff identified nine hazard patterns in the 657 reported incidents. These hazard patterns include: design issues, lack of structural integrity, inadequate restraints, electrical issues, non-product-related or unknown issues, difficulty with correct positioning, miscellaneous product-related issues, unspecified falls, and consumer comments. Although the distribution of the data in this 2019 update varied somewhat, staff finds that the broader hazard categories are very similar. However, within the broader hazard category of design, staff identified one new hazard pattern, as described below.

Staff considered all 451 reported incidents (59 fatal and 392 nonfatal) to identify hazard patterns associated with infant inclined sleep products. The infant inclined sleep products category includes a variety of products. Some products, like hammocks, are suspended in air. Other seat-like products are meant to be placed on a floor, but incident reports indicate these products often were not placed on floor level. Yet other products sit on top of larger nursery products as attachments. Staff identified hazard patterns that are quite different depending on which product is involved and how the product is being used. In order of frequency of incident reports, staff grouped the hazard patterns into the following categories:

1. ***Design*** of the infant inclined sleep product: One hundred and thirty-eight of the 451 reported incidents (30 percent) are in this category. Staff identified three major issues:

    a. According to 59 of the 138 reported incidents (43 percent), infants developed respiratory and/or skin ailments due to the growth of mold on the product;
    b. According to 46 of the 138 reported incidents (33 percent), infants rolled over—fully or partially—from their original supine position. Reports describe infants as young as 1- or 2-months of age as having rolled over; parents/caregivers, who witnessed and reported some of the nonfatal incidents, were able to rescue distressed infants quickly. Eighteen infants died due to suffocation or asphyxiation. Although a few of the infants were strapped into the product, a majority of the infants were either not restrained or the restraint use is unreported.
    c. According to 33 of the 138 reported incidents (24 percent), infants developed physical deformations from extended product use, such as *plagiocephaly* (flat head syndrome), *scoliosis* (curvature) of the back, and/or *torticollis* (twisted neck syndrome).

The design category includes 19 deaths, 5 hospitalizations, and 4 emergency department (ED) visits. All but two of the deaths resulted from infants rolling over into a prone or semi-prone position; one decedent was found still supine and restrained, but slumped in a chin-to-chest position. The other infant rolled out of the product and wedged into a confined space. An additional 62 non-hospitalized, non-ED injuries are reported in this category.

2. *Electrical* issues: One hundred and twenty-seven of the 451 incident reports (28 percent) report battery leakage, electric shock, and/or overheating/melting of components, such as the vibrating unit, battery cover, switch, plug, or motor. Reports include two injuries in this category due to electric shock.

3. *Consumer comments*: Ninety of the 451 reports (20 percent) included consumer feedback, but did not report an actual incident. The reports consist of consumer comments/observations of perceived safety hazards, complaints about unauthorized sale of infant inclined sleep products, or inquiries regarding safety recall on inclined sleep products. One complaint describes misinformation in the instruction material.

4. *Undetermined* due to confounding information: Thirty-four of the 451 reports (8 percent) provide unclear, conflicting, and/or inconsistent information. Among the 28 deaths reported in this category, for example, medical examiners often concluded the cause of death to be SIDS or SUID, along with a co-contributing condition such as an unsafe sleep environment (*e.g.,* soft bedding, inclined sleep surface) or pre-existing medical condition. Staff is unable to determine the role of the product when documents describe multiple potentially contributing factors. Occasionally, the wording on the documents cite "several possibilities" and the cause of death is coded as Undetermined. For the 6 nonfatal injuries, including the 2 hospitalized and 2 ED-treated injuries, the report described respiratory distress due to temporary cessation of breathing; however, these reports contain no official diagnosis for these episodes.

5. Lack of *structural integrity*: Twenty-eight of the 451 incidents (6 percent) report some sort of breakage of the product or its components. These reports include complaints of buckle/straps breaking, components such as hub, rail, or leg detaching/disengaging, hardware coming loose, and other unspecified components breaking. This category includes two ED-treated injuries, both due to falls.

6. *Other product-related* issues: Thirteen of the 451 incidents (3 percent) incidents report other product-related issues, such as instability (product tipping over), inadequacy of restraint (infants falling our in spite of being restrained), or product assembly/installation difficulties. This category contains nine, mostly fall-related injuries, including two injuries that were treated and released from a hospital ED.

7. ***Infant placement*** issues:  Four of the 451 incidents reports (1 percent) indicate that infant placement contributed to the incident.  Of the four fatalities, reports describe three infants placed in a prone position on soft bedding and another infant being crushed by a young sibling who climbed on top of her.

8. ***Insufficient information***: For 17 of the 451 incidents (4 percent), reports contain insufficient information for staff to categorize them accurately.  Staff has no information available on the circumstances of 8 deaths in this category.  Reports for six injuries in this category describe unspecified falls treated in hospital EDs, with no information was on restraint usage.

Figure 1 displays the hazard pattern distribution for the 451 incident reports:

**Figure 1: Distribution of Incident Reports Associated with Infant Inclined Sleep Products by Hazard Pattern Characterizations Reported Between October 1, 2016 - June 30, 2019**



31% Design Issues
(74% of injuries;
32% of deaths)

28% Electrical Issues
(2% of injuries;
no deaths)

20% Consumer
Comments
(No injuries;
no deaths)

8% Undetermined
Issues
(6% of injuries;
47% of deaths)

6% Structural Integrity
Issues
(2% of injuries;
no deaths)

3% Other Product
Related Issues
(9% of injuries;
no deaths)

1% Infant
Placement Issues
(No injuries;
7% of deaths)

4% Insufficient
Information
(6% of injuries;
14% of deaths)

Source: CPSC epidemiological databases CPSRMS and NEISS.
Note: Percentages do not always add to 100 due to rounding.

# TAB B: Biomechanical Analysis of Inclined Sleep

**Biomechanical Analysis of Inclined Sleep Products – FINAL Report 09.18.2019**

*Consumer Product Safety Commission Solicitation Number:* ██████████

*Principal Investigator:*  Erin M. Mannen, Ph.D., *Biomechanics Researcher*
         *Assistant Professor of Orthopaedic Surgery*
         *Director of Translational Orthopaedic Research*
         4301 W. Markham St., Slot 531
         Little Rock, Arkansas 72205
         (501) 686-5416
         emannen@uams.edu

*Co-Investigators:*   John Carroll, M.D., *Pediatric Pulmonologist*
         *Professor of Pediatric Pulmonology*
         University of Arkansas for Medical Sciences
         Arkansas Children's Hospital

         David B. Bumpass, M.D., *Pediatric Spine Surgeon*
         *Assistant Professor of Orthopaedic Surgery*
         University of Arkansas for Medical Sciences
         Arkansas Children's Hospital

         Brien Rabenhorst, M.D., *Pediatric Orthopaedic Surgeon*
         *Associate Professor of Orthopaedic Surgery*
         University of Arkansas for Medical Sciences
         Arkansas Children's Hospital

         Brandi Whitaker, Ph.D., *Pediatric Psychologist*
         *Associate Professor of Pediatric Psychology*
         University of Arkansas for Medical Sciences
         Arkansas Children's Hospital

         Junsig Wang, Ph.D., *Biomechanics Researcher*
         *Postdoctoral Research Fellow*
         Department of Orthopaedic Surgery
         University of Arkansas for Medical Sciences

         Safeer F. Siddicky, Ph.D., *Biomechanics Researcher*
         *Postdoctoral Research Fellow*
         Department of Orthopaedic Surgery
         University of Arkansas for Medical Sciences

*Project Time Period:*  September 2018 to September 2019

32  JA148

**TABLE OF CONTENTS:**

1. Background                                Pg. 3
2. Incident Report Analysis                  Pg. 4
3. Product Analysis                          Pg. 10
4. Biomechanical Testing                     Pg. 23
5. Summary of Findings                       Pg. 60
6. ASTM Standard Recommendations             Pg. 63
7. References                                Pg. 66

*Appendices*
Appendix A: Study Team                       Pg. 69
Appendix B: Facilities and Equipment         Pg. 71
Appendix C: ██████████ [CONFIDENTIAL]        Pg. 72
Appendix D: Incident Report Summaries        Pg. 73

## 1. BACKGROUND

Since 1992, the American Academy of Pediatrics (AAP) has recommended that infants under the age of one should be placed for sleep on a flat and firm surface in the supine position to reduce the incidence of Sudden Infant Death Syndrome (SIDS). The rate of SIDS deaths has decreased by 70% since the National Institute of Child Health and Development (NICHD) "Safe-to-Sleep" campaign (formerly "Back-to-Sleep") was implemented in 1992.[1] However, some infants are currently placed to sleep in Inclined Sleep Products, designed to keep an infant supine at a 10 to 30 degree incline, and do not meet safe sleep guidelines set forth by the NICHD and AAP. Parents are advised to always use restraints in the products and to discontinue use once an infant has the ability to roll over. However, several infant deaths have been reported in Inclined Sleep Products with the deceased infants often found in the prone position, with suffocation as the apparent cause of death. It is, therefore, imperative to understand if the *design* of the Inclined Sleep Products contribute directly to an increased rate of infant deaths by either making it easier to roll from the supine to the prone position or making it more difficult to self-correct from the prone to the supine position when infants are prone in the product. It is hypothesized that an infant's body position on or within a product is related to the infant's ability to move, to perform a head lift, or to achieve a roll. Movement demands based on a product design or body position may have a direct relationship to an infant's risk of suffocation due to inability to maneuver into a safe breathing position.

The following studies were proposed to begin answering these questions:

1. An analysis of the **incident reports** related to Inclined Sleep Products to qualitatively assess trends, similarities, or differences in the incidents that may inform product safety,
2. A thorough **product analysis** of various Inclined Sleep Products within the product class to identify differences in design,
3. A non-invasive *in vivo* **biomechanics study** of infants 2-6 months of age to determine:
   (a) the strength and space requirements for infants to move their heads and/or roll from the supine to the prone position in Inclined Sleep Products compared to a Flat Sleep Product,
   (b) the strength and space requirements for infants to lift their heads and/or roll from the prone to the supine position in Inclined Sleep Products compared to a Flat Sleep Product.

The outcomes of this study will inform the Consumer Product Safety Commission (CPSC) on whether the designs of Inclined Sleep Products impact an infant's ability to move within the products, and if those designs directly impact safety or present a risk factor contributing to suffocation of an infant. Based on the results of the studies, if necessary, the current ASTM International standard will be reviewed to make recommendations to mitigate hazards from this class of products.

Summaries of the project team can be found in Appendix A. Summaries of the facilities and equipment used in this study can be found in Appendix B.

## 2. INCIDENT REPORT ANALYSIS

### *2.1 Incident Report Methods*
The CPSC provided the research team with details of incidents involving Inclined Sleep Products. At the time of this report (July 2019), there were 91 separate incidents reported to or investigated by the CPSC involving an incident (hazard, injury, or death). Varying amounts of information were provided for each incident, including police reports, coroner reports, witness statements, photos, videos, and summaries of the event written by CPSC employees. The summaries written by the CPSC were not considered in this qualitative analysis.

Each incident was reviewed by two members of the research team, separately confirming details of the events. The following data was gathered from the reports and organized in a spreadsheet: date of incident, incident (hazard, injury, or death), manufacturer and model, city and state, infant demographics at time of incident (age, sex, race/ethnicity, height, weight), incident details (initial position, found position, time since last checked, found by, restraint used, soft goods found with infant, other items found with infant, room temperature, current medical conditions, usual sleeping position, other notes), birth and pregnancy details (pregnancy concerns, gestational age, maternal age, paternal age, Apgar Score, height, weight, previous medical history), coroner report details (medical findings, cause of death, manner of death, medical notes), conflicting details noted by the team, and other notes of interest.

The incidents were sorted into the following six categories with descriptions:
- *Supine-supine*: infant was placed in a supine position and found in a supine position.
- *Supine-prone*: infant was placed in a supine position and found in a prone or side-lying position.
- *Supine-other*: infant was placed in a supine position and found in a sitting position, was hanging from the product, or had fallen out of the product.
- *Prone-prone*: infant was placed in a prone position and found in a prone position.
- *Other circumstances*: external circumstances not related to the product caused the incident.
- *Not enough information*: reports do not have enough information to determine event; there were no witness statements, detailed description of the event, police report, hospital records, or medical records included in these incidents.

Because some incident reports were incomplete or contained conflicting details regarding initial and found positions, extra attention was given to these incidents to categorize them as accurately as possible. For instance, if autopsy or police investigative evidence supported that the found position was different than initially reported by the caregivers (i.e. location of lividity in autopsy reports), the categorization was based on an evaluation of all information available for that incident.

Descriptive qualitative analysis of each of these incident categories was provided, with the biomechanists and pediatric orthopaedists focusing on the movement-based incidents (*supine-prone, supine-other)*, and the biomechanists and pediatric pulmonologist focusing on the *supine-supine* and *prone-prone* categories. Student's t-tests (p=0.05) were used to compare average ages of infants who experienced *supine-supine* v. *supine-prone* events. Reference to specific product manufacturers or designs has been blinded from the main portion of this report, so companies are referred to as "Company A, Company B," etc. Similarly, the products are coded as "S01, S02," etc. The key for company and product codes can be found in Appendix C.

4

### 2.2 Incident Report Results

All 91 incidents were reviewed and sorted into the following categories described in section 2.4:

- **Supine-supine**: 38 [Company A (products S01 and S02); Company B (products S03 and S06)]. Of these, 33 were deaths, 4 were injuries, and 1 was a hazardous event.
- **Supine-prone**: 25 [Company A (products S01 and S02); Company B (products S03 and S06); Company C (product S08)]. Of these, 21 were deaths and 4 were injuries.
- **Supine-other**: 4 [Company A (product S01)]. Of these, 2 were injuries and 2 were hazardous events.
- **Prone-prone**: 3 [Company A (products S01 and S02)]. All 3 of these incidents were deaths.
- **Other circumstances**: 2 [Company A (products S01 and S02)].
- **Not enough information**: 19 [Company A (products S01 and S02)].

Detailed summaries of all incidents are provided in Appendix D.

The **_Other circumstances_** category included incidents where external circumstances not related to the product caused the event. Both cases were deaths. These two events are not under consideration as incidents that may have been caused by the inclined sleep products.

After eliminating the two incidents from the **Other circumstances** category, 89 events were left to analyze. Nineteen incidents were categorized as **_Not enough information_**. If incidents did not contain police reports or interviews, medical records, descriptive information regarding the event, or autopsy/coroner's reports, they were considered in this **Not enough information** category. Two of these incidents (1 death, 1 injury) were reported to the CPSC or found via internet research but attempts by the CPSC for follow-up communication were unsuccessful. Of the remaining 17 events, 14 were deaths and 3 were injuries. Most of these incidents were reported to or discovered by the CPSC after the April 2019 voluntary recall of two companies' inclined sleep products. Therefore, many of the CPSC investigations are ongoing. It is expected that many of these events will eventually fall into either the **supine-supine, supine-prone, supine-other,** or **prone-prone** categories after in-depth investigations have been completed, but there is not enough information to be certain at the time of this report.

After excluding the 19 incidents from the **Not enough information** category, 70 events remained. The **_supine-supine, supine-prone, supine-other,_** and **prone-prone** events were considered the highest priority in analyzing and understanding the circumstances surrounding the events, therefore these categories were examined in more detail.

Figure 1 shows a map of the continental United States with pins placed at the locations of each **supine-supine, supine-prone, supine-other,** or **prone-prone** incident, and colors indicate the event (blue-death; orange-injury; green-hazard). Events occurred in 29 states throughout the country.



**Figure 1**. Map of the United States showing *supine-supine, supine-prone, prone-prone,* and *supine-other* incidents related to inclined sleep products reported to and investigated by the CPSC. Blue-death; orange-injury; green-hazard.

### *Supine-Supine Events*

There were 38 **_supine-supine_** events reported and investigated between 2011 to 2019. Of these, 33 resulted in death, 4 resulted in injury, and 1 was a hazard. Events occurred in products from Companies A and B, with basic (S01 and S03) and deluxe (S02 and S06) versions of their inclined sleep products. Sex distribution was 20 males and 18 females. Racial/ethnicity distribution was 23 White, 5 Black, 3 Hispanic, and 7 Not Reported. The average age of the infants at the time of the event was 3.2±2.3 months (adjusted age 3.0±2.3 months). Six infants were reportedly born pre-term (<37 weeks gestation).

The incidents in which a death occurred when an infant was placed supine and found supine show a few notable trends. First, 10/33 (30%) of the deaths occurred in infants who were currently sick with colds, respiratory symptoms, or fevers. Upon further review, 4/33 (12%) of infant deaths occurred in infants with significant health problems or chronic health issues. Four reports indicated smoking in the home, and all of these were of infants who were currently sick or chronically ill. A pediatric pulmonologist determined that 4/33 (12%) of the deaths are likely attributed to health issues not necessarily caused by the sleeping position. While only a few incidents specifically indicated a "chin-to-chest" position, the deaths or injuries may have been related to either a chin-to-chest position that restricted airflow, and/or carbon dioxide rebreathing from contact or near-contact of the infants' faces to the sides of the products, a position that was commonly noted in the police reports in the in-depth investigations. However, no further analyses on these incidents nor on the chin-to-chest position were performed, so the impact of the chin-to-chest position in inclined sleep products is unknown. In addition, many of the reports indicate the parents utilized an inclined sleep product on the recommendation of a medical professional or friend to aid either respiratory sickness or reflux, though this recommendation is not supported with evidence-based research. Of the infants who were not suffering from a chronic health condition or temporary illness at the time of the death, four were sick within the last month. 6/33 (18%) of infants who died were born premature. Two reports indicated the inclined sleep product was not the infant's

6

regular sleeping surface, but most reports had missing information regarding normal sleeping position. Several infants were placed supine with their lower extremities swaddled and their upper extremities free to move. Twelve infants were reportedly not buckled into the product, while six were initially buckled, with many reports not listing the information. No significant trends were found regarding other demographic or situational data, partly due to incomplete reports across the many categories.

Positional asphyxiation is the most likely cause of death for most of the infants in the ***supine-supine*** group, particularly when considering most of the products were "deluxe" versions (S02 and S06) which feature very heavy padding with a pillow-like headrest. It is likely that infants' noses and mouths were too close to the side of the product, resulting in reduced airflow and carbon dioxide rebreathing, leading to their demise. This is further supported by the number of infants who had blood and/or mucus on their noses or mouths when they were found. Nasal hemorrhaging is associated with suffocation in infant deaths (Bercroft et al., 2001), and the presence of blood noted in these reports supports suffocation as the cause of death. However, no breathability analysis was conducted as a part of this study, so it cannot conclusively be stated that the material or design of the product promoted carbon dioxide rebreathing or suffocation based on the incident analyses.

### *Supine-Prone Events*
There were 25 ***supine-prone*** events reported and investigated between 2010 and 2019. Of the 25 events, 21 resulted in death and 4 resulted in injury. Events occurred in products from Companies A, B, and C, with basic (S01 and S03) and deluxe (S02 and S06) inclined sleep products, and product S08 which was sold as a stand-alone sleep product in a larger set by Company C. Sex distribution was 15 males and 10 females. Racial and ethnicity distribution was 15 White, 2 Black, 1 Hispanic, 2 Other, and 5 Not Reported. The average age of the infants at the time of the event was 4.2±1.8 months (adjusted age 4.0±2.1 months), 1.0 months older than the age of infants who experienced supine-supine events (p=0.081). One infant was reportedly born pre-term (<37 weeks gestation).

Similar to the *supine-supine* incident analysis, the incidents in which a death occurred when an infant was placed supine and found prone show a few notable trends. First, 4/21 (19%) of the deaths occurred in infants who were currently sick with colds, respiratory symptoms (at least moderate congestion), or fevers. No deaths occurred in infants with significant health problems or chronic health issues. Of the infants who were not suffering from a temporary illness at the time of the death, three were sick within the last month, and five others had findings during the autopsy that indicated mild lung congestion. 1/21 (5%) of infants who died was born premature. A few reports specifically mentioned that the baby had never before rolled unassisted, but most investigations did not contain this information. Similarly, though many reports did not have the information, five parents indicated the inclined sleep product was not the infant's typical sleeping environment, with one mother stating the infant died the first time the product was used. Nine infants who died were reportedly not buckled into the product, while one was initially buckled, with eleven reports not listing the information. In many of the incidents, the babies were found with their faces in direct contact with the surface, the "pillow" portion, or the seat portion of the inclined sleep product. In the incident where the infant was reportedly initially buckled, it was noted that the caregiver found the infant with the feet in the seat portion of the inclined sleep product, in a "standing" type of prone-lying position within the product. No significant trends were found regarding other demographic or situational data, partly due to incomplete reports across the many categories.

In the United States, it is recommended that infants are put to sleep on their backs, partly based on previous research indicating prone sleeping results in lower oxygen saturation levels in babies (Galland et al., 2000), especially premature babies (Smith et al., 2010). Other peer-reviewed research indicates that at 4 months old, 40% of infants who sleep supine are able to roll (Jantz et al., 1997), with 80% of infants rolling prior to six months of age (Benjamin Neelon et al., 2016). One study reports the age of rolling from front-to-back-to-front is just under six months (Ertem et al., 2018). Once an infant is able to roll on his/her own, the risk of suffocation from prone sleeping may decrease as the infant has increased motor control and has a greater ability to reposition themselves to avoid suffocation. In fact, once an infant is able to roll from supine to prone and prone to supine unassisted, parents are told by the AAP to continue to place the infant to sleep on their backs until 1 year of age, but not to worry or reposition the baby back to supine if the baby rolls to prone on their own during sleep (Moon et al., 2016). This logic likely does not translate to the inclined sleep products because the environment is so different compared to a flat crib mattress. Additionally, other researchers report that the most common risk factor for sleep-related deaths in 4 to 12 month old infants is rolling into other objects in their sleep area such as crib bumpers or pillows (Colvin et al., 2014). This again raises concerns with the inclined sleep products, as the surface is not the same as a crib mattress and often features heavy padding similar to crib bumpers and headrests that are similar to small pillows.

The average age of the infants in these **_supine-prone_** incidents who experienced events of rolling from supine to prone in an inclined sleep product was 4.2 months (approximately 1.5 months less than average front-to-back-to-front rolling age, Ertem et al., 2018), and many of the reports include statements that the parents had never observed the infant roll on his/her own. It is likely that if an infant experiences a supine to prone roll for the first time in an inclined sleep product, that the baby is put in a position he/she has never before experienced: prone in a non-rigid, concave, and/or heavily padded inclined sleep product. The biomechanical analysis (Section 4) explores these ideas further.

### Supine-Other Events
There were four **_supine-other_** events reported and investigated between 2011 and 2013. Two events were injuries and two were hazards. Events occurred in basic products (S01) from Company A. Sex distribution was two males and two females. Racial and ethnicity distribution was 1 White, 1 Other, and 2 Not Reported. The average age of the infants at the time of the events was 7.0±3.4 months. Restraints were reportedly used in three of the four events (75%). No information on prematurity or health was reported in these events.

These four **_supine-other_** incidents occurred in infants aged 5 months to 12 months, an older cohort than the other categories. In two incidents, caregivers reported that infants were able to climb out of the product, even when buckled into the harness. One infant was found sitting backwards in the product. In the remaining incident, the infant was found hanging from the product with her leg caught in the harness straps. These four incidents describe events in which babies have maneuvered within or out of the inclined sleep products, resulting in unintended and hazardous positions. A fall from the product to the floor presents a risk of injury for the infant. The incident describing the infant's leg caught in the product presents a risk of serious injury if circulation is cut off for too long; pain and muscle damage are potential outcomes. These events highlight a unique set of risks that are likely specific for older infants who are able to significantly maneuver within or out of the inclined sleep products

### Prone-Prone Events
There were three **_prone-prone_** events reported and investigated between 2013 and 2017. All three events resulted in deaths. Events occurred in products from Company A basic (S01) and

8

deluxe (S02) inclined sleep products. All three infants were female. Racial and ethnicity distribution was 2 Black and 1 Hispanic. The average age of the infants at the time of the event was 2.3±2.1 months (adjusted age 1.9±2.3 months). One infant was reportedly born pre-term (<37 weeks gestation). At the time of the incidents, one infant was healthy, one was sick, and one was chronically ill. Two parents reported that no restraint was used. While instructions on inclined sleep products indicate that infants should be placed in the supine position, it is clear from these three incidents that those instructions are not always followed by caregivers. The biomechanical analysis (Section 4) will further explore the implications of the prone position in inclined sleep products.

### Incident Report Summary

Ninety-one reported incidents of deaths, injuries, and hazards occurred in inclined sleep products from 2010 to 2019. Most incidents fell into two main categories: *supine-supine* and *supine-prone*. The *supine-supine* events occurred in younger infants (average 3.2 months), and many were currently sick, suffering from chronic conditions, or born prematurely. Many reportedly were found with their faces in contact with the sides of the product, and several had blood or mucus on their nose and mouth when they were found, suggesting suffocation as a cause of death. The *supine-prone* events occurred in older infants (average 4.2 months), and sickness, chronic conditions, and prematurity were less prevalent compared to the *supine-supine* events. The three-point harness was used in at least one *supine-prone* event and three of the four *supine-other* events, and many reports indicated that the infant had not been observed to roll alone prior to the incident.

9

## 3. PRODUCT ANALYSIS

### 3.1 Overview
The CPSC provided the research team with 14 different unassembled products that fell into the category of "Inclined Sleep Product." Most products were frame-type products that were sold alone, but one product (S08) was sold as a part of a set of infant products. Each product was assembled by the research team according to the instructions and was thoroughly examined to ensure no product damage was present.

Each of the 14 inclined sleep products were analyzed and measured using methodology from ASTM F3118-17a: Standard Consumer Safety Specification for Infant Inclined Sleep Products. The research team also identified additional differences in products, and therefore added other measurements as needed. Below is a table of the Measurement, Procedure, and corresponding Photos used to obtain each measurement. A hinged weight gauge infant was also provided by the CPSC. The research team measured and analyzed it to ensure it met the appropriate dimensions prior to using it for measurements.

### 3.2 Measurement Procedures
Table 1 details the measurements taken for each of the 14 inclined sleep products. Some products allowed for different incline settings, so measurements were taken at both the highest and the lowest settings.

**Table 1:** Measurements with detailed procedures and photos in a representative inclined sleep product.

| Measurement | Procedure | Photos |
|---|---|---|
| Minimum Incline at Head | 7.10* = Hinged weight gauge-infant centered in product with hinge centered over seat bight line, upper plate on seat back surface. Digital protractor placed (centered) on upper plate to measure top surface seat back angle relative to horizontal. |  Incline angle at Head |
| Maximum Incline at Head | 7.11* = If applicable, repeated with manufacturer's recommended highest incline position | |
| Minimum Incline at Thigh | Placed as above, for lower plate, to get thigh angle |  Incline angle at thigh |
| Maximum Incline at Thigh | As above, repeated with manufacturer's recommended highest incline position | |

10

| | | |
|---|---|---|
| Side height (Depth at 11.4") | 7.12* = Reference line made at 11.4" from hinge on upper plate. Center point of this reference mark also made. Straight edge with length greater than product width laid across product "rails"/"top", second straight edge placed vertically upwards from reference mark to ensure orthogonal measurement. Vertical distance (d) between underside of straight edge and the upper surface of the hinged weight gauge-infant measured with measuring tape. (Fig. 12, page 13)* | <br>Side Height (Depth at 11.4") |
| Usable length (Hinge, to top of backing seam, where the head sits) | 7.15* = Hinged weight gauge-infant centered in product with hinge centered over seat bight line, upper plate on seat back surface. Measured, using a tape measure, the distance from intersection of gage plates to top edge of head containment area (top seam above which the head cannot be positioned) | <br>Usable length |
| Width at Shoulder (at 11.4") | Start of additional measurements. Straight edge with length greater than product width laid across product "rails"/"top", second straight edge placed vertically upwards from reference mark to ensure orthogonal measurement. Width of product at this point measured with tape measure | <br>Width at shoulder (at 11.4") |
| Width at Hinge | As above, repeated at intersection of upper and lower plate (hinge) | <br>Width at hinge |

11

| | | |
|---|---|---|
| Width at Knee | As above, repeated at bottom of lower plate |  Width at knee |
| Maximum Width | Tape measure used to measure maximum width of product (excluding attachments such as electronics or mobile) |  Maximum width |
| Minimum Width | As above |  Minimum width |

| | | |
|---|---|---|
| Minimum Incline (w/Rock) | Digital protractor placed (centered) on upper plate to measure top surface seat back angle relative to horizontal. Minimum incline w/rock was defined as the angle displayed on protractor with maximum rock/tilt towards head end | <br>Minimum incline angle with rock |
| Maximum Incline (w/Rock) | As above, with maximum tilt/rock towards foot end | <br>Maximum incline angle with rock |
| Curved / Thick Plastic Molding? (Y/N) | Whether the product had curved/thick plastic molding underneath the surface and/or seat | |
| Thin Plastic Molding? (Y/N) | As above, but whether the material was a thin deformable plastic | |
| Side Mesh? (Y/N) | Whether there was side mesh (3.1.9)* | |
| Plastic | For Reference line (11.4 from hinge), Hinge, and Bottom of lower plate, measurements made along the surface parallel to reference line. This measure is from the center line on the reference line to the "edge" of the plastic molding (if any) | <br>At 11.4"<br>Distance, along laying surface, to the end/edge of plastic molding from the center of hinged weight-gauge infant |

13

| Solid | From the center line to the end/edge of the solid "fabric" |  |
|-------|-----------------------------------------------------------|----------------------|
| Mesh | From the center line to the end/edge of the mesh (if any) |  |
| End | From the center line to the end/edge of the product, i.e. up to the rail |  |

*These refer to Sections of ASTM F3118-17a: Standard Consumer Safety Specification for Infant Inclined Sleep Products

### 3.3 Measurement Results

All 14 inclined sleep products were evaluated, and all products exhibited no damage as received. After assembly, product S07 exhibited a slight lateral tilt, and if selected for further biomechanical evaluation, a different product of the exact same model would be purchased to ensure the tilt was not a result of mis-assembly or a manufacturing issue. However, all other results of the product analysis for product S07 would not have changed due to the lateral tilt, therefore the conclusions applicable to product S07 are valid.

Table 2 summarizes the measurements taken defining the design of the product. Products with a "–high" and "-low" row of measurements indicate that they had two incline settings at the head. Blanks (i.e. "x") for "maximum incline" at head or thigh indicates the product did not have an incline adjustable head portion. For products S05, S11 and S12 (i.e. the products with adjustable inclines), the maximum and minimum values are tabulated on the same row (high), and the row below has two blanks since the two values above are the minimum and maximum incline values of the product as a whole. When there is an "x" for min (or max) "incline w/ rock", that means the product does not rock.

**Table 2.** Sample measurements and characteristics

| Sample | Minimum Incline @ Head (deg) | Maximum Incline @ Head (deg) | Thigh Angle @ Minimum Incline (deg) | Thigh Angle @ Maximum Incline (deg) | Side height (Depth at 11.4") (cm) | Usable length (Hinge, to top of backing seam/ head location) (cm) | Width at Shoulder (at 11.4") (cm) | Width at Hinge (cm) | Width at Knee (cm) | Maximum Width (cm) | Minimum Width (cm) | Minimum Incline (w/Rock) (deg) | Maximum Incline (w/Rock) (deg) | Curved / Thick Plastic Molding? (Y/N) | Thin Plastic molding? (Y/N) | Side Mesh? (Y/N) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S01 | 27.7 | x | 44.5 | x | 13.3 | 43.2 | 46.7 | 43.5 | 37.1 | 46.7 | 32.1 | 26.2 | 36.5 | Y | N | Y |
| S02 | 24.4 | x | 51.7 | x | 14.0 | 45.1 | 47.3 | 16.8 | 38.7 | 51.8 | 32.4 | 23.0 | 31.7 | Y | N | Y |
| S03 | 25.5 | x | 24.3 | x | 17.1 | 43.5 | 39.7 | 39.7 | 38.7 | 41.0 | 34.0 | x | x | N | N | Y |
| S04 | 26.0 | x | 23.9 | x | 15.6 | 41.6 | 40.0 | 40.6 | 39.1 | 40.6 | 34.3 | x | x | N | N | Y |
| S05-high | 12.2 | 38.7 | 4.4 | 1.1 | 6.7 | 42.2 | 34.3 | 36.8 | 32.4 | 36.5 | 27.9 | 34.0 | 41.9 | Y | N | Y |
| S05-low | x | x | x | x | 20.0 | 39.4 | 30.2 | 35.6 | 32.4 | x | x | 10.7 | 18.3 | x | x | x |
| S06 | 31.1 | x | 22.0 | x | 11.7 | 39.4 | 41.6 | 43.2 | 40.6 | 43.8 | 30.2 | 29.1 | 35.6 | N | N | Y |
| S07 | 9.3 | x | 24.5 | x | 25.1 | 42.5 | 51.8 | 48.6 | 41.0 | 51.8 | 30.2 | 4.2 | 15.0 | Y | N | Y |
| S08 | 31.3 | x | 38.2 | x | 3.8 | 43.5 | 42.9 | 40.6 | 35.2 | 41.9 | 18.4 | 29.8 | 36.4 | N | N | N |
| S09 | 20.9 | x | 52.1 | x | 14.6 | 43.5 | 45.1 | 43.2 | 37.8 | 45.4 | 31.4 | 18.8 | 26.8 | Y | N | Y |
| S10 | 25.7 | x | 52.6 | x | 13.7 | 44.5 | 44.5 | 43.2 | 38.1 | 44.5 | 31.1 | 24.7 | 30.0 | Y | N | Y |
| S11-high | 11.8 | 20.5 | 31.4 | 22.9 | 22.2 | 39.4 | 50.5 | 47.3 | 42.2 | 51.4 | 35.6 | 14.3 | 17.1 | N | Y | Y |
| S11-low | x | x | x | x | 21.9 | 40.0 | 49.8 | 48.9 | 42.2 | x | x | 20.3 | 22.4 | x | x | x |
| S12-high | 11.7 | 25.7 | 29.0 | 21.7 | 23.2 | 43.5 | 47.0 | 46.4 | 45.1 | 48.3 | 22.9 | x | x | N | Y | Y |
| S12-low | x | x | x | x | 26.0 | 43.5 | 47.3 | 46.0 | 43.5 | x | x | x | x | x | x | x |
| S13 | 21.5 | x | 25.9 | x | 14.8 | 40.0 | 47.3 | 43.2 | 40.6 | 48.9 | 41.3 | 16.8 | 29.0 | Y | N | Y |
| S14 | 16.9 | x | 44.2 | x | 11.4 | 44.1 | 48.3 | 48.6 | 43.2 | 48.9 | 38.1 | 10.8 | 20.6 | Y | N | N |

Table 3 summarizes the material makeup of the product surface. An "x" along the row for any measurement involving "Plastic", "Solid", "Mesh", and "End" indicates that, at the specific measurement location (11.4", hinge, or knee), the corresponding material is not present, so the first measurement written down is the first material that was available to measure. E.g., S08 has no plastic molding, no solid fabric after the lying surface fabric, and no mesh, and hence the only measurement written down is "End", which indicates a measurement made along the width of the product from the center of the hinged weight-gauge infant to the end (edge) of the product.

Table 4 is descriptive text regarding design and measurement of each product.

15

**Table 3.** Distance of different materials on samples from the center, at three locations

| Sample | at 11.4" | | | | at hinge | | | | at knee | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Plastic (cm) | Solid (cm) | Mesh (cm) | End (cm) | Plastic (cm) | Solid (cm) | Mesh (cm) | End (cm) | Plastic (cm) | Solid (cm) | Mesh (cm) | End (cm) |
| S01 | 15.2 | 16.5 | 22.2 | 29.2 | 12.7 | 14.0 | 30.8 | 39.1 | x | 13.0 | 21.3 | 27.9 |
| S02 | 15.9 | 19.4 | 22.2 | 29.2 | 12.1 | 14.9 | 31.8 | 38.7 | x | 14.0 | 21.6 | 27.3 |
| S03 | x | 12.1 | 24.1 | 29.2 | x | 11.1 | x | 39.4 | x | 12.7 | x | 34.9 |
| S04 | x | 13.0 | 24.1 | 29.5 | x | 11.4 | 34.0 | 40.6 | x | 10.8 | 28.9 | 34.9 |
| S05-high | 15.2 | 17.1 | 20.3 | 28.9 | 16.5 | 20.3 | x | 34.3 | x | x | x | 25.4 |
| S05-low | 15.2 | 15.6 | 19.4 | 37.8 | 15.6 | 19.4 | x | 33.3 | x | x | x | 29.2 |
| S06 | x | 12.1 | 21.0 | 27.3 | x | 10.8 | 34.6 | 41.3 | x | 10.5 | 29.8 | 36.2 |
| S07 | 13.0 | 14.0 | x | 40.0 | 10.2 | 12.1 | 34.6 | 41.9 | x | 12.7 | 28.6 | 37.5 |
| S08 | x | x | x | 23.5 | x | x | x | 28.9 | x | x | x | 21.0 |
| S09 | 15.9 | 19.4 | 21.3 | 28.3 | 11.4 | 14.0 | 30.5 | 35.2 | x | 13.7 | 20.6 | 25.1 |
| S10 | 14.6 | 19.1 | 21.0 | 27.6 | 10.8 | 13.7 | 30.8 | 35.9 | x | 14.0 | 20.3 | 25.7 |
| S11-high | 12.7 | 20.6 | 29.8 | 38.1 | 12.1 | 15.2 | 34.3 | 43.2 | 12.7 | 18.7 | 27.9 | 36.2 |
| S11-low | 13.3 | 21.0 | 30.5 | 38.7 | 12.7 | 15.6 | 34.9 | 42.9 | 12.7 | 19.1 | 26.7 | 34.9 |
| S12-high | 16.5 | 20.0 | 33.0 | 41.3 | 8.3 | 19.4 | 37.5 | 43.2 | 12.7 | 16.8 | 33.0 | 38.1 |
| S12-low | 15.2 | 18.1 | 32.4 | 41.3 | 10.2 | 17.9 | 37.5 | 43.2 | 15.9 | 16.5 | 33.0 | 38.1 |
| S13 | 13.7 | 14.9 | 25.1 | 34.6 | x | 14.0 | 28.3 | 38.1 | x | x | 23.2 | 32.4 |
| S14 | 12.7 | 23.5 | x | 30.2 | x | 28.6 | x | 34.0 | x | 19.1 | x | 26.0 |

**Table 4.** Sample measurement notes

| Sample | Notes |
|---|---|
| S01 | Additional Padded Head Rest. Plastic Molded Seat sewn in. |
| S02 | Removable plastic molding. Removable head pillow. Removable body cushion. Built-in vibration electronics. Removable toy on harness. Solid headrest. Detachable top (all). Depth at hinge = 25.4 cm - Done because it seems deeper than the rest. |
| S03 | Flaps to cover buttons. No plastic molding. No rocking motion. Mesh at head only. |
| S04 | Removable full length cushion. Collapsible. Toy attached to harness. Attachable vibration electronics. Flaps on either end. Mesh only at head. Side flaps. Measurements done without cushion. |
| S05 | Non-Rock Sitting Incline at head = 47.95°, at thigh = 3.2°. Sleeping incline at head = 21.25°, at thigh = 3.65°. All measurements performed with non-rocking stopper down. Removable head pillow. Difficult to measure (Assembly instructions unclear). Sitting to sleeping incline shift very difficult. Rocker stopper increases incline for both positions. Thin/short mesh around head and torso. Different (cushion) material on side from bight line down. Product depth at head increases, which increases width of mesh. Removable toy mobile. Minimum width measured above top seam before mesh. Plastic molding is (Y) because it is wood/particle board backing (thin, solid), Aluminium frame, and Seat is plastic molding. At hinge, "Solid" measurement is to the Aluminium frame. "Child" (Hinged weight gage infant) shifted in the product when reclined from sitting to sleeping. Repositioned the best we could, hinge line aligned to seat seam (bight line). At 11.4" for sleeping setting, 19.4 cm is to a second material before mesh, and 37.8" is to end of mesh and this second material. |
| S06 | Side mesh only at head. Flaps on either end. Detachable mobile with toy. Attachable vibration electronics. Detachable head pillow. "Mesh" measurements at hinge and knee are actually of second material. |
| S07 | 4.4° Lateral tilt towards the Electronic unit. Flat padded head rest. Head of baby (hinged weight gage infant) flush with the product. Plastic molded seat sewn in. Top removable. |
| S08 | Measuring only the sleeper. Detachable head. Non-detachable head pillow. Embedded electronics under foot end. Fairly small product. No mesh. No plastic molding. |
| S09 | Detachable top (all). Removable plastic molding. Solid head rest. Removable toy on harness. |
| S10 | Detachable top (all). Removable plastic molding. Non-detachable head pillow. Detachable body cushion. Attachable electronics on rail. |
| S11 | Dual folding mechanism (legs and top). Removable body cushion. 2 incline settings. Mobile embedded with toy. Fairly wide product (visually). Measurements done without body cushion. |
| S12 | Standing product. Large base. Fairly heavy. 2 incline settings at head. Detachable body cushion. Attachable electronics on rail. |
| S13 | Removable full length cushion. Collapsible. Mesh only up to just above the seat hinge (bight line). Hard plastic molding in two parts; there is a gap between the two parts at the seat bight line. |
| S14 | Measuring only sleeper. Removable full length cushion, collapsible. No mesh. Has insertable thick plastic molding. Measurements from center to "Solid" Refers to measurement made to the edge of the cushion. Plastic molding ends above seat bight line. |

16

As shown in the product analysis above, products in the Inclined Sleep Product class varied significantly in design. Inclined angles at the head ranged from 12° to 38°, while angles at the thigh ranged from 1° to 53°. Width of the products varied, where some were wider at the shoulders and narrower at the seat, while others exhibited a more consistent width throughout the entire length of the product. Some products rocked approximately 10° while others were stationary, and three products featured different incline settings. The surface of the product was one of the most obvious design differences, with some products featuring thick rigid plastic molding, others no plastic molding, and one with a semi-rigid thin plastic molding. Material selections in the products were just as broad and included thin padding, thick padding, or mesh, in a variety of combinations on the surface and sides of the products.

### 3.4 Product Selection Rationale

The project team had to select a portion of these inclined sleep products to include in the biomechanical testing, as time limitations prohibited inclusion of all products. Products were selected firstly if any adverse incidents had been reported to the CPSC. Company A's products represented most of the incidents (83), followed by Company B (7), and Company C (1).

The designs of Company A featured rigid plastic molding that conformed into the sides of the products and fell into two categories: basic (S01 and S09) and deluxe (S02 and S10), which featured a pillow or heavily-padded piece. S01 was selected to represent the basic version of Company A and S02 to represent the deluxe version of Company A because several incidents specifically noted these products.

Company B had products with no plastic molding and had basic (S03 and S04) and deluxe versions with padded pillows (S06) as well as a product that featured a maximum incline outside of the range of 10° to 30° (S05). S03 was chosen to represent the basic version of Company B and S06 to represent the deluxe version because incidents were reported in these products.

Company C had two products which were examined (S08 and S13). The incident occurred in product S08, and it was selected since this was the smallest product with an inclined surface made of a single material with no plastic molding or mesh. S13 was also chosen to be included in the biomechanical study because it had a unique design of plastic molding, with the molding split at the seat bight line.

There was room to include one final product in the biomechanical experiment, and a product that was the most different in design to the others and was manufactured by a different company was sought. This left products S07, S11, S12, and S14. Product S14 was received too late to include in testing. S07 and S12 both featured thick plastic molding, not unlike those from Company A, while product S11 had a unique thin plastic molding. S11 also exhibited near maximum product widths at all of the measurement points, making it different than many other products, so S11 from Company D was chosen as the final product.

The final list of products included in further product analysis and biomechanical testing were: S01, S02, S03, S06, S08, S11, and S13.

### 3.4 Contact Area Analysis

Overview

During the pilot testing of the Biomechanical Analysis experiment (section 4), pressure-mapping sensors ████████████ ) were to be used to record the pressure imparted by infants' palms and forearm when lying prone on the inclined sleep products. The pressure-mapping technology consists of matrices of sensors embedded into elastic fabric mats that permit conformability to three-dimensional deformations and can accurately measure the total force and contact area on the interacting surface, even if heterogeneously loaded across the sensor. The particular sensors used in this study were equipped with 128 individual sensors in an 8 X 16 matrix, with an individual sensor area of 1 $cm^2$. However, it was observed that due to a combination of infants' inconsistent arm position during prone time, and the low amount of pressure registered even during proper contact with the sensors, this methodology was not reliable or feasible to control. Figure 2 demonstrates a mockup of this initial setup.



Novel electronics pressure mats record infant hand forces on the product

**Figure 2.** Mockup of prone palm and forearm pressure recording in one product.

Because of the problems with this initial idea, a more consistent methodology was developed to assess the magnitude and distribution of the pressure and contact area recorded on the sensors if a known weight were to be placed orthogonally on the sensors.

Experimental Design

A 2 kg weight was chosen for the controlled testing as it represents approximately 30% of the weight of an average 4-month old infant, a reasonable estimate of the weight a child must bear on their forearms or hands during prone positioning. The calibration weight was placed on a scale to verify its weight (Figure 3). The pressure-mapping sensor was placed on a flat, hard floor and the weight was placed on the sensor to collect the corresponding pressure and contact area

readings. Five repetitions were made for each measurement, Figure 3 demonstrates the experimental setup.



**Figure 3.** Pressure-mapping sensor on floor with weight placed on top between tape.

During initial product testing with the pressure-mapping sensor, it was observed that the deformation of the sensor, as a result of the pliancy of the inclined sleep products, generated high pressure values when the sensor experienced too much deformation. These unreasonable values did not occur on the crib mattress surface, due to less deformation of the product. Since the magnitude of the values were unreasonable, the contact area experienced by the weight on each product was calculated and used as a measure of deformation.



**Figure 4.** Contact area map of crib mattress product with minimal deformation.

A hinged weight-gauge infant (ASTM F3118-17a) was placed in each product, and the position of the top of the head was used as the indicator for placing the pressure-mapping sensor. Following this, the 2 kg weight was placed on the sensor and the product was tilted as needed so that the weight was sitting orthogonal to the sensor. Five repetitions were made for each measurement. The experimental setup is demonstrated on Figure 5.



**Figure 5.** Hinged weight-gauge infant and pressure-mapping sensor location determination (A), and 2 kg weight on pressure-mapping sensor on tilted product (B).

Data Analysis
The contact area was calculated as the number of active cells multiplied by the unit cell area (1 cm$^2$). The calculated contact area served as an estimation for the potential of the inclined surface to deform under a load. For example, when a weight is placed on the sensor on a hard surface, no deformation exists due to the rigidity of the surface, so the contact area reading from the pressure sensor is exactly the contact area of weight. Conversely, if a weight is place on a conforming surface, the sensor deforms with the product, enveloping the sensor such that more surface area of the weight is in contact with the sensor, resulting in a larger contact area reading. Therefore, the larger the contact area, the more deformation. All data analysis was conducted using MATLAB code.

Contact Area Results
Recorded contact area for all inclined sleep products are presented in Table 5 and Figure 6, where the products are categorized by the presence (and type) of plastic molding.

**Table 5.** Recorded measurements for all inclined sleep products and the crib mattress (at no incline)

| Sample | Contact Area (cm$^2$) | Plastic Molding |
|---|---|---|
| Crib Mat | 22.4 ± 1.7 | No |
| S03 | 22.4 ± 2.2 | No |
| S06 | 33.6 ± 0.9 | No |
| S08 | 32.6 ± 0.5 | No |
| S11 | 26.8 ± 1.8 | Thin |
| S01 | 28.8 ± 0.4 | Hard |
| S02 | 33.3 ± 1.9 | Hard |
| S13 | 25.2 ± 0.5 | Hard |



**Figure 6.** Calculated contact area for crib mattress and inclined sleep products.

Contact areas were highest in products S02, S06, and S08; all products that had a "pillow" or extra cushioning near the head. Product S03 featuring no plastic molding demonstrated contact area characteristics most similar to the crib mattress, and was markedly different from S06 and S08. The principle difference between S03 and both S06 and S08 was the absence of any additional heavy padding material on the product, which likely contributed to the findings.

The product with thin plastic molding, S11, demonstrated contact area characteristics similar to S03, S01, and S13. The slightly higher values demonstrated in S11 are likely due to the higher pliability of the plastic molding (vs. S13), and the presence of a flat full-length cushion on the product (vs. S03).

It is curious that, on average, products with solid plastic molding did not demonstrate significantly different force distribution characteristics compared to products with no plastic molding or thin plastic molding. On closer examination, it was observed that one aspect of this homogeneity is likely the presence of cushioning material near the head on some products. If the findings are examined without the products that have cushioning (i.e. S03 vs. S01 and S13), it is observed that S13's contact area is closer to S03 than S01. One likely explanation for this may be that S13 has a flat solid plastic molding, while S01's plastic molding is curved (concave), increasing its potential for a greater contact area as the product shape naturally envelopes the weight.

Beyond the classification criteria, one clear observation can be made of products that were "basic" and "deluxe" versions manufactured by the same company. Both in the case of Company A's S01 (basic) and S02 (deluxe), and Company B's S03 (basic) and S06 (deluxe), it is observed that the basic versions have a substantially lower contact area, indicating that the products' high deformation potential due to extra cushioning may hamper infants' ability to self-correct if they roll from supine to prone, presenting a safety hazard for babies.

## 4. BIOMECHANICAL TESTING

### 4.1 Overview
An *in vivo* experimental biomechanics study was designed to understand how babies move and use their muscles on inclined surfaces and in selected inclined sleep products.

Human Subjects Protections
The Institutional Review Board of the University of Arkansas for Medical Sciences approved this human subjects research study under protocol *228457: Biomechanical Evaluation of Infants in Inclined Sleep Products.* The study was advertised by word-of-mouth and flyers placed near the University of Arkansas for Medical Sciences in Little Rock, Arkansas. The legal guardians of infants enrolled in this study provided written parental permission and HIPAA agreement prior to testing. Testing took approximately two hours, and caregivers were modestly compensated for their time and effort.

Confidentiality
All caregivers signed a confidentiality agreement in which they agreed to not disclose any details about the testing or any products involved in the study. All branding of the products were covered by duct tape, and products were not referred to by name or company at any time during the experimental session.

Participants
A two-sample *a priori* power analysis performed on normalized mean electromyography (EMG) data collected in an ongoing study of healthy infants indicated a sample size of nine participants would be sufficient to produce significant results ($1-\beta = 0.8$; $\alpha = 0.05$). To exceed this minimum suggested sample size and to align with most human motion pilot study designs, ten infants (even gender distribution within 20%) ages two to six months were recruited for the study (Siddicky, 2019; Mannen, 2018). Efforts were made to represent the racial and ethnic make-up of the United States within the cohort (approximately 70% Caucasian, 20% Hispanic, 10% African American).

Inclusion criteria included:
- healthy infants born >37 weeks gestation,
- currently between 5 and 95 percentile height and weight for age according to the CDC (Kuczmarski et al, 2002),
- between the ages of 2.0 and 5.9 months on the date of testing.

Exclusion criteria included:
- infants born at low birth-weight (<5 lbs 8 oz),
- previous or current diagnosed orthopaedic or neurologic conditions,
- sickness or vaccinations within two-weeks of scheduled data collection.

After a pilot subject was tested (CPSC1 – not reported) to evaluate experimental design, ten additional subjects were enrolled in the study (Table 6). The average age was 4.2±1.2 months (range 2.3 to 5.5 months) and adjusted age (age – (40 weeks – gestational age at birth)) was 4.0±1.4 months (range 1.6 to 5.3 months) with an equal sex distribution and a racial distribution of 80% White, 10% Hispanic, 10% Black. Gestational age at birth was 38.6±1.0 (range 37 to 40 weeks). All babies were within the CDC 5 to 95 percentile for height and weight according to their age, were not considered low birth weight, and had not been sick or received vaccinations within two-weeks prior to testing. No infants had orthopaedic or neurological conditions.

23

**Table 6.** Infant participants' demographics.

| Subject ID | Age (months) | Gestational Age (weeks) | Race/ Ethnicity | Sex (M/F) | Height (cm) | Weight (kg) |
|------------|--------------|-------------------------|-----------------|-----------|-------------|-------------|
| CPSC2 | 3.0 | 39 | White | F | 61.0 | 6.7 |
| CPSC3 | 4.6 | 37 | White | M | 64.5 | 7.2 |
| CPSC4 | 5.5 | 39 | Black | M | 69.9 | 8.1 |
| CPSC5 | 2.6 | 38 | White | M | 61.0 | 6.7 |
| CPSC6 | 5.5 | 39 | White | F | 67.3 | 7.6 |
| CPSC7 | 4.9 | 39 | White | M | 64.8 | 7.5 |
| CPSC8 | 2.3 | 37 | White | F | 53.3 | 4.9 |
| CPSC9 | 5.1 | 40 | White | F | 61.3 | 7.4 |
| CPSC10 | 4.2 | 39 | Hispanic | M | 61.0 | 6.0 |
| CPSC11 | 5.2 | 39 | White | F | 54.6 | 5.2 |
| **Mean±SD** | **4.2±1.2** | **38.6±1.0** | **8W/1B/1H** | **5M/5F** | **61.8±5.1** | **6.7±1.1** |

Experimental Conditions and Product Selection

To test the effect of incline angle on motion and muscle activity, a custom-built inclining crib was designed and built for a 51.7" X 27.3" crib mattress (████████████████). The inclining crib was manufactured using medium density fiberboard panels, plywood, whitewood studs, and pine-fir lumber (Figure 7). The crib enabled 0°, 10°, 20°, and 30° inclines which were chosen to represent the range of inclines (10° to 30°) of the product samples and span the allowable inclines detailed in ASTM F3118-17a.



**Figure 7.** Photos of the four incline settings of the inclining crib

The CPSC provided the research team with 14 unassembled samples of different inclined sleep products. Figure 8 depicts the products chosen to be included in experimentation. Based on a preliminary review of the Incident Reports (Section 3) and results of the Product Analysis (Section 2), seven inclined sleep products were chosen for testing: a basic version from Company A (S01), a deluxe version from Company A (S02), a basic version from Company B (S03), a deluxe version from Company B (S06), a product from Company C (S08), a product from Company D (S11), and a second product from Company C (S13). Detailed analysis of these products and rationale for selection can be found in Product Analysis (Section 2).



**Figure 8**. Photos of products used in the biomechanical analysis.
From left to right: S01, S02, S03, S06, S08, S11, S13.

During pilot testing, it was observed that the **30° crib incline did not allow for prone or supine lying without the infant sliding down the mattress** (Figure 9). After several attempts, it was determined that the infant was unable to maintain her position (supine and prone), and slid to the bottom of the crib, presenting a hazard for the infant participants.  Therefore, the 30° incline crib mattress condition was excluded from all future testing, leaving three crib mattress conditions (0°, 10°, 20°) and seven inclined sleep products, totaling 10 product conditions.



**Figure 9.** Infant slips downward at 30° incline, presenting a hazard. Therefore, 30° was not included in future testing.

### *4.2 Experimental Design*

Testing occurred at the HipKnee Arkansas Foundation human motion laboratory under the direction of the Principal Investigator. Height, weight, head circumference, birthdate, birth height and weight, gestational age at birth, and race/ethnicity were recorded.

Developmental Screening

No infants enrolled in the study had been diagnosed with any developmental delays at the time of testing. Caregivers were asked to complete an Ages and Stages Questionnaire corresponding with the age of their infant to assess developmental progress, with focus on the Fine Motor and Gross Motor portions of the test (Valleley and Roane, 2010; AAP, 2006). In addition, a pediatric psychologist, evaluated the movements of the infants via video of the biomechanical testing and provided a qualitative assessment of each infant's developmental age based on head control, bilateral kicking and arm movements, hands to midline, kicking or arm movement in response to being spoken to, reaching for items, and loss of newborn reflexes. No infants were excluded from testing or analysis based on the results of the developmental screenings.

Kinematics

Infant motion (kinematics) was recorded using marker-based motion capture. A set of 10 infrared cameras ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ tracked the position of 21 retro-reflective markers, positioned on specific body segments on the infant, at a sampling rate of 100 Hz. Figure 10 demonstrates the position of these markers, and a schematic of the data capture procedure. The motion capture system included a digital video camera which recorded video at a fixed location at 50 Hz. A ▇▇▇▇ camera (▇▇▇▇▇▇▇▇▇▇▇) mounted on a moveable tripod was used to record the entire data collection process.



**Figure 10.** ▇▇▇▇▇▇▇▇▇▇▇Cameras (A), front and back view of marker location on infants (B), and schematic of camera positions during testing (C).

Muscle Activity

Infant muscle activity was recorded using surface electromyography (EMG). ██████ wireless EMG sensors (██████████████) were placed bilaterally on the cervical paraspinal, erector spinae, triceps, pectoralis major, and rectus abdominis muscles of infants. Muscle activity was recorded at 1000 Hz. To avoid possible motion obstructions from the connecting wires between the EMG sensor enclosure and the EMG electrode head, the sensor application sites (i.e. the torso and upper arm) were wrapped with soft cohesive self-adherent wrapping tape. Figure 11 demonstrates the ██████ EMG sensors used in this study, and the anatomical placement locations of these electrodes. Pilot testing revealed that the pectoralis major EMGs were unable to remain in place during testing, so they were removed from the experiment.



**Figure 11.** ███████████████████ electrodes (A), and EMG sensor placement locations (B).

Oxygen Saturation

Infants' oxygen saturation ($SpO_2$) while placed in each product was recorded using a commercial grade and a medical grade pulse oximeter. During pilot testing the commercial grade oximeter ██████████████████████ was found to be inappropriate for continuous data logging capabilities because it was highly sensitive to leg movements, with slight movements generating a pop-up window that obscured the $SpO_2$ display. Therefore, the ██████ was not used during testing.

The medical grade oximeter was the ██████████████████████████████████ ███████████████████████. The onboard data logger recorded time-stamped $SpO_2$ data at 60 Hz (output at 1 Hz). Figure 12 demonstrates the experimental setup for the placement of the oximeter sensor on the infants' big toe. To avoid motion obstructions and sensor detachment, infants' feet were wrapped in soft cohesive self-adherent wrapping tape. Synchronization between $SpO_2$ data and the experiment data was maintained by time-syncing the oximeter's internal clock with the laboratory computer's internal clock and noting down the start time of each motion capture/EMG trial on the data collection sheet.

For safety of the testing subjects, a trial was ended if the $SpO_2$ reading was <95% for at least 5 seconds. To avoid instances of false readings or artifact, video footage of the infants was examined during postprocessing when the $SpO_2$ readings were <95% to understand the situation which may have led to the low reading.



**Figure 12.** ████████████ SpO$_2$ sensors placed on the
feet of an infant dummy.


Calibration

Calibration of the experimental equipment was conducted prior to each testing session to ensure measurements were accurate. EMG measurements from the prone and supine positions on the Flat Sleeping Surface in this study were compared to a previously collected healthy infant cohort which includes prone and supine positions to ensure reasonableness. If all data from a participant's testing session was found to be errant, the data would be excluded from the analysis and another participant would be recruited.


Testing Procedures

Infants were placed in a random order (Randomizer.org, Urbaniak and Plous, 2013) in each of the 10 testing conditions in both the supine and prone positions for at least 60 seconds (unless the oximeter data fell below 95%, in which case they were removed early to ensure safety, Figure 13). Testing data was considered usable if the infant completed 30 seconds of the task without significant crying or visible distress.

28



**Figure 13.** Infant testing setup for: Inclining crib at 0° supine (A), 0° prone (B), 10° supine (C), 10° prone (D), 20° supine (E), 20° prone (F), and an inclined sleep product with infant supine (G), and prone (H).

Sensor Interference with Normal Movement

It is understood that the laboratory environment differs from an infant's natural home environment. Previous studies have determined that small sensors do not interfere with the normal movement of infants (Trujillo-Priego and Smith, 2017). To further assess this concept, a pediatric psychologist qualitatively assessed video footage of the infants for 2 minutes without any sensors and during all testing conditions with the reflective markers and EMG sensors in place to determine if motion or movement of the limbs was hindered by the experimental equipment.

Missing or Incomplete Data

It was expected that not every infant enrolled in the study would successfully complete every activity, but that each infant would complete at least 70% of the planned conditions. By randomizing the order of activities, enough data from the cohort was collected for each condition to make a complete data set. If fewer than seven infants completed a single activity after the collection of ten participants, more subjects would be enrolled in the study.

Data Storage and Reporting

All raw and processed data was de-identified and stored in password-protected and HIPAA-approved secured storage space provided by the University of Arkansas for Medical Sciences.

### 4.3 Biomechanical Testing Data Analysis

<u>Kinematics</u>
The recorded marker data was used to calculate (1) angular orientation between adjacent body segments, (2) number of times the infants' trunks and necks were raised during prone time, (3) excursion of trunk and hand movements corresponding infants successfully rolling. Angular orientation between adjacent body segments was calculated by using the marker clusters on each body segment to define unit vector matrices forming the axes of local coordinate systems (LCS; Berthouze et al, 2011; Wilk et al., 2006). The element-wise dot product of the LCS unit vector matrices is equivalent to the 3D Cardan rotation matrix representing the relative orientation between the LCS of two adjacent body segments. This calculation is represented in the equation below:

$$R = \begin{bmatrix} c\alpha c\beta & c\alpha s\beta s\gamma - s\alpha c\gamma & c\alpha s\beta s\gamma + s\alpha s\gamma \\ s\alpha c\beta & s\alpha s\beta s\gamma + c\alpha c\gamma & s\alpha s\beta s\gamma - c\alpha s\gamma \\ -s\beta & c\beta s\gamma & c\beta c\gamma \end{bmatrix} = \begin{bmatrix} i.I & j.I & k.I \\ i.J & j.J & k.J \\ i.K & j.K & k.K \end{bmatrix}$$

where [i, j, k] = LCS of body segment 1, [I, J, K] = LCS of body segment 2, c = cosine, s = sine, and [α, β, γ] = rotational angles between the body segments.

Calculations were conducted via custom MATLAB code (MATLAB, Natick, MA). Angular profiles that included data for sagittal plane flexion/extension were calculated for the neck and torso (Figure 14).



**Figure 14.** Infant body segment coordinate systems (L), and neck and trunk sagittal plane angles for which ranges of motion were calculated (R)

30

The neck flexion/extension angular profile was used in conjunction with a peak-finding algorithm to calculate the number of times infants raised their head in each inclined sleep product during the testing duration. The peak-finding algorithm swept through the angular profile data and isolated points in time where the angle value changed by 10° or more. Figure 15 demonstrates a neck extension angular profile with calculated data "peaks" corresponding to head raises.



**Figure 15.** Calculated neck extension angle profile (blue), and data peaks as defined by peak-finder algorithm (red).

Results were compared to the corresponding crib mattress condition (either supine or prone), using paired t-tests (p=0.05), and trends were also noted (p=0.10). Pairwise comparisons were made for all crib mattress conditions.

<u>Muscle Activity</u>
Raw EMG waveforms were assessed for corrupted data using visual amplitude inspection and power spectral analysis (Boxtel, 2001), and such data (clipped amplitude, low power signal, and abnormal frequency pattern) was excluded from analysis. The raw EMG waveforms were band-pass filtered using a 4th order ████████ filter between 35 Hz and 400 Hz, to reduce contamination from movement artefacts, electrocardiogram signals (Drake & Callaghan, 2006), and high frequency noise (Hermens et al., 1999). Additionally, to eliminate the effects of signal interference from nearby electronic sources, EMG waveforms were notch-filtered at 60 Hz using a 4th order ████████ filter. EMG waveforms were then full-wave rectified, demeaned, and subjected to a low-pass 4th order ████████ filter with a cutoff frequency of 50 Hz to obtain the EMG linear envelope (Hodges & Bui, 1996). The mean value of this linear envelope has been reported in the results. Results were compared to the corresponding 0° crib mattress condition (prone and supine, separately), using paired t-tests (p<0.05), and trends were also noted (p<0.10). Pairwise comparisons were also made for all prone and supine crib mattress incline angles, and for the prone and supine 0° crib mattress conditions. All data analysis was conducted using custom MATLAB code. All muscle groups were considered for prone conditions, and all muscle groups except the triceps were considered for the supine conditions since the arms were not in contact with the surface or product when babies were lying supine. Results are presented as normalized values to the crib mattress condition (supine or prone).

Space Required to Roll

Infant rolling data was extracted from an existing data set of healthy infants. Using the net excursion of a marker placed on the lateral epicondyle of the knee (Figure 16), the space required for infants to roll on a flat surface was estimated.



**Figure 16.** Infant rolling and location trajectory of lateral knee marker

The net excursion of the lateral knee marker was calculated in the transverse/horizontal plane as the resultant of the medial/lateral (x) and anterior/posterior (y) motion of the marker during the roll.

Oxygen Saturation

Retrospectively, $SpO_2$ data were extracted from the data logger, and the number of times infants registered a below 95% $SpO_2$ reading for each testing condition was tallied. Video footage was examined when $SpO_2$ <95% to help determine the cause of the reading.

### *4.4 Biomechanical Testing Results*

All ten infants were able to complete at least 7/10 of the testing conditions, so all babies were included in the study. The qualitative video analysis to determine if the motion capture markers and the EMG sensors interfered with normal motion and movement revealed that sensors did not interfere with any arm or leg movement, agreeing with previously published research.(Trujillo-Priego and Smith, 2017) It was noted a few times during testing when a marker or sensor fell off, but the research team reattached it and testing resumed. Developmental screening, kinematic, EMG, and oxygen saturation results are presented below.

Developmental Screening Results
All 10 infants' caregivers completed the ASQ-3 questionnaire (3 1.0-2.9 months; 3 3.0-4.9 months; 4 5.0-6.9 months). ASQ-3 results indicated below average or delayed behavior for: Gross Motor 1/10 and Fine Motor 4/10. Video assessment revealed below average motor behavior in 4/10 infants. Because no babies had been previously diagnosed with developmental delays, all babies were included in the study.

### 4.4.1 Kinematic Results

<u>Effect of Inclined Crib Mattress during Prone Positioning</u>
No significant changes in sagittal plane range trunk or neck range of motion (ROM) were found (Figure 17). A significant trend toward an increased number of neck peaks was found for 20° as compared to 10° (p = 0.08). The inclined angles of the crib surfaces did not affect the number of neck and trunk angle peaks.



**Figure 17**. Effect of inclined crib mattress surface (0° vs. 10° vs. 20°) during prone positioning on (a) ranges of motion and (b) number of peaks [neck: number of times an infants raised heads relative to trunks; trunk: number of times infants raised trunks relative to pelvises]. †p<0.1.

Kinematic parameters during prone positioning were not sensitive to different inclined angles of the crib surfaces. Greater inclined angles (20°) may increase neck movement (the number of angle peaks) during prone positioning, meaning that infants may be lifting their heads more often

at a 20° incline, but this did not reach statistical significance. The incline angle alone also does not appear to significantly impact trunk or neck range-of-motion during prone positioning.

## Effect of Inclined Sleep Products during Prone Positioning

Although incline angle alone did not impact trunk or neck ROM, several inclined sleep products did (Figure 18). S03 resulted in increased neck ROMs as compared to the 0° crib mattress (p = 0.04). S03, S06, S08 increased trunk ROMs as compared to the 0° crib mattress (p = 0.03, p = 0.01, p = 0.04)



**Figure 18.** Effect of inclined sleep products during prone positioning on (a) neck and (b) trunk ranges of motion (ROM). *p<0.05 when compared to 0° crib mattress (Baseline).

36

S03, S06, and S08 are all products that do not have any plastic support underneath the surface (see Product Analysis section 3.3 for details). It appears that trunk and neck movement increases (up to 25°) during prone positioning in inclined sleep products without plastic support at the surface, which differs from the crib mattress incline results which showed no differences. The conformity of these particular products with no rigid support likely causes more movement as infants must work harder to position their bodies. The meaning of these kinematic results will be discussed in more detail after the EMG results are presented below (section 3.1.4).

### Neck and Trunk Movement in Inclined Sleep Products:



**Figure 19.** Effect of inclined sleep products during prone positioning on number of (a) neck and (b) trunk peaks [neck: number of times infants raised heads relative to trunks; trunk: number of times infants raised trunks relative to pelvises]. *p<0.05 and †p<0.1 when compared to 0° crib mattress (Baseline).

37

The number of trunk angle peaks was significantly increased for S8, S11, and S13 as compared to 0° (Figure 19, $p = 0.05$, $p = 0.02$, $p = 0.01$). Similarly, S03, S06, S08, and S11 showed an increased number of trunk angle peaks as compared to 0° ($p = 0.04$, $p = 0.01$, $p = 0.01$, $p = 0.02$).

These results tell a similar story as the ROM results: inclined sleep products result in different movement patterns during prone positioning compared to a flat crib mattress surface. Interestingly, products without any plastic surface support (S03, S06, and S08) caused babies to move more often as they worked against the pliant product to move their bodies compared to the firm and flat crib mattress. These peak results also show that products with a thin plastic surface (S11 and S13) also caused more movement. Only the products with a rigid plastic surface (S01 and S02) showed no difference in the number of times the babies lifted their trunk or neck compared to prone lying on a flat crib mattress. The meaning of these results will be discussed in more detail after EMG results are presented.

Effect of Inclined Crib Mattress during Supine Positioning

Neck ROM was significantly, though only slightly, increased for the 20° surface as compared to 0° surface (Figure 20, p=0.02) while no changes in trunk ROMs were found. Number of neck angle peaks were significantly increased when comparing 20° to 0° and 10° (p=0.02, p=0.01). No changes in trunk ROMs and number of trunk angle peaks were found.



**Figure 20.** Effect of inclined crib mattress surface (0° vs. 10° vs. 20°) during supine positioning on (a) ranges of motion and (b) number of peaks [neck: number of times an infants raised their heads relative to their trunks; trunk: number of times infants raised their trunks relative to their pelvises]. * p<0.05.

Inclined surface angles slightly increased neck motion while trunk motion remained unchanged during the supine position. Babies lifted their heads 2.5 times more often at the 20° incline compared to the flat surface. These results will be discussed in detail in conjunction with the EMG results below.

70    JA186

Effect of Inclined Sleep Products during Supine Positioning
No significant differences in neck ROM were found (Figure 21). S01 and S02 resulted in decreased trunk ROMs as compared to 0° (p=0.03, p=0.08).



**Figure 21.** Effect of inclined sleep products during supine lying on (a) neck and (b) trunk ranges of motion (ROM). *p<0.05 and †p<0.10 when compared to 0° crib mattress (Baseline).

S01 and S02 showed decreased trunk motion as compared to 0° surface. These two products have a hard plastic surface, which may prevent babies from extending their trunks during supine lying, resulting in a lower range-of-motion.

40

No changes in the number of neck angle peaks were found (Figure 22). The number of trunk angle peaks was decreased up to 4 times for S02, S06, S11, and S13 (p = 0.06, p = 0.07, p = 0.01, p = 0.05)



**Figure 22.** Effect of inclined sleep product during supine lying on (a) neck and (b) trunk peaks [neck: number of times an infants raised heads relative to trunks; trunk: number of times infants raised trunks relative to pelvises]. *p<0.05 and †p<0.1 when compared to 0° crib mattress (Baseline).

41

Contrary to the results of the crib mattress incline portion of this study, babies showed no difference in the number of times they lifted their heads in the inclined products but had significantly fewer trunk movements in the products during supine lying. This shows that something about the design of the inclined sleep products is preventing trunk motion during supine lying in a way that an inclined crib mattress surface does not. Decreased trunk movement was measured in all types of inclined sleep products (various angles, various plastic/ no plastic surfaces, various padding). One reason for this observation may be that when babies are positioned supine in the products, some conformity occurs (either due to no rigid plastic surface or due to heavy padding). The conformity causes an increased trunk flexion that does not occur on an inclined crib mattress surface. Because the babies are already in a flexed position, further flexion is more difficult to achieve and therefore they do not move as often. These results will be discussed in conjunction with the EMG results below.

### 4.4.2 EMG Results

<u>Effect of Inclined Crib Mattress during Prone Positioning</u>
The inclined crib mattress significantly impacted muscle activity of the infants (Figure 23, presented as normalized values). Erector spinae EMG activity was significantly decreased when comparing 10° and 20° to 0° (p = 0.04, p = 0.01, respectively). Cervical paraspinal EMG activity was significantly decreased for 20° as compared to 0° (p = 0.02). Abdominal muscle activity was significantly increased when comparing 10° and 20° to 0° (p = 0.02, p = 0.01) as well as when comparing 20° to 10° (p = 0.04). Triceps EMG activity was significantly decreased for 20° as compared to 0° (p = 0.02).



**Figure 23**. Effect of crib mattress surface at various inclines (0° vs. 10° vs. 20°) on EMG: erector spinae, cervical paraspinals, abdominals, and triceps during prone. *p<0.05.

These results indicate that inclined surfaces (especially 20°) require greater abdominal muscle activity while decreasing erector spinae, cervical paraspinal, and triceps muscle activities. In other words, to maintain a prone lying position, an infant must use and coordinate their muscles <u>differently</u> when on an inclined surface; babies must depend more on their abdominal muscles to maintain a lying position. In particular, the core muscles (abdominals) require 70% more activity to maintain a prone lying position, indicating that **muscle fatigue of the abdominals would occur more quickly at an incline compared to a flat surface**. Rather than depending on many muscles to maintain a prone position on a flat surface, the inclined surface increases the effort required of the core muscles. Postural adjustments and core muscle strength are closely related, so the role of abdominal muscles in changing position is critical and is impacted by incline angle.

When analyzed in conjunction with the kinematic results above, the narrative is supported; babies are not moving their heads or trunks more or less often in the prone position on an inclined crib mattress surface, yet the muscle activity profile is significantly different. Further, the <u>decrease</u> in neck and back muscle activity does not result in a decrease in neck or back movement, indicating

that the abdominals must play a significant role in body movement during prone lying on an incline. Because the abdominal muscles are critical for body control and movement, it is likely that an incline makes it more difficult for infants to roll from prone to supine when compared to a flat surface due to the increased demand on their abdominal muscles to maintain a prone position.

Effect of Inclined Sleep Products during Prone Positioning

Erector spinae muscle activity was significantly decreased for S02, S03, and S08 as compared to 0° baseline (Figure 24, p = 0.007, p = 0.05, p = 0.005). Significant trends (i.e. p<0.1) toward decreased erector spinae muscle activity was found for S01 and S11. No significant changes and trends in cervical paraspinals were found.



**Figure 24.** Effect of inclined sleep products during prone positioning on EMG activity of the (a) erector spinae and (b) cervical paraspinals. *p<0.05 and †p<0.10 when compared to 0° crib mattress (Baseline).

S01, S02, S03, S08, and S11 products resulted in decreased trunk extensor muscle activity during prone lying (as compared 0° crib mattress surface). S06 and S13 also showed decreased erector spinae activity but did not show significant changes due to high variability. These results agree with those of the 20° crib surface, showing less erector spinae muscle activity required to maintain

45

a prone position. It is not surprising that the cervical paraspinal activity exhibited high variability. Observationally, babies rested their heads during prone tasks, while others appeared to move their heads continuously, resulting in high variability.

Abdominal EMG activity was increased for S02, S06, and S08 as compared to 0° baseline (Figure 25, p = 0.03, p = 0.01, p= 0.05). A significant trend for S03 (increased abdominal activity) was found (p = 0.08). No significant differences in triceps EMG were found.



**Figure 25.** Effect of inclined sleep product during prone positioning on EMG activity of (a) abdominals and (b) triceps. *p<0.05 and †p<0.1 when compared to 0° crib mattress (Baseline).

46

Similar to the inclined crib mattress testing, infants used their abdominal muscles significantly more when lying prone in the inclined sleep products compared to the flat crib mattress surface. In particular, it was noted that products with the thickest padding (S02, S06, and S08) exhibited increases in abdominal muscle activity of 186%, 245% and 191%, respectively. **This suggests that the combination of incline angle and product design requires infants to use significantly more core effort (abdominal strength) to maintain a prone position compared to a flat surface.** If an infant rolls within an inclined sleep product, the product design of limited horizontal space and a non-rigid concave surface makes rolling prone to supine difficult or impossible. Therefore, infants attempt to maintain a safe prone posture, which the EMG results suggest places an increased demand on the core muscles.

Similar to the cervical paraspinal muscles, it is not surprising that the triceps muscle activity exhibited high variability. Observationally, some babies actively used their arms during prone positioning, while others appeared to utilize their legs to attempt repositioning, resulting in high variability. However, the consistent abdominal and erector spinae data indicate that babies rely on these muscle groups to reposition themselves regardless of variability in technique.

When considered with the kinematic results (section 3.1.3), back muscle activity decreases while the trunk motion actually increases, indicating that different muscles (abdominals) are being recruited to initiate movement during prone positioning in inclined sleep products, **presenting a significant hazard to babies if a roll from supine to prone in an inclined sleep product occurs**. Although babies may receive adequate practice in tummy time on a flat surface, a roll from supine to prone in an inclined sleep product would likely be the first time they have ever experienced a position that required muscles to work together in this particular way – with a significant need for abdominal strength. This situation would likely result in expedited muscle fatigue as the baby attempts to reposition and self-correct.

The role of abdominal muscles during breathing have been previously studied, though not on an inclined surface. In general, the contraction of the abdominal muscles, which normally play a role in breathing and are accessory muscles of respiration, stabilize the chest wall and push up on the abdominal contents, giving the diaphragm something to contract against, thus improving its function. Abdominal muscles are also expiratory accessory muscles that aid in forced expiration (exhalation) against obstructed airways (Campbell and Green, 1953; Martin and De Troyer, 1982). However, there is some evidence in infants that contraction of the abdominal muscles leads to decreased lung volume and hypoxic episodes (Boliver et al., 1995). So, an infant with increased abdominal muscle activity could have restricted rib cage expansion and low lung volumes or hypoxemia.

Effect of Inclined Crib Mattress during Supine Positioning

Erector spinae activity was increased for 20° as compared to 10° (Figure 26, p=0.04) though no changes were found when comparing 20° to 0°. For abdominals and cervical paraspinal muscles, there were no significant changes or trends across 0°, 10°, and 20° inclined surfaces.



**Figure 26.** Effect of crib mattress at various incline angles (0° vs. 10° vs. 20°) during supine lying on EMG activity: erector spinae, cervical paraspinals, and abdominals. *p<0.05

Taken alone, these results suggest that an incline angle does not impact how infants are using their muscles during supine lying. However, when reviewed in conjunction with kinematic data (section 3.1.3), these EMG results become meaningful. The increased incline angle resulted in more neck motion, yet the EMG results mostly do not indicate an increase in muscle activity. Therefore, at an incline, it is easier for babies to move their heads in the supine position as compared to lying on a flat surface.

<u>Effect of Inclined Sleep Products during Supine Positioning</u>
Erector spinae EMG activity was significantly decreased for S06 as compared to 0°(baseline) (Figure 27, p=0.01). S02 also showed a significant trend toward decreased muscle activity when compared to 0° (p=0.07). Most inclined sleep product conditions tended to decrease erector spinae muscle activity when compared to 0°. No significant differences and trends in cervical paraspinal EMG were found.




**Figure 27.** Effect of inclined sleep product during supine positioning on (a) erector spinae and (b) abdominals. * p<0.05 and †p<0.1 when compared to 0° crib mattress (Baseline).

Infants used their back muscles less during supine lying in products S02 and S06, two "deluxe" versions of products which exhibit significant padding. The heavy padding may conform to the infant during supine lying more than other products, resulting in a more flexed trunk which requires

less muscle activity to maintain the position. It is also reasonable that the conforming products offer comfort to infants, resulting is less movement and muscle activity. Across all products, EMG activity was highly variable and not significantly different than the baseline 0° condition during supine lying for both erector spinae and paraspinal muscle groups. When considered with the results of the kinematic analysis (section 3.3.1), infants move their trunks less and use their back muscles less in some inclined sleep products.

No significant changes in abdominal EMG activity during supine lying was found (Figure 28). These results suggest that infants are not using their abdominal muscles differently when positioned supine in an inclined sleep product.



**Figure 28.** Effect of inclined sleep products during supine positioning on EMG activity of the abdominals.

While it is not fully understood how infants achieve a roll from supine to prone, the head represents a significantly higher percentage of total body weight in an infant compared to an adult. Therefore, head motion (in addition to other coordinated movements) likely plays a role in providing momentum and achieving a roll from supine to side-lying or supine to prone. The three incidents of supine to prone rolling that occurred on a flat surface during testing were analyzed, and it was found that the rolling mechanism was initiated by the fetal tuck (hip and trunk flexion) which requires a co-activation from the abdominal muscles and erector spinae as an agonist-antagonist pair. Because the conformity of the inclined sleep products naturally puts the infants in a more flexed hip and trunk position, it may be easier for infants to achieve the fetal tuck position to roll from supine to prone. Regardless if a roll from supine to prone is easier or more difficult to achieve on an inclined surface or in an inclined sleep product, it is fair to say that an inclined sleep product represents a different environment than a flat crib mattress or even a crib mattress at an incline. In particular, the most significant differences in supine lying occurred in the mostly heavily padded products (S02 and S06).

50

## Prone v. Supine EMG Activity

EMG activity of the cervical paraspinals, erector spinae, and abdominal muscle groups were compared between prone and supine lying on a flat crib mattress. Results showed no difference between abdominal muscle activity in prone and supine lying, but 3 times more erector spinae ($p<0.001$) and 5 times more cervical paraspinal ($p=0.004$) muscle activity during prone lying compared to supine lying (Figure 29). In other words, while the abdominal effort may not change between prone and supine lying on a flat surface, the trunk extensor muscle groups (cervical paraspinals and erector spinae) are much more active in the prone position on a flat surface.



**Figure 29.** EMG activity (erector spinae, paraspinal, and abdominals) during flat (0º) crib mattress supine compared to flat (0º) crib mattress prone lying, with EMG amplitudes normalized to the supine condition. *p<0.05.

When taken together with the results that show less extensor, more abdominal muscle activity, and more movement during inclined prone positioning compared to lying prone on a flat surface, it is clear that muscle synergies (i.e. how muscles work together) to achieve mobility and postural changes on a flat surface are not the same when an incline in introduced. The fact that abdominal muscle activity increased by nearly 250% in some inclined sleep products suggests that more effort than is ever needed for flat surface supine or prone lying is required when prone in an inclined sleep product (Figure 30). Positions that demand much more of muscles will also fatigue them more quickly, so if a baby experiences a roll, the baby is in a hazardous and unfamiliar position that requires efforts they have likely never experienced, presenting a risk factor that may contribute to suffocation if self-correction from prone to supine does not occur.



**Figure 30:** EMG activity (erector spinae, paraspinal, and abdominals) during flat (0º) crib mattress prone lying (blue) and with one representative inclined sleep product during prone lying (orange).

52

### 4.4.3 Space Required to Roll

Our dataset contained three full supine-prone rolls with visible marker data. All these rolls occurred on the flat crib mattress and were initiated by the fetal tuck (hip flexion) which drove trunk rotation after the lateral knee contacted the surface. Therefore, the excursion of the lateral knee marker was used to define the horizontal space of a roll. The mean space required to roll (at the knee) was 47.1 cm (range: 27.9 cm – 63.6 cm). However, the product analysis (Section 3.3) confirms that every inclined sleep product analyzed had a knee width less than 47.1 cm.

While in theory, a product narrower than the average space required for a roll on a flat surface should reduce or eliminate the ability of an infant to roll, as evidenced in the 33 incident reports of supine to prone rolls in Section 2, other factors are at play that allow infants to roll even though the width of many of the products appear to be prohibitive. Inclined sleep products have added factors of pliancy, concavity, and inclined surfaces, all of which may reduce the horizontal space required to achieve a supine to prone roll. In addition, every inclined sleep product is different, so space required to roll likely varies between products.

The infants who rolled on the flat surface had a mean knee-to-knee distance (infant's body size at knee) of 21.5 cm (range: 18.5 – 27.0 cm) while lying supine, prior to initiating the roll. Based on the mean space required to roll on the flat surface (47.1 cm), the distance from the outer knee to the side of a flat product should not exceed 12.8 cm if rolling is to be avoided.

If the goal is to avoid any supine to prone rolling in an inclined sleep product, the distance from the lateral aspect of the knee to the side of the product should be minimized when the infant is lying supine. However, due to the range of designs of inclined sleep products (conformity, pliancy, and incline angle) which likely all have an impact on space required to roll, it is difficult to state a width that will prevent rolling in this diverse product class.

### 4.4.4 Oxygen Saturation Results

The number of trials that each baby experienced a drop in oxygen saturation ($SpO_2$) <95% during the 60 second testing conditions were tallied. Nine of ten babies experienced at least one $SpO_2$ event during testing. No babies experienced problems in any supine-lying condition.

There were 18 total prone-lying trials that ended early due to $SpO_2$ readings of <95% (Table 7). Upon video analysis, in each instance where $SpO_2$ readings of <95% were found, the baby's face appeared to be in contact with the surface of the product, both on the crib mattress and in the inclined sleep products (Figure 31). Product S06 (deluxe version of Company B) resulted in four babies experiencing $SpO_2$ readings of <95%. S06 has no plastic molding, a plush thick pillow, and the largest incline angle at the head portion of the product. Product S13 (Company C) was the next highest with 3 babies experiencing $SpO_2$ readings of <95%. S13 has a rigid plastic molding that is split into two parts, making the product unstable if a force is applied to the surface. Products S01 and S02 (basic and deluxe versions from Company A) and S03 (basic version from Company B) each had 2 babies experience $SpO_2$ readings of <95%. One infant experienced $SpO_2$ readings of <95% in each of the other testing conditions (0°, 10°, 20° crib mattress; inclined sleep products S08 and S11). S08 features a low incline with low side heights and a uniform thick plush material. S11 is the widest of all products examined and has a thin plastic molding on the bottom surface.

**Table 7.** Number of events ($SpO_2$<95%) for prone lying on crib mattress and inclined sleep product conditions for each participant (*cpsc* 2 through *cpsc* 11).

| | 0° | 10° | 20° | S01 | S02 | S03 | S06 | S08 | S11 | S13 |
|---|---|---|---|---|---|---|---|---|---|---|
| CPSC2 | √ | √ | | √ | | √ | | | | |
| CPSC 3 | | | | √ | | | √ | √ | | |
| CPSC 4 | | | | | √ | | | | | |
| CPSC 5 | | | | | √ | √ | √ | | | |
| CPSC 6 | | | | | | | √ | | | |
| CPSC 7 | | | | | | | | | | |
| CPSC 8 | | | | | | | √ | | | √ |
| CPSC 9 | | | | | | | | | | |
| CPSC 10 | | √ | | | | | | | | √ |
| CPSC 11 | | | | | | | | | √ | √ |
| Total | 1 | 1 | 1 | 2 | 2 | 2 | 4 | 1 | 1 | 3 |



**Figure 31:** Examples of infants' faces in contact with crib mattress and inclined sleep product surfaces prior to low SpO$_2$ events from left to right: crib mattress, S13, S02, and S08.

When considering all crib conditions v. all inclined sleep product conditions, oxygen saturation concerns were found in 10% of crib mattress trials compared to 21% of inclined sleep product trials. In other words, **babies were more than twice as likely to experience SpO$_2$ readings of <95% while lying prone in an inclined sleep product compared to prone on a crib mattress.** The differences between a crib mattress and an inclined sleep product are vast and include more space to maneuver, no fabric materials on the sides of the product, little conformity with force application, and a flat product design featuring no concavity. These main differences likely contribute to fewer SpO$_2$ incidents in the crib mattress conditions compared to the inclined sleep product conditions.

Although no previous research has been done regarding the impact of inclined surfaces on breathing, these results agree with previous literature looking at prone compared to supine lying on a flat surface. Galland et al. (2000) compared the response of 3-month-old infants to asphyxia in the prone vs. supine position in quiet vs. active sleep. Three-month-old infants responded to asphyxia equally well in prone vs. supine position during quiet sleep. However, during active sleep (REM equivalent in infants), 3-month-old infants had a poorer (reduced) ventilatory sensitivity to asphyxia in the prone position compared to the supine position. This suggests that 3-month-old infants sleeping prone, in active sleep, would likely respond less to an asphyxia challenge compared to infants the same age in the supine position. This is particularly meaningful when considering that most of the incidents in the inclined sleep products occurred during naptime or overnight sleeping, when babies were less awake and possibly even experiencing active sleep.

It is critical to remember that the low oxygen saturation events in this study occurred within 60 seconds of being placed prone in each condition. Therefore, dangerous and fatal oxygen saturation levels could be reached in babies who roll from supine to prone in an inclined sleep product in a short amount of time.

Analyzing the results of this oxygen saturation portion of the study, in conjunction with the biomechanical analysis which showed differences in how muscles must work together to achieve a prone lying position with an increased demand on the core muscles in inclined sleep products, it is clear that **prone lying in a product in the class of Inclined Sleep Products evaluated in this study is a dangerous position that puts an infant's life at risk**, likely within only a few minutes after the roll occurs. These results also have implications for caregivers who may place infants to sleep prone within an inclined sleep product (as evidenced by three of the deaths from the incident analysis); prone positioning in an inclined sleep product, whether due to the infant rolling from supine to prone or due to the caregiver placing the infant prone in the product, is not safe for infants.

*4.5 Study Limitations*

This study is not without limitations. Infant biomechanics is grossly understudied compared to older children and adults. For that reason, established methodology for infant biomechanical studies is scarce. The project team has developed methods to analyze infant position and muscle activity by adapting widely accepted methodology for use in an infant population (Siddicky, 2019; Mannen, 2018). Specifically, the trunk-neck-head angular changes were analyzed to avoid the limitation of finding exact anatomical locations on which to place retroreflective markers. Exact placement of these markers is crucial to achieve high fidelity estimates of body segment kinematics, and the necessary landmarks are not always fully developed in infants. The method of using local coordinate systems on each body segment used in this study avoids the errors of lack of anatomical landmarks in babies and has been used in the spinal biomechanical analyses of children (Wilk et al., 2006).

Furthermore, there are inherent limitations in using surface electromyography (EMG) sensors on adults or children. While fine-wire EMG is more accurate, it is invasive and hence not feasible in a study on healthy infants. Surface EMG is used widely in older child and adult biomechanical studies, so similar methods and smaller EMG sensors were used to account for the infant population. One criticism of EMG technology is crosstalk between muscle groups. Since paired analyses were performed and were not specifically interested in one muscle but rather muscle groups, the results of this study accurately explain muscle use in various conditions. While other muscle groups may be important in achieving a roll, the experimental limitations did not allow for all muscles to be analyzed, and muscle groups were chosen based on preliminary data in the laboratory and knowledge of the field.

Oximetry technology is not without error. For this study, a medical grade handheld device commonly used in hospitals to detect oxygen saturation levels was used. Each event was examined to determine if the infant's face was in contact with a surface or if the reading was possibly false. In all 18 events, the infant's face was observed to be contacting a surface, giving confidence in the results.

Enrolling and testing enough participants for a biomechanical study can be challenging, particularly when considering the critical and expedited timeline for this study. The power analysis was based on EMG data from a previous study, and more subjects were tested than was suggested by the power analysis for achieving sufficient power to detect a significant difference in muscle activity between conditions. While the data showed several significant differences, especially between 0° and 20° crib mattress positions and between 0° crib mattress and inclined sleep products, a larger sample size may give more statistically significant evidence in other comparisons.

Though necessary for high-tech biomechanical testing, the laboratory environment is not the same as a home environment, but efforts were made to keep the temperature warm and the ambiance calm in the laboratory. Challenges of fussiness, crying, and sleeping were overcome by encouraging the caregiver to take an active role in the experiment. Data was included for analysis in this study if the baby was awake and not crying. Caregivers were given unlimited time to calm, feed, or change their infant's diapers to help testing go as smoothly as possible and to replicate a home environment. Experimental constraints also limited the time of testing to 60 seconds per condition, which is less time that infants would spend in these products in a home environment. The fact that biomechanical changes and differences in oxygen saturation levels were seen in this short period of time shows that even short amounts of time in inclined sleep products impacts an infant's ability to move and breathe.

Our testing was conducted on infants who were awake and not recently sleeping. This of course differs from the conditions reported to the CPSC where most infants were put into the inclined sleep products for a nap or for overnight sleep, so those infants were likely sleepier than the infants in the current study. An infant who is not wide awake may have less focus and energy to expend compared to the wide-awake infants in this study. So, while the muscle use and motion may be similar, it is likely that infants who find themselves in a compromised position in an inclined sleep product during a nap or overnight sleep may not have enough energy or alertness to achieve self-correction and may succumb to suffocation earlier or more easily than infants who are fully awake.

### 4.6 Summary of Biomechanical Analysis

An *in vivo* biomechanical study utilizing motion capture and EMG to evaluate the impact of an inclined crib mattress and inclined sleep products on an infant's ability to move and use their muscles to achieve movement was conducted.

Table 8 summarizes the main findings of the biomechanical study on incline angle of a crib mattress. During prone positioning, an increase in crib mattress incline angle resulted in a decrease in neck and back muscle activity and an increase in abdominal and triceps muscle activity, completely altering the normal muscle synergies that babies use to achieve a prone position when compared to the flat surface. Fewer changes were observed during supine positioning, with the most significant difference being an increase in head motion without the corresponding increase in muscle activity, indicating that the incline makes it easier for babies to lift and move their heads.

**Table 8**. Summary of EMG and Kinematic Results for Inclined Crib Mattress . Wide orange arrows indicate p<0.05 and narrow blue arrows indicate p<0.10.

| During prone position | | | |
|---|---|---|---|
| **Parameters** | **0° vs. 10°** | **10° vs. 20°** | **0° vs. 20°** |
| Erector spinae | - | ⬇ (orange) | ⬇ (orange) |
| Cervical paraspinals | - | - | ⬇ (orange) |
| Abdominals | ⬆ (orange) | ⬆ (orange) | ⬆ (orange) |
| Triceps | - | - | ⬆ (orange) |
| Neck ROM | - | - | - |
| Trunk ROM | - | - | - |
| # of neck peaks | - | ↑ (blue) | - |
| # of trunk peaks | - | - | - |
| **During Supine position** | | | |
| Erector spinae | - | ⬆ (orange) | - |
| Cervical paraspinals | - | - | - |
| Abdominals | - | - | - |
| Neck ROM | - | - | ⬆ (orange) |
| Trunk ROM | - | - | - |
| # of neck peaks | - | ⬆ (orange) | ⬆ (orange) |
| # of trunk peaks | - | - | - |

Table 9 summarizes the main findings of the biomechanical study of the inclined sleep products. In general, babies moved their trunks more and more often while positioned prone in products with little or no hard plastic support surface. They also required more abdominal effort and less erector spinae effort to maintain a prone position. During supine lying, products with a hard or semi-rigid plastic support surface decreased trunk motion, and erector spinae muscle activity was significantly lower for products with heavy padding.

**Table 9.** Summary of EMG and kinematic parameters of each inclined sleep product when compared to 0° surface (baseline). Wide orange arrows indicate p<0.05 and narrow blue arrows indicate p<0.10.

| During prone position | | | | | | | |
|---|---|---|---|---|---|---|---|
| Parameters | S01 | S02 | S03 | S06 | S08 | S11 | S13 |
| Erector spinae | ↓ (blue) | ↓ (orange) | ↓ (orange) | - | ↓ (orange) | ↓ (blue) | - |
| Cervical paraspinals | - | - | - | - | - | - | - |
| Abdominals | - | ↑ (orange) | ↑ (blue) | ↑ (orange) | ↑ (orange) | - | - |
| Triceps | - | - | - | - | - | - | - |
| Neck ROM | - | - | ↑ (orange) | - | - | - | - |
| Trunk ROM | - | - | ↑ (orange) | ↑ (orange) | ↑ (orange) | - | - |
| # of neck peaks | - | - | - | ↑ (blue) | - | ↑ (orange) | ↑ (orange) |
| # of trunk peaks | - | - | ↑ (orange) | ↑ (orange) | ↑ (orange) | ↑ (orange) | ↑ (blue) |
| During supine position | | | | | | | |
| Erector spinae | - | ↓ (blue) | - | ↓ (orange) | - | - | - |
| Cervical paraspinals | - | - | - | - | - | - | - |
| Abdominals | - | - | - | - | - | - | - |
| Neck ROM | - | - | - | - | - | - | - |
| Trunk ROM | ↓ (orange) | ↓ (blue) | - | - | - | - | - |
| # of neck peaks | - | - | - | - | - | - | - |
| # of trunk peaks | - | ↓ (blue) | - | ↓ (blue) | - | ↓ (orange) | ↓ (orange) |

The **key findings** of the biomechanics study are:

1. Inclined surfaces and inclined sleep products resulted in significantly higher muscle activity of the trunk core muscle (abdominals), which may lead to quicker fatigue and suffocation if an infant finds themselves prone in an inclined sleep product.

2. Muscle synergies (i.e how muscles work together) are significantly different in inclined sleep products. If an infant rolls from supine to prone in an inclined sleep product, it is likely the first time the baby has experienced the position of lying prone within an inclined sleep product and the demands the position requires of the muscles.

3. Some inclined sleep products require greater neck and trunk adjustments during prone positioning, indicating that infants may struggle to adjust their posture to enable breathing and attempt to self-correct if a roll from supine to prone occurs.

4. Prone lying in the inclined sleep product puts infants at higher risk of suffocation as evidenced by oxygen saturation results.

5. Some evidence was found that supports the idea that the inclined sleep products allow the babies to roll more easily from supine to prone. The flexed trunk and ease of head lifting during supine lying in an inclined sleep product may indicate that supine to prone rolling is achieved more easily.

6. If babies roll from supine to prone in an inclined sleep product, then, due to the high musculoskeletal demands necessary to maintain safe posture to prevent suffocation, babies would fatigue faster than they would on a stable, flat surface.

90   JA206

## 5. SUMMARY OF FINDINGS

### 5.1 Overall Results

The overall goal of this study was to inform the CPSC on whether the designs of Inclined Sleep Products impact an infant's ability to move within the products, and whether those designs directly impact safety or present a risk factor contributing to suffocation of an infant.

To meet this goal, the following studies were conducted:
1. An analysis of the underlined incident reports related to Inclined Sleep Products to qualitatively assess trends, similarities, or differences in the incidents that may inform product safety.
2. A thorough underlined product analysis of various Inclined Sleep Products within the product class to identify differences in design.
3. A non-invasive *in vivo* underlined biomechanics study of infants 2-6 months of age to determine:
    (a) the strength and space requirements for infants to move their heads and/or roll from the supine to the prone position in Inclined Sleep Products compared to a Flat Sleep Product,
    (b) the strength and space requirements for infants to lift their heads and/or roll from the prone to the supine position in Inclined Sleep Products compared to a Flat Sleep Product.

Based on the results of the biomechanical testing, product analysis, and incident report analysis, **none of the Inclined Sleep Products that were tested and evaluated as a part of this study are safe for infant sleep.**

Ninety-one incidents (death, injury, hazard) were reported in inclined sleep products between 2010 and 2019. The majority of the incidents with adequate information supplied in the reports to analyze the events were supine-supine (53%) or supine-prone (35%) events. The supine-supine incidents occurred in younger infants (average 3.2 months), while supine-prone incidents occurred in older infants (average 4.2 months). Many supine-supine deaths occurred in infants who were currently sick, chronically ill, or born premature. Because these infants have higher mortality rates compared to healthy babies, for most incidents, it cannot be confirmed if the event was related to the condition or the product design. However, many reports indicate the infant was found with his/her face contacting the side of the inclined sleep product and that mucus or blood was found on the infant's face, suggesting suffocation was the cause of death. In combination with the product analysis which showed the sides were made of heavy padding or a combination of padding and plastic, it is likely that suffocation in the side of the product contributed to the deaths or injuries of these infants. Future work should consider the materials used on the product sides to reduce the risk of carbon dioxide rebreathing.

The current warning on inclined sleep products suggests that parents should stop using the product once the infant can roll, but the results of this study suggest that the first observed infant roll can occur in the product and can result in a fatal suffocation event evidenced by data within the incident reports. Further supporting that idea are results from the biomechanical analysis. During supine lying within an inclined sleep product, babies moved their trunks less and exhibited less erector spinae muscle activity, likely due to a combination of conformity of the products and the lack of rigidity as quantified in the product analysis. During supine lying, babies' trunks are more flexed solely due to the product design. Coupled with the lack of a rigid surface to move against in many of the inclined sleep products, babies are exposed to a much different environment than a crib mattress or even a crib mattress on a similar incline. The flexed trunk position in combination with flexed hips due to the design of the seat portion of the inclined sleep products puts babies closer to the fetal tuck position that is often used to achieve a supine to prone roll when compared to a flat or inclined crib mattress. This is further supported because the

average age of infants who experienced supine-prone events analyzed in the incident reports was slightly less than the average age of rolling, suggesting that babies who died or were injured in inclined sleep products may have been able to roll more easily in the inclined sleep products than on a flat rigid surface. It is likely a combination of all of these factors that allow babies to roll supine to prone in inclined sleep products, despite the narrow width of the products that may otherwise prohibit rolling.

In the prone position within an inclined sleep product (whether from a roll from supine to prone or from being initially placed prone), infants are required to use their muscles differently and move their body in unusual and unfamiliar ways simply to maintain the prone posture and lift their heads to breathe. In particular, the demands of the core muscles are likely some of the highest that they have ever been exposed to, resulting in increased fatigue rates as the infant tries to self-correct. It is likely that in incidents where babies were found deceased in the prone position, that a roll occurred, and after some amount of struggling, the baby was fatigued and could no longer move into a position to prevent suffocation. This is further supported by the product analysis, which showed inclined sleep products have more deformation with force application compared to a crib mattress, resulting in a pliant surface that distributes force differently than a rigid surface. Therefore, when infants attempt to self-correct in inclined sleep products, their movements are less effective compared to a more rigid surface. Additionally, the oxygen saturation events from the biomechanics analysis indicated that infants in this study experienced <95% $SpO_2$ twice as often when lying prone in inclined sleep products compared to lying prone on a crib mattress. The combination of incline angle, rigidity of the surface, curvature of the surface, and material selection of a plastic surface with padding all contribute to an increased risk of suffocation if infants are positioned prone in an inclined sleep product. The unfamiliar movement requirements coupled with a product design that does not allow for the same force distribution of a flat crib mattress results in a situation in which infants may be unable to self-correct.

While there were differences in the product designs and the biomechanical results of infants within the products, no product that was examined in this study was found to be safe for infant sleep. **All products in the class of Inclined Sleep Products that were tested and evaluated in this study are unsafe for infants.** If this product class remains, ASTM F3118-17a should be rewritten and implemented as a mandatory standard to mitigate hazards posed by and prevent future incidents with Inclined Sleep Products.

### 5.2 Future Considerations

1. Future analysis should seek to understand if 15 degrees is a suitable angle for an inclined sleeping surface, or if movement and muscle activity are significantly different at this angle compared to a flat surface. The research team recommended testing 10 more infants in a biomechanical study at various inclined angles (0, 5, 10, 15, 20) to more specifically identify a safe incline angle for infant sleep.

2. $CO_2$ rebreathing, or breathability of the products, should be quantitatively assessed. The project team recommends utilizing the model by Maltese et al. (2019) (Figure 27) to understand how material selection and product design may impact $CO_2$ rebreathing, and the likelihood of suffocation. As noted in several of the supine-supine incidents, suffocation appeared to have occurred without significant movement within the product. This may be attributed partly to product design. In the same way that infants are not recommended to stay in a car seat for extended amounts of time, a breathability study may further quantify the time that is safe for babies to remain in an inclined sleep product.



**Figure 31.** Infant $CO_2$ rebreathing setup used by Maltese and Leshner (Maltese et al., 2019)

3. A similar study should be conducted to evaluate the safety of seated products for infants by understanding how babies use their muscles to move within the confines of other common infant products.

62

## 6. ASTM RECOMMENDATIONS

With the findings of the biomechanical study, the product analysis, and the incident report analysis, the team reviewed, analyzed, and interpreted the safety and design of specific Inclined Sleep Products. The project team examined other Inclined Sleep Products per the CPSC's requests to determine whether the design specifications in ASTM F3118-17a are appropriate to prevent accidental deaths. **The team believes that no inclined sleep products that were examined as a part of this study are currently safe for infant sleep. The product category should be completely eliminated, or the ASTM standard significantly modified to ensure a safe environment and mitigate risk.**

When analyzing specific design considerations, particular attention was paid to the following: seatback incline angle, surface guidelines, minimum side barrier height and material, and maximum width. Specifically, the following are addressed: (a) the safety or hazard presented by a 30-degree incline, (b) the characteristics of Inclined Sleep Products that may diminish respiration and ways to minimize the hazard, and (c) recommendations to improve the ASTM standard to minimize injuries and deaths in Inclined Sleep Products.

### 6.1 Incline Angle
#### *30-Degree Incline Does Not Allow for a Lying Posture*
Based on the results of the biomechanical study, it was revealed that a 30-degree angle should not be considered a lying position for an infant. Infants could not maintain a lying posture at the 30-degree crib mattress incline and began to slide off the mattress. For this reason, 30-degrees is too steep of an incline for a lying or sleeping product.

#### *20-Degree Incline Puts Infants at Risk for Muscle Fatigue*
Based on the results of the biomechanical study, the 20-degree mattress incline resulted in significantly different muscle activity for the infants compared to the zero-degree incline surface. The increased demand on the abdominal muscles could lead to increased fatigue and suffocation if an infant is unable to reposition themselves after a roll from supine to prone occurs.

#### *10-Degree Incline May Not Significantly Impact Infant Motion or Muscle Activity*
Based on the results of the biomechanical study, fewer differences in muscle activity or lying posture were revealed at a 10-degree mattress incline compared to the zero-incline surface. 10 degrees is likely a safe incline for sleep on a crib mattress type of surface.

#### *Inclines Between 10- and 20-Degrees Should Be More Thoroughly Studied*
The experimental design of this study did not examine the angles between 10- and 20-degrees, so future work should focus on understanding which, if any, angles between 10- and 20-degrees may be safe for infant sleep.

> **_Recommendation:_** An incline angle of 10-degrees is likely safe for an infant Inclined Sleep Product, and an incline of 20-degrees or greater is <u>not</u> safe. In order to determine if angles between 10- and 20-degrees are safe, additional biomechanical testing is required.

### 6.2 Surface
#### *Lying Surface Rigidity should be Standardized*
The results of the biomechanical testing revealed that infants moved differently when lying prone in Inclined Sleep Products compared to an inclined crib mattress. This difference is likely due in part to the lack of surface rigidity of the Inclined Sleep Products. The product analysis revealed

varying designs for the lying surface (hard plastic, malleable plastic, or no plastic with little to heavy padding). Regardless of the rigidity of the underlying plastic surface, the added padding of many of the Inclined Sleep Products resulted in a highly compliant surface, which could result in the inability of infants who have rolled to self-correct as they are unable to apply the force required to lift their head to breathe or perform a roll. It is also important to recognize that the biomechanical testing in this study was done with awake and alert infants; it is likely that infants who are recently aroused from a deep sleep may not have the same amount of effort to expend as fully awake infants, further decreasing the likelihood of self-correction if a roll occurs. For these reasons, specific recommendations for the surface rigidity of the Inclined Sleep Product need to be formulated. In the worst-case scenario, when infants are unable to self-correct after a roll and are lying prone on the product, the maximum allowable deformation of the Inclined Sleep Product surface should not exceed one-half of the infant's head radius. According to the WHO Child Growth Standard (WHO, 2006), a 5th percentile newborn's weight and head circumference are 2.6 kg and 32.2 cm respectively (male and female values averaged). Considering that an infant's head is 25% of the total body weight, the head weight of the 5th percentile newborn is 0.64 kg. From the head circumference measurement, one-half of the head radius of the 5th percentile newborn is 2.6 cm. The maximum allowable deformation on the Inclined Sleep Product surface should be 2.6 cm (1 inch) when a 0.64 kg (1.4 lb.) weight (i.e. a 6.25 N load) is placed on the surface. In order to obtain more robust parameters for the ASTM standard, future work on product surface deformation analyses are recommended.

### Lying Surface Shape should be Flat

Product analysis of some of the Inclined Sleep Products revealed that the sleeping surface is either not flat or not flat with added weight. Concave curvature either in the back or the seat portion of the product increases the suffocation risk for babies who have experienced a roll, as the surface envelopes their face, increasing the risk for rebreathing and suffocation if self-correction is not achieved. Therefore, the surface of the Inclined Sleep Product should be flat with no curvature to the surface either with or without added doll weight. It would be beneficial to adapt a flatness test in the Inclined Sleep Products ASTM standard similar to the flatness test currently in the Bassinets and Cradles standard (F2194-16e1; Section 6.7).

### Surface Material should be Standardized

The incident report analysis revealed that many of the infant deaths occurred in products with heavy plush padding on the surface of the products (S02 and S06). There were also differences in material of the sides of the products, varying from heavy plush to lightweight mesh. The surface of the Inclined Sleep Products should meet the standard used for Crib Mattresses (ASTM F2933-19). Therefore, recommendations for the surface material of the Inclined Sleep Products need to be formulated. In that regard, carbon dioxide rebreathing analyses are recommended to inform material recommendations for the sides of the Inclined Sleep Products. (Paluszynska et al., 2004; Carleton et al, 1998)

### Surface Width should Prevent Supine to Prone Rolling

If all other recommendations regarding the surface are implemented, the concern of suffocation due to a roll from supine to prone will be significantly minimized. However, if the goal is for supine to prone rolling to be completely prevented, the product width should be minimized based on preliminary data from a flat crib mattress rolling.

---

**_Recommendation:_** The surface of the Inclined Sleep Product should have a minimum rigidity, should exhibit no curvature, and should meet material recommendations to minimize rebreathing. If roll prevention is still a concern, the maximum product width should minimize the distance from the lateral knee to the side of the product during supine lying.

---

64

## 6.3 Sides
### Material and Height Minimum of the Sides should be Further Studied
Our study did not quantitatively evaluate safety of materials used for the sides of the Inclined Sleep Products. However, the products evaluated exhibited vastly different side materials. While a breathable side material is necessary, future work should focus specifically on carbon dioxide rebreathing of various materials or material combinations to quantify the level of breathability required for safety. This study also did not provide data to guide the heights of the sides of the product to avoid falling, so future work is required to define the minimum safe height.

> **_Recommendation:_** Additional research should be done to understand the minimum height of the sides of the Inclined Sleep Product. Additional research is required to clearly define the threshold of carbon dioxide rebreathing to inform safe product design.

## 6.4 Warnings for Use
### Caregivers of Infants Who are Sick, Chronically Ill, or were Born Prematurely Should Exercise Additional Caution when Using Inclined Sleep Products
The incident report analysis revealed that several of the supine-supine deaths occurred with infants who had chronic conditions, were experiencing sickness, or were born premature. Because these are risk factors for increased rates of infant mortality, it cannot be confirmed if the inclined sleep product contributed to the incidents for these vulnerable infants. One likely explanation for these incidents is that babies who already had a risk factor for increased mortality experienced suffocation in the sides of the products as many of their faces were found in contact or close contact with the product. A safe sleeping product may be even more important for infants who have previous risk factors for infant mortality. Additional research should be made into crafting and implementing warnings for inclined sleep products and other products regarding infants with sickness, chronic illness, or prematurity.

## 7. REFERENCES

American Academy of Pediatrics AAP Task Force on Infant Positioning and SIDS. (1992). Positioning and SIDS. *Pediatrics*, 89(6 Pt 1):1120-1126.
DOI: N/A; PMID: 1503575.

Becroft D.M.O., Thompson J.M.D., and Mitchell E.A. (2001). Nasal and intrapulmonary haemorrhage in sudden infant death syndrome. *Archives of Disease in Childhood*, 85, 116–120.
DOI: https://doi.org/10.1136/adc.85.2.116; PMID: 11466185; PMCID: PMC1718874.

Benjamin Neelon S.E., Oken E., Taveras E.M., Rifas-Shiman S.L., Gillman M.W. (2016). Age of achievement of gross motor milestones in infancy and adiposity at age 3 years. *Maternal and Child Health Journal*, 16(5):1015-20.
DOI: 10.1007/s10995-011-0828-3; PMID: 21643834; PMCID: PMC3321389.

Berthouze L. and Mayston M. (2011). Design and validation of surface-marker clusters for the quantification of joint rotations in general movements in early infancy. *Journal of Biomechanics,* 44(6):1212-1215.
DOI:10.1016/j.jbiomech.2011.01.016; PMID: 21288525

Bolivar J.M., Gerhardt T., Gonzalez A., Hummler H., Claure N., Everette R., Bancalari E. (1995). Mechanisms for episodes of hypoxemia in preterm infants undergoing mechanical ventilation. *Journal of Pediatrics*, 127(5):767-73.
DOI: 10.1016/s0022-3476(95)70171-0; PMID: 7472834.

Boxtel, A. (2001). Optimal signal bandwidth for the recording of surface EMG activity of facial, jaw, oral, and neck muscles. *Psychophysiology*, 38(1), 22–34.
DOI:10.1111/1469-8986.3810022; PMID: 11321618.

Campbell E.J., Green J.H. (1953). The expiratory function of the abdominal muscles in man; an electromyographic study. *Journal of Physiology*, 120(3):409-18.
DOI: 10.1113/jphysiol.1953.sp004903; PMID: 13070209; PMCID: PMC1365962

Carleton J.N., Donoghue A.M., Porter W.K. (1998) Mechanical model testing of rebreathing potential in infant bedding materials. *Archives of Disease in Childhood*, 78(4):323-8.
DOI: 10.1136/adc.78.4.323; PMID: 9623394; PMCID: PMC1717516.

Colvin J.D., Collie-Akers V., Schunn C., Moon R.Y. (2014). Sleep environment risks for younger and older infants. *Pediatrics*, 134(2):e406-12.
DOI: 10.1542/peds.2014-0401; PMID: 25022735; PMCID: PMC4187235.

Council on Children With Disabilities, Section of Developmental Behavioral Pediatrics, Bright Futures Steering Committee, Medical Home Initiatives for Children With Special Needs Project Advisory Committee. (2006). Identifying Infants and Young Children with Developmental Disorders in the Medical Home: An Algorithm for Developmental Surveillance and Screening. *Pediatrics*, 118(1):405-420.
DOI: 10.1542/peds.2006-1231; PMID: 16818591.

Drake, J. D. M. and Callaghan, J. P. (2006). Elimination of electrocardiogram contamination from electromyogram signals: An evaluation of currently used removal techniques. *Journal of Electromyography and Kinesiology*, 16(2), 175–187. DOI:10.1016/j.jelekin.2005.07.003; PMID: 16139521.

Ertem I.O., Krishnamurthy V., Mulaudzi M.C., Sguassero Y., Balta H., Gulumser O., Bilik B., Srinivasan R., Johnson B., Gan G., Calvocoressi L., Shabanova V., Forsyth B.W.C. (2018). Similarities and differences in child development from birth to age 3 years by sex and across four countries: a cross-sectional, observational study. *Lancet Global Health*, 6(3):e279-e291. DOI: 10.1016/S2214-109X(18)30003-2; PMID: 29433666.

Galland B.C., Bolton D.P., Taylor B.J., Sayers R.M., Williams S.M. (2000). Ventilatory sensitivity to mild asphyxia: prone versus supine sleep position. *Archives of Disease in Childhood*, 83(5):423-8. DOI: 10.1136/adc.83.5.423; PMID: 11040153; PMCID: PMC1718529.

Hermens, H.J., Freriks, B., Merletti, R., Stegeman, D., Blok, J., Rau G., Disselhorst-Klug, C. Hägg, G.G. (1999). SENIAM: European recommendations for surface electromyography. Netherlands: Roessingh Research and Development. DOI:10.1109/TSMC.2017.2692273; PMID: N/A.

Hodges, P. W. and Bui, B. H. (1996). A comparison of computer-based methods for the determination of onset of muscle contraction using electromyography. *Electroencephalography and Clinical Neurophysiology*, 101(6), 511–519. DOI:10.1016/S0921-884X(96)95190-5; PMID: 9020824.

Jantz J.W., Blosser C.D., Fruechting L.A. (1997) A motor milestone change noted with a change in sleep position. *Archives of Pediatric and Adolescent Medicine*, 151(6):565. DOI: 10.1001/archpedi.1997.02170430031006; PMID: 9193239.

Kuczmarski RJ,R.J., Ogden CL,C.L., Gua SS et al., S.S., Grummer-Strawn L.M., Flegal K.M., Mei Z., Wei R., Curtin L.R., Roche A.F., Johnson C.L. (2000.). CDC growth cartscharts for the United States: Methods and development. National Center for Health Statistics. *Vital Health* Stat*Statistics*, 11(246), 2002.):1-190. DOI: N/A; PMID: 12043359.

Maltese M.R., Leshner M. (2019). Carbon dioxide rebreathing induced by crib bumpers and mesh liners using an infant manikin. *BMJ Paediatrics Open*, 3(1):e000374. DOI: 10.1136/bmjpo-2018-000374; PMID: 31206068; PMCID: PMC6542454.

Mannen E.M., Krishnan A., Tackett S.A., McCarthy R., Bumpass D.B. (2018). Infant positioning impacts neck and back muscle activity: a pilot study exploring implications for spinal development. The Spine Journal, 18(8):S146. DOI: https://doi.org/10.1016/j.spinee.2018.06.548; PMID: N/A.

Martin J.G. and De Troyer A. (1982). The behaviour of the abdominal muscles during inspiratory mechanical loading. *Respiratory Physiology*, 50(1):63-73. DOI: N/A; PMID: 6217533.

Moon, R.Y., Task Force on Sudden Infant Death Syndrome. (2016). SIDS and other sleep-related infant deaths: evidence base for 2016 updated recommendations for a safe infant sleeping environment. *Pediatrics*, 138(5): pii: e20162940.
DOI: 10.1542/peds.2016-2940; PMID: 27940805.

Paluszynska D.A., Harris K.A., Thach B.T. (2004). Influence of sleep position experience on ability of prone-sleeping infants to escape from asphyxiating microenvironments by changing head position. *Pediatrics*, 114(6):1634-9.
DOI: 10.1542/peds.2004-0754; PMID: 15574627.

Siddicky S.F., Bumpass, D.B., Krishnan A., Tackett, S.A., McCarthy, R.E., Mannen E.M. (2019) Effect of infant positioning on spinal muscle activity. *Journal of Pediatric Orthopaedics* (in review).
DOI: N/A; PMID: N/A.

Smith A.P., Saiki T., Hannam S., Rafferty G.F., Greenough A. (2010). The effects of sleeping position on ventilatory responses to carbon dioxide in premature infants. *Thorax,* 65(9):824-8.
DOI: 10.1136/thx.2009.127837; PMID: 20805181.

Trujillo-Priego I.A. and Smith B.A. (2017). Kinematic characteristics of infant leg movements produced across a full day. *Journal of Rehabilitation and Assistive Technologies Engineering*, 4: 2055668317717461.
DOI: 10.1177/2055668317717461; PMID: 28845239; PMCID: PMC5565846.

United States Consumer Product Safety Commission. (2017) Proposed Rule: Safety Standard for Infant Inclined Sleep Products. Bethesda, MD. http://www.cpsc.gov.
DOI: N/A; PMID: N/A.

Urbaniak G.C and Plous S. (2013). Research Randomizer, 2013 (Version 4.0).. [Computer software] http://www.randomizer.org/
DOI: N/A; PMID: N/A.

Valleley, R.J., and Roane, B.M. (2010). Review of Ages & Stages Questionnaires®: A Parent Completed Child Monitoring System. In R. A. Spies, J. F. Carlson, & K. F. Geisinger (Eds.), The eighteenth mental measurements yearbook, 13–15. Lincoln, NE: Buros Institute of Mental Measurements
DOI: N/A; PMID: N/A; ISBN: 9780910674614.

WHO Multicentre Growth Reference Study Group. (2006). WHO child growth standards: length/height-for-age, weight-for-age, weight-for-length, weight-for height and body mass index-for-age: methods and development. WHO Child Growth Standards.
DOI: 10.4067/S0370-41062009000400012; PMID: 20919458

Wilk B., Karol L.A., Johnston II C.E., Colby S., Haideri N. (2006) The Effect of Scoliosis Fusion on Spinal Motion: A Comparison of Fused and Nonfused Patients With Idiopathic Scoliosis. *Spine* (Phila Pa 1976), 31(3):309-14.
DOI: 10.1097/01.brs.0000197168.11815.ec; PMID: 16449904.

**Appendix A: STUDY TEAM**

**Principal Investigator:**
*Dr. Erin Mannen* has a Ph.D. in mechanical engineering from the University of Kansas and specializes in biomechanics with over ten years of research experience in the field.  As Principal Investigator, she was responsible for oversight of the entire project. Dr. Mannen led the design of the biomechanics experiment, oversaw data collections, managed data analysis, interpreted results, prepared reports, conducted meetings, ensured data quality, and managed all aspects of the project.  Dr. Mannen has also served as Principal Investigator on similar projects studying biomechanics of infants in various infant products.

**Co-Investigators:**
*Dr. John Carroll* is a medical doctor specializing in pediatric pulmonology. He is a graduate of the University of Texas Southwestern Medical School, completed Pediatrics residency at the State University of New York, Upstate Medical Center, and completed Pediatric Pulmonology fellowship at the University of Arizona and McGill University.  Dr. Carroll is board certified in Pediatrics and Pediatric Pulmonology and is currently an investigator on several NIH-supported projects. As a Clinical Co-Investigator, Dr. Carroll provided clinical guidance on experimental design and data interpretation, focusing on the respiratory aspects of the project. He provided analysis on the supine-supine incidents to help determine if external factors may have caused the events. Dr. Carroll has extensive experience in pediatric pulmonary clinical research.

*Dr. David Bumpass* is a board-certified orthopaedic surgeon specializing in pediatric spine.  He is a graduate of the University of Virginia School of Medicine and completed his orthopaedic and spine surgery training at Washington University in St. Louis.  He specializes in complex pediatric spinal deformity surgery.  As a Clinical Co-Investigator, Dr. Bumpass provided clinical insight into experimental design and data interpretation, focusing on understanding an infant's ability to move based on typical motor development milestones. Dr. Bumpass's familiarity with biomechanics research allowed him to help interpret the results of the biomechanical studies from a clinical perspective.

*Dr. Brien Rabenhorst* is a board-certified pediatric orthopaedic surgeon specializing in pediatric hip development. He is a graduate of Louisiana State University School of Medicine. He completed an orthopaedic residency at Texas Tech Health Science Center, and a pediatric orthopaedic fellowship at the Children's Hospital of Colorado.  As a Clinical Co-Investigator, Dr. Rabenhorst contributed to the experimental design and data interpretation, focusing on the strength and coordination required of infants to move from compromised positions. Dr. Rabenhorst's familiarity with biomechanics research allowed him to help interpret the results of the biomechanical studies from a clinical perspective.

*Dr. Brandi Whitaker* is a psychologist working extensively over the past seven in the areas of psychological assessment and treatment of infants and young children.  She earned her Ph.D. in the Psychology from Washington State University and completed a Post-Doctoral Fellowship in Pediatric Psychology.  As a Co-Investigator, Dr. Whitaker provided guidance on proper selection of a developmental measure for the subjects. She led the effort in analyzing and interpreting the developmental data and offered interpretation of the results from a developmental perspective.

*Dr. Junsig Wang* is a postdoctoral fellow specializing in infant biomechanics. He earned his Ph.D. in Kinesiology from Iowa State University where he specialized in biomechanical research involving human motion data collection and analysis and completed further training as a

postdoctoral fellow in the Department of Orthopaedics at the University of Arizona. Dr. Wang carried out the experimental testing, data analysis, data processing, quality control, and report preparation.

*Dr. Safeer Siddicky* is a postdoctoral fellow specializing in infant biomechanics. He earned his Ph.D. in Engineering and Biomedical Informatics from the University of Missouri-Kansas City, where he specialized in biomechanical research involving human motion data collection and analysis. Dr. Siddicky provided <u>technical support</u> through IRB adherence, data collections, data processing, data analysis, and assisted with report preparation and data quality control.

**Organizational Structure:**
The multi-disciplinary project team consists of investigators with doctoral degrees in mechanical engineering and kinesiology specializing in biomechanics and psychology specializing in pediatrics, and medical doctors in the fields of pediatric pulmonology and pediatric orthopaedics. This team had the technical ability to carefully design and execute the work and interpreted the results from both an engineering and a medical viewpoint.

Dr. Mannen met with the CPSC regularly (every 2-4 weeks) to give updates on the progress of the project. The entire team met as needed throughout the project timeframe to meet goals and discuss outcomes.

**Appendix B: FACILITIES AND EQUIPMENT**

**Laboratory:** The HipKnee Arkansas motion laboratory at which testing will take place is equipped with state-of-the art validated experimental equipment costing over $250,000. Service contracts are in place to ensure all equipment is calibrated and functional.

**Environment:** UAMS is a research and teaching institution, fostering this collaborative team of engineers, researchers, and clinicians in a variety of specialties. As faculty, both research and clinical, we are encouraged and expected to participate in translational, meaningful projects. We are supported by a team of professionals in the UAMS Office of Research and Sponsored Programs to aid in the administrative requirements of a government contract.

**IT:** UAMS has a team of professionals to handle all technical issues that may arise relating to internet connectivity, computers, telephones, video-conferencing, email, and HIPAA-secured cloud storage space.

**Office Space:** The PI and Co-Investigators have their own computers and private offices. Members of the Project Support Team each has their own personal workspace and computer. There are private meeting rooms available to use as needed.

**Appendix C:** ██████████ **[CONFIDENTIAL]**

██████████  ████████████
██████████  ████
██████████  ████

| ████████ | ██████████ | ████████████ | ████████ | ████████ |
|---|---|---|---|---|
| ████ | ████████ | ██████████████ | ████ | ██████████ |
| ████ | ████████ | ████████████████████ | ████ | ██████████ |
| ████ | ████ | ██████████████████ | ████ | ██████████ |
| ████ | ████ | ██████ | ████ | ██████████ |
| ████ | ████ | ████████████████████████ | ████ | ██████████ |
| ████ | ████ | ████████████████ | ████ | ████ |
| ████ | ██████ | ██████████████████ | ██████████ | ████ |
| ████ | ██████ | ████████████████ | ██████████ | ████ |
| ████ | ████████ | ████████████████ | ████ | ████ |
| ████ | ████████ | ████████████████████ | ████ | ████ |
| ████ | ████ | ████████████████████ | ██████████ | ████ |
| ████ | ██████████ | ██████████ | ████ | ████ |
| ████ | ████ | ██████████ | ██████████ | ████ |
| ████ | ████ | ██████████████████<br>██████ | ████████████ | ████ |
| ████<br>██████ | ████ | ████████████████<br>████████████████ | ████████████ | ████ |

**Appendix D: Incident Report Summary**

Data is summarized from all 91 incidents investigated by the CPSC related to inclined sleep products occurring from 2010 to May 2019. Data is separated into incident types: *supine-supine, supine-prone, supine-other, prone-prone, other circumstances,* and *not enough information.* The tables include:

- ████████████████████████████████████
- ████ ████████████████████████████████████
- Incident Date: date of the incident,
- Age (months): age of the infant at the time of the incident,
- Death/Injury/Hazard: type of incident,
- Restraint Use (Y/N/UNK): indicates if the buckle was used in the product prior to the incident [Y=yes; N=no; UNK=unknown],
- Healthy/Sick/Chronic/UNK: indicates if the state of health of the infant at the time of the incident [healthy, sick (includes colds, fevers, respiratory congestion), chronic (includes serious health issues such as sickle cell), UNK=unknown],
- Premature <37 weeks (Y/N/UNK): indicates if the infant was born prematurely (<37 weeks gestational age) [Y=yes; N=no; UNK=unknown].

**Table D1:** Supine-Supine Incidents (2011 to 2018)

| Incident Date | Age (months) | Death/Injury /Hazard | Restraint Use (Y/N/UNK) | Healthy/Sick/Chronic/UNK | Premature <37 weeks (Y/N/UNK) |
|---|---|---|---|---|---|
| 09/23/11 | 3.3 | Death | N | Sick | Y |
| 10/01/11 | 2.0 | Injury | UNK | UNK | UNK |
| 01/21/13 | 1.0 | Injury | UNK | UNK | UNK |
| 10/19/13 | 2.5 | Death | UNK | Sick | N |
| 10/14/14 | 4.0 | Hazard | Y | UNK | UNK |
| 11/07/14 | 3.3 | Death | N | Healthy | Y |
| 12/23/14 | 2.1 | Death | Y | Healthy | UNK |
| 04/13/15 | 1.1 | Death | UNK | Sick | N |
| 05/16/15 | 1.5 | Death | Y | Healthy | N |
| 05/25/15 | 0.2 | Injury | UNK | UNK | UNK |
| 09/23/15 | 4.2 | Death | N | Sick | UNK |
| 09/24/15 | 3.7 | Death | UNK | Healthy | UNK |
| 09/26/15 | 8.7 | Death | UNK | UNK | UNK |
| 10/27/15 | 2.6 | Death | N | Healthy | UNK |
| 04/21/16 | 0.2 | Death | Y | Healthy | UNK |
| 09/09/16 | 4.0 | Death | N | Sick | N |
| 09/11/16 | 2.3 | Injury | Y | UNK | UNK |
| 12/08/16 | 5.0 | Death | UNK | Sick | UNK |
| 01/05/17 | 4.8 | Death | UNK | Sick | UNK |
| 05/05/17 | 0.5 | Death | UNK | Sick | N |
| 06/11/17 | 10.1 | Death | N | Chronic | UNK |
| 07/31/17 | 3.3 | Death | Y | Chronic | N |
| 08/01/17 | 3.4 | Death | UNK | Healthy | Y |
| 09/15/17 | 1.2 | Death | UNK | Sick | UNK |
| 12/23/17 | 2.8 | Death | UNK | Healthy | UNK |
| 01/12/18 | 6.1 | Death | N | Healthy | UNK |
| 03/10/18 | 4.5 | Death | Y | Healthy | N |
| 03/14/18 | 3.1 | Death | UNK | Healthy | Y |
| 03/21/18 | 1.7 | Death | N | Healthy | N |
| 04/01/18 | 0.3 | Death | N | Healthy | N |
| 04/24/18 | 5.1 | Death | N | Chronic | UNK |
| 07/08/18 | 5.1 | Death | UNK | Healthy | N |
| 08/15/18 | 1.3 | Death | UNK | Healthy | UNK |
| 09/21/18 | 3.0 | Death | UNK | Chronic | N |
| 10/20/18 | 4.3 | Death | Y | Healthy | N |
| 11/15/18 | 1.3 | Death | UNK | Sick | Y |
| 12/04/18 | 2.7 | Death | N | Healthy | N |
| 03/01/19 | 7.0 | Death | N | Healthy | Y |

**Table D2:** Supine-Prone Incidents (2010 to 2019)

| | Incident Date | Age (months) | Death/Injury /Hazard | Restraint Use (Y/N/UNK) | Healthy/Sick/ Chronic/UNK | Premature <37 weeks (Y/N/UNK) |
|---|---|---|---|---|---|---|
| | 11/08/10 | 3.2 | Death | UNK | Healthy | UNK |
| | 06/03/13 | 2.8 | Death | N | Healthy | N |
| | 06/19/14 | 8.7 | Death | UNK | UNK | N |
| | 07/25/14 | 1.6 | Injury | N | Healthy | UNK |
| | 02/22/15 | 6.8 | Death | UNK | Sick | Y |
| | 08/10/15 | 4.0 | Death | UNK | Healthy | UNK |
| | 09/23/15 | 3.0 | Death | N | Healthy | N |
| | 12/14/15 | 3.0 | Death | UNK | Healthy | UNK |
| | 07/16/16 | 3.3 | Death | UNK | Healthy | UNK |
| | 09/16/16 | 3.0 | Death | N | Healthy | N |
| | 11/26/16 | 4.0 | Injury | UNK | UNK | UNK |
| | 12/04/16 | 1.0 | Injury | Y | Healthy | UNK |
| | 04/17/17 | 2.9 | Death | UNK | UNK | UNK |
| | 06/12/17 | 1.9 | Death | UNK | Healthy | N |
| | 06/15/17 | 5.3 | Death | N | Healthy | UNK |
| | 07/17/17 | 4.0 | Injury | Y | UNK | UNK |
| | 09/03/17 | 4.8 | Death | N | Healthy | UNK |
| | 12/22/17 | 5.4 | Death | Y | Healthy | N |
| | 01/06/18 | 6.0 | Death | UNK | Sick | UNK |
| | 01/11/18 | 4.1 | Death | N | Healthy | N |
| | 04/10/18 | 4.8 | Death | N | Healthy | N |
| | 04/25/18 | 5.9 | Death | N | Healthy | UNK |
| | 12/13/18 | 6.9 | Death | N | Sick | N |
| | 03/26/19 | 3.0 | Death | UNK | Sick | UNK |
| | 05/02/19 | 5.4 | Death | UNK | UNK | N |

**Table D3:** Supine-Other Incidents (2011 to 2013)

| | Incident Date | Age (months) | Death/Injury /Hazard | Restraint Use (Y/N/UNK) | Healthy/Sick/C hronic/UNK | Premature <37 weeks (Y/N/UNK) |
|---|---|---|---|---|---|---|
| | 09/04/11 | 5.0 | Hazard | Y | UNK | UNK |
| | 09/08/12 | 5.0 | Injury | Y | UNK | UNK |
| | 04/19/13 | 12.0 | Hazard | Y | UNK | UNK |
| | 06/17/13 | 6.0 | Injury | UNK | UNK | UNK |

**Table D4:** Prone-Prone Incidents (2013 to 2017)

| | Incident Date | Age (months) | Death/Injury /Hazard | Restraint Use (Y/N/UNK) | Healthy/Sick/C hronic/UNK | Premature <37 weeks (Y/N/UNK) |
|---|---|---|---|---|---|---|
| | 02/27/13 | 2.0 | Death | N | Healthy | N |
| | 04/17/17 | 4.5 | Death | UNK | Chronic | Y |
| | 07/03/17 | 0.3 | Death | N | Sick | N |

**Table D5:** Other Circumstances (2016 to 2018)

| | Incident Date | Age (months) | Death/Injury /Hazard | Restraint Use (Y/N/UNK) | Healthy/Sick/C hronic/UNK | Premature <37 weeks (Y/N/UNK) |
|---|---|---|---|---|---|---|
| | 08/26/16 | 2.2 | Death | UNK | Healthy | UNK |
| | 03/16/18 | 3.0 | Injury | Y | Healthy | N |

**Table D6:** Not Enough Information (2014 to 2019)

| Incident Date | Age (months) | Death/Injury /Hazard | Restraint Use (Y/N/UNK) | Healthy/Sick/Chronic/UNK | Premature <37 weeks (Y/N/UNK) |
|---|---|---|---|---|---|
| 12/01/14 | 1.6 | Injury | N | Healthy | UNK |
| 12/16/14 | 7.6 | Death | UNK | Healthy | UNK |
| 01/25/15 | 4.2 | Death | UNK | UNK | UNK |
| 04/18/15 | 4.0 | Injury | UNK | UNK | UNK |
| 08/31/16 | UNK | Death | UNK | UNK | UNK |
| 10/17/16 | 1.0 | Injury | UNK | UNK | UNK |
| 11/19/16 | 1.7 | Death | UNK | UNK | UNK |
| 02/27/18 | 3.0 | Death | UNK | UNK | UNK |
| 04/18/18 | UNK | Death | UNK | UNK | UNK |
| 07/08/18 | 5.0 | Death | UNK | UNK | UNK |
| 09/28/18 | 2.8 | Death | UNK | UNK | UNK |
| 10/27/18 | 4.4 | Death | UNK | UNK | UNK |
| 01/02/19 | 2.3 | Death | UNK | UNK | UNK |
| 02/10/19 | 3.2 | Death | UNK | UNK | UNK |
| 02/20/19 | 3.1 | Death | UNK | UNK | UNK |
| 03/02/19 | 3.4 | Death | UNK | UNK | UNK |
| 03/21/19 | 1.2 | Death | Y | Healthy | UNK |
| 04/09/19 | 2.9 | Death | UNK | UNK | UNK |
| 05/13/19 | UNK | Death | UNK | UNK | UNK |

**TAB C:   Staff's Review and Evaluation of ASTM F3118-17a, *Standard Consumer Safety Specification for Infant Inclined Sleep Products*, for Incorporation by Reference into Staff's Draft Supplemental Notice of Proposed Rulemaking**

T
A
B

C



**Memorandum**

Date: October 1, 2019

**To**:          Celestine T. Kish
Infant Inclined Sleep Products Project Manager
Directorate for Engineering Sciences

**Through**:      Mark Kumagai, Division Director
Division of Mechanical and Combustion Engineering
Directorate for Engineering Sciences

**From**:       Kevin Lee, Mechanical Engineer
Division of Mechanical and Combustion Engineering
Directorate for Engineering Sciences

**Subject**:      Staff's Review and Evaluation of ASTM F3118-17a, *Standard Consumer Safety Specification for Infant Inclined Sleep Products*, for Incorporation by Reference into Staff's Draft Supplemental Notice of Proposed Rulemaking

## I.    INTRODUCTION

In accordance with the Danny Keysar Child Product Safety Notification Act (section 104) of the Consumer Product Safety Improvement Act (CPSIA), this memorandum assesses the effectiveness of ASTM F3118-17a, *Standard Consumer Safety Specification for Infant Inclined Sleep Products* (ASTM F3118), and outlines staff's recommendation to propose to incorporate by reference this standard (ASTM F3118-17a)[1] into a mandatory rule for infant sleep products.

---

[1] Current edition approved on September 1, 2017, Published October 2017. This is the fourth revision to the standard originally published in May 2015.

## II. PRODUCT DESCRIPTION

An infant inclined sleep product and a newborn inclined sleep product are defined in ASTM F3118-17a, Section 3 as:

> 3.1.3 *infant inclined sleep product, n*—a freestanding product, intended to provide a sleeping accommodations for an infant up to approximately 5 months of age, that is generally supported by a stationary or rocker base with one or more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal.

> 3.1.4 *newborn inclined sleep product, n*—a free standing product, intended to provide sleeping accommodations for a newborn up to approximately 3 months of age, that is supported by a stationary or rocker base with one or more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal and whose seat back length, measured from the bight, is not greater than 17 in. (432 mm).

Inclined sleep products can be categorized as frame-type, hammock, compact, and inclined sleep product accessory. The types of products within the scope of this standard are described, as follows:

*Frame-Type Inclined Sleep Products*
Frame-type inclined sleep products (Figure 1) are elevated, intended to be placed on the floor, and are self-supporting. Typically, this design uses a metal frame covered by a fabric insert that contains the occupant. Some frame-type products have a rigid plastic insert under the sleeping surface, and/or extra padding with head positioning cushions.

The base may be stationary or allow side-to-side/head-to-toe rocking. This type of product could have a fixed incline or be adjustable, but it must have at least one position between a 10° and a 30° angle. Frame-type products can be intended for use by newborns or infants, or both, depending on the size of the product.



Figure 1: Frame-Type Inclined Sleep Product

*Hammocks*




Support from Above                    Side Support

Figure 2: Hammock Support

Hammocks are typically constructed of fabric and suspended from one or two points, either above or on either side (Figure 2). Hammock products are constructed of various materials and generally conform to the shape of the child when placed in the product. However, some hammock designs use a mat, mattress, or other type of pad to provide a semi-rigid sleeping surface that maintains the product's form (Figure 3). Hammocks are intended to be suspended and can be supported by a frame or other structure, such as a ceiling.



Figure 3: Semi-Rigid Sleep Surface

*Compact Inclined Sleep Products*

Compact inclined sleep products (Figure 4) are freestanding, with the bottom of the seat a maximum of 6 inches (152 mm) above the floor. These products tend to be constructed of foam, with a fixed seat back angle between 10° and 30°. These products are intended to be used on the floor.



Figure 4: Compact Inclined Sleep Product

*Accessory Inclined Sleep Products*
An accessory inclined sleep product is intended to provide sleeping accommodations for infants or newborns and are attached to, or supported in some way, by another product (Figure 5a). These products can be fixed or adjustable, but they must have at least one seat back position with an angle between 10° and 30°. An inclined sleep accessory is typically a rigid-frame product that has a stationary or fixed base and, in some cases, inclined sleep product accessories may be removed and used independently (Figure 5b).



Figure 5a: Play Yard with Inclined Sleep Accessory



Figure 5b: Incline Sleep Accessory Used Independently

## III.    ADEQUACY OF ASTM F3118-17a TO ADDRESS IDENTIFIED HAZARD PATTERNS

*Biomechanical Study*
During the development of this Supplemental NPR briefing package, staff received reports of 451 new incidents, 59 of which were deaths that occurred in an infant inclined sleep product. Commission staff contracted with Dr. Erin Mannen, Ph.D., a mechanical engineer with a biomechanics specialization, to conduct infant testing to evaluate the design of inclined sleep products.  The study examined how 10 infants move and use their muscles on flat, inclined surfaces, and in selected inclined sleep products, and whether those designs directly impact safety or present a risk factor that could contribute to the suffocation of an infant.  Testing

compared infants' muscle movement and oxygen saturation on a flat crib mattress at 0°, 10°, and 20° versus seven different inclined sleep products. Researchers recorded infant muscle activity using surface electromyography (EMG), and recorded oxygen saturation using a medical grade pulse oximeter. Researchers placed infants in a random order in each of the 10 testing conditions, in both the supine and prone positions, for at least 60 seconds (unless the oximeter data fell below 95%, in which case they were removed early to ensure safety).

Key findings state:

- "Inclined surfaces and incline sleep products resulted in significantly higher muscle activity of the turn core muscle (abdominals), which may lead to quicker fatigue and suffocation if an infant finds themselves prone in an incline sleep product.
- Muscle synergies (*i.e.,* how muscles work together) are significantly different in inclined sleep products. If an infant rolls from supine to prone in an inclined sleep product, it is likely the first time the baby has experienced the position and the demands the position requires of the muscles.
- Some inclined sleep products require greater neck and trunk adjustments during prone positioning, indicating that infants may struggle to adjust their posture to enable breathing and attempt to self-correct if a roll from supine to prone occurs.
- Prone lying in the incline sleep products puts infant at higher risk of suffocation as evidenced by oxygen saturation results.
- Some evidence was found that supports the idea that the inclined sleep products make the babies roll more easily from supine to prone. The flexed trunk and ease of head lifting during supine lying in an inclined sleep product may indicate that supine to prone rolling is achieved more easily.
- If babies roll from supine to prone in an inclined sleep product, then, due to the high musculoskeletal demands necessary to maintain safe posture to prevent suffocation, babies would fatigue faster than they would on a stable, flat surface.
- None of the inclined sleep products that were tested and evaluated as a part of this study are safe for infant sleep."

Additionally, Dr. Mannen's study stated:

### *20-Degree Incline Puts Infants at Risk for Muscle Fatigue*
Based on the results of the biomechanical study, the 20-degree incline resulted in significantly different muscle activity for the infants compared to the zero-degree incline surface. The increased demand on the abdominal muscles could lead to increased fatigue and suffocation if an infant is unable to reposition themselves after an accidental roll from supine to prone occurs.

***10-Degree Incline Does Not Significantly Impact Infant Motion or Muscle Activity***
Based on the results of the biomechanical study, fewer differences in
muscle activity or lying posture were revealed at a 10-degree mattress
incline compared to the zero-degree incline surface. Ten degrees is a
safe incline for sleep on a crib mattress surface.

***Inclines Between 10 and 20 Degrees Should Be More Thoroughly Studied***
The experimental design of this study did not examine the angles
between 10 and 20 degrees, so future work should focus on
understanding which, if any, angles between 10 and 20 degrees may be
safe for infant sleep.

Dr. Mannen states, "It is likely that in incidents where babies were found deceased in the prone
position, that an accidental roll occurred, and after some amount of struggling, the baby was
fatigued and could no longer move into a position to prevent suffocation." Dr. Mannen
concludes that an incline of 20 degrees or more puts an infant at risk compared to a 0-10 degree
incline. Although her study did not test infants on inclines between 10-20 degrees, and thus did
not offer conclusions for these angles, CPSC staff does not believe additional testing on inclines
between 10-20 degrees is necessary because we conclude that a flat surface that does not exceed
10 degrees offers the safest sleep environment for infants. This conclusion comports with our
recommendation to remove "inclined" from the standard and to require that all sleep products not
otherwise specified as cribs (full-size or non-full-size), play yards, or bedside sleepers meet the
requirements in 16 CFR 1218 Safety Standard for Bassinets and Cradles, which, among other
requirements, mandates that the seat back surface angle intended for sleep be 10 degrees or less.

Based on these findings, staff determined that ASTM F3118-17a is not adequate because the
standard allows for products with a seat back angle greater than 10 degrees. Staff recommends
more stringent requirements in the standard to further reduce the risk of injury associated with
these products. Staff recommends that the Commission incorporate by reference ASTM F3118-
17a with modifications to address the potential hazards of an infant sleeping on an inclined
surface.

*Staff's Recommended Modification to ASTM F3118-17a*
The following are staff's recommended modifications to ASTM F3118-17a with the double
underlined text being additions and the text with strikethroughs being deletions:

## Modification to the Introduction
Delete the text: ~~This consumer safety specification is intended to cover normal use and~~
~~reasonably foreseeable misuse or abuse of inclined sleep products. This specification does not~~
~~cover inclined sleep products that are blatantly misused or used in a careless manner that~~
~~disregards the safety instructions and warnings provided with each inclined sleep product~~

Add the following text: The purpose of the standard is to address infant sleep products not already covered by traditional sleep product standards and to prevent deaths due to the use of Infant Sleep Products with a seat back angle greater than 10° from the horizontal.

**Modifications to the Scope (section 1)**

Delete the term ~~inclined~~ sleep products and change to infant sleep products.

Add the following text to section 1.3:

1.3  This consumer safety performance specification covers products that are not covered by other ASTM standards such as:

- ASTM F1169 Standard Consumer Safety Specification for Full-Size Baby Cribs
- ASTM F406 Standard Consumer Safety Specification for Non-Full-Size Baby Cribs/Play Yards
- ASTM F2194 Standard Consumer Safety Specification for Bassinets and Cradles
- ASTM F2906 Standard Consumer Safety Specification for Bedside Sleepers

Delete the following ~~text~~ from section 1.3

~~For example, an inclined sleep product that can have the recline angle adjusted below 10° shall also comply with the applicable requirements of Consumer Safety Specification F2194.~~

**Modifications to Reference Documents (section 2)**

Delete all references and FIG. 1-2 except F2194 Consumer Safety Specification for Bassinets and Cradles.

Add the following references:

F1169 Standard Consumer Safety Specification for Full-Size Baby Cribs
F406 Standard Consumer Safety Specification for Non-Full-Size Baby Cribs/Play Yards
F2906 Standard Consumer Safety Specification for Bedside Sleepers
16 CFR 1219 - Safety Standard for Full-Size Baby Cribs
16 CFR 1220 - Safety Standard for Non-Full-Size Baby Cribs
16 CFR 1221 - Safety Standard for Play Yards
16 CFR 1222 - Safety Standard for Bedside Sleepers
16 CFR 1218 - Safety Standard for Bassinets and Cradles

**Modifications to Terminology (section 3)**

For all items identified with the name "inclined sleep product," delete the term *~~inclined~~ sleep product* and replace it with *sleep product*.

Delete sections  ~~3.1.3~~ – ~~3.1.6~~

Modify ~~3.1.7~~ and ~~3.1.10~~ to:

~~3.1.7~~3.1.3 *infant ~~inclined~~ sleep product, n*—a freestanding product...supported by a stationary or rocker base and that is not subject to any of the following standards: ~~with one or~~

~~more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal.~~
- <u>16 CFR 1219 – Safety Standard for Full-Size Baby Cribs</u>
- <u>16 CFR 1220 and 1221 – Safety Standard for Non-Full-Size Baby Cribs and Play Yards</u>
- <u>16 CFR 1222 – Safety Standard for Bedside Sleepers</u>
- <u>16 CFR 1218 – Safety Standard for Bassinets and Cradles</u>

~~3.1.10~~<u>3.1.4</u> *newborn* ~~*inclined*~~ *sleep product, n*—a freestanding product…supported by a stationary or rocker base ~~with one or more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal~~ and whose seat back length, measured from the bight, is not greater than 17 in. (432 mm) <u>and that is not subject to any of the following standards:</u>
- <u>16 CFR 1219 – Safety Standard for Full-Size Baby Cribs</u>
- <u>16 CFR 1220 and 1221 – Safety Standard for Non-Full-Size Baby Cribs and Play Yards</u>
- <u>16 CFR 1222 – Safety Standard for Bedside Sleepers</u>
- <u>16 CFR 1218 – Safety Standard for Bassinets and Cradles</u>

Delete sections ~~3.1.7.1, 3.~~, ~~3.1.8 – 3.1.9~~, ~~3.1.11 - 3.1.13~~
Renumber ~~3.1.14~~ *seat bight line… to* <u>3.1.5</u> and FIG. ~~3~~ to FIG. <u>1</u>.

**Modifications to General Requirements (section 5) –** Delete this section and figure 4.

**Modifications to Performance Requirements (section 6)**
Delete section ~~6.1 – 6.8~~ and ~~6.10 – 6.11~~ and FIG. ~~5~~

Modify section 6.9, 6.9.1 and 6.9.2 to:
~~6.9~~<u>5.1</u> *Maximum* <u>Seat Back Angle</u> ~~*Incline:*~~
~~6.9.1~~ <u>5.1.1 *Accessory, Compact, and*</u> *Infant* ~~*Inclined*~~ *Sleep Product* ~~*and Infant Inclined Sleep Product Accessory*~~ —The angle of the seat back surface <u>intended for sleep</u> along the occupants head to toe axis relative to the horizontal shall not exceed ~~30~~<u>10</u>° when tested in accordance with ~~7.11.2~~ <u>6.1.2.</u>
~~6.9.2~~ <u>5.1.2 *Accessory, Compact, and*</u> *Newborn* ~~*Inclined*~~ *Sleep Product* ~~*and Newborn Inclined Sleep Product Accessory*~~ —The angle of the seat back surface <u>intended for sleep</u> along the occupants head to toe axis relative to the horizontal shall not exceed ~~30~~<u>10</u>° when tested in accordance with ~~7.11.3~~ <u>6.1.3.</u>

Add the following new requirement:
<u>5.2 *Accessory, Compact, Infant Sleep Products, and Newborn Sleep Products* - shall meet requirements of 16 CFR 1218  Safety Standard for Bassinets and Cradles.</u>


**Modifications to Test Methods (section 7)**
Delete section ~~7.1 - 7.10~~ and FIG. ~~7-10~~.

Delete the term ~~Incline~~ and ~~Inclined~~ from the text

Renumber section ~~7.11~~ – ~~7.11.3.2~~ to <u>6.1 – 6.1.3.2</u>

Modify section ~~7.11.2~~ and ~~7.11.3~~ (renumbered to <u>6.1.2</u> and <u>6.1.3</u>) to include *Accessory, Compact, Infant* Sleep Products, *and Newborn Sleep Products*

Modify section 7.11.2 to:
  ~~7.11.2.1~~<u>6.1.2.1</u> If applicable, place the product in the manufacturer's recommended highest ~~incline~~ <u>seat back</u> angle position <u>intended for sleep</u>.

Delete sections ~~7.12~~ - ~~7.15~~, ~~8~~ - ~~9~~ and associated FIG. ~~12~~- ~~16~~

~~**APPENDIX**~~ - delete this section.

*Electrical Hazard.*
Staff determined that 127 of the 451 new incidents are related to electrical issues. The electrical-related issues included battery leakage, electric shock, and overheating of components. Some inclined sleep products have accessories that provide music, rocking motion, or vibration, which are either battery or a/c powered, however, F3118-17a does not include any performance requirements for electrical components. Other juvenile products that have similar features include performance requirements that could apply for infant sleep products. CPSC staff has raised this issue with and is working with the ASTM Ad Hoc task group to develop performance requirements to address electrical hazards across juvenile products. Performance requirements will apply to other children's product standards such as bouncers, swings, and bassinets. Because these requirements are currently being developed, CPSC staff recommends not proposing electrical requirements in this SNPR, but to continue working with applicable ASTM subcommittees to develop electrical requirements for all applicable durable infant or toddler products with electrical components.

## IV.    RECOMMENDATIONS
Staff recommends that the Commission publish the draft supplemental NPR that incorporates by reference the requirements contained in ASTM F3118-17a with modifications. These modifications include:
1. Modify the introduction and scope of the standard to state the purpose of the standard is to address infant sleep products not already covered by traditional sleep product standards.
2. Modify the definition of accessory, compact, infant sleep products, and newborn sleep products to remove the term "inclined."
3. Modify seat back angle so the maximum allowable seat back angle must be equal to or less than 10° in all sleep recommended positions.
4. Add new requirement – accessory, compact, infant sleep products, and newborn sleep products must meet 16 CFR 1218 Safety Standard for Bassinets and Cradles.
5. Remove all the performance requirements except for the above new or modified requirements.

6. Remove all test methods except for maximum seat back angle.

Based on the incident reports and Dr. Mannen's study, staff concludes this draft Supplemental NPR will address incidents and reduce the number of injuries and deaths from infant sleep products. Staff's recommendation would establish more stringent requirements than ASTM F3118-17a. The suggested requirements would further reduce the risk of injury associated with infant sleep products.

# TAB D: Human Factors Assessment of ASTM 3118-17a Requirements for Infant Sleep Products (CPSIA Section 104)

T
A
B

D



**UNITED STATES**
**CONSUMER PRODUCT SAFETY COMMISSION**
**4330 EAST WEST HIGHWAY**
**BETHESDA, MARYLAND 20814**

**Memorandum**

DATE: October 1, 2019

TO:        Celestine T. Kish, Project Manager, Infant Inclined Sleep Products Rulemaking,
Division of Human Factors, Directorate for Engineering Sciences

THROUGH:    Rana Balci-Sinha, Ph.D., Division Director
Division of Human Factors
Directorate for Engineering Sciences

FROM:    Zachary Foster, Industrial Engineer,
Division of Human Factors, Directorate for Engineering Sciences

SUBJECT:    Human Factors Assessment of ASTM F3118-17a Requirements for Infant Sleep Products (CPSIA Section 104)

## BACKGROUND

The ASTM International (ASTM) voluntary standard ASTM F3118, *Standard Consumer Safety Specification Infant Inclined Sleep Products*, establishes requirements for infant inclined sleep products (referred to here as inclined sleep products) in the United States, and is intended to minimize the hazards associated with the reasonably foreseeable use and misuse, or abuse, of these products. ASTM developed this voluntary standard in response to incident data supplied by staff of the U.S. Consumer Product Safety Commission (CPSC). The current published version of the voluntary standard is ASTM F3118-17a.

Staff recommends that infant sleep products have a maximum seat back angle of 10 degrees and that infant sleep products be required to meet 16 CFR 1218  Safety Standard for Bassinets and Cradles. According to 16 CFR 1218, bassinets and cradles must comply with ASTM F2194, *Standard Consumer Safety Specification for Bassinets and Cradles.*

Both ASTM F3117-17a and F2194-16e1 standards specify marking and labeling requirements, which include warning statements that must appear on each infant sleep product. Both standards also specify the instructional literature that must be provided with each product. This memorandum, prepared by staff of CPSC's Directorate for Engineering Sciences, Division of Human Factors (ESHF), assesses the adequacy of these sections of both voluntary standards in addressing the risk of injuries and deaths associated with the use of infant sleep products.

**DISCUSSION**

**ASTM F3118-17a WARNING AND INSTRUCTIONAL REQUIREMENTS**

Section 8, Marking and Labeling of ASTM F3118-17a specifies labeling and warning requirements for inclined sleep products. In short, all inclined sleep products must include warnings on the product about the risk of fall and suffocation hazards. Due to the wide variety of inclined sleep products currently allowable by F3118, the voluntary standard provides eight warning labels for manufacturers to use based on their product(s) design.

On-product warning labels that meet the requirements in the F3118-17a (see Figure 1) address numerous warning format issues related to capturing consumer attention, improving readability, and increasing hazard perception and avoidance behavior. Additionally, HF staff believes that the warning informs consumers of the fall and suffocation hazards, consequences of the hazards, and instructions on how to reduce the risks of injury and death due to falls and suffocation.



**⚠WARNING**

**FALL HAZARD**
To prevent falls, **stop using the product when** infant:
- Begins to roll over, or
- Can pull up on sides (approximately 5 months).
- **Always** use on floor. Never use on any elevated surface
- **Always** use restraint system.

**SUFFOCATION HAZARD**
Infants have suffocated:
- On added pillows, blankets and extra padding.
  - Only **use the pad provided** by the manufacturer.
  - **Never** place extra padding under or beside infant.
- When trapped between product and adjacent surfaces.
  - Only use in *(manufacturer to insert type of product)* when it is securely attached.
  - **Never** use *(manufacturer to insert type of product)* in different product.
  - **Never** use in contained areas (for example, crib, play yard) or next to vertical surfaces (for example, walls and dressers)
- When product was placed on a soft surface and tipped over.
  - **Never** use on a soft surface (for example, bed, sofa, cushion).
- **Always** place child on **back to sleep.**

**Figure 1: Sample label per F3118-17a**

Section 9, Instructional Literature of ASTM F3118-17a specifies that instructions that are easy to read and understand must be provided with the product. The on-product warnings are also required in the instructions. Additionally, a warning that addresses the strangulation hazard from strings is required in the instructions.

## FOCUS GROUP OF CAREGIVERS PERCEPTIONS AND REACTIONS TO SAFE SLEEP

In focus groups conducted by Fors Marsh Group on caregivers' perceptions and reactions to safety messaging[1], nearly all of the participants reported that they were aware of the warning label presented as part of the activity (Figure 2).  Additionally, participants reported that the label looked similar and contained comparable information to labels that they would find on products that they had purchased.  Some participants reported that they tended to gloss over warning labels, as they believe the language to be the same on every label.  Regarding the purpose of warning labels, some participants reported that they thought the main message was to be careful and keep an eye on their infant, while a few participants believed that warning labels were used as a means for manufacturers to protect themselves from liability or litigation.  Participants' recommendations to improve warning labels included making the labels more concise and making the labels "stand out."



**Figure 2: Warning label shown in focus group activity**

The findings of the focus group indicate a shared perception among participants that warning labels contain similar information across a wide range of sleep products.  Therefore, staff believes that the use of eight distinct warning labels provided in F3118 is unnecessary, as consumers will foreseeably perceive these labels to contain identical information.  Instead, warning labels should present concise, direct messaging about general safe sleep practices.

---

[1] Fors Marsh Group under contract: "Consumer Product Safety Commission (CPSC): Caregiver Perceptions and Reactions to Safety Messaging Final Report," August 12, 2019, pp 24-26.

**ASTM F2194-16e1 WARNING AND INSTRUCTIONAL REQUIREMENTS**

Section 8, Marking and Labeling of ASTM F2194-16e1 specifies labeling and warning requirements for bassinets and cradles. In short, all bassinets and cradles must include warnings on the product about the risk of fall and suffocation hazards. Bassinets and cradles must also include a warning about Sudden Infant Death Syndrome (SIDS) and a recommendation that healthy infants are placed on their backs to sleep unless advised otherwise by a physician. Bassinets and cradles also require an additional warning for products that use sheets that instructs consumers to only use the sheet provided by the manufacturer or one specifically designed to fit the dimension of the product. CPSC staff is working with the Bassinet Subcommittee to incorporate the Ad Hoc formatting recommendations into ASTM F2194.

Section 9, Instructional Literature of ASTM F2194-16e1 specifies that instructions that are easy to read and understand must be provided with the product. The on-product warnings are also required in the instructions. Additionally, a warning addressing the strangulation hazard from strings is required in the instructions.

**CONCLUSIONS**

ESHF staff recommends removing the requirements in Sections 8 and 9 of the ASTM F3118-17a that relate to Marking and Labeling and Instructional Literature. Staff recommends that infant sleep products must meet 16 CFR 1218 Safety Standard for Bassinets and Cradles, including that standard's requirements for warnings and instructions, ESHF staff believes the warning and instructional requirements in ASTM F2194-16e1 adequately address the risk of injuries and deaths associated with the use of infant sleep products; staff is working with the bassinet subcommittee to incorporate the Ad Hoc formatting recommendations into ASTM F2194.

**TAB E: Directorate for Health Sciences response to consumer complaints that the sleep product caused plagiocephaly (flat head syndrome), and torticollis (twisted neck syndrome) or both conditions.**

T
A
B

E

**UNITED STATES**
**CONSUMER PRODUCT SAFETY COMMISSION**
**4330 EAST WEST HIGHWAY**
**BETHESDA, MARYLAND 20814**

Date: January 30, 2017

TO       :   Celestine T. Kish, MA, Infant Inclined Sleep Products Project Manager,
                Division of Human Factors, Directorate for Engineering Sciences

THROUGH:   Alice Thaler, D.V.M., MS Bioethics, Associate Executive Director
                Directorate for Health Sciences
                Jacqueline Ferrante, Ph.D., Division Director
                Division of Pharmacology and Physiology
                Directorate for Health Sciences

FROM    :   Suad Wanna-Nakamura Ph.D., Physiologist
                Division of Pharmacology and Physiology
                Directorate for Health Sciences

SUBJECT :   Directorate for Health Sciences response to consumer complaints that the sleep
                product caused plagiocephaly (flat head syndrome), and torticollis (twisted neck
                syndrome) or both conditions.

## I. BACKGROUND

CPSC incident data indicate that some parents believe use of an inclined sleep product caused plagiocephaly (flat head syndrome) and torticollis (a term used to describe the tilting/rotation of an infant's head to one side). Parents also expressed concerns that these morphological changes can have lasting effects on the child's appearance and might have lasting effects on normal development. In this memorandum, Health Sciences (HS) staff describes the various underlying causes of "flattened heads" in infants, and explains that the recent increased incidence of post-natal flattening of infant's head is not unique to inclined sleep products, and also explains that the post-natal head flattening associated with infant sleep position is unlikely to have any lasting negative impact on mental function and developmental capability.

## II. DISCUSION:

### *A. Etiology of Plagiocephaly*:

Plagiocephaly[1] is a term used to describe cranial asymmetry, where one surface of the skull appears flattened. It is commonly applied to describe infants who have a flattened area of their occipital bone, which is the bone located in the lower part of the posterior region of the skull

---

[1] Plagiocephaly means "oblique head" (Greek origin, "plagios," meaning oblique and "kephalè,"  meaning head).

(*i.e.,* at the back of the head). To allow passage through the birth canal during delivery, and allow for brain growth in early childhood, an infant's skull is soft and pliable at birth, and it gradually hardens over the first 4 years of life. Plagiocephaly in infants can result from different causes, and the appropriate treatment may differ significantly according to cause.

### 1. Positional Plagiocephaly:

Positional plagiocephaly, otherwise known as "*flat head syndrome*," is a visible flattening of one side of the skull of an infant due to maintained external pressure exerted on the head. It is the also the most common type of cranial asymmetry in infancy. This deformity may be present at birth, due to mechanical constraint of fetal movement in the womb during pregnancy, mainly from intrauterine crowding (as in the case of multiple births).[1] For example, in twins, the 55.6 percent prevalence of plagiocephaly is more than four times greater than with singletons.[2, 3] It may also result from using vacuum or forceps during assisted deliveries with extraneous pressure on the infant skull. Plagiocephaly is common in premature infants.

Plagiocephaly may also develop during the first few months following birth,[4, 5] when an infant's skull remains relatively soft and pliable. Post-natal skull deformity or head molding is due primarily to sustained pressure on the back of the head that can occur while the baby is placed in a supine sleeping position. Similar pressure on the skull can occur when an infant is placed in a reclined infant carrier/seat. Premature infants are particularly vulnerable because their skull development lags behind a full term infant and therefore have softer skulls for a longer period following birth.

Although the incidence of post-natal plagiocephaly is not uncommon, there has been a six-fold increase in the number of reported incidents since the early 1990s.[6-12] Studies have suggested that this may be a consequence of American Association of Pediatrics' (AAP) recommendation in 1992 that infants be put to sleep in the supine (back) rather than prone position. While that recommendation has been credited with a dramatic decline in incidence of Sudden Infant Death Syndrome (SIDS), an unintended consequence is that the positioning of an infant in the supine position overnight places added pressure to the back of the pliable skull, which increases the risk of plagiocephaly.[4,5]

Although the flattened appearance of an infant's head can be alarming to parents, no scientific evidence suggests that positional plagiocephaly interferes with brain development or function. The condition appears to be preventable and reversible when appropriately treated. The only lasting effect is on the physical shape/deformity of the head.[13-27, 34] Strategies exist to reduce the development of plagiocephaly that largely involve methods for minimizing the pressures on the skull leading to the deformity. Pediatricians should inform parents of the following possible interventions:

- Varying the position of the sleeping infant's head by turning it to the left or right side[11, 13,26] so that the non-flattened side rests on the sleeping surface (ideally a firm crib mattress).
- Increasing the amount of supervised "tummy time" during the infant's waking hours,[11] which helps strengthen muscles of the upper body, arms, and neck.

- Increasing the time the baby is held by parents/caregivers, which also helps strengthen the baby's neck muscle.
- Physiotherapy and repositioning to help align and attain shoulder girdle strength[27,28] and alleviate discomfort.
- In some cases that do not respond adequately to these interventions, pediatricians may recommend a customized orthotic helmet[15, 19, 31] to help reshape the infant's head.

### *2. Plagiocephaly due to Craniosynostosis:*

Craniosynostosis is a more serious condition where an infant's misshapen head results from premature hardening and fusion of the skull bones' sutures [ossification of fibrous junctions (sutures) separating skull bones].[20, 30-35] This can result in insufficient space to accommodate an infant's growing brain, which has very serious consequences. This type of birth defect is a much less common cause of plagiocephaly, but cannot be self-corrected in response to the behavioral interventions listed above. It requires surgical intervention during the first year of life to avoid significant, permanent consequences. The infant's misshapen skull may be present at birth or could develop during the first few months of life. Therefore, it is extremely important for pediatricians to carefully evaluate infants with plagiocephaly in order to differentiate between the underlying causes as early as possible.[10, 11] Accurate diagnosis is critical for reducing morbidity and optimizing management strategies.

### *B. Torticollis*:

Torticollis[2] (twisted neck) can be present at birth or it may develop in the first 6 to 8 weeks of life. Muscular torticollis is a musculoskeletal condition characterized by shortening of the *sternocleidomastoid*, [the muscle that extends from the jawbone (mastoid) to the clavicle (collarbone) and sternum (breastbone), on the side of the neck.][34-38] Clinical signs include a head tilt and a strong preference to look to one side.

Torticollis can be congenital or acquired with the former condition being more prevalent. Congenital torticollis is often associated with positional plagiocephaly because both are caused by constraint of head and neck movement. Facial asymmetry is a characteristic feature of congenital torticollis and often used to distinguish it from acquired torticollis. For most babies, stretch exercises and simple changes in how the infant is held or positioned that are aimed at gradually lengthening the muscle should help correct the problem.

Acquired torticollis on the other hand is not a diagnosis but rather a presentation of other underlying illnesses usually either muscular or neurological in nature.[36-38] They can include skeletal abnormalities (abnormal shape of body parts), damage to the spinal cord induced by trauma and malignancies (exerted pressure by tumors in the neck and the base of the skull). Other causes of acquired torticollis include infection ocular and psychiatric disorders. These conditions require specialized treatments.

---

[2] The word torticollis (twisted neck) is derived from the Latin words "torus" means "twisted" and "collum" means "neck."

## III. SUMMARY

The development of positional plagiocephaly and torticollis are not exclusively attributable to the use of infant inclined sleep products, and the conditions are not addressable with performance standards. Staff is not recommending any modifications to the voluntary standard to address these issues.

### *References Cited:*

1. Littlefield TR, Kelly KM, Pomatto JK, Beals SP. Multiple-birth infants at higher risk for development of deformational plagiocephaly: II. is one twin at greater risk? Pediatrics 2002; 109:19–25.

2. Littlefield TR, Kelly KM, Pomatto JK, Beals SP. Multiple-birth infants at higher risk for development of deformational of deformational plagiocephaly. *Pediatrics.*1999; 103:565 – 569[Abstract/Free Full Text]

3. Kok JH, Den Ouden AL, Verloove-Vanhorick SP, Brand R. Outcome of very preterm small for gestational age infants: the first nine years of life. British Journal of Obstetrics and Gynaecology 1998; 105:162–168.

4. Wallace IF, McCarton CM. Neurodevelopmental outcomes of the premature, small-for-gestational-age infant through age 6. Clinical Obstetrics and Gynecology 1997; 40:843–852.

5. American Academy of Pediatrics, Task Force on Infant Sleep Positioning and SIDS. Positioning and SIDS [published correction appears in Pediatrics. 1992; 90(2 pt 1):264]. Pediatrics. 1992; 89(6 pt 1):1120 –1126.

6. American Academy of Pediatrics, Task Force on Infant Sleep Position and Sudden Infant Death Syndrome. Changing concepts of sudden infant death syndrome: implications for infant sleeping environment and sleep position. Pediatrics. 2000; 105(3 pt 1): 650 – 656.

7. Argenta LC, David LR, Wilson JA, Bell WO. An increase in infant cranial deformity with supine sleeping position. Journal of Craniofacial Surgery 1996; 7:5–11.

8. Kane AA, Mitchell LE, Craven KP, Marsh JL. Observations on a recent increase in plagiocephaly without synostosis. Pediatrics 1996; **97**:877–885.

9. Littlefield TR, Saba NM, Kelly KM. On the current incidence of deformational plagiocephaly: an estimation based on prospective registration at a single center. Semin Pediatr Neurol. 2004; 11(4):301–304

10. Turk AE, McCarthy JG, Thorne CH, Wisoff JH. The 'back to sleep campaign' and deformational plagiocephaly: is there cause for concern? Journal of Craniofacial Surgery 1996; 7:12–18.

11. Persing J, James H, Swanson J, Kattwinkel J. Prevention and management of positional skull deformities in infants. American Academy of Pediatrics Committee on Practice and Ambulatory

Medicine, Section on Plastic Surgery and Section on Neurological Surgery. Pediatrics 2003; 112:199–202.

12. Peitsch W, Keefer C, LaBrie R, Mulliken J. Incidence of cranial asymmetry in healthy newborns. Pediatrics. 2002; 110(6). Available at: www.pediatrics.org/cgi/content/full/110/6/e72.

13. Children's Hospital [Last accessed January 28, 2017] http://www.childrenshospital.org/conditions-and-treatments/conditions/p/plagiocephaly/testing-and-diagnosis.

14. Hellbusch J, Hellbusch L, Bruneteau R. Active counter-positioning of deformational occipital plagiocephaly. Nebr Med J. 1995; 80(12):344 –349.

15. Graham JM Jr, Gomet M, Halberg A, et al. Management of deformational plagiocephaly: repositioning versus orthotic therapy. J Pediatr. 2005; 146(2):258 –262.

16. Laughlin J, Luerssen TG, Dias MS. Prevention and Management of Positional Skull Deformities in Infants Pediatrics 2011;128;1236;www.pediatrics.org/cgi/doi/10.1542/peds.2011-2220 doi:10.1542/peds.2011-2220.

17. Pogliani L, Mameli C, Fabiano V, Zuccotti GV. Positional plagiocephaly: what the pediatrician needs to know. A review. Child s Nerv Syst. 2011 May 26.

18. Robinson S, Proctor M. Diagnosis and management of deformational plagiocephaly. J Neurosurg Pediatr. 2009; 3(4):284 –295.

19. de Ribaupierre S, Vernet O, Rilliet B, Cavin B, Kalina D, Leyuraz PF. Posterior positional plagiocephaly treated by cranial remodeling orthosis. Swiss Med Wkly. 2007; 137(25–26):368 –372.

20. Panchal J, Amirsheybani H, Gurwitch R, et al. Neurodevelopment in children with single-suture craniosynostosis and plagiocephaly without synostosis. Plast Reconstr Surg. 2001; 108(6):1492–1498.

21. Fowler E, Becker D, Pilgram T, Noetzel M, Epstein J, Kane A. Neurologic findings in infants with deformational plagiocephaly. J Child Neurol. 2008; 23(7):742–747.

22. Collett B, Breiger D, King D, Cunningham M, Speltz M. Neurodevelopmental implications of "deformational" plagiocephaly. J Dev Behav Pediatr. 2005; 26(5):379 –389.

23. Govaert B, Michels A, Colla C, van der Hulst R. Molding therapy of positional plagiocephaly: subjective outcome and quality of life. J Cranio Surg. 2008; 19(1):56 –58.

24. Miller R, Clarren S. Long-term develop- mental outcomes in patients with deformational plagiocephaly. Pediatrics. 2000; 105(2). Available at: www.pediatrics.org/cgi/content/full/105/2/e26.

25. Steinbok P, Lam D, Singh S, Mortenson P, Singhal A. Long-term outcome of infants with positional occipital plagiocephaly. Childs Nerv Syst. 2007; 23(11):1275–1283.

26. Pollack IF, Losken HW, Fasick P. Diagnosis and management of posterior plagiocephaly. Pediatrics. 1997; 99(2):180 –185.

27. Huang MH, Gruss JS, Clarren SK, et al. The differential diagnosis of posterior plagiocephaly: true lambdoid synostosis versus positional molding. Plast Reconstr Surg. 1996; 98: 765–774.

28. Moss SD. Nonsurgical, nonorthotic treatment of occipital plagiocephaly: what is the natural history of the misshapen neonatal head? J Neurosurg. 1997 Nov; 87(5):667-70.

29. Huang MHS, Mouradian WE, Cohen SR, Gruss JS. The differential diagnosis of abnormal head shapes: separating craniosynostosis from positional deformities and normal variants. Cleft Palate Craniofacial J. 1998; 35(3):204 –211.

30. Ellenbogen RG, Gruss JC, Cunningham ML. Update on craniofacial surgery: the differential diagnosis of lambdoid synostosis posterior plagiocephaly. Clin Neurosurg. 2000; 47:303–318.

31. Clarren S. Plagiocephaly and torticollis: etiology, natural history, and helmet treatment. J Pediatr. 1981; 98(1):92–95.

32. Mayo Clinic link, [Last accessed January 28, 2017].
 http://www.mayoclinic.org/diseases-conditions/craniosynostosis/symptoms-causes/dxc-20256926.

33. Johns Hopkins Medicine, [Last accessed January 28, 2017]
http://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/pediatric_neurosurgery/conditions/craniosynostosis/types.html.

 34. de Chalain T, Park S. Torticollis associated with positional plagiocephaly: a growing epidemic. J Craniofacial Surg. 2005; 16(3):411– 418.

35. Children's Hospital of Philadelphia, [Last accessed January 28, 2017]
http://www.chop.edu/conditions-diseases/congenital-muscular-torticollis.

36. van Vlimmeren LA1, Helders PJ, van Adrichem LN, Engelbert RH. Torticollis and plagiocephaly in infancy: therapeutic strategies. Pediatr Rehabil. 2006 Jan-Mar; 9(1):40-6.

37. Per H, Canpolat M, Tümtürk A, Gümüş H, Gokoglu A, Yikilmaz A, Özmen S, Kaçar Bayram A, Poyrazoğlu HG, Kumandas S, Kurtsoy A. Different etiologies of acquired torticollis in childhood. Childs Nerv Syst. 2014 Mar; 30(3):431-40.

38. Kumandaş S, Per H, Gümüş H, Tucer B, Yikilmaz A, Kontaş O, Coşkun A, Kurtsoy A. Torticollis secondary to posterior fossa and cervical spinal cord tumors: report of five cases and literature review. Neuro surg Rev. 2006 Oct; 29(4):333-8.

# TAB F: Initial Regulatory Flexibility Analysis of the Draft Supplemental Notice of Proposed Rulemaking for Infant Sleep Products, the Accreditation Requirements for Conformity Assessment Bodies for Testing Conformance to the Infant Sleep Products Standard, and the Impact of the Product Registration Rule

T
A
B

F



**United States**
**Consumer Product Safety Commission**
**4330 East West Highway**
**Bethesda, Maryland 20814**

**Memorandum**

Date:   September 25, 2019

TO            :   Celestine T. Kish
                    Project Manager, Infant Inclined Sleep Products
                    Division of Human Factors
                    Directorate for Engineering Sciences

THROUGH:   Gregory B. Rodgers, Ph.D.
                    Associate Executive Director
                    Directorate for Economic Analysis

                    Robert L. Franklin
                    Senior Staff Coordinator
                    Directorate for Economic Analysis

FROM       :   Jill L. Jenkins, Ph.D.
                    Economist
                    Directorate for Economic Analysis

SUBJECT  :   Initial Regulatory Flexibility Analysis of the Draft Supplemental Notice of
                    Proposed Rulemaking for Infant Sleep Products and the Accreditation
                    Requirements for Conformity Assessment Bodies for Testing Conformance to
                    the Infant Sleep Products Standard

## I.        Introduction

   ASTM F3118-17a, *Standard Consumer Safety Specification for Infant Inclined Sleep
Products*, is the current ASTM International (ASTM) standard for infant inclined sleep products
(inclined sleep products).  Staff recommends that the U.S. Consumer Product Safety
Commission (CPSC) issue a supplemental notice of proposed rulemaking (NPR) under the
requirements of the Danny Keysar Child Product Safety Notification Act (section 104) of the
Consumer Product Safety Improvement Act (CPSIA).  Staff recommends that the supplemental
NPR propose to incorporate by reference the most recent ASTM standard for infant inclined
sleep products, but change the introduction and scope, and delete large portions of the standard.
The supplemental NPR would limit the seat back angle for any infant product intended for sleep,
for infants five months old or younger, to 10 degrees or less, and require that any such product
meet the mandatory bassinet standard.

As required by the Regulatory Flexibility Act (RFA),[1] this memorandum evaluates the potential economic impact the draft supplemental proposed rule would have on small entities, including small businesses. Section 603 of the RFA requires that agencies prepare an initial regulatory flexibility analysis (IRFA) and make it available to the public for comment when the general NPR is published, unless the head of the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. As explained below, the draft supplemental proposed rule could have a significant impact on small firms that currently manufacture or import infant inclined sleep products, as well as small firms whose products may have difficulty meeting the bassinet standard's requirements.

The IRFA must describe the impact of the proposed rule on small entities and identify significant alternatives that accomplish the statutory objective and minimize any significant economic impact. Specifically, the IRFA must contain:

1. a description of the reasons why action by the agency is being considered;
2. a succinct statement of the objectives of, and legal basis for, the proposed rule;
3. a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;
4. a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities subject to the requirements and the type of professional skills necessary for the preparation of reports or records; and
5. an identification, to the extent practicable, of all relevant federal rules that may duplicate, overlap, or conflict with the proposed rule.

## II.      The Product

The draft supplemental proposed rule would impact any infant product with an inclined sleep surface (*i.e.,* position "primarily intended and marketed[2] to provide sleeping accommodations") that is designed for infants five months old or younger and that is not covered by another standard for sleeping accommodations.[3] This includes the inclined sleep products that currently fall under the scope of the voluntary standard ASTM F3118-17a, which covers inclined sleep products "with one or more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal." The draft supplemental proposed rule would also cover products with inclined sleep surfaces greater than 30 degrees and less than 10 degrees, if they are intended or marketed for children under 5 months of age for sleep purposes, and they are not subject to another sleep product standard. For example, the draft supplemental proposed rule would include the hammock-style crib accessory shown in Figure 1. It appears to have an incline of 10 degrees or less, but does not fall under another sleep category.

---

[1] 5 U.S.C. §§ 601-612.
[2] This would include marketing information (such as on websites or in ad campaigns), product and retail package labeling, as well as supplier statements about the product.
[3] These include: Safety Standard for Full-Size Baby Cribs (16 CFR 1219); Safety Standard for Non-Full-Size Baby Cribs and Ply Yards (16 CFR 1220 and 1221); Safety Standard for Bedside Sleepers (16 CFR 1222); and Safety Standard for Bassinets and Cradles (16 CFR 1218).



Figure 1. Crib Accessory – Hammock-Style

In general, products with adjustable seat back positions that are covered by other mandatory or voluntary standards in inclined position(s), such as bouncers, rockers, hand-held carriers, or infant swings, would not be impacted by the draft supplemental proposed rule unless they have a seat back angle that is specifically marketed for sleep for children 5 months or younger. So far, staff has found one bouncer on the market with an inclined position marketed for sleep for children in this age range.

Inclined infant sleep products sell on the U.S. market for approximately: $65 for a frame-style inclined sleeper, $110 for a compact sleeper, $165 for an infant hammock,[4] and $236 for a play yard with an inclined sleeper accessory.[5] The hammock-style crib accessory that would be impacted by the draft supplemental proposed rule (but does not currently fall under the voluntary inclined sleeper standard or another sleep standard) sells for approximately $50.

Several product categories would not fall under the scope of the draft supplemental proposed rule: (1) positioners; (2) sleep wedges, many of which are marketed as medical devices, putting them under the jurisdiction of the Food and Drug Administration; and (3) miniature infant hammocks marketed exclusively for use as photographic props (*i.e.,* photos of newborn babies).

Staff requests comments on products likely to be impacted by the draft supplemental proposed rule. This includes both product categories discussed above and any additional types of products that commenters feel may be impacted by the draft supplemental proposed rule.

### III.    Reason for Agency Action and Legal Basis for the Draft Supplemental Proposed Rule

Section 104 of the CPSIA requires the CPSC to examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products and promulgate consumer product safety standards that are substantially the same as the voluntary standards or more stringent than the voluntary standards if the Commission determines that more stringent requirements would further reduce the risk of injury associated with the products. Although a number of sleep products were specifically mentioned as a durable infant or toddler product in section 104(f)(2), including cribs and bassinets, inclined sleep products were not.

---

[4] Note that the average price for an infant hammock supplied by a home-based manufacturer is approximately $200. Home-based manufacturers will be discussed further in Section VI.
[5] Prices are averaged across all models of a particular type found. Shipping costs for a few hammock models delivered from overseas suppliers have been ignored as unknown, which means that the average cost for an infant hammock may be a low estimate, depending upon how many hammocks are entering the U.S. via these overseas suppliers.

Inclined sleep products were not recognized as a distinct product category until relatively recently. In January 2010, a series of fatalities in infant hammocks came to the attention of CPSC staff and an effort was made to include these products in the bassinets and cradles rulemaking that was being developed at the time. However, bassinets have flat sleep surfaces and it was impossible to make infant hammocks, which are inherently inclined, conform to that standard without fundamentally changing them (*i.e.,* making them flat rather than inclined). Additionally, other inclined sleeping products for infants and toddlers entered the market, making it more effective to address the inclined products together, as a new product type. Therefore, CPSC staff began working with ASTM to develop a voluntary standard that would cover the wide array of products on the market that provide infants and toddlers with inclined sleeping environments. In 2016, the Commission issued an NPR proposing to incorporate by reference the voluntary standard as a mandatory standard.

Since the 2016 NPR was issued, CPSC has become aware of additional deaths in inclined sleep products and several major suppliers of infant inclined sleep products have been recalled. Staff is unaware of any evidence that suggests that an incline greater than 10 degrees is safe for infant sleep, and the results of a CPSC contractor's biomechanical study state that 20 degrees is not safe. As a result, staff developed a draft supplemental proposed rule that would require all infant products intended and marketed for sleep by children 5 months of age or younger, that are not already subject to another sleep standard, to test sleep surface(s) for the degree of incline, as described in Section IV below. Those products with sleep surface angles greater than 10 degrees would fail the test and be prohibited from sale in the United States. Staff concludes that requiring sleep surface angles of 10 degrees or less will address injuries and deaths associated with inclined sleep products.

## IV.        Requirements of the Draft Supplemental Proposed Rule

The draft supplemental proposed rule would incorporate by reference the voluntary standard for inclined sleep products (ASTM F3118-17a) with significant changes (as described in Section IV.A. below). If adopted by the Commission as a final rule, it would become a mandatory consumer product safety standard under section 104 of the CPSIA. If it becomes a mandatory standard, firms with a sleep product that is subject to the rule would need to evaluate their product, determine what changes would be required to meet the standard, and modify the product so that it complies with the standard or cease supplying the product to the U.S. market. The manufacture or importation of noncompliant products would be prohibited after the effective date of the standard.

This section lays out the requirements of the draft supplemental proposed rule and considers the implications on all firms, large and small. Section VI then continues the discussion, focusing exclusively on the small business impacts.

### A. Draft Supplemental Proposed Rule

The draft supplemental proposed rule would eliminate all of the requirements of the voluntary standard, except those listed below (modifications to the remaining requirements are presented in italics):[6]

- The maximum seat back angle requirement and test procedure—intended to ensure that the sleep surface does not exceed the range determined to be safe. *The test procedure applies to all positions recommended for sleep, and the criteria for failure has been changed from more than 30 degrees to more than 10 degrees.*
- *Accessory, Compact, Infant Sleep Products, and Newborn Sleep Products—a new requirement has been added whereby any product that passes the maximum seat back angle requirement/test would be required to meet all of the requirements of the mandatory bassinet standard.[7]*

The draft supplemental proposed rule would also *create definitions for infant sleep products*, based on the existing definitions of an infant inclined sleep product, a newborn inclined sleep product, an accessory inclined sleep product, and a compact inclined sleep product. *It would change the name of the covered products from "inclined sleep products" to "infant sleep products" and modify the scope to specify that the standard includes products not covered by ASTM standards such as those for full-size cribs, non-full-size cribs and play yards, bedside sleepers,[8] and bassinets and cradles.*

The draft supplemental proposed rule would require all infant sleep products intended for children five months or younger, that are not subject to another sleep accommodation standard, to test all of their seat back angles recommended for sleep to the maximum seat back angle requirement. Those with sleep surfaces greater than 10 degrees would fail and be prohibited for sale in the United States. Those with sleep surfaces less than or equal to 10 degrees would be required to meet all of the requirements of the mandatory bassinet standard.

All products with inclined sleep surface angles greater than 10 degrees would fail the maximum angle test (this includes the inclined sleepers covered by the scope of the current voluntary standard and any products with sleep surfaces greater than 30 degrees) *if they are intended for children 5 months or younger.[9]* These firms will all need to decide whether to redesign or drop their current products. Alternatively, some firms may change the marketing of their impacted products to change the intended user age or remove any suggestion that the product is intended for sleep.[10] The latter is similar to the Canadian approach to inclined sleep products; many of the inclined sleepers sold in the U.S. are also sold in Canada but without any

---

[6] The Introduction to the voluntary standard has also been modified, but that would not have an economic impact on firms, so it has been left out here. See Lee (2019) for more information.

[7] 16 C.F.R. part 1218.

[8] Bedside sleepers are fundamentally considered bassinets and must also be tested to the bassinet standard, but do have a standard with additional requirements and are therefore listed separately here.

[9] See Section II for a breakout of the product groups expected to be impacted by the draft supplemental proposed rule.

[10] For importers, redesign would involve either working with their existing supplier(s) or finding alternative suppliers willing to assist them.

reference to overnight sleep in the marketing.[11, 12]  CPSC staff believes that any mention of sleep, including "napping," should be considered "primarily intended and marketed to provide sleeping accommodations."

Any firm that wants to continue marketing products with an inclined sleep surface for children 5 months or younger would need to redesign them to a 10 degree or less incline *and* meet all of the requirements in the mandatory bassinet standard.  Redesign costs are likely to vary for different products, based on the difficulty of modifying the sleep surface incline (some infant hammocks could find this more difficult) and the extent of changes required to meet the bassinet standard (the hammock-style crib accessory shown in Figure 6 would probably have difficulty meeting the bassinet side height requirements, for example).  To provide some perspective on the magnitude of potential redesign costs, we previously estimated that the cost of redesigning a bassinet to comply with the standard could be up to $500,000, depending upon the extent of the changes required.[13]

Alternatively, suppliers might simply change their marketing.  They could only label existing surfaces of 10 degrees or less for sleep or, if none exists, change their marketing of the product to eliminate any mention of sleep, and focus on other uses.  Suppliers could also opt to change the age range for which their existing products are marketed, targeting children older than 5 months.  Changes in marketing do not remove a firm's obligation to comply with existing regulations; they merely modify the applicable standard.  For example, a product currently marketed as an inclined sleep product/rocker could be marketed to focus exclusively on the product's rocker function.  The product would still need to meet applicable standards, in this case ASTM F3084 (*Standard Consumer Safety Specification for Infant and Infant/Toddler Rockers*).  Staff cannot predict whether a particular product will be remarketed, how it will be remarketed, and whether any compliance costs would be associated with the remarketing.

Finally, suppliers have the option simply to withdraw their noncomplying products from the U.S. market.

In all cases, the economic impact will depend upon two factors: (1) the compliance effect, the cost of bringing a product into compliance with the standard; and (2) the demand effect, how demand is affected by the changes made (such as marketing or design changes)[14] and how the firm's revenue is affected (*i.e.,* the importance of the revenue the product generates for the firm).  If consumers value a sleep surface with an incline of 10 degrees or less equivalently to a product

---

[11] In some cases, much of the marketing materials available in the U.S. also do not mention sleep uses, even when the product is known to test for compliance with the ASTM inclined sleeper voluntary standard.

[12] A review of a major Canadian retailer's website for products similar to the inclined sleepers sold in the U.S. found several marketing approaches.  Some focused on "rest" or "naps," while others focused instead on alternative uses, like rocking.  These are approaches taken by first party sellers and are, therefore, considered likely to be acceptable under the Canadian standard.  The approaches taken by some third party sellers (such as simply avoiding marketing materials entirely and saying nothing about what the product should be used for) could be violations of Canadian regulations, depending upon how closely Canadian officials monitor these sites.

[13] See memorandum from Jill L. Jenkins, Ph.D., Economist, Directorate for Economic Analysis, dated July 16, 2012, Subject: Initial Regulatory Flexibility Analysis of Staff-Recommended Proposed
Standard for Bassinets and Cradles. See
https://www.cpsc.gov/Newsroom/FOIA/ReportList?field_nfr_date_value%5Bvalue%5D%5Bmonth%5D=8&field_nfr_date_value_1%5Bvalue%5D%5Byear%5D=2012&field_nfr_type_value=commission&title=&=Apply for a link to the briefing package with this memorandum.

[14] For dropped products, a lack of supply would be equivalent to the result from no demand, although there might still be a positive demand for the product dropped.

with an incline of more than 10 degrees, no demand effect would occur from the draft supplemental proposed rule. If consumers value the product the same, whether or not it is marketed for sleep use, no demand effect would occur. This might be the case if consumers are not intending to use the product for sleep or if consumers are indifferent about marketing strategies (*e.g.*, if consumers consider the product still usable for sleep regardless of the product's marketing).[15] In addition, if consumers value the product equally, regardless of the target age group (or if consumers ignore the target age group marketing in making their purchases), no demand effect would occur. To the extent that any of the product changes is viewed as less desirable by consumers, demand for a product would decrease and the firm would be negatively impacted. Staff lacks the information required to determine how the demand for the infant sleep products of any of the current suppliers might be impacted by the draft supplemental proposed rule.

Staff requests comment on how firms with inclined sleep surfaces will likely respond to the draft supplemental proposed rule, including suppliers of products with inclines above 10 degrees and products with inclines less than or equal to 10 degrees that do not already comply with the bassinet standard. We would also appreciate any information on the possible responses of consumers to changes in marketing. Additionally, any information on the approximate percentage of revenue attributable to these types of products would be valuable. Finally, staff requests any information regarding the safety of sleep angles in excess of 10 degrees but less than 20 degrees.

### B. Third Party Testing

Under section 14 of the CPSA, if the draft supplemental proposed rule becomes effective, all suppliers will be subject to the third party testing and certification requirements under the CPSA and the Testing and Labeling Pertaining to Product Certification rule (16 CFR part 1107), which requires that manufacturers and importers certify that their products comply with the applicable children's product safety standards, based on third party testing. Third party testing costs are in addition to any costs of modifying the products to meet the standard. If a firm opted to change their marketing to eliminate any mention of sleep or target a different user group, as discussed above, there would be no third party testing costs associated with this rule.[16]

However, firms that continue to supply a product with a sleep surface incline of no more than 10 degrees (as well as firms that produce completely flat products that will also require testing to verify the maximum sleep surface angle) would incur third party testing costs associated with the maximum incline test in the draft supplemental proposed rule. Additionally, if firms are not

---

[15] Staff found evidence that numerous products not marketed for sleep are actually used for sleep, so CPSC cannot ignore this possibility. In addition to the incident data available where children were sleeping in inclined products not marketed for sleep, the Durable Nursery Product Exposure Survey conducted by the CPSC in 2013 found that nationally approximately 208,803 children age three and under were most frequently put down in hand-held carriers for naps, approximately 327,036 children age three and under were most frequently put down in strollers for naps, approximately 847,767 children age three and under were most frequently put down in infant swings for naps, and approximately 127,712 children age three and under were most frequently put down in bouncers for naps (data run on 9/4/19). Note that only infant swings and bouncers were also used as the preferred product for overnight sleep but with much lower frequencies.
[16] There could potentially be indirect third party testing costs resulting from remarketing a product as, for example, an infant bouncer (16 CFR 1229).

already testing their products to a sleep standard, such firms' products would be required to pass the bassinet standard and the firm would incur all of those third party testing costs as well.

Staff estimates that third party testing costs associated with the draft supplemental proposed rule to be between $30 to $100 per sample for the maximum incline test alone. Testing to the bassinet standard could add additional costs of up to $1,000.[17] All cost estimates are per sample tested. Therefore, the third party testing costs are expected to range between $0 (for firms that choose to drop their product or change their marketing) and $1,100 per sample tested (for firms that choose to include a sleep position in the 10 degrees or less range).[18] As allowed by the component part testing rule (16 CFR 1109), importers may rely upon third party tests obtained by their suppliers, which could reduce the impact on importers.

We welcome comments regarding the impact that promulgating the draft supplemental proposed rule would have on the cost of testing and certifying products, particularly on small manufacturers and importers. Any information on the number of samples that must be tested would be especially helpful. Staff particularly requests comments on the third party testing costs of the maximum incline test in the draft supplemental proposed rule.

## V.        Other Federal or State Rules

CPSC staff has not identified any federal or state rule that either overlaps or conflicts with the draft supplemental proposed rule.

## VI.        Suppliers of Infant Sleep Products and the Impact on Small Businesses

The U.S. inclined sleep product market has changed substantially since the 2016 NPR was issued. Manufacturers and importers have removed most frame-style inclined sleep product models from the market, including some that were not subject to recalls, although one or two products remain. Additionally, a significant decline in the infant hammock market has occurred, both among larger-scale suppliers and home-based manufacturers. However, the focus of the rulemaking, and therefore the market research, is on products that are still being produced for sale and would be impacted by a change in regulations.[19]

As part of the current market evaluation, staff identified 18 firms still supplying sleep products to the U.S. market with sleep surface angles greater than 10 degrees, but less than or equal to 30 degrees. Staff identified an additional firm supplying a sleep product with an incline of 10 degrees or less that is not also being tested for compliance with either the bassinet standard or another sleep product standard. Of these 19 total firms, six appear to be very small, home-

---

[17] See Jenkins, 2012.
[18] As always, staff expects testing costs to be lower for those firms that conduct product testing overseas and for larger firms that may be able to get a price discount based on volume.
[19] There may still be some frame-style inclined sleeper units available for sale even for products that are no longer being produced (this does *not* include recalled models).

based manufacturers of infant hammocks (two operating domestically and four overseas).[20] None has more than one infant hammock model in their product line, and the majority supply few, if any, other products. They generally have low sales volumes.[21]

Staff identified another 13 firms that supply products that would be subject to the draft supplemental proposed rule that are not home-based and are generally larger than the home-based manufacturers, 11 of which are domestic. These firms include both manufacturers and importers.[22] Seven of those firms, although not as small as the home-based suppliers, still meet the definition of "small" domestic entities based on U.S. Small Business Administration (SBA) guidelines for their North American Industry Classification System (NAICS) codes. These firms also typically have only one inclined sleep product model in their product lines, but have much larger sales volumes than the home-based suppliers.

The remaining two firms are foreign manufacturers (along with the four home-based foreign manufacturers). Additionally, staff identified a few inclined sleep products entering the U.S. market via online retailers that operate marketplaces for smaller sellers and foreign retailers willing to supply foreign-manufactured inclined sleep products directly to U.S. consumers on their own behalf. This market has also changed drastically since February 2019, with many online retailers no longer willing to ship these products to the U.S. Foreign suppliers are not considered in the regulatory flexibility analysis because SBA guidelines and definitions pertain only to U.S.-based entities.

**Table 1. Firms Supplying Products to the U.S. that would be Considered Infant Sleep Products under the Draft Supplemental Proposed Rule**

| CATEGORY | NUMBER OF FIRMS SUPPLYING INFANT SLEEP PRODUCTS |
|---|---|
| **Total Firms** | **19** |
| **Total Domestic Firms** | **13** |
| Very small home-based manufacturers | 2* |
| Small | 7 |
| Manufacturers | 4 |
| Importers | 3 |
| Large | 4 |
| **Total Foreign Firms** | **6*** |

Highlighted categories are the focus of this analysis.
* Staff identified 6 home-based manufacturers (4 foreign and 2 domestic) selling infant hammocks marketed for sleep online, but there may be additional home-based manufacturers that staff was unable to identify (possibly including some without an online presence). Home-based manufacturers not located in the U.S. are captured along with the other foreign firms.

---

[20] These suppliers were identified online and staff believes that there may be additional home-based manufacturers supplying infant hammocks on a very small scale (possibly including some without an on-line presence).
[21] The two domestic home-based manufacturers identified by staff supply approximately 10-20 infant hammocks per year on average.
[22] Determinations were made using information from Dun & Bradstreet and ReferenceUSAGov, as well as firm websites.

### A. Small Manufacturers

The two home-based manufacturers and four other small manufacturers are considered together because the impact on these firms will be similar.[23] As noted, these manufacturers might comply with the requirements of the draft supplemental proposed rule by changing their marketing to eliminate any reference to the product being intended for sleep purposes for children 5 months old or younger. If the manufacturer believes that the change in marketing would significantly impact demand, the manufacturer could opt to redesign the product so that the maximum angle intended for sleep is 10 degrees or less and meets the requirements of the bassinet standard. As discussed in Section IV, depending upon the changes required, the costs of redesign could be up to $500,000. Potentially, manufacturers that redesign their products could also suffer a loss of sales if their customers prefer products with sleep angles greater than 10 degrees. Finally, some manufacturers may choose to drop their inclined sleep products if they believe that the cost of changing their marketing strategies or redesigning their products would adversely impact sales or be too costly.

Small manufacturers that opt to drop their inclined sleepers or stop marketing their products for sleep purposes (or market to older children) would not experience any third party testing costs as a direct result of the draft supplemental proposed rule. Small manufacturers that choose to redesign their products to have sleep positions with an incline of 10 degrees or less, could experience third party testing costs of up to $1,100 per sample tested. This includes testing to the draft supplemental proposed rule's maximum incline test, as well as testing for compliance with the bassinet standard, as discussed in Section IV.B.

Third party testing costs are likely to be significant for the two very small home-based manufacturers of infant hammocks *if* they choose to redesign their products. These firms sell an average of 10 to 20 infant hammocks for approximately $200 each, yielding annual revenue from these products of about $2,000 to $4,000. Testing two or three units per model would eliminate most, if not all, of the revenue these firms generate from their infant hammocks. Similarly, the testing costs for two of the small manufacturers could be significant if as few as four units per model are required to provide a "high degree of assurance" of compliance, as required by part 1107. Finally, no determination could be made for the final two small manufacturers, as no revenue data were available.

Staff requests comments on the cost of redesign, the time required for redesign, the likely response of manufacturers to the draft supplemental proposed rule's requirements (*i.e.,* redesign, remarket, or drop), the possible change in demand due to remarketing or changing the sleep surface's degree of incline, the cost of (and time required for) remarketing, and (for firms supplying comments) the relative significance of inclined sleepers to their total revenue. Staff also welcomes comments on testing costs, including the number of inclined sleeper units that typically need to be tested to provide a "high degree of assurance" of compliance.

---

[23] Whether the inclined sleepers supplied by these firms meet the current voluntary standard is irrelevant because products designed to be between >10 degrees and 30 degrees cannot pass a test that requires them to have sleep surfaces of 10 degrees or less.

### B. Small Importers

Three small importers supply inclined sleepers to the U.S. market, one of which is a subsidiary of a larger foreign firm. All three importers have options that are similar to those available to manufacturers: (1) redesign their product (this would need to be done in conjunction with their supplier and its viability would be affected by the supplier's willingness and the degree of cost pass-through); (2) remarket their product (either removing sleep use or targeting an older age group);[24] (3) drop the inclined sleeper from their product line (possibly replacing it with a different type of product); or (4) replace with a different inclined sleep product from a different supplier (an option only available to importers).

As with manufacturers, the option chosen will depend upon the importer's perceived demand for their product and how the product's revenue affects their overall revenue. The option chosen may also depend upon how difficult and potentially costly it would be to redesign the product and, potentially, how difficult and time-consuming it is to find an alternative supplier. As already noted, firms may find it more difficult to redesign certain types of inclined sleep products. However, staff has insufficient information to determine which option a given importer might select.

As with manufacturers, importers will be subject to third party testing and certification requirements, and consequently, will be subject to costs similar to those for manufacturers if their supplying foreign firm(s) does not perform third party testing. Staff cannot make a determination as to whether the impact of the rule would be significant or affect a substantial number of small entities. As already discussed, to evaluate this criteria, we need information on the choice a given firm is likely to make (and the approximate cost of that choice) (*i.e.*, compliance effect), as well as the expected effect on demand for the product (if any) and the resulting change in revenue relative to overall revenue (*i.e.,* demand effect). Lacking this information, staff cannot rule out a significant impact on the three small importers.

Staff requests information on how importers may respond to the draft supplemental proposed rule (*i.e.,* which option(s) they are likely to select). Staff also requests information on the search costs (and timeframe) needed to identify replacement infant sleep products available from other suppliers. We would additionally like information on the willingness of suppliers to undertake redesign for their customers (the importers) and the degree to which costs may be passed-through to importers (for importers tied to their parent company and importers who are not tied to a particular supplier). Finally, information on how frequently suppliers third party test for their customers would be valuable.

### C. Summary of Impacts

CPSC staff is aware of nine small domestic firms currently marketing products that would be impacted by the draft supplemental proposed rule in the United States. As described above, staff

---

[24] As noted in Section IV.A., a change in marketing could require product modifications to meet the requirements of the standard they are newly targeting. For example, depending upon the alternative use a firm decided to focus on, their inclined sleep product could become a floor seat (ASTM F3317), a rocker (ASTM F3084), a bouncer (16 CFR 1229), or some other product.

cannot definitively determine the impact of the draft supplemental proposed rule because the impact is dependent on several unknown factors including:

- How firms respond to the rule (*e.g.,* they would redesign, remarket, or drop);
- The costs associated with redesigning, remarketing, or replacing an inclined sleeper;
- The change, if any, on demand for that product.

However, staff found that third party costs are likely to be significant for the two very small home-based manufacturers of infant hammocks *if they choose to redesign;* and costs could be significant for an additional two small manufacturers, if they chose to redesign their products and testing as few as four units per model were required to provide a "high degree of assurance."

## VII.    Alternatives

At least two alternatives are available that could minimize the economic impact on small entities while also meeting the statutory objectives:[25] (1) eliminate the requirement that products must meet the bassinet standard if they do not already fall into another sleep product standard; or (2) allow a later effective date.

If the Commission eliminates the requirement that products must meet the bassinet standard if they do not fall into another sleep product category, the cost of redesign for firms that selected that option would still likely be significant.  Firms would still need to modify their products to meet the 10 degree maximum angle requirement (and test to that requirement), but they would not need to make any additional design changes to meet the bassinet standard's requirements (or test to that standard).  However, staff prepared the draft supplemental proposed rule with the intent to ensure that all sleep products meet a base set of safety requirements.  This alternative would not accomplish this goal.

Second, the Commission could also reduce the draft supplemental proposed rule's impact on small businesses by setting a later effective date than the one year currently recommended.  A later effective date would reduce the economic impact on firms redesigning their existing products in two ways.  Firms would be less likely to experience a lapse in production/importation, which could result if they are unable to bring their products into compliance and certify compliance based on third party tests within the required timeframe.  Also, firms could spread the costs of developing compliant products over a longer time period, thereby reducing their annual costs, as well as the present value of their total costs (*i.e.,* they could time their spending to better accommodate their individual circumstances).  Staff specifically requests comments on the 1-year effective date, which was set to help reduce the impact on affected firms, as well as feedback on how firms would likely respond to the draft supplemental proposed rule.

---

[25] Staff considered whether adopting the voluntary inclined sleeper standard with no modifications might also be an alternative, but ruled it out because it would not address the injuries and deaths that led to the recent inclined sleeper recalls.

## VIII.   Small Business Impacts of the Accreditation Requirements for Testing Laboratories

In accordance with section 14 of the CPSA, all children's products that are subject to a children's product safety rule must be tested by a CPSC-accepted third party conformity assessment body (i.e., testing laboratory) for compliance with applicable children's product safety rules.  Testing laboratories that want to conduct this testing must meet the NOR pertaining to third party conformity testing.  NORs have been codified for existing rules at 16 CFR part 1112.  Consequently, staff recommends that the Commission propose an amendment to 16 CFR part 1112 that would establish the NOR for those testing laboratories that want to test for compliance with the infant sleep products final rule (in essence, test for maximum seat back angle).  This section assesses the impact of the amendment on small laboratories.

A final regulatory flexibility analysis (FRFA) was conducted as part of the promulgation of the original 1112 rule (78 FR 15836, 15855-58), as required by the RFA.  Briefly, the FRFA concluded that the accreditation requirements would not have a significant adverse impact on a substantial number of small laboratories because no requirements were imposed on laboratories that did not intend to provide third party testing services.  The only laboratories that were expected to provide such services were those that anticipated receiving sufficient revenue from the mandated testing to justify accepting the requirements as a business decision.

Based on similar reasoning, amending the rule to include the NOR for the infant sleep product standard will not have a significant adverse impact on small laboratories.  Moreover, based upon the number of laboratories in the United States that have applied for CPSC acceptance of the accreditation to test for conformance to other juvenile product standards, we expect that only a few laboratories will seek CPSC acceptance of their accreditation to test for conformance with the infant sleep product standard. Most of these laboratories will have already been accredited to test for conformance to other juvenile product standards, and the only costs to them would be the cost of adding the infant sleep product standard to their scope of accreditation, a cost that test laboratories have indicated is extremely low when they are already accredited for other section 104 rules.  Consequently, the Commission could certify that the NOR for the infant sleep product standard will not have a significant impact on a substantial number of small entities.

# TAB G: Infant Inclined Sleep Products:  Summary of Recalls – May 10, 2000 through August 20, 2019

T
A
B

G



**United States
Consumer Product Safety Commission
4330 East West Highway
Bethesda, Maryland 20814**

**Memorandum**

DATE:    August 20, 2019

TO:            Celestine Kish, Infant Inclined Sleep Products Project Manager,
               Division of Human Factors, Directorate for Engineering Sciences


THROUGH:       Robert Kaye, Director
               Office of Compliance and Field Operations
               Jennifer Timian, Director, Division of Regulatory Enforcement
               Carolyn Manley, Assistant Division Director,
               Division of Regulatory Enforcement


FROM:          Michelle Guice, Compliance Officer, Division of Regulatory
               Enforcement


SUBJECT:       Infant Inclined Sleep Products:  Summary of Recalls – May
               10, 2000 through August 20, 2019


The Office of Compliance provides this summary in support of the draft supplemental notice of proposed rulemaking for infant inclined sleep products.

<u>**Summary of Recalls Involving Infant Inclined Sleep Products**</u>

Compliance staff reviewed recalls of infant inclined sleep products from May 10, 2000 to August 20, 2019.  During that period, there were 13 consumer-level recalls involving infant inclined sleep products. The recalls were conducted in response to hazards involving strangulation, suffocation, fall, structural stability, entrapment, exposure to mold, and death. Six recalls involved infant hammocks, six recalls involved infant inclined sleep products, and one recall involved an infant inclined sleep accessory included with a play yard.

The six infant hammocks were recalled for hazards including: strangulation, suffocation, fall, structural stability, and entrapment.  The recalls affected approximately 25,400 units of infant hammocks.

The six infant inclined sleep products and one infant inclined sleep accessory included with a play yard were recalled due to hazards including: entrapment, suffocation, fall, exposure to mold, and death after infants rolled from their back to their stomach or side while unrestrained

in the products. The recalls affected approximately 6.4 million units of infant inclined sleep products.  One recall for exposure to mold affected 800,000 units, and 2 recalls for entrapment and suffocation affected 195,000 units.

In 2019, two recalls occurred due to reports of deaths while using infant inclined sleep products, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances.  In response to the reported deaths in those products, two additional recalls, one with an infant inclined sleep product, and one with an infant inclined sleep accessory included with a play yard, were conducted due to safety concerns with infant inclined sleep products. The recalls involving infant inclined sleepers affected approximately 5.4 million units and the recall involving the infant inclined sleeper accessory affected approximately 71,000 units.

Table I presents the 13 recalls conducted between May 10, 2000 and August 20, 2019, and notes the recall date, the firm involved, hazard(s), the approximate number of units affected, number of reported incidents/injuries, and the press release number.

| TABLE I – Summary of Infant Inclined Sleep Products Recalls | | | | | |
|---|---|---|---|---|---|
| Recall   Date | Firm | Hazard | Number of Recalled Units | Number of Incidents Reported (Injuries Reported) | Press Release Number |
| May 10, 2000 | Hangouts, of Boulder CO | Strangulation | 350 Infant Hammocks | No Incidents/ Injuries Reported | 00-107b[1] |
| September 18, 2000 | Hamacas | Strangulation | 53 Infant Hammocks | No Incidents/ Injuries Reported | 01-500 [2] |
| August 4, 2009 | Nova Natural Toy & Crafts | Fall and Strangulation | 265 Infant Hammocks | No Incidents/ Injuries Reported | 09-760 [3] |
| August 4, 2009 | Kaplan Early Learning | Fall and Strangulation | 200 Infant Hammocks | No Incidents/Injuries Reported | 09-761 [4] |
| December 8, 2009 | Amby Baby Motion Beds/Hammocks | Structural Stability, Entrapment, and Suffocation | 24,000 Infant Hammocks | Two Infant Suffocation Deaths in the Amby Baby Hammock | 10-056 [5] |

[1] https://www.cpsc.gov/Recalls/2000/cpsc-hangouts-recall-baby-hammocks
[2] https://www.cpsc.gov/Recalls/2000/cpsc-hamacas-recall-baby-hammocks
[3] https://www.cpsc.gov/Recalls/2009/baby-hammocks-recalled-by-nova-natural-toys-crafts-due-to-fall-and-strangulation
[4] https://www.cpsc.gov/Recalls/2009/baby-hammocks-recalled-by-kaplan-early-learning-due-to-fall-and-strangulation-hazards
[5] https://www.cpsc.gov/Recalls/2009/infant-suffocation-deaths-prompt-recall-of-amby-baby-motion-bedshammocks

| Recall Date | Firm | Hazard | Number of Recalled Units | Number of Incidents Reported (Injuries Reported) | Press Release Number |
|---|---|---|---|---|---|
| July 26, 2010 | Baby Matters LLC | Due to Entrapment, Suffocation and Fall Hazards; One Infant Death Reported | 30,000 Inclined Sleep Products | One Infant Death Reported; One Infant became Entrapped; 22 Reports of Infants Hanging or Falling over the side of the Product; One Infant was Bruised as a Result of Hanging over the side of the Product | 10-309 [6] |
| August 24, 2010 | MamaLittleHelper | Suffocation | 500 Infant Hammocks | No Injuries Reported | 10-324 [7] |
| January 8, 2013 | Fisher-Price | Exposure to Mold | 800,000 Inclined Sleep Products | 16 Reports of Infants treated for Respiratory Issues After Sleeping in the Product | 13-087 [8] |
| June 14, 2013 | Baby Matters LLC | Deaths and Falling | 165,000 Inclined Sleep Products | 5 Infant Deaths; 92 Reports of Infants Hanging or Falling over the side of the Products | 13-216 [9] |
| April 12, 2019 | Fisher-Price | Reports of Deaths | 4.7 million Inclined Sleep Products | 30 Infant Fatalities Have Occurred in Rock 'n Play Sleepers | 19-105 [10] |
| April 26, 2019 | Kids II, Inc. | Reports of Deaths | 694,000 Inclined Sleep Products | 5 Infant Deaths | 19-112 [11] |
| | | | | | |

[6] https://www.cpsc.gov/Recalls/2010/baby-matters-recalls-nap-nanny-recliners-due-to-entrapment-suffocation-and-fall-hazards
[7] https://www.cpsc.gov/Recalls/2010/baby-hammocks-recalled-by-mamalittlehelper-due-to-suffocation-hazard
[8] https://www.cpsc.gov/Recalls/2013/fisher-price-recalls-to-inspect-rock-n-play-infant-sleepers-due-to-risk-of-exposure-to#
[9] https://www.cpsc.gov/content/nap-nanny-and-chill-infant-recliners-recalled-by-baby-matters-llc-after-five-infant-deaths
[10] https://www.cpsc.gov/Recalls/2019/fisher-price-recalls-rock-n-play-sleepers-due-to-reports-of-deaths
[11] https://www.cpsc.gov/Recalls/2019/kids-ii-recalls-all-rocking-sleepers-due-to-reports-of-deaths

| Recall Date | Firm | Hazard | Number of Recalled Units | Number of Incidents Reported (Injuries Reported) | Press Release Number |
|---|---|---|---|---|---|
| June 27, 2019 | Fisher-Price | Safety Concerns About Inclined Sleep Products | 71,000 Inclined Sleep Accessories Included with Play Yards | No Injuries Reported | 19-151[12] |
| July 31, 2019 | Dorel Juvenile Group USA | Safety Concerns About Inclined Sleep Products | 24,000 Inclined Sleep Products | No Injuries Reported | 19-177[13] |
| **Total** | **13** | | **6,509,368** | **131 Incidents/ 44 Injuries/11 Deaths** | |
| | | | | | |

---

[12] https://www.cpsc.gov/Recalls/2019/fisher-price-recalls-inclined-sleeper-accessory-included-with-ultra-lite-day-night-play
[13] https://www.cpsc.gov/Recalls/2019/dorel-juvenile-group-usa-recalls-inclined-sleepers-due-to-safety-concerns-about



Holding Company Report (FR 2320), as applicable.

(ii) If a company does not calculate its total consolidated assets under GAAP for any regulatory purpose (including compliance with applicable securities laws), the company may request that the Board permit the company to file a quarterly estimate of its total consolidated assets. The Board may, in its discretion and subject to Board review and adjustment, permit the company to provide estimated total consolidated assets on a quarterly basis. For purposes of this part, the company's total consolidated assets will be the average of the estimated total consolidated assets provided for the assessment period.

(b) Is a top-tier foreign bank holding company on December 31 of the assessment period, with $100 billion or more in total consolidated assets, as determined based on the average of the foreign bank holding company's total consolidated assets reported for the assessment period on the Federal Reserve's Form FR Y–7Q ("FR Y–7Q"), provided, however, that if any such company has filed only one FR Y–7Q during the assessment period, the Board shall use an average of the foreign bank holding company's total consolidated assets reported on that FR Y–7Q and on the FR Y–7Q for the corresponding period in the year prior to the assessment period.

(c) Is a top-tier foreign savings and loan holding company on December 31 of the assessment period, with $100 billion or more in total consolidated assets, as determined based on the average of the foreign savings and loan holding company's total consolidated assets reported for the assessment period on the reporting forms applicable during the assessment period, provided, however, that if any such company has filed only one reporting form during the assessment period, the Board shall use an average of the foreign savings and loan holding company's total consolidated assets reported on that reporting form and on the reporting form for the corresponding period in the year prior to the assessment period, or

(d) Is a nonbank financial company supervised by the Board.

■ 5. Section 246.4, is amended by revising paragraph (c)(1) and adding paragraphs (d)(3) and (4) to read as follows:

**§ 246.4 Assessments.**

\* \* \* \* \*

(c) *Assessment rates.* Assessment rates means, with regard to a given assessment period, the two rates published by the Board for the calculation of assessments for Category IV and "other" firms and for Category I, II, and III firms.

(1)(i) The assessment rate for Category IV and "other" firms will be calculated according to this formula:

*[(Net Assessment Basis × Category IV and "other" firms' share of total assessable Assessment rate assets of all assessed companies) × (1 − S)]*

*Category IV and "other" firms' total assessable assets*

(ii) The assessment rate for Category I, II, and III firms will be calculated according to this formula:

*Assessment rate = [(Net Assessment Basis × Category I, II, and III firms' share of total assessable assets of all assessed companies) + (Net Assessment Basis × Category IV and "other" firms' share of total assessable assets × S)]*

*Category I, II, and III firms' total assessable assets*

\* \* \* \* \*

(d) \* \* \*

(3) Net Assessment Basis is the assessment basis, as defined by paragraph (d)(2), net of the total $50,000 base amount charged to all assessed companies. *Net Assessment Basis* = assessment basis − (number of assessed companies × $50,000).

(4) The variable *S* represents the estimated share of total costs attributable to changes in supervisory and regulatory responsibilities resulting from EGRRCPA for Category IV and "other" firms. *S* = 0.1 (10 percent).

\* \* \* \* \*

By order of the Board of Governors of the Federal Reserve System, November 5, 2019.

**Ann Misback,**

*Secretary of the Board.*

[FR Doc. 2019–24491 Filed 11–8–19; 8:45 am]

**BILLING CODE 6210–01–P**

---

## CONSUMER PRODUCT SAFETY COMMISSION

**16 CFR Parts 1112, 1130, and 1236**

**[CPSC Docket No. 2017–0020]**

## Safety Standard for Infant Sleep Products

**AGENCY:** Consumer Product Safety Commission.

**ACTION:** Supplemental notice of proposed rulemaking.

---

**SUMMARY:** In the **Federal Register** of April 7, 2017, the Consumer Product Safety Commission (CPSC) published a notice of proposed rulemaking (2017 NPR) pursuant to the Danny Keysar Child Product Safety Notification Act, section 104 of the Consumer Product Safety Improvement Act of 2008

(CPSIA), to promulgate a consumer product safety standard for infant inclined sleep products (inclined sleep products). The 2017 NPR allowed an incline between 10 and 30 degrees for the seat back angle of an inclined sleep product. The 2017 NPR proposed to adopt a voluntary standard for inclined sleep products developed by ASTM International, with a modification to the standard's definition of "accessory." Based on subsequent information and events, the Commission is now issuing a supplemental proposed rule (Supplemental NPR), proposing to adopt the current ASTM standard for inclined sleep products, with modifications that would make the mandatory standard more stringent than the voluntary standard. The proposed changes include limiting the seat back angle for sleep to 10 degrees or less. CPSC's proposed standard would cover products intended for infant sleep that are not already addressed by another standard. Additionally, the Commission proposes to include the mandatory standard for infant sleep products in the Commission's list of notices of requirements (NORs). The Commission also proposes to amend the consumer registration rule to identify explicitly infant sleep products as a durable infant or toddler product subject to CPSC's consumer registration requirements.

**DATES:** Submit comments by January 27, 2020.

**ADDRESSES:** Comments related to the Paperwork Reduction Act aspects of the marking, labeling, and instructional literature requirements of the proposed mandatory standard for infant sleep products should be directed to the Office of Information and Regulatory Affairs, the Office of Management and Budget, Attn: CPSC Desk Officer, FAX: 202–395–6974, or emailed to *oira_submission@omb.eop.gov.*

Other comments, identified by Docket No. CPSC–2017–0020, may be submitted electronically or in writing:

*Electronic Submissions:* Submit electronic comments to the Federal eRulemaking Portal at: *http://www.regulations.gov.* Follow the instructions for submitting comments. CPSC does not accept comments submitted by electronic mail (email), except through *www.regulations.gov.* CPSC encourages you to submit electronic comments by using the Federal eRulemaking Portal, as described above.

*Written Submissions:* Submit written submissions in the following way: Mail/Hand delivery/Courier (for paper, disk, or CD–ROM submissions) to: Division of the Secretariat, Consumer Product

Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814; telephone (301) 504–7923.

*Instructions:* All submissions received must include the agency name and docket number for this proposed rulemaking. All comments received may be posted without change, including any personal identifiers, contact information, or other personal information provided, to: *http:// www.regulations.gov.* Do not submit electronically any confidential business information, trade secret information, or other sensitive or protected information that you do not want to be available to the public. If you wish to provide such information, please submit it in writing.

*Docket:* For access to the docket to read background documents or comments received, go to: *http:// www.regulations.gov,* and insert the docket number, CPSC–2017–0020, into the "Search" box, and follow the prompts.

**FOR FURTHER INFORMATION CONTACT:**
Celestine T. Kish, Project Manager, Directorate for Engineering, U.S. Consumer Product Safety Commission, 5 Research Place, Rockville, MD 20850; telephone: (301) 987–2547; email: *ckish@cpsc.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background and Statutory Authority**

*A. Statutory Authority*

Section 104(b) of the CPSIA, 15 U.S.C. 2056a(b), requires the Commission to: (1) Examine and assess the effectiveness of voluntary consumer product safety standards for durable infant or toddler products, in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts; and (2) promulgate consumer product safety standards for durable infant or toddler products. Standards issued under section 104 are to be "substantially the same as" the applicable voluntary standards, or more stringent than the voluntary standard if the Commission concludes that more stringent requirements would further reduce the risk of injury associated with the product. 15 U.S.C. 2056a(b)(1)(B).

Section 104 of the CPSIA requires the Commission to consult with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts to examine and assess the effectiveness of the relevant voluntary standards. CPSC staff regularly participates in the juvenile products subcommittee meetings of ASTM International (ASTM). ASTM subcommittees consist of members who represent producers, users, consumers, government, and academia.[1] The consultation process for the inclined sleep products rulemaking commenced in 2011, and CPSC staff has been actively participating in the development of the new standard since that time.

A "durable infant or toddler product" is a "durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years." *Id.* 2056a(f)(1). The CPSIA includes a non-exhaustive list of categories of products that are durable infant or toddler products, such as cribs, toddler beds, and bassinets and cradles. *Id.* 2056a(f)(2). As discussed in section I.B of this preamble, in the 2017 NPR CPSC proposed to categorize infant inclined sleep products as a "durable infant or toddler product" under section 104 of the CPSIA, as a subset of the bassinet and cradle category. In this Supplemental NPR, CPSC proposes to identify "infant sleep products" as a category of durable infant or toddler products under section 104(f) of the CPSIA. CPSC proposes to define "infant sleep products" as products that provide sleeping accommodations for infants and are not currently covered by bassinets/cradles, cribs (full-size and non-full size), play yards, and bedside sleepers, as a durable infant or toddler product under section 104(f) of the CPSIA. Section 104(d) of the CPSIA requires durable infant or toddler products to establish product registration programs and comply with CPSC's implementing rule, 16 CFR part 1130. Under section 14 of the CPSA, children's products (such as durable infant or toddler products) must comply with testing and certification requirements that are implemented through 16 CFR parts 1107 and 1109.

*B. 2017 NPR*

When staff began work on the bassinet and cradle standard, staff considered infant inclined sleep products to fall within the scope of the bassinet/cradle standard. However, because the bassinet/cradle standard did not address products on the market that had a sleep incline greater than 10 degrees, the Commission directed staff to initiate a separate rulemaking effort for infant inclined sleep products. Accordingly, the infant inclined sleep products safety standard was an outgrowth of the bassinet/cradle safety standard, intended to address products with an incline greater than 10 degrees from horizontal.

In 2011, at the time CPSC separated infant inclined sleep products from the bassinet/cradle standard, ASTM simultaneously began work on developing a voluntary standard for infant inclined sleep products. ASTM published the resulting infant inclined sleep products standard in May 2015, and updated the standard twice in 2016 and twice in 2017. ASTM's latest standard for this product category is designated, ASTM F3118–17a, *Standard Consumer Safety Specification for Infant Inclined Sleep Products* (ASTM F3118–17a).

Pursuant to the procedure described in section 104 of the CPSIA, the 2017 NPR proposed a mandatory standard for infant inclined sleep products, incorporating by reference the then-current voluntary standard, ASTM F3118–17, with a modification to the standard's definition of "accessory." 82 FR 16964 (April 7, 2017). At the time of the 2017 NPR for infant inclined sleep products, which included hammocks, the Commission was aware of 14 fatal incidents related to infant inclined sleep products, which were reported to have occurred between January 1, 2005 and September 30, 2016. Staff determined that 8 of the 14 infant deaths involved freestanding, framed inclined sleep products, and that 3 infant deaths involved an unrestrained infant who was found to have rolled over into a facedown position. Staff found that in two additional deaths, the infant reportedly rolled over into a facedown position, but the reports did not include any information about use of a restraint. CPSC staff had little information about the cause or manner of the three remaining infant deaths. *Id.* at 16965– 66. Staff's incident data analysis in the 2017 NPR considered that these 14 fatalities and other reported incidents could be addressed by the requirements in the voluntary standard, ASTM F3118–17. *Id.* at 16967–68.

The 2017 NPR indicated that ASTM F3118–17 addressed the primary hazard patterns CPSC identified in the 657 incidents (including 14 deaths), except for the definition of "accessory." Specifically, the 2017 NPR proposed that CPSC's standard would not include the term "rigid frame" in the definition of "accessory inclined sleep product" in section 3.1.1 of ASTM F3118–17, broadening the definition to encompass a new product that did not have a rigid frame. *Id.* at 16968–69, and 16975. The Commission concluded that these more stringent requirements were necessary to further reduce the risk of injury associated with infant inclined sleep products relating to the use of an

---

inclined sleep product accessory. *Id.* at 16967.

As the 2017 NPR explained, durable infant or toddler products are children's products that must be certified as complying with all applicable CPSC-enforced requirements. 15 U.S.C. 2063(a); 82 FR at 16969. Certification must be based on testing conducted by a CPSC-accepted third party conformity assessment body (test laboratory). 15 U.S.C. 20163(a)(2). CPSC must publish a NOR for the accreditation of test laboratories to assess a product's conformity with a children's product safety rule, such as the proposed rule on infant inclined sleep products. Accordingly, the 2017 NPR proposed that if issued as a final rule, the new *Standard Consumer Safety Specification for Infant Inclined Sleep Products,* to be codified at 16 CFR part 1236, would be added to the list of NORs for children's product safety rules in 16 CFR part 1112, so that test laboratories applying for CPSC-acceptance could seek accreditation to test inclined infant sleep products. 82 FR at 16969.

Finally, the 2017 NPR proposed to amend 16 CFR part 1130, the Commission's requirements for consumer registration for durable infant or toddler products. *Id.* at 16969–70. The Commission proposed to amend the definition of ''durable infant or toddler product'' to clarify that infant inclined sleep products fall within the term, and are subject to the product registration card requirements in part 1130. *Id.*

On June 12, 2019, CPSC staff submitted a briefing package and a draft **Federal Register** notice to the Commission recommending that the Commission terminate the 2017 NPR. Staff recommended terminating the 2017 NPR because, by that time, CPSC had received reports of 42 additional fatalities since issuing the 2017 NPR, which were associated with rocker-like inclined sleep products, and because the Commission had issued additional safety alerts and recalls involving infant inclined sleep products. On October 16, 2019, staff provided the Commission with a briefing package recommending that the Commission instead issue this Supplemental NPR.[2]

## C. 2019 Supplemental NPR—Overview

In this Supplemental NPR, the Commission proposes to issue a standard for infant sleep products, *i.e.,* products that (1) Provide sleeping accommodations for infants and (2) are not currently covered by bassinets/cradles, cribs (full-size and non-full size), play yards, and bedside sleepers. The Supplemental NPR proposes to incorporate by reference ASTM F 3118–17a with modifications to require that: (1) The seat back angle position for sleep must be equal to or less than 10° and (2) the infant sleep product must meet the requirements for a bassinet/cradle in the standard at 16 CFR part 1218. The Commission also proposes to amend the consumer registration rule to identify ''infant sleep products'' as a category of durable infant or toddler products under section 104(f) of the CPSIA. Additionally, the Commission proposes to amend its regulation at 16 CFR part 1112 to add infant sleep products to the list of products that require third party testing.

## II. Product Description

### A. Scope of Products Within the Supplemental NPR

The scope of products covered by the 2017 NPR tracked the scope of ASTM F3118–17, covering ''a free standing product with an inclined sleep surface primarily intended and marketed to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on sides, whichever comes first.'' The Supplemental NPR proposes to incorporate ASTM F3118–17a with substantial modifications, including revisions in the scope of the standard, section 1.3, to remove the term ''inclined,'' and to include any infant sleep product not currently covered by another mandatory rule for infant sleep products: Bassinets/cradles, cribs (full-size and non-full-size), play yards, and bedside sleepers. Accordingly, the scope of the Supplemental NPR includes all of the products in the 2017 NPR, plus additional infant sleep products not covered by any other infant sleep product standard. The following types of infant sleep products fall within the scope of the Supplemental NPR:

• *Frame-Type Inclined Sleep Products*—Frame-type inclined sleep products are elevated, intended to be placed on the floor, and are self-supporting. Typically, this design uses a metal frame covered by a fabric insert that contains the occupant. Some frame-type products have a rigid plastic insert under the sleeping surface, and/or extra padding with head positioning

cushions. The base may be stationary or allow side-to-side/head-to-toe rocking. This type of product could have a fixed incline or be adjustable. Frame-type products can be intended for use by newborns or infants, or both, depending on the size of the product.

• *Hammocks*—Hammocks are typically constructed of fabric and suspended from one or two points, either above or on either side. Hammock products are constructed of various materials and generally conform to the shape of the child when placed in the product. However, some hammock designs use a mat, mattress, or other type of pad to provide a semi-rigid sleeping surface that maintains the product's form. Hammocks are intended to be suspended and can be supported by a frame or other structure, such as a ceiling.

• *Compact Inclined Sleep Products*—Compact inclined sleep products are freestanding, with the bottom of the seat a maximum of 6 inches (152 mm) above the floor. These products tend to be constructed of foam and are intended to be used on the floor.

• *Accessory Inclined Sleep Products*—An accessory inclined sleep product is intended to provide sleeping accommodations for infants or newborns and are attached to, or supported in some way, by another product. These products can be fixed or adjustable. An inclined sleep accessory is typically a rigid-frame product that has a stationary or fixed base and, in some cases, inclined sleep product accessories may be removed and used independently.

### B. Market Description

The Supplemental NPR proposes to cover any infant product ''primarily intended and marketed[3] to provide sleeping accommodations'' that is designed for infants five months old or younger and that is not covered by another standard.[4] In general, the Supplemental NPR does not propose to cover products with adjustable seat back positions that are covered by other mandatory or voluntary standards in inclined position(s), such as bouncers, rockers, hand-held carriers, or infant swings, unless they have a seat back angle that is specifically marketed for sleep for children 5 months or younger.

---

[2] The October 16, 2019, Staff Briefing Package: Draft Supplemental Notice of Proposed Rulemaking for Infant Sleep Products under the Danny Keysar Child Product Safety Notification Act (Staff Supplemental Briefing Package) is available at: *https://www.cpsc.gov/s3fs-public/SupplementalNoticeofProposedRulemakingforInfantSleepProducts_10_16_2019.pdf?TPVAJZEQcz9x9sKeEGltm4LskkonxUWv.*

[3] This would include marketing information (such as on websites or in ad campaigns), product and retail package labeling, as well as supplier statements about the product.

[4] These include: Safety Standard for Full-Size Baby Cribs (16 CFR 1219); Safety Standard for Non-Full-Size Baby Cribs and Ply Yards (16 CFR 1220 and 1221); Safety Standard for Bedside Sleepers (16 CFR 1222); and Safety Standard for Bassinets and Cradles (16 CFR 1218).

To date, CPSC staff has found one bouncer on the market with an inclined position marketed for sleep for children in this age range.

Inclined infant sleep products sell on the U.S. market for approximately $65 for a frame-style inclined sleeper, $110 for a compact sleeper, $165 for an infant hammock,[5] and $236 for a play yard with an inclined sleeper accessory.[6] A hammock-style crib accessory that would be covered by the Supplemental NPR (but does not currently fall under the voluntary inclined sleeper standard or another sleep standard) sells for approximately $50.

Several product categories would not fall under the scope of the Supplemental NPR: (1) Sleep positioners; (2) sleep wedges, many of which are marketed as medical devices, putting them under the jurisdiction of the Food and Drug Administration; and (3) miniature infant hammocks marketed exclusively for use as photographic props (*i.e.*, photos of newborn babies).

## III. Incident Data and Hazard Patterns

At the time of the 2017 NPR, the Commission was aware of 14 fatal incidents related to infant inclined sleep products, which were reported to have occurred between January 1, 2005 and September 30, 2016. Eight of the 14 deaths involved rocker-like inclined sleep products; in three cases, the unstrapped decedent was found to have rolled over into a facedown position. Two additional cases also reported a rollover into a facedown position, but the reports did not include any information about use of a restraint. CPSC had little information about the cause or manner of the three remaining deaths. The NPR recognized that reporting was ongoing and the number of reported fatalities could change. This Supplemental NPR updates fatal and nonfatal incident reports associated with the use of an infant inclined sleep product.

CPSC is aware of 451 incidents (59 fatal and 392 nonfatal) related to infant inclined sleep products that occurred from January 1, 2005 through June 30, 2019 and reported between October 1, 2016 and June 30, 2019. This count includes incidents reported after the reporting end date stated in the 2017

NPR. Forty-three percent of the incident reports (196 out of 451) are based solely on information from manufacturers/retailers. Various sources, such as hotlines, internet reports, newspaper clippings, medical examiners, and other state/local authorities provided the remaining incident reports to CPSC. Reporting is ongoing, and therefore, the number of reported fatalities, nonfatal injuries, and non-injury incidents may change in the future. Tab A of the Staff Supplemental Briefing Package describes the incident data and the hazard patterns associated infant inclined sleep products.

### A. Fatalities

Since the 2017 NPR, through June 30, 2019, CPSC received reports of 59 deaths. One fatality involved a foam-based infant reclined sleeper; two fatalities occurred in napper attachments of play yards; and the remaining fatalities occurred in freestanding framed inclined sleep products. CPSC staff reviewed and categorized incident reports associated with the fatalities:

• Twenty-eight of the 59 reports contain unclear, conflicting, and/or inconsistent information. For example, in this category medical examiners often conclude the cause of death to be Sudden Infant Death Syndrome (SIDS) or Sudden Unexpected Infant Death (SUID) along with a co-contributing condition such as unsafe sleep environment (*e.g.*, soft bedding, inclined sleep surface) or other pre-existing medical condition. Considering all factors in each report confounds staff's ability to determine the pre-dominant factor causing a fatality. Occasionally, wording on the documents cite "several possibilities" and the cause of death is coded as Undetermined. Lack of clarity in these reports make it difficult for CPSC staff to consistently classify the 28 deaths.

• Eighteen reports describe infants placed in the product supine but who ended up in a compromised position in the product, resulting in suffocations or positional asphyxiations. In 11 of the 18 cases, no restraints were used; another six infants were placed in a supine position, but the use of restraints is unknown; and in one case, the infant was left restrained and supine, but found supine, slumped in a chin-to-chest position. One additional unrestrained infant fell out of the product and became wedged in a confined space.

• Eight reports provide very little information on the incidents. Lack of any information on the circumstances

leading up to the death does not allow staff to classify these deaths.

• Four reports describe infant placement issues; three of the four decedents were reportedly placed prone on soft bedding in the product; and another decedent suffocated when a young sibling climbed into the sleep product on top of her.

CPSC does not know the age for 10 deceased infants. Staff concludes that for the remaining deaths, 39 infants were 5 months or less in age, while six infants were between 6- and 8-months of age. One decedent was 9-months old.

### B. Nonfatal Incidents

Reports indicate that 96 of the 451 inclined sleep product-related nonfatal incidents involved an injury to the infant during product use. The severity of the injury types among the 96 reported injuries are as follows:

▪ Seven infants required hospital admission. Six of the seven infants suffered episodes of respiratory distress due to rolling over in the product; mold in the product; or undetermined reasons. One of the seven infants had to be hospitalized for *scoliosis* (curvature) of the back attributed to product use.

▪ Sixteen infants were treated and released from emergency departments (EDs). Eleven of these infants were treated for head injuries and contusions/bruises resulting from falls; three infants were treated for unexplained respiratory distress. Mold growth on the product was associated with respiratory distress in one additional infant and seizure symptoms in another.

▪ Seventy-three infants received some professional medical care, first-aid treatment, or the level of care received was not reported. Among them, 32 infants suffered from plagiocephaly (flat head syndrome), torticollis (twisted neck syndrome), or both conditions, associated with the use of the inclined sleep product; 27 infants suffered mostly respiratory and some skin problems associated with mold on the product; infants sustained the remaining injuries due to a fall from the product or a minor electric shock, or their injuries are unspecified.

The remaining 296 incident reports indicate that no injury occurred to the infant or provided no information about an injury. However, many of the descriptions indicate the potential for a serious injury, or even death, similar to those reported in the incident data.

### C. Hazard Pattern Identification

The 2017 NPR identified nine hazard patterns among the 657 reported incidents. These hazard patterns included: Design issues, lack of

---

[5] The average price for an infant hammock supplied by a home-based manufacturer is approximately $200.

[6] Staff averaged prices across all models found for a particular type. Staff ignored an unknown shipping costs for a few hammock models delivered from overseas suppliers, which means that the average cost for an infant hammock may be a low estimate, depending upon how many hammocks are entering the U.S. via these overseas suppliers.

structural integrity, inadequate restraints, electrical issues, non-product-related or unknown issues, difficulty with correct positioning, miscellaneous product-related issues, unspecified falls, and consumer comments. Although the distribution of the data in this Supplemental NPR update varied somewhat, CPSC finds that the broader hazard categories are very similar. Within the broader hazard category of design, the Supplemental NPR identifies one new hazard pattern, as described below.

CPSC staff considered all 451 reported incidents (59 fatal and 392 nonfatal) to identify hazard patterns associated with infant inclined sleep products. The infant inclined sleep products category includes a variety of products. Some products, like hammocks, are suspended in air, while other seat-like products are meant to be placed on a floor level (yet incident reports indicate these products often were not placed on floor level). Other products sit on top of larger nursery products as attachments. CPSC staff identified hazard patterns that are quite different depending on which product is involved and how the product is being used. In order of frequency of incident reports, CPSC staff grouped the hazard patterns into the following categories:

1. *Design* of the infant inclined sleep product: One hundred and thirty-eight of the 451 reported incidents (31 percent) are in this category. Staff identified three major issues:

*a.* Fifty-nine reported incidents (43 percent) involved infants who developed respiratory and/or skin ailments due to the growth of mold on the product;

*b.* Forty-six reported incidents (33 percent) involved infants that rolled over—fully or partially—from their original supine position. Reports describe infants as young as 1- or 2-months of age as having rolled over; parents/caregivers, who witnessed and reported some of the nonfatal incidents, were able to rescue distressed infants quickly. Eighteen infants died due to suffocation or asphyxiation. Although a few of the infants were strapped into the product, a majority of the infants were either not restrained or the use of restraint is unreported.

*c.* Thirty-three reported incidents (24 percent) involved infants that developed physical deformations from extended product use, such as *plagiocephaly* (flat head syndrome), *scoliosis* (curvature) of the back, and/or *torticollis* (twisted neck syndrome).

The design category includes 19 deaths, 5 hospitalizations, and 4 emergency department (ED) visits. All but two of the deaths resulted from infants rolling over into a prone or semi-prone position, one decedent was found still supine and restrains, but slumped in a chin-to-chest position. The other infant rolled out of the product and wedged into a confined space. Infants unrestrained in the product caused two ED-treated falls. An additional 62 non-hospitalized, non-ED injuries are reported in this category.

2. *Electrical issues:* One hundred and twenty-seven of the 451 incident reports (28 percent) report battery leakage, electric shock, and/or overheating/melting of components, such as the vibrating unit, battery cover, switch, plug, or motor. Reports include two injuries in this category due to electric shock.

3. *Consumer comments:* Ninety of the 451 reports (20 percent) fall into this category. The reports consist of consumer comments/observations of perceived safety hazards, complaints about unauthorized sale of infant inclined sleep products, or inquiries regarding safety recall on inclined sleep products. One complaint describes misinformation in the instruction material. None of these reports indicate that an incident actually occurred.

4. *Undetermined due to confounding information:* Thirty-four of the 451 reports (8 percent) provide unclear, conflicting, and/or inconsistent information. Among the 28 deaths reported in this category, for example, medical examiners often concluded the cause of death to be SIDS or SUID, along with a co-contributing condition such as an unsafe sleep environment (*e.g.,* soft bedding, inclined sleep surface) or pre-existing medical condition. Staff is unable to determine the role of the product when documents describe multiple potentially contributing factors. Occasionally, the wording on the documents cite "several possibilities," and the cause of death is coded as Undetermined. For the 6 nonfatal injuries, including the 2 hospitalized and 2 ED-treated injuries, the report described respiratory distress due to temporary cessation of breathing; however, these reports contain no official diagnosis for these episodes.

5. *Lack of structural integrity:* Twenty-eight of the 451 incidents (6 percent) report some sort of breakage of the product or its components. These reports include complaints of buckle/straps breaking, components such as hub, rail, or leg detaching/disengaging, hardware coming loose, and other unspecified components breaking. This category includes two ED-treated injuries, both due to falls.

6. *Other product-related issues:* Thirteen of the 451 incidents (3 percent) report other product-related issues, such as instability (product tipping over), inadequacy of restraint (infants falling out in spite of being restrained), or product assembly/installation difficulties. This category contains seven fall-related injuries, including two injuries that were treated and released from a hospital ED.

7. *Infant placement* issues: Four of the 451 incidents reports (1 percent) indicate that infant placement contributed to the incident. Of the four fatalities, reports describe three infants placed in a prone position on soft bedding; and another infant being crushed by a young sibling who climbed on top of her.

8. *Insufficient information:* For 17 of the 451 incidents (4 percent), reports contain insufficient information for staff to categorize them accurately. Staff has no information available on the circumstances of 8 deaths in this category. Reports for six injuries in this category describe unspecified falls treated in hospital EDs, with no information was on restraint usage.

### D. Product Recalls and Safety Alerts

From May 10, 2000 to August 20, 2019, CPSC conducted 13 consumer-level recalls involving infant inclined sleep products. The recalls were conducted in response to hazards involving strangulation, suffocation, fall, structural stability, entrapment, exposure to mold, and death. Six recalls involved infant hammocks, six recalls involved infant inclined sleep products, and one recall involved an infant inclined sleep accessory included with a play yard. Tab G in the Staff Supplemental Briefing Package contains a detailed chart outlining recalls involving infant inclined sleep products.

The six infant hammocks were recalled for hazards including: Strangulation, suffocation, fall, structural stability, and entrapment. Recalls affected approximately 25,400 units of infant hammocks.

The six infant inclined sleep products and one infant inclined sleep accessory included with a play yard were recalled due to hazards including: entrapment, suffocation, fall, exposure to mold, and death after infants rolled from their back to their stomach or side while unrestrained in the products. Recalls affected approximately 6.4 million units of infant inclined sleep products. One recall for exposure to mold affected 800,000 units, and two recalls for entrapment and suffocation affected 195,000 units.

In 2019, two recalls occurred due to reports of infant deaths while using infant inclined sleep products, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances. In response to the reported deaths in those products, CPSC conducted two additional recalls due to safety concerns with infant inclined sleep products, one with an infant inclined sleep product, and one with an infant inclined sleep accessory included with a play yard. Recalls involving infant inclined sleep products affected approximately 5.4 million units and the recall involving the infant inclined sleep accessory affected approximately 71,000 units.

The Commission also has issued two safety alerts involving infant inclined sleep products. A May 31, 2018 safety alert [7] advised of infant rollover deaths in inclined sleep products, and reminded caregivers to always use restraints and to stop using the product as soon as an infant can roll over. An April 5, 2019 safety alert [8] advised consumers to stop use of the inclined sleep product when an infant reaches three months of age, or as soon as an infant exhibits rollover capabilities.

## IV. Mannen Study

During the development of this Supplemental NPR briefing package, staff received reports of 451 new incidents, 59 of which were deaths that occurred while in infant inclined sleep products. Accordingly, Commission staff contracted with Dr. Erin Mannen, Ph.D., a mechanical engineer with a biomechanics specialization, to conduct infant testing to evaluate the design of inclined sleep products. Tab B of the Staff Supplemental Briefing Package contains Dr. Mannen's study, *Biomechanical Analysis of Inclined Sleep* (Mannen Study).

The Mannen Study examined how 10 infants move and use their muscles on flat, inclined surfaces, and in selected inclined sleep products, and whether such product designs directly impact safety or present a risk factor that could contribute to the suffocation of an infant. Testing compared infants' muscle movement and oxygen saturation on a flat crib mattress at 0°, 10°, and 20° versus seven different inclined sleep products. Researchers recorded infant muscle activity using surface electromyography (EMG), and recorded oxygen saturation using a medical grade pulse oximeter. Researchers placed infants in a random order in each of the 10 testing conditions, in both the supine and prone positions, for at least 60 seconds (unless the oximeter data fell below 95%, in which case they were removed early to ensure safety).

Following are key findings of the Mannen Study:

• Inclined surfaces and incline sleep products resulted in significantly higher muscle activity of the turn core muscle (abdominals), which may lead to quicker fatigue and suffocation if an infant finds themselves prone in an incline sleep product.

• Muscle synergies (*i.e.,* how muscles work together) are significantly different in inclined sleep products. If an infant rolls from supine to prone in an inclined sleep product, it is likely the first time the baby has experienced the position and the demands the position requires of the muscles.

• Some inclined sleep products require greater neck and trunk adjustments during prone positioning, indicating that infants may struggle to adjust their posture to enable breathing and attempt to self-correct if a roll from supine to prone occurs.

• Prone lying in the incline sleep products puts infant at higher risk of suffocation as evidenced by oxygen saturation results.

• Some evidence was found that supports the idea that the inclined sleep products make the babies roll more easily from supine to prone. The flexed trunk and ease of head lifting during supine lying in an inclined sleep product may indicate that supine to prone rolling is achieved more easily.

• If babies roll from supine to prone in an inclined sleep product, then, due to the high musculoskeletal demands necessary to maintain safe posture to prevent suffocation, babies would fatigue faster than they would on a stable, flat surface.

• None of the inclined sleep products that were tested and evaluated as a part of this study are safe for infant sleep.

Additionally, the Mannen Study concludes:

• *20-Degree Incline Puts Infants at Risk for Muscle Fatigue and Suffocation:* Based on the results of the biomechanical study, the 20-degree incline resulted in significantly different muscle activity for the infants compared to the zero-degree incline surface. The increased demand on the abdominal muscles could lead to increased fatigue and suffocation if an infant is unable to reposition themselves after an accidental roll from supine to prone occurs.

• *10-Degree Incline Does Not Significantly Impact Infant Motion or Muscle Activity:* Based on the results of the biomechanical study, fewer differences in muscle activity or lying posture were revealed at a 10-degree mattress incline compared to the zero-degree incline surface. Ten degrees is a safe incline for sleep on a crib mattress surface.

• *Inclines Between 10 and 20 Degrees Should Be More Thoroughly Studied:* The experimental design of this study did not examine the angles between 10 and 20 degrees, so future work should focus on understanding which, if any, angles between 10 and 20 degrees may be safe for infant sleep.

The Mannen Study further states: "It is likely that in incidents where babies were found deceased in the prone position, that an accidental roll occurred, and after some amount of struggling, the baby was fatigued and could no longer move into a position to prevent suffocation." Dr. Mannen concludes that an incline of 20 degrees or more puts an infant at risk compared to a 0–10 degree incline. Although her study did not test infants on inclines between 10–20 degrees, and thus did not offer conclusions for these angles, CPSC staff advises that additional testing on inclines between 10–20 degrees is unnecessary, because staff concludes that a flat surface that does not exceed 10 degrees offers the safest sleep environment for infants. This conclusion comports with staff's recommendations to remove the term "inclined" from the proposed mandatory standard, and to require that all sleep products not otherwise specified as cribs (full-size or non-full-size), play yards, or bedside sleepers meet the requirements in 16 CFR 1218 Safety Standard for Bassinets and Cradles, which, among other requirements, mandates that the seat back surface angle intended for sleep be 10 degrees or less.

## V. International Standards for Inclined Sleep Products

The 2017 NPR described international standards that include infant inclined sleep products within its scope, noting that these standards are intended primarily to address hazards associated with products having flat sleeping surfaces, such as bassinets and cradles. These standards include:

▪ *The Cribs, Cradles, and Bassinets regulation included in the Canada Consumer Product Safety Act:* The Canadian regulation has similar requirements to ASTM F3118, such as

[7] https://www.cpsc.gov/content/cpsc-consumer-alert-caregivers-urged-to-use-restraints-with-inclined-sleep-products.

[8] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC–ALERT–CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product.

warnings, labels, and general performance requirements (*e.g.* lead content, small parts, openings). The Canadian regulation has additional requirements for slat strength, mesh material, structural integrity, and mattress supports. CPSC staff determined that the Canadian regulation provides similar performance requirements as ASTM F3118, but contains a more stringent requirement limiting the sleep seat back angle to 7° or less. However, the Canadian regulation allows a product to be marketed as a "napper," which the Supplemental NPR proposes not to allow.

■ *The European standard (SS–EN 1130: Furniture, Cribs, and Cradles Safety Requirements):* EN 1130 covers only inclined sleep products with a body and frame. The European standard would not include hammocks or similar products that are suspended from ceilings or other structures. EN 1130 includes requirements for construction and materials similar to the general ASTM F3118 requirements. Additional requirements include labeling, use instructions, packaging, and stability. EN 1130 is intended primarily to address hazards associated with bassinets and cradles and not the unique hazards associated with inclined sleep products. CPSC staff believes the ASTM standard is more inclusive because it includes all hammock styles. Additionally, EN 1130 does not address the hazards identified in the Mannen Study.

■ *The Australian standard (AS/NZS 4385 Infants' rocking cradles—Safety requirements):* AS/NZS 4385 is intended for rocking cradles that swing, rock, or tilt, but specifically excludes hammocks that do not have this feature. Staff is unclear whether tilt means incline, thereby including in the Australian standard inclined sleep products as defined in ASTM F3118. AS/NZS 4385 contains requirements for construction, toxicology, and flammability, as well as general provisions, such as those for included toys. AS/NZS 4385 has some similar performance requirements as ASTM F3118, but is not as comprehensive. Additionally, the AS/NZS 4385 does not address the hazards identified in the Mannen Study.

## VI. Voluntary Standard—ASTM F3118

### A. History of ASTM F3118

Section 104(b)(1)(A) of the CPSIA requires the Commission to consult representatives of "consumer groups, juvenile product manufacturers, and independent child product engineers

and experts" to "examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products." As a result of incidents arising from inclined sleep products, the Commission directed CPSC staff to work with ASTM to develop voluntary requirements to address the hazard patterns related to the use of inclined sleep products. ASTM first approved ASTM F3118 on April 1, 2015, and published it in May 2015. Through the ASTM process, CPSC staff consulted with manufacturers, retailers, trade organizations, laboratories, consumer advocacy groups, consultants, and members of the public. The current standard, ASTM F3118–17a, was approved on September 1, 2017, and published in October of 2017. This is the fourth revision to the standard since it was first published in May 2015. ASTM F3118–17a is intended to address the following hazards: (1) Falls, (2) positional asphyxiation, and (3) obstruction of nose and mouth by bedding.

### B. Description of the Current Voluntary Standard—ASTM F3118–17a

The 2017 NPR described the key provisions of ASTM F3118–17, including: scope, terminology, general requirements, performance requirements, test methods, marking and labeling, and instructional literature. 82 FR at 16967. The Supplemental NPR proposes to incorporate by reference the most recent version of the voluntary standard, ASTM F3118–17a, which is substantially the same as ASTM F3118–17, except that the accessory definition was updated to match the modification recommended in the 2017 NPR. Like the previous version, ASTM F3118–17a describes the scope of the voluntary standard, defines terms for various types of inclined sleep products, and sets out requirements for performance (such as for structural integrity and stability) and for warnings and instructions. As discussed elsewhere in this preamble, CPSC's proposed standard would make substantial modifications to ASTM F3118–17a.

## VII. Assessment of the Voluntary Standard ASTM F3118–17a

In the 2017 NPR, CPSC proposed that incorporating by reference ASTM F3118–17, with a modification to the definition of "accessory," would address the primary hazard patterns identified in the incident data. 82 FR at 16967–68. However, since the 2017 NPR, CPSC has become aware of additional fatalities and contracted the Mannen Study. The Mannen Study and

more recent incident data indicate that ASTM F3118–17a is not adequate to address the risk of injury associated with infant inclined sleep products because the standard allows for products with a seat back angle greater than 10 degrees. The Commission finds that more stringent requirements than those found in ASTM F3118–17a are necessary in a mandatory rule to further reduce the risk of injury associated with infant inclined sleep products.

Following is an explanation of how the Supplemental NPR would address the product-related hazard patterns identified in section III.C of this preamble, discussing the proposed more stringent requirements where appropriate.

### A. Design Problems

#### 1. Suffocation Hazard

The Mannen Study results reveal that a 20° incline results in significantly different muscle activity for the infants compared to a 0° incline surface. The increased demand on infant abdominal muscles could lead to increased fatigue and suffocation if an infant is unable to reposition themselves after a roll from supine to prone occurs. At a 10° incline, fewer differences in muscle activity or lying posture were revealed compared to the 0° incline surface. According to Dr. Mannen's report, "ten degrees is likely a safe incline for sleep on a crib mattress surface." Accordingly, the Commission proposes modifications to the introduction, scope, definitions, and performance requirements in ASTM F3118–17a, as described in section VIII of this preamble, to address the potential hazards of an infant sleeping on an inclined surface. Although her study did not test infants on inclines between 10°–20°, and thus did not offer conclusions for these angles, CPSC staff advises that additional testing on inclines between 10°–20° is unnecessary, concluding that a flat surface that does not exceed 10° offers the safest sleep environment for infants and would further reduce the risk of injury associated with inclined sleep products.

#### 2. Additional Design Issues

CPSC staff identified two additional design issues: (1) Infant respiratory and/or skin ailments due to mold growth on the product, and (2) infant physical deformations such as *plagiocephaly* (flat head syndrome) and/or *torticollis* (twisted neck syndrome) from extended product use. In the reported cases of mold that resulted in respiratory problems for infants using the product, all cases were related to one particular

manufacturer's inclined sleep product. CPSC conducted a recall of that product in 2013. Infants who use an inclined sleep product that is known to develop visible mold can be at risk of developing health effects such as allergies, asthma, mycosis, and effects of mycotoxins. However, because the mold growth was restricted to one manufacturer's product and that product was recalled, the Commission is not proposing any modifications to address potential hazards associated with mold.

Plagiocephaly, cranial deformity or asymmetry (commonly known as flat head) is a condition that may exist at birth due to mechanical constraint of fetal head movement in the womb, birth-related injuries during assisted delivery, or as a result of increased likelihood of skull deformity as a consequence of premature birth. Muscular torticollis (twisted neck) is a known risk factor associated with plagiocephaly caused by constraint of head and neck movement. Although incident data indicate that consumers believe use of an inclined sleep product is the cause for their child's plagiocephaly/torticollis, no evidence supports this belief. Increase in the number of children with plagiocephaly may actually be attributed to the American Academy of Pediatrics' (AAP) recommendation to place infants to sleep on their backs to decrease the risk of sudden infant death syndrome (SIDS). Because the development of plagiocephaly and torticollis is not exclusively attributable to the use of infant inclined sleep products, the conditions are not addressable with performance standards. The Commission is not proposing any modifications to the voluntary standard to address these issues. Tab E of the Staff Supplemental Briefing Package provides the Directorate for Health Science's analysis of plagiocephaly and torticollis related to infant sleep products.

### B. Electrical Issues

Staff determined that 127 of the 451 new incidents are related to electrical issues. The electrical-related issues included battery leakage, electric shock, and overheating of components. Some inclined sleep products have accessories that provide music, rocking motion, or vibration, which are either battery- or a/c-powered; however, F3118–17a does not include any performance requirements for electrical components. Other juvenile products that have similar features include performance requirements that could apply for infant sleep products. CPSC staff has raised this issue and is working with the

ASTM Ad Hoc task group to develop performance requirements to address electrical hazards across juvenile products. Performance requirements would apply to other children's product standards, such as bouncers, swings, and bassinets. Because these requirements are currently under development, the Commission is not proposing electrical requirements in this Supplemental NPR, and instead expects staff to continue working with applicable ASTM subcommittees to develop electrical requirements for all applicable durable infant or toddler products with electrical components.

### C. Structural Integrity and Other Product Related Issues

Structural integrity and other product related issues identified in this Supplemental NPR are similar to issues previously found in bassinet/cradle incidents. Accordingly, performance and testing requirements in the bassinet/cradle standard will likely address these incidents for infant sleep products.

### D. Infant Placement Issues

Infants placed prone on soft bedding in inclined sleep products are at great risk for suffocation because of the incline and the soft bedding. Although requiring infant sleep products to comply with the bassinet/cradle standard will reduce the incline angle, and will provide warnings about not using soft bedding, parents may still place infants prone in the product. Staff will continue to work with ASTM and other organizations with information and education campaigns to prevent infants' deaths due to unsafe sleep practices.

### VIII. Proposed Standard for Infant Sleep Products

This Supplemental NPR proposes to establish a children's product safety standard for infant sleep products as a type of durable infant or toddler product under section 104 of the CPSIA. The Mannen Study findings and incident reports indicate that neither ASTM F3118–17, nor ASTM F3118–17a, are adequate to address the risk of injury associated with infant inclined sleep products, because these voluntary standards allow for infant inclined sleep products with a seat back angle greater than 10 degrees. More stringent requirements are necessary in the mandatory standard to further reduce the risk of injury associated with infant inclined sleep products. Accordingly, the Supplemental NPR proposes to incorporate by reference ASTM F3118–17a as the mandatory standard for infant

sleep products, with the following modifications:

a. Modify the introduction and scope of the standard to state the purpose of the standard is to address all infant sleep products not already covered by traditional sleep product standards.

b. Modify the definitions of accessory, compact, infant inclined sleep products, and newborn inclined sleep products to remove the term "inclined."

c. Modify seat back angle so the maximum allowable seat back angle must be equal to or less than 10° in all positions recommended for sleep.

d. Add new requirement—infant sleep products must meet 16 CFR 1218 Safety Standard for Bassinets and Cradles.

e. Remove all the performance requirements except for the above new or modified requirements.

f. Remove all test methods except for maximum seat back angle.

The Supplemental NPR proposes that infant sleep products meet 16 CFR 1218 Safety Standard for Bassinets and Cradles because this standard is an established standard for products that provide sleep accommodations for infants, and the standard addresses the hazard associated with inclined sleep by limiting the seat back angle to 10 degrees or less. Additionally, the name of CPSC's standard would not include the term "inclined," and would be codified as 16 CFR part 1236, Safety Standard for Infant Sleep Products. A redline of these proposed changes is included at Tab C of the Staff Supplemental Briefing Package.

The Supplemental NPR proposes that infant sleep products meet the warning requirements in the bassinet and cradle standard, instead of those stated in ASTM F3118–17a. For this proposed modification, the Supplemental NPR relies on focus groups with parents and grandparents of infants less than 1 year of age. Participants provided information on caregivers' perceptions and reactions to safety messaging, indicating that participants were aware of warning labels on infant sleep products. Additionally, participants reported that the label shown during the focus group looked similar and contained comparable information to labels that they find on products they own. Some participants reported that they tend to gloss over warning labels, as they believe the language to be the same on every label. Some participants reported that they thought the main message on a warning label was to be careful and keep an eye on their infant. In contrast, a few participants believed that manufacturers use warning labels to protect themselves from liability or litigation. Participants'

recommendations to improve warning labels included making the labels more concise and making the labels "stand out." CPSC staff is working with a contractor to develop new safe sleep warnings and messaging, potentially across all sleep products. In the future, staff could recommend changes in warnings based on this work.

## IX. Proposed Amendment to 16 CFR Part 1112 To Include NOR for Infant Sleep Products

The CPSA establishes certain requirements for product certification and testing. Products subject to a consumer product safety rule under the CPSA, or to a similar rule, ban, standard or regulation under any other act enforced by the Commission, must be certified as complying with all applicable CPSC-enforced requirements. 15 U.S.C. 2063(a). Certification of children's products subject to a children's product safety rule must be based on testing conducted by a CPSC-accepted third party conformity assessment body. *Id.* 2063(a)(2). The Commission must publish an NOR for the accreditation of third party conformity assessment bodies to assess conformity with a children's product safety rule to which a children's product is subject. *Id.* 2063(a)(3). Thus, the proposed rule for 16 CFR part 1236, *Standard Consumer Safety Specification for Infant Sleep Products,* if issued as a final rule, would be a children's product safety rule that requires the issuance of an NOR.

The Commission published a final rule, *Requirements Pertaining to Third Party Conformity Assessment Bodies,* 78 FR 15836 (March 12, 2013), codified at 16 CFR part 1112 ("part 1112") and effective on June 10, 2013, which establishes requirements for accreditation of third party conformity assessment bodies to test for conformity with a children's product safety rule in accordance with section 14(a)(2) of the CPSA. Part 1112 also codifies all of the NORs issued previously by the Commission.

All new NORs for new children's product safety rules, such as the inclined sleep products standard, require an amendment to part 1112. To meet the requirement that the Commission issue an NOR for the inclined sleep products standard, as part of this NPR, the Commission proposes to amend the existing rule that codifies the list of all NORs issued by the Commission to add inclined sleep products to the list of children's product safety rules for which the CPSC has issued an NOR.

Test laboratories applying for acceptance as a CPSC-accepted third party conformity assessment body to test to the new standard for inclined sleep products would be required to meet the third party conformity assessment body accreditation requirements in part 1112. When a laboratory meets the requirements as a CPSC-accepted third party conformity assessment body, the laboratory can apply to the CPSC to have 16 CFR part 1236, *Standard Consumer Safety Specification for Infant Sleep Products,* included in the laboratory's scope of accreditation of CPSC safety rules listed for the laboratory on the CPSC website at: *www.cpsc.gov/labsearch.*

## X. Proposed Amendment to Definitions in Consumer Registration Rule

The statutory definition of "durable infant or toddler product" in section 104(f) applies to all of section 104 of the CPSIA. In addition to requiring the Commission to issue safety standards for durable infant or toddler products, section 104 of the CPSIA also directed the Commission to issue a rule requiring that manufacturers of durable infant or toddler products establish a program for consumer registration of those products. Public Law 110–314, section 104(d).

Section 104(f) of the CPSIA defines the term "durable infant or toddler product" and lists examples of such products, including several types of infant sleep products, such as cribs and bassinets and cradles. Section 104(f)(2)(A) & (L). As discussed previously, the infant sleep products safety standard is an outgrowth of the bassinet safety standard. The Supplemental NPR proposes that any infant sleep product that is not already subject to a mandatory consumer product safety rule for infant sleep, be subject to proposed part 1236, which would limit the seat back incline angle to 10 degrees or less. Like bassinets, such sleep products are durable products within the meaning of section 104 of the CPSIA.

Because this infant sleep product standard is an outgrowth of the bassinet standard, infant sleep products may be considered a sub-category of bassinets. To provide greater clarity that inclined sleep products are durable infant or toddler products, the Commission proposes to amend the Commission's consumer registration rule to explicitly include infant sleep products.

In 2009, the Commission issued a rule implementing the consumer registration requirement. 16 CFR part 1130. As the CPSIA directs, the consumer registration rule requires each manufacturer of a durable infant or toddler product to:

provide a postage-paid consumer registration form with each product; keep records of consumers who register their products with the manufacturer; and permanently place the manufacturer's name and certain other identifying information on the product. When the Commission issued the consumer registration rule, the Commission identified six additional products as "durable infant or toddler products":

- Children's folding chairs
- changing tables;
- infant bouncers;
- infant bathtubs;
- bed rails; and
- infant slings.

16 CFR 1130.2. The Commission stated that the specified statutory categories were not exclusive, but that the Commission should explicitly identify the product categories that are covered. The preamble to the 2009 final consumer registration rule states: "Because the statute has a broad definition of a durable infant or toddler product but also includes 12 specific product categories, additional items can and should be included in the definition, but should also be specifically listed in the rule." 74 FR 68668, 68669 (Dec. 29, 2009).

In this Supplemental NPR, the Commission proposes to amend the definition of "durable infant or toddler product" in the consumer registration rule to clarify that infant sleep products fall within the term "durable infant or toddler product" as a subset of bassinets and cradles, and must comply with the product registration card rule and section 104 of the CPSIA.

## XI. Incorporation by Reference

The Commission proposes to incorporate by reference ASTM F3118–17a, with substantial modifications to further reduce the risk of injury. The Office of the Federal Register (OFR) has regulations concerning incorporation by reference. 1 CFR part 51. For a proposed rule, agencies must discuss in the preamble of the NPR ways in that the materials the agency proposes to incorporate by reference are reasonably available to interested persons or how the agency worked to make the materials reasonably available. In addition, the preamble of the proposed rule must summarize the material. 1 CFR 51.5(a).

In accordance with the OFR's requirements, section VIII of this preamble summarizes the provisions of ASTM F3118–17a that the Commission proposes to incorporate by reference. ASTM F3118–17a is copyrighted. By permission of ASTM, the standard can

be viewed as a read-only document during the comment period on this NPR, at: *http://www.astm.org/cpsc.htm.* Interested persons may also purchase a copy of ASTM F3118–17 from ASTM International, 100 Bar Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; *http://www.astm.org/cpsc.htm.* One may also inspect a copy at CPSC's Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923.

## XII. Effective Date

The Administrative Procedure Act (APA) generally requires that the effective date of a rule be at least 30 days after publication of the final rule. 5 U.S.C. 553(d). ASTM F3118–17a is a relatively new voluntary standard that covers a variety of products whose manufacturers may not be aware that their product must comply. The Commission is proposing to incorporate by reference ASTM F3118–17a, with substantial modifications to further reduce the risk of injury associated with infant inclined sleep products. To allow time for infant sleep product manufacturers to bring their products into compliance after a final rule is issued, the Commission proposes a 12-month effective date after publication of a final rule, for products manufactured or imported on or after that date. Because of the number of proposed modifications to ASTM F3118–17a, compliance with the mandatory standard may require time beyond the typical 6-month effective date for a section 104 rule. The Commission expects that most firms should be able to comply within the 12-month timeframe. Alternatively, given the hazards involved with infant inclined sleep products, the Commission could issue a final rule with a shorter effective date so that safer products would be available sooner. The Commission requests comments on whether either a longer or shorter effective date would be appropriate.

## XIII. Regulatory Flexibility Act

### A. Introduction

The Regulatory Flexibility Act (RFA) requires that agencies review a proposed rule for the rule's potential economic impact on small entities, including small businesses. Section 603 of the RFA generally requires that agencies prepare an initial regulatory flexibility analysis (IRFA) and make the analysis available to the public for comment when the agency publishes an NPR. 5 U.S.C. 603. Section 605 of the RFA provides that an IRFA is not required if

the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. The IRFA must describe the impact of the proposed rule on small entities and identify significant alternatives that accomplish the statutory objectives and minimize any significant economic impact of the proposed rule on small entities. Specifically, the IRFA must contain:

■ A description of the reasons why action by the agency is being considered;

■ a succinct statement of the objectives of, and legal basis for, the proposed rule;

■ a description of, and where feasible, an estimate of the number of small entities to which the proposed rule will apply;

■ a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities subject to the requirements and the type of professional skills necessary for the preparation of reports or records; and

■ identification, to the extent possible, of all relevant federal rules that may duplicate, overlap, or conflict with the proposed rule; and

Additionally, the IRFA must describe any significant alternatives to the proposed rule that accomplish the stated objectives of applicable statutes and minimize any significant economic impact of the proposed rule on small entities.

CPSC staff prepared an IRFA for this rulemaking which appears at Tab F of the Staff Supplemental Briefing Package. We provide a summary of the IRFA below.

### B. Reasons for Agency Action and Legal Basis for Supplemental NPR

As explained elsewhere in this preamble, section 104 of the CPSIA authorizes the Commission to issue standards for durable infant or toddler products and requires that such products comply with product registration requirements. The Commission is issuing this Supplemental NPR in response to reports of deaths involving inclined sleep products.

### C. Supplemental NPR Requirements

The Supplemental NPR would incorporate by reference the voluntary standard for inclined sleep products (ASTM F3118–17a) with substantial modifications described in section VIII of this preamble. Products subject to the proposed standard would need to have

a sleep surface angle no greater than 10° and would need to meet the requirements of the CPSC standard for bassinets and cradles. If the Commission issues a final rule, the proposed rule would become a mandatory standard, and firms with a sleep product that is subject to the rule would need to evaluate their product, determine what changes would be required to meet the standard, and modify the product so that it complies with the standard or cease supplying the product to the U.S. market. The manufacture or importation of noncompliant products would be prohibited after the effective date of the standard. Additionally, manufacturers and importers must certify that their products comply with applicable children's products safety standards, and this certification must be based on testing by a third party. 16 CFR part 1107.

### D. Small Entities Supplying Infant Sleep Products and the Supplemental NPR's Impact on Small Businesses

Since the Commission issued the 2017 NPR, the U.S. inclined sleep product market has changed substantially. Manufacturers and importers have largely stopped producing for sale most frame-style inclined sleep products from the market, including some that were not subject to recalls, although one or two types of products remain.[9] Additionally, a significant decline in the infant hammock market has occurred, both among larger-scale suppliers and home-based manufacturers.

As part of the current market evaluation, staff identified 18 firms still supplying sleep products to the U.S. market with sleep surface angles greater than 10 degrees, but less than or equal to 30 degrees. Staff identified an additional firm supplying a sleep product with an incline of 10 degrees or less that is not being tested for compliance with either the bassinet standard or another sleep product standard (and thus, likely would be subject to the Supplemental NPR). Of these 19 total firms, six appear to be very small, home-based manufacturers of infant hammocks (two operating domestically and four overseas).[10] The RFA covers only domestic suppliers. Seven of the 19 firms are not as small as the home-based infant hammock

---

[9] Some units may still be available for sale even for products that are no longer being produced (this does *not* include recalled models).

[10] These suppliers were identified online, and staff believes that there may be additional home-based manufacturers supplying infant hammocks on a very small scale (possibly including some without an on-line presence).

manufacturers, but would meet the definition of "small" domestic entities based on U.S. Small Business Administration (SBA) guidelines for their North American Industry Classification System (NAICS) codes. These seven firms typically have only one inclined sleep model in their product lines.

In summary, CPSC staff is aware of nine small domestic firms currently marketing products that would be impacted by the Supplemental NPR in the United States (two home-based domestic hammock manufacturers, four small domestic manufacturers of inclined sleep products, and three small importers of inclined sleep products). Staff cannot definitively determine the impact of the Supplemental NPR because the impact would depend on several unknown factors including:

• How firms respond to the rule (*e.g.,* they would redesign, remarket, or drop products subject to the Supplemental NPR);

• The costs associated with redesigning, remarketing, or replacing an inclined sleep product;

• The change, if any, on demand for that product.

Staff estimates that third party testing costs could be $30 to $100 per sample for the maximum incline test alone, and testing to the bassinet standard could add costs up to another $1,000. Reliance on third party tests obtained by suppliers as allowed by the component part testing rule (16 CFR part 1109) could reduce testing costs to some extent. Staff found that third party costs are likely to be significant for the two very small home-based manufacturers of infant hammocks *if they choose to redesign;* and costs could be significant for an additional two small manufacturers, if they chose to redesign their products and testing as few as four units per model were required to provide a "high degree of assurance."

### E. Alternatives

At least two alternatives are available that could minimize the economic impact on small entities while also meeting the statutory objectives:[11] (1) Eliminate the requirement that products must meet the bassinet standard if they do not already fall into another sleep product standard; or (2) allow a later effective date. However, under the first alternative, the cost of redesign would still likely be significant. Moreover, the

Supplemental NPR is intended to ensure that all products providing sleep accommodations for infants meet a base set of safety requirements. This alternative would not accomplish this goal.

Second, the Commission could also reduce the Supplemental NPR's impact on small businesses by setting a later effective date than the proposed 12 months. A later effective date would reduce the economic impact on firms redesigning their existing products in two ways. Firms would be less likely to experience a lapse in production/ importation, which could result if they are unable to bring their products into compliance and certify compliance based on third party tests within the required timeframe. Also, firms could spread the costs of developing compliant products over a longer time period, thereby reducing their annual costs, as well as the present value of their total costs (*i.e.,* they could time their spending to better accommodate their individual circumstances). The Commission requests comments on the 12-months effective date, which was set to help reduce the impact on affected firms, as well as feedback on how firms would likely respond to the Supplemental NPR.

### F. Small Business Impacts of the Accreditation Requirements for Testing Laboratories

In accordance with section 14 of the CPSA, all children's products that are subject to a children's product safety rule must be tested by a CPSC-accepted third party conformity assessment body (*i.e.,* testing laboratory) for compliance with applicable children's product safety rules. Testing laboratories that want to conduct this testing must meet the NOR pertaining to third party conformity testing. NORs have been codified for existing rules at 16 CFR part 1112. Consequently, the Commission proposes to amend 16 CFR part 1112 to establish the NOR for those testing laboratories that want to test for compliance with the infant sleep products final rule (in essence, test for maximum seat back angle). This section assesses the impact of the amendment on small laboratories.

A final regulatory flexibility analysis (FRFA) was conducted as part of the promulgation of the original 1112 rule (78 FR 15836, 15855–58), as required by the RFA. Briefly, the FRFA concluded that the accreditation requirements would not have a significant adverse impact on a substantial number of small laboratories because no requirements were imposed on laboratories that did not intend to provide third party testing

services. The only laboratories that were expected to provide such services were those that anticipated receiving sufficient revenue from the mandated testing to justify accepting the requirements as a business decision.

Based on similar reasoning, amending the rule to include the NOR for the infant sleep product standard will not have a significant adverse impact on small laboratories. Moreover, based upon the number of laboratories in the United States that have applied for CPSC acceptance of the accreditation to test for conformance to other juvenile product standards, we expect that only a few laboratories will seek CPSC acceptance of their accreditation to test for conformance with the infant sleep product standard. Most of these laboratories will have already been accredited to test for conformance to other juvenile product standards, and the only costs to them would be the cost of adding the infant sleep product standard to their scope of accreditation, a cost that test laboratories have indicated is extremely low when they are already accredited for other section 104 rules. Consequently, the Commission certifies that the NOR for the infant sleep product standard will not have a significant impact on a substantial number of small entities.

### XIV. Environmental Considerations

The Commission's regulations address whether the agency is required to prepare an environmental assessment or an environmental impact statement. Under these regulations, certain categories of CPSC actions normally have "little or no potential for affecting the human environment," and therefore do not require an environmental assessment or an environmental impact statement. Safety standards providing requirements for products come under this categorical exclusion. 16 CFR 1021.5(c)(1). The Supplemental NPR falls within the categorical exclusion.

### XV. Paperwork Reduction Act

This proposed rule contains information collection requirements that are subject to public comment and review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501– 3521). In this document, pursuant to 44 U.S.C. 3507(a)(1)(D), we set forth:

▪ A title for the collection of information;

▪ a summary of the collection of information;

▪ a brief description of the need for the information and the proposed use of the information;

---

[11] Staff considered whether adopting the voluntary inclined sleeper standard with no modifications might also be an alternative, but ruled it out because it would not address the injuries and deaths that led to the recent inclined sleeper recalls.

■ a description of the likely respondents and proposed frequency of response to the collection of information;

■ an estimate of the burden that shall result from the collection of information; and

■ notice that comments may be submitted to the OMB.

*Title:* Safety Standard for Infant Sleep Products.

*Description:* The Supplemental NPR would incorporate by reference ASTM F3118–17a, *Standard Consumer Safety*

*Specification for Infant Inclined Sleep Products,* but with modifications, including to sections 8 and 9 which contain requirements for marking, labeling, and instructional literature. The Supplemental NPR would exclude from the rule infant sleep products covered by another mandatory standard for sleep products (Section 1.3). However, the Supplemental NPR would modify section 5.2 of ASTM F3118–17a to require that accessory, compact, infant sleep products, and newborn sleep products meet the requirements of

the Safety Standard for Bassinets and Cradles (16 CFR 1218), including the marking, labeling, and instructional requirements. These marking, labeling, and instructional requirements fall within the definition of ''collection of information,'' as defined in 44 U.S.C. 3502(3).

*Description of Respondents:* Persons who manufacture or import infant sleep products.

*Estimated Burden:* We estimate the burden of this collection of information as follows:

TABLE 1—ESTIMATED ANNUAL REPORTING BURDEN

| Burden type | Type of supplier | Number of respondents | Frequency of responses | Total annual responses | Hours per response | Total burden hours |
|---|---|---|---|---|---|---|
| Labeling ............................. | Home-based manufacturers | 6 | 1 | 6 | 7 | 42 |
| | Other Suppliers ................... | 13 | 1 | 13 | 1 | 13 |
| Labeling Total ............. | ............................................. | .................... | .................... | .................... | .................... | 55 |
| Instructional literature ......... | Home-based manufacturers | 6 | 1 | 50 | 300 | 300 |
| Total Burden ............... | ............................................. | .................... | .................... | .................... | .................... | 355 |

Our estimate is based on the following:

Two groups of quantifiable entities supply infant sleep products to the U.S. market that will likely need to make some modifications to their existing warning labels to meet the requirements for bassinet and cradle warnings. The first group consists of very small home-based manufacturers, which may not currently have warning labels on their infant sleep products. Similar rulemakings (such as that for sling carriers) assumed that it would take home-based manufacturers approximately 15 hours to develop a new label. Given that some home-based manufacturers supply infant sleep products with warning labels already, we have estimated approximately 7 hours per response for this group of suppliers. Therefore, the total burden hours for very small home-based manufacturers is 7 hours per model × 6 entities × 1 models per entity = 42 hours.

The second group of quantifiable entities supplying infant sleep products to the U.S. market that will need to make some modifications to their existing warning labels are non-home-based manufacturers and importers. These firms do not operate at the low production volume of the home-based firms. All of the firms in this second group have existing warning labels on their products, but not for bassinets and cradles and would therefore, have to make label modifications. Given that these firms are used to working with warning labels, we estimate that the

time required to make any modifications now or in the future would be about 1 hour per model. Based on an evaluation of supplier product lines, each entity supplies an average of 1 model of infant sleeper; therefore, the estimated burden associated with labels for this second group is 1 hours per model × 13 entities × 1 models per entity = 13 hours.

The total burden hours attributable to warning labels is the sum of the burden hours for both entity groups: Very small home-based manufacturers (42 burden hours) + non-home-based manufacturers and importers (13 burden hours) = 55 burden hours. We estimate the hourly compensation for the time required to create and update labels is $34.61 (U.S. Bureau of Labor Statistics, ''Employer Costs for Employee Compensation,'' March 2019, total compensation for all sales and office workers in goods-producing private industries, series id CMU201C000200000D: *http://www.bls.gov/ncs/*). Therefore, the estimated annual cost to industry associated with the labeling requirements is $1,904 ($34.61 per hour × 55 hours = $1,904). No operating, maintenance, or capital costs are associated with the collection.

The Standard for Bassinets and Cradles (section 9) requires instructions to be supplied with the product. As already noted, the proposed Safety Standard for Infant Sleep Products requires accessory, compact, infant sleep products, and newborn sleep products to meet these requirements. Under the OMB's regulations (5 CFR 1320.3(b)(2)), the time, effort, and

financial resources necessary to comply with a collection of information that would be incurred by persons in the ''normal course of their activities'' are excluded from a burden estimate, where an agency demonstrates that the disclosure activities required to comply are ''usual and customary.''

We are unaware of infant sleep products that generally require use instructions but lack such instructions. However, it is possible that the six home-based manufacturers of infant hammocks may not supply instruction manuals as part of their ''normal course of activities.'' Based on information collected for the infant slings rulemaking, staff tentatively estimates that each small entity supplying homemade infant hammocks might require 50 hours to develop an instruction manual to accompany their products. These entities typically supply only one infant hammock model. Therefore, the costs of designing an instruction manual for these firms could be as high as $10,383 (50 hours per model × 6 entities × 1 models per entity = 300 hours × $34.61 per hour = $10,383). Not all firms would incur these costs every year, but new firms that enter the market would incur these costs, and this is a highly fluctuating market. Other firms are estimated to have no burden hours associated with section 9 of the Standard for Bassinets and Cradles because any burden associated with supplying instructions with infant sleep products would be ''usual and customary'' and not within

the definition of "burden" under the OMB's regulations.

Based on this analysis, CPSC staff estimates that the Supplemental NPR for infant sleep products would impose a burden to industry of 355 hours at a cost of $12,287 annually.

In compliance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), we have submitted the information collection requirements of this rule to the OMB for review. Interested persons are requested to submit comments regarding information collection by December 12, 2019, to the Office of Information and Regulatory Affairs, OMB (see the **ADDRESSES** section at the beginning of this notice).

Pursuant to 44 U.S.C. 3506(c)(2)(A), we invite comments on:

▪ Whether the collection of information is necessary for the proper performance of the CPSC's functions, including whether the information will have practical utility;

▪ the accuracy of the CPSC's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

▪ ways to enhance the quality, utility, and clarity of the information to be collected;

▪ ways to reduce the burden of the collection of information on respondents, including the use of automated collection techniques, when appropriate, and other forms of information technology;

▪ the estimated burden hours required for home-based manufacturers to modify warning labels;

▪ the estimated burden hours associated with label modification for non-home-based suppliers, including any alternative estimates;

▪ the estimated burden hours required for home-based manufacturers to modify (or, in some cases, create) instruction manuals.

## XVI. Preemption

Section 26(a) of the CPSA, 15 U.S.C. 2075(a), provides that when a consumer product safety standard is in effect and applies to a product, no state or political subdivision of a state may either establish or continue in effect a standard or regulation that prescribes requirements for the performance, composition, contents, design, finish, construction, packaging, or labeling of such product dealing with the same risk of injury unless the state requirement is identical to the federal standard. Section 26(c) of the CPSA also provides that states or political subdivisions of states may apply to the Commission for an exemption from this preemption under certain circumstances. Section 104(b) of

the CPSIA refers to the rules to be issued under that section as "consumer product safety rules." Therefore, the preemption provision of section 26(a) of the CPSA would apply to a rule issued under section 104.

## XVII. Request for Comments

This Supplemental NPR proposes a rule under section 104(b) of the CPSIA to issue a consumer product safety standard for infant sleep products, to amend part 1112 to add infant sleep products to the list of children's product safety rules for which the CPSC has issued an NOR, and to amend part 1130 to identify infant sleep products as a durable infant or toddler product subject to CPSC consumer registration requirements. The Commission requests comments on the standard's scope language; the proposed effective date; the costs of compliance with, and testing to, the proposed Safety Standard for Infant Sleep Products; and any aspect of this proposal. During the comment period, the ASTM F3118–17a Standard Consumer Safety Specification for Infant Inclined Sleep Products, is available as a read-only document at: *http://www.astm.org/cpsc.htm.*

The Commission requests comments on the following specific issues:

• Products likely to be impacted by the Supplemental NPR, including the product categories discussed in the preamble and any additional types of products that commenters believe may be impacted by the Supplemental NPR.

• How firms with inclined sleep surfaces will likely respond to the Supplemental NPR, including suppliers of products with inclines above 10 degrees and products with inclines less than or equal to 10 degrees that do not already comply with the bassinet standard. We would also appreciate any information on the possible responses of consumers to changes in marketing. Additionally, any information on the approximate percentage of revenue attributable to these types of products would be valuable. The Commission also requests any information regarding the safety of sleep angles in excess of 10 degrees but less than 20 degrees.

• The impact that promulgating the Supplemental NPR would have on the cost of testing and certifying products, particularly on small manufacturers and importers. Any information on the number of samples that must be tested would be especially helpful. The Commission also requests comments on the third party testing costs of the maximum incline test in the Supplemental NPR.

• The cost of redesign, the time required for redesign, the likely

response of manufacturers to the Supplemental NPR's requirements (*i.e.*, redesign, remarket, or drop), the possible change in demand due to remarketing or changing the sleep surface's degree of incline, the cost of (and time required for) remarketing, and (for firms supplying comments) the relative significance of inclined sleepers to their total revenue. The Commission also requests comments on testing costs, including the number of inclined sleeper units that typically need to be tested to provide a "high degree of assurance" of compliance.

• The age and developmental milestones referenced in the scope and definitions of the various infant inclined sleep products covered by ASTM F3118–17a. Because this Supplemental NPR proposes to address "infant sleep products" not already covered by traditional sleep products, the Commission is considering removing the upper age limit from the scope of the mandatory standard, to accommodate a broad scope of infant sleep products within the standard. The Commission's consideration is based on the fact that when staff knew the age of an infant, twenty percent of the fatalities and injuries involved infants 6 months and older.

• The APA generally requires that the effective date of a rule be at least 30 days after publication of the final rule. 5 U.S.C. 553(d). Section XII of this preamble proposes a 12-month effective date after publication of a final rule, for products manufactured or imported on or after that date, stating that a longer effective date than the typical 6 months for a section 104 rule may be necessary because of the number of proposed modifications to ASTM F3118–17a. Given the hazards involved with infant inclined sleep products, the Commission could issue a final rule with a shorter effective date so that safer products would be available sooner. The Commission requests comments on whether either a longer or shorter effective date would be appropriate.

Comments should be submitted in accordance with the instructions in the **ADDRESSES** section at the beginning of this notice.

## List of Subjects

### 16 CFR Part 1112

Administrative practice and procedure, Audit, Consumer protection, Reporting and recordkeeping requirements, Third party conformity assessment body.

*16 CFR Part 1130*

Administrative practice and procedure, Business and industry, Consumer protection, Reporting and recordkeeping requirements.

*16 CFR Part 1236*

Consumer protection, Imports, Incorporation by reference, Infants and children, Labeling, Law enforcement, and Toys.

For the reasons discussed in the preamble, the Commission proposes to amend Title 16 of the Code of Federal Regulations as follows:

## PART 1112—REQUIREMENTS PERTAINING TO THIRD PARTY CONFORMITY ASSESSMENT BODIES

■ 1. The authority citation for part 1112 continues to read as follows:

**Authority:** Pub. L. 110–314, section 3, 122 Stat. 3016, 3017 (2008); 15 U.S.C. 2063.

■ 2. Amend § 1112.15 by adding paragraph (b)(46) to read as follows:

**§ 1112.15 When can a third party conformity assessment body apply for CPSC acceptance for a particular CPSC rule or test method?**

\*   \*   \*   \*   \*

(b) \* \* \*

(46) 16 CFR part 1236, Safety Standard for Infant Sleep Products.

\*   \*   \*   \*   \*

## PART 1130—REQUIREMENTS FOR CONSUMER REGISTRATION OF DURABLE INFANT OR TODDLER PRODUCTS

■ 3. The authority citation for part 1130 continues to read as follows:

**Authority:** 15 U.S.C. 2056a, 2065(b).

■ 4. Amend § 1130.2 by revising paragraph (a)(12) to read as follows:

**§ 1130.2 Definitions.**

\*   \*   \*   \*   \*

(a) \* \* \*

(12) Bassinets and cradles, including bedside sleepers and infant sleep products;

\*   \*   \*   \*   \*

■ 5. Add part 1236 to read as follows:

## PART 1236—SAFETY STANDARD FOR INFANT SLEEP PRODUCTS

Sec.
1236.1   Scope.
1236.2   Requirements for infant sleep products.

**Authority:** Sec. 104, Pub. L. 110–314, 122 Stat. 3016 (15 U.S.C. 2056a); Sec. 3, Pub. L. 112–28, 125 Stat. 273.

**§ 1236.1   Scope.**

This part establishes a consumer product safety standard for infant sleep products, including: Frame-type, hammock, compact, and accessory. This consumer product safety standard covers all infant sleep products that are not covered by another consumer product safety standard, including:

(a) 16 CFR part 1218 Safety Standard for Bassinets and Cradles;

(b) 16 CFR part 1219 Safety Standard for Full-Size Baby Cribs;

(c) 16 CFR part 1220 Safety Standard for Non-Full-Size Baby Cribs;

(d) 16 CFR part 1221 Safety Standard for Play Yards; and

(e) 16 CFR part 1222 Safety Standard for Bedside Sleepers.

**§ 1236.2   Requirements for infant sleep products.**

(a) Except as provided in paragraph (b) of this section, each infant sleep product must comply with all applicable provisions of ASTM F3118–17a, Standard Consumer Safety Specification for Infant Inclined Sleep Products (approved on September 1, 2017). The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from ASTM International, 100 Bar Harbor Drive, P.O. Box 0700, West Conshohocken, PA 19428; *http://www.astm.org/cpsc.htm.* You may inspect a copy at the Office of the Secretary, U.S. Consumer Product Safety Commission, Room 820, 4330 East West Highway, Bethesda, MD 20814, telephone 301–504–7923, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, email *fedreg.legal@nara.gov,* or go to: *www.archives.gov/federal-register/cfr/ibr-locations.*

(b) Comply with ASTM F3118–17a with the following additions or exclusions:

(1) Instead of complying with Introduction of ASTM F3118–17a, comply with the following:

(i) *Introduction.* (A) This consumer safety specification addresses incidents associated with infant inclined sleep products identified by the U.S. Consumer Product Safety Commission (CPSC).

(B) In response to incident data compiled by the CPSC, this consumer safety specification attempts to minimize the following: Fall hazards, positional asphyxiation, and obstruction of nose and mouth by bedding. The purpose of the standard is to address infant sleep products not already covered by traditional sleep product

standards and to prevent deaths due to the use of Infant Sleep Products with a seat back angle greater than 10° from the horizontal.

(C) This consumer safety specification is written within the current state-of-the-art of infant sleep product technology and will be updated whenever substantive information becomes available that necessitates additional requirements or justifies the revision of existing requirements.

(ii) [Reserved]

(2) In section 1.1 of ASTM F3118–17a, replace the term ''infant inclined sleep products'' with ''infant sleep products.''

(3) In section 1.2 of ASTM F3118–17a, replace the term ''infant inclined sleep products'' with ''infant sleep products.''

(4) Instead of complying with section 1.3 of ASTM F3118–17a, comply with the following:

(i) 1.3 This consumer safety performance specification covers products that are not covered by other ASTM standards such as:

(A) ASTM F1169 Standard Consumer Safety Specification for Full-Size Baby Cribs;

(B) ASTM F406 Standard Consumer Safety Specification for Non-Full-Size Baby Cribs/Play Yards;

(C) ASTM F2194 Standard Consumer Safety Specification for Bassinets and Cradles; and

(D) ASTM F2906 Standard Consumer Safety Specification for Bedside Sleepers. This consumer safety performance specification covers free standing products with an infant sleep surface primarily intended and marketed to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on sides, whichever comes first. It also covers smaller products intended for newborns up to 3 months old or when a newborn begins to wiggle out of position or turn over in the product or weighs more than 15 lb (6.8 kg), whichever comes first. It also covers infant and newborn sleep product accessories, which are attached to or supported by, another product with the same age or abilities, or both, as the free standing products. If the infant sleep product can be converted into a product for which another ASTM standard consumer safety specification exists, the product shall meet the applicable requirements of that standard.

(ii) [Reserved]

(5) In section 1.4 of ASTM F3118–17a, replace the term ''infant inclined sleep product'' with ''infant sleep products.''

(6) Instead of complying with section 2 of ASTM F3118–17a, comply with the following:

(i) 2. Referenced Documents.

(ii) 2.1 ASTM Standards.[12] (A) F406 Standard Consumer Safety Specification for Non-Full-Size Baby Cribs/Play Yards;

(B) F1169 Standard Consumer Safety Specification for Full-Size Baby Cribs;

(C) F2194 Consumer Safety Specification for Bassinets and Cradles;

(D) F2906 Standard Consumer Safety Specification for Bedside Sleepers.

(iii) 2.2 Federal Standards.[13]

(A) 16 CFR part 1218—Safety Standard for Bassinets and Cradles;

(B) 16 CFR part 1219—Safety Standard for Full-Size Baby Cribs;

(C) 16 CFR part 1220—Safety Standard for Non-Full-Size Baby Cribs;

(D) 16 CFR part 1221—Safety Standard for Play Yards; and

(E) 16 CFR part 1222—Safety Standard for Bedside Sleepers.

(7) Do not comply with sections 2.3 and 2.4 of ASTM F3118–17a, including Figures 1 and 2.

(8) In section 3.1.1 of ASTM F3118–17a, replace the following terms:

(i) Replace the term ''accessory inclined sleep product'' with ''accessory infant sleep product.''

(ii) Replace the term ''inclined sleep product'' with ''infant sleep product.''

(9) In section 3.1.2 of ASTM F3118–17a, replace the following terms:

(i) Replace the term ''compact inclined sleep product'' with ''compact infant sleep product.''

(ii) Replace the term ''newborn inclined sleep product'' with ''newborn infant sleep product.''

(10) Do not comply with sections 3.1.3 through 3.1.6 of ASTM F3118–17a.

(11) Instead of complying with section 3.1.7 of ASTM F3118–17a, comply with the following:

(i) 3.1.7 *infant sleep product, n*—a freestanding product, intended to provide a sleeping accommodation for an infant up to approximately 5 months of age, that is generally supported by a stationary or rocker base and that is not subject to any of the following standards:

(A) 16 CFR part 1218—Safety Standard for Bassinets and Cradles;

(B) 16 CFR part 1219—Safety Standard for Full-Size Baby Cribs;

(C) 16 CFR parts 1220 and 1221—Safety Standard for Non-Full-Size Baby Cribs and Play Yards; and

[12] For referenced ASTM standard, visit the ASTM website, *www.astm.org,* or contact ASTM Customer Service at *service@astm.org.* For Annual Book of ASTM Standards volume information, refer to the standard's Document Summary page on the ASTM website.

[13] Available from U.S. Government Printing Office Superintendent of Documents, 732 N. Capitol St. NW, Mail Stop: SDE, Washington, DC 20401, *http://www.access.gpo.gov.*

(D) 16 CFR part 1222—Safety Standard for Bedside Sleepers.

(ii) [Reserved].

(12) Do not comply with sections 3.1.7.1 through 3.1.9 of ASTM F3118–17a.

(13) Instead of complying with section 3.1.10 of ASTM F3118–17a, comply with the following:

(i) 3.1.10 *newborn sleep product, n*—a free standing product, intended to provide sleeping accommodations for a newborn up to approximately 3 months of age, that is supported by a stationary or rocker base and whose seat back length, measured from the bight, is not greater than 17 in. (432 mm) and that is not subject to any of the following standards:

(A) 16 CFR part 1218—Safety Standard for Bassinets and Cradles;

(B) 16 CFR part 1219—Safety Standard for Full-Size Baby Cribs;

(C) 16 CFR parts 1220 and 1221—Safety Standard for Non-Full-Size Baby Cribs and Play Yards; and

(D) 16 CFR part 1222—Safety Standard for Bedside Sleepers.

(ii) [Reserved].

(14) Do not comply with sections 3.1.11 through 3.1.13 of ASTM F3118–17a.

(15) Do not comply with section 5 of ASTM F3118–17a.

(16) Do not comply with sections 6.1 through 6.8 of ASTM F3118–17a.

(17) Instead of complying with section 6.9 of ASTM F3118–17a, comply with the following:

(i) 6.9 *Maximum Seat Back Angle.*

(ii) 6.9.1 *Accessory, Compact, and Infant Sleep Product*—The angle of the seat back surface intended for sleep along the occupant's head to toe axis relative to the horizontal shall not exceed 10° when tested in accordance with 7.11.2.

(iii) 6.9.2 *Accessory, Compact, and Newborn Sleep Product*—The angle of the seat back surface intended for sleep along the occupant's head to toe axis relative to the horizontal shall not exceed 10° when tested in accordance with 7.11.3.

(iv) 6.9.3 *Accessory, Compact, Infant Sleep Products, and Newborn Sleep Products*—shall meet requirements of 16 CFR part 1218 Safety Standard for Bassinets and Cradles.

(18) Do not comply with sections 6.10 through 7.10 of ASTM F3118–17a.

(19) In section 7.11.2.1 of ASTM F3118–17a, replace ''*Infant Inclined Sleep Product and Infant Inclined Sleep Product Accessory*'' with ''*Accessory, Compact, Infant Sleep Products, and Newborn Sleep Products.*''

(20) In section 7.11.2.1 of ASTM F3118–17a, replace ''If applicable, place

the product in the manufacturer's recommended highest incline angle position.'' with ''If applicable, place the product in the manufacturer's recommended highest seat back angle position intended for sleep.''

(21) In section 7.11.3 of ASTM F3118–17a, replace ''*Newborn Inclined Sleep Product and Newborn Inclined Sleep Product Accessory*'' with ''*Accessory, Compact, Infant Sleep Products, and Newborn Sleep Products.*''

(22) Do not comply with sections 7.12 through 9, or the Appendix, of ASTM F3118–17a.

**Alberta E. Mills,**

*Secretary, Consumer Product Safety Commission.*

[FR Doc. 2019–23724 Filed 11–8–19; 8:45 am]

**BILLING CODE 6355–01–P**

# COMMODITY FUTURES TRADING COMMISSION

**17 CFR Part 160**

**RIN 3038–AE91**

## Privacy of Consumer Financial Information

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Proposed rule.

**SUMMARY:** The Commodity Futures Trading Commission (''CFTC'' or ''Commission'') is proposing to make a correction to one of the Commission's regulations to restore text that was inadvertently deleted in a 2011 amendment to that regulation.

**DATES:** Comments must be received on or before December 12, 2019.

**ADDRESSES:** You may submit comments, identified by RIN 3038–AE91, by any of the following methods:

• *CFTC Comments Portal: https:// comments.cftc.gov.* Select the ''Submit Comments'' link for this rulemaking and follow the instructions on the Public Comment Form.

• *Mail:* Send to Christopher Kirkpatrick, Secretary of the Commission, Commodity Futures Trading Commission, Three Lafayette Center, 1155 21st Street NW, Washington, DC 20581.

• *Hand Delivery/Courier:* Follow the same instructions as for Mail, above.

Please submit your comments using only one of these methods. Submissions through the CFTC Comments Portal are encouraged.

All comments must be submitted in English, or if not, accompanied by an English translation. Comments will be



December 12, 2019

TRANSMITTED VIA EMAIL
Scott Lewis
Subcommittee Chairman for ASTM Bassinets and Cradles
Richard Rosati
Subcommittee Chairman for ASTM Infant Incline Sleep Product
ASTM International
100 Barr Harbor Dr.
West Conshohocken, PA 19428-2959

Re: ASTM F15.18 Bassinet and Cradles and Infant Inclined Sleep Products Updates

Dear Mr. Lewis and Mr. Rosati:

U.S. Consumer Product Safety Commission (CPSC) staff[1] appreciates your willingness to work together to address the infant deaths in products with seatback angles greater than 10 degrees. Additionally, staff is aware that ASTM is considering updates to the ASTM F15.18 Bassinet and Cradles and Infant Inclined Sleep Products standards to address additional infant sleep products. Given the recently published Supplemental Notice of Proposed Rulemaking (SNPR) for Infant Sleep Products,[2] staff reviewed infant sleep products as a category of durable infant or toddler products under section 104(f) of the CPSIA and provides our "safe sleep" concerns regarding in-bed sleepers and compact bassinets that can potentially be used as in-bed sleepers.

The SNPR addresses products that provide infant sleeping accommodations that are not already covered by safety standards for bassinets/cradles, cribs (full-size and non-full size), play yards, and/or bedside sleepers. Under that proposal, sleep products that do not clearly fall into an existing sleep product category would be required to meet CPSC's bassinet/cradle standard, including a requirement for a sleeping angle of 10 degrees or less. Staff considers bassinets/cradles, cribs, play yards, and bedside sleepers that meet their relevant standards to be safe sleep products because they provide a flat, firm, stable surface on which infants can sleep on their backs. In addition, these products provide infants their own sleeping space separate from parents' bed.

Staff has concerns about the safety of in-bed sleepers because they have the potential for instability as well as the inability to prevent an adult from rolling onto the infant. Both of these potential scenarios can lead

---

[1] The views or opinions expressed in this letter are solely those of the staff, and these views and opinions do not necessarily represent those of the Commission.
[2] https://www.federalregister.gov/documents/2019/11/12/2019-23724/safety-standard-for-infant-sleep-products

to positional asphyxiation or suffocation for the infant. Another concern of staff's is the safety of compact bassinets and baby boxes because, without a built-in stand, compact bassinets and baby boxes could be used as an in-bed sleeper with the potential for instability. Moreover, depending on the side height, these products might not prevent an adult from rolling onto the infant. Therefore, staff believes that in-bed sleepers and compact bassinets should not be included in the bassinet/cradle standard, meaning that any infant sleep product should meet one of the four sleep product standards (bassinets/cradles, cribs, play yards, and bedside sleepers).

Staff looks forward to working with you to ensure that: (1) the bassinet/cradle standard maintains requirements for safe sleep environments for infants, and (2) the infant inclined sleep products standard also provides for a safe sleep environment.

Sincerely,

Digitally signed by Celestine T Kish
DN: cn=Celestine T Kish, o=Human Factors,
ou=CPSC, email=ckish@cpsc.gov, c=US
Date: 2019.12.12 08:10:15 -05'00'

Celestine Kish,
Project Manager,
Infant Inclined Sleep Products

cc:   Molly Lynyak, Manager, Technical Committee Operations
      Patricia Edwards, CPSC Voluntary Standards Coordinator
      Hope Nesteruk, Children's Program Area Manager


January 8, 2020

Subject: Re-Supplemental Notice of Proposed Rulemaking for Infant Sleep Products/Docket No. 2017-0020

Thank you for allowing me to comment on the Subject matter. I have worked in the children's products business since 1996. For the past 23+ years I have worked in the field of product safety, product quality and regulatory compliance for major children's products manufacturers. During this time, I have been an active participant at ASTM International working with CPSC and other stakeholders to develop and enhance safety standards for children's products. I am the Subcommittee Chair for Booster Seats, Baby Monitors & Floor Seats and recently volunteered to chair the newly formed ASTM Subcommittee on In-Bed Sleep Products.

The use of bed sharing products is widespread in the United States. It is estimated that the number of In Bed Sleep Products sold to consumers annually is 500,000 to 1.5 Million units. Many parents want their children to sleep with them. It is their choice. Presently, there is no specific regulation for this category of product as it falls outside the current definition of a bassinet/cradle. US CPSC has not regulated or banned In Bed Sleep Products and the current CPSC position on this category of product is unknown. To my knowledge, there have been no recalls on this category of product. An ASTM Subcommittee has been formed to develop a safety standard for In Bed Sleep Products to assist with making the bed sharing experience as safe as possible through product design, hazard elimination and education via warnings and instructions. Progress has been made and a DRAFT standard is being refined.

The SNPR for Infant Sleep Products proposes a definition of infant sleep products "as products that provide sleeping accommodations for infants and are not covered by bassinets/cradles, cribs (full-size and non-full size), play yards, and bedside sleepers, as a durable infant or toddler product under section 104(f) of the CPSIA. ". In Bed Sleep Products fit this proposed definition.

A CPSC letter addressed to ASTM , dated December 12, 2019, from Celestine Kish-Project Manager Infant Inclined Sleep Products raises concerns as stated in the letter " Staff has concerns about the safety of in-bed sleepers because they have the potential for instability as well as the inability to prevent an adult from rolling onto the infant. Both of these potential scenarios can lead to positional asphyxiation or suffocation for the infant. Another concern of staff's is the safety of compact bassinets and baby boxes because, without a built-in stand, compact bassinets and baby boxes could be used as an in-bed sleeper with the potential for instability. Moreover, depending on the side height, these products might not prevent an adult from rolling onto the infant. Therefore, staff believes that in-bed sleepers and compact bassinets should not be included in the bassinet/cradle standard, meaning that any infant sleep product should meet one of the four sleep product standards (bassinets/cradles, cribs, play yards, and bedside sleepers). "

The CPSC Incident Data, for In Bed Sleep Products, provided to ASTM does not include incidents of parent roll over or instability. There is a disconnect which CPSC must shed light on. Has CPSC provided ASTM with a complete set of Incident Data for In Bed Sleep Products ?

CPSC should consider the information above and bring clarity, to the SNPR, for the category of In Bed Sleep Products by:
1. Stating their position , in the Proposed Rulemaking ,on the category with evidence that substantiates the position. Consider employing third party research as necessary.
2. Explicitly allow, in the Proposed Rulemaking, for incorporation of In Bed Sleep Products Safety Requirements, Test Methods and Warnings into a revised ASTM Safety Standard for Bassinets and Cradles which the CPSC can adopt as a revision to the Federal Rule -16 CFR 1218 or
3. Support the development of the ASTM Safety Standard for In Bed Sleep Products which can ultimately be adopted as a Federal Rule

Respectfully submitted,
Anthony A. Paolo
Credo Advisors LLC

Credo Advisors LLC          ✉ credoadvisors@gmail.com
60 Russet Way              🌐 credoadvisorsne.com
Cranston, RI 02920         📱 401-316-0161

JA283

# Consumer Safety Consultancy LLC

17404 Blossom View Drive Olney, Maryland 20832 | 240-605-6614 | maryfrancistoro@gmail.com

January 21, 2020

Division of the Secretariat
Consumer Product Safety Commission
Room 820
4330 East West Highway
Bethesda, MD  20814-4408

RE:  Comments to Docket No. CPSC-2017-0020 submitted electronically through www.regulations.gov

Dear Secretary:

I am a consultant in the field of product safety providing services to manufacturers and importers on the mandatory requirements and testing of consumer products under the purview of the CPSC.  My entire professional career has been in the area of consumer product safety and the development and enforcement of mandatory standards.  I retired from the Consumer Product Safety Commission after a 30-year career, finishing my tenure as the Director of Regulatory Enforcement in the Office of Compliance.

On April 7, 2017 CPSC published a notice of proposed rulemaking (NPR) to promulgate a mandatory standard for infant inclined sleep products.  The 2017 NPR proposed to adopt a voluntary standard for inclined sleep products developed by ASTM International, with a modification to the standard's definition of "accessory."  However, subsequent to proposing the rule, reports of fatalities associated with infant inclined sleep products became known to the Commission and on June 12, 2019 the Staff recommended terminating the NPR.  Based on subsequent events, the Commission issued the SNPR proposing to issue a standard for infant sleep products that will adopt the current ASTM Standard for inclined sleep products with modifications that would make the mandatory standard more stringent than the voluntary standard.  The proposed standard would cover products intended for infant sleep that are not already addressed by another mandatory standard.  Currently the CPSC has four mandatory standards for sleep products: cribs (full-size and non-full size), bassinets and cradles, play yards, and bedside sleepers.

The SNPR proposes to incorporate by reference the Safety Standard for Inclined Sleep Products, ASTM F3118-17a, as the mandatory standard for infant sleep products.  The SNPR proposes to remove the reference to inclined in the title, modify the introduction and scope of the standard to address all infant sleep products not already covered by traditional sleep product standards, modify the definitions of accessory, compact, infant inclined sleep products and newborn inclined sleep products to remove the term inclined, modify the seat back angle to allow only an angle of 10 degrees or less, require all infant sleep products to meet the safety Standard for Bassinets and Cradles, 16 CFR part 1218 which incorporates by reference the provisions of ASTM F2194-13,  Standard Consumer Safety Specification for Bassinets and Cradles, and remove all performance requirements except for those stated above and remove all test methods except for the method for measuring the maximum seat back angle.

The removal of performance requirements for the product is disconcerting.  How can the performance of all infant sleep products be that of a bassinet or cradle?  What about the depth of the seat or the length of

JA284

the seat side? How can you be sure that only the angle of the seat and the stability of the product is important? Why do all infant sleep products need to be on a stand and off the floor? Of course, there are required warning statements on the product regarding extra bedding and to not leave the baby unsupervised. Has the staff exercised sufficient due diligence to only require these provisions in a mandatory standard for infant sleep products?

As noted in the 2017 NPR, staff initially considered inclined sleep products to fall within the scope of the bassinet/cradle rule, however, as work progressed on that standard it became evident that one rule could not effectively address all products and the staff embarked on working with ASTM to develop an independent standard for inclined sleep products. The subsequent events noted above have taken the staff from developing a safety standard for a specific type of infant sleep product and now the staff has gone full circle, eliminating work on the mandatory standard for inclined sleep products and proposing that all infant sleep products that are not subject to one of the existing mandatory standards for sleep products, e.g., cribs (full size and non-full size), play yard, or bedside sleeper, meet the requirements of the bassinet/cradle rule in addition to an infant sleep products standard.

The 2013 FR notice for the Safety Standard for Bassinets and Cradles states that ASTM F2194-13 defines a bassinet/cradle as "a small bed designed primarily to provide sleeping accommodations for infants, supported by free standing legs, a stationary frame/stand, a wheeled base, a rocking base, or which can swing relative to a stationary base." Bassinets/cradles are off the ground products that have requirements that may not be relevant to all infant sleep products. Requiring all currently non-regulated infant sleep products to be evaluated against the existing standard for bassinets/cradles in addition to a proposed mandatory standard that has no performance requirements, seems hastily considered and may not provide the anticipated results.

There are many infant products on the market that provide utility to new parents. Entrepreneurs are always working on finding new solutions for parents to transition through the difficult time of bringing a newborn into the home and into a safe environment. While CPSC has the responsibility to protect the public from unreasonable risk of injury and death associated with consumer products, they also have a responsibility to act reasonably in their rulemaking. Writing one standard to cover all infant sleep products that are not already subject to a standard and determining that the bassinet/cradle standard is an adequate standard for all "other" infant sleep products seems like trying to fit a square peg into a round hole.

While the SNPR is out for comment I learned that, on December 12, 2019, the staff sent a letter to the ASTM committee on bassinets and cradles requesting that the scope for the bassinet voluntary standard be revised to exclude in-bed sleep products because the staff is concerned about in-bed sleeper stability and the risk of suffocation from parents rolling over the barrier sides of in-bed sleepers. The letter states that

> "Staff considers bassinets/cradles, cribs, play yards, and bedside sleepers that meet their relevant standards to be safe sleep products because they provide a flat, firm, stable surface on which infants can sleep on their backs. In addition, these products provide infants their own sleeping space separate from parents' bed.
>
> Staff has concerns about the safety of in-bed sleepers because they have the potential for instability as well as the inability to prevent an adult from rolling onto the infant. Both of these potential scenarios can lead to positional asphyxiation or suffocation for the infant. Another concern of staff's is the safety of compact bassinets and baby boxes because, without a built-in stand, compact bassinets and baby boxes could be used as an in-bed sleeper with the potential for

JA285

instability. Moreover, depending on the side height, these products might not prevent an adult from rolling onto the infant. Therefore, staff believes that in-bed sleepers and compact bassinets should not be included in the bassinet/cradle standard, meaning that any infant sleep product should meet one of the four sleep product standards. . . "

The two concerns raised in this letter are not supported by the data. First, there are no overlay deaths in CPSC's data with in-bed sleepers. The sides of these products mitigate or possibly prevent overlay, particularly compared to placing the baby directly on the mattress without anything separating the baby and adult(s). There are two cases where infants tipped into the mesh side, however, in one case, the infant was placed on his side; and in the other case, two babies were placed in the same product together. Both cases are not proper use of the product. Moreover, the letter to ASTM implies that babies **do not** die when placed in sleep products that meet the mandatory standards for cribs, cradles, bassinets or play yards. It is a fact that about 100 infants die each year in cribs. Infants also die in bassinets/cradles and play yards. In any sleep product, including cribs, bassinets/cradles and play yards, babies die when they sleep for four main reasons:

1) Baby is placed on tummy or placed on side and rolls to tummy
2) There is loose bedding, like blankets or pillows, over or under the baby.
3) The baby becomes entrapped and suffocates because of a broken crib or gets trapped in the gap between an undersized mattress and the side of the play yard or crib, or
4) The baby is sick.

These factors are the leading causes of infant death during sleep regardless of whether the baby sleeps in a crib, bassinet, cradle, play yard, baby box, or in-bed sleeper. I have not seen any data to support the CPSC staff request for this change to the scope of the bassinet/cradle standard.

The staff is using a back-door method to remove infant products from the market without the data to support or justify their action. Changing the scope of the existing Standard that the proposed standard would incorporate by reference is a significant change to the proposed rule during the rulemaking process. The staff is making this decision that affects a range of products, based on their "beliefs" about the products, without the data to support that action, and without thought given to the repercussions of removing those products from the market.

The CPSC staff should be instructed to write safety standards that will ensure safe sleep environments for infants by writing standards that address each individual type product, and not funnel various infant sleep product into one standard that is meant for one or two types of specific products (bassinets/cradles).

Thank you for consideration of my comments.

Respectfully submitted,

*Mary F. Toro*

Mary F. Toro

Pip & Grow

2133 SW Arnold Street

Portland, OR 97219


Division of the Secretariat

Consumer Product Safety Commission

4330 East West Highway

Bethesda, MD 20818-4408


RE: Comments to Docket No. CPSC-2017-0020 : Safety Standard for Infant Sleep Products

Dear Secretary,

I have over 10 years of experience in the field of pediatrics/pediatric trauma. My career has been dedicated to reducing infant death due to unsafe sleep. In 2015 I founded a company that brought an infant bassinet box to the market in America. My previous focus group studies demonstrated parents needed a small portable safe sleep space and my research demonstrated a lack of availability in the market for such a product.

Coming from a public health background, Pip & Grow has been working with the CPSC since 2014, conversing on potential safety tests we could implement on our product. We have actively participated in relevant groups to develop appropriate safety standards for products that may fall under the definition of 'baby box'.

This proposal is concerning in that it lumps compact bassinets into a category that isn't applicable. The 2019 Supplemental NPR is concerning in this matter. The concern and discussion circulates around 'inclined sleep product' of which baby boxes are not considered given there is no incline.

Recently, a letter was submitted through a taskforce on behalf of the CPSC regarding compact bassinets:

Ms Kish writes, "[A] concern of staff's is the safety of compact bassinets and baby boxes  because, without a built-in stand, [these] could be used as an in-bed sleeper with the

potential for instability. Moreover, depending on the side height, these products might not prevent an adult from rolling over on an infant. Therefore, the staff believes that in-bed sleepers and compact bassinets should not be included in the bassinet/cradle standard..."

We confess to being shocked and dismayed by Ms Kish's comment, written on CPSC letterhead. One wonders if Ms Kish has reviewed any of the published data about baby boxes. Namely, Temple University's finding that there were **no adverse safety events** during the course of the study, but also that families with a baby box **bedshared 25-50% less** than families without a baby box. This research study, as well as available adverse event data, completely refutes Ms Kish's concerns. Further, we have been developing this standard for more than 5 years. It would have been easy to address these concerns through warning labels and side height requirements during the process. Her submission at the eleventh hour only raises the question of why now? What issue does the CPSC take with baby boxes? We seek to understand why the CPSC, in the face of mounting data in support of baby boxes as safe sleep spaces, would resist applying a safety standard to this product.

At present there are 3 major baby box manufacturers in the US. All of us have done our due diligence to produce a safe product for consumers. And consumers are purchasing it. Withholding the safety standard does not stop consumers from buying the product but merely opens the door for substandard products with safety risks. Yes we are business owners. But we are public health professionals, first. It seems that in the CPSC's rush to avoid another "inclined sleeper" incident, you are failing consumers by opening the door to poorly made, cheaply sold products that only increase the risk of infant death.

Here is a summary, with links and citations, of the available data on baby boxes.

• **Finland.** In a 2011 poll, 42% of parents reported using the Finnish baby box as a sleep space for their infant. There were 59961 live births in Finland in 2011. By extrapolation, that means approximately 25,183 babies slept in a Finnish baby box for some period of time in 2011. Of those babies, there are zero reported product-related deaths or injuries.

• **Rate of injury in gold-standard safe sleep spaces:** According to the CPSC, in 2015, there were 10,600 crib/mattress-related injuries and 2,700 playard-related injuries. That's out of 3,978,497 live births in 2016. Presuming that every single live birth had access to a crib or play yard (a generous assumption) that's an injury rate of 0.33%.

• **Rate of injury in baby boxes.** In 2018, Pip & Grow and FinnBinn, distributed more than 10,000 baby boxes. Based on publicly available data, there have been 0 product-related infant deaths or injuries associated with baby boxes. Applying the crib/playard injury rate, the task force should permit 3-4 baby box-related injuries per 1000 baby boxes distributed to still consider the baby box a safe sleep space. These products are no longer "new" to the US market, as they have been in the field for more than 4 years and distributed to tens of thousands of consumers.

**Ongoing studies.** A number of research studies have demonstrated positive safety outcomes. None of these studies have reported product-related adverse events (such as injury

or death). Two studies have publicly available results. <u>Temple</u> and the University of Milwaukee-Wisconsin:

Temple's baby box pilot results:

- **5,187 dyads** received baby boxes and follow up phone calls
- **2763** parents completed the follow-up survey
- Patient satisfaction with the distribution of the bassinet was high.
- **25% reduction in bed-sharing for all infants.** Face-to-face sleep education and providing a baby box with a firm mattress and fitted sheet reduced the rate of bed-sharing by 25% in the first eight days of life.
- **50% reduction in bed-sharing for breastfed infants.** For exclusively breastfed infants, a population at increased risk of bed-sharing, bed-sharing was reduced by 50%.
- **Mothers use the baby box.** Of the mothers who received the baby box, a majority said they used the box as a sleeping place for their infants.
- **12% of mothers use the baby box as a primary sleep space.** Of the mothers who received the baby box, 12% said they used the box as the primary or usual sleeping space for their infants.
- Looking specifically at the breastfed infant population (breastfeeding has been shown to reduce the risk of SUIDS but also increase bed-sharing):
  - **92% (184/199) of the breastfeeding respondents used the bassinet;**
  - **52% (104/199) used the bassinet as a sleeping space; and 11% used the bassinet as the primary sleeping space.**
  - Of the 104 recipients who used the bassinet as a sleeping space, **63 (60%) responded the bassinet makes breastfeeding easier.**
  - In the present study, a majority of bassinet recipients used it as an infant sleeping space. A majority of exclusively breastfeeding mothers reported that the cardboard bassinet facilitated breastfeeding.

University of Milwaukee-Wisconsin:

- **1312 mothers received baby boxes** at hospital discharge
- 813 (62%) mothers were using their baby box at follow up, 14% were not, 24% were lost to follow-up
- **118 (9%) of families reported that the baby box was the only safe sleep space in their homes**
- "Baby boxes appear to be well accepted in this sample with more than half of mothers who received a baby box reporting is use of the box at 2-3 days postpartum. For some mothers, the baby box served as the sole safe sleep space for the infant. When considering the utility and safety of baby boxes, future work should consider the role of baby boxes to support safe sleep in vulnerable mothers and infants."
- (Source: Maternal Use of the Baby Box in the Early Postpartum Period. Rebecca Sinicki BSN, RNC-MNN, Jennifer Doering PhD, RN, Airielle Pritchett, University of Wisconsin-Milwaukee College of Nursing (under review for publication))

## In summary

Cribs are considered to be the gold standard of safe sleep spaces. The data above demonstrate that baby boxes have a lower injury rate than cribs. There is no data to support the question of baby box safety - only opinion and imagination. Given the presence of evidence to support baby box safety and the absence of data demonstrating risk, I propose we move past the overall safety question and return our focus to passing a robust safety standard.

**AAP Headquarters**
345 Park Blvd
Itasca, IL 60143
Phone: 630/626-6000
Fax: 847/434-8000
www.aap.org

**Reply to**
**AAP Washington Office**
601 13th St NW, Suite 400N
Washington, DC 20005
Phone: 202/347-8600
E-mail: kids1st@aap.org

**Executive Committee**

**President**
Sara H. Goza, MD, FAAP

**President-Elect**
Lee Savio Beers, MD, FAAP

**Immediate Past President**
Kyle E. Yasuda, MD, FAAP

**Secretary/Treasurer**
Warren M. Seigel, MD, FAAP

**CEO/Executive Vice President**
Mark Del Monte, JD

**Board of Directors**

**District I**
Wendy S. Davis, MD, FAAP

**District II**
Warren M. Seigel, MD, FAAP

**District III**
Margaret C. Fisher, MD, FAAP

**District IV**
Michelle D. Fiscus, MD, FAAP

**District V**
Richard H. Tuck, MD, FAAP

**District VI**
Dennis M. Cooley, MD, FAAP

**District VII**
Gary W. Floyd, MD, FAAP

**District VIII**
Martha C. Middlemist, MD, FAAP

**District IX**
Yasuko Fukuda, MD, FAAP

**District X**
Lisa A. Cosgrove, MD, FAAP

**At Large**
Charles G. Macias, MD, FAAP

**At Large**
Constance S. Houck, MD, FAAP

**At Large**
Joseph L. Wright, MD, FAAP

February 25, 2020

The Honorable Robert Adler, Acting Chairman
The Honorable Elliot Kaye, Commissioner
The Honorable Dana Baiocco, Commissioner
The Honorable Peter Feldman, Commissioner
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, Maryland 20814

**Re: CPSC-2017-0020**

Dear Acting Chairman Adler and Commissioners Kaye, Baiocco, and Feldman:

On behalf of the American Academy of Pediatrics (AAP), a non-profit professional organization of over 67,000 primary care pediatricians, pediatric medical sub-specialists, and pediatric surgical specialists dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults, I am writing to provide comments on the Supplemental Notice of Proposed Rulemaking (SNPRM) on Infant Sleep Products issued on November 12, 2019, by the U.S. Consumer Product Safety Commission (CPSC). The AAP strongly supports this SNPRM and urges the CPSC to expeditiously finalize this proposed rule to protect children from unsafe sleep products.

Infants are uniquely vulnerable in their early stages of development, when immature cardiorespiratory or arousal systems can lead to a failure of the protective responses that older children exhibit.[1] Because of these developmental differences, a sleeping position or environment that is perfectly safe for an older child can pose potentially fatal risks for infants. Approximately 3,600 infants die annually in the United States from sudden unexpected infant deaths, including sudden infant death syndrome (SIDS), accidental suffocation in a sleeping environment including positional asphyxia, and other deaths from unknown causes.[2]

Drawing on the latest research and the work of preeminent national safe sleep experts, AAP develops evidence-based recommendations[3] for a safe infant sleep environment to inform pediatricians' conversations with families. These safe sleep recommendations include placing babies alone, on their back, and on a flat, firm surface with no restraints or loose fabric nearby. Greater adoption of safe sleep practices has contributed to a substantial decline in sleep-related infant deaths since 1990 with the collaboration of government agencies, pediatricians, and other child safety advocates.[4] More recently, however, this progress has plateaued.

The Consumer Product Safety Commission (CPSC) has a critical role to reduce the risk of injuries and deaths from consumer products, and consistent regulatory action is needed to protect infants from sleep-related products that are not safe for sleep. The safest sleep environments for infants are cribs, bassinets, portable cribs, or play yards that conform to CPSC mandatory safety standards. Pediatricians are concerned by the proliferation of untested infant sleep products that are incompatible with safe sleep guidelines. While infants are safest in a supine position on a flat, firm surface, products such as infant inclined sleep products place them in positions with greater risk for morbidity and mortality.

JA291

A growing body of research demonstrates the risk posed by inclined sleep for infants. Products that position infants at an incline pose a risk of suffocation and asphyxia when the infant assumes a position where the airway is obstructed by fabric, bedding, or other materials. Infants are also at risk for positional asphyxia, which is when a non-neutral position of the head and neck obstructs the airway. When sleeping at an incline, an infant's head can slump downwards and potentially constrict or obstruct the airway. Depending on the infant's developmental trajectory, any age up to 1 year may be at risk. Sitting devices, such as car seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep, particularly for young infants.[5,6,7,8,9,10] Research has identified infant sleep-related deaths in inclined sitting devices that are used for sleep in nontraveling contexts.[11,12] Due to these risks, the AAP does not recommend that these sitting devices be used as an alternative to a crib or bassinet, which meet safe sleep guidelines. Inclined sitting devices such as car seats are neither marketed, nor intended, for sleep.

Infant inclined sleep products are currently marketed and intended to provide sleeping accommodations for infants, despite being incompatible with the safe sleep recommendation of supine sleep on a firm, flat surface. These products include free standing inclined sleep products such as the Fisher-Price Rock 'n Play Sleeper and Kids II rocking sleepers that were recalled in 2019, as well as other products like infant hammocks and the previously recalled Nap Nanny. The CPSC-commissioned report by mechanical engineer Dr. Erin Mannen, Ph.D. found that none of the infant inclined sleep products that were tested are safe for infant sleep.[13] The Mannen study conducted an incident report analysis and identified likely causes of death in various sleeping positions in infant inclined sleep products. These circumstances of death include positional asphyxiation, suffocation after rolling into a facedown position, higher abdominal muscle activity that may lead to fatigue and suffocation, and other hazards related to the design of these products. As of June 2019, the CPSC has received reports of 1,108 incidents, including 73 infant deaths, related to infant inclined sleep products.[14] The AAP does not recommend the use of infant inclined sleep products, which are inherently unsafe and have no place in a safe sleep environment.

Parents and caregivers may seek out inclined sleep products out of concern about gastroesophageal reflux in their infants. However, research has demonstrated that the supine sleep position does not increase the risk of choking and aspiration in infants, even those with gastroesophageal reflux, because they have protective airway mechanisms.[15,16] The AAP continues to recommend that infants with gastroesophageal reflux should be placed for sleep in the supine position for every sleep, with the rare exception of infants for whom the risk of death from complications of gastroesophageal reflux is greater than the risk of SIDS (i.e., those with upper airway disorders, for whom airway protective mechanisms are impaired),[17] including infants with anatomic abnormalities such as type 3 or 4 laryngeal clefts who have not undergone antireflux surgery. Elevating the head of the infant's crib while the infant is supine is not recommended.[18] It is ineffective in reducing gastroesophageal reflux; in addition, it might result in the infant sliding toward the foot of the crib into a position that might compromise respiration. The North American Society for Pediatric Gastroenterology, Hepatology, and Nutrition (NASPGHAN) also recommends supine positioning during sleep, because the risk of SIDS outweighs any potential benefit of other sleep positions on gastroesophageal reflux.[19] Infant inclined sleep products pose substantial risk and are not effective in treating gastroesophageal reflux in infants.

In addition to infant inclined sleep products, infant sleeping products that do not meet any safety standard pose risks to infants. Soft objects within the infant's sleep environment can obstruct an infant's nose and mouth, posing a risk of suffocation, entrapment, or SIDS. Sleep positioning products that keep an infant on his or her side or back are not safe for infants, because the infant can roll over and suffocate against the mattress or the positioner. There is insufficient evidence to assure the safety of in-bed sleep products, and many of these products have soft sleep surfaces, and non-rigid sides that pose a suffocation risk. The safest sleeping

environment is one free of soft objects and loose bedding. The AAP supports subjecting in-bed sleeper products to existing safety standards and removing products that are found not to meet existing safety standards. Baby boxes and other alternative sleeping spaces, which are not yet proven to be safe and effective, should also be required to meet existing safety standards.

This SNPRM would protect children by requiring all infant sleep products to meet requirements in the bassinet standard, which requires a flat surface without an incline above 10 degrees, no restraints, and adequate side height to safely contain an infant. These requirements should apply to all products intended or marketed for infant sleep that are not currently covered by a mandatory safety standard, including inclined sleep products and in-bed sleeper products. Requiring infant sleep products to meet the same safety standard for bassinets and cradles would protect infants from dangerous products that are not suitable for sleep by holding them to a rigorous existing safety standard and no longer allowing these products to remain on the market without meeting current safety standards.

AAP urges the CPSC to expeditiously finalize this rule with the shortest possible effective date so that safer products are available sooner and dangerous products are removed from store shelves. Currently, products intended or marketed for infant sleep but which are unsafe for sleep remain on store shelves without meeting any safety standard. This is confusing to parents and caregivers, who presume that the infant sleep products they can buy must be safe. An effective date as long as twelve months would unnecessarily put children at risk as products with known hazards remain on the market. Infant sleep products should be held to a rigorous safety standard to protect infants from suffocation and other hazards.

For the reasons stated above, the AAP strongly supports this proposed rule and urges the CPSC to finalize it without undue delay. Thank you for the opportunity to provide input on this critical issue for child health and safety. If you have any questions, please contact Zach Laris in our Washington, D.C. office at 202/347-8600 or zlaris@aap.org.

Sincerely,

Sara H. Goza, MD, FAAP
President
SHG/zml

---

[1] Filiano JJ, Kinney HC. A perspective on neuropathologic findings in victims of the sudden infant death syndrome: the triple-risk model. Biol Neonate. 1994;65(3-4):194–197pmid:8038282.

[2] U.S. Centers for Disease Control and Prevention (2018). About SUID and SIDS. Retrieved from https://www.cdc.gov/sids/data.htm.

[3] SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment. AAP Task Force on Sudden Infant Death Syndrome. *Pediatrics* Nov 2016, 138 (5) e20162938; DOI: 10.1542/peds.2016-2938

[4] Trachtenberg FL, Haas EA, Kinney HC, Stanley C, Krous HF. Risk Factor Changes for Sudden Infant Death Syndrome After Initiation of Back-to-Sleep Campaign. Pediatrics. 2012;129(4)630-638; DOI: 10.1542/peds.2011-1419.

[5] Bass JL, Bull M. Oxygen desaturation in term infants in car safety seats. Pediatrics. 2002;110(2 pt 1):401–402pmid:12165598

[6] Kornhauser Cerar L, Scirica CV, Stucin Gantar I, Osredkar D, Neubauer D, Kinane TB. A comparison of respiratory patterns in healthy term infants placed in car safety seats and beds. Pediatrics. 2009;124(3). Available at: www.pediatrics.org/cgi/content/full/124/3/e396

[7] Côté A, Bairam A, Deschenes M, Hatzakis G. Sudden infant deaths in sitting devices. Arch Dis Child. 2008;93(5):384–389. pmid:17641002

[8] Merchant JR, Worwa C, Porter S, Coleman JM, deRegnier RA. Respiratory instability of term and near-term healthy newborn infants in car safety seats. Pediatrics. 2001;108(3):647–652. pmid:11533331

[9] Willett LD, Leuschen MP, Nelson LS, Nelson RM Jr. Risk of hypoventilation in premature infants in car seats. J Pediatr. 1986;109(2):245–248. pmid:3734961

[10] Batra EK, Midgett JD, Moon RY. Hazards associated with sitting and carrying devices for children two years and younger. J Pediatr. 2015;167(1):183–187. pmid:25917769

[11] Peter Liaw, Rachel Y. Moon, Autumn Han and Jeffrey D. Colvin. *Pediatrics* 2019;144; DOI: 10.1542/peds.2018-2576

[12] Freyne B, Hamilton K, McGarvey C, Shannon B, Matthews TG, Nicholson AJ. Sudden unexpected death study underlines risks of infants sleeping in sitting devices. Acta Pædiatrica. DOI:10.1111/apa.12488

[13] See here beginning on page 91.

[14] See https://www.cpsc.gov/content/cpsc-cautions-consumers-not-to-use-inclined-infant-sleep-products

[15] Malloy MH. Trends in postneonatal aspiration deaths and reclassification of sudden infant death syndrome: impact of the "Back to Sleep" program. Pediatrics. 2002;109(4): 661– 665.

[16] Tablizo MA, Jacinto P, Parsley D, Chen ML, Ramanathan R, Keens TG. Supine sleeping position does not cause clinical aspiration in neonates in hospital newborn nurseries. Arch Pediatr Adolesc Med. 2007;161(5): 507–510

[17] Vandenplas Y, Rudolph CD, Di Lorenzo C, et al. Pediatric gastroesophageal reflux clinical practice guidelines: joint recommendations of the North American Society for Pediatric Gastroenterology, Hepatology, and Nutrition (NASPGHAN) and the European Society for Pediatric Gastroenterology, Hepatology, and Nutrition (ESPGHAN). J Pediatr Gastroenterol Nutr. 2009;49(4):498 –547.

[18] Tobin JM, McCloud P, Cameron DJ. Posture and gastro-oesophageal reflux: a case for left lateral positioning. Arch Dis Child. 1997; 76(3):254 –258.

[19] Vandenplas et al. Pediatric Gastroesophageal Reflux Clinical Practice Guidelines: Joint Recommendations of the North American Society for Pediatric Gastroenterology, Hepatology, and Nutrition (NASPGHAN) and the European Society for Pediatric Gastroenterology, Hepatology, and Nutrition (ESPGHAN). *Journal of Pediatric Gastroenterology and Nutrition*. 49:498–547.



Office: (207)894-3200                                    Joanne E. Mattiace, Esq.
Fax: (207)894-3201          Admitted to Practice in Washington, DC, not admitted in ME
jmattiace@productsafetylaw.com
www.productsafetylaw.com

February 25, 2020

Division of the Secretariat
Consumer Product Safety Commission
 Room 820
4330 East West Highway
Bethesda, MD20814

Re: Supplemental Notice of Proposed Rulemaking for Infant Sleep Products Docket No. 2017-0020

*Submitted Electronically to "oira_submission@omb.eop.gov"*

Dear Secretariat Mills:

This is in response to the Consumer Product Safety Commission's Supplemental Notice of Proposed Rulemaking for Infant Sleep Products (SNPR) published in the Federal Register on November 12, 2019.  Please accept these comments from this law firm as filed on behalf of multiple baby product companies, each with either a direct or indirect interest in the impact of the SNPR.

Notably, on December 12, 2019, Commission staff authored a letter (a copy of which is attached herein) that appears to significantly affect the impact of the SNPR.  That letter, however, was sent only to several ASTM stakeholders and subsequently received only limited distribution thereafter, resulting in an extremely limited discussion of the new issues raised. **It did not appear in the SNPR.** In fact, it was not sent to various ASTM stakeholders with an interest in this proceeding. For that

reason, this firm (and various other stakeholders) had sought the publication of either a revised SNPR pursuant to various provisions of the Administrative Procedures Act (APA) and designed to provide all interested parties an opportunity to weigh in on these important issues, or, in the alternative, secure a short extension of time in which to comment so that we might be able to better comment upon the newly raised issues. While we were grateful for the thirty (30) day extension of time with which to file these comments, we were disappointed that the Commission did not choose to revise the SNPR itself.

As a consequence, any resulting agency action may well be flawed and unable to withstand judicial scrutiny.

While this letter will point out specific legal issues inherent in the SNPR, please note that several overall concepts are critically important and worthy of thought throughout this process:

- The need for every product safety practitioner to recognize the realities of product use and/or product settings;
- The importance of promoting product innovation;
- The critical need for engaging in a collaborative process with all stakeholders;
- The significance of budgetary constraints, both at the manufacturer and the consumer level;
- The critical importance of product traceability; and
- The need to expect reasonable consumer product use.

It is critical that the Commission keep each of the above-noted concepts in mind.

***Safety is not theoretical!***

<u>The In-Bed Infant Sleeper Standard Process Must Continue</u>

Since 1981 the Commission has been directed to defer to voluntary standards under certain conditions. See 15 U. S. C. 2056. It is noteworthy that Section 104 of the Consumer Product Safety Improvement Act (CPSIA) continues with that mandate. The legislative history is clear on the point that the agency and its resources of talent and of anecdotal data (typically not available in its totality to individual stakeholders) is critically valuable in the development of a voluntary product standard. Further, Congress recognized the enormity of time and expense that is spared with going this route as opposed to engaging in a lengthy rulemaking proceeding.

The reality, of course, is that this preference for deference to a voluntary standard assumes that the Commission allows, and directs, its staff to participate in the voluntary standards process. The Commission's own website provides that it follows OMB Circular A-119, but it has not done so in this case. Instead, in this instance short shrift was given to the voluntary standards process of "non-inclined" infant sleep products, underway since 2017.

Further, this action was not in accordance with Section 104 rulemaking, Consumer Product Safety Improvements Act of 2008 (CPSIA).

We are sorely disappointed that the Commission has chosen to skip this important step. If the Commission staff was, or is, aware of data which points to an immediate need for a mandatory standard that might cover numerous types of infant products, it should share same. In this instance it has not. What little data has been shared has not been made widely available and certainly not fully evaluated. Coupled with a lack of anecdotal data for studied review, the result is a procedurally deficient rulemaking effort insofar as "non-inclined" infant sleep products are concerned.[1]

Inclined Infant Sleep Products versus the rest of the World of Infant Products

We note the massive publicity associated with inclined infant sleep products. Without commenting upon the proposed requirements for such products, we do strongly object to the inclusion of other, "non-inclined" infant products in this SNPR. Instead, we urge the development of product-specific safety standards for "non-inclined" infant products.

We urge that the Commission refrain from adopting a "one size fits all" approach. While the intention behind such a broad regulation is laudable, it is misguided.

Instead, we urge that the current rulemaking be limited to that of inclined infant sleep products and that the issue of "non-inclined infant products" be left to another effort, perhaps back to ASTM where the voluntary standards community (and therefore

---

[1] Also noteworthy is the massive information breach in recent years by the Commission, all in direct violation of the important procedural safeguards of Section 6(b) of the CPSA. Ironically, this information breach ultimately led to the withholding of incident data for many months to ASTM participants involved in the development of a performance standard for in-bed sleepers. If the Commission is truly "data driven" at all, as senior officials like to say, then all relevant data must be carefully considered.

stakeholders from consumer groups, government and industry) had begun to address these issues.

Accordingly, we strongly object to the replacement of the term "inclined infant sleep products" with the much, much broader term of "infant sleep products." We urge that the Commission limit the scope of any new rulemaking to that of inclined infant sleep products accordingly. The scope of the new regulation should, in short, plainly exclude "non-inclined" infant sleep products.

Infants Sleep---much of the time!

The reality is that newborns sleep much of the time. That means that infants will sleep in most situations, including in most product-use situations. Because the SNPR fails to define specifically what sleep is, confusion will abound with those attempting to comply with any final regulation.  Exactly what is "sleep?" Is it dozing off? Is it a nap of more than a moment or two?  Must it be "overnight?"  **What constitutes "sleep?"**

Accordingly, we urge that any new regulation provide more precise definitions of the terms "sleep" and "sleeping accommodations," with careful differentiation in any new regulation between products intended for overnight sleep versus those products in which an infant may fall asleep (for, perhaps, only a short period of time) while using.

We also respectfully suggest that deference be accorded to the manufacturer's marketing and other product messaging regarding whether or not a product is "primarily intended for sleep."

Further, we urge the Commission to continue with its vigorous information and education outreach efforts and its work with all stakeholders on the development of standards, voluntary and/or mandatory.

Let's be Realistic about Bedsharing

The reality is that if these proposed requirements are made mandatory, products currently in the marketplace that are promoted for bedsharing will have no specific standard to which they can comply.  Many of these products have scant, if any, incident or anecdotal data associated with them.  Removing these products from the market will force tired parents and other caregivers to either sleep with their baby in

the bed next to them or to jerry-rig products to create a barrier between them and their baby; such practices potentially introduce a much **greater** risk to infants during sleep. It is simply counterintuitive to prohibit bedsharing products when, in reality, these products potentially **reduce** the risk of overlay, which is a cause of infant fatalities when sharing a sleep surface with an adult.

**Notably, there is no data which indicates any overlay injury or fatality when an infant in-bed sleeper has been used.**

The reality is that just as babies tend to sleep a lot, parents and other caregivers place babies in an adult bed from time to time. Dr. Rachel Moon, a fierce advocate and researcher of infant safe sleep practices herself has recognized the reality of bedsharing. See, e.g., "Factors Associated with Choice of Infant Sleep Location," December 18, 2019, by Rachel Y. Moon, MD et. al. Other researchers have similarly noted such realities recently.

<u>Product terms are vague and ambiguous</u>

As noted above, a number of terms and phrases intended to identity various products are at best ambiguous. As such, they only invite confusion in the marketplace and challenges in the courtroom. For example, the use of the term "free standing" is at best ambiguous. Does that mean products which need no support? Products that are "rigid" or with defined sides?

The promulgation of a new regulation, or a newly revised regulation, which includes the use of vaguely defined terms, attempts to cover too many product types and takes the approach of "if the product is not covered by another regulation, it is covered by this one," invites massive confusion in the marketplace. The result will surely be a substantial reduction in product innovation and an unnecessary increase in consumer misperceptions.

**We urge that the Commission abandon its use of a "one size fits all" approach and limit this rulemaking to inclined sleep products. It should immediately resume work with all stakeholders as to the development of standards applicable to non-inclined sleep products that are not already subject to a mandatory or a voluntary safety standard. Only in this way can it better address such product-specific safety concerns.**

Product Traceability

We have no objections to the mandating of registration cards for products selected for inclusion in the scope of the new regulation. We do respectfully suggest that the Commission remain open to innovation as to the specific methods of achieving optimum product traceability, particularly now that so many products are linked with internet devices.

Effective Date

The redesign of a product is typically a multi-faceted process. Each manufacturer will need to carefully evaluate its products, confer with experts and testing labs, source new or different product components, etc. The proposed effectiveness date of 12 months in the SNPR is unrealistic for the manufacturers of so many of the products that may be included in the scope of any final rule. So that no unintended safety consequences results from too short an effectiveness date, we propose an effectiveness date of at least 18 months from date of publication of any final rule.

Summary and Suggestions

In summary, the SNPR appears to be procedurally suspect, particularly in light of the staff's December 12, 2019 letter. That makes the possibility of a successful judicial challenge more likely than not, resulting in a delay of any new requirements. The consuming public is not served in any way should that occur.

In addition, the new regulation would be stunningly broad, based upon an incomplete, and insufficiently reviewed, data set, and full of insufficiently defined terms and phrases. For these reasons, we strongly urge that work be further defined and that any new regulation be limited to that of inclined infant sleep products.

Thank you, as ever, for affording this law firm the opportunity to submit comments. We are proud of the work that those of us at this firm have done with the staff, both technical and compliance, these past decades, particularly insofar as infant product safety has been involved. We look forward to continuing work on product-specific safety standards.

Respectfully Submitted,

/s/

Joanne E. Mattiace

Enc. Staff letter of 12/12/19

February 25, 2020

The Honorable Robert Adler, Acting Chairman
The Honorable Elliot Kaye, Commissioner
The Honorable Dana Baiocco, Commissioner
The Honorable Peter Feldman, Commissioner
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, Maryland 20814

**Re: CPSC-2017-0020**

Dear Acting Chairman Adler and Commissioners Kaye, Baiocco, and Feldman:

We, the undersigned 94 national and state medical, public health, and consumer organizations, write to express our support for the Supplemental Notice of Proposed Rulemaking on Infant Sleep Products issued on November 12, 2019, by the U.S. Consumer Product Safety Commission (CPSC). We urge the agency to swiftly finalize this proposed rule to protect children and remove dangerous products from the marketplace.

Our organizations are concerned that products intended or marketed for infant sleep that are not bassinets, cribs, or play yards can enter the marketplace today without meeting a safety standard. This is confusing to parents and caregivers, who presume that the infant sleep products they can buy must be safe. The CPSC has a critical role to reduce the risk of injuries and deaths from consumer products, and consistent regulatory oversight is needed to protect infants from sleep-related products that are not safe for sleep.

Infants are uniquely vulnerable in their early stages of development, when immature cardiorespiratory or arousal systems can lead to a failure of the protective responses that older children exhibit.[1] Because of these developmental differences, a sleeping position or environment that is perfectly safe for an older child can pose potentially fatal risks for infants. Safe sleep guidelines, as outlined by the American Academy of Pediatrics (AAP), require placing babies alone, on their back, and on a flat, firm surface with no restraints or loose fabric nearby. These practices have contributed to a substantial decline in sleep-related infant deaths since 1990.

However, inherently dangerous products that are incompatible with these safe sleep guidelines remain on the market. Infants are safest in a supine position on a flat, firm surface. Inclined infant sleep products pose a clear fatality risk, as demonstrated by the CPSC-commissioned report finding that none of the infant inclined sleep products evaluated were actually safe for sleep.[2] These products include free standing inclined sleep products such as the Fisher-Price Rock 'n Play Sleeper and Kids II rocking sleepers that were recalled in 2019, as well as other products like infant hammocks and the previously recalled Nap Nanny. Although inclined sleep

---

[1] Filiano JJ, Kinney HC. A perspective on neuropathologic findings in victims of the sudden infant death syndrome: the triple-risk model. Biol Neonate. 1994;65(3-4):194–197pmid:8038282.

[2] See here beginning on page 91.

products have been associated with 73 publicly reported infant deaths, many remain on the market. Products marketed to support in-bed sleeping likewise do not meet any current safety standard, and pose significant sleep-related death risk by promoting co-sleeping.

This proposed rule would protect children by requiring all infant sleep products to meet requirements in the bassinet standard, which requires a flat surface, no restraints, and adequate side height to safely contain an infant. These requirements -- which should apply to all products intended or marketed for infant sleep that are not currently covered by a mandatory safety standard -- will protect infants including because they will prohibit dangerous inclined sleep products, which are inherently unsafe for infant sleep. Our groups strongly urge the CPSC to swiftly advance this proposal to protect children.

If you have further questions, you may reach out to Zach Laris with the American Academy of Pediatrics at zlaris@aap.org. Thank you for your consideration.


Sincerely,

**National Organizations:**

American Academy of Pediatrics
Association of Maternal & Child Health Programs
Center for Justice & Democracy
Child Care Aware® of America
Children's Advocacy Institute
Consumer Federation of America
Consumer Reports
Cribs for Kids, Inc.
First Focus Campaign for Children
Keeping Babies Safe
Kids In Danger
MomsRising
National Association of Pediatric Nurse Practitioners
Ounce of Prevention Fund
Parents for Window Blind Safety
Safe States Alliance
U.S. Public Interest Research Group

**State and Local Organizations:**

AKPIRG
American Academy of Pediatrics - Arizona Chapter
American Academy of Pediatrics - California Chapter 3
American Academy of Pediatrics - Hawaii Chapter
American Academy of Pediatrics Georgia Chapter

American Academy of Pediatrics New York Chapter 1
American Academy of Pediatrics New York Chapter 2
American Academy of Pediatrics New York Chapter 3
American Academy of Pediatrics, Colorado Chapter
American Academy of Pediatrics, Orange County Chapter
American Academy of Pediatrics, Rhode Island Chapter
American Academy of Pediatrics, Utah Chapter
American Family Children's Hospital
Ann & Robert H. Lurie Children's Hospital of Chicago
Arizona PIRG
Arkansas Chapter, American Academy of Pediatrics
California Chapter 1, American Academy of Pediatrics
CalPIRG
Children's Health Alliance of Wisconsin
Colorado PIRG
ConnPIRG
Delaware Chapter of the American Academy of Pediatrics
Empire State Consumer Project, Inc.
Florida Chapter - American Academy of Pediatrics
Florida PIRG
Georgia PIRG
Idaho Chapter of the American Academy of Pediatrics
Illinois Action for Children
Illinois Chapter, American Academy of Pediatrics
Illinois PIRG
Indiana Chapter of the American Academy of Pediatrics
Iowa Chapter of the American Academy of Pediatrics
Iowa PIRG
Kansas Chapter, American Academy of Pediatrics
Kentucky Chapter of the American Academy of Pediatrics
Louisiana Chapter of the American Academy of Pediatrics
Maine Chapter, American Academy of Pediatrics
Maryland Chapter, American Academy of Pediatrics
Maryland PIRG
Massachusetts Chapter of the American Academy of Pediatrics
MassPIRG
Michigan Chapter American Academy of Pediatrics
Minnesota Chapter of the American Academy of Pediatrics
Missouri Chapter, American Academy of Pediatrics
Missouri PIRG
Montana Organizing Project
NC PIRG
Nevada Chapter of the American Academy of Pediatrics
New Hampshire PIRG

New Mexico PIRG
NJ PIRG
North Carolina Pediatric Society
North Dakota Chapter of the American Academy of Pediatrics
NY Chapter 2 and NY Chapter 3
Ohio Chapter, AAP
Ohio PIRG
Oklahoma Chapter of the American Academy of Pediatrics
OSPIRG
PennPIRG
Pennsylvania Chapter of the American Academy of Pediatrics
PIRGIM (PIRG in Michigan)
Rhode Island PIRG
South Carolina Chapter of the American Academy of Pediatrics
Sudden Infant Death Services of Illinois, Inc.
Tennessee Chapter of the American Academy of Pediatrics
Texas Pediatric Society
Texas PIRG
The Consumer Assistance Council, Inc.
UW Health
Virginia Chapter, American Academy of Pediatrics
WashPIRG
West Virginia Chapter of the American Academy of Pediatrics
Wisconsin Chapter American Academy of Pediatrics (WIAAP) and WIAAP Foundation
Wisconsin PIRG
Wyoming Chapter of the American Academy of Family Physicians (WAFP)
Wyoming Chapter of the American Academy of Pediatrics
Wyoming Medical Society

# U.S. Consumer Product Safety Commission
# LOG OF MEETING

**SUBJECT:** Compact Bassinet, Task Group of Bassinet subcommittee

**DATE OF MEETING:** 25 February 2020

**LOG ENTRY SOURCE:** Celestine Kish, ESHF

**LOCATION:** Teleconference from Rockville, MD

**CPSC ATTENDEE(S):** Celestine Kish, ESHF; Hope Nesteruk, ESMC; Carlos Torres, ESMC; Suad Wanna-Nakamura, HSPP

**NON-CPSC ATTENDEE(S):** Kay Samulak-Roschlau, Task Group (TG) Lead; Scott Lewis; Paul Ware; Steven Anzaroot; Amber (Pip & Grow); Tony Paolo; Peter Richier; Brian Grochal; Piyush Shah; Lisa Trofe; Meredith Birkhead; Sean Oberle; Dave (Kids in Danger); Rachel Weintraub; Carol Pollack-Nelson; Sarah Newens; please contact ASTM for the full list of participants.

**SUMMARY OF MEETING:**
The meeting was called to discuss the 12 December 2019 CPSC letter regarding compact bassinets and in-bed sleepers and to discuss next steps.

Ms. Kish explained that in light of Infant Inclined Sleep Products development, staff is concerned with adding "compact" bassinets and "in-bed sleepers" to the Bassinet standard because they do not meet the current bassinet standard. Dr. Pollack-Nelson asked if they could be their own standard. Ms. Kish explained that inclined sleep products were taken out of the bassinet standard and made their own standard and then we started seeing deaths and injuries. Ms. Samulak-Roschlau stated that the bassinet subcommittee pursued compact bassinets because there weren't any injuries and that they were not intended to be used in adult beds. Mr. Paolo also stated that in-bed sleepers don't have incident data for roll overs or instability. A few other task group members stated that in-bed sharing is not going away and therefore, there needs to be a standard to allow in-bed sleepers so infants have their own space in the bed. There isn't any data showing infant injury or death because of adult roll-over while infant in the product. A member stated that 39 deaths a year occur in cribs because of mis-use. Ms. Kish explained that this is exactly why we are concerned with in-bed sleepers and compact bassinets because they can be used in enclosed areas that lead to potential injury and death. We are already aware that infants are put of risk because of extra bedding, mattresses, and soft bedding while in products that should be used correctly, why should another product that can be used incorrectly be introduced. Ms. Samulak-Roschlau stated that EN1466:2014 Standard for Carry Cots and Stands has been around for almost 20 years and that ASTM F2050-19 Hand-Held Infant Carriers is an established standard. Mr. Grochal stated that he felt compact bassinets should definitely be included in the bassinet standard. He indicated that the 20 degree stability test is

sufficient to address potential tipping if placed in a bed.  Ms. Samulak-Roschlau then asked if the rest of the task group agrees with Mr. Grochal that compact bassinets should be included with bassinets.  There was not a formal count of members, but those who responded states agreement.  Two members stated that they support the AAP guidelines for safe sleep.  Mr. Lewis then encouraged task members to submit comments for the open comment period for Infant Sleep Products.  Ms. Kish explained that the comment period closes at midnight Feb 26, 2020.  Then Ms. Samulak-Roschlau said the compact inclusion was ready to go to ballot.   Meeting adjourned at 11:35am.



February 26, 2020

*Via e-Rulemaking Portal @ www.regulations.gov*
Division of the Secretariat
Consumer Product Safety Commission ("CPSC")

     Re:    CPSC's November 12, 2019 Supplemental Notice of Proposed Rulemaking for
               Infant Sleep Products / Docket No. 2017-0020 (the "SNPR")

Dear Secretariat:

Please accept this comment regarding the SNPR. DockATot is a juvenile product company
with European roots. We manufacture a popular multi-functional product that is flat and firm,
and is promoted for, among other things, use as an infant in-bed sleeper. We care deeply
about safety and the well-being of consumers, and are an active participant in the ongoing
development of an ASTM standard for in-bed sleepers.

The SNPR primarily addresses sleep products with an incline of greater than ten degrees from
horizontal, which are commonly called "inclined sleep products." We do not manufacture
inclined sleep products and are not commenting on such products.

The SNPR, however, also uses broad language that encompasses all products—other than
cribs, bassinets/cradles, play yards, and bed-side sleepers—that are promoted as providing
sleeping accommodations for infants, including products promoted as in-bed sleepers.

We believe ASTM standards should be developed for in-bed sleepers, and that all stakeholders
should continue to contribute to such important work. On December 12, 2019, however,
Celestine Kish, of the CPSC, sent a letter addressed to two ASTM subcommittee chairmen
regarding "ASTM F15.18 Bassinet and Cradles and Infant Inclined Sleep Products Updates." In
this letter, Ms. Kish references the SNPR, and notes two concerns about in-bed sleepers—(1)
the potential for instability, and (2) the inability to prevent an adult from rolling onto the
infant. Ms. Kish's letter can be read as the Commission pulling away from the ASTM process.

Critically, the concerns identified by Ms. Kish are not supported by the CPSC data provided by
staff and reviewed by the ASTM task group working on an in-bed sleeper standard. Rather, the
relevant data reveals no overlay incidents involving in-bed sleepers, and also a lack of support
for stability concerns regarding such products.

Moreover, when considering the utility of in-bed sleepers, it is important to appreciate that a
majority of families bedshare at least some of the time. In some cultures bedsharing is a
widely-accepted norm. In the United States, there have been efforts to discourage it.
Regardless, all indications are that bedsharing is widely practiced in the U.S. Recognizing this,

in its <u>SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment</u>, the American Academy of Pediatrics confirms that bedsharing is a frequent practice, suggests ways to reduce its risk, and notes that it has insufficient evidence to recommend against the use of devices promoted as in-bed sleepers.

Families choose to bedshare for a variety of reasons—to breastfeed, bond, get sleep, and identify with cultural norms. Even many families that have been advised not to bedshare by medical providers bedshare regularly or occasionally. As part of our research during the comment period, we retained independent consultants to conduct a focus group and interviews with mothers who bedshare. At the following web address there is a nine minute video providing outtakes of this group and a brief demonstration of bedsharing with and without an in-bed sleeper: https://tinyurl.com/SNPRcomment26Feb2020

Published and independent research confirms that families bedshare and will continue to do so. Accordingly, when evaluating products that may assist bedsharing families, the products must be considered in relation to bedsharing without a product (i.e. with the baby directly on the adult bed). For example, Ms. Kish's concern that an in-bed sleeper may not prevent every incident of an adult rolling onto a baby seems to ignore the more relevant question of whether in-bed sleepers reduce the likelihood that an adult will roll onto a baby when bedsharing directly on the adult mattress. Similarly, her stability concern seems to ignore the more relevant question of whether in-bed sleepers create any greater instability than a baby placed directly on the adult mattress. Again, critically, neither of her concerns find support in the data.

On a personal note, I invented the DockATot product after giving birth to my first child in my home country of Sweden, in 2006. I used it for playing, tummy time, feeding, changing diapers, and all the other great bonding moments we shared as a new family. We chose to bedshare with our son, which is encouraged by midwives in Scandinavian culture and the norm in many cultures. We also used the product for this, as it provided a separate space for my baby while allowing proximity for bonding and feeding. Once I chose to offer my invention to consumers, I began by searching for voluntary certifications and testing and the highest quality materials to produce the safest product possible.

In conclusion, research indicates bedsharing is a practice that is here to stay, and the available data does not support concerns of stability or layover.  We believe that well-designed products promoted for bedsharing can help mitigate bedsharing risks. Accordingly, we encourage the Commission to continue participating in the ongoing development of in-bed sleeper standards. Our company will continue to participate in and support the development of such standards.

Thank you for the opportunity to comment.

> Sincerely,
> */s/ Lisa Furuland Kotsianis*
> Lisa Furuland Kotsianis, Founder
> info@dockatot.com

February 26, 2020

RE:  Comments to Docket No. CPSC-2017-0020

Thank you for the opportunity to comment on the November 12, 2019 Supplemental Notice of Proposed Rulemaking (SNPR) to promulgate a mandatory standard for infant inclined sleep products and on the December 12, 2019 letter recommending the exclusion of in-bed sleepers and compact bassinets from the bassinet standard's scope. We are human factors professionals working as consultants, professors, researchers, and expert witnesses in the field of product safety. In our work, we are concerned with the safety of consumers and consumer products. We are leaders of the Human Factors and Ergonomics Society and founding members of the Children's Issues Technical Group (CITG) which focuses on human factors issues relating to children. We all hold Ph.Ds. related to human factors and each have more than 20 year's professional experience in the field.

The SNPR proposes to issue a standard for infant sleep products not already addressed by another mandatory standard. There are four such standards for full-size and non-full-size cribs, bassinets and cradles, play yards, and bedside sleepers. The SNPR proposes to require all infant sleep products, not already covered by traditional sleep product standards, to meet the bassinet standard, ASTM F2194-13, Standard Consumer Safety Specification for Bassinets and Cradles. The December 12, 2019 letter from CPSC to the ASTM committee on bassinets cradles requests the bassinet voluntary standard exclude in-bed sleep products and compact bassinets because of concern about the structural stability of these products and the potential for an adult to roll over on the infant when the product is used in a bed.

Both the SNPR and the December 12th letter are alarming because they suggest a failure to appreciate key research relating to consumer behavior and infant sleep. Notably, published research confirms that bedsharing is widely practiced in the United States and around the world (Bombard, et al., 2018; Colson et al., 2013; Thompson & Moon, 2015; Weimer, et al., 2002). In some regions and cultures, bedsharing is common. Furthermore, placing a baby directly on the adult mattress to sleep is a known hazard pattern and cause of infant death when bedsharing (Drago & Dannenberg, 1999; Lambert, Parks, Cottengim, Faulkner, Hauck & Shapiro-Mendoza, 2019; Nakamura, Wind, & Donello, 1999).

In-bed sleepers are used by some consumers when bedsharing to facilitate sleep for reasons and in ways they believe traditional products cannot satisfy. Namely, they allow bedsharing immediately adjacent to adults in the bed without placing the baby directly on the mattress. The low sides of in-bed sleepers are a barrier to some degree, but are low enough to allow for close visual and touch contact with the baby. For this reason, requiring in-bed sleepers to have sides as high as a bassinet defeats a key utility of these products. If these products are required to have sides as high as a bassinet, we expect some parents would ultimately remove the baby from in-bed sleeper during the night out of necessity (e.g., crying baby that needs soothing) and place the baby directly on the mattress. Doing so causes the problem of no separation between the baby and adult(s), thereby exposing the child to the risk of overlay. Putting the baby in a crib or a

1

bedside sleeper does not work for some parents, particularly if they wish to breastfeed over the course of the night or if the baby cries without adult comfort.

Research indicates that mothers who bedshare do it for a variety of reasons including to facilitate breastfeeding, to increase sleep for mother and baby (mothers report getting more sleep when bedsharing compared to having to get up to calm a crying baby), and to experience closeness with their baby (AAP, 2000; Ateah and Hamelin, 2008; Ball, 2002; McCoy, Hunt, Lesko, et. al., 2004; Ward, Kanu, and Anderson, 2017). Therefore, simply telling people not to bedshare is unlikely to cause this behavior to stop. For example, research shows that even mothers who are educated about the risks of bedsharing, *and who indicate that they will not bedshare,* end up doing so (Ateah and Hamelin, 2008; Stemler, et. al., 2013; Tully, Holditch-Davis and Brandon, 2015).

The December 12th letter raises a concern of overlay with in-bed sleepers. However, as of this date, there are no overlay deaths reported on any brand or style of in-bed sleeper in CPSC's database. We suspect that the sides of these products mitigate (or in some cases, prevent) the risk of overlay, thus we have not been made aware of such instances in our expert witness practices.

The December 12th letter also raises a concern for instability of these products if used in a bed. Compact bassinets are not designed nor are they marketed for use in a bed, and to our knowledge there are no data to suggest that they are being used in this way. Tragically, infants die when they sleep in all products including cribs, play yards, bassinets, and cradles. However, these deaths are often not attributed to the product, but rather to the way in which they were used. This is the same for in-bed sleepers.

What is most troubling about the CPSC's proposed action is that it unilaterally stops work by stakeholders who are actively engaged in developing voluntary standards for these products. The ASTM bassinet subcommittee has been working to develop standards, including performance requirements, for these products. The standards process includes all stakeholders and strives to provide guidance to industry on minimum safety specifications. Stopping this process suggests that the CPSC aims to eliminate such products from the market. This is concerning not only because it removes products that satisfy needs for consumers, but also because consumers will likely improvise and compensate in ways that are potentially more dangerous, often without an adequate understanding of how certain design features present hazards to infants. For example, as noted previously, removing in-bed sleepers can be expected to lead some consumers to place their babies directly in the bed, exposing them to the risk of overlay.

We urge the CPSC to continue working with ASTM to develop voluntary standards that will provide guidance to manufacturers on how these products are designed. There is insufficient evidence that in-bed sleepers present an unreasonable risk of injury. As stated, infants die when they sleep. This is true of cribs, bassinets, play yards, cradles and it will be true of these products as well. Outside of SIDS or death due to illness, the primary causes of infant death relate to the parent's behavior and how they place the baby to sleep. Babies who are placed prone or with soft bedding are vulnerable as are infants who are placed in a broken crib or play yard with entrapment hazards (e.g., due to missing hardware or an undersized mattress).

JA311

Thank you for your consideration of our comments.

Michael S. Wogalter, Ph.D., CPE
Professor Emeritus, Psychology
North Carolina State University

Michael J. Kalsher, Ph.D.
Associate Professor of Psychology and Cognitive Science
Department of Cognitive Science
Rensselaer Polytechnic Institute

Alison Vredenburgh, Ph.D., CPE
Principal, Vredenburgh & Associates, Inc.
Founding Member - Children's Issues Technical Group
Program Chair – Forensic Professional Technical Group
Human Factors & Ergonomics Society

Ilene Zackowitz, Ph.D., CPE
Senior Consultant
Vredenburgh & Associates, Inc.
Founding Member and Program Chair
Children's Issues Technical Group
Human Factors & Ergonomics Society

JA312

Independent Safety Consulting, LLC
13713 Valley Drive
Rockville, Maryland 20850

February 26, 2020

*Re: Comments to Docket No. CPSC-2017-0020*

Thank you for the opportunity to comment today. We are human factors professionals, having spent our entire careers in the field of product safety, including as a Senior Engineering Psychologist and a Human Factors Engineer at the Consumer Product Safety Commission (CPSC) in the Division of Human Factors. Our work includes consulting with manufacturers, helping them identify potential hazards in their products; and testifying on behalf of consumers who suffered a serious or fatal injury as a result of their use of a consumer product. Working with both industry and consumers requires we employ the same criteria when evaluating a product.

In addition to our client work, we advocate for consumer product safety; however, we do not advocate for any particular stakeholder group. We serve on numerous voluntary standards committees and participate in product safety organizations like ICPHSO, and various safety-related boards, and committees. Our participation in these organizations is not on behalf of any particular stakeholder group and is usually without remuneration. We also conduct and publish research studies of human factors issues relating to consumer behavior and product safety. Additionally, Dr. Pollack-Nelson has petitioned the CPSC on a variety of product hazards including: the hot glass on gas fireplaces, entrapment potential in home elevators, strangulation in bunk beds (where the ladder meets the lower bunk), window blinds cord strangulation hazard, and fall and strangulation hazards associated with hunting tree stands. Each petition raised concerns about products posing unnecessary and serious hazards to consumers, mostly children. Drafting a petition involves careful analysis of injury and fatality data and, in many cases, the findings are published. All petition work is conducted independently and without funding.

We are commenting on the Supplemental Notice of Proposed Rulemaking (SNPR), published on November 12, 2019, to promulgate a mandatory standard for infant inclined sleep products and the December 12, 2019 letter recommending excluding in-bed sleepers and compact bassinets from the scope of the bassinet standard. Although we work with a manufacturer whose product(s) might be used by some in a bed-sharing scenario, these comments are written and issued independently and not on behalf of any manufacturer and without funding from any manufacturer. Further, these comments are generic and not specific to any particular brand or type of product.

The SNPR proposes to issue a standard for infant sleep products not already addressed by another mandatory standard, such as full-size and non-full-size cribs, bassinets and cradles, play yards, and bedside sleepers. Additionally, it would require all infant sleep products, not already covered by a standard, to meet the safety Standard for Bassinets and Cradles, 16 CFR part 1218 which incorporates by reference the provisions of ASTM F2194-13, Standard Consumer Safety Specification for Bassinets and Cradles. ASTM F2194-13 defines a bassinet/cradle as "a small bed designed primarily to provide sleeping accommodations for infants, supported by free standing legs, a stationary frame/stand, a wheeled base, a

1

JA313

rocking base, or which can swing relative to a stationary base. Further, the performance requirement in section 6.5.4 Side Height requires: "The upper surface of the non-compressed mattress of a bassinet/cradle, when the mattress support is in any position, must be at least 7.5 in. (191 mm) lower than the upper surface of the lowest side in all intended **bassinet/cradle use positions...**"

In-bed sleepers have low sides and are not built on a stand; these products intentionally do not meet ASTM F2194-13 **in order to achieve the products' objectives of facilitating bedsharing.** Requiring products marketed for in-bed sleep to comply with the current bassinet standard, as proposed in the SNPR, fails to acknowledge the design utility of these products for consumers and in some cases, their safety functions. In-bed sleepers are used by parents who wish to be close – both visually and tactilely - to their babies at night. These parents may desire some barrier separating them from their baby.  This is important as overlay when bedsharing is an identified hazard pattern in the published literature.

In a December 12, 2019 letter to the ASTM committee on bassinets and cradles, CPSC staff suggested that the scope of the bassinet voluntary standard not include in-bed sleep products and compact bassinets because the staff is concerned about the stability and the inability of these products to prevent overly.

> Staff has concerns about the safety of in-bed sleepers because they have the potential for instability as well as the inability to prevent an adult from rolling onto the infant.  Both of these potential scenarios can lead to positional asphyxiation or suffocation for the infant.  Another **concern of staff's is the safety of compact bassinets and** baby boxes because, without a built-in stand, compact bassinets and baby boxes could be used as an in-bed sleeper with the potential for instability. Moreover, depending on the side height, these products might not prevent an adult from rolling onto the infant.  Therefore, staff believes that in-bed sleepers and compact bassinets should not be included in the bassinet/cradle standard, meaning that any infant sleep product should meet one of the four sleep product standards...

**Staff's proposals are offered** without an analysis of the risks and utility of the product and without any discussion of the data. For example, the staff letter expressed concern about the risk of an adult rolling over onto a baby in an in-bed sleeper; however, there are no overlay deaths reported on any in-bed sleeper products. The staff letter also expresses concerns regarding instability, but again, the data does not support this concern, as discussed below.

Through our work, we have studied in-bed sleepers and related research extensively. Below we provide an analysis of in-bed sleepers, including the utility of these products for consumers, the safety functions they serve, the reasons that mothers bedshare, and the published research regarding bedsharing practices in the U.S. and around the world.  All of these facts and research should be considered and addressed by the Commission before taking actions to regulate these products.  (The same considerations should be afforded compact bassinets and baby boxes). Based on this analysis, we propose that the Commission continue to support the ASTM subcommittee effort to develop standards for in-bed sleepers.

JA314

<u>Bedsharing is commonly practiced around the world and in the U.S.</u>

Bedsharing refers to an adult sharing the same sleep surface with a baby. This includes when the adult and baby sleep together in a bed, as well as when they fall asleep together on a couch or sofa.

Bedsharing is commonly practiced around the globe, with different rates and frequencies (Ateah and Hamlen, 2008; Fu, Colson, Corwin and Moon, 2008; Lahr, Rosenberg and Lapidus, 2007). To some extent, the rate that is reported depends on the questions asked (e.g., if the mother bedshares always, usually or often, or if they bedshared on the last night, etc.) and respondents' demographics. Thompson and Moon report that bedsharing is common – "76% of American mothers, 72% of Canadian mothers, and 65% of British mothers report bedsharing" (2015). Bombard, Kortsmit, Warner, Shapiro-Mendoza, Cox, Kroelinger, Parks, Dee, D'Angelo, Smith, Burley, Morrow, Olson, Shulman, Harrison, Cottengim and Barfield (2018) report an overall rate of any bedsharing in 14 U.S. states at 61.4%. A recent study of bedsharing rates in Canada found 60% of women bedshared (Gilmour, Ramage-Morin, Wong, 2019). In this study, 33% of women reported bedsharing frequently (i.e., nightly or most nights) and 27% bedshared occasionally; 40% had never bedshared. The rate of bedsharing is increasing (Colson, Willinger, Rybin, Heeren, Smith, Lister and Corwin, 2013).

<u>Understanding <i>why</i> caregivers bedshare is important</u>

Bedsharing affords health and emotional benefits to mothers and babies. Two important health benefits associated with bedsharing are increased breastfeeding and reduced stress. Additionally, mothers report that both they and their baby get more sleep and better sleep when bedsharing.

Breastfeeding is consistently associated with bedsharing in the U.S., Canada, and England (AAP, 2000; Ball, 2002; McCoy, Hunt, Lesko, Vezina, R., Corwin, M. J., Willinger, M., Hoffman, H. J., and Mitchell, A. A., 2004; Ateah and Hamelin, 2008; Ward, Kanu, and Anderson, 2017). Bedsharing is known to increase the frequency, duration and likelihood of breastfeeding (McKenna, Mosko and Richard, 1997; Lahr, Rosenberg and Lapidus, 2005; The Academy of Breastfeeding Medicine, 2005 in Mileva-Seitz, Bakermans-Kranenburg, Battaini and Luijk, 2017) and breastfeeding is protective against SIDS (AAPTFSIDS, 2016, p. 4; Hauck Thompson, Tenabe, Moon and Venneman, 2011). Per the American Academy of Pediatrics (AAP) Task Force on Infant Sleep Position and Sudden Infant Death Syndrome: "it is recognized that a significant portion of the population practices bed sharing between mother and infant as a strategy to facilitate breastfeeding…" (2000, p. 654).

Laboratory research has found that breastfeeding episodes were significantly longer and more frequent on bedsharing nights than on solitary nights (Bail, 2003 in Mileva-Seitz, et al., 2017) and in naturalistic laboratory observations, bedsharing infants woke up and fed more often (Ball, et., al.., 2006 in Mileva-Seitz, et al., 2017). Further, studies find that infants that have routinely bedshared since birth breastfeed three times longer than routinely solitary sleeping infants (Huang, Hauck, Signore, Wu, Raju, Huang, Fein, 2013; McKenna et al, 1997, in Mileva-Seitz, et al., 2017). Other studies show a strong relationship between bedsharing and the successful initiation and maintenance of breastfeeding (Blair and Ball, 2004; McCoy, Hunt, Lesko, 2004; and Santos, Mota, Matijasevitcch, Barros and Barros, 2009). Breastfeeding and bedsharing are, therefore, mutually reinforcing. The major benefit to infants who are breast-fed include an overall lower infant mortality rate, even in western societies (Chen and Rogan, 2004).

JA315

In addition to increased frequency and duration of breastfeeding, bedsharing is also associated with reduced stress for the baby. A review of the literature in this area is provided by Bartick, Tamori and Ball (2017). They summarize research findings showing increased levels of the stress hormone cortisol in both infants and mothers as a result of sleep separation.

Understanding the reasons why caregivers bedshare is important and helps explain why simply telling them not to is ineffective. For some parents, bedsharing is *intentional*. Parents who choose to bedshare do so for a number of reasons including: to facilitate breastfeeding, desire to be close to the baby (for bonding), to comfort a sick child, to alleviate parental anxiety, generational guidance, and cultural reasons. Furthermore, some mothers believe having the baby in the bed with them is the safest place for the baby so that the mother can keep an eye on them while they sleep (Joyner, Oden, Ajao, and Moon, 2010).

For other parents, bedsharing is unintentional or "*reactive*". These parents do not intend to bedshare, but circumstances cause them to bring the baby into the bed (e.g., to feed the baby, or if the baby is fussy or having difficulty sleeping). The AAP "acknowledges that parents frequently fall asleep while feeding the infant," (AAP Taskforce on SIDS, 2016, p. 5). A focus group study of mothers in suburban Maryland found that most mothers did not intend to bedshare but resorted to doing so when their baby would not sleep independently (Pollack-Nelson and Newens, research in progress, 2020). One mother stated that she tried using a bed-side sleeper, however, it did not work for her baby; if she or her husband was not touching the baby, the baby would start to cry. Another mother reported that constantly getting up to nurse her baby led to her getting no sleep and feeling exhausted the next day which she did not feel was safe for the baby.

Research out of Canada explored differences in reasons for bedsharing "frequently" (i.e., nightly or almost every night) versus "occasionally" (i.e., once or twice a week, a few times a month, or less than once a month). For the latter group, bedsharing typically occurs in an effort to get more sleep or because of a sick child; whereas "frequent bed sharers" were more likely to bed share for breastfeeding or because they believed it was best for the child (Gilmour, Ramage-Morin, and Wong, 2019).

Pediatrician involvement and parent reporting regarding bedsharing

The 2011 AAP guidelines state that the AAP "does not recommend any specific bedsharing situation as safe" (Moon and AAP, 2011). Rather, parents are advised to room-share. Some researchers report that parents who received negative advice about bedsharing from their physicians were less likely to bedshare than those who received no advice (Colson, Willinger, Rybin, Heeren, Smith, Lister and Corwin, 2013). However, this finding may be erroneous and due to social desirability bias; i.e., mothers' unwillingness to inform their physicians that they bedshare despite having been advised of the risks. Kellams, Hauck, Moon, Kerr, Heeren, Corwin, and Colson, (2020) reported that for mothers who intended to exclusively room-share, but ended up bedsharing, the doctor's advice to room-share had no impact.

In a focus group conducted in January 2020, as part of a research study of mothers who bedshare, the majority of participants reported that they did not disclose their bedsharing practices because they knew their pediatricians were opposed to it (Pollack-Nelson and Newens, research in progress, 2020). These mothers reported feeling embarrassed or ashamed and also, not wanting to 'get a lecture". One mother reported that when asked by her pediatrician if her baby was sleeping on his back in the crib, she affirmed that to be the case. However, her four-year-old daughter who was present in the room corrected her, telling

JA316

the pediatrician that the baby sleeps in the bed. Another mother interviewed outside of the focus group stated that her pediatrician had her fill out a checklist which included *baby sleeps on his/her back in the crib.* This mother checked the box. Her husband asked her why she did that, knowing that they sleep with the baby in the bed. She told him to be quiet because she didn't want to get a lecture from the doctor.

Schaeffer and Asnes (2017) interviewed 24 primary care pediatricians from a variety of practice settings, inquiring about the guidance they give to parents whose infants are in the at-risk age group for SIDS. They found that the majority of pediatricians surveyed consistently advised patients to put their babies on their backs to sleep, but varied considerably on the advice they reportedly gave to parents regarding bedsharing. Most reported that bedsharing is acceptable under certain circumstances. These pediatricians expressed one of the following four beliefs: (1) bedsharing can be practiced safely; (2) it facilitates breastfeeding; (3) parents should have the right to make a personal choice about sleep location; and (4) bedsharing that is a cultural practice is acceptable. The researchers concluded that there is considerable variation among pediatricians in terms of the advice they give patients about bedsharing, and most advice is not congruent with the AAP recommendations. Note, however, that although this study was published in 2017, the research was conducted in 2010, which predates the 2011 AAP guidelines.

Simply advising parents not to bedshare is ineffective

Although the AAP advises against bedsharing, simply advising mothers not to bedshare does not mean it will not happen. Studies show that parents who room-share often bring their babies into bed overnight (Paul, Hohman, Loken, Savage, Anzman-Frasca, Carper, Marini and Leann, 2017; Batra, Teti, Schaefer, Neumann, Meek and Paul, 2016; Keegan, 2017).

Even parents who had not initially planned to do so end up bedsharing for reasons previously discussed - convenience for breastfeeding, ease of comforting a fussy baby, and both parent and baby getting more sleep (Ateah and Hamelin, 2008; Stremler, Hodnett, Kenton, Lee, Macfarlane, Weiss, Weston, Willan, 2013; Tully, Holditch-Davis and Brandon, 2015). A study by Tully, Holditch-Davis and Brandon (2015) compared postpartum hospital interview data of new mothers with interview data collected at one-month post-partem. They found significantly more women reported bedsharing with their infant during the first postpartum month (21 of 44 or 47.7%) than said they planned to do so when interviewed prior to bringing the baby home. The researchers concluded that understanding parents' needs and values is critical to the success of reducing risks in infant sleep environments.

In their study of 246 first-time mothers, Stremler, et. al. and Kellams, et. al. (2020) also found bedsharing was more common than women anticipated in the immediate postpartum (2013). Both studies demonstrate that intended sleep location may not necessarily be predictive of actual (future) sleep location. This is particularly the case when stated intentions are subject to social desirability bias, as is the case with bedsharing. Kellams, et. al. found subjective social norms and attitudes were associated with intended sleep location.

Further, bedsharing occurs despite an awareness of risks. Among mothers of infants aged 3 months who were surveyed by Ateah and Hamelin (2008), nearly all (89%) agreed there were some risks associated with bedsharing including overlay, suffocation on bedding, falling out of bed, and getting entrapped within the bed or between the bed and the wall. Yet 72% bedshared on a regular or occasional basis, and of those, 13% of those experienced a non-fatal overlay. The authors concluded "this risk seemed to be outweighed

by the perceived benefits and convenience" (Ateah and Hamelin, 2008, p. 279).

In focus group research conducted for the CPSC, open-ended discussions with mothers shed light on why they bedshare even when they are aware of safe sleep recommendations (WPI, 2017). The focus group included seven mothers who were familiar with "the most well-known recommendations" for safe sleep. Nonetheless, all of the mothers in this focus group had bedshared in the past. One said she had difficulty operating on such little sleep and bedsharing "changed her life." Another mother said bedsharing made it easier to breastfeed at night; many of the mothers agreed. The CPSC report containing the focus group findings also referenced focus group research by Dr. Rachel Moon, who learned that parents' decisions about where to put their babies for sleep was based on their own needs for sleep more than safe sleep recommendations. "This causes parents, despite being generally aware of safe sleep recommendations, to compromise on the recommendations just to get the infant to sleep. Dr. Moon found that the desperation for sleep is when parents are likely to turn to bedsharing" (WPI, 2017).

Bartick, Tomori and Ball state that research demonstrates AAP's bedsharing recommendations are not working (2017, p. 11). They cite a study by Moon, Matthews, Joyner, Oden, He, and McCarter (2017) which looked at the effects of enhanced health information for preventing suffocation, strangulation, and SIDS in a randomized, controlled trial of African-American mothers of infants. According to researchers, "African-American infants are more than twice as likely to die of SIDS and other sleep-related deaths, and also are also twice as likely to bedshare with their parents" (Moon, et al., 2017, p.1). In this study:

> The control group received standard messaging emphasizing AAP-recommended safe sleep practices, including avoidance of bedsharing, for the purposes of SIDS risk reduction. The intervention group received enhanced messaging emphasizing safe sleep practices, including avoidance of bedsharing, for both SIDS risk reduction and suffocation prevention. Participants completed interviews at 2-3 weeks, 2-3 months, and 5-6 months after the infant's birth.

More than 600 mothers completed all interviews. Receipt of the enhanced message did not impact sleep location. Researchers concluded that African-American mothers who received enhanced messaging about SIDS risk reduction and suffocation were no less likely to bedshare with their infants. In fact, those mothers who bedshared were more likely to cite placement of the infant in their bed as a way to protect the infant from SIDS and suffocation. The researchers concluded that efforts to find health messages that resonate with families must continue and these messages must take into account the strong maternal belief that bedsharing is a strategy to protect the infant from harm during sleep.

Kendall-Tacket, Cong and Hale (2010) found messaging that fails to consider recipient perspectives can have unintended consequences. Of nearly 5,000 mothers, 25% reported falling asleep with their infants in hazardous locations such as sofas and recliners in order to avoid bedsharing. More recently, Doering's (2019) research into the prevalence of unintentional bedsharing found that "44% of parents reported unintentionally bedsharing on couches or chairs during naps, and 19% unintentionally bedshared on couches or chairs at night, locations which pose extreme danger to infants" (AAP Task Force on SIDS, 2016).

According to Middlemiss, et. al. (2017), a singular recommendation not to bedshare may not be effective for all segments of the population. Such advice ignores the beliefs, desires, and/or needs of different segments of the population and may not work for those for whom bedsharing is a treasured practice, for parents who use bedsharing as part of their nighttime care routine, and/or for families with no dedicated sleep space. "In

6

short, indigenous, racial, and ethnic minority and low-income families tended to be detrimentally affected at relatively high rates by the misdirected and insufficiently nuanced information" (Middlemiss, et al., 2017, p. 663).

<u>Risks associated with bedsharing</u>

With bedsharing practiced around the world, anecdotally, it is clear that millions of women do so with no adverse events. At the same time, there are known risks associated with sharing the same sleep surface with a baby. Generally, there is agreement on the increased risk associated with bedsharing when there is alcohol/drug use involved, maternal smoking, and younger infants (Blair, Sidebotham, Pease, and Fleming, 2014; Carpenter, McGarvey, Mitchell, Tappin, Vennemann, Smuk, and Carpenter, 2013).

Hazards associated with bedsharing were identified in the published literature in 1999 by Drago and Dannenberg and by Nakamura, Wind and Donello. Drago and Dannenberg studied 2178 mechanical suffocation deaths involving infants from birth through 12 months, reported in the CSPC's Death Certificate File from Jan 1, 1980 through Sept 1, 1997. They determined that the leading patterns of suffocation were (1) wedging (40%), (2) oronasal obstruction by items such as bedding and plastic bags (24%); and (3) overlay (8%). While overlay accounted for a small percentage of deaths in this study, the researchers remarked that the rate overlay death increased about 5 times over the study period.

Nakamura, Wind and Danello (1999) conducted a retrospective data analysis of deaths from 1990 through 1997 involving infants younger than 2 years who were in an adult bed, daybed, or waterbed. Their search of IPII, INDP, and Death Certificate File determined that 24% of the incidents were due to overlay.

More recently, Lambert, Parks, Cottengim, Faulkner, Hauck, and Shapiro-Mendoza (2019) analyzed 250 infant suffocation cases from 2011 to 2014 and determined that overlay accounted for 19% of the infant suffocation deaths. Most of overlay deaths (71%) occurred in the adult bed.  Most often, the mother was the person responsible for the overlay fatality (47%); fathers (25%) and siblings (22%) were also identified in the data.

<u>In-bed sleepers mitigate the risk of suffocation due to overlay when bedsharing</u>

Consumers who wish to bedshare, but have heard warnings from health care providers not to share a bed surface with their baby, may view in-bed sleepers as a solution (Thompson and Moon, 2015).  In-bed sleepers (sometimes called "nests" or "co-sleepers") are sold by various manufacturers and crafters. Some have mesh sides with a thin mattress, similar to a play yard; others are a solid fabric construction with a firmly stuffed perimeter that slopes away from the baby's face. Some products marketed for in-bed sleeping are also marketed for lounging and tummy-time.

When used for bedsharing, in-bed sleepers provide a flat, separate sleep space for the infant in the adult bed. In-bed sleepers are bounded by elevated sides that are low enough to allow visual and tactile closeness during sleep that some parents desire for purposes of interacting with and comforting the baby, breastfeeding, and obviating the need for parents to get up repeatedly throughout the night to feed or soothe a crying baby. At the same time, the perimeter sides provide physical separation between mother and baby that mitigates, and in some cases prevents, the risk of overlay. A higher side height may inhibit

7

JA319

such interaction and would likely cause some caregivers to remove the baby from the product and place the baby directly on the mattress, negating the benefit of using the in-bed sleeper in the first place.

The use of an in-bed sleeper for the purpose of safe bedsharing was discussed by Mitchell, Cowan and Tipene-Leach in 2016. Mitchell, et. al. published findings of a Safe Sleep program that was designed with the purpose of reducing post-neonatal infant mortality in New Zealand. This effort was prompted after observing that the previously declining sudden unexplained death in infancy (SUDI) mortality had stalled between, requiring an "intervention rethink" (2016, p. 1313). Beginning in 2009, the researchers introduced a multi-pronged intervention effort to promote safe infant sleep. This effort included distribution of portable "infant Safe Sleep devices" or ISSDs, as well as distribution of information about safe sleep.

One of the ISSDs described in the Mitchell study is the wahakura, a portable device designed to increase safety in the bedsharing environment among the Maori (see Figure 1). The rates of SIDS and post-neonatal mortality rates were higher in Maori and a survey of infant care and SIDS knowledge reported increased at-risk behaviors among Maori including smoking in pregnancy and "some bedsharing" on the last night before being surveyed (Tipene-Leach, Hutchinson, Tangiora, Rea, White and Stewart, 2010). The wahakura was distributed by Maori midwives to families, along with "wahakura rules" for promoting safe use (Table 1). The program also encouraged families to influence others by role-modeling safe sleep practices and sharing safe sleep information with family and friends.


Figure 1. The wahakura

Mitchell, et. al. report that the wahakura was acceptable to Maori. However, it was difficult to manufacture in bulk. This led to the production of another ISSD called the pepi-pod. (The word "pepi" means "baby" in Maori). The pepi-pod is a wahakura-sized container made from polypropylene and fitted with a mattress and bedding (see Figure 2, below).



JA320

Figure 2. The pepi-pod

ISSDs are now an established norm in New Zealand. Ministry of Health leaflets on safe infant sleep advise parents to use a wahakura or pepi-pod if babies are to share an adult bed. Education is built into ISSD distribution, including "rules" for infant protection (see Table 1) and an invitation to recipients to help spread Safe Sleep awareness.

Table 1. Rules for using ISSDs

| Wahakura Rules: | Pepi-pod "Rules of Protection" |
|---|---|
| Smoke-free environment | On the back, clear face; |
| Face up, face clear |     only baby in this space. |
| Flat surface, no pillows | Breastfed, smoke-free; |
| No loose blankets, no toys |     sober carer close by me. |
| Put baby back into the | Own space, gentle care; |
| Wahakura after feeding. |     drinking nowhere near. |
| No intoxicated adults | |
| Take the wahakura | |
| Everywhere for sleep | |

Mitchell, et. al. (2016) reported that over 16,500 ISSDs were supplied to vulnerable infants since 2010. Of these, 15,000 were pepi-pods and 1,500 were wahakura. In the six years since the Safe Sleep programme initiation in 2009, post-perinatal mortality decreased by 29% (2016, p. 1315). It is important to note that two infants died while using an ISSD, however, in neither case was the cause of death thought to be associated with its use (Mitchell, et al., 2016, p.1315). Additional findings reported by the authors include:

- Parents reported that most (96.1%) infants were "always or usually" placed on their back to sleep, and most were placed in an ISSD when sleeping in risk locations such as an adult bed or sofa (88.1%).
- Surveyed families reported that ISSDs were beneficial:
  - "You get a good night's sleep having baby sleep close to you."
  - "I don't think I would have breastfed him if he wasn't right next to me."
  - "I love how she can see out the sides, how it feels like she's in bed with you, but safe."
  - "The pepi-pod was good to have close by so I could touch him."
  - "Great for when away from home so baby stays settle in his own bed."
  - "I told all new mums at church about it and I look forward to passing it on."

From their research, Mitchell, et. al. concluded:

The advice to avoid bedsharing when the parent is asleep has been controversial, which has resulted in conflicting messages. Controversy, especially when played out in the media, tends to immobilize prevention. The deliberate effort made to resolve controversy in the design of education, and align people with evidence for which there is strong agreement, has been important. (p. 1318).

JA321

Baddock, Tipene-Leach, Williams, Tangiora, Jones, Iosua, Macleod and Taylor (2017) conducted a study comparing use of wahakura for bedsharing to bassinets used beside the bed by 200 Maori women in New Zealand. The research protocol included caregiver questionnaires and an overnight video in the home at one month. Researchers found no significant differences in infant risk behaviors in the wahakura compared with bassinets (Baddock, et al., 2017). The number of infants in each group experiencing head covering was not significantly different between the groups (33% wahakura; 34% bassinet). Baddock, et. al. determined that the likelihood of blankets covering a baby was no greater in the wahakura than in a bassinet. There was no increase in prone/side sleeping in the wahakura compared to sleeping in a bassinet. No fatal events occurred in the course of conducting this study. Frequency of protective behaviors were also similar between the two groups for pacifier use (24% wahakura; 25% bassinet) and full breastfeeding at 1 and 3 months (61% wahakura; 64% bassinet). The only significant difference was in sustained breastfeeding, at 6 months (22.5% wahakura; 10.7% bassinet) between mothers using wahakura versus bassinets. There were three episodes of partial wall collapse of wahakura in 45 days of video observation. However, four researchers observed the video segments and agreed that these episodes were unlikely to pose a significant risk to the infant.

Baddock, et. al. (2017) concluded that wahakura can be promoted as an alternative to infant and adult bedsharing.

> Our key findings were no increase in the SUDI risk factors of head covering or prone/side sleep position from use of the wahakura compared with the current gold standard of safe infant sleep: a bassinet beside the mother's bed. We noted no differences in maternal sleep or fatigue levels related to device allocation, but mothers using the wahakura reported a significantly higher rate of full breastfeeding by 6 months. (p. 9).

Based on their findings, Baddock, et. al. concluded that "[p]romoting use of this device may be a more effective strategy for combating SUDI in this high-risk population than current emphasis on discouraging culturally embedded practices, such as bed-sharing, which have proven resistant to change" (2017, p. 11).

Nocturnal research conducted by Keegan (2017) studied 11 mothers who were assigned to use an "infant safer sleep box" (ISSB) for one night and a crib (cot) condition on another night. The ISSB was similar to the pepi-pod shown in Figure 2, above. Keegan reported that in some cases, babies assigned to the cot condition were brought into the bed. Further, two head covering incidents were observed (and researchers intervened) by mothers who were sleeping on the mattress. There were no recordings of head coverings on the evenings when mothers were assigned to the box condition. Additionally, Keegan did not identify any tipping or falling risk during the ISSB conditions. Based on observations, the author concluded that ISSBs may increase the "duration of breastfeeding, reduce the occurrence of head covering events, and create a safer sleep environment compared to a standalone cot in the same room (Keegan, 2017)."

The wahakura and pepi-pod differ in materials from in-bed sleepers found in the U.S. market. Nonetheless, these products offer the same basic design - a flat place on which to lay the baby with a low-sided structural perimeter that provides some separation while still allowing visual and tactile contact.

JA322

<u>The Data</u>

The December 12, 2019 CPSC staff letter expresses concern about "…the safety of in-bed sleepers because they have the potential for instability as well as the inability to prevent an adult from rolling onto the infant." Yet these hazard patterns are not reflected in CPSC's own data. CPSC staff compiled and, in 2017 and 2019, shared incident data with the ASTM Task Group on In-Bed Sleepers from its databases, including saferproducts.gov. The data from January 2012 through March 2019 does not include a single case of overlay, from any manufacturer or for any style of in-bed sleeper. This is likely due to the perimeter sides which serve both as a tactile cue and also a barrier that can mitigate (or in some cases, prevent) overlay.

In terms of instability, there is no evidence that these products are unstable and certainly no evidence that when a parent lies down in the bed, it creates a tilt any greater than is permissible in the bassinet standard. There are two deaths in the CPSC data where babies' faces went into the mesh sides of an in-bed sleeper. In one case, there were two babies sharing the same in-bed sleeper, both swaddled. (These products are intended for use by one infant only). In the other incident, the baby was placed on its side and rolled towards the mesh and suffocated. Side and prone sleeping are considered unsafe and are associated with infant sleep-related deaths in cribs and other infant sleep products.

**Understanding the "human" factor**

One of the greatest reasons health and safety initiatives fail is due to the lack of understanding of the consumers these programs are designed to protect. In this regard, it is a mistake to think that removing in-bed sleepers from the market will cause consumers to place babies to sleep in a crib, bassinet, or cradle. For these parents, the alternative to using an in-bed sleeper is to put the baby directly on the mattress, not in the crib, even when the crib is nearby.

Consumers – including new parents – are not blank slates to which any advice can be written and followed. Pease, Ingram, Blair and Fleming (2017) conducted interview research with mothers of infants determined to be at higher risk of SIDS in order to understand how they make decisions regarding infant sleep. They found prior experience had a substantial impact on decisions mothers made for their baby. Their prior experience – which sometimes conflicted with safe sleep messages – informed them of what works in terms of promoting the longest sleep for their babies and themselves. At the same time, they appreciated that what 'worked' with a previous child may not work with the next child; mothers sought to find the most successful strategy and this often took priority over safe sleep advice, especially when it came to decisions about infant sleep position and co-sleeping.

Mothers' adherence to safe sleep messages was also influenced by the credibility of the advice given (Pease, et al., 2017). Notably, they found pressure from health professionals was unhelpful. Mothers were more likely to follow advice that had a logical physiological link between the advice and risk; e.g., making sure the baby's head could not be covered by blankets. Another important factor influencing how their babies were put to sleep was disruptions to routines. Several mothers gave examples of bed- or sofa-sharing that was unplanned, usually occurring due to being tired. Finally, when mothers were unconvinced or dissatisfied with safe sleep advice, they compensated with alternative strategies in order to reduce the risk such as the use of movement monitors, regularly checking on the baby. Also, consistent with findings

JA323

by Moon, et. al. (2010, 2017) mothers interviewed for this study believed they have increased, protective, awareness when sleeping with the baby. Based on these interviews, the researchers concluded:

> Safer sleep messages should be tailored to fit with the lived realities of mothers, especially those at higher risk. The traditional list of 'do's' and 'don'ts' was not well accepted by this group. Interventions that seek to influence this higher-risk group should acknowledge mothers' own protective instincts and consider their beliefs and understanding behind the safer sleep messages if they are to be effective and encourage this group to change (2017, p.1).

Understanding the "human" factor is essential for the success of a safety campaign. This includes recognizing the real-world experiences and perspectives of caregivers that motivate their behavior. Telling caregivers to stop bedsharing may be well-intended, however, for those who wish to bedshare in order to facilitate breastfeeding, in order to get better sleep for them and their baby, and to experience the closeness they desire, it is tone-deaf and will not be accepted.

Recognizing that parents bedshare, AAP recently began advising parents to proactively prepare the bed as follows (Moon, 2017):

1. Use a firm, flat mattress without a mattress topper or memory foam (no waterbed, air mattresses, couches, or armchairs).
2. No pillows, sheets, blankets, comforters, soft bedding that could obstruct baby's breathing or cause overheating.
3. Place baby on his/her back.

AAP's acknowledgement that parents bedshare – both intentionally and reactively – and that this behavior should be taken into account in the advice offered to caregivers demonstrates an important shift by the medical community to consider the perspectives and behaviors of intended recipients. However, the AAP's advice relates only to risks associated with prone positioning and head covering; it does not provide strategies for reducing the risk of overlay, an important hazard pattern associated with bedsharing. Furthermore, AAP continues to advise parents against bedsharing. Messaging of this type which flows in one direction - from practitioners to caregivers – without taking into account existing beliefs, constraints certain people face, or the impact of culture on behavior, is not likely to be widely effective.

The take-away from these research studies is that health directives must be transactional and based not only on the science of safe practices but also with consideration for the cultural practices, caregiver beliefs, needs and values. Understanding consumers motivation for bedsharing is requisite to identifying consumer-acceptable solutions. Moreover, it is essential that health directives parse out what factors make a behavior like bed-sharing safe versus unsafe; specifically, the risk factors supported by the research – falling asleep on a sofa or armchair, smoking, and alcohol consumption (Fleming, Pease and Blair, 2014).

<u>Moving forward with infant safe sleep: developing industry standards</u>

Like other sleep devices, in-bed sleepers can benefit from a safety standard that provides guidance in the form of performance requirements, and language for product warnings and instructions. The ASTM Subcommittee for Bassinets recently formed a Task Group (TG) to develop requirements for in-bed sleepers. In addition, there are Task Groups for Compact Bassinets and Baby Boxes. ASTM standards are

12

JA324

developed by all stakeholders. Input – particularly from CPSC representatives – is welcomed and sought. These standards specify performance criteria, test requirements, and product warnings and instructions that inform parents about the safest way to use these products. Performance criteria are developed based on published research, user characteristics, developmental milestones, anthropometrics, and incident data.

Both the SNPR and Staff's proposal to remove in-bed sleepers and compact bassinets from the bassinet voluntary standard, without simultaneously creating a separate standard for these products, means there is no mandatory or voluntary standard applicable. The absence of a standard leaves consumers to either purchase products that are not subject to industry minimum requirements or to improvise; e.g., by using common household products as substitutes or fashioning their own products. This, as we know from historical data involving other products, can lead to tragic unintended consequences.

In addition to developing standards for in-bed sleepers, baby boxes, and compact bassinets, a clear, consistent, concise, and evidence-based educational campaign about safe infant sleep should be developed. The educational component should allow for honest discussion between pediatricians and patient (families), and advise parents of how their behavior is an important determinant of their baby's safety during sleep. Specifically (1) place baby on back (not tummy or sides); (2) no loose blankets or pillows in the sleep space; (3) never place a baby in a broken sleep device, or on a mattress that does not fit the sleep device; (4) if bedsharing, follow guidelines for safer bedsharing.

Guidance for bedsharing should be protective, but also practical and sensitive to real life situations. In that regard, we recommend modifying AAP's guidance for parents who bedshare as follows: (1) place baby on his/her back in an in-bed sleep device; (2) don't add blankets to the baby's sleep space; use wearable blankets instead; (3) use twin sheets and blankets on the bed to reduce the chance that covers will be pulled up over the baby; (4) parents should only use pillows under their heads; remove all decorative and excess pillows from the bed.


Conclusions

The ASTM bassinet subcommittee and Task Groups have been working to develop standards, including performance requirements, for in-bed sleepers, compact bassinets, and baby boxes. The December 12, 2019 letter from CPSC to the ASTM committee on bassinets cradles, requests the bassinet voluntary standard exclude in-bed sleep products and compact bassinets because the staff is concerned about the stability of these products and the potential for an adult to roll over on the infant if the product is used in the bed. Not only does the data not support this statement, but it is troubling that CPSC would consider withdrawing from the voluntary standards process that is actively underway.

The CPSC's mission is to protect the public from unreasonable risk of injury associated with consumer products. There is no evidence that in-bed sleepers, compact bassinets, or baby boxes present an unreasonable risk of injury. An article in Consumer Reports (Oct 21, 2019) quoted Dr. Hoffman of the AAP as saying: "We need to put the burden of proof on the manufacturers and the regulatory system to demonstrate that something is indeed safe before it's unleashed on vulnerable babies." The argument that infant sleep devices should be proven "safe" before they are put on the market sounds like it makes a lot of sense. But what does that mean? How do you operationally define "safe"? Should it be that no deaths occur in the product? If that is the case, then the four "approved" infant sleep devices – cribs, bassinets, cradles and play yards – would not be considered safe, as infants die in these products every year

JA325

(Chowdhury, 2019).

Deaths in nursery products are often due to a cluttered environment (including the presence of loose bedding such as pillows, blankets, or comforters) and/or problems with the crib and the surrounding environment (e.g., cords, plastic bags). In addition, we know that infants are at greater risk of death when placed on their tummy to sleep. Warning labels found on cribs, bassinets, play yards, and cradles call attention to these potential suffocation hazards and how they can be avoided. Yet infants die from these use (or misuse) patterns each year. In a majority of deaths in nursery products, the sleep device is *not* considered the cause of death; rather, death is attributed to the way the baby was put to sleep. In fact, the hazard patterns causing infant deaths in cribs, play yards, bassinets, and cradles are the same hazard patterns causing infant death in other sleep devices. The question for the Commission is – Can criteria for product "safety" be applied consistently across infant sleep products?

Tragically, infants die when they sleep. This is true of cribs, bassinets, play yards, cradles and it will be true of compact bassinets, baby boxes, and in-bed sleepers as well. Outside of SIDS or death due to illness, the primary causes of infant death relate to the parent's behavior and how they place the baby to sleep. Babies who are placed prone or with soft bedding are vulnerable. So are infants who are placed in a broken crib or play yard with entrapment hazards (e.g., due to missing hardware or an undersized mattress). Just as it is important to provide caretakers with safe sleep guidelines (baby on back, no loose bedding, etc.) for non-shared sleep, it is also important to provide safe sleep guidelines for shared sleep. This includes, placement of a baby in an in-bed sleeper rather than directly on the adult mattress.

In closing, we urge the Commission to continue working with ASTM on the development voluntary standards that (1) recognize the value of in-bed sleepers, baby boxes, and compact bassinets; and (2) provide guidance to manufacturers on how these products can be designed for maximum safety of users.

Respectfully submitted,

Carol Pollack-Nelson, Ph.D.   Sarah B. Newens
pollacknel@comcast.net    sarahbnewens@gmail.com
301-340-2912       301-461-4015

JA326

References

American Academy of Pediatrics Task Force on Infant Sleep Position and Sudden Infant Death Syndrome (2000). Changing concepts of sudden infant death syndrome: Implications for infant sleeping environment and sleep position, *Pediatrics,* 105(3), 650-656

American Academy of Pediatrics Task Force on Sudden Infant Death Syndrome (2005). The changing concept of Sudden Infant Death Syndrome (SIDS): Diagnostic coding shifts, controversies regarding the sleeping environment, and new variables to consider in reducing risk, *Pediatrics, 116(5),* 1245-1255

American Academy of Pediatrics Task Force on Sudden Infant Death Syndrome (2016). SIDS and other sleep-related infant deaths: Updated 2016 recommendations for a safe infant sleeping environment, *Pediatrics* 138(5)

Ateah CA, Hamelin KJ (2008). Maternal bedsharing practices, experiences, and awareness of risks, *JOGNN,* 274-281

Baddock SA, Tipene-Leach D, Williams SM, Tangiora A, Jones R, Iosua E, Macleod EC, Taylor BJ (2017). Wahakura versus bassinet for safe infant sleep: A randomized trial, *Pediatrics,* 139 (2): e20160162

Ball H (2002). Reasons to bedshare: Why parents sleep with their infants. *Journal of Reproductive Infant Psychology,* 20(4), 207-221

Bartick M, Tomori C, Ball HL (2017). Babies in boxes and the missing links on safe sleep: Human evolution and cultural revolution. *Matern Child Nutr.* 2017; e12544. https://doi.org/10.1111/mcn.12544

Batra, EK, Teti, DM, Schaefer, EW, Neumann, BA, Meek, EA, Paul, IM (2016). Nocturnal video assessment of infant sleep environments, *Pediatrics,* Sep; 138(3). pii: e20161533. doi: 10.1542/peds.2016-1533

Blair PS, Ball HL (2004). The prevalence and characteristics associated with parent-infant bed-sharing in England. *Arch Dis Child.* 89(12):1106-10.

Blair, P. S., Sidebotham, P., Pease, A., Fleming, P. J. (2014). Bed-sharing in the absence of hazardous circumstances: is there a risk of sudden infant death syndrome? An analysis from two case-control studies conducted in the UK. *PLoS One, 9*(9).

Bombard, JM, Kortsmit, K, Warner, L, Shapiro-Mendoz, CK, Cox, S, Kroelinger, CD, Parks, SE, Dee, DL, D"Angelo, DV, Smith, RA, Burley, K, Morrow, B, Olson, CK, Shulman, HB, Harrison, L, Cottengim, C, and Barfield, M (2018). Vital signs: Trends and disparities in infant safe sleep practices – United States, 2009-2015, *Morbidity and Mortality Weekly Report,* Jan 12, (67)1.

Carpenter, R., McGarvey, C., Mitchell, E. A., Tappin, D. M., Vennemann, M. M., Smuk, M., Carpenter, J. R. (2013). Bed sharing when parents do not smoke: is there a risk of SIDS? An individual level analysis of five major case–control studies. *BMJ open, 3*(5), e002299.Chen A, Rogan WJ (2004). Breastfeeding and the risk of postneonatal death in the United States. *Pediatrics* 113:435-9.

JA327

Chowdhury, R. T. (2019). Injuries and deaths associated with nursery products among children younger than age five, retrieved from CPSC website. Accessed on 5 Feb 2020

Colson ER, Willinger M, Rybin D, Heeren, T, Smith, L, Lister G, Corwin, MJ (2013). Trends and factors associated with bed-sharing: The National infant Sleep Position Study (NISP) 1993-2010

Doering, JJ, Lim, PS, Ward, TC, Davies WH (2019). Prevalence of unintentional infant bedsharing. *Applied Nursing Research,* 46, 28-30

Drago D, Dannenberg, AL (1999). Infant mechanical suffocation deaths in the United States, 1980-1997. *Pediatrics.* 103(5): e59.

Drago, D, Pollack-Nelson, C (2020). Infant fatalities associated with shared and non-shared sleep.

Fleming P, Pease A, Blair P (2014). Bed-sharing and unexpected infant deaths: What is the relationship, *Pediatric Respiratory Reviews,* 16, 62-67

Fu L.Y, Colson ER, Corwin MJ, Moon RY (2008). Infant sleep location: Associated maternal and infant characteristics with sudden infant death syndrome prevention recommendations. *Journal of Pediatrics, 153,* 503-508

Gilmour, H., Ramage-Morin, P. L., Wong, S. L. (2019). Infant bed sharing in Canada. *Health reports*, *30*(7), 13-19.

Hauck FR, Herman SM (2006). Bed sharing and sudden infant death syndrome in a largely African-American population, *Paediatric Child Health, 11,* May/June, 16A-18A

Hauck FR, Thompson J, Tanabe KO, Moon RY, Vennemann MM (2011). Breastfeeding and reduced risk of sudden infant death syndrome: A meta-analysis, *Pediatrics, 128,* 103-110

Huang Y, Hauck FR, Signore C, Yu A, Raju TN, Huang TT, Fein SB (2013). Influence of bedsharing activity on breastfeeding duration among US mothers. *JAMA Pediatr* Nov; 167(11):1038-44. Doi: 10.1001/jamapediatrics.2013.2632.

Joyner BL, Oden RP, Ajao TI, Moon RY (2010). Where should my baby sleep: a qualitative study of African American infant sleep location decisions. *J Natl Med Assoc.* 2010; 102(10): 881-889

Keegan, Alice-Amber,Charlotte,Eli (2017). **Master's Thesis:** Safe co-sleeping for all babies: Do infant safer sleep boxes provide a safe and beneficial sleep environment for infants?  Durham theses, Durham University. Available at Durham E-Theses Online: http://etheses.dur.ac.uk/12043/

Kellams, A., Hauck, F. R., Moon, R. Y., Kerr, S. M., Heeren, T., Corwin, M. J., Colson, E. (2020). Factors Associated With Choice of Infant Sleep Location. *Pediatrics*.

JA328

Kendall-Tackett K, Cong Z, Hale T (2010). Mother-infant sleep locations and nighttime feeding behavior: U.S. data from the survey of mothers' sleep and fatigue. *Clinical Lactation,* 1.

Lahr MB, Rosenberg KD, Lapidus JA (2005). Bedsharing and Maternal Smoking in a Population-Based Survey of New Mothers, *Pediatrics,* October, 116(4).

Lahr MB, Rosenberg KD, Lapidus JA (2007). Maternal-infant bedsharing: Risk factors for bedsharing in a population-based survey of new mothers and implications for SIDS risk reduction, *Matern Child Health J,* May 11(3): 277-86. Epubl 2006 Dec 29

Lambert, A. B. E., Parks, S. E., Cottengim, C., Faulkner, M., Hauck, F. R., Shapiro-Mendoza, C. K. (2019). Sleep-related infant suffocation deaths attributable to soft bedding, overlay, and wedging. *Pediatrics,* *143*(5), e20183408.

McCoy RC, Hunt CE, Lesko SM, Vezina, R, Corwin, MJ, Willinger, M, Hoffman, HJ, Mitchell, AA (2004). Frequency of bed sharing and its relationship to breastfeeding, *Journal of Developmental Behavioral Pediatrics, 25(3),* 503-508

McKenna JJ, Mosko SS, and Richard CA (1997). Bedsharing promotes breastfeeding. *Pediatrics;* 100; 214-9.

Mileva-Seitz VR, Bakermans-Kranenburg MJ, Battaini C, Luijk MPCM (2017). Parent-child bedsharing: The good, the bad, and the burden of evidence, *Sleep Medicine Reviews,* 32, 4-27

Middlemiss W, Cowan S, Kildare C, Sedio K. (2017). Collaborative translation of knowledge to protect infants during sleep: a synergy of discovery and practice. *Family Relations* 66: 659-69

Mitchell EA, Cowan S, Tipene-Leach D (2016). The recent fall in postperinatal mortality in New Zealand and the Safe Sleep programme, *Acta Paediatrica,* 105, 1312-1320

Moon RY (2017). Engaging Families in Safe Sleep: Lesson Learned from high Risk Family Focus Groups. AAP Annual Meeting: Chicago, IL

Moon RY and AAP Taskforce on Sudden Infant Death Syndrome (2011). SIDS and other sleep-related infant deaths: Expansion of recommendations for a safe infant sleeping environment. *Pediatrics, 128(5),* 1030-1039. https://doi.org/10.1542/peds.2011-2284

Moon RY, Matthews A, Joyner BL, Oden RP, He J, McCarter R (2017). Health messaging and African-American infant sleep location: A randomized controlled trial. *J Community Health,* February; 42(1): 1-9, doi:10.1007/s10900-016-0227-1

Moon RY, Oden RP, Joyner BL, Ajao TI. (2010a). Qualitative analysis of beliefs and perceptions about sudden infant death syndrome (SIDS) among African-American mothers: Implications for safe sleep recommendations. *J Pediatr* 157(1):92-97. Doi:S0022-3476(10)00042-9[pii]10.1016/j.jpeds.2010.01.027

JA329

Nakamura S, Wind M, Donello MA (1999). Review of hazards associated with children placed in adult beds, *Archives of Pediatric and Adolescent Medicine,* 153(10), 1019-1023, doi:10.1001/archpedia.153.10.10119

Paul, IM, Hohman, EE, Loken, E, Savage, JS, Anzman-Frasca, S, Carper, P, Marini, M, Birch, LL (2017). Mother-infant room-sharing and sleep outcomes in the INSIGHT study, *Pediatrics,* 140(1):e20170122

Pollack-Nelson, C, Newens, S (research in progress). Focus group study of mothers who bedshare

Pease, A, Ingram, J, Blair, P, Fleming, P (2017). Factors influencing maternal decision-making for the infant sleep environment in families at higher risk of SIDS: A qualitative study. *BMJ Paediatrics Open,* 1(1), [e000133]. https://doi.org/10.1136/bmjpo-2017-000133

Santos IS, Mota DM, Matijasevitch A, Barros AJD, Barros FCF (2009). Bed-sharing at 3 months and breast-feeding at 1 year in southern Brazil. *J Pediatr* Oct; 155(4-1): 505-09.

Schaeffer P, Asnes AG (2017). What do pediatricians tell parents about bedsharing? *Maternal and Child Health Journal,* Aug doi: 10.1007/s10995-017-2353-5. [Epub ahead of print]

Stremler R, Hodnett E, Kenton L, Lee K, Macfarlane J, Weiss S, Weston J, Willan A (2013). Infant sleep location: Bed sharing, room-sharing and solitary sleeping at 6 and 21 weeks postpartum. *The Open Sleep Journal,* 6(1), 77-86

Thompson EL, Moon RY (2015). Hazard patterns associated with co-sleepers, *Clinical Pediatrics, Jun* 55(7), 645-649. DOI: 10.1177/0009922815603188

Tipene-Leach D, Hutchinson L, Tangiora A, Rea C, White R, Stewart A (2010). SIDS-related knowledge and infant care practice among Maori mothers. *NZ Med J.* 123(1326):88-96

Tully KP, Holditch-Davis D, Brandon D (2015). The relationship between planned and reported home infant sleep locations among mothers of late preterm and term infants, *Maternal Child Health Journal,* 19, 1616-1623

Ward, TC, Kanu FA, Anderson AK (2017). Trends and Factors Associated with Breastfeeding and Infant Sleep Practices in Georgia. *J Community Health.* Nov 11. doi: 10.1007/s10900-017-0442-4

Weimer, SM, Dise, TL, Evers, PB, Ortiz, MA, Welidaregay, W, Steinmann, WC (2002). Prevalence, predictors, and attitudes toward cosleeping in an urban pediatric center, *Clinical Pediatrics,* 41(6), 433-438

Worcester Polytechnic Institute (2017). Analyzing Methods to Improve Infant Sleep Safety. Prepared for the U.S. Consumer Product Safety Commission

JA330

Thank you for the opportunity to comment on Docket #CPSC-2017-0020.

I am a Life Science professional that has led or assisted in the development and regulatory clearance of over 100 products across the globe. My experience includes work in medical devices, diagnostics, medical imaging, durable medical equipment, biologics, wearables, genetic testing, and consumer products. For over 35 years, I have worked closely with Physicians and leaders in Pediatrics, Sports Medicine, Orthopedics, Pain Management, Ob/GYN, and Cardiology. I am a member of the ASTM Compact Bassinet Task Group. Additionally, I am a Principal Investigator on a study funded by the National Institutes of Health. Finally, I lead a company introducing an infant mattress recently designated by the FDA as a "breakthrough device." Like many others responding, my interest is in improving infant health and wellness.

I am commenting on the Supplemental Notice of Proposed Rulemaking (SNPR), published on November 12, 2019, and a December 12, 2019, letter recommending excluding in-bed sleepers and compact bassinets from the scope of the bassinet standard.

My recommendation is for the Commission to continue working with ASTM to develop voluntary standards to guide manufacturers of in-bed sleepers, compact bassinets, and baby boxes.

I submit the following statements to the Commission supporting my recommendation.

There is no evidence that in-bed sleepers, compact bassinets, or baby boxes present an unreasonable risk of injury. This fact helps explain why States, including Minnesota, Wisconsin, Ohio, Colorado, California, Texas, Alabama, Virginia, and New Jersey, initiated safe sleep programs providing free baby boxes. This week, Massachusetts moved closer to starting a safe sleep program with free baby boxes.

Despite the concerns of CPSC staff, to the contrary, products that provide a separate in-bed environment mitigate the risk of infant death by suffocation when bedsharing. Recent studies by Mitchel et al. (2016), Baddock, et al. (2017), and Keegan (2017) support this statement. These are critical new findings considering that despite the American Academy of Pediatrics continuous advice, bedsharing is a common practice. Further, Schaeffer and Anes (2017) reported in a study of 24 primary care pediatricians that bedsharing is acceptable under certain circumstances. We remind ourselves that advice from the AAP may be inconsistent with its membership. Unfortunately, AAP advice has precedent minimizing the importance of cultural practice and the underlying beliefs of caregivers.

Finally, the Commission staff proposal that infant sleep products meet the standards of cribs, bassinets, cradles, and play yards. Yet, infants die in the "approved" products every year. The proposal creates a new conundrum. Specifically, the staff proposal provides no clear understanding of what is safe or a threshold for an unreasonable risk of injury.

In summary, unless the Commission is ready to make across the board changes to the process to develop voluntary standards providing guidance, it should continue working with ASTM Subcommittee for Bassinets and its functioning Task Groups for Compact Bassinets and Baby Boxes. Departing from an established process that is underway, based on staff concerns without supporting data, is no way to earn the public trust.

Sincerely,

John Konsin



February 26, 2020

Office of the Secretary
U.S. Consumer Product Safety Commission
4330 East West Highway, Room 820
Bethesda, MD 20814

Submitted via www.regulations.gov

**Comments of Kids In Danger to the Consumer Product Safety Commission on the Supplemental Notice of Proposed Rulemaking on Infant Sleep Products (CPSC-2017-0020)**

**Introduction**

Kids In Danger (KID) submits the following comments in response to the U.S. Consumer Product Safety Commission ("CPSC" or "Commission")'s request for comments in the above-referenced Supplemental Notice of Proposed Rulemaking (SNPR).[1]

**Background**

Dozens of infants have lost their lives due to unsafe sleep products that do not meet a federal standard. There have been 73 reported deaths due to infant inclined sleep products such as the Fisher-Price Rock 'n Play and Kids II rocking sleeper that were recalled in 2019 and the previously recalled Nap Nanny and hammocks. The Nap Nanny was marketed as a safer alternative to a sleep positioner because it had a harness. Parents began placing their children into the inclined and padded seat that did not meet a federal infant sleep standard. Six children died.

The American Academy of Pediatrics recommends that infants should sleep alone, on their back, on a firm surface without a harness, and in a crib, bassinet or play yard that meets a federal standard.[2] Infant sleep products that are introduced into the market that do not fall under the crib, bassinet, or play yard standard such as infant inclined sleep products pose inherent risk to infants because they are not required to meet a federal standard.

In 2019, a CPSC-commissioned study conducted by Erin Mannen, Ph.D. on the safety concerns for infants sleeping at inclined angles showed that none of the products that were tested were

---

[1] "Safety Standard for Infant Sleep Products," 84 FR 60949, November 12, 2019, p. 60949-60963.
[2] American Academy of Pediatrics, "How to Keep Your Sleeping Baby Safe: AAP Policy Explained" (Apr. 15, 2019) (online at www.healthychildren.org/English/ages-stages/baby/sleep/Pages/A-Parents-Guide-to-Safe-Sleep.aspx).

found to be safe for infants to sleep. The study concluded that any sleep product that contained an incline above 10-degrees poses a serious health risk to infants.[3]

**Recommendations**

KID supports CPSC's proposed rule to mandate all infant sleep products meet the bassinet standard if they are not currently covered by another mandatory rule for infant sleep products. KID also supports the proposed changes that would limit the angle of any product intended for sleep to 10 degrees or less. There are many products currently on the market labeled as "sleepers", "loungers" or "nappers" which is misleading to parents who may assume these products are safe for sleep, when they do not meet a federal standard. KID strongly urges the CPSC to finalize the proposed rule on infant sleep products to protect children.

**Response to CPSC Questions**

Scope of the SNPR:
The Supplemental NPR proposes to incorporate ASTM F3118-17a with substantial modifications, including revisions in the scope of the standard, section 1.3, to remove the term "inclined," and to include any infant sleep product not currently covered by another mandatory rule for infant sleep products: bassinets/cradles, cribs (full-size and non-full-size), play yards, and bedside sleepers. The scope of the Supplemental NPR includes frame-type inclined sleep products, hammocks, compact inclined sleep products, and accessory inclined sleep products as well as in bed sleepers or other sleep products. KID supports the scope in the SNPR because as noted above, infant inclined sleep products have led to 73 reported infant deaths. KID believes that the proposed scope will adequately ensure that infant sleep products not currently held to a standard will be properly regulated in order to protect infants from hazardous products. The scope does not include sleep positioners. KID urges the CPSC to better enforce the ban on sleep positioners.

The age and developmental milestones referenced in the scope and definitions of the various infant inclined sleep products covered by ASTM F3118-17a:
All infant sleep products should meet a mandatory standard. Given the incorporation of requirements of the bassinet standard into this Infant Sleep Product proposed rule, products intended for children over five months would not be able to comply, as many of those requirements only make a product safe for infants under five months. If CPSC decided to incorporate products for children over five months in this rule, new requirements addressing containment, stability and side height would have to be added for those products since the bassinet requirements don't make a product safe for infants over five months. Alternatively, CPSC could keep the age at under five months and require products for older infants to meet the requirements of the crib, non-full-size crib or play yard standards instead. It is important to cover all infant sleep products with a mandatory standard.

Proposed effective date:

---

[3] https://cpsc.gov/s3fs-public/SupplementalNoticeofProposedRulemakingforInfantSleepProducts_10_16_2019.pdf
beginning at page 91.

JA334

The Supplemental NPR proposes a 12-month effective date after publication of a final rule, for products manufactured or imported on or after that date. KID supports a shorter effective date of six months after the publication date due to the dangerous nature of the infant sleep products that are currently on the market that are not held to a federal standard. As previously noted, infant inclined sleep products have caused the deaths of at least 73 infants and should therefore be regulated as soon as possible. In addition, KID believes that similarly to the crib standard effective June 28, 2011, the effective date should apply to all products sold after that date to more quickly remove dangerous products from the marketplace.

## <u>Conclusion</u>

KID supports CPSC moving forward with the Supplemental Notice of Proposed Rulemaking that would mandate all infant sleep products be held to the current bassinet standard if not already held to a current federal standard.


Respectfully submitted,

Nancy A. Cowles
Executive Director
Kids In Danger

JA335

April 13, 2020

The Honorable Robert S. Adler, Acting Chairman
The Honorable Elliot F. Kaye, Commissioner
The Honorable Dana Baiocco, Commissioner
The Honorable Peter A. Feldman, Commissioner
U.S. Consumer Product Safety Commission
4330 East-West Highway
Bethesda, MD 20814

Dear Acting Chairman Adler and Commissioners Kaye, Baiocco, and Feldman:

Our coalition of medical and consumer organizations strongly urges the Consumer Product Safety Commission (CPSC) to finalize without delay its rule on infant sleep products proposed under section 104 of the Consumer Product Safety Improvement Act (CPISA).[1] One year ago, on April 12, 2019, Fisher-Price and the CPSC announced the recall of about 4.7 million Rock 'n Play inclined sleepers. Since that time, there have been a number of additional recalls, but many inclined sleepers remain on the market and continue to place infants at a serious risk of death from suffocation.

To date, at least 92 infant deaths are linked to inclined sleepers, including at least 73 infant deaths reported to the CPSC and 19 additional infant deaths identified by Consumer Reports.[2] Finalizing a strong rule is essential to reduce confusion and help parents and caregivers across the country trust that the infant sleep products they buy and use for their babies are safe. A safety standard for infant sleep products must be strong enough to prevent the manufacture and sale of all inclined products with a back angle greater than 10 degrees that are intended or marketed for any duration of sleep, including those that refer to "napping," "resting," "snoozing," or similar terms.[3] In addition, we urge the CPSC to follow through on its stated intent to finalize a safety standard that keeps off the market other infant sleep products with known risks, including in-bed sleepers, which have been linked to infant deaths.[4]

Our organizations have persistently called for stronger measures to promote safe sleep environments for infants. For example, Consumer Reports has continued to investigate and report on the dangers associated with infant inclined sleepers and in-bed sleepers, and the American Academy of Pediatrics (AAP) has long urged people not to use infant inclined sleep products because they conflict with the organization's evidence-based safe sleep recommendations.[5] All of the undersigned organizations have pressed the CPSC for strong regulatory and compliance actions, commended the agency as it has taken steps forward, and submitted individual comments supporting the proposed safety standard for infant sleep products. We also have urged Congress to pass the Safe Sleep for Babies Act of 2019, which would ban infant inclined sleepers and crib bumper pads. The bill passed the U.S. House of Representatives in December 2019 and now awaits action by the U.S. Senate.[6]

JA336

We understand that the CPSC has been adapting to the COVID-19 pandemic and implementing related safety precautions, which is causing unavoidable delays for some of the agency's work; however, there is no reason to delay the final rule for infant sleep products given there is no additional research or testing that is needed for the CPSC to issue a strong and final mandatory safety standard. Dr. Erin M. Mannen's groundbreaking research,[7] along with the 92 documented infant deaths linked to inclined sleepers and the AAP's safe sleep recommendations, clearly provide sufficient evidence to finalize a rule ensuring that infant sleep products with a back incline greater than 10 degrees are kept out of the marketplace. Similarly, the CPSC's proposal sufficiently documents how having strong mandatory standards in place for *all* infant sleep products, including in-bed sleepers, would further reduce the risk of injury associated with infant sleep products and minimize confusion for parents and caregivers on infant safe sleep best practices.

In summary, all infant sleep products should adhere to the strong, mandatory safety standards for bassinets, cribs, or play yards. This will protect children by preventing the manufacture and sale of products that inherently conflict with the American Academy of Pediatrics safe sleep recommendations -- which include that babies should be placed alone to bed on a firm, flat surface in their own space, with no extra bedding. The proposed rule for infant sleep products is critical to minimize the risk of future infant injuries and deaths in unsafe sleeping conditions. We urge the CPSC to finalize its proposed safety standard for infant sleep products without delay. The safety of babies across the country depends on it.

Sincerely,

American Academy of Pediatrics          Consumer Federation of America

Consumer Reports                        Kids In Danger

Public Citizen                          U.S. PIRG Education Fund

cc:    Mary Boyle, Executive Director, CPSC
       Joseph Martyak, Director of Communications, CPSC
       John "Gib" Mullan, General Counsel, CPSC
       Alberta Mills, Secretary, CPSC

[1] 15 U.S.C. 2056a; CPSC, *Safety Standard for Infant Sleep Products,* supplemental notice of proposed rulemaking, 84 Fed. Reg. 60949 et seq. (Nov. 12, 2019) (CPSC Docket No. 2017-0020-0010) (online at: www.federalregister.gov/d/2019-23724).

[2] CR, "New Evidence Shows More Infant Deaths Tied to Inclined Sleepers Than Previously Reported," (March 11, 2020) (online at: www.consumerreports.org/child-safety/new-evidence-shows-more-infant-deaths-tied-to-inclined-sleepers-than-previously-reported).

[3] This includes all inclined sleep products identified in the CPSC's proposal, including frame-type inclined sleep products, hammocks, compact inclined sleep products, and accessory inclined sleep products.

[4] Letter from Celestine Kish, Project Manager, Infant Inclined Sleep Products, CPSC to Scott Lewis, Subcommittee Chairman for ASTM Bassinets and Cradles and Richard Rosati, Subcommittee Chairman for ASTM Infant Incline

JA337

Sleep Products, ASTM International (Dec. 12, 2019) (online at: www.regulations.gov/document?D=CPSC-2017-0020-0016); *see also* Joint letter from the AAP, Consumer Federation of America, CR, Kids In Danger, Public Citizen, and U.S. PIRG Education Fund urging the CPSC not to delay infant sleep rules (Jan. 22, 2020) (online at: www.regulations.gov/document?D=CPSC-2017-0020-0022); CR, "More Infant Sleep Products Linked to Deaths, a Consumer Reports Investigation Finds" (Oct. 21, 2019) (online at: www.consumerreports.org/child-safety/more-infant-sleep-products-linked-to-deaths).

[5] AAP, "SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment" (Nov. 2016) (online at: pediatrics.aappublications.org/content/pediatrics/early/2016/10/20/peds.2016-2938.full.pdf).

[6] CFA, KID, CR, and Public Citizen, joint letter to House Committee on markup of product safety bills (July 16, 2019) (online at: advocacy.consumerreports.org/wp-content/uploads/2019/07/CFA-KID-CR-PC-to-House-EC-on-product-safety-bills-at-full-committee-markup-7-16-2019.pdf);

[7] Mannen EM. Biomechanical Analysis of Inclined Sleep. Tab B of CPSC Staff Supplemental Briefing Package on Infant Sleep Products. 2019 (online at: www.cpsc.gov/s3fs-public/SupplementalNoticeofProposedRulemakingforInfantSleepProducts_10_16_2019.pdf#page=91) at PDF p. 154.

JA338



Celestine T. Kish
Division of Human Factors

CKish@cpsc.gov

July 16, 2020

TRANSMITTED VIA EMAIL
Richard Rosati
ASTM Subcommittee Chair for ASTM Infant Inclined Sleep Products
100 Barr Harbor Dr.
West Conshohocken, PA 19428-2959

Re: ASTM F15.18 Infant Inclined Sleep Products

Dear Mr. Rosati:

On November 12, 2019, the U.S. Consumer Product Safety Commission (CPSC) published a supplemental notice of proposed rulemaking (SNPR) for infant sleep products. This SNPR proposed incorporating by reference, ASTM F3118-17a, *Standard Consumer Safety Specification for Infant Inclined Sleep Products*, with modifications to address safe sleep for infants, including limiting the seat back angle to less than 10 degrees, and requiring that all products marketed for infant sleep meet requirements of an existing infant sleep product standard: bassinets/cradles, cribs, play yards, and/or bedside sleepers. Staff believes that a similarly scoped voluntary standard would provide greater clarity for both the industry and caregivers, explicitly requiring that sleep products meet one of a delineated set of standards. To date, however, neither the subcommittee, nor any task group, has met to discuss the SNPR, or the proposed modifications to F3118-17a. Therefore, staff[1] is writing to reiterate our position that these are important issues for the safety of infant sleep products, and staff is ready to discuss the proposed modifications with the ASTM subcommittee.

CPSC staff plans to submit a final rule (FR) briefing package to the Commission under Section 104 of the Consumer Product Safety Improvement Act (CPSIA) on infant sleep products in fiscal year 2021. CPSC staff would like to work with the ASTM subcommittee members to address safe sleep modifications to F3118-17a, and we request that the subcommittee meet in the immediate future, rather than wait for staff to complete work on the final rule briefing package.

---

[1] The views or opinions expressed in this letter are solely those of the staff, and these views and opinions do not necessarily represent those of the Commission.

Thank you for your consideration of this issue.

Sincerely,

*Celestine T. Kish*

Celestine T. Kish
Project Manager, Infant Sleep Products
CPSIA Section 104 Rulemaking

CC:    Molly Lynyak, Manager, Technical Committee Operations
Meredith Birkhead, Juvenile Products Manufacturers Association (JPMA)
Patricia Edwards, CPSC Voluntary Standards Coordinator
Hope Nesteruk, Children's Program Area Manager



**U.S. CONSUMER PRODUCT SAFETY COMMISSION**
5 Research Place, Rockville, MD 20850

January 11, 2021

TRANSMITTED VIA EMAIL
Richard Rosati
Subcommittee Chairman for ASTM Infant Inclined
Sleep Products
ASTM International
100 Barr Harbor Dr.
West Conshohocken, PA 19428-2959

Re: ASTM F15.18 Infant Inclined Sleep Products: Ballot F15-18 (20-01), Item #1

Dear Mr. Rosati:

I am writing to commend and support the Infant Inclined Sleep Products Subcommittee on Ballot F15-18 (20-01), Item #1. [1]

As presented in the CPSC Supplemental Notice of Proposed Rulemaking (SNPR) for infant sleep products, the CPSC is pursuing rulemaking to ensure that infant sleep surfaces are flat and meet at least the federal regulation for bassinets/cradles, if the infant sleep product does not already meet the federal regulation for full-size cribs, non-full-size cribs, play yards, or bedside sleepers. [2] Accordingly, CPSC staff supports the ballot item proposing to remove the word "inclined" from the title, introduction, and scope, because it aligns with the SNPR.

The balloted scope language states, "All infant sleep products *shall meet this standard or* meet one of the current sleep product standards which include Cribs (F1169), Bassinets (F2194), Bedside Sleepers (F2906), and Non Full-Size Cribs/Play Yards (F406). A mattress that is covered by F2933 is out of scope for this standard." (Emphasis added). Staff abstains from voting on this language because the final requirements of "this standard" are under revision and currently unknown. However, CPSC staff encourages the subcommittee to consider the language proposed in the SNPR as you continue your work to update the standard.

---

[1] The views or opinions expressed in this letter are solely those of the staff, and these views and opinions do not necessarily represent those of the Commission.

[2] https://cpsc.gov/s3fs-public/SupplementalNoticeofProposedRulemakingforInfantSleepProducts_10_16_2019.pdf?TPVAJZEQcz9x9sKeEGltm4LskkonxUWv

JA341

Thank you for your consideration of these issues.

Sincerely,

Celestine T. Kish
Project Manager Infant Sleep Products

cc:   Molly Lynyak, Manager, Technical Committee Operations
      Patricia Edwards, CPSC Voluntary Standards Coordinator
      Hope Nesteruk, Children's Program Area Manager



Ms. Patricia Edwards
Voluntary Standards Coordinator
Consumer Product Safety Commission (CPSC)
4330 East West Highway
Bethesda, MD 20814

**Transmitted via email.**

February 2, 2021

Dear Ms. Edwards,

On behalf of juvenile product manufacturers and brands, this letter outlines industry concerns related to the Supplemental NPR (SNPR), issued November 12, 2019[1], and discussed in subsequent ASTM subcommittee and task group meetings. This is a follow-up to previously filed comments related to CPSC's unprecedented effort to establish a mandatory rule which in effect would require pre-market testing and approval for an entire product category. This is contrary to the regulation of specific product types within a category of products as has been customarily required in rule-making based upon available hazard data. In this regard, it is incumbent in setting standards to avoid the unintended consequences which limit product innovation or are inappropriately applied beyond specific well-defined product types. We offer these comments in an effort to provide a clear pathway forward to development of additional regulations by product type within the broader category of infant sleep products. We provide these comments aware that ASTM is working diligently in this direction.

The SNPR aims to limit inclines of sleep surfaces as has occurred with inclined sleepers and align requirements for sleep surfaces in products reasonably intended by manufacturers for unattended infant sleep (such as exists in ASTM Standards for play yards and bassinets[2]). While we support such goals, it remains to be determined whether this requirement and others can be established in an omnibus Standard rather than via product specific standards within the broader category of sleep products. It is one thing to establish Standards for infant inclined sleep

---

[1] Federal Register Vol.84, No. 218 p.60949, November 12, 2019
[2] 16 CFR 1221 (incorporating ASTM F 406-19); 16 CFR 1218 (incorporating ASTM F2194)

**JUVENILE PRODUCTS MANUFACTURERS ASSOCIATION, INC.**

1120 Route 73, Suite 200 • Mt. Laurel, NJ 08054
**TEL:** 856.638.0420 • **FAX:** 856.439.0525
jpma@jpma.org • www.jpma.org

JA343

products, but quite another to modify an NPR with a broad based SNPR to seek to simultaneously sweep all other infant sleep products without a current federal rule into a  standard.  With this effort underway it is clear that compliance to 16 CFR 1218, *Safety Standard for Bassinets and Cradles,* cannot be broadly required for products which are not defined as such or are outside the scope of such Standard. The differences between products necessitates different requirements; hence the existence of different Standards for bassinets, play yards, cribs, non-full size cribs, bed side sleepers and carriages and strollers.[3] This is because although there may be commonality on a specific requirement in Standards, differences in product design and function necessitated different dynamic performance test requirements. Such Standards evolved with due consideration of design features and functions unique to each such product type within the broader category of durable infant products[4] and were based upon demonstrable hazard data.  We note that existing ASTM Standards for specific products are constantly subject to update and addition per ASTM requirements for periodic review.[5]

With such efforts, subcommittees are data-driven and rely on CPSC-provided, product-specific hazard data, and peer reviewed published research by independent researchers, safety experts and medical professionals. Such data analysis includes due consideration of reasonable use and reasonably foreseeable abuse of specific products within a category of products, and unreasonable misuse or other factors such as added adult bedding within infant sleep products.

Most pointedly, in this context concern arises if CPSC attempts to convert Section 104 of the Consumer Product Safety Improvement Act ("CPSIA") into a de-facto pre-market approval mechanism for all infant sleep products (a loosely defined category of products that has not heretofore existed). In this regard, greater specificity is required, as exists with regulation of specific products within the broader category of infant products.

Section 104 does not permit the application of the bassinet and cradle standard to an open-ended and undefined scope of products. The practical result of such an arbitrary approach is a reversal of the Section 104 process for existing and new product types

---

[3] 16 CFR 1218, 16 CFR 1221, 16 CFR 1219, 16 CFR 1220, 16 CFR 1222, 16 CFR 1227, et seq.
[4]  As defined 15 U.S.C 2056a(f); 16 CFR 1130
[5] Ex: requirements and test methods for compact or 'low to the ground' bassinets being evaluated by ASTM task groups for inclusion in F2194.

that fit the loosely and broadly defined "infant sleep products" category but are not bassinets or cradles. JPMA has urged CPSC to clearly define the scope of such Standard and to specifically define each type of product that it proposes to apply the standard to in a specific manner similar to the enumerated product types listed in 15 U.S.C 2056a(f)(2) and 16 CFR 1130, in conjunction with ASTM subcommittee F15.18 working on F3118. Similarly, products already defined and subject to regulation under other existing or pending ASTM Standards should be specifically excluded from such definition.

Additionally, to the extent that the agency does propose to apply the bassinet and cradle standard to specific identifiable product types within the infant sleep product category, the agency must provide a rationale supported by substantial evidence regarding the specific application of the bassinet and cradle standard, or parts thereof, to each of those types of products. Other than inclined sleep products, the SNPR provides no rationale for the application of the bassinet and cradle standard to specific product types within the infant sleep products category. Whether the SNPR provides sufficient rational regarding infant inclined sleep products is outside the scope of this letter and is best determined by the ASTM subcommittees in a manner consistent with establishment of Standards for other infant products.

**CPSC's SNPR Approach Is Not Permitted under or Consistent with its 10+ Year Approach to Section 104 of the CPSIA**

Through the SNPR, and CPSC's broadening of the regulatory intent of the SNPR, CPSC proposes to issue a standard and require registration cards for the entire product category of "infant sleep products" based solely on whether a product is primarily marketed and intended for use as a sleeping accommodation for infants.

The Commission has previously recognized the problematic nature of this type of open-ended approach in its 2009 rulemaking for durable infant nursery product registration cards, stating:

> [t]he [registration card] rule needs to identify the items covered with specificity in order for manufacturers to know whether the registration requirements apply to their particular product. Because the statute has a broad definition of a durable infant or toddler product but also

includes 12 specific product categories, additional items can and should be included in the definition but should also be specifically listed in the rule.[6]

In response to comments submitted in the same rulemaking that opined on the specific product characteristics that should qualify an infant or toddler product as "durable," the Commission concluded that the comments "illustrate some of the problems that may be encountered with an open-ended definition of durable infant or toddler product rather than a specific list." [7]

The need for specificity of product type within a product category under 15 U.S.C. 2056a(f) has been consistently cited as a basis for development of CPSC's regulation of specific product types at 16 CFR 1130, et seq.[8]

Similar problems with such a general approach are highlighted by the SNPR's lack of discussion about which product types within the infant sleep products category would also be considered "durable infant or toddler products." It is a necessary predicate for any "infant sleep product" to also meet the definition of a "durable infant or toddler product" in order for Section 104 regulatory jurisdiction to exist. The SNPR simply concludes in a circular fashion that infant sleep products "are durable products within the meaning of Section 104 of the CPSIA" without offering a rationale. If the SNPR instead listed only specific product types without a "catch all" category, then a specific rationale would be possible for why each of those product types independently qualify as durable infant or toddler products. To avoid such facial defect, this should be enumerated.

Without products being readily defined and identifiable as an "infant sleep product" and the SNPR's necessary inclusion of definitions that exclude specific product types subject to existing or pending ASTM Standards, the SNPR will face difficulty proceeding to a final rule. As ASTM works diligently to develop applicable Standards, consideration must also be duly given to whether it will be necessary to reissue an ANPR as a predicate to development of an FR under the Administrative Procedure Act.

---

[6] 74 FR 68668 (12/29/2009)

[7] Ibid

[8] Ibid; see also 84 FR 49947 (9/24/2019)

The creation of standards for specific types of infant sleep products is not by the choice of the Commission but rather due to the construction of Section 104 of the CPSIA. Congress specifically charged CPSC with creating standards for cribs, bassinets, cradles, and play yards within the infant sleep category alone. Congress also included on its non-exhaustive list other specific types of products such as infant carriers, toddler beds, strollers, walkers, swings, bath seats, gates, and high chairs. Many of the products enumerated by Congress, including those fitting the newly proposed definition of infant sleep products, overlap significantly in terms of their intended use and larger product category. Congress, however, purposefully listed different types of infant sleep products (e.g. cribs and bassinets) separately because the differences between those products warrant individual consideration in any rulemaking proceeding. The same holds true for the remaining product types that could fit within the infant sleep products definition.

**Pre-Market Approval, Innovation, and Unintended Consequences**

The agency should also do more than list different product types that fall within the infant sleep products category. The agency must provide the reasoning for application of the bassinet and cradle standard in part to each different product type within the category, including the establishment of status as a durable infant nursery product. Such an analysis must account for specific characteristics for each type of product as well as related hazards and describe how the standard being promulgated addresses the hazards. This requires specific delineation of unique definitions that recognize different product types within the broader category of infant sleep products and recognition that specific dynamic performance requirements may differ among the specific product types. A requirement applicable to one type of product may be inapplicable or ill-suited for another type of product. This is often specifically recognized within ASTM Standard's defined scope, definition and subsections which apply such requirements (or not). The same approach is necessary here.

If CPSC intends to put a rule in place that would require that no new product type that fits within the loose and broad definition of "infant sleep products" could be offered on the market, then each such product type and dynamic performance requirement must clearly and specifically be identified to avoid confusion or misapplication. No broad product category to date has ever been subject to a rule without such specificity. Without such specificity there would be little guidance to an innovator as to what would or would not be required. To avoid chilling of innovation or overly

broad application of requirements to specific products for which such requirements may not be applicable, it is essential that the scope, definitions and hazard-based requirements be appropriately developed for each specific product type within the broader category of infant sleep products.

**Conclusion**

Congress did not draft Section 104 of the CPSIA in a manner that permits CPSC to broadly regulate all infant sleep products as durable infant products without due consideration of specific product types, characteristics and hazards. Under the current SNPR approach, in order to continue selling an existing infant sleep product or bring a new infant sleep product to market, greater specificity in definition, scope and applicability of performance requirements is required. Otherwise an open-ended approach to regulation inverts the statutory mechanism established by Congress in Section 104, could needlessly ban safe existing products or stifle future innovation for infant sleep products.

Based upon the foregoing, JPMA suggests the agency proceed in accordance with Section 104 of the CPSIA, work to develop within a better defined scope of the Standard, clear definitions and delineation of performance requirements by specific product types within the broader category of infant sleep products. This requires development of specific requirements within ASTM Standards, re-issuance of an ANPR and then adoption of a final rule or rules in adherence with due process requirements applicable to such rule issuance.

Product safety is the top priority for JPMA and its members. We appreciate the opportunity to provide comment on this matter and look forward to remaining engaged as leaders in ensuring the safe design, manufacture and use of juvenile products. In this context, we believe participation within the ASTM Standard setting process with due consideration of specific hazard data applicable to specific product types provides the best pathway to adoption of infant product safety Standards. We look forward to working with all interested stakeholders in furtherance of improved product safety Standards.

Regards,

Kelly Mariotti, JD, CPA, CAE
Executive Director


cc:     Hope Nesturk, CPSC
        Celestine Kish, CPSC

        Commissioner Dana Baiocco
        Commissioner Robert Feldman
        Commissioner Elliott Kaye
        Acting Chairman Robert Adler